**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| DIANE M. TRAHANAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-11192 |
| | ) | |
| NORTHWESTERN UNIVERSITY and | ) | Hon. John J. Tharp, Jr., |
| STEVEN J. SCHWULST, M.D., | ) | Judge Presiding. |
| | ) | |
| Defendants. | ) | Hon. Michael T. Mason, |
| | ) | Magistrate Judge |
| | ) | |
| | ) | JURY DEMAND |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Now comes the plaintiff, Diane M. Trahanas, by and through her attorney John P. DeRose of John P. DeRose & Associates, and in response to Defendants' Motion to Dismiss the First Amended Complaint [Doc #: 23], states as follows:

**LEGAL STANDARD**

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the sufficiency of a claim. Under federal pleading standards, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. FRCP 8(a)(2). A claim for relief must also be plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662,678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 555. "In determining a complaint's sufficiency, [a court

1

will] . . . construe it in light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmovant's] favor." *Zahn v. N. Am. Power & Gas, LLC*, 8l5 F.3d 1082, 1087 (7th Cir.2016) (internal citation omitted).

## I. Plaintiff Adequately Alleges She Was Disabled under the ADA

Contrary to the assertions of defendants[1], Ms. Trahanas has adequately alleged in the First Amended Complaint (sometimes hereinafter simply referred to as "FAC") she was disabled under the Americans with Disabilities Act in Counts I, II, and III because not only has she asserted that she long been treated for anxiety, depression, ADHD and she has a record of impairment (FAC, ¶ 6), since 2012, Ms. Trahanas has been treated for attention deficit hyperactivity disorder, has been diagnosed with a major depressive disorder, and has been prescribed a regular regimen of psychotropic medication, which includes at various times such antianxiety, antidepressant, and ADHD medications as Wellbutrin (Bupropion), Klonopin (clonazepam), Adderall XR (dextroamphetamine sulfate), Prozac (fluoxetine hydrochloride), and Lamictal (lamotrigine), and although she has received counseling and treatments for many years, from on or about 2007, Ms. Trahanas is being treated by Dr. Deborah Cano, M.D., a psychiatrist for her disorders because she would get manically depressed at times and suffer from ADHD. (FAC, ¶¶ 8 and 10).

### A. The Anxiety, Depression, and ADHD of Trahanas Qualifying As a Disability under the ADA

---

[1] Assertions made in Defendants' Motion to Dismiss First Amended Complaint [Doc #:23], p. 2, ¶5a and Defendants' Memorandum of Law [Doc #:24], pp. 2 and p. 5, IV. A.

"A disability is defined under the ADA as: (A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having an impairment." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 600 (7th Cir.2011).

## II. In Performing the Job Responsibilities of a Research Technician II, Plaintiff Far Exceeds Her Employer's Reasonable Expectations

### A. Complex Job Responsibilities

Ms. Trahanas was hired by Dr. Schwulst to work as a Research Technician and Laboratory Manager in the Department of Surgery, Trauma and Critical Care Laboratory at Northwestern University. (FAC, ¶ 13).

The First Amended Complaint catalogs the tremendous job responsibilities that were entrusted to Ms. Trahanas, including, but not limited to, "acting as a technical expert or specialist in a particular field within a research lab, establishes and optimizes protocols and coordinates conduct of multiple complex experiments; co-authors scientific papers for presentation and publication; creates and maintains land manuals regarding operating, safety, and procedures; presents published findings at national SHOCK society meetings. (FAC, ¶ 18).

Although her coworkers were around the laboratory for an 8 hour day, Plaintiff would usually be alone in the laboratory for the majority of time while conducting the 24 hour experiments. (FAC, ¶ 22).

### B. Glowing Praise of Plaintiff's Work from Supervisors

Although Defendants contend that "according to plaintiff", her superiors, including Dr. Schwulst, praised her work throughout her tenure at Northwestern[2], the First Amended Complaint publishes verbatim those glowing praises by Dr. Schwulst and "his mentor", Harris Perlman, PhD. On October 14, 2014 Dr. Schwulst writes an excellent Letter of Recommendation stating, among other things:

> The executive summary is that Ms. Trahanas is an exceptional candidate to pursue the study of medicine, and she carries my **highest possible** recommendation for admission to medical school. (FAC, ¶ 23).

On November 1, 2014, Harris Perlman, PhD writes in a Letter of Recommendation opining, among other highly complementary statements:

> I am writing to provide my enthusiastic and strongest support for Diane Trahanas' application to Medical School. Diane is an extremely strong and ideally suited candidate for studying medicine. (FAC, ¶ 25).

### III. Plaintiff Advises Defendants of Need for an Accommodation And the Hostile Work Environment Emerges

Defendants superciliously contend that "Plaintiff's own allegations are internally inconsistent", "she noticeably puts no time frame around the alleged comments, except to say that they occurred after Dr. Schwulst disclosed her disability" and were 'continual' after she 'filed her grievance with the EEOC.' But as she acknowledges, by the time she filed her EEOC Charge in September 2015, she had been away from the workplace on leave for seven months and never returned."[3]

---

[2] Defendants' Memorandum of Law [Doc #:24], p. 3.
[3] Defendants' Memorandum of Law [Doc #:24], pp. 8, IV. C.

Not satisfied with those assertions and ignoring the clear language of the First Amended Complaint, Defendants go on to assert "Plaintiff does not allege when she made this request, and in any event it contradicts the allegation in her Charge that Northwestern first learned of her purported disability when she asked for the leave of absence she was granted and took on February 17, 2015…. At that time, Northwestern approved her for a full twelve weeks of medical leave because her psychiatrist had diagnosed her with insomnia, anxiety, panic attacks, and depression"[4].

Northwestern University as the employer is responsible for the discrimination and retaliation perpetrated by Dr. Schwulst, the supervisor of its employee, Ms. Trahanas. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998).

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.

### A. The Anxiety, Depression, ADHD of Trahanas Affecting Her Work, so She Requests an Accommodation

The First Amended Complaint makes it very clear that Ms. Trahanas requested a reasonable accommodation to have help or work less than 24 hours a day alone in the laboratory on experiments.  With that request, the mockery and ridicule from Dr. Schwulst commenced. Because of the strain she was experiencing in the workplace, Plaintiff advised her supervisor, Dr. Schwulst of her disability and for her need for accommodation and relief from the excessive hours of employment

---

[4] Defendant's Memorandum of Law [Doc #:24], p. 3.

she was performing under his supervision. (FAC, ¶ 27). Instead, Dr. Schwulst would mock and ridicule Plaintiff in front of her coworkers because she could not maintain the work schedule he was imposing. (FAC, ¶ 29).

To qualify under the ADA, the disability from which Ms. Trahanas suffers must limit a "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

### B. The Mockery and Ridicule As Severe and Pervasive Harassment

Although Defendants criticize Ms. Trahanas of "stretching 'severe and pervasive harassment' beyond its limits by claiming an undisclosed number of innocuous comments amount to a hostile work environment"[5], the First Amended Complaint is not the place where that detail should be or must it be set forth. Defendants complain that "Plaintiff has failed to quantify the number of times her coworkers told her she needed 'psychiatric help' but very clearly alleges that the "take your meds" comment was uttered on just a single occasion."[6]

Defendants will learn soon enough through the course of discovery in this cause that the "frequency" of Dr. Schwulst's mockery and ridicule occurred several times daily and humiliated Ms. Trahanas in front of numerous colleagues, coworkers, lab members, etc. She and other of her co-workers will testify that Ms. Trahanas would have to walk away from her desk or lab bench in order to prevent

---

[5] Defendant's Memorandum of Law [Doc #:24], p. 2.
[6] Defendants' Memorandum of Law [Doc #:24], pp. 8, IV. C.

more embarrassment/misery and curtail Dr. Schwulst's harassment. Ms. Trahanas would take bathroom breaks, get emotional at times because of how bad it was, and then go back to continue her work--with extreme discomfort and anticipating of it happening again within the hour or the entire rest of the day or in the presence of the number of people before whom she would be further humiliated. Ms. Trahanas was helpless because Dr. Schwulst was her supervisor in the workplace.

Defendants characterizing comments made by Dr. Schwulst as "patently… not references to her gender or disability, but rather refer to her work performance, or to her being lazy and spoiled, characteristics for which she is unprotected by Title VII or the ADA"[7] is facetious at best. The cases cited by Defendants, where the "alleged harasser 'fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor…. Such failures are too commonplace in today's America regardless of the sex of the employee, to be classified as discriminatory'" and "'terms 'bitchy' or 'dumb' did not constitute gender-based harassment"[8] are not at all comparable to the situation about which Ms. Trahanas complaints.

### C. Disclosure of Plaintiff's Confidential Medical Information

Among other information, Ms. Trahanas shared with Dr. Schwulst the fact that she was so fatigued she was seeing Dr. Deborah Cano who had placed her on a regular regimen of psychotropic medications which he would witness her taking. (FAC, ¶43). Immediately following her notification of her need for accommodation

---

[7] Defendants' Memorandum of Law [Doc #:24], pp. 7, IV. C.
[8] Defendants' Memorandum of Law [Doc #:24], p. 7, IV. B.

and relief from the excessive hours of employment she was performing, Dr. Schwulst disclosed private and confidential information about Ms. Trahanas disability to her coworkers. (FAC, ¶40).

### D. Certain Coworkers Join in Mockery and Ridicule of Plaintiff

Following the disclosure of Plaintiff's confidential medical information, Dr. Schwulst allowed and participated in harassment and ridicule of her with coworkers because of her disability. (FAC, ¶ 44). On several occasions thereafter, certain coworkers and peers demeaned, embarrassed, and ridiculed Plaintiff by claiming that she needed psychiatric help. (FAC, ¶ 46). Dr. Schwulst would mockingly ask Plaintiff's peers, "Can you do this with Diane because she is riding the struggle bus again today". (FAC, ¶ 54).

### E. The Sabotage of Plaintiff's Work

Coworkers admitted that they had provided Ms. Trahanas with outdated protocol to conduct experiments, and Dr. Perlman, the mentor of Dr. Schwulst merely said they should have provided the updated protocol. (FAC, ¶ 63).

The First Amended Complaint provides sufficient notice to Defendants and is not the place to give any more detail. Defendants will learn that the certain coworkers who were found to be giving Ms. Trahanas incorrect/outdated information to use in her experiments were observed by another Doctor whose identity will be disclosed during discovery to be laughing at her and reported that Ms. Trahanas should have been given the correct information to conduct her experiments because now she had wasted a lot of time and money. The Doctor called

8

out those two coworkers in front of everyone at a lab meeting on their mistreatment of Ms. Trahanas.

Ms. Trahanas agrees with Defendants that "the Court will look to the surrounding circumstances of the allegedly harassing conduct, including its frequency, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with plaintiff's work performance"[9] and further agrees with Defendants that "courts in this jurisdiction look for the allegedly harassing comments to be frequent enough to have interfered with plaintiff's work performance"[10] .

### IV. Granting Plaintiff Full 12 Week FMLA Leave Does Not Exonerate Defendants

Following the advice of her psychiatrist, Plaintiff made application for leave under The Family and Medical Leave Act. (FAC, ¶68). Plaintiff was allotted 12 weeks leave under FMLA during 2015. (FAC, ¶73). Defendants incorrectly argue that "Plaintiff's FMLA interference and ADA failure to accommodate claims both fail, and must be dismissed, because she actually took the FMLA leave she requested"[11]. Defendants go on to facetiously argue further "failing to allege she suffered a materially adverse, retaliatory employment action".[12] Those statements and arguments just ignore the clear assertions throughout the First Amended Complaint. It is respectfully submitted that the mockery and ridicule, the disclosure

---

[9] Defendants' Memorandum of Law [Doc #:24], pp. 6-7, IV. B.
[10] Defendants' Memorandum of Law [Doc #:24], pp. 8, IV. C.
[11] Defendants' Motion to Dismiss First Amended Complaint [Doc #:23], p. 2, ¶5e and Defendant's Memorandum of Law [Doc #:24], p. 2.
[12] Defendant's Memorandum of Law [Doc #:24], p. 2.

9

of Plaintiff's confidential medical information, and the sabotage of Plaintiff's work are all "materially adverse, retaliatory employment actions".

Ms. Trahanas agrees with Defendants' assertion that "[a] claim for ADA, FMLA, or Title VII retaliation requires plaintiff to allege (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action"[13] and does acknowledge that will be her responsibility, but it is not a burden that she is required to undertake at this stage of the litigation.

As the Supreme Court has taught us, notice pleading has not been supplanted by detailed fact pleading under the Federal Rules:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.] Internal citations omitted.

*Twombly, supra,* at 1964.

### V. Trahanas Treated Differently Than Similarly Situated Employees Not Suffering from Disability or Making Application for FMLA Leave

Contrary to the assertions of defendants, plaintiff is not abandoning her ability to establish retaliation under the "indirect method".[14] Ms. Trahanas respectfully that her First Amended Complaint adequately alleges that she was

---

[13] Defendants' Memorandum of Law [Doc #:24], p. 9, IV. D.
[14] Defendants' Memorandum of Law [Doc #:24], P. 9, footnote 3.

performing her job according to her employer's legitimate expectations as it sets forth the glowing letters of recommendation of her job performance from Dr. Schwulst and Dr. Perlman. The First Amended Complaint clearly states that Ms. Trahanas was treated less favorably than similarly situated employees who did not engage in the protected activity of taking FMLA leave:

> Similarly situated employees, peers, and coworkers who did not suffer such a disability and/or make application for FMLA leave received more favorable treatment and were not subjected to such a hostile work environment, discrimination, ridicule, and humiliation (FAC, ¶75).

### VI. The Hostile Work Environment Sufficiently Pled Under the ADA and Title VII

On examining Count I of the First Amended Complaint, Defendants contend that "no allegation suggests that [Ms. Trahanas] intends to assert a claim for discrimination under the ADA or Title VII, apart from the alleged harassment".[15] Defendants contend that Ms. Trahanas must allege the formalistic requirements of each count under which she claims she is entitled to relief. Plaintiff's counsel respectfully disagrees. References to the ADA and Title VII are clearly made in the First Amended Complaint and facts supporting those claims and serving notice on Defendants that those claims are being asserted are replete throughout the document. (See FAC, ¶¶ 29, 30, 33, 40, 43, 44, 46, 54, 63, 76, 77, 86, 117, 118, 124, and 125). If this Honorable Court rules that the elements of each claim must be specifically pled, Plaintiff's counsel requests leave to file a Second Amended Complaint to meet that requirement.

---

[15]Defendants' Memorandum of Law [Doc #:24], P. 9, footnote 2.

## VII. INTENTIONAL INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE
## AGAINST NORTHWESTERN UNIVERSITY and STEVEN J. SCWULST, M.D.

### A. Acknowledgment of the Prospective
### Economic Advantage of Medical School

Defendants' quizzical and cavalier wonderment "if professional school admission is even a prospective economic advantage"[16] must be disingenuous. Admission to medical school and law school has generated two of the most important and hotly debated decisions to come out of the United States Supreme Court in the last forty years, has fostered *Amicus* Briefs from the most influential groups and organizations in our country, and has resulted in holdings that could only be achieved by a concurrence of a majority of justices on a very limited issue while spawning dissenting and concurring opinions by the individual justices, each expressing well-reasoned but widely divergent views.

In *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court dealt with the use of race as a factor in student admissions by the University of California at Davis Medical School and in *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), the Supreme Court dealt with the use of race as a factor in student admissions by the University of Michigan Law School. The "Harvard College Admissions Program" was cited with approval by Justice Powell in *Regents of Univ. of Cal. v. Bakke* and appended to his opinion:

> In practice, this new definition of diversity has meant
> that race has been a factor in some admission decisions.

---

[16] Defendant's Memorandum of Law [Doc #:24], p. 2.

12

> When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases. A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer.

*Id.,* at 316.

After citing Justice Powell's opinion in *Bakke* and the "Harvard College Admissions Program", Justice O'Connor stated in *Grutter v. Bollinger*:

> In the landmark *Bakke* case, we reviewed a racial set-aside program that reserved 16 out of 100 seats in a medical school class for members of certain minority groups. The decision produced six separate opinions, none of which commanded a majority of the Court. Four Justices would have upheld the program against all attack on the ground that the government can use race to "remedy disadvantages cast on minorities by past racial prejudice." (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). Four other Justices avoided the constitutional question altogether and struck down the program on statutory grounds. (opinion of STEVENS, J., joined by Burger, C. J., and Stewart and REHNQUIST, JJ., concurring in judgment in part and dissenting in part). Justice Powell provided a fifth vote not only for invalidating the set-aside program, but also for reversing the state court's injunction against any use of race whatsoever. The only holding for the Court in *Bakke* was that a "State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." Thus, we reversed that part of the lower court's judgment that enjoined the university "from any consideration of the race of any applicant." (Internal quotations omitted).

*Id.,* at 322.

13

### B. Defamation Caused by the
### Recantation of the Letter of Recommendation

### 1. Considering the Recommender's Enthusiasm

The Supreme Court justices acknowledged that admissions officials must evaluate each applicant based on all the information available in the file, including the personal statement, letters of recommendation, an essay describing how the applicant will contribute to school life and diversity, and the applicant's undergraduate grade point average and Medical School Admission Test (MCAT) or Law School Admission Test (LSAT) score. Additionally, officials must look beyond grades and scores to so-called "soft variables," such as recommenders' enthusiasm, the quality of the undergraduate institution and the applicant's essay, and the areas and difficulty of undergraduate course selection. See *Grutter*, at 306.

### 2. Defamatory[17] Recantation Made by Doctor Schwulst
### To Block the Medical School Application
### Of Ms. Trahanas

Defendants correctly point out that "Plaintiff does not allege that her candidacy as a medical student was imminent at even a single institution."[18] To the contrary, Ms. Trahanas contends that "on February 26, 2015, Plaintiff received another email from AMCAS saying that a third email had been uploaded to her School Applications by Dr. Schwulst". (FAC, ¶¶ 86 and 97). When she inquired at the Admissions Offices of the Medical Schools the later letters submitted by Dr.

---

[17] According to Wikipedia, "Under common law, to constitute defamation, a claim must generally be false and have been made to someone other than the person defamed."

[18] Defendant's Memorandum of Law [Doc #:24], p. 3.

Schwulst "were not good", "it doesn't look good", "it looks bad", and besmirched her professional reputation and competence, and foreclosed her enrollment in medical school. (FAC, ¶ 101).

### 3. Production of the Later Letters of Recantation To Be Achieved through Discovery in This Cause

The requests for an explanation and production of letters of recantation by Ms. Trahanas herself and then after soliciting the aid of HR personnel from Northwestern University were ignored by Dr. Schwulst. (FAC, ¶¶ 87 to 100). Demand on February 27, 2015 by an attorney for Ms. Trahanas that the later letters be produced "lest suit be filed against him in the Circuit Court of Cook County" (FAC, ¶ 103), was met with a response on March 2, 2015 from "an attorney on behalf of Dr. Schwulst responded and indicated that any communications between Dr. Schwulst and AMCAS were privileged and confidential, would not be produced to Plaintiff, and threatened a countersuit against her if she filed a frivolous lawsuit against him". (FAC, ¶ 104). Further information concerning these later letters sent by Dr. Schwulst to AMCAS will be the subject of discovery in this cause and will result in later application to amend this complaint. (FAC, ¶ 102).

Respectfully Submitted,

/s/ John P. DeRose
John P. DeRose

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com

15

## CERTIFICATE OF SERVICE

I, John P. DeRose, hereby certify that on May 20, 2016, I electronically filed the aforementioned document through the Court's CMECF system, with a copy automatically served via the Court's CMECF system upon the following counsel of record:

Anna Wermuth
Alexandra G. Wright
COZEN O'CONNOR
123 N. Wacker Drive
Suite 1800
Chicago, Illinois 60606

E-mail:     awermuth@cozen.com E-mail:
            agwright@cozen.com

/s/ John P. DeRose
John P. DeRose

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com

16