**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DIANE M. TRAHANAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Case No. 1:15-cv-11192 |
| | ) | |
| NORTHWESTERN UNIVERSITY and | ) | Hon. John J. Tharp, Jr., |
| STEVEN J. SCHWULST, M.D., | ) | Judge Presiding. |
| | ) | |
| Defendants. | ) | Hon. Michael T. Mason, |
| | ) | Magistrate Judge |
| | ) | |
| | ) | JURY DEMANDED |

**SECOND AMENDED COMPLAINT**

NOW COMES the Plaintiff, DIANE M. TRAHANAS, by and through her attorneys, John P. DeRose & Associates, and as and for her Second Amended Complaint against Defendants, NORTHWESTERN UNIVERSITY and DR. STEVEN J. SCHWULST, and states as follows:

**JURISDICTION AND VENUE**

1. This action is brought pursuant to 29 U.S.C. § 794; and the jurisdiction of this court is invoked pursuant to 29 U.S.C. § 794(a)(1). Venue lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1331, 1343, and 1391(b) because the events giving rise to this claim occurred in this judicial district and plaintiff and defendants reside in this District. Supplemental jurisdiction is requested over state law claims pursuant to 28 U.S.C. § 1367.

1

**PRELIMINARY STATEMENT**

2.      This is an action seeking redress for violations of rights and protections guaranteed to the Plaintiff under the Americans with Disabilities Act (ADA) of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq. and under Title VII of the Civil Rights Act of 1964 when she was subjected to a hostile work environment and retaliation, and because of retaliation when she sought to exercise her rights under the Family Medical Leave Act (FMLA), 29 U.S.C.A. § 2615(a)(1).  Plaintiff also seeks recovery for the damages she sustained when she was defamed and for the intentional infliction of emotional distress she endured.

**PARTIES**

3.      Plaintiff, DIANE M. TRAHANAS (hereinafter sometimes simply referred to as "Plaintiff" or "Plaintiff Trahanas") is a resident of the State of Illinois and a citizen of the United States of America.

4.      Defendant NORTHWESTERN UNIVERSITY (hereinafter sometimes simply referred to as "Northwestern University") at all relevant times was Plaintiff's employer at the NORTHWESTERN UNIVERSITY FEINBERG SCHOOL OF MEDICINE in Chicago, Illinois.

5.      Defendant Dr. STEVEN J. SCHWULST (hereinafter sometimes simply referred to as "Dr. Steven J. Schwulst" or "Dr. Schwulst") is an attending Physician in the Department of Surgery, Trauma and Critical Care at Northwestern University Feinberg School of Medicine in Chicago, Illinois and was Plaintiff's immediate supervisor for and during her employment.

**FACTS**

**A. Plaintiff's Disability**

6.      Plaintiff has long been treated for anxiety, depression, ADHD and she has a record of impairment.

7. In approximately 2007 Plaintiff started treatment for ADHD and depression in Palos Hills, Illinois where she lives with her parents.

8. Plaintiff is now under the care of Dr. Maria Lentzou because she would get manically depressed at times and suffer from ADHD.

9. Since 2012, Plaintiff has been treated for attention deficit hyperactivity disorder, has been diagnosed with a major depressive disorder, and has been prescribed a regular regimen of psychotropic medication, which includes at various times such antianxiety, antidepressant, and ADHD medications as Wellbutrin (Bupropion), Klonopin (clonazepam), Adderall XR (dextroamphetamine sulfate), Prozac (fluoxetine hydrochloride), and Lamictal (lamotrigine).

10. Although she has received counseling and treatments for many years, from on or about 2007, Plaintiff Trahanas is now being treated by Dr. Deborah Cano, M.D., a psychiatrist for her disorders.

11. At all relevant times of this Complaint, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

### B. Plaintiff Hired As a Research Technician II

12. Commencing in June 2012, plaintiff became employed by Defendant Northwestern University at the Feinberg School of Medicine as a Research Technician II under the supervision of Dr. Schwulst.

13. On or about June 1, 2012, Plaintiff was hired by Dr. Schwulst to work as a Research Technician and Laboratory Manager in the Department of Surgery, Trauma and Critical Care laboratory at Northwestern University.

14. At the time of her hire, Dr. Schwulst and Northwestern University had full knowledge that Plaintiff had extensive research experience and backgrounds in Biology, Psychology,

Biotechnology, relevant to the experiments they were conducting.

15.     Upon interviewing with Dr. Schwulst, his mentor Dr. Perlman, and many of the laboratory coworkers, it was announced that Plaintiff was "their best candidate".

16.      Dr. Schwulst offered the position of Research Technician II to Plaintiff at the salary rate of eighteen dollars per hour.

17.     When Plaintiff made a counter request for a salary of twenty-two dollars an hour, they agreed that Plaintiff would start at nineteen dollars per hour and, after a mandatory six month probationary period, Dr. Schwulst would revise her pay structure if she was invited to stay longer than six months.

## C. Plaintiff's Job Responsibilities

18.     Plaintiff's job duties for Defendants included, but were not limited to:

Acting as a technical expert or specialist in a particular field within a research lab, establishes and optimizes protocols and coordinates conduct of multiple complex experiments;

Reviews results and revises protocols as necessary to ensure that project objectives are attained; and

Using an expert level of skill, completes the following activities:

Immunology
- Flow cytometry
- ELISA, Elispot assay
- Cytokine assay
- Antibody production and purification
- BDFacs Cell Sorting

Animal
- Husbandry
- Breeding and screening transgenic mice
- Monitoring animals recovery from surgeries
- Performing Dissections
- Blood and tissue collection
- Blood and tissue processing for Flow Cytometry

4

- Regulated and administered approved drugs to animals
- Stereotaxic Surgery
- Surgical procedures
- Database management of colony

Administration
- Oversees and manages land databases may include ensuring that experiments are observed and that data is collected and entered correctly;
- Reviews and analyzes data;
- Creates computer models, graphs, reports and summaries for use in publications, professional journals, and grant applications;
- Co-authors scientific papers for presentation and publication;
- Creates and maintains land manuals regarding operating, safety, and procedures;
- Presents published findings at national SHOCK society meetings;
- Travels to learn techniques to stay current on project techniques; and
- Performs other duties as required or assigned.

19. As a Research Technician II under Dr. Schwulst, Plaintiff was often required to work longer than an 8 hour day.

20. When involved in conducting experiments, Plaintiff would often have to work as much as a 24-hour day-- constantly cleaning tissue processing machines and collecting samples.

21. Although Dr. Schwulst was Plaintiff's supervisor, he would be away from the laboratory for 2 week periods at a time.

22. Although her coworkers were around the laboratory for an 8 hour day, Plaintiff would usually be alone in the laboratory for the majority of time while conducting the 24 hour experiments.

**D. Glowing Praise of Plaintiff's Work from Defendant Dr. Schwulst**

23. On October 14, 2014 Dr. Schwulst had provided Plaintiff Trahanas with an excellent Letter of Recommendation in which he wrote the following as she sought admission to medical school:

Ladies and Gentlemen of the Admissions Committee,

I write in response to a request for a reference for Ms. Diane Trahanas, who is a candidate for medical school admission. I have known Diane since 2012 when I hired her as my laboratory manager. I have had the opportunity to work with her at the bench side in my laboratory, in the small animal operating suite, and from the podium on the national conference circuit. This gives me unique perspective with regards to assessing the quality of her research endeavors, commitment to the science of injury, and her desire to translate this commitment towards clinical medicine at the patient's bedside.

The executive summary is that Ms. Trahanas is an exceptional candidate to pursue the study of medicine, and she carries my **highest possible** recommendation for admission to medical school.

Diane distinguishes herself from the rest of the applicant pool in three ways. First, unusual in the current era, Diane has a genuine interest in science of injury. She is immersed in the physiology and pathophysiology of trauma and in working towards new strategies for the treatment of traumatic brain injury and the traumatic brain injury immune suppression syndrome. Second, Diane is both a talented small animal surgeon as well as a talented scientist. The combination is unfortunately rare. Diane has great "hands" in the animal operating theater and can be trusted to perform intricate procedures with good outcomes. She also has the right blend of "smarts" and common sense to make progress in the laboratory. Third, she has an enthusiasm for innovation and is unafraid to ask the "what if?" and "why?" questions. As you know, the socialization that is a part of medical education all too often suppresses creativity. Not Diane. For example, Diane is the first author of an original scientific manuscript (currently in press) describing a novel method for the flow cytometric differentiation of microglia from infiltrating myeloid cells from traumatic brain injury.

Diane has received recognition locally as well as nationally for her laboratory work—she has co-authored 4 original scientific manuscripts with an additional 5th first-authored manuscript currently in press. She is highly sought after as "the lab tech you want with you" when problems arise in the small animal operating room.

Diane's goal for the next several years is to immerse herself in the study of the physiology and pathophysiology of human disease. Her potential as a medical student is as bright as it gets, and her potential as a physician and physician-scientist is frankly

6

> unlimited. In summary, Diane is an outstanding young scientist and a terrific candidate for admission to your medical school. Please do not hesitate to contact me if you have any questions.

24. Dr. Schwulst reviewed the Letter of Recommendation with Plaintiff and sent her a copy of it before he uploaded it to the American Medical College Application Service (AMCAS).

### E. Glowing Praise of Plaintiff's Work from Dr. Perlman

25. On November 1, 2014. Harris Perlman, PhD, Solovy/Arthritis Research Society Professor of Medicine provided Plaintiff Trahanas with an excellent Letter of Recommendation in which he wrote the following as she sought admission to medical school:

> Dear Members of the Medical School Admissions Committee:
>
> I am writing to provide my enthusiastic and strongest support for Diane Trahanas' application to Medical School. Diane is an extremely strong and ideally suited candidate for studying medicine. Her background combines psychology, biology, biotechnology, genetics, neuroscience, immunology, surgery, trauma and critical care. Her career trajectory is that of a highly productive and talented young medical scientist.
>
> Diane joined my laboratory almost three years ago as a Research Scientist and Lab Manager. Since then she has become an indispensable part of the group and has established herself as an outstanding scientist. I would rank her in the top 5% of all lab managers I interact with who are at a similar stage of their career. Diane is an extremely quick learner and has rapidly mastered the techniques and vocabulary of immunology, specifically relating to traumatic brain injuries, bioinformatics and statistical analyses used in our lab. Her project uses state-of-the-art tools to examine the pathogenesis of traumatic brain injury-induced immune dysfunction, systematic infections and mortality.
>
> Upon her arrival, Diane began working on a large-scale project that involves creating and fine-tuning a method to model traumatic brain injury in mice, assessing Neurological Severities, mastering flow cytometry, designing bone marrow chimeras and pharmaceutical therapies. She recently completed the critical stage in her project and completed her first authorship publication and conference presentation in addition to her previous 3 published abstracts and conference presentations and 1 second authorship

publication. Needless to say, her contributions to the lab have been significant, and I am exceedingly satisfied by her progress.

Diane is a strikingly bright, hard-working, and ambitious scientist and prospective medical student. Her ability to plan and execute studies is complimented by her thoughtful and insightful reading of the literature. Diane would like to develop a research-based medical career at the interface of neuroscience, primary care medicine and preventive medicine. I have no doubt whatsoever that she will succeed in this goal. Her background provides her a powerful breadth of experience, and I believe that with further medical training in the nuances of neuroscience and medicine she will become an influential contributor to the field. She expressed interest in attending Medical School at her initial interview and she has continuously expressed this interest since then. I feel that now is the perfect time for her to attend. It is my belief that she would be an asset to any of the Medical Schools that accepts her into the upcoming class. Thus, I am extremely confident that Diane will be [an] exemplary medical student will excel and become a leader in the medical school.

Please do not hesitate to contact me if you have any questions or require additional information.

26. Dr. Perlman reviewed the Letter of Recommendation with Plaintiff and sent her a copy of it before he uploaded it to the American Medical College Application Service (AMCAS).

**E. Plaintiff Advises Defendants of Need for an Accommodation**

27. Because of the strain she was experiencing in the workplace, Plaintiff advised her supervisor, Dr. Schwulst of her disability and for her need for accommodation and relief from the excessive hours of employment she was performing under his supervision.

28. Notwithstanding that Plaintiff needed accommodation and relief from her excessively long work schedule because of the undue stress it was causing her, Dr. Schwulst failed to accommodate her disability and request for consideration.

**F. The Creation of a Hostile Work Environment**

**1. Mockery and Ridicule from Dr. Schwulst**

8

29. Instead, Dr. Schwulst would mock and ridicule Plaintiff in front of her coworkers because she could not maintain the work schedule he was imposing.

30. Dr. Schwulst mocked and ridiculed Plaintiff in front of her coworkers went even further beyond the bounds of decency.

31. In front of her coworkers, Dr. Schwulst would regularly refer to Plaintiff as "A Typical Millennial" or "Princess Diana", stating that she was spoiled compared to him and what he had to go through in his life to achieve all his accomplishments.

32. Because Plaintiff would not share information about her personal life with Dr. Schwulst, he presumed and referred to her as "a lesbian" in front of her coworkers.

33. When he learned of Plaintiff's sports participation and regular workout program, Dr. Schwulst began commenting to and in front of her coworkers that Plaintiff's athletic build, fitness and participation proved his accusations that she was a lesbian.

34. Dr. Schwulst nicknamed plaintiff "Softball player" in front of her coworkers and regularly made the statement that "All Softball Players are lesbians".

35. When Dr. Schwulst commenced this activity in Plaintiff's first year of employment, she would just turn away from him or make an uncomfortable face.

36. When his behavior did not cease, Plaintiff protested and told him that she was not a softball player; she plays basketball.

37. Dr. Schwulst quickly retorted, "That's no different than a softball player. You basketball players are lesbians, too."

38. At Christmas time, 2014, while Dr. Schwulst was talking about buying his wife a charm bracelet, he commented in front of coworkers that if plaintiff were to buy such a charm bracelet, "she would need a mitt and softball on it- but she probably wouldn't wear it because softball

9

players are manly and don't wear pretty shiny things".

39. In December 2014 when his wife was expecting with a baby girl, Dr. Schwulst announced in front of Plaintiff's coworkers that he hoped his baby girl would be like Plaintiff, so he would not have to worry about her getting pregnant.

**2. Disclosure of Plaintiff's Confidential Medical Information**

40. Immediately following her notification of her need for accommodation and relief from the excessive hours of employment she was performing, Dr. Schwulst disclosed private and confidential information about Plaintiff's disability to her coworkers.

41. Before the disclosure of such sensitive and private information, Plaintiff had specifically requested via email that Dr. Schwulst respect her privacy and share no information about her health with her coworkers.

42. Plaintiff had shared very private and confidential information about her medical condition and history with Dr. Schwulst, never intending or authorizing the spread of that medical information to others in the workplace.

43. Among other information, Plaintiff shared with Dr. Schwulst the fact that she was so fatigued she was seeing Dr. Deborah Cano who had placed her on a regular regimen of psychotropic medications which he would witness Plaintiff taking.

**3. Certain Coworkers Join in Mockery and Ridicule of Plaintiff**

44. Following the disclosure of Plaintiff's confidential medical information, Dr. Schwulst allowed and participated in harassment and ridicule of her with coworkers because of her disability.

45. Shortly thereafter, Dr. Schwulst and certain of Plaintiff's coworkers began harassing and ridiculing her and submitting her to a hostile work environment because of her disability.

46. On several occasions thereafter, certain coworkers and peers demeaned, embarrassed, and ridiculed Plaintiff by claiming that she needed psychiatric help.

47. On one occasion a certain coworker told Plaintiff Trahanas in front of their supervisor, Dr. Schwulst and other coworkers that Plaintiff needed help and, "Stop messing things up", "You're doing everything wrong and you have no idea what you are doing", and "Dude, take your meds!"

48. Dr. Schwulst merely laughed and did not correct or reprimand the coworker who made the statement.

49. Dr. Schwulst and a coworker yelled at Plaintiff Trahanas in front of other peers and coworkers and said, "Diane always screws something up", claiming that Plaintiff did not know how to complete experiments and use the equipment.

50. Plaintiff would never get a chance to defend herself or explain her thought process if an experiment was done unconventionally, with novelty or a particular procedure was followed as instructed by another coworker or supervisor.

51. Several coworkers were present when Dr. Schwulst said that Plaintiff always messes things up, some would speak up and defend the Plaintiff, while other coworkers would walk away nodding, laughing or smiling, which was embarrassing and humiliating to Plaintiff in front of her peers and coworkers.

52. In front of Plaintiff's coworkers and peers, Dr. Schwulst would regularly make statements about Plaintiff such as, "You always make mistakes" and "Don't work on this because you will mess it up, so do it with (a specific coworker)" and "Email (the specific coworker) to see when [he/she] can do it with you."

53. Despite these demeaning and harassing statements made to Plaintiff about her physical

11

and mental condition and impairment in front of her peers, Dr. Schwulst found them amusing and did and said nothing to correct the coworkers.

54. Dr. Schwulst would mockingly ask Plaintiff's peers, "Can you do this with Diane because she is riding the struggle bus again today."

55. Certain peers regularly mocked Plaintiff to Dr. Steven J. Schwulst and in front of other coworkers, claiming that Plaintiff had "no idea" and "Honey, you haven't done anything right. I'm going to have to fix all of this".

56. Plaintiff found the statements made by Dr. Schwulst and certain coworkers very disconcerting, upsetting, and humiliating.

57. As certain peers and coworkers continued to embarrass, humiliate, sabotage, and ridicule Plaintiff, Defendants took no action to correct and stop them.

58. Many of the statements made by Dr. Schwulst and certain coworkers were made in front of Dr. Perlman, the mentor and supervisor of Dr. Schwulst.

59. Just as the coworkers were not corrected or disciplined in any way, neither did Dr. Perlman correct or discipline Dr. Schwulst for his hostile and harassing behavior toward Plaintiff in the workplace.

### 4. The Sabotage of Plaintiff's Work

60. Certain coworkers from the Perlman Laboratory deliberately gave Plaintiff an incorrect and outdated protocol for a tissue processing experiment called "Flow Cytometry."

61. When, during a meeting of the Perlman Laboratory staff, Plaintiff indicated that she was having difficulties 6 months into the experiment, the coworkers began to laugh.

62. Dr. Perlman asked which protocol had been given to Plaintiff to use on the experiment.

63. The coworkers then admitted that they had provided Plaintiff with the outdated protocol,

12

and Dr. Perlman merely said they should have provided the updated protocol.

64.     Neither Dr. Schwulst nor Dr. Perlman disciplined the coworkers in any way for sabotaging Plaintiff's work.

### G. Plaintiff Turns for Help to Her Psychiatrist

65.     Because of the harassment and the hostile work environment under which she labored as long as twenty-four hours at a time in the laboratory, Plaintiff began feeling fatigued, tense, sluggish, depressed and overwhelmed.

66.     Because of the harassment and hostile work environment under which she was laboring, Plaintiff sought help and received treatment from Dr. Deborah Cano, M.D., her psychiatrist because she was experiencing insomnia, anxiety, panic attacks, and depression in the work place and was contemplating hurting herself.

67.     Plaintiff reported to Dr. Deborah Cano suicidal thoughts, major depression, and anxiety.

### H. Plaintiff Makes Application for FMLA Leave

68.     Following the advice of her psychiatrist, Plaintiff made application for leave under The Family and Medical Leave Act (FMLA).

69.     The appropriate application forms were completed by Dr. Cano and forwarded to Defendant Northwestern University, through its Third-Party Administrator ("The Hartford").

70.     Plaintiff sought and was granted FMLA leave for her medical condition commencing on February 17, 2015 while she treated with her psychiatrist.

71.     On February 17, 2015 Plaintiff Trahanas began her FMLA leave.

72.     While Plaintiff Continued on FMLA leave, her psychiatrist reported regularly to The Hartford concerning Plaintiff's progress and her need for continued treatment.

73.     Plaintiff was allotted 12 weeks leave under FMLA during 2015.

74.     At the conclusion of Plaintiff's FMLA leave, Dr. Deborah Cano indicated that she had recovered sufficiently so that she could go back to gainful employment at Northwestern University, but under no circumstances would she be able to return under the supervision of Dr. Schwulst and the hostile work environment he had fostered.

75.     Similarly situated employees, peers, and coworkers who did not suffer such a disability and/or make application for FMLA leave received more favorable treatment and were not subjected to such a hostile work environment, discrimination, ridicule, and humiliation.

### I. Retaliation Commences Because of Exercise of FMLA Rights

76.     Immediately after Plaintiff commenced her FMLA leave on February 17, 2015, Dr. Schwulst's retaliatory actions against her were exacerbated.

77.     February 18, 2015 Plaintiff was locked out of her work computer.

78.     On February 19, 2015 Heather Burke, Manager of Professional Affairs Department of Surgery emailed Plaintiff certain information.

79.     When Plaintiff attempting to provide Ms. Burke the requested information, she discovered that remote control access to her work computer had been blocked by Dr. Schwulst.

80.     Plaintiff informed both HR of Northwestern University and the Manager of Professional Affairs Department of Surgery, Heather Burke that she was locked out of her work computer and could only answer a few questions.

81.     Daina Fernandez, HR Representative for Northwestern University inquired as to who had Plaintiff's computer username and password.

82.     Plaintiff told Ms. Fernandez that only she and Defendant Dr. Schwulst had the information.

83.     Ms. Fernandez advised Plaintiff that under FMLA nothing from Plaintiff's work status

should have been changed, including computer access.

84.     Ms. Fernandez assured Plaintiff that she would look into it.

85.     Plaintiff's access to work computer was never reestablished.

### 1. Recantation of the Letter of Recommendation

86.     Contrary to his initial behavior, on February 19, 2015 Plaintiff Trahanas received an unexpected email from AMCAS advising her that Dr. Schwulst had uploaded a second letter to all fifteen (15) Medical School Applications Plaintiff had initiated:

> AMCAS has received a letter of evaluation in support of your application to the 2015 entering class.
>
> Author Name: Dr. Steven Schwulst
> Author Institution: Northwestern University
> Date Received: February 19, 2015

87.     Plaintiff notified both Northwestern HR and Heather Burke Manager of Professional Affairs Department of Surgery about this issue.

88.     HR Representative Daina Fernandez recommended that Plaintiff inquire via email of Dr. Schwulst concerning his knowledge of this letter and "see what he says before anything further happens".

89.     HR Representative Daina Fernandez recommended that Plaintiff "bcc" her and Ms. Burke on the email that she was sending to Dr. Schwulst.

90.     HR Representative Daina Fernandez further recommended that Plaintiff not accuse Dr. Schwulst of any wrongdoing in her inquiry because "he might just get mad again and start hollering, like the last time you involved me in your discussions with him concerning a pay raise".

91.     Plaintiff emailed Dr. Scwhulst questioning the meaning of his latest Letter of Recommendation:

> I have received the following email from AMCAS and was wondering if you know anything about this upload? Your first letter was uploaded back in October and I have that confirmation already, so there is no reason I should be receiving this email now.
>
> I'm wondering if our accounts have been compromised? And if now someone has access to my private med school application information, or your Letter Writer Login information.
>
> Please let me know as this is a very serious issue I would have to address.

92.     When Dr. Scwhulst did not reply to her email, Plaintiff wrote to Heather Burke, Manager of Professional Affairs Department of Surgery:

> Dr. Scwhulst may just be limiting communication as I have requested, however, I need a response to this email as soon as possible. Can you please see to it that he receives and replies to it?

93.     Ms. Burke promptly responded via email:

> Of course, I will forward to him and ask that he reply to [it] at his earliest convenience.

94.     Ms. Burke contacted Plaintiff telephonically and assured her, "We will get back to you when we figure out what's happening."

95.     Shortly thereafter, Ms. Burke confirmed with Plaintiff via email:

> I just wanted to let you know that we are looking into this and will follow-up with you via email sometime next week.

### 2. Defendants Take No Action to Correct the Retaliation

96.     Plaintiff received no further response from Dr. Schwulst, Ms. Fernandez, or Ms. Burke.

97.     A week later on February 26, 2015, Plaintiff received another email from AMCAS saying that a third email had been uploaded to her School Applications by Dr. Schwulst.

98.     Plaintiff immediately tried to make contact with HR Representative Fernandez to advise her of the situation and had to leave a message.

99.     Ms. Fernandez did not call Plaintiff back to follow up on this situation.

100.    Plaintiff never did receive another phone call from Daina Fernandez of the Northwestern University HR Department or from Heather Burke, the Manager of Professional Affairs Department of Surgery about the letters uploaded by Dr. Schwulst to AMCAS.

101.    On information and belief, and based on the very limited responses Plaintiff has been able to gather from the medical schools to which she made application, the later letters submitted by Dr. Schwulst "were not good", "it doesn't look good", "it looks bad on the applicant (i.e. the Plaintiff) ", and besmirched her professional reputation and competence, and foreclosed her enrollment in medical school.

102.    Further information concerning these later letters sent by Dr. Schwulst to AMCAS will be the subject of discovery in this cause and will result in a later request for leave to amend this Second Amended Complaint.

### J. Demand for Production of Later Letters of Recantation

103.    On February 27, 2015, knowing of only one letter of recommendation, an attorney on behalf of Plaintiff wrote a letter to Dr. Schwulst stating, among other things:

> There is no valid reason for you submitting a second Letter to the AMCAS, nor have you provided with any sort of explanation as to the second Letter.  You have completely ignored Diane's attempts to contact you as well as Human Resource's requests.  Given that this second Letter coincides with Diane's notification for medical leave, one can infer that you uploaded the second Letter as a negative Letter in retaliation for Diane seeking medical leave. The only motive imaginable is that you are seeking to impede Diane's application to medical education institutions.  As you are well aware retaliation is an actionable offense. Such falsified retaliatory information gives rise to actions of retaliation, defamation, slander, and tortious interference with contract, among others.

The attorney went on to demand a copy of the second letter Dr. Schwulst had written to AMCAS lest suit be filed against him in the Circuit Court of Cook County.

104.    On March 2, 2015 an attorney on behalf of Dr. Schwulst responded and indicated that any communications between Dr. Schwulst and AMCAS were privileged and confidential, would not be produced to Plaintiff, and threatened a countersuit against her if she filed a frivolous lawsuit against him.

### K. Plaintiff Receives a Right to Sue from EEOC

105.    Plaintiff filed a Complaint of Discrimination with the EEOC, Charge Number 440-2015-04907 on September 24, 2015 and received a Right to Sue on September 29, 2015, copies of which were attached as Exhibit A and Exhibit B respectively to Plaintiff's original Complaint.

### COUNT I
### HOSTILE WORK ENVIRONMENT / DISCRIMINATION
### UNDER TITLE VII of the CIVIL RIGHTS ACT of 1964
### AGAINST DEFENDANT NORTHWESTERN UNIVERSITY

106.    Plaintiff repeats and realleges Paragraphs 1 through 105 of this Complaint as Paragraphs 1 through 105 of Count I as though fully set forth herein.

107.    Plaintiff was engaging in a statutorily protected activity when she sought an accommodation from the work schedule that Dr. Schwulst had imposed on her in working in the laboratory, when she was subjected to a hostile work environment and sexual harassment, when she filed for FMLA leave, when she was subjected to defamation of her character and professional reputation, and when she filed her grievance with the EEOC.

108.    After filing the grievance, her supervisors and coworkers consistently harassed, embarrassed, and ridiculed her about her disability and depression, made comments about her disability, and mocked her intelligence and disability.

109.    Defendants fostered the hostile work environment when they ignore and/or refuse to correct certain of Plaintiff's peers and coworkers for the harassment, embarrassment and ridicule of her.

110. Defendants continued to foster a hostile work environment while Plaintiff exercised her rights under FMLA, and sought accommodations under the ADA.

111. Plaintiff continues to experience the hostile work environment up to and including the date of the filing of this Complaint and has not been able to secure gainful employment with Defendant Northwestern University or anywhere else.

WHEREFORE, Plaintiff DIANE M. TRAHANAS respectfully prays for judgment against Defendant NORTHWESTERN UNIVERSITY as follows:

a. Judgment for compensatory damages in favor of Plaintiff and against Defendant in an amount in excess of $1, 000,000.00;

b. Reasonable attorney's fees;

c. Costs of this suit; and

d. Such other relief as may be proper and just.

## COUNT II
## RETALIATION FOR EXERCISING RIGHTS
## UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)
## AGAINST NORTHWESTERN UNIVERSITY ONLY

112. Plaintiff repeats and realleges Paragraphs 1 through 111 of this Complaint as Paragraph 1 through 111 of Count II as though fully set forth herein.

113. Plaintiff had battled depression, anxiety and other psychiatric issues since 2007.

114. However, the consistent mockery, harassment and retaliation Plaintiff experienced at work exacerbated her depression and anxiety issues.

115. Plaintiff's disability substantially limited her ability to focus in her work environment.

116. Plaintiff's supervisors were aware of her disability as they consistently talked to her about it when she requested an accommodation and FMLA leave.

117. While on disability leave, Dr. Schwulst retaliated against plaintiff because she was on

FMLA leave, defamed and besmirched her good name and professional reputation, and Northwestern University failed to take any corrective action against him whatsoever.

118. While working, Plaintiff was subjected to harassment and verbal abuse by her coworkers and supervisors.

WHEREFORE, Plaintiff DIANE M. TRAHANAS respectfully prays for judgment against Defendant NORTHWESTERN UNIVERSITY as follows::

    a.    Judgment for compensatory damages in favor of Plaintiff and against Defendant in an amount in excess of $1,000,000.00;

    b.    Reasonable attorney's fees;

    c.    Costs of this suit; and

    d.    Such other relief as may be proper and just.

<u>**COUNT III**</u>
<u>**RETALIATION FOR EXERCISING RIGHTS**</u>
<u>**UNDER THE FAMILY MEDICAL LEAVE ACT (FMLA)**</u>
<u>**AGAINST NORTHWESTERN UNIVERSITY and**</u>
<u>**AGAINST STEVEN J. SCHWULST, M.D.**</u>

119. Plaintiff repeats and realleges Paragraphs 1 through 118 of this Complaint as Paragraph 1 through 118 of Count III as though fully set forth herein.

WHEREFORE, Plaintiff DIANE M. TRAHANAS respectfully prays for judgment against Defendants NORTHWESTERN UNIVERSITY and STEVEN J. SCHWULST, M.D. as follows:

    a.    Judgment for compensatory damages in favor of Plaintiff against Defendants in an amount in excess of $1,000,000.00;

    b.    Judgment for punitive damages in favor of plaintiff and against defendants in an amount in excess of $1,000,000;

    c.    Reasonable attorney's fees;

    d.        Costs of this suit; and

    e.        Such other relief as may be proper and just.

## COUNT IV
## DEFAMATION AGAINST STEVEN J. SCHULST, M.D.
## And NORTHWESTERN UNIVERSITY

120.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 119 of this Complaint as Paragraphs 1 through 119 we read I going to 08 of this Count III as though fully set forth herein.

121.    Defendant Steven J. Schulst, M.D. made defamatory statements about plaintiff and Northwestern University failed to take any corrective action against him whatsoever.

122.    Having drafted and forwarded the aforementioned very positive letter of recommendation on October 14, 2014 in support of plaintiff's application for admission to medical school, Defendant Steven J. Schulst, M.D., with actual malice toward her, drafted and forwarded a second letter to the American Medical College Application Service (AMCAS) containing false information that besmirched her qualifications and competency.

123.    On February 19, 2014, Plaintiff received notification via email from the American Medical College Application Service (AMCAS) that Dr. Schulst had uploaded a second letter to all fifteen (15) Medical School Applications to which she had sought admission for the 2015 entering class.

124.    A week later on February 26, 2015, Plaintiff received another email from AMCAS saying that a third email had been uploaded to her School Applications by Dr. Schwulst.

125.    On February 27, 2015, knowing of only one letter of recommendation, an attorney on Plaintiff's behalf wrote a letter to Dr. Schwulst stating, among other things:

> There is no valid reason for you submitting a second
> Letter to the AMCAS, nor have you provided with any

sort of explanation as to the second Letter. You have completely ignored Diane's attempts to contact you as well as Human Resource's requests. Given that this second Letter coincides with Diane's notification for medical leave, one can infer that you uploaded the second Letter as a negative Letter in retaliation for Diane seeking medical leave. The only motive imaginable is that you are seeking to impede Diane's application to medical education institutions. As you are well aware retaliation is an actionable offense. Such falsified retaliatory information gives rise to actions of retaliation, defamation, slander, and tortious interference with contract, among others.

126. The attorney went on to demand a copy of the second letter Dr. Schwulst had written to AMCAS lest suit be filed against him in the Circuit Court of Cook County.

127. On March 2, 2015 an attorney on behalf of Dr. Schwulst responded and indicated that any communications between Dr. Schwulst and AMCAS were privileged and confidential, would not be produced to Plaintiff, and threatened a countersuit against her if Plaintiff filed a frivolous lawsuit against him.

128. On March 17, 2015, Plaintiff made inquiries of the medical schools to which she had made application for enrollment in the 2015 class.

129. Plaintiff was able to make contact with 12 of the 15 medical schools and many of the persons who answered the phones at the Admissions Offices indicated that they could not give their identity because of the requirement that they keep anonymity from those persons inquiring about admission to medical school.

130. The persons with whom Plaintiff communicated in the Admissions Office of each of the Medical Schools acknowledged that they had three different letters from Dr. Schwulst.

131. Plaintiff received the following responses to her inquiries at the Admissions Offices of the Medical Schools to which he was seeking admission in the 2015 class:

    a. Central Michigan University College of Medicine 989-774-7882
Kelly said, "The second letter from Dr. Schwulst doesn't look good; it looks bad on applicant (me)"

    b. FIU Herbert Wertheim College of Medicine 305-348-0570
Unidentified female said to email them at med.admissions@FIU.edu with an explanation of why Plaintiff would have "more than one letter from the same individual";

    c. Florida State University College of Medicine 850-644-1855
An unidentified female wanted Plaintiff to email them at admissionsmed@FSU.edu an explanation of why there were additional communications from Dr. Schwulst;

    d. Sidney Kimmel Medical College 215-955-6983
Unidentified person said Plaintiff should explain in next year's application the circumstance to why those letters are there;

    e. Virginia Tech College of Medicine 540-526-2500
An unidentified female told Plaintiff to get new letter writers for next year and hopefully next year's letter are as strong of letters; in essay or application try to explain why/circumstance "the letter writer did that" to Plaintiff the previous year;

    f. Quinnipiac University School of Medicine 203-582-7766
TONI SORRENTINO confirmed that the medical school had received a second letter from Dr. Schwulst "withdrawing his support" and a third letter saying to "disregard his 2nd letter and brings up the manuscript publication and if any questions to contact him";

g.  The University of Miami School of Medicine 305-243-3234
An unidentified person cautioned me that I shouldn't tell them who I am because they'll have to flag my application and that will be problematic for me;

h. University of South Carolina School of Medicine 864-455-7992
An unidentified person was not too helpful and wouldn't elaborate over the phone about adverse effects of such a letter;

i. Western Michigan University School of Medicine 269-337-4500
Call back Thursday and talk to the Director of Admissions. Plaintiff never did call back because of the information she received when she called Wayne State College of Medicine;

j. Wayne State College of Medicine 313-577-1466
An unidentified female told Plaintiff, "Definitely don't bring it to people's/programs attention. It will reflect very poorly on you, and will be seen as a negative";

k. University of Central Florida College of Medicine 407-266-1000
An unidentified female told Plaintiff, "Don't use Dr. Schwulst as a letter writer in the future. Get a different person to write a letter of recommendation for you."

l. Florida Atlantic University College of Medicine 561-297-4828
A person who identified himself as "Eddie" said to call him back at the end of April because the cycle would be over and only then can he tell plaintiff if the letters were good, ok or bad.

132.   Because of the false and defamatory statements written by Defendant Steven J. Schulst, M.D., with actual malice toward her, his later letters damaged and foreclosed plaintiff's ability to gain admission to medical school.

133.   Knowing full well that the assertions by him in the later writings were not true and maliciously intending to sabotage Plaintiff's application to medical school to her damage, these

24

later writings by Defendant Steven J. Schulst, M.D. are not protected by any privilege whatsoever.

134. The statements and writings by Defendant Steven J. Schulst, M.D. and sent to the American Medical College Application Service (AMCAS) intentionally and maliciously defamed and besmirched plaintiff's good name and professional reputation.

135. Although requested to do so, Defendant Northwestern University failed to take any corrective action whatsoever against Defendant Steven J. Schulst, M.D. concerning the malicious defamation of plaintiff and the damage to her plans to attend medical school.

136. Though often requested, Defendant Steven J. Schulst, M.D. has refused to produce the defamatory writings he sent to the American Medical College Application Service (AMCAS) resending is earlier letter of recommendation concerning Plaintiff.

137. Although the contents of the letter rescinding the earlier recommendation by Defendant Steven J. Schulst, M.D. are unknown to plaintiff, those contents will be discovered during the course of this litigation and plaintiff will seasonably seek leave from this Honorable Court to include the contents of the defamatory letter in a later amendment of the Complaint in this cause.

138. Because of the defamatory actions taken by Defendant Steven J. Schulst, M.D., and the failure by Northwestern University to take any corrective action whatsoever, Plaintiff has been unable to secure placement in medical school.

139. Following the advice of her psychiatrist that she should not go back to work under the supervision of Defendant Steven J. Schulst, M.D , Plaintiff sought another position of employment at Northwestern University Medical School.

140. Plaintiff received no response whatsoever to her several applications for another position of employment at Northwestern University Medical School.

25

WHEREFORE, Plaintiff DIANE M. TRAHANAS respectfully prays for judgment against Defendants NORTHWESTERN UNIVERSITY and STEVEN J. SCHWULST, M.D. as follows:

a. Judgment for compensatory damages in favor of Plaintiff against Defendants in an amount in excess of $1,000,000.00;

b. Judgment for punitive damages in favor of plaintiff and against defendants in an amount in excess of $1,000,000;

c. Reasonable attorney's fees;

d. Costs of this suit; and

e. Such other relief as may be proper and just.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

141. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 140 of this Complaint as Paragraphs 1 through 140 of this Count V as though fully set forth herein.

142. The above described conduct of the Defendants was truly extreme and outrageous.

143. The Defendants intended their conduct to cause severe emotional distress to Plaintiff.

144. The Defendants knew that there was at least a high probability that their conduct would cause severe emotional distress to Plaintiff.

145. Defendants, by and through their conduct, did in fact cause Plaintiff severe emotional distress.

146. As a proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer extreme mental anguish, severe emotional distress, and ongoing medical bills.

WHEREFORE, Plaintiff DIANE M. TRAHANAS respectfully prays for judgment against Defendants NORTHWESTERN UNIVERSITY and STEVEN J. SCHWULST, M.D. as follows:

a. Judgment for compensatory damages in favor of Plaintiff and against Defendants in an amount in excess of $1,000,000.00;

b. Judgment for punitive damages in favor of Plaintiff and against Defendants in the amount in excess of $1,000,000.

c. Reasonable attorney's fees;

d. Costs of this suit; and

e. Such other relief as may be proper and just.

Respectfully submitted,

s/John P. DeRose
John P. DeRose

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com