**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE M. TRAHANAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:15-cv-11192** |
| **v.** | ) | |
| | ) | **Judge John J. Tharp, Jr.** |
| **NORTHWESTERN UNIVERSITY and** | ) | |
| **STEVEN J. SCHWULST, M.D.,** | ) | **Magistrate Judge Jeffrey Cummings** |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a)(3) of this Court, Defendants Northwestern University (the "University") and Dr. Steven Schwulst ("Dr. Schwulst") hereby submit this statement of facts in support of their Motion for Summary Judgment. The following facts, accepted as true by Defendants for purposes of this motion only, are taken primarily from Plaintiff's own sworn deposition testimony.

## I.    JURISDICTION AND VENUE

1.    This Court has original federal question jurisdiction of Plaintiff's Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*; Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; and The Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* claims under 28 U.S.C. § 1331.  (Ex. A, Answer to Plaintiff's Second Amended Complaint ("Answer") at ¶¶ 1-2.)  This Court has supplemental jurisdiction of Plaintiff's defamation and intentional infliction of emotion distress claims pursuant to 28 U.S.C. § 1367.  (*Id.*)

2.     This case involves events which are alleged to have occurred within the venue of this Court.  (*Id*.)

## II.     THE PARTIES

3.     Defendant Northwestern University is a private university which includes the University's Feinberg School of Medicine ("Feinberg") located in Chicago, Illinois.  (Ex. A, Answer at ¶ 4.)

4.     Defendant Dr. Steven Schwulst is a Doctor of Medicine ("M.D.") and an Assistant Professor of Surgery in the Department of Surgery, Trauma and Critical Care at Feinberg.  (Ex. A, Answer at ¶ 5; Ex. B, Excerpts from Plaintiff's Deposition ("P. Dep.") at 47; Ex. C, Excerpts from Deposition of Dr. Steven Schwulst ("Schwulst Dep.") at 6.)  He was Plaintiff's immediate supervisor during her employment.  (*Id*.)

5.     Plaintiff Diane Trahanas ("Plaintiff") is a heterosexual female who resides in the State of Illinois and was employed by the University.  (Ex. A, Answer at ¶¶ 3, 12; Ex. B, P. Dep. at 68, 268-269; P. Dep. Ex. 40.)

## III.     THE UNIVERSITY'S POLICIES

6.     The University maintains a leave of absence policy which instructs employees to give at least two weeks' notice when the need for leave is foreseeable.  (Ex. B, P. Dep. at 65-66; P. Dep. Ex. 5 at Trahanas-NU001356.)  Plaintiff admits that it was reasonable for the University to expect advanced notice of an absence.  (Ex. B, P. Dep. at 67.)

7.     The University, an Equal Employment Opportunity employer, maintains a policy prohibiting discrimination or harassment "by any member of its community" against any individual on any lawfully protected basis, including but not limited to gender and sexual orientation.  (Ex. B, P. Dep. at 61-62, 68; P. Dep. Ex. 5 at Trahanas-NU001332.)

LEGAL\42020613\1

8.     Plaintiff admits that she received the University's handbook, that it contained a variety of complaint avenues, and that it included information about how to file a complaint of discrimination.  (Ex. B, P. Dep. at 60-63; P. Dep. Ex. 4.)  These complaint procedures notified employees that they could file a complaint with the Director of the University Sexual Harassment Prevention Office, Associate Vice President for Human Resources, or the Director of Equal Employment Opportunity, Affirmative Action, and Labor Relations, and a host of other counselors and advisors who are trained to receive a complaint and answer questions about the policy.  (Ex. B, P. Dep. at 60-63; P. Dep. Ex. 5 at Trahanas-NU001375-76.)  Plaintiff admittedly signed an acknowledgement form which stated that she should "call anyone in the Department of Human Resources if [she should] have questions about these policies."  (Ex. B, P. Dep. at 60-61; P. Dep. Ex. 4.)

9.     The University prohibits retaliation against anyone for registering a complaint pursuant to these policies or against any individual based on any protected characteristic.  (Ex. B, P. Dep. at 68; P. Dep. Ex. 5 at Trahanas-NU1332.)

## IV.    PLAINTIFF'S EMPLOYMENT AT THE UNIVERSITY

10.     Plaintiff began working as a Research Technologist II at Feinberg's Department of Surgery (the "Department") on June 11, 2012, reporting to Dr. Schwulst.  (Ex. B, P. Dep. at 51-52.)

11.     Plaintiff completed a personal data form on her first day of work at the University.  (Ex. B, P. Dep. at 55-56; P. Dep. Ex. 2.)  On that form, she checked the box "No" next to the question "Do you have a disability?"  (*Id*.)

12.     Dr. Schwulst is a surgeon, who has clinical duties at Northwestern Memorial Hospital.  (Ex. B, P. Dep. at 47, 72; Ex. C, Schwulst Dep. at 103.)    He is also a scientist

conducting laboratory research on traumatic brain injuries. (Ex. B, P. Dep. at 72-73; Ex. C, Schwulst Dep. at 12.) He uses live mice in his laboratory experiments. (Ex. B, P. Dep. at 75; Ex. C, Schwulst Dep. at 38.)

13. The University allotted Dr. Schwulst bench space in a laboratory. (Ex. C, Schwulst Dep. at 34.) The laboratory also housed bench space that was used by two other research scientists and Doctors of Philosophy (Ph.D.), Dr. Perlman and Dr. Stehlik. (Ex. B, P. Dep. at 47; Ex. C, Schwulst Dep. at 34.) A lab bench is a long counter workspace where research experiments are performed. (Ex. C, Schwulst Dep. at 72.)

14. Dr. Perlman was Dr. Schwulst's "scientific mentor," which means he would help him refine his abilities with designing experiments, critical thinking, and applying scientific methods to new hypotheses. (Ex. B, P. Dep. at 47-49; Ex. C, Schwulst Dep. at 67-68.)

15. Plaintiff's job duties consisted of assisting with experiments related to traumatic brain injuries. (Ex. B, P. Dep. at 47-48.) During the relevant time period, Plaintiff's responsibilities generally included: purchasing mice, inflicting the mice with a brain injury, euthanizing the mice to collect and analyze blood and tissue from laboratory mice, and assisting with preparing research papers for publication and presenting the research results. (Ex. B, P. Dep. at 72-73, 75, 76, 82-84, 251, 253.)

16. By 2015, Plaintiff was qualified and authorized to inject the mice with clodronate which depleted white blood cells before inflicting the brain injury. (Ex. B, P. Dep. at 251; Ex. D, Declaration of Dr. Steven Schwulst ("Schwulst Dec.") at ¶ 5; Schwulst Dec. Ex. A.) Plaintiff was required to test the depletion of the white blood cells in the day or days following the clod injection to make sure the immune system was sufficiently compromised to test its reaction to the brain injury. (Ex. D, Schwulst Dec. at ¶ 6.)

17.     Plaintiff was the only employee in the laboratory who reported directly to Dr. Schwulst.  (Ex. B, P. Dep. at 48.)  Dr. Schwulst would be away from the lab for up to two weeks each month in trauma surgery or in the trauma unit.  (Ex. B, P. Dep. at 72.)

18.     Post-doctoral research scientists and lab technicians who reported to Dr. Perlman helped train Plaintiff in performing the lab work.  (Ex. B, P. Dep. at 74-75.)  Plaintiff also attended monthly laboratory meetings Dr. Perlman held with his research team.  (Ex. B, P. Dep. at 81-82.)

19.     In working with the mice, Plaintiff understood that she had to follow specific scientific protocols.  (Ex. B, P. Dep. at 75-77.)  Such protocols involving animal subjects had to be approved by the University's Institutional Animal Care and Use Committee ("IACUC"), which oversees the humane treatment of research animals.  (Ex. B, P. Dep. at 75-77; Ex. D, Schwulst Dec. at ¶¶3-4; Schwulst Dec. Ex. A.)  In addition, Plaintiff followed protocols or "recipes" for processes being used in the lab, including for the preparation of cells for analysis with lab equipment.  (Ex. B, P. Dep. at 80-81, 290.)  Written protocols for laboratory methodologies and processes are modified as part of the scientific process.  (Ex. B, P. Dep. at 80-81.)  Plaintiff was sometimes involved in modifying the lab protocols.  (Ex. B, P. Dep. at 81.)

20.     Plaintiff admits that Dr. Schwulst provided her with many professional opportunities in order to help further her career.  (Ex. B, P. Dep. at 86.)  Plaintiff co-authored four research papers, with Dr. Schwulst as the senior author.  (Ex. B, P. Dep. at 82-84.)  She also traveled out of state with Dr. Schwulst to two national scientific conferences, and presented a poster describing their research at one of those conferences.  (Ex. B, P. Dep. at 84-87; P. Dep. Ex. 22 at Trahanas-NU002220 (photograph from conference).)

## V. PLAINTIFF CLAIMS TWO LAB MEMBERS TRIED TO SABOTAGE HER WORK ON A SINGLE OCCASION

21.     Plaintiff contends that at some unidentified point in 2013, two employees, who worked for Dr. Perlman, Rana Saber ("Saber") and Alexander ("Sasha") Misharin ("Misharin") intentionally gave her an outdated "cocktail" or "recipe" or "protocol" to use in analyzing cells for Dr. Schwulst's research. (Ex. B, P. Dep. at 73, 287-290.) Plaintiff believes this was done in an attempt to intentionally sabotage her work and interfere with Dr. Schwulst and Dr. Perlman's science. (Ex. B, P. Dep. at 287, 291.) Plaintiff admits that neither Dr. Schwulst nor Dr. Perlman had any involvement with her allegedly receiving the outdated cocktail. (Ex. B, P. Dep. at 288-289.)

22.     Plaintiff admits that the outdated cocktail had only recently been revised and that it was possible that Saber and Misharin accidentally gave her the prior version. (Ex. B, P. Dep. at 291-293.)

23.     When Plaintiff mentioned during a laboratory meeting that she had an outdated cocktail, Dr. Perlman told the lab members to make sure she received the correct version. (Ex. B, P. Dep. at 294.) Plaintiff never received any other outdated cocktails after that one occasion in 2013. (Ex. B, P. Dep. at 294-295.)

24.     Plaintiff did not complain to Human Resources about this incident, and only reported it to Dr. Schwulst in a "lighthearted" way. (Ex. B, P. Dep. at 289.)

## VI. ALLEGED COMMENTS BY DR. SCHWULST AND SABER

25.     Plaintiff dated men when she worked for Dr. Schwulst and she shared with him in 2014 that she had a boyfriend. (Ex. B, P. Dep. at 164.)

26.     Plaintiff admits that sometimes she and Dr. Schwulst got along "very nicely" and joked together. (Ex. B, P. Dep. at 186-187.)

6

27.     Plaintiff claims that Dr. Schwulst referred to her as "a typical millennial" and "Princess Diana." (Ex. B, P. Dep. at 162-163.) For instance, in one text message, Dr. Schwulst wrote to Plaintiff, "Princess Diana . . . You rock. Have a great weekend. I'll see you Monday." (Ex. B, P. Dep. at 187; P. Dep. Ex. 22 at Trahanas-NU002188.) Plaintiff did not object to these names and at times also used the term "millennial" in communications with Dr. Schwulst. (Ex. B, P. Dep. at 204-205; P. Dep. Ex. 28 at Trahanas-NU10267; Ex. D, Schwulst Dec. at ¶ 12; Schwulst Dec. Ex. C.) She admits that these phrases were not derogatory and were not based on sexual orientation. (Ex. B, P. Dep. at 163.)

28.     Plaintiff alleges that in October 2012, for the first time, Dr. Schwulst referred to her as a "lesbian" while she was discussing her workout routines with him. (Ex. B, P. Dep. at 166.) She claims that Dr. Schwulst stated that if women workout too much then they will start to look "manly" and "butch" and that they are lesbians. (Ex. B, P. Dep. at 166-169.) Plaintiff claims that Dr. Schwulst then asked, "You're a lesbian, Diane aren't you, right? You're a lesbian." (Ex. B, P. Dep. at 169.) Plaintiff alleges that Dr. Schwulst also told Plaintiff that she looked "manly." (Ex. B, P. Dep. at 167.) Plaintiff allegedly responded stating that she was not a lesbian. (Ex. B, P. Dep. at 168.) Only Plaintiff and Dr. Schwulst were present during this alleged conversation. (Ex. B, P. Dep. at 167.) Plaintiff did not tell Dr. Schwulst that his comments were inappropriate or that she did not like what he was saying. (Ex. B, P. Dep. at 170.) She did not report this alleged conversation to Human Resources, Dr. Perlman or anyone within the Department administration. (Ex. B, P. Dep. at 168.)

29.     Plaintiff claims Dr. Schwulst referred to her as a "lesbian" at other times, but could not quantify how many times this occurred. (Ex. B, P. Dep. at 170.) She claims that at some unidentified point in late 2012, Dr. Schwulst began calling her a "softball player" instead

of "lesbian" because he allegedly stated that "softball players are lesbians." (Ex. B, P. Dep. at 171-172.) According to Plaintiff, he did not use the word "lesbian" frequently after he allegedly started using the phrase "softball player." (Ex. B, P. Dep. at 170.) Plaintiff claims Dr. Schwulst would use these phrases towards Plaintiff in front of other co-workers in the lab. (Ex. B, P. Dep. at 178.) She does not recall how many times Dr. Schwulst referred to her as a "softball player," but claims that during the two weeks per month when he was in the lab, he used that phrase "regular" and "frequently." (Ex. B, P. Dep. at 174-175.)

30. Plaintiff also claims that in May or June of 2014, when Dr. Schwulst learned that he and his wife were going to have a baby girl, Dr. Schwulst said it would "make his life easier if his daughter grew up to be a lesbian like [Plaintiff]." (Ex. B, P. Dep. at 181-84.) Later, in December 2014, Dr. Schwulst allegedly told Plaintiff that he was thinking of getting his wife a charm bracelet and that if Plaintiff were to get a charm bracelet, it would "have a mitt, a ball and a bat on it because that's what softball players would do." (*Id.*)

31. Plaintiff contends that she told Dr. Schwulst, "a couple of times" in 2013 and 2014 that "I'm not a softball player, I'm not a lesbian; I don't know why we keep going back to this." (Ex. B, P. Dep. at 179.) However, Plaintiff admits that she never reported Dr. Schwulst's comments to Human Resources or anyone else in the Department administration at the medical school. (Ex. B, P. Dep. at 174-176.)

32. On a single occasion, Dr. Schwulst allegedly asked Plaintiff why she did not dress like Saber at work. (Ex. B, P. Dep. at 394-395.) Plaintiff cannot recall the year when this comment was allegedly made, but contends that Ms. Saber wore "stilettos, short shorts and low tops" in the lab. (*Id.*) Plaintiff did not complain to Human Resources or the Department administration about this alleged comment. (*Id.*)

33.     Plaintiff occasionally referred to herself as a softball player.  (Ex. B, P. Dep. at 192, 196; P. Dep. Ex. 22 at Trahanas-NU002208-09; 2213; Ex. D, Schwulst Dec. at ¶12; Schwulst Dec. Ex. C.)  Plaintiff used the term "lost sparkle" and "hot mess" in reference to herself in communications with Dr. Schwulst and does not contend that any reference to her losing her "sparkle" is related to sexual orientation.  (Ex. D, Schwulst Dec. at ¶12; Schwulst Dec. Ex. C.)

34.     She would also participate in jokes with Dr. Schwulst, as well as other lab members about sports, "millennials" or their colleagues.  (Ex. B, P. Dep. 187, 196, 199-200, 204-206, 211-212; P. Dep. Ex. 22 at Trahanas-NU002204, 2211, 2213, 2180; P. Dep. Exs. 26-28.) While Plaintiff was on leave for an injury, Dr. Schwulst texted her, "I'm lonely without you. I have nobody to make fun of [Saber] with ☺" and Plaintiff responded, "Hahahahahaha."  (Ex. B, P. Dep. at 187; P. Dep. Ex. 22 at Trahanas-NU002211.)  On another occasion, Plaintiff texted Dr. Schwulst telling him she had gone to church and he responded asking "Did you do something bad?" and she responded, "Hahaha, if I were [Saber] I would say yes" and texted that Saber needed to go to "church and confession."  (Ex. B, P. Dep. at 187; P. Dep. Ex. 22 at Trahanas-NU002180.)

35.     Plaintiff claims that Saber: blamed Plaintiff "if something went wrong in the lab," remarked that the "blind [was] leading the blind" when Plaintiff was "showing somebody how to do something," asked Plaintiff if she was "going to play softball" "ten, maybe 15 times," and called her a "lesbian" a "few times," in front of her "co-workers." but not in front of Dr. Schwulst. (Ex. B, P. Dep. at 206-210.)  Plaintiff did not report these comments to Dr. Schwulst, Dr. Perlman or Human Resources.  (Ex. B, P. Dep. at 209.)  On a single occasion, Saber told Plaintiff, "dude, take your meds."  (Ex. B, P. Dep. at 283.)  Plaintiff also called Saber an "ass,"

"a jerk" and possibly "a bitch." (Ex. B, P. Dep. at 209.)

## VII.    PLAINTIFF COMPLAINS ABOUT HER 2014 PAY INCREASE

36.    Performance reviews are usually done in the spring of each year, so that pay increases can be approved at the start of the University's fiscal year, September 1 of each year. (Ex. B, P. Dep. at 107, 110; P. Dep. Exs. 8-9.)

37.    Dr. Schwulst rated Plaintiff's performance as "Highly Effective" for 2013 and 2014, the two years that Plaintiff worked a full year at Northwestern. (Ex. B, P. Dep. at 88-90; P. Dep. Exs. 8-9.) Plaintiff believed that she was "a very good performer" and that she was performing one full grade above, at the level of a Research Technologist III. (Ex. B, P. Dep. at 87, 117-118.)

38.    Between 2013 and 2014, Plaintiff actively searched for other jobs within the University and outside of the University. (Ex. B, P. Dep. at 132.)

39.    On March 17, 2014, Plaintiff and Dr. Schwulst met to discuss her performance and pay. (Ex. B, P. Dep. at 93-95.) During that meeting, Plaintiff told Dr. Schwulst she wanted to be "retitled," and to receive an attendant pay increase, because she believed she was performing the job duties of a Research Technologist III. (Ex. B, P. Dep. at 93-95, 114.) That same day, Dr. Schwulst emailed former Department Manager of Professional Affairs, Nicole Buikema ("Buikema"), stating that he and Plaintiff had discussed increasing her pay and "possibly retitling her position to a higher level" and inquired as to how to begin that process. (Ex. B, P. Dep. at 97; P. Dep. Ex. 11.) Dr. Schwulst forwarded that e-mail and Buikema's response to Plaintiff. (Ex. B, P. Dep. at 98.) Buikema informed Dr. Schwulst that he could propose that Plaintiff receive a merit increase when he completed her 2013 performance review and that any changes would be effective at the beginning of the fiscal year on September 1, 2014.

(Ex. B, P. Dep. at 97-98; P. Dep. Ex. 11.)  He was also informed that a retitling would require a different process, which would require approval by the HR Compensation team.  (*Id*.)

40.     Plaintiff thanked Dr. Schwulst for being receptive to her requests regarding pay and a possible retitling of her position.  (Ex. B, P. Dep. at 94; P. Dep. Ex. 10.)  Plaintiff did not formally apply for the Research Technologist III position.  (Ex. B, P. Dep. at 102.)

41.     Dr. Schwulst completed Plaintiff's 2013 written performance review in April 2014.  (Ex. B, P. Dep. at 89-90; P. Dep. Ex. 9.)  Dr. Schwulst rated Plaintiff as "Highly Effective" and complimented her on her improved use of laboratory equipment and stated that she "should be considered for a performance based raise."  (Ex. B, P. Dep. at 91-92; P. Dep. Ex. 9.)  However, Dr. Schwulst did not state in Plaintiff's written review that she should be retitled to a Research Technologist III.  (Ex. B, P. Dep. at 89-90, 92; P. Dep. Ex. 9.)  Plaintiff was permitted to attach a response to her 2013 performance review, but did not do so.  (Ex. B, P. Dep. at 90.)

42.     On June 27, 2014, Plaintiff inquired of her retitling directly with the Department of Surgery Financial Manager at the time, Rachel Rufer.  (Ex. B, P. Dep. at 106-107; P. Dep. Ex. 13 at Trahanas-NU001895.)  Ms. Rufer responded that it was "something that is in the works for the new fiscal year which starts September 1."  (*Id*.)  Ultimately, however, the Department did not approve of the re-grading of Plaintiff's job.  (Ex. C, Schwulst Dep. at 117-118; Schwulst Dep. Ex. 247.)

43.     In September 2014, Plaintiff received her annual salary letter, notifying her that she remained in the Research Technologist II position and that she received a 3% merit increase.  (Ex. B, P. Dep. at 113-114; P. Dep. Ex. 16.)  Plaintiff e-mailed Krissy Dulek, the Research Administration Manager in the Department of Surgery, and Human Resources because she

believed the letter was incorrect. (Ex. B, P. Dep. at 115-117; 138-139; P. Dep. Ex. 17 at Trahanas 268.) In the multiple communications with the Department administrators and Human Resources on the topic of her title and pay, Plaintiff did not raise any concerns about comments purportedly made by Dr. Schwulst or anyone else in the laboratory that Plaintiff now contends were offensive to her. (Ex. B, P. Dep. at 168, 174, 208-209, 395.)

44.     Between September 2014 through December 2014, Dr. Schwulst continued to communicate with Plaintiff, Human Resources and with the Department administrators in an attempt to obtain for Plaintiff a pay increase to at least $21.00 per hour and to change her job title to Research Technologist III. (Ex. B, P. Dep. at 125-128; P. Dep. Ex. 13 at Trahanas-NU001893.) Dr. Schwulst advised Plaintiff to stop contacting the HR Compensation team directly regarding the issues because the proper procedure was for him to make the request. (Ex. B, P. Dep. at 148-149; P. Dep. Ex. 18 at Trahanas 45.)

45.     Dr. Schwulst emphasized to the Department administrators that "[o]ther than her compensation, [Plaintiff] is happy with the work and the work environment" and that he was worried she was going to take a new job. (Ex. B, P. Dep. at 130; P. Dep. Ex. 13 at Trahanas-NU001891.)

46.     Because the new fiscal year was well under way, Dr. Schwulst was advised that he would have to seek an "off-cycle" increase for Plaintiff. (Ex. B, P. Dep. at 136-137; P. Dep. Ex. 13 at Trahanas-NU001890-91.) This required a mid-year performance review. (Ex. B, P. Dep. at 142.) Dr. Schwulst was on paternity leave at the time, but came in during his leave to meet with Plaintiff to permit her to sign the review so that she could be considered for an increase. (Ex. B, P. Dep. at 142-143.) Plaintiff refused to show up for that meeting, which admittedly made Dr. Schwulst angry given that he returned from leave for the sole purpose of

conducting this meeting.  (Ex. B, P. Dep. at 143; Ex. C, Schwulst Dep. at 174.)

47.     Despite Dr. Schwulst's efforts, he was not successful in convincing the Department to retitle Plaintiff's job.  (Ex. C, Schwulst Dep. at 117-118.)  Former Manager of Professional Affairs in the Department Surgery, Heather Burke ("Burke"), reviewed her job tasks and concluded that while she performed some Research Technologist III tasks, the bulk of her work was consistent with the Research Technologist II position.  (Ex. C, Schwulst Dep. at 117-118; Schwulst Dep. Ex. 247.)  Burke also indicated that the Department would "work to" retitling her in September 2015.  (*Id.*)  Dr. Schwulst did, however, obtain approval to increase her pay by 15% mid-year.  (Ex. B, P. Dep. at 141; P. Dep. Ex. 24.)  On February 4, 2015, Dr. Schwulst notified Plaintiff that her pay would increase by 15% retroactive to January 2015, raising her hourly pay rate from $20.06 to $23.00.  (Ex. B, P. Dep. at 141; P. Dep. Ex. 24.)

## VIII.   PLAINTIFF'S MENTAL HEALTH DIAGNOSIS AND LEAVE OF ABSENCE

48.     Plaintiff was diagnosed with depression, anxiety, and ADHD in 2007.  (Ex. B, P. Dep. at 213.)  She began taking medications for these conditions prior to her employment at the Department.  (Ex. B, P. Dep. at 213-214.)

49.     Plaintiff claims she informed Dr. Schwulst of her conditions in October 2012 and explained to him that she used exercising as a way to mitigate the symptoms she allegedly suffered as a result.  (Ex. B, P. Dep. at 215-216.)  Plaintiff was friendly with Saber and shared information with her about her home life and personal issues.  (Ex. B, P. Dep. at 200, 276-279.)  Plaintiff took her medication for her conditions while at work.  (Ex. B, P. Dep. at 282.)

50.     Plaintiff was being treated by a psychiatrist named Dr. Deborah Cano ("Dr. Cano") whom she saw on a monthly basis until December 2016.  (Ex. B, P. Dep. at 218, 220-221.) Dr. Cano took contemporaneous notes of their sessions.  (Ex. B, P. Dep. at 219; Ex. E,

Excerpts from Deposition of Dr. Deborah Cano ("Cano Dep.") at 12-13.)  Plaintiff admits that she has no reason to dispute the accuracy of Dr. Cano's notes.  (Ex. B, P. Dep. at 266.)

## IX.   PLAINTIFF TAKES A LEAVE OF ABSENCE IN FEBRUARY 2015, FILES FOR UNEMPLOYMENT BENEFITS, AND NEVER RETURNS TO WORK

51.     Plaintiff had taken a medical leave of absence in 2014.  (Ex. B, P. Dep. at 222-223; 356; P. Dep. Ex. 61.)  Plaintiff returned to work from that leave without incident.  (Ex. B, P. Dep. at 222-223.)

52.     On Wednesday, February 11, 2015, Plaintiff met with Dr. Cano.  (Ex. B, P. Dep. at 223-225; P. Dep. Ex. 29 at Trahanas-NU010397-400.)  During that session, Plaintiff told Dr. Cano that her "depressive and anxiety symptoms have mildly improved" and that "I feel good." (Ex. B, P. Dep. at 222, 226.)  Nevertheless, Plaintiff informed Dr. Cano during that visit that she was planning to take time off work the following week because she was "burnt out."  (Ex. B, P. Dep. at 223-225; P. Dep. Ex. 29 at Trahanas-NU010397-400; Ex. E, Cano Dep. at 61.)  Plaintiff claims that she and Dr. Cano had previously discussed a leave of absence from work, but Dr. Cano's notes have no reference of such prior discussion.  (Ex. B, P. Dep. at 224-225.)  Plaintiff did not ask Dr. Cano that day for a doctor's note to support her stated intention to take leave. (Ex. B, P. Dep. at 231; Ex. E, Cano Dep. at 62.)

53.     Plaintiff also informed Dr. Cano that she was trying out for a professional soccer team the next day, February 12, 2015.  (Ex. B, P. Dep. at 226-227; P. Dep. Ex. 29 at Trahanas-NU010397.)  Plaintiff tried out for the professional soccer team and admittedly felt physically and mentally well enough to do that.  (Ex. B, P. Dep. at 227-228.)

54.     Plaintiff did not inform Dr. Schwulst or Human Resources at that time that she would be taking a leave of absence from work.  (Ex. B, P. Dep. at 231-233.)

55.     On February 16, 2015, Plaintiff did not report to work.  (Ex. B, P. Dep. at 233.)

14

She sent Dr. Schwulst a text message stating only that she was staying home sick for the day. (Ex. B, P. Dep. at 245; P. Dep. Ex. 22 at Trahanas-NU002247.)

56. On February 17, 2015, Plaintiff did not report to work. (Ex. B, P. Dep. at 242.) Later that day, Plaintiff told Dr. Schwulst that she was on a medical leave and would only communicate with Human Resources while she was on leave and that she wanted to limit all communication with him. (Ex. B, P. Dep. at 243.)

57. The University approved Plaintiff for a full twelve weeks of FMLA leave, through May 10, 2015 and granted her additional paid short-term disability through May 24, 2015. (Ex. B, P. Dep. at 250, 257-259; P. Dep. Exs. 36 and 39.) Plaintiff never filed a workers' compensation claim. (Ex. B, P. Dep. at 251.) During her leave, Plaintiff alleges that her remote access to University systems was suspended. (Ex. B, P. Dep. at 348.)

58. According to Dr. Cano's notes regarding her session with Plaintiff on April 28, 2015, Plaintiff told Dr. Cano that she "plans to leave current job," meaning her employment with the University. (Ex. E, Cano Dep. at 70-71; Cano Dep. Ex. 3 at Trahanas-NU10631-632.)

59. According to Dr. Cano's notes of her session with Plaintiff on May 26, 2015, Plaintiff told Dr. Cano that she had already left her job and planned to file for unemployment benefits. (Ex. B, P. Dep. at 263-264; P. Dep. Ex. 29 at Trahanas-NU10467; Ex. E, Cano Dep. at 71.) Plaintiff had filed for unemployment benefits two days prior on May 24, 2015. (Ex. F, Declaration of Kimberly Higgins ("Higgins Dec.") at ¶6; Higgins Dec. Ex. A.) At this time, Plaintiff had not informed Dr. Schwulst or Human Resources that she would not be returning to work. (Ex. B, P. Dep. at 270; P. Dep. Ex. 42 at Trahanas-NU001835.)

60. On June 8, 2015, after Plaintiff's leave expired, she instructed the University's third party leave administrator to close her short-term disability claim. (Ex. B, P. Dep. at 259-

15

260; P. Dep. Ex. 38.)  On June 9, 2015, Plaintiff received a letter from Victoria Sherb ("Sherb")

in Human Resources that stated she was required to inform Sherb whether she intended to resign

or submit documentation from her physician in order for the University to determine if her leave

could be extended.  (Ex. B, P. Dep. at 259; P. Dep. Ex. 38.)  The letter stated that failure to

provide this information by June 17, 2015 would result in the termination of Plaintiff's

employment.  (Ex. B, P. Dep. at 259; P. Dep. Ex. 38.)

61.     Later that evening, Sherb followed up with Plaintiff via email and stated that she

had tried calling her several times to inquire about the status of her medical leave.  (Ex. B, P.

Dep. at 270; P. Dep. Ex. 42 at Trahanas-NU001835.)  On June 15, 2015, Plaintiff responded to

Sherb and stated that she was not returning to work at the University.  (Ex. B, P. Dep. at 270; P.

Dep. Ex. 42 at Trahanas-NU001835.)

62.     Plaintiff informed Dr. Cano on June 16, 2015 that her application for

unemployment benefits had been denied.  (Ex. B, P. Dep. at 265-266; P. Dep. Ex. 29 at

Trahanas-NU10462; Ex. E, Cano Dep. at 73-74.)  That same day, Plaintiff asked Dr. Cano for a

return to work letter.  (Ex. B, P. Dep. at 267; P. Dep. Ex. 29 at 10464; Ex. E, Cano Dep. at 75-

77.)  Dr. Cano gave Plaintiff a return to work letter which stated, in relevant part, that "[Plaintiff]

was able to return to work on May 25, 2015.  I do not recommend she return to her previous job,

as the high stress from the work environment there would cause exacerbation of symptoms and

likely lead to psychiatric decompensation."  (Ex. B, P. Dep. at 267-268; P. Dep. Ex. 29 at

Trahanas-NU010465.)  According to Plaintiff, she was able to return to work as long as Dr.

Schwulst was not her supervisor.  (Ex. B, P. Dep. at 261, 271-272.)  Plaintiff used the letter to

contest the denial of her unemployment benefits, but does not recall giving the letter to anyone in

Human Resources prior to that time.  (Ex. B, P. Dep. at 268; Ex. F, Higgins Dec. at ¶8.)

63.     On June 18, 2015, Plaintiff received a letter from Human Resources that stated Plaintiff's employment was terminated retroactive to May 25, 2015 because she failed to return to work and never re-opened her leave claim with the third party leave administrator.  (Ex. B, P. Dep. at 268-269; P. Dep. Ex. 41.)

64.     Plaintiff applied for other jobs within the University after her employment ended.  (Ex. B, P. Dep. at 368.)  She received an interview with another lab, but does not recall who she interviewed with or which lab it was.  (Ex. B, P. Dep. at 368.)  Plaintiff does not have any knowledge as to whether Dr. Schwulst was involved with her application to this particular lab or her getting the interview.  (Ex. B, P. Dep. at 368-369.)

## X.     PLAINTIFF'S FAILED ATTEMPTS TO GAIN ADMISSION INTO MEDICAL SCHOOL

65.     Plaintiff has applied to medical school at least three times.  (Ex. B, P. Dep. at 36-37.)  She applied to medical school for 2009, 2015, and 2018 matriculation and has never been accepted by any medical school in any one of these cycles.  (Ex. B, P. Dep. at 36-37, 627-628.)  Plaintiff submitted her medical school applications through the American Medical College Application Service ("AMCAS"), which is a third party service that collects and distributes her application to the medical schools she applied to for each particular cycle.  (Ex. B, P. Dep. at 295; P. Dep. Ex. 44.)

66.     Applicants can submit their applications in the summer and fall of the preceding year in which they seek to matriculate.  (Ex. G, Excerpts from Deposition of Dr. Jorge Girotti ("Girotti Dep.") at 93.)  Medical schools begin selecting their entering class as early as October of the year in which the applicant applied through the spring of the matriculation year.  (Ex. G, Girotti Dep. at 93-94.)

67.     Plaintiff has taken the Medical College Admission Test ("MCAT"), which is the

entrance exam for medical school, seven times. (Ex. B, P. Dep. at 595; P. Dep. Ex. 99 at Trahanas Add Ex 433-434.) Plaintiff's composite score for each exam ranged between the 19th to 37th percentile ranking. (Ex. B, P. Dep. at 307; P. Dep. Exs. 46-47, 99.) Plaintiff admits that her MCAT scores were not strong. (Ex. B, P. Dep. at 309.)

68.     In June 2014, Plaintiff emailed Dr. Schwulst and requested to use her vacation time in August in order to study for the MCAT that would be held in September. (Ex. B, P. Dep. at 299-300; P. Dep. Ex. 45.) Dr. Schwulst granted Plaintiff's request and although she took a few weeks off work, she did not take the MCAT until September 2015, over a year later. (Ex. B, P. Dep. at 300, 303.) When Dr. Schwulst asked Plaintiff how she did on the September 2014 exam, Plaintiff stated that it "went okay." (Ex. B, P. Dep. at 300.) Plaintiff admits that she led Dr. Schwulst to believe that she had taken the exam although she had not. (Ex. B, P. Dep. at 302.)

69.     Plaintiff asked Dr. Schwulst to write a letter of recommendation in support of her medical school application for 2015 matriculation. (Ex. B, P. Dep. at 322, 324.) As a physician, Dr. Schwulst is expected to adhere to certain ethical codes and professional standards. (Ex. B, P. Dep. at 325.) These standards require Dr. Schwulst to use candor when evaluating an individual who is interested in joining the medical profession. (Ex. B, P. Dep. at 325.) Dr. Schwulst wrote Plaintiff a positive letter of recommendation which was dated October 14, 2014. (Ex. B, P. Dep. at 321-322; P. Dep. Ex. 50.)

70.     Plaintiff also received a positive letter of recommendation from Dr. Perlman. (Ex. B, P. Dep. at 322; P. Dep. Ex. 52.) Another Northwestern professor, Dr. Debra Goldstein, M.D., also wrote Plaintiff a letter of recommendation and pointed out that her MCAT composite score was a "negative" in her medical school application. (Ex. B, P. Dep. at 329; P. Dep. Ex. 53

at Trahanas 159.)  When completing her AMCAS application, Plaintiff waived her right to see the contents of the letters of recommendation.  (Ex. B, P. Dep. at 326.)

71.    At the time of her application for 2015 matriculation, Plaintiff's most recent MCAT score listed on her application was dated September 2011.  (Ex. B, P. Dep. at 302; P. Dep. Ex. 44 at p. 7.)  She received a 21 composite score for the September 2011 exam, which ranked her in the 24th to 27th percentile.  (Ex. B, P. Dep. at 306-307; P. Dep. Ex. 46.)  Plaintiff also had to disclose her letter grades for courses she had taken in undergraduate and graduate school on her AMCAS application.  (Ex. B, P. Dep. at 317.)  Her reported letter grades for some science courses were C's and F's.  (Ex. B, P. Dep. at 317-318; P. Dep. Ex. 44 at Trahanas 144-148.)  According to AMCAS data, the acceptance rate for a Caucasian applicant with Plaintiff's MCAT score and undergraduate Grade Point Average ("GPA") range (3.0-3.19) during the 2014 application cycle was 4%.  (Ex. B, P. Dep. at 309-310; P. Dep. Ex. 48.)

72.    Plaintiff was not accepted into any of the medical schools she applied to for 2015 matriculation.  (Ex. B, P. Dep. at 316.)

## XI.    PLAINTIFF BREACHES RESEARCH ETHICS BEFORE GOING ON MEDICAL LEAVE IN FEBRUARY 2015 AND DR. SCHWULST WITHDRAWS HIS LETTER OF RECOMMENDATION AS A RESULT

73.    Under the IACUC-approved protocol being used in Dr. Schwulst's lab in February 2015, Plaintiff was expected to inject the mice with a substance, clodronate or "clod," at a specific interval in advance of applying an injury to the mice.  (Ex. B, P. Dep. at 251; Ex. C, Schwulst Dep. at 105-106, 274.)  The purpose of the clodronate injection was to deplete white blood cells in order to study how the compromised immune system would react to the brain injury.  (Ex. C, Schwulst Dep. at 105-107.)  Plaintiff was required to test the depletion of the white blood cells in the day or days following the clod injection to make sure the immune system

was sufficiently compromised to test its reaction to the brain injury. (Ex. C, Schwulst Dep. at 105-107; Schwulst Dec. at ¶6.)

74.     Plaintiff maintained a laboratory notebook where she documented the details of the experiments. (Ex. C, Schwulst Dep. at 223; Ex. D, Schwulst Dec. at ¶9; Schwulst Dec. Ex. B.) It was important to document the date and dosage of the clodronate injections, so that a plan for care of the mice could be implemented before applying the injury and euthanizing the mice for purposes of studying the brain. (Ex. C, Schwulst Dep. at 221-223, 226-227.) Thus, Plaintiff should have recorded the clod injection date and dosage in the laboratory notebook and on the card that was hung on the cages housing the mice. (Ex. C, Schwulst Dep. at 221-223, 226-227.)

75.     On February 6, 2015, Plaintiff told Dr. Schwulst that she could not start the next "clod experiment" because the lab did not have sufficient amounts of clodronate. (Ex. C, Schwulst Dep. at 265-266; Schwulst Dep. Ex. 291.)

76.     On February 9, 2015, Plaintiff told Dr. Schwulst that she planned to "do another 48 hour clod experiment next week." (Ex. C, Schwulst Dep. at 280-281; Schwulst Dep. Ex. 76(A).) In order to do the experiment the following week on Monday, February 16, 2015, the clodronate would have needed to be injected some time prior to that date. (Ex. C, Schwulst Dep. at 279-281; Schwulst Dep. Ex. 76(A).)

77.     After Plaintiff went on leave on February 16, 2015, Dr. Schwulst informed Burke that he needed certain information from Plaintiff (*e.g.*, location of mice, computer password, location of controlled substances) in order to continue running the laboratory while she was on leave. (Ex. H, Excerpts from Deposition of Heather Burke ("Burke Dep.") at 137-139; Burke Dep. Ex. 83.) Burke reached out to Plaintiff via her work email on February 18, 2015 and her personal email on February 19, 2015 in order to obtain this information. (Ex. B, P. Dep. at 343;

Ex. H, Burke Dep. at 137-139; Burke Dep. Exs. 83, 298.)

78.     Plaintiff responded on February 20, 2015.  (Ex. B, P. Dep. at 346; Ex. H, Burke Dep. at 139; Burke Dep. Ex. 83.)

79.     Dr. Schwulst visited the animal cages on February 19, 2015.  (Ex. C, Schwulst Dep. at 239-240.)  At that time, he saw notations on the cage cards that caused him to believe that the mice had been injected with clodronate and thus had been started on the protocol.  (Ex. C, Schwulst Dep. at 239-240.)  However, the date and time when the injections were given was not documented in either the laboratory notebook or on the cage cards.  (Ex. C, Schwulst Dep. at 221-223, 226-227, 239-240.)

80.     Moreover, Plaintiff told Dr. Schwulst that she only wanted to communicate with Human Resources while she was on leave, so he was unable to inquire of her directly.  (Ex. B, P. Dep. at 243.)  Consequently, in considering the information available to him, Dr. Schwulst believed that the mice had been placed on protocol (e.g., had received the clodronate injection).  (Ex. C, Schwulst Dep. at 226-227.)  However, he was unable to discern where in the protocol the mice stood because he did not know the date of the injection.  (Ex. C, Schwulst Dep. at 226-227.)

81.     Dr. Schwulst then consulted with his research science mentor, Dr. Perlman, about the issue, and Dr. Perlman recommended that Dr. Schwulst euthanize the mice.  (Ex. C, Schwulst Dep. at 278-279.)  Dr. Schwulst euthanized the mice that same day on February 19, 2015 at which time, per protocol, he removed the cage cards and placed them in locked drop boxes for processing and destruction by the University's Center for Comparative Medicine (CCM).  (Ex. C, Schwulst Dep. at 274-276.)

82.     Based on what Dr. Schwulst believed to be Plaintiff's failure to document the clod injection, Dr. Schwulst concluded that he could no longer support Plaintiff's candidacy to medical school for 2015 matriculation.  (Ex. C, Schwulst Dep. at 242.)  In his view, "what [he] had a huge ethical problem with was the fact that these research animals were not going to be used for their intended purpose. So they ended up having to be unnecessarily euthanized because [he] couldn't figure out where they were on experimental protocol."  (*Id.*)

83.     That same day, Dr. Schwulst uploaded a second letter to AMCAS.  (Ex. B, P. Dep. at 330, 337-338; P. Dep. Ex. 56.)  This February 19, 2015 letter, which was misdated February 9, 2015, provided that he was "formally withdraw[ing] [his] prior letter of reference for [Plaintiff]" and that he could "no longer support her candidacy for admission to medical school." (Ex. B, P. Dep. at 330, 337-338; P. Dep. Ex. 56.)  On February 20, 2015 Plaintiff emailed Dr. Schwulst, Burke and former Human Resources Business Partner, Daina Fernandez, because she received a notification email from AMCAS regarding Dr. Schwulst's upload and was inquiring about its contents.  (Ex. B, P. Dep. at 330; P. Dep. Ex. 54.)

84.     Shortly after, Chris Scarpelli ("Scarpelli"), the Administrator for the Department of Surgery, contacted Dr. Schwulst about his February 19, 2015 letter.  (Ex. C, Schwulst Dep. at 247.)  Scarpelli informed Dr. Schwulst that withdrawing his original letter could be misconstrued, despite Dr. Schwulst's reasoning behind the withdrawal, and instructed him to "cease and desist."  (Ex. C, Schwulst Dep. at 234, 247.)  Dr. Schwulst agreed and they agreed that Dr. Schwulst would retract the letter he uploaded to AMCAS on February 19, 2015.  (Ex. C, Schwulst Dep. at 247-249.)

85.     On February 26, 2015, Dr. Schwulst uploaded a letter to AMCAS which stated, in relevant part, to "disregard the letter dated February 9th, 2015 as it was entered in error" and that

he "[stood] by the evaluation offered in the original letter of reference dated October 14th 2015 [sic]." (Ex. B, P. Dep. at 335, 341; P. Dep. Ex. 57.)

86.     That same day, Plaintiff e-mailed her former attorney, Pamela Visvardis ("Visvardis"), asking her to let Plaintiff know when they "can start talking about lawsuit stuff." (Ex. B, P. Dep. at 336; P. Dep. Ex. 55 at Trahanas 212.) On February 27, 2015, Visvardis sent Dr. Schwulst a letter demanding that he revoke and produce copies of the letters he uploaded to AMCAS on February 19 and February 26, 2015. (Ex. B, P. Dep. at 429; P. Dep. Ex. 77.) The letter also stated that Plaintiff authorized Visvardis to "file suit" against Dr. Schwulst for "defamation, slander, [and] tortious interference with contract" if he did not revoke and produce the letters. (Ex. B, P. Dep. at 434; P. Dep. Ex. 77.)

## XII.    PLAINTIFF FAILED TO GAIN ADMISSION TO ANY MEDICAL SCHOOL PRIOR TO DR. SCHWULST'S FEBRUARY 2015 LETTER

87.     Applications to medical school have a variety of components: application, grades, personal statement, and letters of recommendation. (Ex. G, Girotti Dep. at 48-49, 88-89, 221-222, 234, 253.) If an applicant meets certain preliminary admission criteria (e.g., grades, GPA, and minimum MCAT scores) the medical school may invite the applicant to submit a secondary or supplemental application. (Ex. G, Girotti Dep. at 230-231.) Some schools reject applicants without requesting supplemental/secondary applications, which is known as a "preliminary rejection." (Ex. G, Girotti Dep. at 230-231, 234, 259.) Thereafter, applicants may be selected for interviews. (Ex. G, Girotti Dep. at 230-231.)

88.     Plaintiff applied to 15 medical schools for 2015 matriculation, none of which accepted her. (Ex. B, P. Dep. at 316, 485.) Based on subpoenaed documents received from

these schools:[1]

89.     Nine of the medical schools to which Plaintiff applied rejected her application or declined to invite her to continue in the application cycle prior to February 19, 2015:

- University of Central Florida College of Medicine emailed Plaintiff on **November 18, 2014** informing her it would no longer consider her application because she did not meet two of their four prerequisites, namely a minimum MCAT score of 24 points and a minimum 3.0 Biology, Chemistry, Physics, and Math (BPCM) GPA. (Ex. B, P. Dep. at 508, 509, 517; P. Dep. Ex. 83 at Trahanas-NU11741; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. E.)[2]

- Central Michigan University College of Medicine emailed Plaintiff on **December 1, 2014** informing her it was declining to move her application forward. (Ex. B, P. Dep. at 549-550; P. Dep. Ex. 87 at Trahanas-NU11800; Ex. G, Girotti Dep. at 11; Girotti Dep. 362 at Ex. I.)

- Virginia Tech Carillion School of Medicine emailed Plaintiff on **December 4, 2014** informing her it would not invite her to submit secondary application materials. (Ex. B, P. Dep. at 574-576; P. Dep. Ex. 93 at VTCSOM0002; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. M.)

- Quinnipiac University's Frank H. Netter School of Medicine emailed Plaintiff on **December 8, 2014** declining to invite her to complete secondary application materials. (Ex. B, P. Dep. at 586; P. Dep. Ex. 96 at Trahanas-NU11824; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. J.)

- Western Michigan University Homer Stryker M.D. School of Medicine emailed Plaintiff on **December 9, 2014** informing her it would not invite her to submit secondary

---

[1] Plaintiff did not retain communications she received from the medical schools she applied to in 2015, with one exception. (Ex. B, P. Dep. at 636-640; P. Dep. Ex. 106.) She could not recall when she destroyed these communications. (Ex. B, P. Dep. at 316-317, 486.) Defendants subpoenaed 15 medical schools and received materials directly from the schools. (ECF No. 75 at p. 8.) On Defendants' Motion for Sanctions, the Court granted Defendants' motion in part stating that communications from the 15 medical schools are "undoubtedly relevant to [Plaintiff's] lawsuit." (ECF No. 86 at p. 3.) The Court allowed Defendants to "re-depose Plaintiff with respect to her medical school applications as well as her failure to produce the emails in question." (ECF No. 86 at pp. 3-4.) During that second deposition, Plaintiff testified that she could not recall when she deleted these communications or why she deleted them. (Ex. B, P. Dep. at 486.)

[2] The exhibits cited to from Plaintiff's deposition and the exhibits from Dr. Jorge Girotti's Amended Expert Report (Dep. Ex. 362) in Paras. 85-86 are duplicative. For purposes of the Court having a complete version of Girotti's report, Defendants attached both sets of exhibits.

materials. (Ex. B, P. Dep. at 588-589; P. Dep. Ex. 97 at Trahanas-NU11769; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. B.)

- Oakland University William Beaumont School of Medicine emailed Plaintiff on **January 5, 2015** informing her she did not meet its prerequisite minimum MCAT score of 24. (Ex. B, P. Dep. at 531, 533-534; P. Dep. Ex. 85 at Trahanas-NU11665; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. C.)

- Florida State University College of Medicine emailed Plaintiff on **January 6, 2015** informing her it was not considering her because she failed to meet all of their admission criteria. (Ex. B, P. Dep. at 568, 570-571; P. Dep. Ex. 92 at Trahanas-NU11658; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. G.)

- Wayne State University School of Medicine rejected Plaintiff on **January 9, 2015**. (Ex. B, P. Dep. at 576-577; P. Dep. Ex. 94 at Trahanas-NU11987-11988; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. O.)

- Sidney Kimmel Medical College at Thomas Jefferson University rejected Plaintiff on **January 20, 2015**. (Ex. B, P. Dep. at 590-592; P. Dep. Ex. 98 at Trahanas-NU11683; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. D.)

90.    The deadline for secondary application materials for medical schools is between December until January for that particular application cycle. (Ex. G, Girotti Dep. at 230, 258.) Plaintiff failed to complete her secondary application materials for the six remaining schools by deadlines which pre-dated February 19, 2015:

- Florida International University Herbert Wertheim College of Medicine deemed Plaintiff as to have voluntarily withdrawn her application on **December 16, 2014** because she failed to complete her application. (Ex. B, P. Dep. at 558, 561-562; P. Dep. Ex. 89 at Trahanas-NU12041; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. N.)

- Geisinger Commonwealth School of Medicine emailed Plaintiff on January 15, 2015 informing her it was "not accepting" her application because her materials were incomplete. (Ex. B, P. Dep. at 537-538, 542; P. Dep. Ex. 86 at Trahanas-NU11723; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. F.)

- University of Miami Miller School of Medicine rejected Plaintiff because she failed to submit secondary application materials by **January 15, 2015**. (Ex. B, P. Dep. at 524, 531; P. Dep. Ex. 84 at Trahanas-NU11777; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. H.)

- Washington University School of Medicine in St. Louis sent Plaintiff several communications inviting her to complete a secondary application. The last communication was sent to her on **January 18, 2015**. Plaintiff was not invited to interview and the University coded her status as "PW" in its database. (Ex. B, P. Dep. at 581; P. Dep. Ex. 95 at WU0008; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. L.) "PW" means "passive withdrawal" which is the terminology used to indicate an applicant has voluntarily chose not to complete the necessary paperwork to be considered for admission into the medical school. (Ex. G, Girotti Dep. at 233.)

- University of South Carolina School of Medicine Greenville coded Plaintiff in their database as "passive[ly] withdraw[ing]" on **February 12, 2015** because she failed to complete her secondary application by January 15, 2015. (Ex. B, P. Dep. at 554-555, 557; P. Dep. Ex. 88 at Trahanas-NU11822-1; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. K.)

- Florida Atlantic University Charles E. Schmidt College of Medicine invited Plaintiff to submit secondary application materials on December 15, 2014. In the "Candidate Status Report," there are no entries between **December 18, 2014**, when the University logs the receipt of a letter of recommendation and the log entry "Withdrew Before Accepted" on **April 1, 2015**. (Ex. B, P. Dep. at 563-564; P. Dep. Ex. 90 at Trahanas-NU12060; Dep. Ex. 91; Ex. G, Girotti Dep. at 11; Girotti Dep. Ex. 362 at Ex. P.)

91.    Plaintiff also applied to 11 medical schools for 2018 matriculation. (Ex. B, P. Dep. at 627-628.) Plaintiff only reapplied to 4 (Wayne State University, Florida State University, Central Michigan University, and Oakland University) of the medical schools that she had applied to for 2015 matriculation. (Ex. B, P. Dep. at 600-601.) AMCAS does not retain letters of recommendation from previous application cycles and medical schools only consider letters for the particular application cycle in which they were written. (Ex. B, P. Dep. at 311; Ex. G, Girotti Dep. at 120-121.) Plaintiff was not accepted into any medical school that she applied to for 2018 matriculation. (Ex. B, P. Dep. at 627-628.)

## XIII.   PLAINTIFF'S EEOC CHARGE

92.    Plaintiff filed her charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") on September 24, 2015 alleging sex and

26

disability discrimination and retaliation.  (Ex. B, P. Dep. at 358; P. Dep. Ex. 63.)  She checked

the box "No" next to the question "Do you have a disability?" on the intake questionnaire form.

(Ex. B, P. Dep. at 350; P. Dep. Ex. 59 at Trahanas-NU001625.)


Dated: <u>July 19, 2019</u>

                                      Respectfully submitted,

                                      COZEN O'CONNOR

                                      By <u>*s/   Anneliese Wermuth*</u>
                                      *Attorney for Northwestern University and*
                                      *Steven J. Schwulst, M.D.*


Anneliese Wermuth (#06270970)
Danielle Harris (#6324017)
Cozen O'Connor
123 North Wacker Drive, Suite 1800
Chicago, IL  60606
(312) 474-7900
(312) 474-7898 (Fax)
awermuth@cozen.com
danielle.harris@cozen.com

LEGAL\42020613\1

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on July 19, 2019 she electronically filed **DEFENDANTS' LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the ECF system, which will send notification of such filing to the following counsel of record:

John P. DeRose
JOHN P. DEROSE & ASSOCIATES
615 North York Road
Hinsdale, IL 60521
john@johnderoselaw.com
*Attorney for Plaintiff*


*/s/ Anneliese Wermuth*