# EXHIBIT B

Page 1

1

2               IN THE UNITED STATES DISTRICT COURT

3             FOR THE NORTHERN DISTRICT OF ILLINOIS

4                      EASTERN DIVISION

5

6    DIANE M. TRAHANAS,              )

7              Plaintiff,            )

8               vs.                  ) No. 1:15-cv-11192

9    NORTHWESTERN UNIVERSITY;        )

10   and STEVEN J. SCHWULST, M.D.,   )

11             Defendants.           )

12

13              Deposition of DIANE M. TRAHANAS, taken

14   before GREG S. WEILAND, CSR, RMR, CRR, pursuant to

15   the Federal Rules of Civil Procedure for the United

16   States District Court pertaining to the taking of

17   depositions, at Suite 400, 123 North Wacker Drive,

18   in the City of Chicago, Cook County, Illinois,

19   commencing at 10:13 o'clock a.m., on the 5th day of

20   January, 2018.

21

22

23

24   Reported By: Greg Weiland

25   Job No: 135524

Page 2

1

2    PRESENT:

3

4    ON BEHALF OF THE PLAINTIFF:

5         JOHN P. DeROSE & ASSOCIATES

6         BY: MR. JOHN DeROSE, ESQ.

7              15 Spinning Wheel Road

8              Hinsdale, IL 60521

9

10

11

12

13   ON BEHALF OF THE DEFENDANTS:

14        COZEN O'CONNOR

15        BY: MS. ANNA WERMUTH, ESQ.

16             MS. DANIELLE HARRIS, ESQ.

17             123 North Wacker Drive

18             Chicago, IL 60606

19

20

21

22

23

24

25

Page 3

1

2    ALSO PRESENT:

3         MS. THALIA L. MYRIANTHOPOULOS,

4              Office of General Counsel,

5              Northwestern University;

6         STEVEN J. SCHWULST, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1
 2                         INDEX
 3   January 5th, 2018
 4   TESTIMONY OF DIANE M. TRAHANAS
 5                                          PAGE
 6   Examination by Ms. Wermuth ......................14
 7   Examination by Mr. DeRose ......................396
 8
 9               DEPOSITION EXHIBITS
10   NUMBER            DESCRIPTION            PAGE
11   Exhibit 1    Letter dated May 31 ,2012,      51
12                Bates labeled Trahanas-NU000064
13   Exhibit 2    Personal Data Form, Bates       55
14                labeled Trahanas-NU000066
15   Exhibit 3    Northwestern University On Line  56
16                Application Form, Bates labeled
17                Trahanas-NU000081 through
18                000083
19   Exhibit 4    Document Bates labeled           60
20                Trahanas-NU000084
21   Exhibit 5    Northwestern University Staff    61
22                Handbook, Bates labeled
23                Trahanas-NU001324 through
24                001404
25
```

```
 1
 2              DEPOSITION EXHIBITS (CONTINUED)
 3    NUMBER            DESCRIPTION              PAGE
 4    Exhibit 6      Letter dated October 18, 2012,    69
 5                   Bates labeled Trahanas-NU000039
 6    Exhibit 7      Letter dated November 20, 2013,   71
 7                   Bates labeled Trahanas-NU000044
 8    Exhibit 8      Performance Excellence Annul      87
 9                   Plan, Bates labeled
10                   Trahanas-NU000040 through
11                   000043
12    Exhibit 9      Performance Excellence Annual     89
13                   Plan, Bates labeled
14                   Trahanas-NU000046 through
15                   000049
16    Exhibit 10     E-mail sent on March 17, 2014,    93
17                   Bates labeled Trahanas-NU009952
18    Exhibit 11     E-mails, Bates labeled Trahanas   96
19                   21 through 22
20    Exhibit 12     Messages sent on Monday,          98
21                   March 17, 2014, Bates labeled
22                   Trahanas 77
23    Group Exhibit 13 E-mails, Bates labeled          103
24                   Trahanas-NU001886 through
25                   001897
```

```
 1
 2              DEPOSITION EXHIBITS (CONTINUED)
 3   NUMBER              DESCRIPTION              PAGE
 4   Exhibit 14     E-mail, Bates labeled          108
 5                  Trahanas-NU009056
 6   Exhibit 15     Letter dated August 19, 2014,  109
 7                  Bates labeled Trahanas-NU009057
 8   Exhibit 16     Letter dated September 2014,    113
 9                  Bates labeled Trahanas 1
10   Group Exhibit 17 E-mails, Bates labeled       115
11                  Trahanas 261 through 270
12   Exhibit 18     E-mails, Bates labeled         145
13                  Trahanas 45 through 46
14   Exhibit 19     Voicemail, Steve Schwulst,     150
15                  mobile, January 14, 2015, at
16                  12:11 p.m.
17   Exhibit 20     Voicemail, Steve Schwulst,     153
18                  mobile, January 14, 2015, at
19                  1:43 p.m.
20   Exhibit 21     E-mails, Bates labeled         154
21                  Trahanas-NU010039 through
22                  010042
23   Exhibit 22     Text messages, Bates labeled   154
24                  Trahanas-NU002177 through
25                  002247
```

Page 7

```
 1
 2              DEPOSITION EXHIBITS (CONTINUED)
 3   NUMBER              DESCRIPTION              PAGE
 4   Exhibit 23    E-mails, Bates labeled          159
 5                 Trahanas-NU009994 through
 6                 009995
 7   Exhibit 24    E-mails, Bates labeled Trahanas 160
 8                 43 through 44
 9   Exhibit 25    Second Amended Complaint        161
10   Exhibit 26    E-mail, Bates labeled           199
11                 Trahanas-NU010187
12   Exhibit 27    E-mail, Bates labeled           202
13                 Trahanas-NU010259
14   Exhibit 28    E-mail, Bates labeled           204
15                 Trahanas-NU010267
16   Exhibit 29    Amended Subpoena to Produce     220
17                 Documents, Information, or
18                 Objects or to Permit Inspection
19                 of Premises in a Civil Action,
20                 medical records, Bates labeled
21                 Trahanas-NU010280 through
22                 010486
23   Exhibit 30    E-mails, Bates labeled Trahanas 241
24                 192 through 198
25
```

Page 8

```
 1
 2            DEPOSITION EXHIBITS (CONTINUED)
 3    NUMBER           DESCRIPTION              PAGE
 4    Exhibit 31    Voicemail, February 17, 2015,    246
 5                  1:19 p.m.
 6    Exhibit 32    Document Bates labeled Trahanas   248
 7                  118
 8    Exhibit 33    Letter dated 02/20/2015, Bates    255
 9                  labeled Trahanas-NU007743
10                  through 007745
11    Exhibit 34    Letter dated March 4, 2015,       256
12                  Bates labeled Trahanas-NU010615
13                  through 010616
14    Exhibit 35    Letter dated 04/21/2015, Bates    256
15                  labeled Trahanas-NU007907
16                  through 007909
17    Exhibit 36    Letter dated 05/13/2015, Bates    257
18                  labeled Trahanas-NU005506
19    Exhibit 37    Letter dated 05/13/2015, Bates    257
20                  labeled Trahanas-NU005916
21                  through 005918
22    Exhibit 38    Letter dated June 9, 2015,        259
23                  Bates labeled Trahanas 3
24    Exhibit 39    Letter dated June 12, 2015,       260
25                  Bates labeled Trahanas-NU010610
```

Page 9

1

2             DEPOSITION EXHIBITS (CONTINUED)

3   NUMBER              DESCRIPTION              PAGE

4   Exhibit 40     Letter dated June 18, 2015,     268

5                  Bates labeled Trahanas-NU000062

6   Exhibit 41     E-mail, Bates labeled           269

7                  Trahanas-NU001837 through

8                  001838

9   Exhibit 42     E-mail, Bates labeled           270

10                 Trahanas-NU001835 through

11                 001836

12  Exhibit 43     Text messages, Tuesday,         271

13                 February 17, 1:46 p.m., Bates

14                 labeled Trahanas 108 through

15                 117, and 107

16  Exhibit 44     AMCAS Report - 2015 Entering    295

17                 Class, Bates labeled Trahanas

18                 143 through 154

19  Exhibit 45     E-mail, Bates labeled           299

20                 Trahanas-NU009894

21  Exhibit 46     MCAT Conversion                 305

22  Exhibit 47     Document labeled Table 1, MCAT  307

23

24

25

```
 1
 2            DEPOSITION EXHIBITS (CONTINUED)
 3   NUMBER              DESCRIPTION              PAGE
 4   Exhibit 48     Table A-24.4: MCAT and GPA Grid    309
 5                  for White Applicants and
 6                  Acceptees to U.S. Medical
 7                  Schools
 8   Exhibit 49     Web page printout, AMCAS FAQs      312
 9   Exhibit 50     Letter dated October 14th,         322
10                  2014, Bates labeled Trahanas
11                  200
12   Exhibit 51     Group on Student Affairs (GSA),    327
13                  Committee on Admissions (COA),
14                  Bulletin dated January 31, 2012
15   Exhibit 52     E-mail, Bates labeled Trahanas     329
16                  161
17   Exhibit 53     Letter dated December 15, 2014,    329
18                  Bates labeled Trahanas 158
19   Exhibit 54     E-mails, Bates labeled Trahanas    330
20                  173 through 177
21   Exhibit 55     E-mails, Bates labeled Trahanas    335
22                  212 through 215
23   Exhibit 56     Letter dated February 9th,         337
24                  2015, Bates labeled
25                  Trahanas-NU0015
```

Page 11

1

2                    DEPOSITION EXHIBITS (CONTINUED)

3    NUMBER              DESCRIPTION                 PAGE

4    Exhibit 57     Letter dated February 24th,      341

5                   2015, Bates labeled

6                   Trahanas-NU0015

7    Exhibit 58     E-mails, Bates labeled           345

8                   Trahanas-NU000056 through

9                   000058

10   Exhibit 59     U.S. Equal Employment            349

11                  Opportunity Commission, Intake

12                  Questionnaire, Bates labeled

13                  Trahanas-NU001625 through

14                  001627, and 001629

15   Exhibit 60     Handwritten notes, Bates         352

16                  labeled Trahanas-NU001633

17                  through 001636

18   Exhibit 61     Letter dated May 21, 2014,       356

19                  Bates labeled Trahanas-NU000009

20   Exhibit 62     Letter to file dated September    357

21                  24, 2015, Bates labeled

22                  Trahanas-NU001622 through

23                  001623

24   Exhibit 63     Charge of Discrimination, Bates   358

25                  labeled Trahanas-NU001619

Page 12

```
 1
 2              DEPOSITION EXHIBITS (CONTINUED)
 3   NUMBER              DESCRIPTION                 PAGE
 4   Exhibit 64    U.S. Equal Employment             360
 5                 Opportunity Commission,
 6                 Dismissal and Notice of Rights,
 7                 Bates labeled Trahanas-NU001616
 8   Exhibit 65    Web printout, Schools and         362
 9                 Deadlines - AMCAS for
10                 Applicants - Applications -
11                 Students, Bates labeled
12                 Trahanas 246 through 260
13   Exhibit 66    Plaintiff's Answers to            363
14                 Defendants' First Set of
15                 Interrogatories
16   Exhibit 67    Northwestern, myHR, Application   369
17                 Summary, Bates labeled Trahanas
18                 142
19   Exhibit 68    Handwritten notes, Bates          371
20                 labeled Trahanas 162
21   Exhibit 69    Curriculum Vitae, Diane M.        372
22                 Trahanas, Bates labeled
23                 Trahanas 223 through 229
24
25
```

Page 13

```
 1
 2            DEPOSITION EXHIBITS (CONTINUED)
 3   NUMBER              DESCRIPTION              PAGE
 4   Exhibit 70    Curriculum Vitae, Diane M.     374
 5                 Trahanas, Bates labeled
 6                 Trahanas 230
 7   Exhibit 71    Curriculum Vitae, Diane M.     376
 8                 Trahanas, Bates labeled
 9                 Trahanas 235 through 241
10   Group Exhibit 72 Letters, Bates labeled      376
11                 Trahanas 231 through 234
12   Exhibit 73    Work Search Record for Diane   378
13                 Trahanas, Bates labeled
14                 Trahanas 219 through 222
15   Exhibit 74    E-mails, Bates labeled Trahanas 383
16                 141
17   Exhibit 75    Document Bates labeled Trahanas 385
18                 244
19   Exhibit 76    Document dated December 16,    391
20                 2015, at 2:10 p.m., Bates
21                 labeled Trahanas 292 through
22                 293
23
24
25
```

1                    D. Trahanas

2                 (Witness sworn.)

3                 DIANE M. TRAHANAS

4    after being first duly sworn, testified as follows:

5                    EXAMINATION

6    BY MS. WERMUTH:

7        Q.   Hi, Ms. Trahanas.  How are you this

8    morning?

9        A.   Good.  How are you?

10       Q.   Good.  So my name is Anna Wermuth.  I

11   represent both Northwestern University and

12   Dr. Schwulst in connection with this litigation.

13            Okay?

14       A.   Okay.

15       Q.   So let me just state for the record that

16   we are taking the deposition of the plaintiff,

17   Diane Trahanas, in Case Number 15-cv-11192 pending

18   in the Northern District Court, the U.S. District

19   Court of the Northern District of Illinois, and that

20   this deposition is being taken pursuant to both the

21   Federal Rules of Civil Procedure and the local rules

22   of the court and also pursuant to notice.

23            So can you please state your name for the

24   record.

25       A.   Diane, middle initial M, Trahanas.

                              D. Trahanas

1

2       Q.    And what does the M stand for?

3       A.    It's just M.  There's no name associated

4   with it.

5       Q.    Okay.  And, Ms. Trahanas, have you ever

6   had your deposition taken before?

7       A.    No.

8       Q.    Have you ever testified before?

9       A.    No.

10      Q.    Okay.  So let me just go through a couple

11  of ground rules so we're all kind of working from

12  the same place today.

13            Obviously I'm reminding you that you're

14  under oath.

15            It is important because, as you can see,

16  we have a court reporter here who is taking down

17  everything that's being said today.  So it's

18  important that I allow you to finish your responses

19  before I start asking you the next question.

20            Okay?

21      A.    Okay.

22      Q.    And, likewise, I would ask that you allow

23  me to finish my question before you start answering.

24  Sometimes that's hard, but I'll remind you if I'm

25  not done.  This is mainly so we can get a clear

                              D. Trahanas
1
2    record so we're not talking at the same time.
3              Okay?
4        A.    Sure.
5        Q.    It's also important that you give verbal
6    answers, right, because, again, the court reporter
7    is taking this down and can't always take nods of
8    the head.
9              Okay?
10       A.    Yes.
11       Q.    All right, good.  I am not going to
12   pretend like I am always the most articulate
13   examiner.  If there's a question I ask that you
14   don't understand or doesn't make sense to you, will
15   you please let me know that?
16       A.    Definitely.
17       Q.    Okay.  And if for some reason you don't
18   let me know that I'm going to assume that you
19   understood my question.
20             Is that fair?
21       A.    Yes.
22       Q.    Your lawyer may object from time to time,
23   but as you can see there's no judge here to rule on
24   objections.  So unless your lawyer instructs you not
25   to answer a question you're going to have to answer

```
1                          D. Trahanas
2    over the objection.
3              Okay?
4         A.   Okay.
5         Q.   All right.  Let me ask you this question:
6    Are you currently on any medications?
7         A.   Yes.
8         Q.   What are you taking currently?
9         A.   I'm taking Wellbutrin.
10        Q.   What's the dosage?
11        A.   300 milligrams.
12        Q.   And how frequently?
13        A.   Once a day in the morning.
14        Q.   Okay.  So you took that this morning?
15        A.   Yes.
16        Q.   And what does Wellbutrin treat?
17        A.   Depression.
18        Q.   Okay.  And what time this morning did you
19   take it?
20        A.   7:30.
21        Q.   All right.  Any other medications?
22        A.   Adderall XR.
23        Q.   What's the dosage?
24        A.   25 milligrams.
25        Q.   How frequently?
```

1                        D. Trahanas

2        A.   Once a day about five times a day -- I'm

3   sorry, five times a week.

4        Q.   Not every day?

5        A.   No.

6        Q.   Okay.  And which days of the week do you

7   take it?

8        A.   Monday through Friday.

9        Q.   And you took that this morning as well?

10       A.   Yes.

11       Q.   7:30?

12       A.   Yes.

13       Q.   And what does that treat?

14       A.   ADHD.

15       Q.   Okay.  Any other medications?

16       A.   I take -- I haven't taken it this morning.

17   Is that still --

18       Q.   Yes.

19       A.   Clonazepam.  That's 1 milligram.

20       Q.   How many times?

21       A.   As needed.  It could be once a day, it

22   could be twice or not at all.

23       Q.   And today you did not take it?

24       A.   I have not, no.

25       Q.   And what does clonazepam treat?

Page 19

```
 1                          D. Trahanas
 2         A.     Anxiety.
 3         Q.     Okay.   Any other medications?
 4         A.     No.
 5         Q.     Does the Wellbutrin or Adderall impact
 6   your ability to recall events?
 7         A.     No.
 8         Q.     Okay.   Is there anything, any substance,
 9   alcohol or any other substance that you've had in
10   the last 24 hours that could impact your ability to
11   recall events accurately and truthfully?
12         A.     No.
13         Q.     Is there anything that I should know about
14   that would impact your ability to testify accurately
15   and truthfully today?
16         A.     No.
17         Q.     All right.   Did you review any documents
18   to prepare for your deposition today?
19         A.     As you have sent over the Bates stamps
20   I've gone over those, but, I mean, not specifically
21   yesterday or anything like that.
22         Q.     Okay.   Did you speak with anybody other
23   than your lawyer to prepare for your deposition
24   today?
25         A.     I've spoken to them but not to prepare.
```

```
 1                        D. Trahanas
 2        Q.   Okay.
 3        A.   About the trial, but not about -- or about
 4   the case rather.
 5        Q.   Okay.  So let me ask you this:  Did you
 6   meet with your -- and I don't want you to tell me
 7   what you and your lawyer talked about, but did you
 8   meet with your lawyer to prepare for your
 9   deposition?
10        A.   I'm not sure what you mean by "prepare,"
11   but he gave me a general idea of what was going to
12   happen.
13        Q.   Again, I don't want to know about the
14   content of your discussion.
15        A.   Sure.
16        Q.   I just want to know, did you spend time
17   with your lawyer preparing for your deposition
18   today?
19        A.   Sure.
20        Q.   Okay.  And was that yesterday?
21        A.   No.
22        Q.   When was that?
23        A.   Wednesday.
24        Q.   Wednesday.
25        A.   The 3rd.
```

                              D. Trahanas

1

2        Q.    And how much time did you spend with your

3    lawyer?

4        A.    Probably an hour.

5              MR. DeROSE:  I'll say two hours because

6    I'm keeping track of my hours, and I don't want to

7    get hooked on this later.

8              THE WITNESS:  Okay, two.

9    BY MS. WERMUTH:

10       Q.    You recall one hour?

11       A.    It was an hour, an hour and a half --

12       Q.    Okay.

13       A.    -- at most.

14       Q.    Okay.

15             MR. DeROSE:  It was two hours at most.

16             THE WITNESS:  Sure, two.

17   BY MS. WERMUTH:

18       Q.    All right.  Let me ask you this:  You said

19   that you have spoken with folks about the trial or

20   the case, the litigation.

21             Can you identify who you've spoken with

22   for me, please?

23       A.    My mom, Christina Trahanas.

24       Q.    Okay.  Anyone else?

25       A.    My brother, Jim Trahanas.

Page 22

1                         D. Trahanas

2        Q.    Okay.  Anyone else?

3        A.    As of recently, or are you talking about

4   anything that happened during the case, like during

5   the time of?

6        Q.    Since you've left the employment of

7   Northwestern University.

8        A.    Since Northwestern?

9        Q.    Yes.

10       A.    Sure.  Renee Davros.

11       Q.    Who is Renee Davros?

12       A.    She is my friend.

13       Q.    She did not work for Northwestern?

14       A.    No.

15             Nicki Davros.

16       Q.    Who is Nicki Davros?

17       A.    Also my friend.

18       Q.    She did not work for Northwestern?

19       A.    No.

20             Dimitra Stamatoukos.

21             MR. DeROSE:  Would you spell that, please?

22             THE WITNESS:  Yes.  D-i-m-i-t-r-a.

23   BY MS. WERMUTH:

24       Q.    And what's the last time?  Can you spell

25   that?

```
 1                        D. Trahanas
 2      A.   S-t-a-m-a-t-o-u-k-o-s.  She has been
 3 married, so I'm not sure if she changed it to her
 4 married.  Her last name is Freehill.
 5      Q.   F-r --
 6      A.   Free and then hill.
 7           MR. DeROSE:  Excuse me one second.  You
 8 tend to talk real fast.  She might not get worn out
 9 listening, but the court reporter will get worn out
10 trying to take you down.  Slow down.  She has got a
11 lot of questions for you.  You're going to be here
12 for a while.
13           THE WITNESS:  Okay.
14           MR. DeROSE:  Talk slowly.
15           THE WITNESS:  Okay.  Sorry about that.
16 BY MS. WERMUTH:
17      Q.   No apologies.  Dimitra Freehill.
18           Who else?
19      A.   Seth Wescott.
20      Q.   Who is Seth Wescott?
21      A.   He is a friend from since college.
22      Q.   Okay.  Did not work at Northwestern?
23      A.   No.  He's in the Navy right now.
24      Q.   Who else?
25      A.   Mike and Lisa Psarros.  They're my
```

Page 24

1                          D. Trahanas
2     cousins.
3              MR. DeROSE:  Spell the last name.
4              THE WITNESS:  P-s-a-r-r-o-s.
5     BY MS. WERMUTH:
6         Q.   Cousins?
7         A.   Yes.
8         Q.   Mike is also your tax preparer; is that
9     right?
10        A.   Yes.
11        Q.   Okay.  Anyone else?
12        A.   Nick Giangrande, G-i-a-n-g-r-a-n-d-e.
13        Q.   Okay.  And who is Nick?
14        A.   He's a friend.
15        Q.   Did not work at Northwestern?
16        A.   Did not, no.
17        Q.   Anyone else?
18        A.   Would just kind of notifying somebody,
19    would that count?
20        Q.   Yes.  So when you say you've notified
21    somebody, are you talking about you've given them
22    notification by way of written notification, like a
23    text, an e-mail?
24        A.   I chatted with them about there's going to
25    be a case going on and --

Page 25

                    D. Trahanas

1
2      Q.   So who are you talking about?
3      A.   Salina Dominguez.
4           MR. DeROSE:  Can you spell the last name?
5           THE WITNESS:  Sure.  D-o-m-i-n-g-u-e-z.
6   BY MS. WERMUTH:
7      Q.   Okay.  And she currently works at
8   Northwestern?
9      A.   I believe so, yes.
10     Q.   And she worked at Northwestern at the time
11  that you --
12     A.   Yes.
13     Q.   -- worked at Northwestern?
14     A.   Her position has changed.
15          MR. DeROSE:  Just wait until counsel
16  finishes the question.
17          THE WITNESS:  Okay.
18  BY MS. WERMUTH:
19     Q.   Okay.  When you say you chatted with her,
20  by what means?
21     A.   Over the phone.
22     Q.   And when did you last chat with her?
23     A.   Probably October.  I think it was around
24  the time of Halloween.
25     Q.   This past October?

Page 26

1                           D. Trahanas

2        A.    Yes.

3        Q.    Of 2017?

4        A.    Of 2017, correct.

5        Q.    Have you communicated with her in any way

6   other than through telephonic discussions?

7        A.    About the case or in general?

8        Q.    About the case.

9        A.    The case, I believe we sent the text

10  messages that I had communicated with her but not at

11  the time in October.

12       Q.    Okay.  So have you communicated with her

13  by text message about your lawsuit or any of the

14  incidents involved in your lawsuit?

15       A.    I perhaps sent her a text in alliance with

16  the phone call.  I can't remember because I also

17  texted Carla Cuda, and I think that I -- I know I

18  texted Carla, but I can't remember if I texted

19  Salina only or if I called her.

20            MR. DeROSE:  And could you spell

21  Ms. Cuda's last name?

22            THE WITNESS:  Sure.  C-u-d-a.  She has

23  since been married also, so I'm not sure if she's

24  changed it, but I think she still goes by Cuda.

25

```
 1                      D. Trahanas
 2   BY MS. WERMUTH:
 3       Q.   And does Carla still work for Northwestern
 4   University?
 5       A.   She does.
 6       Q.   And she worked there when you worked
 7   there --
 8       A.   Yes.
 9       Q.   -- as well?
10            Anyone else that you have spoken with
11   about either the incidents involved in your lawsuit
12   that form the basis of your lawsuit or the
13   litigation itself?
14       A.   Melissa Wallin.
15       Q.   And that's spelled W-a-l-l-i-n?
16       A.   Correct.
17       Q.   Okay.  Does she still work at
18   Northwestern?
19       A.   She does not.
20       Q.   She used to?
21       A.   Yes.
22       Q.   Do you know when she left?
23       A.   I believe late 2015.
24       Q.   Okay.  And you've stayed in touch with her
25   since that time?
```

1                          D. Trahanas

2        A.    Yes.

3        Q.    And do you communicate with her by text

4    message as well as phone conversations?

5        A.    Yes, that would be correct.

6        Q.    Any other form of communication with

7    Melissa, Carla and Salina, like Facebook Messenger

8    or Facebook posts, Instagram, Snapchat?

9        A.    No, other than liking one of their

10   pictures or something, but nothing to do with this,

11   nothing in conjunction with this case.

12       Q.    Okay.  Any other individuals?

13       A.    I think that covers -- I think that's it.

14       Q.    Now, as you mentioned, you did produce

15   some text messages between yourself and Salina

16   Dominguez and then separately between yourself and

17   Melissa Wallin, Wallin --

18       A.    I think it's Wallin.

19       Q.    -- some dated February of 2015, but I have

20   not seen any text messages other than those that

21   were I think the same day as the day that you went

22   on leave on February 17 of 2015.

23             Do you have other text messages between

24   these individuals about your litigation, the

25   lawsuit, the claims in your Complaint?

Page 29

D. Trahanas

1

2    A.    Not before that obviously; and then after

3    that, not that I can scroll back and find.  I would

4    have to -- I tried to call my phone company, but

5    they won't go back as far as that, so there would

6    have to be another means of me trying to see.  I

7    can't recall any.

8    Q.    What about October of 2017?

9    A.    Oh, yes, I can send you those or give you

10   the one that I sent Carla.

11   Q.    Okay.

12         MR. DeROSE:  Counsel, for those kind of

13   requests, would you put that in a letter to me, and

14   I'll remind her to get them to me and I will get

15   them to you.

16   BY MS. WERMUTH:

17   Q.    So let me ask you this -- I will certainly

18   follow up with a 37.2 letter, John.

19         Can I ask you about what you did to

20   collect documents and electronically-stored

21   information in connection with this litigation?

22   A.    What I did as far as -- I mean, I had a

23   folder from work, and basically whatever I had in

24   the folder I gave John or my attorney.

25   Q.    Okay.

D. Trahanas

1

2      A.    And then I tried to search through my

3   e-mails anything Northwestern, but I can't produce

4   as many as Northwestern can because the e-mails that

5   I had written, a lot of them that I'd written was

6   via my Northwestern account.  We get an e-mail

7   account once we start working there.  And so I no

8   longer have access to that account.

9      Q.    Do you currently have the same Gmail

10  account -- you have a Gmail account, right?

11     A.    Yes, yes.

12     Q.    And is that the same e-mail account that

13  you had while you were employed at Northwestern?

14     A.    Yes.

15     Q.    And it was an e-mail account that you used

16  for some work-related purposes, correct?

17     A.    Yes.

18     Q.    Okay.  And you searched your Gmail account

19  in connection with the document requests that were

20  sent to you?

21     A.    Yes.

22     Q.    Okay.  And what did you do, like what

23  search terms did you use to search for documents?

24     A.    People's names, like Dr. Schwulst,

25  Dr. Perlman or Harris, Salina, pretty much anybody

1                          D. Trahanas

2    that worked in the lab.

3         Q.   Okay.

4         A.   If there was a specific event that I

5    recalled.

6         Q.   So primarily you were searching for names.

7    Do I understand that correctly?

8         A.   Yes.

9         Q.   And the names that you were searching for

10   were anyone who worked in the lab?

11        A.   In the lab, also with Ms. Fernandez, Daina

12   Fernandez.

13        Q.   Okay.

14        A.   And Mrs. or Ms. Burke.  I'm not sure if

15   either are married.

16        Q.   B-u-r-k-e?

17        A.   Yes.

18        Q.   Fernandez, F-e-r-n-a-n-d-e-z?

19        A.   Yes.

20        Q.   What's your date of birth?

21        A.   July 17th, 1985.

22        Q.   And where do you live?  What's your

23   residential address?

24        A.   10602 South Vicky Lane, V-i-c-k-y.

25        Q.   And do you live with anyone?

Page 32

1                            D. Trahanas

2          A.    I live with my parents.

3          Q.    Your parents live together?

4          A.    Yes.

5          Q.    Are they divorced?

6          A.    They are not.

7          Q.    How long have you lived at that

8     residential address?

9          A.    We moved there probably right as I turned

10    one, so 30 -- I moved away for college and then I

11    moved back, so I'm not sure.  Do you want me to

12    include the college years?

13         Q.    That's okay.  So you've lived with your

14    parents --

15         A.    Correct.

16         Q.    -- your whole life except for when you

17    were at college?

18         A.    Correct.

19         Q.    Okay.  And so do you assist with household

20    expenses?  Do you pay rent?

21               Let me ask you this:  Do you pay rent?

22         A.    I do not pay rent, no.  I pay for my own

23    groceries.

24         Q.    Do you pay utilities?

25         A.    Not directly.

1                              D. Trahanas

2          Q.    Okay.  Are you an owner of the home?

3          A.    I am not.

4          Q.    Do you own any vehicles?

5          A.    Yes.

6          Q.    What vehicles do you own?

7          A.    A 2017 Acura.

8          Q.    What about a motorcycle?

9          A.    Yes.

10         Q.    What kind of motorcycle?

11         A.    It's a Honda.  Do you want me to give you

12  the specific?

13         Q.    That's okay.  Do you have payments on

14  those two vehicles, or do you own them?

15         A.    I have payments on the Acura.  I own the

16  motorcycle.

17         Q.    Okay.  And what are the monthly payments

18  on the Acura?

19         A.    500.

20         Q.    Is it a lease or is it a loan?

21         A.    It's a loan through the car company.

22         Q.    And what is your educational background?

23  What degrees do you have?

24         A.    I did my Bachelor's of Science in biology.

25         Q.    Okay.  Where did you obtain that degree?

1                          D. Trahanas

2          A.    At the University of Illinois at Chicago.

3          Q.    What year?

4          A.    In 2007, and then a Bachelor of Arts in

5    psychology at the same school.

6          Q.    Okay.

7          A.    In 2007 as well, and then a Master's of

8    Science in biotechnology at Rush University.

9          Q.    What year did you obtain your Master's?

10         A.    2009.

11         Q.    And do you know off the top of your head

12   what your GPA for your biology degree was?

13         A.    3.2, between a 3 and a 3.2 I would say.

14         Q.    You don't know precisely sitting here as

15   you speak?

16         A.    I would guess more 3.2, but just so I'm

17   not -- I just want to be as accurate as I can.

18         Q.    What about your Bachelor's in psychology?

19         A.    3.8.

20         Q.    And what about your Master's?

21         A.    3.77.

22         Q.    And are you currently in school?

23         A.    I -- not this semester.  I did take a

24   class.

25         Q.    When did you take a class?

1                        D. Trahanas

2       A.    Last fall.

3       Q.    Where?

4       A.    I'm sorry, last -- this is 2017, so 2016

5    at Moraine Valley.

6       Q.    So, I'm sorry, so in the fall of 2016 --

7       A.    Correct.

8       Q.    -- you took a single class?

9       A.    Correct.

10      Q.    At Moraine Valley?

11      A.    Yes.

12      Q.    Is that a community college?

13      A.    Yes.

14      Q.    Okay.  And what was the class?

15      A.    Anatomy and physiology and lab.

16      Q.    The lab was attendant to the class?

17      A.    Lecture, yes.

18      Q.    And how did you perform?

19      A.    I received an A in both the lab and

20   lecture.

21      Q.    And why did you not continue taking

22   classes?

23      A.    There's certain programs that require

24   certain electives, and I had not taken anatomy at

25   UIC.  So one, I wanted to better prepare myself in

                              D. Trahanas

1    case I go back to school or when I go back to

2    school, and it was a requirement for some of the

3    schools that I would be applying to.

4          Q.   When you say a requirement of the program

5    or a requirement of the school that I would be

6    applying to, what are you referring to?

7          A.   Medical schools.

8          Q.   Okay.  Have you applied to medical school

9    before?

10         A.   Since 2015?

11         Q.   Ever.

12         A.   Yes.

13         Q.   How many times?

14         A.   Three, maybe four.

15         Q.   When was the first time?

16         A.   2008, 2009.

17         Q.   For the '08-'09 academic year?

18         A.   I applied -- I probably applied starting

19    my Master's for matriculation in 2009.

20         Q.   Okay.  And were you accepted anywhere?

21         A.   No.

22         Q.   Okay.  And then when did you apply the

23    second time?

24         A.   I believe that would be my time when I was

```
 1                          D. Trahanas
 2    at Northwestern, the 2014.  So you apply 2014 for
 3    matriculation starting fall of 2015.
 4          Q.    And you did actually apply that year?
 5          A.    Yes.
 6          Q.    You completed your application?
 7          A.    Yes.
 8          Q.    Okay.  All right.  And when was the next
 9    time?
10          A.    Fall of 2017.
11          Q.    So you're in the application process now?
12          A.    Correct, right now.
13          Q.    Okay.  And you said three or four times.
14    Was there a fourth time?
15          A.    I took such a break in between the
16    Master's and working I can't precisely say if I had
17    or hadn't.  So I think check with AMCAS, and if
18    you'd like me to send that with John in the
19    letter --
20          Q.    Yes, I would.  We actually made a request
21    for those documents.
22          A.    Sure, no problem.
23          Q.    I'm going to need those.
24                And, John, just depending what those
25    documents show, we may have to agree to keep the
```

```
 1                    D. Trahanas
 2   deposition open just because I didn't get the
 3   documents.
 4          MR. DeROSE:  Could you give me all the
 5   documents you're --
 6          MS. WERMUTH:  Certainly.
 7          MR. DeROSE:  Very well.
 8   BY MS. WERMUTH:
 9      Q.   Okay.  So immediately prior to working --
10   strike that.
11          What is Express Hair Studios?
12      A.   That's my mother's salon.
13      Q.   A hair salon?
14      A.   Yes.
15      Q.   Do you work there?
16      A.   I help her.  I don't -- I'm not employed
17   there.
18      Q.   Okay.  Have you ever received any wages
19   from Express Hair?
20      A.   No, I have not.
21      Q.   Do you have an ownership interest?
22      A.   No.
23      Q.   Now, you first started working at
24   Northwestern University in the summer of 2012.
25          Is that accurate?
```

1                          D. Trahanas

2       A.    Yes.

3       Q.    Okay.  Now, you had applied to various

4    jobs, research-type jobs at Northwestern University

5    starting in 2010.

6             Does that sound right to you?

7       A.    Yes.

8       Q.    Okay.  So you applied to several jobs in

9    2010, correct?

10      A.    Yes.

11      Q.    You did not get any of those jobs?

12      A.    No.  I did have an interview prior to

13   interviewing with Dr. Schwulst.  However, I'm not

14   sure what year that -- that application may have

15   been submitted in 2011, but I was interviewed in

16   2012 for another position at Northwestern.

17      Q.    Okay.  So between 2010 and the time that

18   you were hired by Dr. Schwulst, how many different

19   jobs at Northwestern did you apply to?

20      A.    Between 2010 and 2012, if I had to take a

21   guess, maybe --

22            MR. DeROSE:  Don't talk out -- excuse me,

23   don't think out loud because the reporter takes

24   everything down.

25            MS. WERMUTH:  Excuse me.

                            D. Trahanas

1

2          MR. DeROSE:  Just when you're ready to

3    answer, answer.

4          MS. WERMUTH:  Let's try to refrain from

5    informing the witness how to answer questions.  I

6    understand -- if you want to take a break and if at

7    any point in time you need a break, please let me

8    know.  I'm happy to accommodate folks with breaks.

9    But let's just be careful about instructing the

10   witness during the examination.

11         MR. DeROSE:  Counsel, I don't need to be

12   lectured by you as to how to take a deposition.

13   When I want to talk to my client I will.  The record

14   will reflect if I am correct or wrong in doing so.

15   You may make your objection to it.

16         Right now may go ahead and ask your

17   question, Counsel.

18         MS. WERMUTH:  Well, first of all, I wasn't

19   lecturing anybody.  I want -- you know, this is --

20   and you are not taking the deposition.  I'm taking

21   the deposition, and I don't need your permission to

22   ask questions.

23         So all I'm suggesting is that if you want

24   to give your client instructions you should do so

25   off the record; that while a question is pending

```
1                        D. Trahanas
2    it's not appropriate to do that.  That's all I'm
3    suggesting.  We don't have to argue about it.  I
4    just want to -- I'd like to --
5              MR. DeROSE:  Very well, Counsel.  I am
6    trying to help you make a good record here.  But
7    I'll refrain.  You go ahead.
8              But I will tell my client first, and if
9    you want to step out while I do it, fine.  I want
10   you not to be thinking out loud.  I want you only to
11   wait and then answer the question when you're
12   firmly -- when you have it firmly in your mind.
13             Go ahead, Counsel.  I'm through.
14             MS. WERMUTH:  Okay.  And I will state for
15   the record again I think it is inappropriate for you
16   to advise your client during the course of a
17   deposition; I'm going to make that clear.  And if it
18   continues, we will take it up as we need to.
19   BY MS. WERMUTH:
20        Q.   All right.  So how many times to the best
21   of your recollection did you apply to jobs at
22   Northwestern University before you were hired in
23   2012?
24        A.   15.
25        Q.   Okay.  And you got two interviews, one
```

Page 42

                          D. Trahanas

1

2    with Dr. Schwulst and -- is that right?

3         A.   Yes.

4         Q.   So one was with Dr. Schwulst and the other

5    was with whom?

6         A.   I don't recall his name, but I can give

7    you the building and the projects that they were

8    working on.

9         Q.   Okay.

10        A.   It was in the Robert H. Lurie building.

11        Q.   Okay.

12        A.   And they worked on nanotechnology with

13   cancer.

14        Q.   Were you offered that job?

15        A.   I can't remember if Dr. Schwulst offered

16   me a job before they did.

17        Q.   So my question is, did you get a job offer

18   from this other lab?

19        A.   No.

20        Q.   Okay.  And the job that you applied for at

21   Northwestern University was Research Technologist 2;

22   is that correct?

23        A.   For Dr. Schwulst or -- yes.

24        Q.   I'm sorry, good question.

25             So the job that you applied for in

1                      D. Trahanas

2   Dr. Schwulst's lab was Research Technologist 2?

3        A.   Yes.

4        Q.   Okay, thank you.  And at the time that you

5   applied were you working anywhere else?

6        A.   Yes.

7        Q.   Where were you working?

8        A.   The University of Chicago.

9        Q.   What were you doing at the University of

10  Chicago?

11       A.   I was a research tech there.

12       Q.   And did you voluntarily leave that

13  position?

14       A.   Yes.

15       Q.   What was your pay at the time that you

16  left?

17       A.   15 an hour.

18       Q.   And what was your position there?

19       A.   Research -- Lab Technician 1.

20       Q.   And that position, do you know, was that a

21  position that was funded by a grant, if you know?

22       A.   Most likely, yes.

23       Q.   And why do you say "most likely"?

24       A.   Most research projects at academic

25  institutions are grant-based.

1                     D. Trahanas

2          Q.   Okay.  Did you interview with

3   Dr. Schwulst?

4          A.   Yes.

5          Q.   And do you recall when you interviewed

6   with Dr. Schwulst?

7          A.   May of 2012.

8          Q.   Did you interview with anyone else for the

9   job in Dr. Schwulst's lab?

10         A.   Yes.  I met with a few others that were

11  already in the lab with Dr. Perlman's lab.

12         Q.   And who were those individuals?

13         A.   Rana.

14         Q.   What's her last name?

15         A.   Saber, S-a-b-e-r.

16         Q.   Okay.  Anyone else?

17         A.   Alexander Misharin, M-i-s-h-a-r-i-n.

18         Q.   Anyone else?

19         A.   Dr. Perlman, Harris Perlman.

20         Q.   Anyone else?

21         A.   Carla Cuda.

22              MR. DeROSE:  Spell that.

23              THE WITNESS:  C-u-d-a last name.

24  BY MS. WERMUTH:

25         Q.   Anyone else?

                        D. Trahanas

1

2       A.    That's all I can recall.

3       Q.    Okay.  So Dr. Perlman, obviously he's a

4    Ph.D.; is that right?

5       A.    Yes.

6       Q.    Okay.  What about Alexander Misharin, a

7    Ph.D.?

8       A.    Yes.

9       Q.    Okay.  Was he a faculty member, do you

10   know?

11      A.    I believe he is an associate professor.

12   I'm not sure if that qualifies him as faculty.

13      Q.    Okay.  What about Rana or Rana Saber, is

14   she a Ph.D.?

15      A.    She has a Master's, I believe.  I wouldn't

16   know in what.

17      Q.    Okay.  And what about Carla Cuda?

18      A.    She has her Ph.D.

19      Q.    Do you know, is Carla faculty also?

20      A.    I think she would be the same as

21   Alexander, but I'm not sure.  I don't remember them

22   teaching.

23      Q.    What about Dr. Perlman, was he faculty at

24   the university?

25      A.    I believe so.

1                         D. Trahanas

2        Q.    When you interviewed with Dr. Schwulst,

3    did you have any conversation with him about your

4    pay, your pay expectations?

5        A.    No, not that day.

6        Q.    Okay.  At some point -- how would you --

7    strike that.

8              At some point did you talk with

9    Dr. Schwulst about your pay expectations?

10       A.    Yes, after the interview.

11       Q.    After the interview.  And when did that

12   conversation take place about the pay?

13       A.    It took place starting over e-mail to set

14   up a phone call conversation, and then he called me

15   and we spoke about it over the phone.

16       Q.    And what do you recall saying to him about

17   pay?

18       A.    We were negotiating.

19       Q.    Did you tell him that your expectation was

20   to be paid somewhere in the 20 to $23 per hour

21   range?

22       A.    I believe so.

23       Q.    And did he tell you about how the --

24   whether the position was a funded position?

25       A.    I don't remember specifically.

                              D. Trahanas

1

2       Q.    Okay.   Now, when you ultimately joined

3  Dr. Schwulst's lab, you understood that he was being

4  mentored as a young scientist by Dr. Perlman; is

5  that right?

6       A.    Yes.

7       Q.    Okay.   So Dr. Schwulst's lab was set up

8  within the confines of Dr. Perlman's lab; is that

9  right?

10      A.    Yes.

11      Q.    Okay.   And so there was some sharing of

12 equipment; is that right?

13      A.    Yes.

14      Q.    Okay.   And the two labs were ultimately

15 studying different systems in the human body, right?

16      A.    Can I ask you what you mean specifically

17 by "systems"?

18      Q.    So let me ask you this:  Dr. Perlman is a

19 rheumatologist?

20      A.    Yes.

21      Q.    And what is Dr. Schwulst?

22      A.    He's a trauma surgeon, and we were

23 interested in traumatic brain injury.

24      Q.    Okay.   So Dr. Perlman wasn't necessarily

25 studying -- well, both labs were studying white

1                          D. Trahanas

2    blood cells as I understand it?

3         A.   We were studying the immune system.

4         Q.   But for looking at different anatomical

5    systems.  So, for example, you and Dr. Schwulst were

6    looking at the brain, correct?

7         A.   Sure.  Like prior to analysis of let's say

8    the immune system our prior functions were different

9    as a rheumatologist and then Dr. Schwulst as a

10   trauma surgeon.

11        Q.   As a trauma surgeon?

12        A.   Yes.

13        Q.   Okay.  And so you were the only person in

14   the lab that reported directly to Dr. Schwulst,

15   right?

16        A.   Yes.

17        Q.   Okay.  So you were hired to help

18   Dr. Schwulst with his research, right?

19        A.   Yes.

20        Q.   Okay.  Which was distinct from

21   Dr. Perlman's research?

22        A.   Yes.

23        Q.   So the reason you were in Dr. Perlman's

24   lab, however, is because Dr. Schwulst was a junior

25   scientist who needed to have a mentor with respect

Page 49

                              D. Trahanas

1

2    to the development of his own scientific research?

3         A.    Yes.

4         Q.    Okay.  And so, for example, Rana, Carla

5    and Sasha I think Alexander --

6         A.    Yes.

7         Q.    -- all worked for Dr. Perlman?

8         A.    Correct.

9         Q.    Okay.  And when you joined Dr. Schwulst's

10   lab, you were aware that he did not yet have any NIH

11   funding for the work that he was doing, correct?

12        A.    No, after a few months when I knew we were

13   applying for an NIH grant, but in terms of when I

14   started if I knew that, I don't think so.

15        Q.    Okay.  So at some point you became aware

16   of the fact that his research was not yet funded by

17   the federal government?

18        A.    By NIH, yes, correct.

19        Q.    NIH, okay.  All right.  Do you know what

20   his funding sources were prior to obtaining NIH

21   funding?

22        A.    I did not.

23        Q.    Okay.  When you told Dr. Schwulst what

24   your salary requirements or desires were, what did

25   he say to you?

Page 50

```
 1                      D. Trahanas
 2        A.   Are you referring specifically to that pay
 3   amount that you gave me or --
 4        Q.   Well, so you testified that you told
 5   Dr. Schwulst you were looking for somewhere between
 6   20 and $23 per hour, correct?
 7        A.   Correct.
 8        Q.   Okay.  How did Dr. Schwulst respond to
 9   that?
10        A.   He said that what he would like to do is
11   he actually counteroffered me I believe 17, and so I
12   told him that that was too low.
13        Q.   When you say he countered at 17, what was
14   his initial offer?
15        A.   Well, I think I began with, you know, I
16   wanted 20, 23, because I think in an e-mail I gave
17   him an idea prior to our phone call ballpark of at
18   least the yearly salary that I would expect, which
19   would fall under that amount, 20 or 23 an hour.
20        Q.   Okay.  And he countered with 17?
21        A.   I believe so, yes.
22        Q.   And you said that's not enough?
23        A.   I said -- I was trying to negotiate, so I
24   believe I countered with 21, and then we ended up
25   agreeing with 19.
```

Page 51

                              D. Trahanas

1

2       Q.    Okay.  And then you agreed to accept the

3    job; is that right?

4       A.    Yes, with the stipulation that after six

5    months if we got along and if we were making

6    progress we would go back to the issue.

7       Q.    Of pay?

8       A.    And talk about it, yes.

9       Q.    And then you were given formal

10   notification of the offer and acceptance?

11      A.    Yes.

12            MS. WERMUTH:  Mr. Court Reporter, can we

13   mark this, please, as Exhibit 1.

14                      (Exhibit 1 was marked for

15                       identification.)

16   BY MS. WERMUTH:

17      Q.    Okay.  Ms. Trahanas, I've given you now

18   what's been marked as Deposition Exhibit Number 1.

19            Do you recognize that document?

20      A.    Yes.

21      Q.    And have you seen that letter before?

22      A.    Yes.

23      Q.    So that was a letter that you received on

24   or about May 21st of 2012 regarding the contours of

25   your job at Northwestern; is that right?

Page 52

1                              D. Trahanas

2          A.    Yes.

3          Q.    Okay.   And it has in here a start date of

4     June 11th, 2012.

5                Do you see that?

6          A.    Yes.

7          Q.    And is that when you actually started at

8     the university?

9          A.    Yes.

10         Q.    Okay.   And it says in the next sentence --

11    well, it says above that that you were being -- that

12    you had accepted the offer to work as a Research

13    Technologist 2.

14               Do you see that?

15         A.    Yes.

16         Q.    Okay.   And you understood that to be your

17    position at the time, correct?

18         A.    Yes.

19         Q.    Okay.   And then in the next sentence it

20    says your compensation will be $19 per hour.

21               Do you see that?

22         A.    Yes.

23         Q.    Okay.   So that was your starting pay?

24         A.    Yes.

25         Q.    That's accurate?

                          D. Trahanas

1

2      A.   Yes.

3      Q.   And then the letter goes on to say you

4  will be eligible for a salary review based on your

5  performance in September 2013.

6           Do you see that?

7      A.   Yes.

8      Q.   Okay.  So that informed you that the first

9  time you could get your salary reviewed would be not

10  six months later but about 14 months later.

11          Do you see that?

12     A.   Yes.

13     Q.   Okay.  And you didn't take issue with that

14  at the time?

15     A.   I probably didn't think that this would

16  override Dr. Schwulst's word.

17     Q.   So here's my question.  You didn't take

18  that issue up with HR at the time, correct?

19     A.   No.

20     Q.   Okay.  And you didn't take it up with

21  Dr. Schwulst at the time that you received this

22  letter?

23     A.   No.

24     Q.   Okay.  All right.  So when you started

25  working at Northwestern you were required to fill

Page 54

```
 1                     D. Trahanas
 2   out some forms and an application; is that right?
 3   Do you remember?
 4       A.   I'm sorry, can you restate it, the
 5   beginning part at least?
 6       Q.   Sure.  So once you actually started
 7   working at Northwestern University you were required
 8   to fill out a job application; is that right?
 9       A.   Yes.
10       Q.   Okay.  And you were also required to fill
11   out a Personal Data Form.
12            Does that sound familiar to you?
13       A.   Yes.
14       Q.   And you actually filled these documents
15   out on your first day of work.
16            Does that sound right to you?
17       A.   I can't specifically say if it was
18   June 11th.  We had like an orientation day, and I'm
19   not sure if that was assigned or how much -- it was
20   in the beginning.  It was definitely in June, but I
21   can't specifically testify that it was June 11th.
22       Q.   Okay.  Fair enough.
23            Can we have this marked as 2, please.
24                    (Exhibit 2 was marked for
25                     identification.)
```

1                          D. Trahanas

2    BY MS. WERMUTH:

3         Q.    Okay.  So you've now been handed what's

4    been marked as Deposition Exhibit Number 2.

5               Do you recognize that document,

6    Ms. Trahanas?

7         A.    Yes.

8         Q.    Okay.  And is that your signature down

9    sort of two-thirds of the way down where it says

10   Employee's Signature?

11        A.    Yes.

12        Q.    Okay.  And the date looks like it was

13   6/11/12; is that right?

14        A.    Correct.

15        Q.    Okay.  And is this your handwriting on

16   this form?

17        A.    Yes.

18        Q.    So you completed this form, correct?

19        A.    Yes.

20        Q.    And let me just note for the record that I

21   see your social security number is here, and we will

22   make sure that that gets redacted --

23        A.    Thank you.

24        Q.    -- insofar as it's used in connection with

25   the litigation at all.

Page 56

                        D. Trahanas

1                  Okay.  Now, will you look with me at the

2     box that says Demographic Data.

3                  Are you with me?

4          A.    Yes.

5          Q.    Okay.  And then Question 18 appears to

6     have a number of subquestions, and the last one is

7     on the far right of the page.  It says, "Do you have

8     a disability?"

9                  Do you see that?

10         A.    Yes.

11         Q.    And there's a checkmark in the box that

12    says "no"?

13         A.    Yes.

14         Q.    And you put that checkmark there?

15         A.    At the time, yes.

16         Q.    Okay.  Can you mark this as 3, please.

17                        (Exhibit 3 was marked for

18                         identification.)

19    BY MS. WERMUTH:

20         Q.    Okay.  You've now been handed what's been

21    marked as Deposition Exhibit Number 3.

22                 Do you recognize that document?

23         A.    I don't recognize it by seeing it.

24    However, it is Bates stamped, so I may have seen it

1                             D. Trahanas

2    within the exhibits that you sent my attorney.

3         Q.    Okay.  Fair point.  So let me turn your

4    attention to the very last page, the third page of

5    the document.  There's a handwritten signature

6    there.

7         A.    Yes.

8         Q.    Is that your signature?

9         A.    Yeah.

10        Q.    Okay.  So you -- and I'm sorry, there's a

11   date there of June 11, 2012.

12              Do you see that?

13        A.    Yes.

14        Q.    Okay.  And is that your handwriting?

15        A.    Yeah.

16        Q.    So does this refresh your recollection as

17   to whether or not you would have seen this on

18   June 11th, 2012, and signed it?

19        A.    It's possible.  I mean, if I signed it

20   that day, then yes.

21        Q.    Okay.  And according to the box just above

22   your signature, the application was complete and

23   accurate, correct?

24        A.    Can you restate your question?

25        Q.    Yes.  By signing this document, you were

1                          D. Trahanas

2      attesting that the information that you had provided

3      in your application was true and accurate?

4           A.   Yes.

5           Q.   Okay.  Let me ask you just a couple quick

6      questions.  I notice you didn't put any former pay

7      information for any of your prior jobs.

8                Can you tell me why?

9           A.   I don't -- probably because I didn't think

10     it was necessary.

11          Q.   Okay.  And also I noticed that you don't

12     put your last day of employment at the University of

13     Chicago.

14                Is there any reason why you didn't put

15     that date?

16          A.   No.  That must have been an oversight.

17          Q.   Okay.  You were not fired from the

18     University of Chicago?

19          A.   No.  I gave two weeks' notice there.

20          Q.   Okay.  And then I see on the second page

21     under License/Certificate there's something that

22     says LCNL.

23                Can you just tell me what that is?  I just

24     don't know what that is.

25          A.   Which?

Page 59

                              D. Trahanas

1

2      Q.    On the page that's Bates labeled 82

3    there's a box that says License/Certificate about a

4    third of the way down, and then it says LCNL.

5           Do you see that?

6      A.    Yes.

7      Q.    Do you know what that refers to?

8      A.    Right now I don't know what that acronym

9    stands for.

10     Q.    Do you hold any licenses or certificates?

11     A.    We were certified in laboratory-based

12   techniques from Rush.

13     Q.    Okay.  And certified by what entity?

14     A.    Via the university; and there was probably

15   one other signature on anything, but I don't know

16   what the entity was.

17     Q.    Okay.  And when you say "the university,"

18   you're talking about Rush University?

19     A.    Yes.

20     Q.    Okay, thank you.  And you don't hold any

21   licenses?

22     A.    No.

23     Q.    Okay.  Can you mark this, please, as 4.

24                       (Exhibit 4 was marked for

25                        identification.)

Page 60

1                          D. Trahanas

2    BY MS. WERMUTH:

3        Q.   Ms. Trahanas, you've been handed what's

4    been marked as Deposition Exhibit 4.

5             Do you recognize the name and signature on

6    this document?

7        A.   Yes.

8        Q.   Is that your name and your signature?

9        A.   Yes.

10       Q.   And you personally filled this form out?

11       A.   Yes.

12       Q.   Okay.  And you filled it out on June 11th

13   of 2012?

14       A.   Yes.

15       Q.   Okay.  And this is a form acknowledging

16   receipt of the Northwestern University Staff

17   Handbook; is that correct?

18       A.   Yes.

19       Q.   Okay.  And this form acknowledges that you

20   actually received a copy of the handbook on that

21   date, correct?

22       A.   Correct.

23       Q.   Okay.  And the first paragraph of this

24   acknowledgment form informs the recipient that the

25   handbook contains important information about

Page 61

```
 1                         D. Trahanas
 2    policies at the university, correct?
 3         A.   Yes.
 4         Q.   And it specifically talks about
 5    information about leaves of absences.
 6              Do you see that?
 7         A.   Yes.
 8         Q.   Okay.  And it also specifically mentions
 9    that certain policies that, quote, every employee
10    must know, end quote, included the sexual harassment
11    policy.
12              Do you see that?
13         A.   Yes.
14         Q.   Okay.  And then it said also be sure to
15    call human resources if you have questions about the
16    policies.
17         A.   Sure.
18         Q.   Okay.  Can we mark this as 5, please.
19                        (Exhibit 5 was marked for
20                         identification.)
21    BY MS. WERMUTH:
22         Q.   So I've handed you now what's been marked
23    as Deposition Exhibit 5.
24              Do you have that, Ms. Trahanas?
25         A.   Yes.
```

Page 62

                              D. Trahanas

1

2       Q.    Okay.  And does this look like the

3   handbook that you received on June 11th of 2012?

4       A.    Yes.

5       Q.    Okay.  And this handbook, in fact, does

6   have information in it about leaves of absences and

7   sexual harassment, correct?

8       A.    Yes.

9       Q.    Okay.  So, for example, if you would turn

10  with me to -- it's Page 9 of the handbook.  It's

11  also Bates labeled 1332.

12      A.    Okay.

13      Q.    There's a provision there about

14  nondiscrimination at the university, correct?

15      A.    Yes.

16      Q.    Okay.  And it specifically says that the

17  university does not discriminate against any

18  individual on a variety of bases, and it included

19  sex and sexual orientation.

20            Do you see that?

21      A.    Yes.

22      Q.    It also included disability, correct?

23      A.    Yes.

24      Q.    And then it explained -- it gave a

25  definition of what harassment can be, correct?

1                              D. Trahanas

2          A.    Yes, it gives a definition.

3          Q.    Okay.  And then it gives you information

4    about how to file a complaint of discrimination at

5    the university, correct?

6          A.    It does.

7          Q.    Okay.  And on the next page there's a

8    section regarding how to seek an accommodation for a

9    disability, correct?

10         A.    Yes.

11         Q.    Okay.  And on the next page, Page 11,

12   which is also marked 1334, there's information about

13   how to seek a promotion, correct?

14         A.    Yes.

15         Q.    Okay.  And it informs the employee that a

16   promotion must be accompanied by an application,

17   correct?

18         A.    What line are you looking at?  I'm sorry.

19         Q.    So there's a bolded word section that

20   reads Application, period.

21               Do you see that?

22         A.    Yes.

23         Q.    And it says, "To ensure consideration for

24   a position, the staff member submits an application

25   for transfer or promotion along with a resumï¿½ to the

Page 64

1                           D. Trahanas

2    human resources department."

3                Right?

4        A.   Yes.

5        Q.   Okay.  Okay.  And then if you turn to

6    Page 33, which is also Bates labeled 1356 -- strike

7    that.  That's an unpaid leave of absence.  Give me

8    just a moment.

9                I'm sorry, 1356, if you would go to that

10   page, please.  Oh, that is where we were, right?

11   Okay.

12               So there are a variety of types of --

13   well, strike that.

14               Go to 1354, Page 31.  The university on

15   this page explains the various types of paid leaves

16   of absence.

17               Do you see the second section on that

18   page?

19       A.   Yes.  Kinds of leave?

20       Q.   Yes.  And it says paid leave is available

21   for absence due to sickness or injury, and then it

22   also goes on to say unpaid leave of absence is

23   granted for personal medical care for an employee's

24   serious health condition.

25               Do you see that?

Page 65

1                              D. Trahanas

2        A.    Yes.

3        Q.    And on Page 33 then it has information

4   about how to obtain that type of a leave, correct?

5        A.    Under -- I'm sorry, specifically

6   certifications and approval, is that what you're

7   looking at?

8        Q.    Correct.  And that provision actually

9   provides that the employee's written request

10  specifying the reason for the leave and the start

11  and ending dates must be submitted to the department

12  manager at least two weeks before the leave starts

13  except in emergency.

14            Do you see that?

15       A.    Yes.

16       Q.    Okay.  So if there's an emergency

17  situation notice might not -- an employee might not

18  be able to give notice, right?

19       A.    Yes.

20       Q.    But if you have an opportunity to give

21  notice the university expected that, right?

22       A.    As it states here, yes.

23       Q.    Okay.  And do you know what the reason for

24  giving notice would be or the rationale why the

25  university would want notice of an impending leave

Page 66

```
 1                          D. Trahanas
 2   or absence?
 3            MR. DeROSE:  Objection to the form to the
 4   extent this calls for a conclusion on the part of
 5   the witness for somebody else's reason.
 6            But you may answer.
 7            THE WITNESS:  I guess they would just want
 8   to know.
 9            MR. DeROSE:  Objection to guessing.
10            THE WITNESS:  They would like to know.
11   BY MS. WERMUTH:
12       Q.   So that they can make arrangements for
13   coverage, for example, that would be a reason for
14   giving notice; is that right?
15            MR. DeROSE:  Objection to the form that
16   this calls for a conclusion on the witness' part for
17   someone else's stated motives.
18            But you may answer the question if you
19   know.
20            THE WITNESS:  Maybe they would like it as
21   a courtesy.
22   BY MS. WERMUTH:
23       Q.   So you would agree with me that it's
24   reasonable for an employer to expect notice of a
25   leave if notice can be given?
```

```
 1                           D. Trahanas
 2        A.    I'm sorry, can you resay that?
 3        Q.    Yes.  You would agree with me that it's
 4   reasonable generally speaking for an employer to
 5   expect notice of an absence if such notice can be
 6   given?
 7        A.    Sure.
 8        Q.    Okay.  Now, if you look at Page 51 of the
 9   handbook, which is also Bates labeled 1374.
10              MR. DeROSE:  Wait one second.  51, I'm
11   sorry, Counsel?
12              MS. WERMUTH:  No problem.  Yes, 51 of the
13   handbook, which is Bated labeled 1374.
14   BY MS. WERMUTH:
15        Q.    Are you with me, Ms. Trahanas?
16        A.    Yes.
17        Q.    So you would see on this page that the
18   university lays out its policy on sexual harassment,
19   correct?
20        A.    Yes.
21        Q.    And under the section labeled Examples,
22   are you with me?
23        A.    Yes.
24        Q.    Okay.  It specifically mentions that
25   belittling remarks about a person's gender or sexual
```

Page 68

D. Trahanas

1   orientation is an example of what sexual harassment

2

3   may include, correct?

4       A.   Yes, it's stated there.

5       Q.   Okay.  And it also talks about the

6   university's position on retaliation for making

7   reports under this policy, correct?

8       A.   Yes, it does state it.

9       Q.   And it states that it prohibits

10  retaliation, correct?

11      A.   Yes.

12      Q.   Okay.  And if you go to the next two

13  pages, there's a variety of information about to

14  whom an employee can make reports of harassment,

15  correct?

16      A.   Are you specifically talking about the

17  Personal Safeguards page or the other page?

18      Q.   Pages 52 and 53.  There's information

19  about where an employee -- what an employee can do

20  if they believe they are being harassed and where

21  they can go for help?

22      A.   Yes.

23      Q.   Okay.  What is your sexual orientation?

24      A.   Heterosexual.

25      Q.   Okay.  Can you mark this, please, as 6.

Page 69

1                        D. Trahanas

2                        (Exhibit 6 was marked for

3                        identification.)

4    BY MS. WERMUTH:

5         Q.   Ms. Trahanas, you've been handed what's

6    been marked as Deposition Exhibit 6.

7              Do you recognize that document?

8         A.   Yes.

9         Q.   Okay.  And what do you recognize this

10   document to be?

11        A.   A welcoming letter.

12        Q.   Okay.  And this one is dated October 2012,

13   right?

14        A.   Yes.

15        Q.   So this is about, what, four months after

16   you started?

17        A.   Yes.

18        Q.   Okay.  And so the offer letter that we

19   looked at previously was -- and, I'm sorry, it was

20   marked as Exhibit -- was it 1?

21             MR. DeROSE:  I think it was.

22   BY MS. WERMUTH:

23        Q.   Okay.  So that record -- or, I'm sorry,

24   Exhibit 1 did not have an end date on the

25   employment, correct?  It just had a start date,

Page 70

```
1                        D. Trahanas
2   right?
3        A.   Yes.
4        Q.   Okay.  And so was that an orientation
5   period to your understanding?
6        A.   In May -- I'm sorry, in June?  Yes.
7        Q.   Okay.  And so then in October you had
8   passed your orientation period, and you got the
9   formal one-year appointment, is that correct, that
10  we see in Exhibit 6?
11       A.   Yes.
12       Q.   Okay.  And according to this document your
13  position would begin on October 30th, 2012, and end
14  the following October 30th, a year later.
15            Do you see that?
16       A.   Yes.
17       Q.   Okay.  And the salary rate given to you or
18  you were notified of was $19 per hour?
19       A.   Yes.
20       Q.   Okay.  So your rate did not go up in that
21  first year of employment?
22       A.   No.
23       Q.   Okay.  And did you complain to anybody in
24  HR at the time that you got this letter?
25       A.   No.
```

```
 1                          D. Trahanas
 2        Q.   Okay.  Can we mark this as 7, please.
 3                         (Exhibit 7 was marked for
 4                          identification.)
 5   BY MS. WERMUTH:
 6        Q.   Okay.  You've been handed what's been
 7   marked as Deposition Exhibit 7.
 8             Do you recognize that document?
 9        A.   Yes.
10        Q.   What do you recognize it to be?
11        A.   An extension offer.
12        Q.   Okay.  And this was given to you in
13   November of 2013; is that correct?
14        A.   Correct.
15        Q.   And according to this letter, the position
16   began on November 1st, 2013, and ended on August 31,
17   2014; is that right?
18        A.   Yes.
19        Q.   And your pay was increased to 19.48 per
20   hour at that time?
21        A.   Yes.
22        Q.   And you accepted that offer?
23        A.   Yes.
24        Q.   And you did not complain to human
25   resources about your pay at that time?
```

                            D. Trahanas

1

2      A.    No.

3      Q.    Okay.  All right.  So can you briefly

4  describe for me what your job functions at the

5  university working in Dr. Schwulst's lab were?

6      A.    From 2012 all the way until --

7      Q.    Yes, just generally during the period of

8  time that you worked.  And if they changed over time

9  let me know that.

10          But during the period of time that you

11  worked in Dr. Schwulst's lab, what were you

12  responsible for doing?

13      A.    So mostly I -- because Dr. Schwulst was in

14  trauma surgery or in his trauma unit two weeks --

15  for two weeks at a time, I would basically be

16  handling all of the lab sort of duties from

17  experiments, such as inducing a traumatic brain

18  injury to the mice that we were using as a model.

19      Q.    Okay.

20      A.    To collecting samples, tissue samples.

21      Q.    From the mice?

22      A.    From the mice, correct.

23      Q.    The mice's brain?

24      A.    It wasn't just the brain.  We did other

25  organs as well.

1                        D. Trahanas

2        Q.    Okay.

3        A.    Processing those tissues, like cleaning

4   and filtering, and then isolating the specific cells

5   that we were interested in, immune cells, and then

6   staining those so that we could run them through

7   flow cytometry.

8        Q.    And what is flow cytometry?

9        A.    Flow cytometry, basically you put colored

10  stained cells in a tube, the isolated stained cells

11  that you want through a tube, and then it goes

12  through a specific machine; and the machine then is

13  connected to a computer who shows you the data as to

14  what type of cells you're collecting or population

15  of cells.

16       Q.    And then what do you do with the data?

17       A.    You analyze the data to see if our

18  hypothesis was correct or what we were really

19  learning that TBIs were inducing.

20       Q.    Have you ever used this -- I'm sorry.

21             Is flow cytometry the process or the

22  machine?

23       A.    Flow cytometry is the process.

24       Q.    Okay.  And what was the name of the

25  machine that you used to do that process?

1                        D. Trahanas

2        A.    LSR II.

3        Q.    Okay.  And was that equipment, the LSR II,

4   was that equipment owned by Dr. Perlman's lab?

5        A.    It was in that lab.  However, I'm not sure

6   if only Dr. Perlman -- it's a very expensive

7   machine, so I'm not sure if only Dr. Perlman owned

8   it or if there was another lab or I guess doctor

9   that -- doctor's lab that owned it with him.

10       Q.    Okay, fair enough.  Now, before you

11  started working in Dr. Schwulst's lab, had you ever

12  done flow cytometry before?

13       A.    Once at Rush, and prior to leaving the

14  University of Chicago I took a course there that

15  Dr. Schwulst had suggested for me prior to going to

16  Northwestern.

17       Q.    Okay.  To help you learn --

18       A.    Sure.

19       Q.    -- how to do the job?

20       A.    Yes.

21       Q.    And then you I assume had to have some

22  additional training while you were in Dr. Schwulst's

23  lab?

24       A.    Yes.

25       Q.    Okay.  And because Dr. Schwulst was not in

Page 75

D. Trahanas

1    the lab all the time, some of that training came

2    from individuals in Dr. Perlman's lab; is that

3    right?

4    A.    Yes.

5    Q.    Okay.  And you said you mentioned that the

6    subjects that you used in Dr. Schwulst's research

7    were mice; is that right?

8    A.    Yes.

9    Q.    And those mice have to be purchased by

10   Dr. Schwulst?

11   A.    Yes, via a vendor, yes.

12   Q.    Okay.  And so you would help with those

13   purchasing responsibilities; is that right?

14   A.    Yes.

15   Q.    Okay.  And because it's an animal subject,

16   there are certain protocols that have to be put into

17   place about the treatment of the animal, correct?

18   A.    Yes.

19   Q.    Okay.  And that has to go through a

20   committee at Northwestern University.  Those

21   protocols have to be approved by a committee at

22   Northwestern University, right?

23   A.    Correct, IACUC.

24   Q.    I'm sorry?

25

```
 1                        D. Trahanas
 2      A.    It's called IACUC, I-A-C-U-C.
 3      Q.    And do you know what that stands for?
 4      A.    I can't recall the acronym's exact name.
 5      Q.    Okay.
 6            MR. DeROSE:  I bet they had something to
 7  do with animal cruelty though.
 8            MS. WERMUTH:  Okay.
 9  BY MS. WERMUTH:
10      Q.    You understood that and you were actually
11  included on the protocol in Dr. Schwulst's lab as
12  someone who would be working with the mice?
13      A.    Yes.
14      Q.    Okay.  And so you were well-versed in that
15  protocol then?
16      A.    Yes.
17      Q.    Right.  And you knew that there were
18  certain -- that, for example -- well, let me back up
19  for a minute.
20            So you said that part of your job involved
21  applying an injury to the mice; is that right?
22      A.    Yes.
23      Q.    Okay.  Is that knocking?  Do you call that
24  knocking?
25      A.    We would -- formally on an IACUC protocol
```

1                          D. Trahanas

2    we wouldn't call it that.

3         Q.   I understand.

4         A.   But we would say hit.

5         Q.   Okay.  And did the protocol contain

6    information about how long after the injury had been

7    applied to the mice it could remain alive before it

8    had to be euthanized?

9         A.   Yes.

10        Q.   Okay.  And do you recall off the top of

11   your head what that time period was?

12        A.   Our experiments varied.  I can't remember

13   in 2012.  Each year we had to update it.

14             So in 2012 I'm not sure if our study

15   included, if that protocol included each time point

16   that we would use between 24 hours and 72, so it's

17   possible it only stated 24.  And then once we

18   hypothesized maybe changing the amount of time we

19   would wait after the injury, then that would have to

20   be included in the protocol.

21        Q.   Okay.  And that has to do with making sure

22   that the animals are treated humanely and not

23   suffering?

24        A.   Of course.

25        Q.   Is that right?

1                          D. Trahanas

2        A.    Yes.

3        Q.    Okay.  And so the protocol might be that

4   anywhere between 24 to 72 hours after injuring the

5   mouse the mouse had to be euthanized; is that right?

6        A.    Yes.

7        Q.    Okay.  And do you know, how many mice

8   would you have in the lab at any given time?

9        A.    The mice were housed in a subbasement

10  actually, not in the lab.

11       Q.    Okay.

12       A.    But depending on when we would schedule

13  experiments, because each day that a mouse -- I

14  wouldn't call it cabin but we called them cabins

15  within the lab, but each box contains five mice.  So

16  that box would cost X amount per day for

17  Dr. Schwulst or Dr. Perlman or whoever to keep the

18  mice in housing because they need to be monitored,

19  and there's specific things that need to be taken

20  care of in the basement; so they would be charged.

21             So sometimes we would have four cages,

22  which is five mice per cage, so about 20 mice.

23       Q.    Okay.

24       A.    At one time -- I can't recall a time that

25  we had more than 30.

Page 79

                                D. Trahanas

1

2      Q.   30 cages or 30 mice?

3      A.   30 mice.

4      Q.   Okay.

5      A.   But our mice were not genetically

6   engineered.  They were more or less common mice, so

7   we could order them and receive them relatively

8   quickly.  So as long as we could plan about a week

9   or so ahead of time we would be able to have the

10  mice in the lab -- not in the lab, I'm sorry, in the

11  subbasement.

12           So once we were done with an experiment we

13  would analyze it, see what the results say,

14  fine-tune things, adjust things; and then it could

15  be a week or it could be a couple days and then I

16  would order another set.  So there was time periods

17  where there were none; there were other times where

18  there were 20 or 30 at most.

19     Q.   Okay.

20     A.   20 to 30 total mice.

21     Q.   And so there was a cost for ordering the

22  mice as well as a cost for storing the mice?

23     A.   Correct, separate.

24     Q.   Got it, okay.  So one was an external cost

25  and one was an internal cost?

1                          D. Trahanas

2        A.   Yes.  One was for the vendor to deliver

3    the models, the mice, and then the other was for the

4    university's management.

5        Q.   Okay.  But that came out of Dr. Schwulst's

6    research budget?

7        A.   Yes, both did.

8        Q.   Both did, okay.  Now, you mentioned that,

9    you know, from time to time as you hypothesized and

10   analyzed data you would have to tweak your

11   methodologies and your protocols; is that right?

12       A.   Yes.

13       Q.   Okay.  And that's sort of what science is,

14   right, so it's trial and error often, correct?

15       A.   Yes.

16       Q.   And the same would be true for protocols

17   as they relate to processes being used in the lab as

18   well; is that right?

19       A.   Yes.

20       Q.   Okay.  And so there may be changes to, for

21   example, the flow cytometry protocol from time to

22   time?

23       A.   So the flow cytometry protocol has -- I

24   don't want to just lump it into one protocol.

25   There's kind of different steps to it.  But

1                         D. Trahanas

2    generally the preparation of the cells, the protocol

3    remained relatively similar, but depending on the

4    tissue and what cells we were looking for and the

5    colors that we would use with those cells, that

6    could change.

7         Q.   Okay.  And these protocols that relate to

8    the variety of processes that you were using in the

9    lab, were they in writing?

10        A.   Yes.

11        Q.   Okay.  And typically they have to be in

12   writing for purposes of any sort of funding that

13   goes along with them, correct?

14        A.   Funding, but also so we could keep record

15   and know where we started, where we ended, where we

16   may have gone wrong, just for record keeping.

17        Q.   Got it.  Okay.  And so sometimes you were

18   involved with tweaking and modifying some of the

19   protocols; is that right?

20        A.   Yes.

21        Q.   Okay.  And when you did that, did you

22   share that information with others in the lab?

23        A.   With Dr. Schwulst.  I presented a couple

24   times during lab meetings with Dr. Perlman's lab.

25   We would -- I would also attend, and if Dr. Schwulst

Page 82

1                         D. Trahanas

2     was not on service he would also attend.

3              So during those times I would speak to

4     others about it and within the Perlman lab.

5         Q.    Okay.  And how frequently did Dr. Perlman

6     hold lab meetings?

7         A.    It would depend on the time of year also.

8     I know he celebrated specific holidays, so if it

9     wasn't -- he would be accommodating, knowing, you

10    know, Christmas break for some in the lab, and then,

11    you know, he celebrated Hanukkah and stuff.

12             So naturally during holiday season the lab

13    meetings would kind of taper off, but generally

14    during the year I would say at least once a month.

15        Q.    And they would take place in the lab

16    proper?

17        A.    No.  They would take place in the

18    conference room that was kitty-corner to the lab.

19        Q.    And how long would they last?

20        A.    Anywhere from 15 minutes to an hour and a

21    half.

22        Q.    Okay.  Now, while you were working in

23    Dr. Schwulst's lab, you also, in terms of analyzing

24    the data, you also coauthored papers and manuscripts

25    with Dr. Schwulst; is that right?

1                        D. Trahanas

2        A.    Yes.

3        Q.    Okay.  And you actually appear as an

4   author on a number of articles with Dr. Schwulst --

5        A.    Yes.

6        Q.    -- is that right?  Okay.

7              Do you know how many of those, how many

8   articles that you were a coauthor on during the

9   period of time that you worked with Dr. Schwulst?

10       A.    Articles, do you mean just specifically

11  papers or presentations as well?

12       Q.    Well, why don't you tell me the full

13  gamut.

14       A.    Four papers, three presentations.

15       Q.    And what does it mean in terms of being

16  like -- when a publication is or a paper is

17  published, the multiple authors' names appear in

18  succession.

19              What does it mean if your name is the

20  first in the name of succession?

21       A.    Generally it's pretty much someone who did

22  most of the work and then, you know, the second

23  person -- everyone contributed.  The first person

24  contributed the most, but then the last name is the

25  senior author, which basically shows like oversight,

1                         D. Trahanas

2    just like Dr. Perlman and Dr. Schwulst would more

3    than likely be mostly at the end of publications at

4    this point in their careers just because they're

5    very versed and so far in their careers.

6         Q.   Okay.  And, I'm sorry, you said you had

7    how many papers published with Dr. Schwulst?

8         A.   I believe four.

9         Q.   And you would agree that was a good

10   opportunity for you to get published as a result of

11   your work at the university?

12        A.   Yes.

13        Q.   Okay.  And you also -- I think you just

14   mentioned that you from time to time also presented

15   at conferences?

16        A.   I presented a -- myself had a poster

17   presentation, and Dr. Schwulst lecture presented.

18        Q.   Okay.  And what is a poster presentation?

19        A.   We basically would have a giant-sized

20   poster with pictures, and it kind of gives you a

21   synopsis of our entire research paper but just on a

22   poster board so people could walk around and talk

23   about it.

24        Q.   Okay.  So you were responsible for

25   preparing the poster board that was being displayed

1                          D. Trahanas

2     then?

3         A.    Yes.

4         Q.    Okay.  And that's considered a

5     presentation?

6         A.    A poster presentation, yeah; a

7     presentation, but poster presentation specifically.

8         Q.    Okay.  And so you can put that on your

9     resumï¿½ as sort of like you being the senior author

10    of that particular presentation, like your name

11    would go last?

12        A.    No, it would go -- because it's based on a

13    paper, whatever the paper -- if I was first author

14    on that paper, then yes.  I would never be a senior

15    author just because I would never oversee anything.

16    I'm not, you know, a mentor or a boss at that point.

17             So I would not be a senior author, so I

18    would more than likely be the first author.

19        Q.    Okay.

20        A.    But it's based on the paper that we were

21    writing about, so that's how that order would go.

22    It would be parallel to that paper.

23        Q.    I see.  Thank you for that clarification.

24    Okay.  So it's very different in legal publications.

25        A.    Sure.

                              D. Trahanas

1

2        Q.    So you would agree with me that having

3   those opportunities to present at national

4   conferences was also good for your career?

5        A.    Yes.

6        Q.    Okay.  And you traveled with Dr. Schwulst

7   on at least a couple of occasions to national

8   conferences; is that right?

9        A.    Yes.

10       Q.    Once I think West Coast, is that right,

11  and once in North Carolina?

12       A.    Yes.  Once was in San Diego, California,

13  and the other time was in Charlotte, North Carolina,

14  yes.

15       Q.    Okay.  And that was the Shock conference;

16  is that right?

17       A.    Yes.

18       Q.    And that's sort of the premier association

19  for injury-related research; is that right?

20       A.    What was the first part?  I'm sorry?

21       Q.    Is Shock the -- Shock is an association,

22  am I right, about that, a medical association?

23       A.    Yes, yes.

24       Q.    And that's the premier association for the

25  study of injury?

```
 1                         D. Trahanas
 2        A.    Yes.
 3        Q.    Okay.  And you went to two of those
 4   national conferences?
 5        A.    Correct.
 6        Q.    Okay.  And you would agree with me that
 7   you did a pretty good job while you worked at
 8   Northwestern University?
 9        A.    Yes.
10        Q.    Okay.  So you would say that you did
11   better than a pretty good job; is that right?
12        A.    Yes.
13        Q.    Okay.  You think you were a very good
14   performer?
15        A.    Yes.
16        Q.    Okay.  Can we mark this, please, as 8.
17                    (Exhibit 8 was marked for
18                     identification.)
19   BY MS. WERMUTH:
20        Q.    Okay.  You've been handed Deposition
21   Exhibit 8, Ms. Trahanas.
22              Looking at the last page, can you tell me
23   if that's your signature?
24        A.    Yes.
25        Q.    Okay.  And can you tell -- so you've seen
```

```
 1                        D. Trahanas
 2   this document before?
 3        A.   Yes.
 4        Q.   And what do you know it to be?
 5        A.   It's our performance review, our annual
 6   performance review.
 7        Q.   Is this your annual performance review?
 8        A.   It's a performance review that our
 9   superiors gave to me, so Dr. Schwulst gave to me.
10        Q.   Okay.  And in this document it is your
11   performance that is being reviewed, correct?
12        A.   Correct.
13        Q.   Okay.  And the date of your signature is
14   May 28th of 2013?
15        A.   Yes.
16        Q.   So this was about a year into working in
17   the lab?
18        A.   Yes.
19        Q.   Okay.  So this is your first formal
20   review?
21        A.   Yes.
22        Q.   Okay.  And you agreed with it, correct?
23        A.   I did.
24        Q.   Okay.  Your overall year-end rating was
25   highly effective?
```

```
1                          D. Trahanas

2        A.    Yes.

3        Q.    Okay.  And underneath your signature

4    there's a sentence that reads that the employee may

5    attach a response page if he or she wishes.

6              Do you see that?

7        A.    I do.

8        Q.    Okay.  And you did not attach a response

9    to this particular document?

10       A.    I did not, no.

11       Q.    Okay.  Was there something else you wanted

12   to add?

13       A.    No.

14       Q.    Can you mark this, please, as 9.

15                       (Exhibit 9 was marked for

16                       identification.)

17   BY MS. WERMUTH:

18       Q.    Okay.  Ms. Trahanas, you've been handed

19   Deposition Exhibit 9.

20             Do you recognize that document?

21       A.    Yes.

22       Q.    And what do you recognize that document to

23   be?

24       A.    It is another performance annual review.

25       Q.    And if you look at the last page, that's
```

1                        D. Trahanas

2    your signature on the document?

3        A.   Yes.

4        Q.   Okay.  And it's dated April 17th, 2014.

5             Do you see that?

6        A.   Yes.

7        Q.   Okay.  So this was about a year after the

8    one we just saw in Exhibit 8; is that right?

9        A.   Yes.

10       Q.   Okay.  And, again, your overall rating was

11   highly effective.

12            Do you see that?

13       A.   Yes.

14       Q.   And you agreed with that rating?

15       A.   I did.

16       Q.   Okay.  And you did not attach any

17   responses to this document either?

18       A.   I did not.

19       Q.   Okay.  Now, in the Comments section on the

20   last page, do you see that?

21       A.   Yes.

22       Q.   Okay.  Do you know whose comments those

23   are?

24       A.   I believe this to be Dr. Schwulst's.

25       Q.   Okay.  And did the two of you have any

1                    D. Trahanas

2    conversations about the contents of his comments in

3    or around the time of April 2014?

4        A.   Yes.

5        Q.   Okay.  And when do you recall having a

6    conversation about the topics raised in his

7    comments?

8        A.   Very close to that date, if not that day.

9        Q.   Okay.  And what do you recall about that

10   conversation?  First of all, where do you recall it

11   taking place?

12       A.   The conversation, his office,

13   Dr. Schwulst's office.

14       Q.   Okay.  And it was just the two of you?

15       A.   Yes.

16       Q.   Okay.  And what do you recall about that

17   conversation?

18       A.   He went over the performance review that

19   you see in front here, I guess performance marked

20   Exhibit 9.  We went over specifics and spoke about

21   the projection of how to -- I'm sorry, we planned,

22   we made subsequent plans as to kind of what our

23   goals for the rest of the year or specific time

24   frame, and then I can't remember what those goals

25   specifically were at this time; and we also touched

1                         D. Trahanas

2     on me asking about receiving a pay increase.

3          Q.   Okay.  And did you ask for a particular

4     increase?

5          A.   As a percentage or a specific amount?

6          Q.   Either.

7          A.   No.  We spoke about it being a promotion,

8     so my conclusion would be it would be within this

9     range.

10         Q.   Okay.  Within what range?

11         A.   The Research Tech 3, their pay, their pay

12    raise.

13         Q.   Okay.  Now, there isn't anything in the

14    comments that mentions promotion specifically,

15    right?  You would agree with me on that?

16         A.   Yes, not in the Comments section, correct.

17         Q.   Okay.  And nothing in the document at all

18    that mentions promotion?

19         A.   No.

20         Q.   Okay.  Now, did he compliment you in this

21    meeting on your improvement with the advanced flow

22    cytometry skill set?

23         A.   Are you referring to the Comments section?

24         Q.   Yes.  Did you guys discuss that?

25         A.   Yes.

Page 93

1                          D. Trahanas

2        Q.   Okay.  And he complimented you?

3        A.   Yes.

4        Q.   Okay.  And you said you discussed the

5   prospect of a raise, which you say was also

6   discussed as a promotion; is that right?

7        A.   Yes.

8        Q.   Okay.  And what specifically did you ask

9   for and what did Dr. Schwulst respond with?

10       A.    My -- my response was if we could take a

11  look at me receiving a pay raise, and then also if,

12  because I had taken on more responsibility, if I

13  could be moved to Research Tech 3.

14            And so I even wrote an e-mail to him I

15  believe this same day thanking him for being

16  receptive and accepting of our discussion of the

17  promotion and pay raise.

18       Q.   Can we mark this, please.

19                      (Exhibit 10 was marked for

20                       identification.)

21  BY MS. WERMUTH:

22       Q.   Okay.  You've been handed what's

23  Deposition Exhibit 10.

24            Do you recognize that document?

25       A.   Yes.

Page 94

1                        D. Trahanas

2        Q.    Is that the e-mail you were just

3   referencing?

4        A.    Yes.

5        Q.    Okay.  Now, this e-mail is dated

6   March 17th, 2014.

7              Do you see that?

8        A.    It is, yes.

9        Q.    So it was actually about a month before

10  you got your review that you had the conversation

11  with Dr. Schwulst?

12       A.    Yes.

13       Q.    Okay.  And so this was you letting

14  Dr. Schwulst know that you appreciated him taking

15  the time to meet with you, correct?

16       A.    Yes.

17       Q.    And being receptive to your requests

18  regarding pay and possible promotion; is that right?

19       A.    Yes.

20       Q.    Okay.  Now, and then you say you can't

21  wait until Shock and this paper and the new stuff

22  gets fine-tuned.

23              Do you see that?

24       A.    Yes.

25       Q.    So Shock was coming up that June?

1                         D. Trahanas

2        A.    Correct.

3        Q.    All right.  And that was when you were

4   going to do your first poster presentation?

5        A.    Yes.

6        Q.    June of 2 --

7        A.    In Charlotte, yes.

8        Q.    And you write also that you were excited?

9        A.    Yes.

10       Q.    All right.  So you were feeling good about

11  work at that point in time?

12       A.    About the papers and work, yes.

13       Q.    Okay.  And can you tell me, you say that

14  your duties, you took on additional duties.

15            Can you tell me what additional duties you

16  took on?

17       A.    Sure, more of ordering supplies.

18       Q.    Okay.  Anything else?

19       A.    I was given access to budgets or funding

20  and so kept track of the funds.

21       Q.    Did Dr. Schwulst have NIH funding at that

22  point in time?

23       A.    He was granted, NIH-funded, and then they

24  withdrew it because I suppose unfortunately that

25  grant went bankrupt for some reason.

```
 1                        D. Trahanas
 2        Q.   So he didn't -- so during the period of
 3   time that you worked in his lab he had not actually
 4   received NIH funds?
 5        A.   They did not give him, yeah, the money.
 6        Q.   Okay.  And he then followed up pretty
 7   immediately with the business manager about the
 8   discussion that the two of you had.
 9             Do you recall that?
10        A.   Yes.
11        Q.   Okay.  May I have that marked, please.
12                       (Exhibit 11 was marked for
13                        identification.)
14   BY MS. WERMUTH:
15        Q.   So I've handed you now what's been marked
16   as Deposition Exhibit 12 [sic].  This is a document
17   that you produced to us, okay.
18             Do you see the Bates on the lower right
19   looks a little different than the documents we've
20   been looking at?
21        A.   Yes.
22        Q.   Okay.  So if you look at the bottom of the
23   first page, which is marked Trahanas 21, you see an
24   e-mail from Steve to someone by the name of Nicole
25   Buikema.
```

Page 97

D. Trahanas

1

2          Do you see that?

3      A.   Yes.

4      Q.   Okay.  And he writes to her, and this

5  is -- so this is March 17th, 2014, the same day that

6  you met with him, correct?

7      A.   Yes.

8      Q.   And it's at 10:23 in the morning,

9  according to this record that you produced to us.

10     A.   Yes.

11     Q.   So would that have been directly after

12  your meeting with him or shortly after your meeting

13  with him?

14          Is that 11?  I called it Exhibit 12.

15  Thank you.  I should correct the record.

16          MR. DeROSE:  Yes, thank you.  I'll change

17  this.

18          MS. WERMUTH:  Sorry about that.

19          THE WITNESS:  Yes.

20  BY MS. WERMUTH:

21     Q.   So he very quickly followed up and said we

22  have started talking about raises and possibly

23  retitling her position to a higher level.

24          Do you see that?

25     A.   Yes.

                              D. Trahanas

1
2        Q.   So he's at least inquiring about it,
3    right?
4        A.   Yes, here, yes.
5        Q.   And he then forwards it to you to show you
6    that he -- well, I don't know.  I'm not going to ask
7    you why.  But he ends up forwarding his
8    conversation, his e-mail conversation to you,
9    correct?
10       A.   Yes.
11       Q.   And that's what we see at the top of the
12   page?
13       A.   Yes.
14       Q.   Okay.  Can we mark that, please, as 12.
15   I'll get that one right.
16                      (Exhibit 12 was marked for
17                       identification.)
18   BY MS. WERMUTH:
19       Q.   So, Ms. Trahanas, you're looking now at
20   Deposition Exhibit 12.
21       A.   Yes.
22       Q.   And this again is a document that you
23   produced to us with Bates label Trahanas 77.
24            Do you see that?
25       A.   I see that.

1                          D. Trahanas

2       Q.    So what is this?

3       A.    This is a conversation between me and my

4    friend Dimitra.

5       Q.    And where -- how were you communicating

6    with Dimitra?

7       A.    This is a text message or Gchat.

8       Q.    What's Gchat?

9       A.    It's a form of texting through our Gmail.

10      Q.    Okay.  And when you were doing your

11   searches for documents, did you search through your

12   Gchat as well for relevant documents?

13      A.    If I searched through specific words like

14   title, this probably came up, yes.

15      Q.    So my question is, did you search Gchat

16   for relevant documents?

17      A.    Not specifically.

18      Q.    Okay.  Now, this looks like it's an

19   excerpt, like it's a part of a conversation.

20            Is that accurate?

21      A.    Yeah, it's a screen shot.

22      Q.    Okay.  And there's then a translation at

23   the bottom of the page -- I don't know, it's not the

24   bottom, the middle of the page I guess.

25            Do you see that?

1                          D. Trahanas

2        A.    Yeah, yeah.

3        Q.    Who added this translation to the

4   document?

5        A.    I gave the translation because it was in

6   Greek.

7        Q.    So like what I'm trying to understand is,

8   how did this document come to exist?  So you took a

9   screen shot of a portion of a conversation, correct?

10       A.    Yes.

11       Q.    And then you turned that into some sort of

12  document upon which you could add additional text?

13       A.    Yes.

14       Q.    And you typed the additional text that is

15  the translation?

16       A.    Yes.

17       Q.    Okay.  And when in time did you create

18  this document that looks the way it looks today?

19       A.    As soon as -- between the time that the

20  defendants or you sent us the interrogatories and

21  the I guess discovery items that you needed.

22       Q.    Okay.  So did you take the screen shot on

23  March 17th, 2014, or did you take the screen shot

24  after you got a request for documents?

25       A.    No, that is part of -- that was when the

Page 101

1                          D. Trahanas

2    conversation happened.  That's like on a text

3    message, right.  It will tell you that it's the same

4    thing.

5         Q.   Right.  So the conversation that is

6    displayed here took place on March 17th, 2014?

7         A.   Correct.

8         Q.   At 10:33 in the morning?

9         A.   Correct.

10        Q.   Okay.  So at the same time Dr. Schwulst is

11   sending his e-mail to Buikema?

12        A.   Yes.

13        Q.   Okay.  And when did you screen shot it?

14   Was it on March 17th, 2014, or was it in connection

15   with the request for documents?

16        A.   No, it was the request for documents.

17        Q.   Okay.  And that's when you added this

18   additional text?

19        A.   Yes.

20        Q.   Okay.  So according to your translation,

21   it says, "I spoke with my boss.  He's going to give

22   me a job title change, which means I can make more

23   money."

24        A.   Yes.

25        Q.   Okay.  Now, his e-mail doesn't say he's

1                          D. Trahanas

2    going to give you a job title change, right?

3         A.   His e-mail does not.

4         Q.   Right.  In fact, his e-mail says about

5    possibly retitling her position?

6         A.   Yes, his e-mail says that.

7         Q.   And when he forwarded this to you,

8    Exhibit 11 to you, the Gmail conversation, you did

9    not correct him and say anything about what are you

10   talking about possibly retitling my position?

11        A.   No.  I mean, we spoke that I do more

12   duties, so I would be -- it would be retitled.

13        Q.   Right.  But I guess in Exhibit 11 you see

14   that he's referring to a possible retitling.

15             Do you see that?

16        A.   Yes.

17        Q.   Okay.  And you didn't go to him and say

18   what do you mean by that?

19        A.   No.

20        Q.   Okay.  Did you formally apply for the

21   Tech 3 position?

22        A.   No.

23        Q.   Now, at some point -- well, strike that.

24             Was there any portion of the conversation

25   between you and Dr. Schwulst about a potential pay

1                        D. Trahanas

2    raise and a potential retitling of your position

3    about when that might go into effect?

4        A.   He didn't give me a specific date, but he

5    did say very soon, I mean as soon as he could get

6    the paperwork done.

7        Q.   He told you that as soon as he got the

8    paperwork done this would all be in place?

9        A.   Yeah, he would have to talk to his

10   department.

11       Q.   Okay.  And did you know what paperwork

12   needed to get submitted?

13       A.   No.

14       Q.   Did you ask him if there was any paperwork

15   that you needed to prepare?

16       A.   I didn't specifically say paperwork, but

17   if there was anything he needed me to do to let me

18   know.

19       Q.   Okay.  Can we mark this, please.

20                    (Group Exhibit 13 was marked for

21                     identification.)

22   BY MS. WERMUTH:

23       Q.   Okay.  I'm going to turn your attention.

24   So Exhibit 13, Ms. Trahanas, is a string of e-mails,

25   but it's a single document.  As you can see by the

```
 1                         D. Trahanas
 2    page numbers at the bottom it starts from Page 1
 3    through Page 12.
 4              MR. DeROSE:  Are you going to call it a
 5    group or just --
 6    BY MS. WERMUTH:
 7         Q.   We can call it a group, that's fine.
 8              I bring this to your attention only
 9    because you would not have received all of these
10    e-mails, okay, but some of these I don't -- you
11    know, they exist in this form.
12              So if I could turn your attention to
13    Page 10, which is also Bates labeled 1895.
14              MR. DeROSE:  And it's Group 13?
15              MS. WERMUTH:  That's fine.  We can call it
16    Group 13 if that's your preference.
17    BY MS. WERMUTH:
18         Q.   Are you with me on Page 10?
19         A.   Yes.
20         Q.   So I see an e-mail in the middle of the
21    page; it looks to be from you at your Northwestern
22    account to Rachel Rufer.
23              Do you see that?
24         A.   Yes.
25         Q.   And do you recall sending this e-mail to
```

1                          D. Trahanas

2    Ms. Rufer?

3          A.    I do.

4          Q.    And who is Ms. Rufer or who was she?

5          A.    Rachel at the time worked for the

6    department, and she was the one I would contact in

7    terms of anything I would be purchasing, anything

8    really financially oriented with the lab.

9          Q.    Okay.  And the first part of your e-mail

10   is referencing precisely that sort of information,

11   right?

12         A.    Yes.

13         Q.    Okay.  So when you talk about a Chart

14   string, this has to do with availability of funds to

15   make purchases; is that right?

16         A.    Yes.

17         Q.    Okay.  All right.  And then in the last

18   paragraph you write in addition -- and by the way,

19   this e-mail is dated June 27th, 2014, right?

20         A.    Yes, I see that.

21         Q.    And is that consistent with your memory as

22   to when you had this e-mail communication with

23   Ms. Rufer?

24         A.    It is.

25         Q.    Okay.  And you in the last paragraph of

Page 106

                         D. Trahanas

1

2    your e-mail, you say, "I know Dr. Schwulst submitted

3    the paperwork for my promotion, but I have not seen

4    the change since the submission."

5            Do you see that?

6    A.   Yes.

7    Q.   "Is there someone I or Dr. Schwulst need

8    to contact?"

9            Do you see that?

10   A.   Yes.

11   Q.   Okay.  And then you go on to say, "It's

12   been months that my pay increase has not been in

13   effect.  Do we need to backdate this?"

14   A.   Yes.

15   Q.   Now, before you sent this e-mail, it

16   sounds like you talked to Dr. Schwulst; is that

17   right?

18   A.   About the promotion, yes.

19   Q.   Okay.  And did you talk to Dr. Schwulst

20   about the paperwork, because it says "I know

21   Dr. Schwulst submitted the paperwork for my

22   promotion."

23           What's the basis for that statement?

24   A.   I must have spoken to him.

25   Q.   You don't recall?

```
 1                    D. Trahanas
 2      A.   I don't recall.
 3      Q.   Okay.  And Ms. Rufer responded to you
 4  later that day, right?
 5           MR. DeROSE:  What page, Counsel?
 6  BY MS. WERMUTH:
 7      Q.   Same page.  It's starts on the preceding
 8  page.  So it says -- on Page 9 it says from Rufer,
 9  Rachel, Friday, June 27, 2014, at 2:50 p.m.
10           Do you see that?
11      A.   Yes.
12      Q.   And then on the next page, Page 10, it
13  says to Diane M. Trahanas with a carbon copy to
14  Krissy Dulek?
15      A.   Yes.
16      Q.   Okay.  And she says, "This is something
17  that is in the works for the new fiscal year, which
18  starts September 1," right?
19      A.   Yes.
20      Q.   Okay.  And that satisfied you at the time;
21  is that right?
22      A.   At the time, yes.
23      Q.   Okay.  And then in September of that year
24  you got your new salary letter?
25      A.   I received a merit increase.  I'm not
```

```
 1                        D. Trahanas

 2    sure.  I don't want to -- that's what it was called

 3    or that's how I know it as.

 4         Q.   Okay.  Can we have that marked, please.

 5                   (Exhibit 14 was marked for

 6                    identification.)

 7    BY MS. WERMUTH:

 8         Q.   All right.  Do you see what's now been

 9    marked as Deposition Exhibit 14?

10         A.   Yes.

11         Q.   And is that an e-mail that you received on

12    or about August 19th of 2014?

13         A.   Yes.

14         Q.   Okay.  And according to this e-mail you

15    were being notified that your employment was being

16    extended for an additional year in the position of

17    Research Technologist 2.

18                   Do you see that?

19         A.   Yes.

20         Q.   With the begin date being September 1,

21    2014, and end date being August 31, 2015 --

22         A.   Yes.

23         Q.   -- do you see that?  Okay.

24                   So you knew as of August that you were

25    going to remain in the research technologist
```

```
1                        D. Trahanas
2    position 2 for the following year?
3         A.   Yes.
4         Q.   Okay.  Can we mark that, please.
5                    (Exhibit 15 was marked for
6                     identification.)
7              THE WITNESS:  Can I add to that?
8    BY MS. WERMUTH:
9         Q.   Sure.
10        A.   When I knew -- I knew with this letter I
11   was being told that, but I'm pretty sure I responded
12   to this e-mail.
13        Q.   When you say "this e-mail," what are you
14   referring to?
15        A.   I'm responding to --
16        Q.   Just tell me the exhibit number.  I just
17   want to make sure I'm looking at the same document
18   that you're looking at.
19        A.   So we were just talking about Exhibit 14.
20        Q.   Okay.
21        A.   And so you had asked me if I knew that I
22   would be in the Research Tech 2 position in
23   October 19, 2014, starting from September 1st to
24   August 31st.  I had seen this, but the -- from what
25   I knew it would not be -- it had to be changed,
```

                                D. Trahanas

1

2    which would be effective September 1st because of

3    what Ms. Rufer wrote me in Group Number 13's e-mail,

4    that she was essentially saying my promotion would

5    be effective September 1st for the new fiscal year.

6         Q.   And so this Exhibit 13 has -- I'm sorry,

7    Exhibit 14 has a sentence at the very end that says,

8    "Please reply confirming you have received this

9    e-mail."

10             Do you see that?

11        A.   Yes.

12        Q.   And did you reply to confirm that you had

13   received it?

14        A.   I did not.

15        Q.   So you did not reply to Exhibit 14?

16        A.   No.

17        Q.   All right.  Now you've been handed what's

18   been marked as Exhibit 15.

19             Do you recognize that letter?

20        A.   I recognize it from the Bates or discovery

21   that you had sent us.

22        Q.   Okay.

23        A.   But I noticed that it's not my name at the

24   top that it's addressed to.

25        Q.   So you do see in the upper left there's a

1                            D. Trahanas

2    date August 19, 2014, right?

3        A.    Correct.

4        Q.    And it has your name and your residential

5    address correct there?

6        A.    It does.

7        Q.    And then it says "Dear Kendra" instead of

8    "Dear Diane"?

9        A.    Yes.

10       Q.    And did you receive this at your home

11   address in August of 2014?

12       A.    I don't recall.

13       Q.    Okay.  Do you ever remember asking

14   somebody why you might have gotten a letter that was

15   addressed to Kendra as opposed to yourself?

16       A.    I never asked.  I'm sure I would have if I

17   did receive the letter.

18       Q.    Do you have any reason to believe this was

19   not sent to your home?

20       A.    I would most definitely just inquire about

21   there possibly being a mistake because they maybe

22   had confused me with this person that it is

23   addressed to as Kendra.

24       Q.    So let me ask you this though:  You were

25   working in the department of trauma and --

1                         D. Trahanas

2      A.   Critical care.

3      Q.   -- critical care, although "care" is

4   missing as well, right?

5           And the department -- here it's listed the

6   Feinberg School of Medicine, Department of Trauma

7   and Critical.

8           Do you see that?

9      A.   Yes.

10     Q.   So that's at least your right department,

11  correct?

12     A.   Yes.

13     Q.   And the research technologist position 2

14  is the same position that was in the e-mail that was

15  in the exhibit marked 14, correct?

16     A.   Yes.

17     Q.   Okay.

18     A.   Those two agree.

19     Q.   Okay.  And in the second-to-last paragraph

20  it says Diane, we are looking forward to working

21  with you.

22          Do you see that?

23     A.   Yes, I do.

24     Q.   Okay.  But you just can't recall if you

25  actually received this at your home address?

1                        D. Trahanas

2        A.    No.   The only letter I recall receiving

3   about any sort of merit or title position letter is

4   from Mr. Chris Scarpelli.

5        Q.    And who is Mr. Chris Scarpelli?

6        A.    Definitively I can't tell you what

7   department he works for, but I know that he was the

8   one that sent us -- he would send us our annual

9   merit increase.

10       Q.    Can we mark this, please, then as 16.

11                      (Exhibit 16 was marked for

12                       identification.)

13  BY MS. WERMUTH:

14       Q.    Okay.   You've now been handed what's been

15  marked as Deposition Exhibit 16.

16             Do you recognize that document?

17       A.    Yes.

18       Q.    Okay.   And this is a letter to you from

19  Chris Scarpelli dated September 2014; is that right?

20       A.    Yes.

21       Q.    Okay.   And according to this letter, under

22  your name in the upper left it says Research

23  Technologist 2.

24             Do you see that?

25       A.    Yes.

Page 114

                            D. Trahanas

1

2       Q.   And it says "MED dash Trauma & Critical"?

3       A.   Yes.

4       Q.   So that information is accurate or was

5   accurate at the time?

6       A.   It was not.  I responded to this, to this

7   letter.

8       Q.   Okay.  And you say it was not accurate

9   because you believed that you were entitled to a

10  promotion to Research Technologist 3?

11      A.   Yes, I believed that I was supposed to be

12  retitled to Research Tech 3.

13      Q.   Okay.  And so when you got this letter you

14  were unhappy?

15      A.   I just thought that there was a mistake.

16      Q.   Oh, okay.  Now, let me ask you this:

17  According to this letter, your new hourly rate was

18  $20.06 according to this letter, right?

19      A.   As the letter states, yes, $20.06.

20      Q.   And that was an increase over 19.48 the

21  prior year, $19.48?

22      A.   Yes.

23      Q.   So that was about a 3 percent increase?

24      A.   Yes.

25      Q.   So when you got this letter, what did you

```
 1                        D. Trahanas
 2   do?
 3        A.   I e-mailed -- I believe I e-mailed Rachel,
 4   Ms. Rufer, Rachel Rufer, and then she directed me to
 5   Krissy Dulek because Rachel was no longer within the
 6   department, or I'm not sure, maybe her position
 7   changed; and I notified them that there was
 8   something inconsistent with this letter.
 9        Q.   Okay.  Can you mark that, please.
10                         (Group Exhibit 17 was marked for
11                         identification.)
12   BY MS. WERMUTH:
13        Q.   Okay.  So you're looking now at I guess
14   what we can call Group Exhibit 17.  This is a series
15   of e-mails that you produced to us in this
16   litigation, okay?
17        A.   Okay.
18        Q.   And you can see the Bates labeling at the
19   bottom is Trahanas 261 through Trahanas 270.
20             Do you see that?
21        A.   Yes.
22        Q.   Okay.  So let's go to Page 268, which
23   is -- it's Trahanas 268.
24        A.   Okay.
25        Q.   And that's the e-mail that you sent to
```

Page 116

```
 1                    D. Trahanas

 2    Krissy Dulek; is that right?

 3         A.   Yes.

 4         Q.   At the bottom there?

 5         A.   Yes.   On September 24th of 2014?

 6         Q.   Yes.   At 2:34 p.m.?

 7         A.   Yes.

 8         Q.   Okay.   And you copied Rachel Rufer?

 9         A.   Yes.

10         Q.   Okay.   And so is this the date upon which

11    you received the letter from Mr. Scarpelli?

12              MR. DeROSE:   That was Exhibit 16.

13              THE WITNESS:   I believe it was

14    September 24th, yes.

15    BY MS. WERMUTH:

16         Q.   Okay.   And you say, "I wanted to inform

17    you that this is not reflective of the promotion

18    Dr. Schwulst issued me back in March."

19         A.   Yes.

20         Q.   Okay.   Now, we haven't seen any

21    documentation that shows that you were issued a

22    promotion, have we?

23         A.   Thus far, no.

24         Q.   Do you have any documentation that

25    supports your assertion that Dr. Schwulst issued you
```

Page 117

                        D. Trahanas

1

2   a promotion in March of 2014?

3        A.   I don't have any documentation that he

4   issued it to me.  However, within the evidence that

5   Northwestern provided us there is an e-mail chain in

6   which he is discussing with somebody about my

7   promotion.

8        Q.   Right.  Well, we did see already today

9   that on March 17th he mentioned to the department

10  administrator the possibility of retitling your

11  position, right?

12       A.   In March, correct.

13       Q.   Okay.  And you're saying there's a

14  subsequent conversation where he is actually trying

15  to or where it's documented that he has issued you

16  the promotion?

17       A.   He is having a discussion with I believe

18  Ms. Burke in an e-mail about finishing the paperwork

19  for the promotion and discussing the duties and the

20  pay so that it could be implemented September 1st.

21  However, I mean, at this time in September 24th of

22  2014 I did not have that documentation.

23       Q.   Right, okay.  And you say, "I have been

24  fulfilling my Research Tech 3 responsibilities since

25  March."

                              D. Trahanas

1

2          Do you see that?

3     A.   Yes.

4     Q.   Okay.  And that was the purchasing

5  responsibilities that you talked about?

6     A.   Amongst others.

7     Q.   What are the others?

8     A.   I mean, I was the only person that -- I

9  was the only person in the lab, so I did -- I was

10  essentially a lab manager and not just a Research

11  Tech 3.

12     Q.   And what duties are associated with being

13  a lab manager?

14     A.   Managing the lab in terms of knowing

15  goals; knowing projects; attending meetings;

16  making -- schedule meetings; ordering, as we

17  discussed earlier, supplies.

18     Q.   The duties that you've just described, are

19  those duties that you just started assuming in March

20  of 2017?

21     A.   I list it as March of 2017, but I believe

22  I was probably -- not probably.  I believe I was

23  fulfilling them a little bit earlier than that.

24     Q.   Okay.  And Krissy referred you back to

25  Dr. Schwulst, correct?

1                              D. Trahanas

2        A.    Yes.

3        Q.    On Page 268 she referred you back to

4   Dr. Schwulst, right?

5        A.    Yes.

6        Q.    And this trail is confusing.  I don't know

7   if it's a Gmail situation, but if look at

8   Page Trahanas 267.

9        A.    Uh-huh.

10       Q.    It looks like -- so I'm looking at the

11  bottom third of the page where it says On Wednesday,

12  September 24th, 2014, at 4:27 p.m.

13              Do you see that?

14       A.    Yes.

15       Q.    And it looks like an e-mail from

16  Dr. Schwulst?

17       A.    Yes.

18       Q.    To you?

19       A.    Correct.

20       Q.    Okay.  It says, "Diane, can we talk about

21  this when I am off service?"

22              So he was in his surgery service or

23  clinical work at that time?

24       A.    Yes, at that time.

25       Q.    Okay.  And then he goes on to say, "My

1                          D. Trahanas

2    impression was that this was a substantial

3    percentage raise, 4.5 percent I think, and in line

4    with what we discussed at your review.  Please

5    refresh my memory if this is correct."

6              MR. DeROSE:  Incorrect.

7    BY MS. WERMUTH:

8         Q.   Incorrect, I'm sorry.  Do you see that?

9         A.   Yes, I do see that.

10        Q.   And your review happened in as we've seen

11   in April of 2017, correct?

12        A.   Yes.

13        Q.   Okay.  So that was a month after the March

14   conversation about the promotion?

15        A.   Yes.

16        Q.   Okay.  And if you look at Exhibit 9.

17        A.   Okay.

18        Q.   And if you could go to the last page with

19   Dr. Schwulst's comments.

20        A.   Okay.

21        Q.   At the time of your review he does say

22   that you should be considered for a

23   performance-based raise, right?

24        A.   Yes.

25        Q.   Okay.  But at the time of your review he's

1                              D. Trahanas

2    not saying anything in his comments about a

3    promotion, correct?

4         A.    In the Comments section, no.

5         Q.    Okay.  So then later that day, going back

6    to the current exhibit, which is Group Exhibit 17,

7    Page Trahanas 267, you write back at 5:58, you say,

8    "Hello, everyone," but I can't tell who's on your

9    e-mail.

10              Do you see that, the upper third on

11   September 24, 2014, at 5:58 p.m.?  Do you see that?

12        A.    Oh, yes.

13        Q.    Okay.  It's an e-mail from you, and it

14   says, "Hello, everyone."

15              Who are you sending this to?  I can't

16   tell.

17        A.    It would have to be Krissy and Heather.

18        Q.    It was not Dr. Schwulst?

19        A.    And Dr. Schwulst, yes.

20        Q.    Okay.  So you say that you'd like to talk

21   to Dr. Schwulst before you get back to them and get

22   things straightened out, right?

23        A.    Yes.

24        Q.    But you did ask about when the

25   clarification when he returns would take effect,

```
1                        D. Trahanas
2    right?  So in the last paragraph you say, "My
3    concern:  Will the clarification/agreement we make
4    when he returns in October take effect for this
5    September 2014?"
6              Do you see that?
7         A.   Yes.
8         Q.   Okay.  Okay.  And then two days later it
9    looks like you e-mailed them again, and it looks
10   like -- I'm looking at the top of 267, Trahanas 267.
11   You say -- and this looks like it's just to Krissy
12   and Heather.
13        A.   Yes.
14        Q.   Not to Dr. Schwulst.
15        A.   No.
16        Q.   So are you certain that the other one also
17   copied Dr. Schwulst, the one just below?
18        A.   Yes, because he would be the one that
19   directed me, so I would want to keep him in the
20   loop.
21        Q.   Okay.  But you didn't keep him in the loop
22   on this other e-mail, right?
23        A.   If he's on service he's probably not going
24   to see it anyways was probably my thinking so why
25   spam him.  But realistically he wouldn't be able to
```

1                          D. Trahanas

2    answer any questions I asked anyways.

3         Q.   So you repeated your question about when

4    any potential agreement might take effect, right?

5         A.   Correct.

6         Q.   And Krissy did say that on the preceding

7    page, Trahanas 266, that if changes were approved by

8    the dean's office they can be retroactive, right?

9         A.   Are you --

10        Q.   Do you see the bottom of Trahanas 266?

11        A.   Yes.

12             Yes, I see that Ms. Burke wrote any

13   changes would need to be approved by the dean's

14   office, FSM dean's office.

15        Q.   By the way, up above that e-mail it says

16   "Quoted text hidden," and I see that like four times

17   on this page.

18        A.   Uh-huh.

19        Q.   What is that?

20        A.   So it's basically when you have a

21   signature on Gmail -- can I ask, do you have a Gmail

22   account, or am I not allowed to ask?  It doesn't

23   matter.

24             MR. DeROSE:  She asks questions.  Just

25   answer.

```
 1                       D. Trahanas
 2            THE WITNESS:  So on a Gmail account what
 3    happens is when you have like a signature, like your
 4    name, maybe like a department you work for and your
 5    degrees, it will -- when you're looking at things,
 6    so it doesn't span I guess the entire page when
 7    you're viewing something, it will compact that so
 8    you're not seeing everyone's ending or their,
 9    quote-unquote, signature as Gmail calls it.
10    BY MS. WERMUTH:
11        Q.    So everywhere I see that "Quoted text
12    hidden" that's the only thing that's hidden?
13        A.    Yes.
14        Q.    There isn't like substantive conversation
15    that you've hidden?
16        A.    No, not that I have hidden, no.  That's
17    how it prints out.
18              So I can go back and triple check, but as
19    far as everything I've already looked over I did
20    look that over because my attorney asked me the same
21    thing, and that's what I found.  It's just the
22    signature or it's showing you what you're responding
23    to.
24        Q.    Okay.  Did you have a conversation with
25    Dr. Schwulst when he returned from service?  I think
```

```
 1                    D. Trahanas
 2   that's what you call it, service.
 3        A.   About the promotion, yes.
 4        Q.   And what do you recall about that
 5   conversation?
 6             Strike that.
 7             So let me ask you this:  When did
 8   Dr. Schwulst return from service after these
 9   particular e-mails that we looked at in Group 17?
10        A.   Probably after the first week of October.
11        Q.   Okay.  And where do you recall having the
12   conversation with Dr. Schwulst on this topic?
13        A.   In the lab.
14        Q.   Okay.  And tell me what you recall about
15   that conversation, what he said to you and what you
16   said to him.
17        A.   He told me that he would talk to the
18   department and I guess reach out to the department
19   and see what needed to be done.
20        Q.   To do what?  What needed to be done for
21   what purpose?
22        A.   For the promotion, the retitle.
23        Q.   So is it a promotion or is it a retitling?
24        A.   I mean, the retitling would be to a higher
25   job, so it would be equal to a promotion.
```

1                          D. Trahanas

2        Q.   Okay.  So it's your testimony that in

3    October of 2014 Dr. Schwulst was still telling you

4    that he was seeking to get you promoted?

5        A.   Yes.

6        Q.   Okay.  And do you know if he, in fact,

7    took efforts to get you a promotion with the

8    department administration?

9        A.   Yes.

10       Q.   Okay.  And you know that because he told

11   you that?

12       A.   Well, he told me, and I believe there's a

13   few e-mails that I read from Northwestern that show

14   that as well.

15       Q.   Right.  And it shows that he was, in fact,

16   trying to get you higher pay, correct?

17       A.   Yes.

18       Q.   And he was also at least inquiring as to

19   whether or not you could still be graded as a

20   Tech 3, correct?

21       A.   I'm sorry, still graded as a Tech 3, or do

22   you mean --

23       Q.   He was still inquiring about whether or

24   not you could be graded as a Tech 3?

25       A.   Yes.

```
 1                        D. Trahanas
 2            MR. DeROSE:  Counsel, we haven't had a
 3    break, but I don't want to wear out the reporter.
 4    Are we close to lunchtime, or should we take a break
 5    at some point?
 6            MS. WERMUTH:  Sure.  So let's go off the
 7    record for a quick second here.
 8                        (Whereupon, an off-the-record
 9                        discussion was held.)
10    BY MS. WERMUTH:
11        Q.   So we can go back on the record.
12            There is an exhibit that we have marked
13    already, Group Exhibit 13.  If you could go back to
14    that for a moment.
15            Do you have it?
16        A.   Oh, yes.  I'm sorry.
17        Q.   No worries.  So Page 8 of this exhibit,
18    which is also Bates marked Trahanas-NU1893.
19        A.   Yes, I'm there.
20        Q.   Okay.  So are these the e-mails that you
21    said that you read that showed that Dr. Schwulst was
22    endeavoring to get you a higher rate of pay and a
23    retitling of your position?
24        A.   This is part of them, yes.
25        Q.   Okay.  So after you reached out to
```

```
 1                      D. Trahanas
 2   Rachel Rufer on September 24th, 2014, ultimately
 3   Heather Burke got involved and she reached out to
 4   Dr. Schwulst, right, according to these e-mails?
 5        A.   According to these e-mails, yes.
 6        Q.   And if you look at Page 8, you can see
 7   that Dr. Schwulst says to Heather I can't afford to
 8   lose Diane right now.
 9             Do you see that?
10        A.   Yes.
11        Q.   "Can we make her an RT3 at $21 per hour?"
12        A.   Yes.
13        Q.   Okay.  And RT3, do you know what that
14   refers to?
15        A.   Research Tech 3.
16        Q.   Okay.  So in September of 2014 he was
17   asking if he could change your pay and change your
18   title?
19        A.   Correct.
20        Q.   Okay.  And there's some back and forth
21   which you were not copied on at the time that tells
22   him that -- where he learns according to these
23   e-mails that this would require an off-cycle budget
24   request, right?
25             So look at Page 7, for example --
```

1                          D. Trahanas

2        A.    Okay.

3        Q.    -- which is Trahanas-NU1892.

4              Do you see at the bottom the e-mail from

5   Heather to Dr. Schwulst?

6        A.    Yes.

7        Q.    It says, "Unfortunately, since this

8   request is not considered off-cycle and Diane's

9   salary isn't funded, it won't be approved by the

10  dean's office."

11             Do you see that?

12       A.    I do see that.

13       Q.    And do you know what that means, that your

14  salary is not funded?

15       A.    No.   I would assume --

16             MR. DeROSE:   Well, objection to assuming

17  anything.

18             THE WITNESS:   No, I don't know.

19  BY MS. WERMUTH:

20       Q.    Okay.   Did Dr. Schwulst have -- he didn't

21  have NIH funding at that point in time, correct?

22       A.    He did not.

23       Q.    Okay.   And then on Page 6, the preceding

24  page at Trahanas-NU1891, do you see that?

25       A.    Yes.

Page 130

```
 1                         D. Trahanas

 2       Q.   Okay.  He writes to Heather.  Now we're in

 3  December of 2014.

 4            Do you see that?

 5       A.   Yes, I see that.

 6       Q.   December 11, 2014.  He writes to Heather

 7  saying, "Diane, my research technician, is really

 8  unhappy with her compensation."

 9            Do you see that?

10       A.   I do see that.

11       Q.   And that's what you told Dr. Schwulst,

12  right, you were not happy with your compensation?

13       A.   Amongst other things, yes.

14       Q.   Okay.  Well, so when you say "amongst

15  other things," what are you referring to?

16       A.   That was -- that wasn't the only topic of

17  our conversation.

18       Q.   What conversation?

19       A.   About the compensation, the conversation

20  including the compensation.

21       Q.   What was the other part of that

22  conversation?

23       A.   How tired I was, just how I felt, yeah.

24       Q.   So you told him you were working a lot,

25  and the compensation was not sufficient for the
```

1                          D. Trahanas

2    hours you were putting in?

3        A.   Not just for the hours I was putting in

4    but for the work I was doing.

5        Q.   Okay.  So you told him you were not happy;

6    is that right?

7        A.   Unhappy or disappointed.

8        Q.   Were you frustrated?

9        A.   No.

10       Q.   You weren't frustrated?

11       A.   I think I was just -- not I think.  I was

12   really just disappointed.

13       Q.   Okay.  And he writes that you were

14   actively looking for and had received an offer of

15   alternate employment.

16            Do you see that?

17       A.   I do see that.

18       Q.   And did you tell him that, that you had

19   gotten another offer somewhere else?

20       A.   I told him that if I were going somewhere

21   else they would pay me more.

22       Q.   So here's my question:  Did you actually

23   tell him you had another job offer?

24       A.   No.

25       Q.   So he just made that up?

1                         D. Trahanas

2        A.    Maybe he misunderstood.  I'm not sure.

3        Q.    So you never told him that you had another

4    job offer?

5        A.    No.

6        Q.    Okay.  All right.  Can you turn to Page 4,

7    which is also marked Trahanas-NU1889.

8              By the way, you didn't have another job

9    offer in December of 2014, did you?

10       A.    No.

11       Q.    Were you actively looking for work outside

12   the university at that time?

13       A.    That is correct.

14       Q.    Okay.  And when did you start actively

15   looking for alternate work?

16       A.    It was starting back in 2013.

17       Q.    And where?  Were you looking inside the

18   university or outside the university?

19       A.    Mostly inside the university.

20       Q.    Okay.  Were you also looking outside the

21   university?

22       A.    Yes.

23       Q.    And did you -- between 2013 and December

24   of 2014, did you have any interviews with anybody,

25   any other employers, whether within the university

1                           D. Trahanas

2    or outside the university?

3         A.    I believe in 2014.

4         Q.    And did you receive any offers?

5         A.    They gave me a recommendation to apply for

6    another -- they gave me a recommendation that based

7    on my background that I would be better for a

8    different position than the one that I had

9    interviewed for, but I did not receive an offer for

10   that specific position that I had interviewed for at

11   the time.

12        Q.    And was that inside the university or

13   outside the university?

14        A.    It was outside.

15        Q.    Okay.  Where was it?

16        A.    It was for a medical sales group.  They

17   sold anything from cardiology equipment to plastics

18   equipment, plastic surgery equipment.  And so I had

19   interviewed for a plastics device sales position,

20   and they recommended me for a neuro sales position.

21        Q.    And did you -- when you say they

22   recommended you, did they refer you over to that

23   unit?

24        A.    They did, but I did not follow up with

25   them.

Page 134

D. Trahanas

1    Q.   Okay.  So you chose to take yourself out

2    Q.   Okay.  So you chose to take yourself out

3    of the running for that job?

4    A.   I didn't -- based on the interview that I

5    did with the woman, I didn't think that that company

6    or position was exactly what I needed, what I was

7    looking for.

8    Q.   Okay.  So you took yourself out of the

9    running for any potential employment with that

10   employer?

11   A.   Yes.

12   Q.   And what was the name of the company?

13   A.   I would -- I would have to go back and

14   look for it.  I don't recall.

15   Q.   Okay.  Can you stay in that same group

16   exhibit and turn to Page 4.

17   A.   Sure.

18   Q.   And when you say you have to go back and

19   look for it, would you have records of your

20   application with that employer?

21   A.   I have records of jobs that I was applying

22   to on my notebook.

23   Q.   What notebook?

24   A.   My -- the list of jobs that you guys had

25   sent us, the Research Tech 3 jobs or Research Tech 4

Page 135

1                            D. Trahanas

2    jobs, like back in 2000 [sic], so that would be

3    that --

4              MR. DeROSE:  We produced that?

5              THE WITNESS:  Yeah.

6    BY MS. WERMUTH:

7         Q.   Back in 2000?

8         A.   Not in 2000, after 2010, like all those

9    jobs that you were mentioning about applying to

10   Northwestern between 2010 and 2012.

11        Q.   Okay.

12        A.   I probably noted somewhere the job or

13   maybe the company somehow or maybe a suggestion that

14   somebody told me to apply to that position.

15        Q.   What we produced to you is only records

16   that Northwestern would have about applications you

17   made to Northwestern.

18        A.   Sure.

19        Q.   So when you say that you applied to some

20   company outside of Northwestern and you kept a

21   notebook, I'd like to know what you're referring to.

22   Those are not records that we produced.

23        A.   Like a --

24              MR. DeROSE:  We produced to you, Counsel,

25   her job searches; you know that.

```
 1                      D. Trahanas
 2              THE WITNESS:  Yeah.
 3  BY MS. WERMUTH:
 4         Q.    Dating back to 2014?
 5         A.    Yeah.  It was between -- I believe you
 6  asked from 2012 to 2015.
 7         Q.    And you produced all of that?
 8         A.    Yes, so it should be within that list.
 9         Q.    Okay.  All right.  Looking at Group
10  Exhibit 13, Page 4, which is Trahanas 1889,
11  Trahanas-NU1889.  I should be clear.
12         A.    Okay, yes.
13         Q.    And in the middle of the page it says
14  forwarded message, Steven Schwulst to Diane
15  Trahanas, December 16, 2014, at 1:15 p.m.
16              Do you see that?
17         A.    Yes.
18         Q.    Okay.  So according to this Steven
19  Schwulst forwarded to you the following e-mails with
20  a note that says, "See below.  Can you start this
21  while I am on service?"
22              Do you see that?
23         A.    I do see that.
24         Q.    Okay.  So at this point in time
25  Dr. Schwulst was back on service again; is that
```

Page 137

```
 1                        D. Trahanas
 2   right?
 3        A.   Correct.
 4        Q.   Okay.  And so the e-mails that he forwards
 5   are all the e-mails that follow in Pages 5 through
 6   12, right?
 7        A.   Yes.
 8        Q.   Okay.  And so when you look at Page 5,
 9   which is Trahanas-NU1890, it says the process --
10   it's an e-mail from Heather Burke to Steven Schwulst
11   saying, "The process for requesting an off-cycle
12   increase is attached.  This document details the
13   steps and the process as well as supplementary
14   information you'll need to provide."
15             So Dr. Schwulst in his e-mail to you on
16   December 16th is asking you to start pulling that
17   information together.
18             Is that what you understood his e-mail to
19   be?
20        A.   Yes.
21        Q.   Okay.  And you quickly as of 2:01 p.m.
22   forward his e-mail to Daina Fernandez.
23             Do you see that?
24        A.   What page, I'm sorry?
25        Q.   Page 3, 1888.
```

1                          D. Trahanas

2          A.    Okay.   I'm there.

3          Q.    So do you see at the very bottom from

4    Diane Trahanas, December 16th, 2014, at 2:01 p.m. to

5    Daina Fernandez, subject, forward promotion.

6          A.    Yes.

7          Q.    Do you see that?

8          A.    I do.

9          Q.    Okay.  So you say, "Hello, Diane.  I think

10   you meant Daina.  And I don't know if she pronounces

11   it Daina or --

12               MS. MYRIANTHOPOULOS:  Daina.

13   BY MS. WERMUTH:

14         Q.    D-a-i-n-a.  But you write, "Hello, Diane,"

15   and then you say, "I am a bit confused again."

16               So who is Daina Fernandez?

17         A.    She's in HR.  She's in the department of

18   HR.

19         Q.    And you say, "I am a bit confused again."

20               Was this the first time -- this was not

21   the first time you had reached out to Daina?

22         A.    No.  I had met with her right before that.

23         Q.    I see.  To talk about this issue of the

24   promotion?

25         A.    Yes.

                              D. Trahanas

1

2     Q.    Okay.   And that was the first time you had

3 contacted Daina; is that right?

4     A.    Correct.

5     Q.    Okay.   And you say, "I am not

6 understanding why Dr. Schwulst needs to submit all

7 this unnecessary paperwork."

8     A.    Yes, I see that.

9     Q.    "For something that was submitted and

10 agreed upon back in March."

11          Do you see that?

12    A.    I do see that.

13    Q.    And when you say, again, when you say

14 "agreed upon back in March," you're referring to the

15 conversation on March 17th, 2014, that we've already

16 talked about?

17    A.    Yes.

18    Q.    Okay.   And so you had questions about why

19 this was considered off-cycle and why this paperwork

20 needed to be completed?

21    A.    Yes.

22    Q.    Okay.   And so tell me about your meeting

23 with Daina Fernandez.   When did that occur?

24    A.    It must have been -- I'm sorry, not must

25 have.   It was -- it was in December after

```
 1                    D. Trahanas
 2   Dr. Schwulst and I had met about revisiting this
 3   promotion issue, and he was -- he was unhappy with
 4   me.  And so my co-worker Salina, she saw me upset
 5   and insisted that I go and see someone at least and
 6   talk to in HR; so I -- so Salina walked me to HR,
 7   and I met with Ms. Fernandez, and I gave her a
 8   little bit of background of sort of from the
 9   beginning of March until kind of what was going on
10   at the moment and what I could do or what my options
11   were in terms of who I could contact and get a
12   better idea of kind of what was going on.
13        Q.   Okay.  So you met with her in December of
14   2014, is that fair?
15        A.   Yes.
16        Q.   Okay.  And the topic of the meeting was
17   your concerns about your pay and promotion?  That's
18   what you discussed with her?
19        A.   Yes, and also another one of my concerns
20   was all these e-mails that had been going back and
21   forth, and it just seemed -- I got that e-mail back
22   in June from Rachel saying this will be starting in
23   September, and then September rolls around and next
24   thing you know it's December and we've kind of been
25   playing e-mail tag with everyone.
```

1                          D. Trahanas

2          Q.    Okay.

3          A.    So --

4          Q.    So you wanted to get closure on this topic

5     of the pay and promotion --

6          A.    Yes.

7          Q.    -- and so sought out HR's assistance --

8          A.    Yes.

9          Q.    -- to make that happen?

10               And as you pointed out, you were unhappy

11    at this point in time?

12         A.    I was sad.

13         Q.    Okay.  Were you mad?

14         A.    No.

15         Q.    Were you frustrated?

16         A.    I just felt really hurt and just

17    disappointed, and I kind of felt helpless.

18         Q.    Okay.  Ultimately you did get a pay

19    increase, correct?

20         A.    In January of 2015.

21         Q.    Okay.  And that increase was to $23 an

22    hour?

23         A.    Yes.

24         Q.    Okay.  So even higher than the 21 that we

25    saw Dr. Schwulst asking for in September, right?

1                              D. Trahanas

2          A.   Correct.

3          Q.   Okay.  And it was implemented beginning

4     1/1 of '15; is that right?

5          A.   January 1st.  I believe there's an e-mail

6     that says the start date of it.  I can't recall that

7     it was January 1st, but it was in January that it

8     did begin, the promotion.

9          Q.   Okay.  Now, one of the pieces of paperwork

10    that needed to get done in order to make --

11    ultimately to make the pay increase happen was

12    midyear review.

13              Do you remember that?

14         A.   Yes.

15         Q.   Okay.  And so Dr. Schwulst prepared a

16    midyear review, correct?

17         A.   He did.

18         Q.   Okay.  And he tried to meet with you to go

19    over that midyear review, right?

20         A.   Yes.

21         Q.   Okay.  And, again, he needed you to sign

22    it so that he could submit it so that he could get

23    you the pay increase, correct?

24         A.   Correct.

25         Q.   Okay.  And at the time that he prepared

1                          D. Trahanas

2    it, he was out on FMLA leave, correct?

3         A.   I'm -- I can't speak to the FMLA, but I

4    believe he was on paternity leave at the time.

5         Q.   Caring for a newborn, right?

6         A.   Correct.

7         Q.   So he was on a leave of absence to care

8    for a newborn, correct?

9         A.   Yes.

10        Q.   Okay.  But he nevertheless took the time

11   to put together the midyear review, correct?

12        A.   When he came back, I believe he came back

13   a day early from the paternity leave to prepare the

14   midyear review, correct.

15        Q.   And he tried to meet with you to go over

16   that review, right?

17        A.   Correct.

18        Q.   But you would not meet with him, correct?

19        A.   I did not meet with him.  I could not meet

20   with him.

21        Q.   And the reason you couldn't meet with him

22   is because your car was in the shop; is that right?

23        A.   Yes.  My car had broken.  I'm not sure

24   what the exact mechanical term is, but it wasn't --

25   the heat wasn't working amongst a couple of other

1                        D. Trahanas

2    problems I ended up finding out, but it wasn't

3    drivable.

4         Q.   And there was no other way for you to get

5    to the lab to meet with him?

6         A.   No, because I would need the car to get to

7    the train station, which would be the other way that

8    I would often commute to work.

9         Q.   And there was nobody else who could give

10   you a ride to the train station?

11        A.   Not at that time.

12        Q.   And you didn't have Uber or Lyft or any

13   other type of app on your phone that would give you

14   a ride to the train station?

15        A.   I don't even think I knew about Uber in

16   2015.

17        Q.   Really?

18        A.   Yeah, really.  I'm not sure when the

19   company started.  But no, I did not have Uber on my

20   phone at that time, no.

21        Q.   You do now?

22        A.   I do now, yes.

23        Q.   And you couldn't take a cab to get to the

24   train station to go meet with Dr. Schwulst?

25        A.   There's not really cabs in the southwest

1                          D. Trahanas

2    suburbs.  I mean, I'm not sure if they would even

3    come.  I know that they cab you from the burbs to an

4    airport, but I wouldn't be able to cab from home to

5    the city because that would be at least $50 plus

6    another $50 to go home.  And I had to pick up my car

7    that day or the next day; I wasn't sure.

8         Q.   So you couldn't take a cab to the train

9    was my question, not downtown but to the train.

10        A.   No.

11        Q.   Because there's no ability to call a cab

12   service in the southwest suburbs, is that fair?

13        A.   There is an ability.  I don't believe I

14   said there isn't an ability.

15        Q.   But you didn't take advantage of that,

16   correct?

17        A.   I believe my car may have also been ready

18   that day, so I needed to be ready to possibly

19   somehow get my car.  I wasn't sure if it could be

20   towed to my house or how that would really work.

21        Q.   Can we mark that, please.

22                         (Exhibit 18 was marked for

23                         identification.)

24   BY MS. WERMUTH:

25        Q.   You've been handed now what's been marked

1                          D. Trahanas

2     as Exhibit 18.

3              Do you recognize those e-mails?

4        A.   Yes.

5        Q.   Okay.  And these are documents that you

6     produced to us in connection with this litigation;

7     is that right?

8        A.   Yes.

9        Q.   Okay.  And the top portion is an e-mail

10    from Dr. Schwulst to you on January 13th of 2015.

11             Do you see that?

12       A.   Yes.

13       Q.   Okay.  And then below that there's a

14    message from Heather Burke to Dr. Schwulst that he

15    forwards to you, correct?

16       A.   Yes.

17       Q.   Okay.  And the e-mail from Heather to

18    Dr. Schwulst is dated January 13th of 2015.

19             Do you see that?

20       A.   Yes.

21       Q.   Okay.  And she writes that HR compensation

22    contacted her on Friday regarding Diane Trahanas'

23    promotion.

24             Do you see that?

25       A.   I do.

Page 147

                                D. Trahanas

1

2      Q.    And she writes Diane has been contacting

3  them directly rather than working with you and the

4  department and that it's appropriate -- that the

5  appropriate course of action is to have the manager

6  submit the request.

7            Do you see that?

8      A.    I do.

9      Q.    Okay.  And, in fact, we saw from the

10  Exhibit 17 -- no, I'm sorry, Exhibit 13 that he sent

11  you back in December the information that he wanted

12  you to get together to submit the request, right?

13      A.    I'm sorry, what exhibit was that?

14      Q.    So in Group Exhibit 13.  We've already

15  looked at this.

16      A.    Yes.

17      Q.    On Page 4, Page 4 he's asking you to start

18  putting the documentation together.

19      A.    Yes.

20      Q.    Okay.  And so he was trying to get it

21  together to get it approved, correct?

22      A.    Yes.

23      Q.    Okay.  And you understood that

24  Dr. Schwulst had to get approval from the dean to do

25  increases and promotions, right?  You had been

Page 148

1                           D. Trahanas

2    advised of that already?

3         A.   I knew he needed approval.  I suppose

4    maybe in the e-mails, I don't know what they were

5    dated, then it would be the dean's approval,

6    correct.

7         Q.   Okay.  So he had to put up the case to get

8    the approval, right?

9         A.   I'm not --

10        Q.   He had to submit the documentation in

11   order to get the approval?

12        A.   Yes.

13        Q.   Okay.  And so when you look now at

14   Exhibit 18, he writes to you there is a specific

15   protocol to get this done.

16             Do you see that?

17        A.   Yes.

18        Q.   Okay.  And he says we will talk on Friday

19   when I'm back from paternity leave.

20             Do you see that?

21        A.   Yes.

22        Q.   And do you know how long he was on

23   paternity leave?

24        A.   I don't recall.

25        Q.   Okay.  And he forwards you the protocol

Page 149

```
 1                    D. Trahanas
 2   again now on January 13, correct?
 3        A.   Is it on Exhibit 18?
 4        Q.   Yes.  If you look at the e-mail he
 5   forwards you, the protocol starts at the bottom of
 6   the page and goes on to the following page, right?
 7        A.   Yes.
 8        Q.   And this was the second time he sent you
 9   the protocol?
10        A.   I don't believe I received a protocol with
11   can you start this while I'm on service from
12   Exhibit 13.
13        Q.   Well, he forwarded it to you, right, and
14   he forwarded the e-mail to you from Heather on
15   December 13th, 2014?
16             So if you look at Page 5 of Group
17   Exhibit 13.
18        A.   Uh-huh, yes.
19        Q.   Heather says to Steven the process for
20   requesting an off-cycle increase is attached.
21             Do you see that?
22        A.   Yes.
23        Q.   Okay.  And then he forwards that e-mail to
24   you, if you look at Page 4, right?
25        A.   Yes.
```

1                        D. Trahanas

2        Q.   And says can you start this while I'm on

3   service, right?

4        A.   Yes.

5        Q.   So he had sent you the process back in

6   December, correct?

7        A.   Yes.

8        Q.   And he sends it to you again, now we can

9   see, in Exhibit 18 again in January, right?

10       A.   Yes.

11       Q.   And then he actually tried to contact you

12  to set up a time to meet to go over your review,

13  right?

14       A.   Yes, after January 13th.

15       Q.   So he texted you, correct?

16       A.   Yes.

17       Q.   And he called you, correct?

18       A.   I don't recall.

19       Q.   Okay.  Can I have that marked, please.

20                      (Exhibit 19 was marked for

21                      identification.)

22  BY MS. WERMUTH:

23       Q.   Okay.  So you've been handed Exhibit 19.

24       A.   Yes.

25       Q.   Do you see that?  And this isn't Bates

```
 1                         D. Trahanas
 2    labeled, but I'll represent that we received this
 3    from your attorney, and it looks like a
 4    transcription in part of a voicemail from it says
 5    Steve Schwulst.
 6              Was he in your contacts?
 7    A.    Yes.
 8    Q.    On January 14th, 2015?
 9    A.    Correct.
10    Q.    Okay.  So he did call you, correct?
11    A.    Yes.
12    Q.    And he left you a message because you
13    didn't pick up, right?
14    A.    Yes.
15    Q.    And he said he expected you in his office
16    I think that morning, right?  He wanted to see you
17    on the 14th, correct?
18              MR. DeROSE:  It says tomorrow morning on
19    the second line.
20              MS. WERMUTH:  My question is to the
21    witness.
22              THE WITNESS:  No, it would have to be
23    January 15th because he called me January 14th.
24    That voicemail was left at 12:11, so it would have
25    to be the next day, 8:15 in the morning.
```

```
 1                        D. Trahanas

 2   BY MS. WERMUTH:

 3        Q.   Okay.  So he's telling you he's going to

 4   come in the following morning, and he expected you

 5   to meet him at 8:15?

 6        A.   Correct.

 7        Q.   Okay.  Did you respond to this?  Did you

 8   call him back when you got this voicemail?

 9        A.   I recall e-mailing him.  I do not recall

10   if I called him.

11        Q.   Okay.  Well, he called you again later

12   that day, right?  Do you remember?

13        A.   I believe so because there was another

14   voicemail that day.

15        Q.   Okay.  And by the way, so if he's saying

16   tomorrow is Friday, this is a Thursday, right?

17   January 14th must have been Thursday then; is that

18   right?

19        A.   Yes.

20        Q.   Okay.  So you were not in the lab that

21   day?

22        A.   No.

23        Q.   Okay.

24                       (Exhibit 20 was marked for

25                        identification.)
```

Page 153

1                              D. Trahanas

2    BY MS. WERMUTH:

3         Q.    So you've been now handed Exhibit 20.

4               Are you with me?

5         A.    Yes.

6         Q.    And this is a voicemail from Dr. Schwulst

7    the same day at 1:43.

8               Do you see that?

9         A.    Yes.

10        Q.    So about an hour and a half later than the

11   other?

12        A.    Yes.

13        Q.    So in that hour and a half had you called

14   him back?

15        A.    I don't recall.

16        Q.    Okay.  And he again is trying to schedule

17   a meeting with you for the following morning to go

18   over your review, correct?

19        A.    Correct.

20        Q.    Okay.  And so at some point did you

21   respond to his attempts to schedule this meeting

22   with you?

23        A.    Yes.  As I said before, I believe I

24   e-mailed him.

25        Q.    Okay.  And when did you e-mail him?

Page 154

                              D. Trahanas

1

2        A.    Definitely on the 14th.  I don't recall

3    what time specifically.

4        Q.    Can you mark this as 21, please.

5                        (Exhibit 21 was marked for

6                        identification.)

7    BY MS. WERMUTH:

8        Q.    Do you have Exhibit 21 now?

9        A.    Yes.

10       Q.    And this again is a series of e-mails, but

11   let's look at the second-to-last page, which is

12   Bates labeled Trahanas-NU10041.

13             Are you with me?

14       A.    Yes.

15       Q.    Okay.  So at 12:32 p.m., so this is after

16   his first phone call to you before his second phone

17   call to you on January 14th, 2015, right?

18       A.    Yes.

19       Q.    Okay.  And he has also texted you, is that

20   right, on this day?  Do you recall?

21       A.    It's possible.

22       Q.    Can you mark this, please.

23                        (Exhibit 22 was marked for

24                        identification.)

25

Page 155

1                                D. Trahanas

2    BY MS. WERMUTH:

3         Q.   I've handed you now what's been marked as

4    Deposition Exhibit 22.  I see these copies are kind

5    of poor, so we may have to get a better set.

6              Can you read your copy okay?

7         A.   I think so.

8         Q.   Okay.  Can you look at Page 2240, the

9    Bates page 2240, so it's near the end.  This copy is

10   terrible.

11             Can you read the date and the time on that

12   page?

13             MR. DeROSE:  I've got twin copies of 2229.

14   I don't know if I go to 2220.

15             MS. WERMUTH:  Yours is cut off?

16             MR. DeROSE:  No, no, I've got many, many

17   copies of 2229.

18             Would you see if you could turn this for

19   me to 2240?

20             Okay.  Go ahead, Counsel.

21   BY MS. WERMUTH:

22        Q.   Okay.  So when we break I can get a better

23   copy, but if you look at the bottom third of the

24   page, it looks like -- well, what I can see is on

25   January 14th, 2015, at 1:06 p.m. there's a text from

Page 156

                              D. Trahanas

1

2      Dr. Schwulst to you saying, "Please confirm meeting

3      in my office at 8:15 tomorrow."

4                Do you see that?

5      A.    Yes.  I can't see the time, but yes.

6      Q.    Okay.  And you don't respond to that text,

7      correct, at least not on January 14th?

8      A.    No, not -- no.

9      Q.    Okay.  All right.  Now, go back, please,

10     to Exhibit 21.

11     A.    Okay.

12     Q.    So he e-mails you that day also and asks

13     for you to meet with him at 8:15.

14               So now what we can see is he e-mailed you,

15     texted you and called you twice, correct?

16     A.    Yes.

17     Q.    Okay.  And on the -- at 1:49 p.m. you

18     responded to his e-mail that same day, correct?

19     A.    Oh, yes.

20     Q.    Okay.  And where were you?

21     A.    I was at the mechanics.

22     Q.    So how did you respond?

23     A.    I had their wifi and had my laptop on me,

24     so I checked my e-mail.

25     Q.    Do you have your Gmail on your phone?

1                          D. Trahanas

2       A.    I do.

3       Q.    But you specifically recall that you

4    responded through your computer and not through your

5    phone?

6       A.    Yes.

7       Q.    Okay.  And so you tell him that your car

8    is in the shop and that your reception and service

9    is horrible.

10            Why are you telling him that?  You're

11   referring to your phone reception; is that right?

12      A.    Yes.

13      Q.    Why are you telling him that?

14      A.    Just so he would know if he was trying to

15   contact me because I can't remember if he was in the

16   lab or not.  I don't quite know at that time if I

17   knew he was returning from paternity leave or not,

18   what day he would be back.

19      Q.    You were giving him an excuse as to why

20   you weren't calling him back or responding to his

21   texts, right?

22      A.    No.

23      Q.    And you say that at that point in time you

24   were unsure if you were going to have a ride to work

25   or to the train tomorrow, the following day?

Page 158

```
 1                          D. Trahanas
 2      A.   Correct.
 3      Q.   And you say you'll follow up with him
 4  tomorrow about meeting on Friday.  Oh, so the
 5  14th was a Wednesday?
 6      A.   Yes, because underneath it says Wednesday,
 7  January 14th.
 8      Q.   Okay.  And then if you turn to Page -- the
 9  first page of this exhibit, you respond to him at
10  11:44 p.m. telling him that you're not going to make
11  it into the office the following day?
12      A.   Yes.
13      Q.   Because your car is in the shop?
14      A.   Yes.  I had to leave it overnight.
15      Q.   Okay.  But he did then ultimately send you
16  your midyear review, correct?
17      A.   He e-mailed it to me, yes.
18      Q.   And you signed it?
19      A.   Correct.
20      Q.   Okay.  And you agreed with it, correct?
21      A.   I signed it.  I did not agree with it.
22      Q.   You didn't send any additional
23  information, attach any commentary to it when you
24  signed it, correct?
25      A.   I did not.
```

Page 159

1                              D. Trahanas

2          Q.    Okay.   Can you mark that, please.

3                         (Exhibit 23 was marked for

4                         identification.)

5     BY MS. WERMUTH:

6          Q.    I'm handing you Exhibit 23.   That's an

7     e-mail from you to Dr. Schwulst, correct?

8                MR. DeROSE:   Did we have a 22?   That was

9     the big one.

10               MS. WERMUTH:   The big one, yes.

11    BY MS. WERMUTH:

12         Q.    Exhibit 23, that's an e-mail from you to

13    Dr. Schwulst dated January 15, 2015 at 9:30 in the

14    morning, correct?

15         A.    Yes.

16         Q.    Okay.   And that's you enclosing your

17    signature for the performance review, the midyear?

18         A.    Correct.

19         Q.    Okay.   And do you know if Dr. Schwulst

20    then also prepared a letter to support the request

21    for the increase?  Did he share with you a letter?

22         A.    I don't recall a letter.

23         Q.    Okay.   And ultimately you were notified

24    that you did get the increase?

25         A.    Yes.

                                                      Page 160

1                        D. Trahanas

2        Q.    Okay.

3                        (Exhibit 24 was marked for

4                        identification.)

5    BY MS. WERMUTH:

6        Q.    Okay.  So giving you Exhibit 24 now, do

7    you recognize those series of e-mails?

8        A.    Yes.

9        Q.    Okay.  And Dr. Schwulst e-mailed you on

10   February 4th, 2015, informing you that your raise

11   had been approved.

12              Do you see that?

13       A.    Yes.

14       Q.    And it was retroactive to January 19th,

15   2015?

16       A.    Yes.

17       Q.    And your pay, do you know -- it went up to

18   $23; is that right?

19       A.    Yes.

20       Q.    Okay.  So from $20.06 to $23; is that

21   right?

22       A.    Correct.

23              MS. WERMUTH:  Okay.  Let's go off the

24   record.

25

Page 161

1                    D. Trahanas

2                    (Whereupon, a lunch recess was

3                    taken from 1:19 p.m. to

4                    1:56 p.m.)

5          MS. WERMUTH:  Can we get this marked.

6                    (Exhibit 25 was marked for

7                    identification.)

8  BY MS. WERMUTH:

9      Q.   Okay.  Ms. Trahanas, do you recognize

10 Exhibit 25?

11     A.   I do.

12     Q.   Okay.  Did I just say it wrong?  No, I

13 said it right.

14          And what do you recognize that document to

15 be?

16     A.   The Second Amended Complaint of Diane

17 Trahanas, plaintiff, versus Northwestern University

18 and Steven Schwulst as defendants.

19     Q.   Okay.  So it's the operative Complaint in

20 your lawsuit?

21     A.   Yes.

22     Q.   Okay.  And did you review this before it

23 was filed?

24     A.   I did.

25     Q.   Okay.  All right.  Can you -- so strike

1                         D. Trahanas

2    that.

3             Let me ask you this:  Do you know what

4    Title VII of the Civil Rights Act is?

5         A.   Yes.

6         Q.   Okay.  And you're bringing a claim under

7    Title VII of the Civil Rights Act contending that

8    you were subjected to harassment based on sexual

9    orientation.

10            Do I understand that correctly?

11        A.   Yes.

12        Q.   And you say that this harassment took the

13   form of certain name calling; is that right?

14        A.   Correct.

15        Q.   Okay.  And you contend that it was

16   Dr. Schwulst who participated in this name calling;

17   is that correct?

18        A.   Yes.

19        Q.   Okay.  So can you look with me at Page 9

20   of your Complaint, the Second Amended Complaint,

21   Paragraph 31.

22        A.   Yes.

23        Q.   Okay.  So that paragraph reads, "In front

24   of her co-workers, Dr. Schwulst would regularly

25   refer to plaintiff as, quote, a typical millennial,

Page 163

                              D. Trahanas

1

2    end quote, or Princess Diana, stating that she was

3    spoiled compared to him."

4              Do you see that?

5        A.    I do see that.

6        Q.    Okay.  Now, it's not your contention that

7    the phrase "a typical millennial" is derogatory

8    based on sexual orientation, correct?

9        A.    That phrase, no.

10       Q.    Okay.  And Princess Diana, again you would

11   not say that that's a phrase that is derogatory

12   based on sexual orientation, correct?

13       A.    Correct.

14       Q.    Okay.  And there are other people in your

15   life that call you Princess Diana; is that right?

16       A.    No.

17       Q.    There's nobody?  Nobody has ever called

18   you Princess Diana except for Dr. Schwulst?

19       A.    No.

20       Q.    No family members?

21       A.    No.

22       Q.    Okay.  And then in Paragraph 32 you write,

23   "Because plaintiff would not share information about

24   her personal life with Dr. Schwulst, he presumed and

25   referred to her as a lesbian in front of

```
1                         D. Trahanas

2   co-workers."

3              Do you see that?

4        A.   What number, I'm sorry?

5        Q.   32.

6        A.   Yes, okay.

7        Q.   Okay.  So it's your contention that you

8   did not share personal information with

9   Dr. Schwulst; is that right?

10       A.   With that aspect, yes.

11       Q.   What aspect?  What do you mean by "that

12  aspect"?

13       A.   My relationship.

14       Q.   Okay.  So you did tell Dr. Schwulst you

15  had a boyfriend who was in professional school, one

16  of the professional schools, right?

17       A.   In 2014.

18       Q.   Uh-huh, okay.  And that boyfriend lived

19  out of state, correct?

20       A.   Correct.

21       Q.   Okay.  And he was in school?

22       A.   Yes.

23       Q.   And you did share that with Dr. Schwulst?

24       A.   Yes.

25       Q.   Okay.  So you say that he referred to you
```

```
 1                      D. Trahanas
 2   as, quote, a lesbian, end quote.
 3            Do you see that?
 4       A.   Yes.
 5       Q.   So he actually called you a lesbian.
 6            Is that your allegation?
 7       A.   Yes.
 8       Q.   Used that word?
 9       A.   Yes.
10       Q.   When was the first time Dr. Schwulst
11   called you a lesbian?
12       A.   2012.
13       Q.   And where did that take place?
14       A.   In the lab.
15       Q.   And who was present?
16       A.   For each time or for --
17       Q.   When was the first time?  You said it was
18   2012.
19       A.   The first time it was him and I.
20       Q.   Okay.  And when in 2012?
21       A.   October.
22       Q.   Okay.  And he specifically -- tell me how
23   it was he came to refer to you as a lesbian at that
24   point in time.
25       A.   We would speak about working out, and he
```

```
 1                       D. Trahanas
 2    was interested in finding a new workout technique,
 3    and so I had informed him of the workouts that I was
 4    doing, like I specifically told him I was doing P90,
 5    and there was also by the same company a workout
 6    program called Insanity.  So he was interested in
 7    that, and he would talk about how if you work out
 8    too much you start to look manly, and then, you
 9    know, all lesbians are manly looking, and then he
10    asked me are you a lesbian.  And then I swallowed
11    it.  I didn't -- I didn't -- I didn't want to
12    respond to that at the time.  I was kind of taken
13    aback, and I think that after -- after he made
14    the -- after he made the statement that people who
15    work out start to look -- specifically women who
16    work out too much start to look manly, then he
17    inferred that they are lesbians; and he asked me how
18    often I worked out, and then asked me if I was a
19    lesbian, and then basically he stated so you're a
20    lesbian.
21         Q.   Okay.  So this was October of 2012,
22    everything that you've just described right now, is
23    my understanding --
24         A.   The first time, correct.
25         Q.   -- is October of 2012.
```

```
 1                          D. Trahanas
 2              And it was in the lab?
 3      A.    Correct.
 4      Q.    And who else was present?
 5      A.    The first conversation was just him and I.
 6      Q.    Nobody else was present?
 7      A.    No.
 8      Q.    Okay.  And you're saying that during this
 9   conversation you guys were talking the context of
10   the conversation was working out, working out
11   routines?
12      A.    Yes.
13      Q.    Okay.  And he made a statement to you,
14   according to you, that women who work out too much
15   start to look too manly?
16      A.    Yes.
17      Q.    Okay.  Did he tell you he thought you
18   looked too manly?
19      A.    Not too manly but he said manly.
20      Q.    You're telling me that Dr. Schwulst told
21   you that you looked manly?
22      A.    Yes.
23      Q.    Okay.  By the way, when you were in the --
24   strike that.
25              And how did you respond to that comment?
```

1                          D. Trahanas

2       A.    I was kind of just shocked at the whole

3   conversation because I thought I was just kind of

4   giving workout advice, and then it kind of got

5   turned very quickly into a very personal topic.  So

6   I didn't say anything.  I just kind of sat there

7   with a shocked face and pretty much thinking what I

8   could say but didn't say anything.

9       Q.    Okay.  And when he asked you if you were a

10  lesbian, what did you say?

11      A.    No.

12      Q.    Okay.  And was that the end of the

13  conversation then?

14      A.    At that time I believe so, yes.

15      Q.    Okay.  And you did not report that

16  conversation to HR, correct?

17      A.    No.

18      Q.    Okay.  And you did not report that

19  conversation to Dr. Perlman, his mentor?

20      A.    No.

21      Q.    Okay.  Or anyone else in the

22  administration at the medical school?

23      A.    No.

24      Q.    Okay.  All right.  So how many times --

25  just so I'm clear, because at one point you said he

Page 169

                              D. Trahanas

1    inferred that manly women are lesbians.  I don't

2    know what you mean by he inferred that.

3              Do you mean he implied that?

4        A.   No.  He basically said they are -- women

5    who work out too much and start to look manly, then

6    they look butch, and, of course, they're lesbians;

7    so I wouldn't say inferred or implied, concluded.

8        Q.   Okay.  You used the word "inferred."

9    That's what I was trying to clarify.

10       A.   Okay, yeah, sorry.

11       Q.   Okay.  So you're saying he actually said

12   women who work out too much look manly, they look

13   butch?  Now you're saying that he used the word

14   "butch"?

15       A.   He included that in there, yes.

16       Q.   Okay.  And therefore they are lesbians?

17       A.   He didn't say therefore.  He just said

18   those women are lesbians.

19       Q.   And he didn't call you a lesbian?  He

20   asked if you were a lesbian, correct?

21       A.   He said, "You're a lesbian, Diane, aren't

22   you, right?  You're a lesbian?"  And that was it.

23   And I said no.

24             And then we were at our desks, so I think

Page 170

1                    D. Trahanas

2   I just turned around and did something else.

3       Q.   Okay.  So you didn't object to him

4   directly?

5       A.   I said no.

6       Q.   I understand that you answered his

7   question no, but you didn't say to him I don't like

8   what you're saying, I think it's inappropriate, I

9   want you to stop?  You didn't say anything like

10  that?

11      A.   Not the first time, no.

12      Q.   Okay.  All right.  How many times did

13  Dr. Schwulst call you a lesbian?

14      A.   Well, after that initial conversation with

15  my coworker Salina, who was present at the time, he

16  changed -- instead of saying the word "lesbian," he

17  basically said lesbians are softball players.  So he

18  wouldn't as frequently say lesbian, but when he

19  would say softball player he was saying lesbian.

20      Q.   Okay.  So let me go back to my question.

21           How many times did Dr. Schwulst call you a

22  lesbian?  Not softball player, I'm asking about

23  lesbian.

24      A.   I don't recall a specific number.

25      Q.   Was it -- is it your testimony that he

1                           D. Trahanas

2    stopped using the word "lesbian" at some point in

3    time and started using the phrase "softball player"?

4         A.    Lesbian still came up.

5         Q.    But you can't tell me how frequently?

6         A.    For the word "lesbian" --

7         Q.    Yes.

8         A.    -- specifically?

9         Q.    Yes.

10        A.    No, I don't recall.

11        Q.    Okay.  And are you telling me that every

12   time it did come up he was directing it at you?  He

13   was calling you a lesbian?

14        A.    Yes.

15        Q.    Okay.  And then you said at some point in

16   time with Salina he changed the reference to lesbian

17   to being a reference to softball player?

18        A.    Yes.

19        Q.    Okay.  And when did that happen?

20        A.    It was in 2012, so towards the end of

21   2012.

22        Q.    Okay.  And tell me about that

23   conversation.  It took place in the lab?

24        A.    Yes.

25        Q.    And you were present, Salina Dominguez was

1                    D. Trahanas

2     present --

3          A.    Yes.

4          Q.    -- and Dr. Schwulst was present?

5          A.    Correct, yes.

6          Q.    Tell me how that conversation went.

7          A.    It started out with Salina was playing

8     like a fantasy football league or she was in a

9     fantasy football league, and so we started talking

10    about sports.  I can't recall if Dr. Schwulst also

11    had a fantasy football league group, or I'm not sure

12    what they call it but competition.

13             And so Salina would do one every year, but

14    she was talking to me about it.  And I didn't know

15    anything about really the whole football, the

16    fantasy football world I guess, and so we started

17    speaking about sports.  And Dr. Schwulst at one

18    point chimed in and told her her picks -- she

19    shouldn't have picked this person, or he made some

20    sort of comment towards one of the players.

21             And so we just got on the topic of sports,

22    and subsequently he made a comment that softball

23    players are lesbians.

24         Q.    And I'm sorry, when did this take place?

25         A.    Towards the end of 2012, so probably

                              D. Trahanas

1                      D. Trahanas

2    November-ish.

3         Q.    Okay.  And during the course of this

4    conversation did you say you were a softball player,

5    that you played softball?

6         A.    No.

7         Q.    Okay.  So at some point you guys are

8    talking about sports, and at some point during that

9    conversation he says, well, softball players are

10   lesbians?

11        A.    Yes.

12        Q.    Okay.  And did he call you a lesbian in

13   that conversation?

14        A.    He said, yes, like Diane.

15        Q.    So he said softball players are lesbian

16   like Diane?

17        A.    Softball players are lesbian, you know,

18   like Diane.

19        Q.    Okay.  And what did you say when he said

20   that?

21        A.    I think I just turned to Salina and just

22   gave her a straight face and turned around, like, I

23   mean, what am I going to say to that.

24        Q.    So you didn't object directly to

25   Dr. Schwulst at that time?

Page 174

1                          D. Trahanas

2          A.   I may have muffled something underneath my

3     breath, but I can't say that he heard it for sure,

4     but no, I pretty much just walked away.

5          Q.   Okay.  And Salina didn't say anything to

6     him --

7          A.   No.

8          Q.   -- either?

9               And you didn't take that discussion to HR

10    either?

11         A.   No.

12         Q.   Or to any administrator in the medical

13    school?

14         A.   No.

15         Q.   Or to Dr. Perlman?

16         A.   No.

17         Q.   Okay.  And is it your testimony that he

18    then referred to you or nicknamed you Softball

19    Player?

20         A.   Yes.

21         Q.   And so how many times during the course of

22    the time that you worked with him did he call you

23    Softball Player?

24         A.   I can't give you a specific number, but it

25    was regular and frequently when he was around.

```
 1                      D. Trahanas
 2       Q.   So he was only around at most two weeks
 3   out of every month; is that right?
 4       A.   About, yeah.
 5       Q.   Okay.  And are you telling me that every
 6   single day that you saw him during those two weeks
 7   in each month he called you Softball Player, or what
 8   are you telling me about the frequency which he
 9   purportedly called you Softball Player?
10       A.   I mean, if it wasn't one day he said it --
11   maybe he said it twice the next day or he was
12   calling me other things.
13       Q.   What are the other things that he called
14   you?
15       A.   Millennial, typical millennial, Princess
16   Diana.  He would allude to other things, like at 28
17   you lose your sparkle, so, you know, you have to
18   find someone because after you lose your sparkle, it
19   was just things that he would say.
20       Q.   Okay.  So losing your sparkle is not
21   related to sexual orientation?
22       A.   Correct.
23       Q.   Okay.  And we already talked about
24   millennial and Princess Diana, correct?
25       A.   Correct.
```

1                          D. Trahanas

2          Q.   So set aside those comments.  I understand

3    that, you know, that you contend he made those other

4    comments to you, but set those aside for the moment,

5    and if you can separate out how many times he

6    supposedly called you Softball Player, I'd like to

7    know that information.

8          A.   I can't give you an exact number.  Like I

9    said, it was just pretty regular and frequently.

10         Q.   And you never went to HR to complain about

11   that --

12         A.   No.

13         Q.   -- conduct, correct?

14              Is that correct or incorrect?

15         A.   That's correct.

16         Q.   And you never complained to anybody in the

17   administration about any of this commentary,

18   correct?

19         A.   Correct.

20         Q.   Okay.  And who else did Dr. Schwulst

21   purportedly use that nickname for you in front of

22   other than Salina?  Who else supposedly was witness

23   to this?

24         A.   Pretty much everybody in the lab.

25         Q.   Well, tell me who those people are.

Page 177

                              D. Trahanas

1

2      A.    Carla Cuda.

3      Q.    Okay.  So you contend that Carla Cuda

4  heard Dr. Schwulst call you Softball Player?

5      A.    Yes.

6      Q.    Okay.  And when Carla Cuda was present,

7  did he also use it in connection with the word

8  "lesbian"?

9      A.    At least once, but I can't give you a

10 specific number if it was how many other times after

11 that.

12     Q.    So he did not use the word "lesbian" every

13 time he called you Softball Player, correct?

14     A.    Not every time, no.

15     Q.    So he was using, to your allegation, he

16 was using the word "Softball Player" as a proxy for

17 "lesbian," right?

18     A.    Yeah, in substitution of saying the word

19 "lesbian" he would say a softball player.

20     Q.    But if he used that phrase "softball

21 player" without using the word "lesbian," you don't

22 know how someone else might interpret that, right?

23     A.    Well, everyone in the lab knew.

24     Q.    Well, first of all, I don't know who

25 everyone in the lab is yet, and I don't know how you

1                          D. Trahanas

2    can testify to what other people know or don't know,

3    so let's break that down.

4          Who in the lab heard Dr. Schwulst call you

5    lesbian?

6    A.    Carla Cuda, Alexander Misharin, Rana

7    Saber, Salina Dominguez, Melissa Wallin.  There were

8    people in other labs as well.  Oh, Angelica Spare

9    who was there for a few years.  She wasn't there the

10   entire time I was.  Luisa Gonzalez, she was part of

11   a different lab.

12   Q.    Anyone else?

13   A.    Not that I can recall right now.

14   Q.    Who was present when Dr. Schwulst used the

15   phrase "Softball Player" and "lesbian" together?

16   A.    Each one of those people at some point,

17   because they probably, as you said, didn't know or

18   wouldn't understand perhaps what he meant.  It would

19   be clarified.

20   Q.    I don't understand your answer.  What do

21   you mean "it would be clarified"?

22   A.    So if he said Softball Player and kind of

23   like looked at them or looked at me, they would be

24   like, huh, and so he would say lesbian, you know

25   what I mean, like a lesbian.

Page 179

1                           D. Trahanas

2        Q.    Who would say that?

3        A.    Dr. Schwulst.

4        Q.    Okay.  So everyone that -- so all of the

5   people that you just named that you said heard him

6   call you lesbian also heard him call you Softball

7   Player and lesbian together?

8        A.    Correct.

9        Q.    Okay.  Did you sometimes refer to yourself

10  as Softball Player?

11       A.    I had told him I don't play softball as a

12  way to basically get him to stop saying that.

13       Q.    And what did he say?

14       A.    It didn't work.

15       Q.    When did that conversation take place?

16       A.    Probably a couple times in 2013 and a

17  couple times in 2014.

18       Q.    Where you told him you don't play

19  softball?

20       A.    Where I told him, yeah, I'm not a softball

21  player, I'm not a lesbian; I don't know why we keep

22  going back to this.

23       Q.    You said that, "I don't know why we keep

24  going back to this"?

25       A.    Yeah.

1                         D. Trahanas

2      Q.    When did you say that?

3      A.    2014.

4      Q.    And who else was present?

5      A.    I believe Salina was there.

6      Q.    When in 2014 was that conversation?

7      A.    August or September, I want to say around

8  summertime, late summertime.

9      Q.    Now, in August of 2014 didn't you take the

10 month off to study for the MCAT?

11     A.    I didn't take a month off.  Yes, I did

12 take some time off.

13     Q.    Okay.  But you think that conversation

14 might have happened in the lab in August of 2014?

15     A.    Like I said, August or September.

16     Q.    And did he ever refer to you as Softball

17 Player or as a lesbian after that conversation?

18     A.    Yeah.  I was just -- it was something that

19 wasn't going away.

20     Q.    So but I need you to answer my question.

21          So you say in August or September of 2014

22 you asked him why do we keep going back to this.

23          After you asked him that question, did you

24 ever call you a softball player or a lesbian again?

25     A.    Yes.

1                          D. Trahanas

2          Q.    Okay.  How many times after that

3     conversation?

4          A.    I can't give you an exact number.

5          Q.    Can you give me any kind of a number?

6          A.    I'll say at least ten.

7          Q.    So at least ten times between August 2014

8     and early February --

9          A.    Yes.

10         Q.    -- of '15 --

11         A.    Yes.

12         Q.    -- when you went out and never returned?

13         A.    Yes.

14         Q.    And did you ever refer to yourself as a

15    softball player?

16         A.    No.

17         Q.    Okay.  Other than softball player, lesbian

18    and butch, which I think you said he said once, are

19    there any other references to sexual orientation

20    that he made that you haven't told me about?

21         A.     It was before his -- it was actually

22    twice.  It was once when he found out his second kid

23    was going to be a girl, and the other time was

24    subsequent to that a few months.  It was probably

25    closer to the time that I think he -- it was

```
 1                          D. Trahanas
 2    December-ish of 2014, and it was him worrying that
 3    having a girl would mean that basically she would --
 4    there's a higher possibility of her getting
 5    pregnant, and so that was one of his concerns that
 6    he voiced.  His response to that was he hoped that,
 7    you know, perhaps to make his life easier if his
 8    daughter grew up to be a lesbian like me that he
 9    wouldn't have that problem.
10         Q.   Okay.  And when did that conversation take
11    place?
12         A.   It was around the time after he found out
13    he was having a girl and then again right before I
14    think he left.  It was around the holidays, like
15    December-ish of 2014.
16         Q.   Of 2014?
17         A.   Correct.
18         Q.   Okay.  And so these were two separate
19    conversations?
20         A.   Yes.
21         Q.   And they both happened in late 2014.  Do I
22    understand that correctly?
23         A.   One happened in late 2014.
24         Q.   When did the other one happen?
25         A.   When he found out he was having a girl,
```

1                          D. Trahanas

2    around that time.

3        Q.   When was that time?

4        A.   May or June of 2014.

5        Q.   Okay.  And so in May or June of 2014 when

6    you had this conversation who else was present?

7        A.   May and June it was just him and I.  The

8    one in December it was the two of us and Salina and

9    Melissa Whalen.

10       Q.   So the one in December of 2014 took place

11   in the lab?

12       A.   Correct.  Both did.

13       Q.   Both did, okay.  The springtime one as

14   well?

15       A.   Correct.

16       Q.   Okay.  And did -- and the -- so it was the

17   same conversation about I'm glad I'm having a

18   girl -- or no, if my daughter is a lesbian I don't

19   have to worry about her getting pregnant?  Is that

20   the same conversation both in the springtime and in

21   December of 2014?

22       A.   In December we were also speaking about

23   gifts that he was thinking about getting his wife.

24   That was part of the conversation, the one that was

25   similar to the May or June one, the earlier on one.

Page 184

1                              D. Trahanas

2    And then also we spoke about gifts that he could get

3    his wife, and that's when the conversation about

4    if -- he was thinking about getting her a charm

5    bracelet, amongst other things.  I can't remember

6    what else he was thinking about getting her.  But he

7    also said that if I were to get a charm bracelet it

8    would have like a mitt, a ball and a bat on it

9    because that's what softball players would do.

10        Q.   And what did you say?

11        A.   I think I just responded -- I just

12   responded with no, I wouldn't.

13        Q.   Okay.  Can you turn to Paragraph 39 in

14   your Complaint on Page 10.

15        A.   Okay.

16        Q.   So Paragraph 39 says, "In December 2014

17   when his wife was expecting a baby girl,

18   Dr. Schwulst announced in front of plaintiff's

19   co-workers that he hoped his baby girl would be like

20   plaintiff so he would not have to worry about her

21   getting pregnant."

22        A.   Yes.

23        Q.   So that's the conversation you were just

24   telling me about?

25        A.   Yes.

Page 185

                            D. Trahanas

1

2       Q.    And you said that a similar conversation

3   happened earlier that year?

4       A.    Yes.

5       Q.    Is there any reason why you didn't include

6   that in your Complaint?

7       A.    No.

8       Q.    Okay.  And have you met Dr. Schwulst's

9   wife?

10      A.    I have.

11      Q.    Okay.  Does she wear a charm bracelet?

12      A.    Not that I've seen her.

13      Q.    Do you have any -- have you ever talked to

14  her about charm bracelets?

15      A.    No.

16      Q.    All right.  Other than softball player,

17  lesbian, butch, charm bracelet and baby girl, any

18  other conversations or offensive statements that

19  Dr. Schwulst made directed at calling you a lesbian

20  or referring to sexual orientation that you haven't

21  told me about?

22      A.    Unless I missed one that's already

23  included in the Complaint, I can't think of any

24  right now.

25      Q.    All right.  Well, this is the one

Page 186

D. Trahanas

1    opportunity that I get to depose you, so if there

2    are any other words that he used to refer to being a

3    lesbian or sexual orientation that -- any words that

4    he has used that you haven't shared with me, I need

5    to know them now.

6    A.    Not that I recall.

7    Q.    Now, you -- sometimes you got along very

8    nicely with Dr. Schwulst, right?

9    A.    Yes.

10   Q.    So sometimes you had fun together?

11   A.    I mean, we had a professional

12   relationship.  It's hard to have fun with your boss.

13   Q.    Okay.  Well, you learned from him, right?

14   A.    Well, of course.

15   Q.    And he gave you opportunities for

16   publication and professional opportunities to go to

17   conferences and the like, right?

18   A.    Yes.

19   Q.    And when you traveled you'd find fun

20   things to do together, like go kayaking, correct?

21   A.    Yes.

22   Q.    And so sometimes you did engage in some

23   banter with him, correct?

24   A.    Can you define "banter," what you're

1                          D. Trahanas

2   specifically referring to?

3        Q.    Well, sometimes you would joke with him,

4   right?

5        A.    It's possible, yeah.

6        Q.    Okay.  Can we -- I'm just going to ask the

7   court reporter, can we switch out the set of text

8   messages that we previously marked with this better

9   version?  Does it make sense to go off the record

10  and take care of this?

11                     (Whereupon, an off-the-record

12                      discussion was held.)

13             MS. WERMUTH:  So let's go back on the

14  record.

15  BY MS. WERMUTH:

16        Q.    So, Ms. Trahanas, the exhibit that was

17  marked as 22, so these are text messages, let me

18  just represent to you these are text messages that

19  we pulled from Dr. Schwulst's phone between you and

20  him, and they date from June 14th, 2012, through

21  February 17th, 2015, okay?

22        A.    Okay.

23        Q.    All right.  So let me turn your

24  attention -- and so it looks like the very first

25  text that you sent him, it looks like maybe you sent

```
 1                       D. Trahanas
 2   him your contact information -- no, I'm sorry,
 3   that's to him -- that's to Diane, that's to you, I'm
 4   sorry.  Maybe he was sending you his contact
 5   information.
 6             Do you know?
 7        A.   Most likely.
 8        Q.   Okay.  So can you turn with me to
 9   Page 2204.
10             Let me ask you this:  We produced these to
11   your lawyer.  Did you review these text messages at
12   some point in time when you got them?
13        A.   Some of them, most of -- most of them.
14        Q.   Okay.  Actually I'm sorry, yeah, 2204.
15             So there's a text message in the dark
16   bubble at the top of the page which is to you.
17             Do you see that?
18        A.   Yes.
19        Q.   Okay.  So he texted you and says he can't
20   find his badge; can you let me know when you get in
21   so someone can let him in.
22             Right?
23        A.   Yes.
24        Q.   And you respond LOL, yea, NP.
25             So what does that mean?
```

Page 189

                          D. Trahanas

1

2      A.   I'm sorry, I might be on the wrong page.

3      Q.   Are you on 2204?

4      A.   Sorry, I was on 2202.  Okay.

5      Q.   So at the top of the page he's asking you

6  to let him in?

7      A.   Yes.

8      Q.   Okay.

9      A.   LOL is like laugh out loud; yea; NP stands

10 for no problem.

11     Q.   Okay.  And then later that day he sends

12 you a text that says Harris sucks and then frowning

13 face, right?

14     A.   Yes.

15     Q.   And you respond with "I'm not going to say

16 what tho," right?

17     A.   Yes.

18     Q.   Okay.  So you're joking with him about

19 Harris sucking something but something that you're

20 not going to say, right?

21          MR. DeROSE:  Wait.  That's a half hour

22 later.

23          MS. WERMUTH:  That's not my question.

24 BY MS. WERMUTH:

25     Q.   He texts you at 1:32 and Harris sucks

Page 190

```
 1                        D. Trahanas
 2    smiley face -- or frowning face, right?
 3         A.   Yes.
 4         Q.   And at 2:48 you respond "I'm not going to
 5    say what tho"?
 6         A.   I'm not sure what I was referring --
 7         Q.   So you weren't trying to say there that
 8    Harris sucks penis?
 9         A.   No.
10         Q.   What were you saying, I'm not going to say
11    what?  Wasn't that a reference to say I'm not going
12    to say what he sucks?
13              MR. DeROSE:  Well, objection, Counsel.
14    The man before said he sucks.  He doesn't say what
15    he sucks either.
16              MS. WERMUTH:  That's not my question.
17    BY MS. WERMUTH:
18         Q.   Your question is -- your statement is,
19    "I'm not going to say what tho."
20              Does that mean I'm not going to say what
21    Harris sucks?
22         A.   I mean, that was an hour and 15 minutes
23    after that, so I don't even know if we had a
24    conversation in between that.
25         Q.   That's not my question.  Is that text
```

1                        D. Trahanas

2    message "I'm not going to say what tho" in response

3    to the message "Harris sucks"?

4         A.   I can't say yes to that.  I don't know.

5         Q.   Okay.  Fast forward to 2208, please.  So

6    there's a series of text messages that start in the

7    middle of the page on April 9th.

8              Do you see that?

9         A.   Yes.

10        Q.   Okay.  And you tell him that you're still

11   at a funeral, that if you get done before

12   2:30 you'll head in, but if not you'll work from

13   home and stay late tomorrow, Tom/Friday.

14             I'm assuming that means tomorrow/Friday?

15        A.   Correct.

16        Q.   And then you correct a spelling error in

17   the next text, and he responds, "Don't worry about

18   it, just keep working on your paper"?

19        A.   Yes.

20        Q.   Okay.  And you say, "Thank you, Boss,"

21   right?

22        A.   Yes.

23        Q.   Okay.  And then two days later he sends

24   you a text message that says, "Millennials

25   dot-dot-dot," right?

1                          D. Trahanas

2          A.    Yes.

3          Q.    And what was that?  Do you remember what

4     that was in reference to?

5          A.    No.

6          Q.    Okay.  And then he -- then you respond

7     with the word "softball" and a picture of a baseball

8     or a softball, right?

9          A.    Right.

10         Q.    Okay.  And he doesn't respond to your text

11    at all that day, right?

12         A.    No.

13         Q.    Am I wrong or am I right?

14         A.    That's -- you are right.

15         Q.    Okay.  Thank you.  So you refer -- you're

16    the one using the term "softball" in this text

17    message, correct?

18         A.    Responding to his "millennial" text,

19    correct.

20         Q.    Okay.  And millennial you've already

21    testified isn't a reference to sexual orientation,

22    right?

23         A.    Not sexual orientation.

24         Q.    Okay.  All right.  Then if you could turn

25    to 2212.  Let's start with the May 15th, 2014 text

Page 193

D. Trahanas

1

2    to you from Dr. Schwulst where he says, "We are

3    getting an undergraduate for the summer."

4              Do you see that?

5        A.   Yes.

6        Q.   Okay.  And then he goes on to say, "You

7    can make her your biotch."

8              Do you see that?

9        A.   Yes.

10       Q.   And did you find that offensive?

11       A.   I did.

12       Q.   You did?

13       A.   Yes.

14       Q.   Okay.  But you go with it, and you say,

15   "Just ours or Perlman's?"

16             Do you see that?

17       A.   Yes.

18       Q.   Okay.  And by the way, did you ever use

19   the word "bitch" or "biotch" in the lab?

20       A.   To refer to somebody else, no.

21       Q.   Never?

22             MR. DeROSE:  Can you pick that up?

23             THE WITNESS:  It's possible, but I don't

24   recall a time that I have.

25

1                           D. Trahanas

2    BY MS. WERMUTH:

3        Q.   Okay.  And this was not a reference to

4    sexual orientation here, correct?

5             MR. DeROSE:  Which one, the one she's

6    making?

7    BY MS. WERMUTH:

8        Q.   No, the "You can make her your biotch."

9    You did not understand that to mean a reference to

10   sexual orientation?

11            MR. DeROSE:  Objection to the way the

12   question is asked.  She doesn't know what he means.

13   That's not her prerogative.  Objection to the form

14   of the question.

15            You may answer though.

16            THE WITNESS:  Yeah, I'm not sure what

17   exactly he was -- you know, how many things he was

18   meaning by that, but I take it offensively just

19   because that refers to a female dog.

20   BY MS. WERMUTH:

21       Q.   Okay.  Okay.  So you think it's a

22   derogatory --

23       A.   Correct.

24       Q.   -- term?

25       A.   Correct.

1                          D. Trahanas

2        Q.    Okay.  But did you interpret it as a term

3    that referred to anyone's sexual orientation or just

4    a derogatory term meaning female dog?

5        A.    At face value, a derogatory term, a

6    disrespectful term.

7        Q.    Okay.  But you didn't protest at the time

8    in writing at least, right?

9        A.    I did not, but you can't really protest

10   with your boss.

11       Q.    Well, you didn't take that text message to

12   HR?

13       A.    No.

14       Q.    Okay.  So then he responds, "Technically

15   Harris' but he is assigning her to our projects,"

16   right?

17       A.    Yes.

18       Q.    And you say, "That's good.  It's

19   officially for is then," and then you correct and

20   say "us."

21             And then he responds, "Apparently she's

22   some sort of prodigy," probably smarter than us; and

23   you respond, "Thankfully cuz I won't trust some rich

24   lazy kid, hahahaha, highly doubt it," right?

25       A.    Yes.

Page 196

1                          D. Trahanas

2        Q.   And that's all from you?

3        A.   Yes.

4        Q.   And then you also -- and this is all

5   within the same minute, "Softball players can be

6   smart"?

7        A.   Yes.

8        Q.   Okay.  So again that's a text from you

9   using the phrase "softball player," correct?

10       A.   That's correct.

11       Q.   And he responds, "I think she plays

12   violin, not softball"?

13       A.   Yes.

14       Q.   And then you say, "I was referring to

15   myself, LOL."

16       A.   Yes.

17       Q.   Okay.  So you were correcting his thinking

18   there or at least explaining what you meant, right?

19       A.   I was sticking up for myself.

20       Q.   By calling yourself a softball player?

21       A.   Well, that's what he would call me, so

22   that's basically me saying we can be smart too since

23   you think I'm that.

24       Q.   Okay.  But he then responds, "I think she

25   plays violin, not softball," so he seems to not know

```
 1                    D. Trahanas
 2   what you're talking about, and then you --
 3        MR. DeROSE:  Objection, Counsel, to your
 4   testifying.
 5   BY MS. WERMUTH:
 6        Q.   Let me ask you this:  He texts you "I
 7   think she plays violin, not softball," right?
 8        A.   That's in the text, correct.
 9        Q.   Right.  And so then you clarify what you
10   meant by your text, right, by saying "I was
11   referring to myself, LOL"?
12        A.   Yes.
13        Q.   Okay.  And then later down at the end of
14   that page you say, "Never mind about the violin."
15        Do you see that?
16        A.   Yes.
17        Q.   And that's because up above he says,
18   "Huh," right?
19        A.   I'm not sure why he said "huh."
20        Q.   But he says "huh," right?
21        MR. DeROSE:  Counsel, objection, out of
22   context, the sentence above it also.
23        MS. WERMUTH:  I can ask the questions,
24   okay.
25        MR. DeROSE:  You can, but you can't take
```

Page 198

1                          D. Trahanas

2     them out of context.

3               MS. WERMUTH:  Certainly I can ask if he

4     texted "huh," okay.  Now if she wants to -- look,

5     what you're doing is you're telling your witness how

6     to answer the question.

7               MR. DeROSE:  No, Counsel.  For the federal

8     rules of completeness, if you're going to talk about

9     one little sentence and there's a whole sentence

10    above, I ask that you complete it.

11              MS. WERMUTH:  We need to stop with the

12    speaking objections because your speaking objections

13    are counseling your witness on how to answer the

14    question.  She has the document in front of her.

15    BY MS. WERMUTH:

16         Q.   There's no mistake about what the document

17    says, and one of the things that he says to her is

18    "huh."

19              Is that correct?

20         A.   There is a text here that says "huh."

21         Q.   All right.  And up above that, to be

22    complete if I may, he tells you he's on service for

23    a week and he anticipates being busy, and he wants

24    you to perfect our new equipment and become the

25    Midwest regional expert when he gets back, right?

1                           D. Trahanas

2       A.   Correct.

3       Q.   Okay.  But he also says "huh"?

4       A.   Yes, he says that.

5       Q.   Okay.  And you respond to the "huh" with,

6   "Never mind about the violin.  I will be the Midwest

7   expert when you get back."

8            Right?

9       A.   Yes.

10      Q.   Okay.  Can we mark that, please.

11                     (Exhibit 26 was marked for

12                     identification.)

13  BY MS. WERMUTH:

14      Q.   Ms. Trahanas, you've been handed what's

15  been marked Deposition Exhibit 26.

16           Can you help me understand what these

17  e-mails are?  So it looks like Rana on March 1st,

18  2013, sends an e-mail that you respond to; is that

19  right?

20      A.   Yes.

21      Q.   Okay.  And you say, "I'm offended because

22  in no way do I want to be associated with LeBron"?

23      A.   Correct.

24      Q.   "But I could see the basketball

25  connection, LOL"?

Page 200

1                         D. Trahanas

2        A.    Yes.

3        Q.    So are you joking here?  What is this

4   YouTube video?

5        A.    I believe it's something with the

6   Cleveland Cavaliers.  LeBron is LeBron James, who

7   plays basketball for the Cleveland Cavaliers.  I

8   mean, I play basketball, so, I mean, I'm not joking

9   about that.  I guess I'm just trying to be friendly

10   with Rana.

11        Q.    Okay.  So this e-mail exchange has nothing

12   to do with sexual orientation; is that right?

13        A.    Right.

14        Q.    Okay.  So just because it's a

15   sports-related topic doesn't mean it's related to

16   sexual orientation, correct?

17             MR. DeROSE:  Counsel, this part of the

18   chain, was this part of an e-mail chain, do we know?

19             MS. WERMUTH:  Yeah, I mean, it has the

20   underlying e-mail from Rana in there.

21   BY MS. WERMUTH:

22        Q.    Here's my question:  Is there -- just

23   because a conversation in the lab revolves around

24   the topic of sports doesn't mean it also includes

25   sexual orientation, correct?

1                          D. Trahanas

2        A.    Not unless it's been previously

3    established that something means something else, no.

4        Q.    Okay.  But there's nothing in this e-mail

5    chain in Exhibit 28 -- 26, I'm sorry, that

6    specifically you can recall referencing sexual

7    orientation in any way?

8        A.    No.

9              MR. DeROSE:  Objection.  Wait, objection.

10   Exhibit 26 is a one -- two-line e-mail.  It is not

11   the whole e-mail chain.  She's obviously responding

12   to something.  I object to giving me one e-mail out

13   of a whole e-mail chain.

14             MS. WERMUTH:  I don't -- I object with

15   your characterization of the document, but I'm not

16   going to argue with you.

17             MR. DeROSE:  But I do know that there are

18   more e-mails to this, Counsel.  I object to you --

19   so the record reflects, you can ask your questions.

20   I object to Exhibit 26 being one part of a several

21   e-mail conversation.

22             MS. WERMUTH:  Well, if you have those

23   other e-mails, I'd like to see them.

24             MR. DeROSE:  You will.

25             MS. WERMUTH:  You've produced them to me?

Page 202

1                          D. Trahanas

2             MR. DeROSE:  Yes, I have.

3             MS. WERMUTH:  Can we mark this, please.

4                     (Exhibit 27 was marked for

5                      identification.)

6    BY MS. WERMUTH:

7        Q.   So, Ms. Trahanas, I've handed you now

8    Exhibit 27 or you've been handed Exhibit 27.

9             That's an e-mail that you sent to

10   Dr. Schwulst, right?

11       A.   Yes.

12       Q.   And you sent him a video from YouTube,

13   right?

14       A.   Yes.

15       Q.   And the re line subject line says

16   "football in basketball"?

17       A.   Yes.

18       Q.   Okay.  What is that referring to?  What is

19   this video that you sent Dr. Schwulst?

20       A.   I don't recall what the video is, but I'm

21   assuming two people probably hit their heads during

22   basketball.

23       Q.   Okay.  So this has to do with trauma and

24   injury, right?

25       A.   I would think so, yes.

                        D. Trahanas

1

2      Q.    Okay.  So this has nothing to do with

3   sexual orientation?

4      A.    No.

5      Q.    Even though it has to do with sports?

6      A.    Correct.

7      Q.    Okay.  So some of your work, because it

8   involved traumatic injuries, you were interested in

9   it in connection with sports injuries, is that

10  right, Ms. Trahanas?

11     A.    I mean, there -- concussions and TBI, I

12  mean, that whole area is kind of under a big

13  umbrella.  But, I mean, I was interested in sports

14  prior to, but there's no suggestion that -- I mean,

15  mostly if anything we would speak about football in

16  terms of brain injuries just because they're so

17  frequent.

18     Q.    Okay.  So just because you sent him a

19  video about sports doesn't mean that you were

20  raising the topic of sexual orientation, correct?

21     A.    Correct.

22     Q.    And you also asked Dr. Schwulst to help

23  you raise money in connection with a basketball

24  tournament.

25           Do you remember that?

1                            D. Trahanas

2       A.   I believe I sent an e-mail to everyone in

3   the lab about --

4       Q.   Including Dr. Schwulst?

5       A.   Yes, about a basketball tournament I was

6   involved in.

7       Q.   Asking to raise money, right?

8       A.   It's possible.  I don't recall the exact

9   contents of that e-mail.

10      Q.   And did he, did Dr. Schwulst give you any

11  money for the basketball tournament?

12      A.   No.  No one from the lab did.

13      Q.   Can you mark this, please.

14                      (Exhibit 28 was marked for

15                      identification.)

16  BY MS. WERMUTH:

17      Q.   Okay.  You've been handed Deposition

18  Exhibit 28.

19           Do you see that e-mail?

20      A.   Yes.

21      Q.   And that's an e-mail that you sent to

22  Dr. Schwulst with a YouTube video, right?

23      A.   Yes.

24      Q.   Do you recall what that YouTube video

25  showed?

                          D. Trahanas

1

2       A.    I don't recall this video either.

3       Q.    And you wrote "Millennial written all over

4    this"; is that right?

5       A.    It does say that, yes.

6       Q.    So you were teasing back?

7       A.    Teasing?

8       Q.    Well, what was your intent in sending this

9    to him?

10           MR. DeROSE:  Counsel, was this part of

11   another e-mail chain, do you know?

12           THE WITNESS:  I think it's just a single

13   e-mail.

14           MS. WERMUTH:  I mean, at least this

15   exhibit is a single e-mail, and I'm asking her about

16   her e-mail to the doctor.

17           MR. DeROSE:  I know you are.  I'm just

18   trying to see if I can figure out what's going on

19   here either.

20   BY MS. WERMUTH:

21      Q.    You were joking with him when you sent

22   that to Dr. Schwulst, right?

23      A.    I don't want to say I was joking.  If I

24   could make a synonymous situation, it's like -- it's

25   like me kind of trying to stay part of -- like part

Page 206

D. Trahanas

1    of the group, somewhat seeking approval or

2    seeming -- I guess that's the best way to say it is

3    just kind of seeking approval and him seeing me not

4    as an outcast, because at the time, I mean, I just

5    felt like -- I felt that him and at least one other

6    lab member had -- they had a lot of inside jokes or

7    ways of offending me, and I think this is me trying

8    to just be friendly with him so maybe he doesn't see

9    me as an outcast amongst him and the other lab

10   member.

11        Q.   Who was the other lab member you're

12   talking about?

13        A.   Rana.

14        Q.   Rana Saber?

15        A.   Yes.

16        Q.   And you said they had inside jokes and

17   ways to offend you.

18             What does that mean?  I don't understand

19   that.

20        A.   One thing is that I would just get blamed

21   everything in the lab, for the lab.

22        Q.   So if something went wrong in the lab you

23   got blamed for it?

24        A.   Yes.

Page 207

1                            D. Trahanas

2        Q.    By Rana?

3        A.    A lot of the time, yes.

4        Q.    Okay.  So that's what you were saying,

5   what you referred to by inside jokes and trying to

6   offend you?

7        A.    Part of it, yeah.

8        Q.    Well, what's the other part?

9        A.    I mean, she would join in with the

10   softball playing.  She would join in with just

11   saying, you know, the blind leading the blind if I

12   was showing somebody how to do something.

13        Q.    Okay.  So the blind leading the blind

14   doesn't refer to sexual orientation.  You would

15   agree with that?

16        A.    That, yes, I would agree.

17        Q.    Okay.  And you said that she joined in

18   with the softball playing.

19              Does that mean she played softball, or she

20   called you a softball player?

21        A.    She called me a softball player.

22        Q.    Did she ever call you a lesbian?

23        A.    Yes.

24        Q.    Okay.  When was the first time Rana Saber

25   called you a lesbian?

1                        D. Trahanas

2        A.   At least by early 2013.  I can't say for

3   sure if it was in 2012.

4        Q.   And where did she call you a lesbian?

5        A.   In the lab.

6        Q.   How many times?

7        A.   It wasn't -- it wasn't regular and

8   frequent, but it was a few times.

9        Q.   Who was present when she called you a

10  lesbian other than yourself?

11       A.   Some of my co-workers, so Salina, Melissa,

12  Angelica, Carla, Sasha or Alexander, maybe five

13  times.

14       Q.   And were those people that you just named

15  present every single -- all of them present at the

16  same time for every single of the five times that

17  she called you a lesbian?

18       A.   One or more of those were present during

19  that time.

20       Q.   And did you tell her to knock it off or

21  that you didn't like it or appreciate it?

22       A.   Yeah.

23       Q.   You did?

24       A.   For sure.

25       Q.   Okay.  And what did she say?

Page 209

```
 1                        D. Trahanas
 2        A.    Sometimes she would laugh it off.
 3   Sometimes she would say, oh, come on, you know it's
 4   true, just tell us; you don't have any boyfriends.
 5              That's all I can recall for right now.
 6        Q.    Did you ever report her comments to HR?
 7        A.    I did not.
 8        Q.    Did you report them to Dr. Schwulst?
 9        A.    No.
10        Q.    Did you report them to Dr. Perlman?
11        A.    No.
12        Q.    Did you ever call her anything, any names?
13        A.    Directly to her?
14        Q.    Yes.
15        A.    No.
16        Q.    Okay.  Did you ever call her names to
17   anybody else?
18        A.    When I was upset with her I would be
19   venting to some of my co-workers.  I can't say
20   specifically what I called her, but I alluded to her
21   being passive-aggressive.  I called her probably an
22   ass, a jerk.
23              That's all I can recall for right now.
24        Q.    Did you call her a bitch?
25        A.    It's possible, but I don't recall.
```

```
 1                        D. Trahanas
 2        Q.   So you said that she called you a lesbian
 3   five times.
 4             How many times did she call you a softball
 5   player?
 6        A.   She wouldn't always necessarily refer to
 7   me as softball player.  She was talking about
 8   softball.  She would just say, so are you going to
 9   play softball tonight, Diane, something like that.
10        Q.   How many times did she do that?
11        A.   Ten, maybe fifteen times.
12        Q.   Ten or fifteen times?
13        A.   Yeah.
14        Q.   And who was present when she made those
15   references to softball directed toward you?
16        A.   A few of my co-workers, again Angelica,
17   Carla, Salina, Melissa, Sasha, Alexander.
18        Q.   Dr. Schwulst?
19        A.   A couple of the times.
20        Q.   Anybody else call you lesbian or softball
21   player?
22        A.   Not directly.  Sasha would pretty much
23   kind of chime in with Rana in making fun of me.
24        Q.   Okay.  So making fun of you?
25        A.   With --
```

```
 1                         D. Trahanas
 2        Q.    How?
 3        A.    In regards to my orientation, you know,
 4   dating, I don't have boyfriends, anything like I
 5   said earlier.  She would say are you going to go
 6   play softball tonight, and Sasha would be like yeah,
 7   come on, Diane, tell us, like that.
 8        Q.    So he never used the phrase himself?
 9        A.    No.
10        Q.    Okay.  Or lesbian, right?  He never used
11   that phrase?
12        A.    Sasha did not, no.
13        Q.    Okay.  Anyone else?
14        A.    No.
15        Q.    There were times when Dr. Schwulst praised
16   you, correct?
17        A.    Yes.
18        Q.    He would tell you you rocked or you did a
19   great job, correct?
20        A.    Sure.
21        Q.    And there were times when you did joke
22   around with him, correct?
23        A.    With certain things.
24        Q.    And there were other -- there were times
25   when you joked around with others in the lab as
```

Page 212

                              D. Trahanas

1

2    well; is that right?

3         A.   Yes.

4         Q.   Now let's talk for a minute about your

5    ADHD diagnosis and your depression and anxiety

6    diagnosis.

7              So let's first establish, you are aware

8    that the court dismissed your disability

9    discrimination claim, right?  You understand that?

10        A.   Yes.

11        Q.   Okay.  So you have a retaliation claim but

12   you don't have a disability harassment claim.

13             You understand that, right?

14        A.   Yes.

15        Q.   Okay.  So tell me what you contend your

16   disability is.

17        A.   I mean, at the time that I was -- at the

18   time that I was at work at Northwestern, I mean, I

19   basically got to the point where I had -- I was

20   going to have a nervous breakdown.  It was just very

21   stressful.  I felt like if I did something I'd be in

22   trouble; if I didn't do something it would still

23   fall on my shoulders.

24             And so my disability is just being -- I

25   was extremely sad.  I -- work was just very hard for

                              D. Trahanas

1
2    me.  Working in that environment was very hard for
3    me.
4         Q.   So just so I'm clear then, you're not
5    claiming that your ADHD diagnosis is a disability
6    for purposes of this litigation, correct?
7         A.   I think that's part of it.
8         Q.   Oh, okay.  So you were first diagnosed
9    with ADHD in 2007; is that right?
10        A.   Yes.
11        Q.   Okay.  And you were actually diagnosed
12   with depression and anxiety around the same time or
13   earlier than that?
14        A.   I believe around the same time.
15        Q.   Okay.  And eating disorders and insomnia;
16   is that right?
17        A.   It was -- yes.
18        Q.   Okay.  And you've been taking a variety of
19   types of medications to treat the ADHD and the
20   depression and anxiety since before you started
21   working at Northwestern; is that right?
22        A.   I was -- I was being treated by my primary
23   physician, and then I found a psychiatrist to manage
24   my medication, and she put me on I guess a cocktail
25   of what I needed to be treated with.

                              D. Trahanas

1

2              My primary care physician, I don't believe

3    she gave me an anti-anxiety medication.  I believe I

4    started taking that in 2012, around that time.

5         Q.   Okay.

6         A.   But she was giving me the antidepressant.

7    She was giving me some form of antidepressants and

8    Adderall.

9         Q.   So is Lexapro an antidepressant?

10        A.   It is.

11        Q.   Okay.  And so you were taking Adderall and

12   some sort of antidepressant before you started

13   working at Northwestern, right?

14        A.   Yes.

15        Q.   Okay.  And then subsequent or at some

16   later point in time after you started treating with

17   Dr. Cano -- is it Cano --

18        A.   Dr. Cano.

19        Q.   -- C-a-n-o, you also started taking an

20   anti-anxiety medication?

21        A.   Correct.

22        Q.   And you currently still take all three,

23   correct?

24        A.   Yes.

25        Q.   Okay.  And has your anxiety and your

Page 215

                              D. Trahanas

1       depression interfered with other of your jobs other

2       than your job at Northwestern?

3           A.    Prior to Northwestern or --

4           Q.    Yes.

5           A.    No.

6           Q.    Do you remember telling your primary care

7       physician while you worked at University of Chicago

8       that you had difficulty focusing and organizing your

9       thoughts at work?

10          A.    Yes.

11          Q.    Okay.  All right.  So did you ever tell

12      Dr. Schwulst that you were being treated for ADHD?

13          A.    Yes.

14          Q.    When did you tell him that?

15          A.    It was around the same time we were having

16      the conversation of working out and how I kind of

17      managed that.

18          Q.    How you managed what?

19          A.    The anxiety or the depression and the

20      anxiety and the ADHD, working out helped.

21          Q.    Okay.  So just so I'm clear, so when

22      you -- so my question was did you tell him about the

23      ADHD; you said yes; I said when.

24                So is it your testimony that you told him

25

```
 1                        D. Trahanas
 2    about your diagnosis of ADHD, depression and anxiety
 3    all at the same time?
 4         A.   Yes.
 5         Q.   Okay.  And when did you have that
 6    conversation with him?
 7         A.   October of 2012.
 8         Q.   And where did you have that conversation
 9    with him?
10         A.   In the lab.
11         Q.   And this was where you were explaining to
12    him how you used exercise as way to mitigate the
13    symptoms that you suffered as a result of those
14    three conditions?
15         A.   Yeah.
16         Q.   Okay.  And is this the same conversation
17    in which he said you were manly?
18         A.   Not at the same time.
19         Q.   Okay.  And you did not have any job
20    restrictions that you turned in to him like from
21    your doctor saying -- in October of 2012 saying she
22    can't perform her job functions without this sort of
23    accommodation, right?
24         A.   No.
25         Q.   All right.  And what major life activities
```

1                          D. Trahanas

2     do you contend were impacted in 2012 through 2015 as

3     a result of your ADHD?

4               MR. DeROSE:  I need a minute.

5               MS. WERMUTH:  Let her answer the question,

6     and then we can take break.

7               MR. DeROSE:  All right.  Go ahead and

8     answer.

9               THE WITNESS:  Can you repeat the question?

10    BY MS. WERMUTH:

11        Q.   Yes.  So what major life activities do you

12    contend were impacted by your diagnosis of ADHD

13    during the 2012 to 2015 time frame?

14        A.   I can say typical symptoms of ADHD, just

15    lack of organization, life activities.  I can't

16    definitively say it was only ADHD.  I'm not sure how

17    much of the depression in conjunction with the ADHD

18    and anxiety contributed.

19        Q.   Okay.  So what were the symptoms?

20              MR. DeROSE:  Whoa, whoa, whoa.

21              MS. WERMUTH:  So you want to take a break?

22              MR. DeROSE:  Yes, right now.

23                        (Whereupon, a recess was taken

24                         from 3:24 p.m. to 3:30 p.m.)

25

1                          D. Trahanas

2    BY MS. WERMUTH:

3         Q.    Okay.  So, Ms. Trahanas, you took a

4    medical leave of absence from Northwestern starting

5    in February of 2015; is that right?

6         A.    Yes.

7         Q.    Okay.  And let me ask you this:  So

8    Dr. Cano -- I'm sorry, Cano?

9         A.    Cano.

10        Q.    Okay.  So you've been treating with her

11   for several years; is that right?

12        A.    Yes.

13        Q.    And she's a psychiatrist?

14        A.    Correct.

15        Q.    And you trust her; is that right?

16        A.    Yes.

17        Q.    She has been helpful to you?

18        A.    Yes.

19        Q.    And you know her to be honest in her

20   dealings with you, right?

21        A.    Yes.

22        Q.    And you meet with her on, what, about a

23   monthly basis?

24        A.    Once a month.

25        Q.    Okay.  And you've been meeting with her

```
 1                      D. Trahanas
 2   once a month for several years now --
 3        A.   Yes.
 4        Q.   -- is that right?
 5             Okay.  The sessions are relatively short
 6   typically, is that right, 20 minutes or so?
 7        A.   Up to a half hour.
 8        Q.   Okay.  And does she take notes when you
 9   meet with her?
10        A.   She puts things in the computer.  I'm not
11   sure if she's -- I know doctors, there's different
12   programs, and so I'm not sure if she's checking
13   boxes or writing notes.
14        Q.   But you see her at the computer entering
15   information?
16        A.   Sure.
17        Q.   Okay.  So let's -- and you know that we
18   subpoenaed her records in connection with this
19   litigation, right?
20        A.   Yes.
21        Q.   So why don't we look at her records.
22   Since they're voluminous, I tried not to kill too
23   many trees, so we will mark one, and then is there a
24   chance that the two of you can look over each
25   other's shoulder?
```

Page 220

1                         D. Trahanas

2            MR. DeROSE:  I'll just listen.  If I need

3   to, I'll ask.

4            MS. WERMUTH:  Okay.

5            MR. DeROSE:  Put it on my lap, not now

6   though.  Go ahead, you just do it together.

7                    (Exhibit 29 was marked for

8                     identification.)

9   BY MS. WERMUTH:

10       Q.   So your leave of absence in February of

11  2015 began on the 17th of February; is that right?

12       A.   Yes.

13       Q.   Okay.  All right.  So if you could with me

14  on Exhibit 29 take a look at -- I'll just have to

15  give you the page number.

16            Can we go off the record for a second.

17                    (Whereupon, an off-the-record

18                     discussion was held.)

19  BY MS. WERMUTH:

20       Q.   Can you turn to Bates page 10392.

21            By the way, do you still treat with

22  Dr. Cano?

23       A.   My last appointment with her was December

24  of 2016.

25       Q.   Why did you stop treating with her?

1                    D. Trahanas

2      A.    She -- I can't afford the insurance that

3  she takes.

4      Q.    Are you treating with anyone else?

5      A.    Yes.

6      Q.    Who are you treating with now?

7      A.    I actually just switched, so the doctor of

8  the clinic is Dr. Jada Johnson, but there's also a

9  therapist, and I don't know his name.

10     Q.    Okay.  And when did you start treating

11  with the therapist, the new therapist?

12     A.    October of 2017.

13     Q.    Okay.  So this particular -- these

14  treaters haven't been disclosed to me, so we will

15  need to get that information and their records as

16  well.

17          MR. DeROSE:  Put it in a letter, and I'll

18  get it for you.

19  BY MS. WERMUTH:

20     Q.    So -- I'm sorry, actually it's 10397.  I'm

21  sorry.

22          So this looks like a progress note for a

23  session you had with Dr. Cano on February 11th of

24  2015.

25          Do you see that at the top?

Page 222

1                           D. Trahanas

2        A.    Yes.

3        Q.    Okay.  And under Chief Complaint it says

4   depressive -- so she writes "Says depressive and

5   anxiety symptoms have mildly improved."

6              Do you see that?

7        A.    Yes.

8        Q.    Okay.  And you have no reason to doubt

9   that she accurately wrote down what you told her on

10  this date; is that right?

11       A.    No, I don't have a reason.

12       Q.    Okay.  And so this is about a week before

13  you went on leave from work, right?

14       A.    Correct.

15       Q.    By the way, this was not your first

16  medical leave of absence at Northwestern, right?

17       A.    Correct.

18       Q.    Okay.  You had at least one prior one?

19       A.    About in June of 2014.

20       Q.    Okay.  And you returned to work with no

21  problems after that medical leave of absence, right?

22       A.    Yeah.

23       Q.    And you don't claim that you were

24  retaliated against in any way in connection with

25  that leave of absence, right?

Page 223

1                        D. Trahanas

2        A.    Not the June of 2014, no, leave.

3        Q.    Okay.  All right.  So on February 11th of

4   2015 you tell Dr. Cano that you're depressive and

5   anxiety symptoms have mildly improved, right?

6        A.    Yes.

7        Q.    Okay.  And if you look under HPI, do you

8   see the area that says HPI?

9        A.    Yes.

10       Q.    Okay.  And the second paragraph, the last

11  sentence, "Denies recent and current SI," do you see

12  that?

13       A.    Yes.

14       Q.    Do you understand SI to mean suicidal

15  ideation?

16       A.    Yes.

17       Q.    Okay.  So is that accurate, that on

18  February 11th of 2015 you denied any suicidal

19  ideation?

20       A.    Yes.

21       Q.    Okay.  And then do you see where it says

22  Past/Family/Social?

23       A.    Yes.

24       Q.    Okay.  It says, "Says she has not been

25  studying for MCATs but will have to take the new

```
1                         D. Trahanas
2    test."
3              So were you planning on taking the MCAT
4    test in 2015?
5         A.   In -- I wasn't sure when I would take it,
6    but I was hoping for sometime at the end of the
7    summer of 2015.
8         Q.   For matriculation in what year?
9         A.   For 2016.
10        Q.   Okay.  And then she goes on to write,
11   "Says she is taking time off from job starting next
12   Monday, February 16th."
13             Do you see that?
14        A.   Yes.
15        Q.   Okay.  So you were actually planning in
16   advance to take the leave of absence from your job
17   at Northwestern University?
18        A.   Well, as of that day.
19        Q.   Okay.  And you are the one informing your
20   physician that you're going to take the time off,
21   right?
22        A.   We had spoken before about -- she wanted
23   me to take time off because I was burnt out.  And so
24   we had spoken about it, and I had told her that we
25   had deadlines at the time and I didn't -- I didn't
```

1                        D. Trahanas

2     want to not make those deadlines for our publication

3     purposes and so that basically I promised her like

4     once we were done with those deadlines that I would

5     take her advice and I would take some time off.

6         Q.   Okay.  And if I were to tell you that

7     there's nothing in her notes from the month

8     preceding this visit that suggests that she

9     recommended you taking time off, would you have

10    reason to dispute that?

11        A.   We spoke about it, so I'm not sure if --

12    are you saying that you didn't see it, or are you

13    saying that you might not see it?  I didn't quite

14    catch the beginning.

15        Q.   I'll strike that.

16             So let me ask you this:  So you're feeling

17    better on February 11th, 2015, but you're also

18    telling her that you're going to take time off the

19    next week, right?

20        A.   Feeling better is -- feeling better to how

21    I was.  I mean, getting out of bed at that point is

22    feeling better.

23        Q.   All right.  Well, look at Page 10398 about

24    a third up from the bottom where it says Mood.

25        A.   Yes.

Page 226

1                          D. Trahanas

2       Q.    And it says, quote, "I feel good."

3             Do you see that?

4       A.    Yes.

5       Q.    Okay.  So according to her notes, on

6  February 11th, 2015, you told her not just that you

7  were feeling better but that you feel good?

8       A.    She asked me that every day that I would

9  go into the office.

10      Q.    Right.  And on February 11th, 2015, you

11 told her "I feel good"?

12      A.    Compared to probably previous times, yes.

13      Q.    Okay.  And but, again, you are

14 nevertheless telling her you're going to take time

15 off starting next week, the following week, right?

16      A.    Right.  I already said why.

17      Q.    Now, also there's a note in here that says

18 you were trying out for Chicago Red Stars tomorrow.

19            Do you see that at the bottom, at the end

20 of the paragraph on Past/Family/Social on

21 Page 10397?

22      A.    Oh, yeah.

23      Q.    Okay.  What are the Chicago Red Stars?

24      A.    It's a soccer team.

25      Q.    Professional soccer team, right?

Page 227

```
 1                        D. Trahanas
 2        A.    Yes.
 3        Q.    Okay.  So that would be a full-time job --
 4        A.    No.
 5        Q.    -- if you were to get on the team?
 6        A.    No.
 7        Q.    It's not a full-time job?
 8        A.    No.
 9        Q.    The tryouts last how long about?
10        A.    An hour and a half.
11        Q.    They're not two days?
12        A.    No, unless you get invited, like you have
13   to -- there's certain groups depending on your
14   position, certain things like that.  It depends what
15   they were looking for, what they were in most need
16   of that dictates what days you go and how long you
17   stay.
18        Q.    Did you try out for the Chicago Red Stars
19   on February 12th, 2015?
20        A.    Yes.
21        Q.    Did you get invited to join the team?
22        A.    No.
23        Q.    Okay.  But you felt physically and
24   mentally well enough to go through the tryout
25   process on February 12th, 2015?
```

1                           D. Trahanas

2          A.    I would say as well as I was trying to

3     function at work.

4          Q.    Okay.  Now, if you go to Page 10399, it

5     says under Plan, the very last entry, "Patient

6     agrees to follow up Monday, March 2nd, at 10:00

7     a.m."

8               Do you see that?

9          A.    Yes.

10         Q.    So you agreed you would meet with her the

11    following month on March 2nd at 10:00 a.m., right?

12         A.    Yes.

13         Q.    And she did not give you or you did not

14    ask her for a letter regarding your leave from work

15    the following week, correct?

16         A.    On March 2nd?

17         Q.    On February 11th.

18              MR. DeROSE:  If you want her to refer to

19    the notes for the answer --

20              MS. WERMUTH:  No, I'm just asking her.

21              MR. DeROSE:  Don't look at the notes.

22    Just answer her question.

23              THE WITNESS:  Can you repeat that?  I'm

24    sorry.

25

```
 1                      D. Trahanas
 2  BY MS. WERMUTH:
 3      Q.   On February 11th, 2015, did you ask your
 4  physician to give you a note to excuse you from work
 5  the following week?
 6           MR. DeROSE:  Without referring to the
 7  notes.
 8           MS. WERMUTH:  Please do not direct the
 9  witness.
10           MR. DeROSE:  Wait a minute, Counsel.  Are
11  you asking her from her notes or from her memory?  I
12  don't want her to be referring to notes if you're
13  asking --
14           MS. WERMUTH:  Please don't instruct the
15  witness.  I've asked you at least four times now.
16  You're telling the witness how to answer.
17           MR. DeROSE:  You can ask me a hundred
18  times, Counsel.  I have a right to make a record
19  here too, okay.  I do want --
20           MS. WERMUTH:  You do not have a right to
21  give the witness instructions on how to answer a
22  question.  You don't.
23           MR. DeROSE:  Counsel, please.  If you are
24  asking her a question from her memory, I have a
25  right to tell my client --
```

Page 230

1                        D. Trahanas

2            MS. WERMUTH:  You do not.

3            MR. DeROSE:  -- do not look at notes.

4            MS. WERMUTH:  No, you do not.

5            MR. DeROSE:  -- answer the question.  She

6    will refer you to a note if she wants.

7    BY MS. WERMUTH:

8        Q.   You can answer the question.  Let's

9    proceed.

10       A.   I know that she would have to write a

11   note.  I can't recall if she gave me a note that

12   day.

13       Q.   Okay.  And there's nothing in the notes

14   that suggests that you asked her to fill out any

15   FMLA forms or give you a note on that particular

16   day, correct?

17           MR. DeROSE:  Objection.  Unless she can

18   see the notes, how would she know the answer?

19           MS. WERMUTH:  The notes are right in front

20   of her.

21           MR. DeROSE:  Do you want her to look at

22   the notes?

23   BY MS. WERMUTH:

24       Q.   I'm asking her there's nothing in those

25   notes, right?  I've asked you that question.

Page 231

D. Trahanas

1
2          There's nothing in the notes from
3   February 11th, 2015, that suggests that you asked
4   your physician to give you a note or to fill out any
5   forms to go on leave the following week?
6          A.   I'm not sure that she would necessarily
7   note that.
8          Q.   Okay.  But you don't see anything in the
9   notes, right?
10         A.   I don't see anything in her notes, no.
11         Q.   Thank you.  So now you did not then go
12  back to Dr. Schwulst or to HR that same day and tell
13  them that you were planning on taking a leave the
14  following week?
15         A.   I did not.  If I told anybody, if I told
16  Dr. Schwulst my personal information, I knew it
17  would get spread throughout the lab in minutes.
18         Q.   Okay.  But you knew that you were expected
19  to give notice before going on a leave if notice --
20  if the leave was not an emergency, right?
21         A.   I mean, like I said before, I was burnt
22  out, so I considered it, yeah, as an emergency.  I
23  mean --
24         Q.   Well, you knew a whole week in advance you
25  were going to take that -- you were going on leave

                          D. Trahanas

1    the following week.  So it wasn't an emergency,

2    right?  You had the ability to give your employer

3    notice, correct?

4         A.    My employer being Dr. Schwulst?

5         Q.    Dr. Schwulst, the university, HR --

6         A.    Right.

7         Q.    -- administration.

8         A.    As I stated, if I gave him that

9    information it would be given to everybody else.  My

10   personal medical information would be given to

11   everybody else in the lab.

12        Q.    Okay.  So let me ask my question again.

13              You had the ability to give notice but you

14   chose not to, correct?

15        A.    No.

16        Q.    Okay.  You could have -- you had gone on a

17   leave before, so you knew the process for going on a

18   leave of absence, right?

19        A.    Somewhat.  I mean, it was over a year.  I

20   can't -- I'm sure each type of problem has a

21   different, you know, protocol or procedure or

22   paperwork I suppose.

23        Q.    You could have gone to HR on

24   February 11th, 2015, and said I'm going to need to

Page 233

```
1                          D. Trahanas
2    start a leave of absence next week, right?
3         A.    Right.  I did that on February 16th.
4         Q.    You didn't do it on the 11th though when
5    you knew you were going to be out?
6         A.    No, I did not send them an e-mail that
7    day, correct.
8         Q.    Okay.  So on the 16th, so let's talk about
9    what happened on the 16th.
10             So the 16th of February is a Monday,
11   correct, or you don't recall?
12        A.    I don't remember if the 15th or the
13   16th is a Monday.
14        Q.    But you did not report to work on the
15   16th, correct?
16        A.    Correct.
17        Q.    And before you went on a leave of absence
18   you cleaned out your workspace, right?
19        A.    Cleaned out?
20        Q.    Yes, like took home personal effects,
21   cleaned out your desk area.
22        A.    I mean, I -- when I left or after I was
23   terminated I asked for my belongings to be returned
24   to me.
25        Q.    So that's not my question.  Before you
```

```
 1                      D. Trahanas
 2   went on a leave of absence you cleaned out your
 3   workspace, cleaned it out of its personal effects?
 4        A.   No.
 5        Q.   And before you went on a leave of absence
 6   you removed personal pictures and the like from your
 7   work computer that was issued to you?
 8        A.   Maybe in the years prior, but not -- are
 9   you saying on a specific day?
10        Q.   Yes.  Immediately prior to going on the
11   leave of absence you started to remove, for example,
12   the wallpaper picture of you and your mother on the
13   computer?
14        A.   No.
15        Q.   You did not?
16        A.   I don't recall anything like that, no.
17        Q.   And the week of February 16th, whatever
18   that fell in, did you take a trip that week?
19        A.   No.
20        Q.   You stayed in town?
21        A.   Yeah.  Yes.
22        Q.   You did not go to visit your boyfriend?
23        A.   No.
24        Q.   By the way, are you still currently dating
25   the individual that you were dating in 2014?
```

Page 235

                           D. Trahanas

1

2    A.    We're not together anymore.

3    Q.    So you're not dating?

4    A.    No.

5    Q.    And what is his name?

6    A.    John.

7    Q.    John, what's his last name?

8    A.    Sitaras.

9          MR. DeROSE:  Can you spell that for the

10   record?

11         THE WITNESS:  S-i-t-a-r-a-s.

12   BY MS. WERMUTH:

13   Q.    Were you dating him in February of 2015?

14   A.    Yes.

15   Q.    And January of 2015?

16   A.    Yes.

17   Q.    Okay.  So did you talk to him about what

18   was going on at work?

19   A.    I mentioned to him a little bit, yes.

20   Q.    Okay.  And do you have text messages and

21   e-mails with him regarding what was going on at

22   work?

23   A.    The only e-mails that I have are what were

24   included in the I guess chains that we sent you or I

25   sent you or gave to John to give to you.  So I think

1                          D. Trahanas

2    there's a total of maybe two over the span of

3    however many years, and I don't have texts from him

4    since 2016 when him and I separated.

5          Q.    So you did produce texts between you and

6    Salina from February of 2015, right?

7          A.    Yes.

8          Q.    And also texts from you to Melissa Wallin

9    in February of 2015 --

10         A.    Yes.

11         Q.    -- right?

12               But you didn't produce any text messages

13   with Dr. Schwulst from that time period, correct?

14         A.    His texts were already provided to us, and

15   my carrier can't go that far back to give me those

16   text messages.

17         Q.    So that's not my question, okay.

18               So you were able to get text messages to

19   produce from Salina and from -- or to Melissa,

20   right?

21         A.    I had screen shot those to show them to my

22   attorney at the time of that year.

23         Q.    So you screen shotted those text messages

24   in February of 2015?

25         A.    No, later on in 2015.

Page 237

                            D. Trahanas

1

2      Q.    Okay.  And so are you telling me that all

3  the old text messages between you and Carla and

4  Salina and Angelica and Melissa and Dr. Schwulst,

5  you didn't do anything to preserve them?

6      A.    Beyond keeping as much as I could or like

7  voicemails or screen shots, no.  My phone -- I mean,

8  I had a different model phone at the time, and so

9  that one actually got run over so it completely

10  cracked.  So whatever ended up being saved was

11  saved, and the rest I can't retrieve because it's

12  too far, it's too far back to go.

13      Q.    When did your phone get run over?

14      A.    2016.

15      Q.    Okay.  So between the time you went to the

16  EEOC in 2015 and the time your phone got run over in

17  2016 you didn't take any steps to preserve the data

18  that you had on your phone?

19      A.    There is -- like Apple does that, but I

20  don't know a way for me to access that information.

21  I would have to ask Apple to, you know, retrieve

22  that data or information or texts.

23      Q.    You were represented by counsel when you

24  filed at the EEOC; is that correct?

25      A.    At the time that I was there?

D. Trahanas

1                  D. Trahanas

2     Q.   No.  When you -- so you actually engaged

3  counsel in February of 2015, right?

4     A.   Yes.

5     Q.   And vis-a-vis your disputes with the

6  university and Dr. Schwulst, you've been represented

7  by some lawyer since that time, correct?

8     A.   There was a break in between February and

9  until my current attorney, but, yes, after that

10  probably April of 2015, so maybe there was like a

11  month where I didn't have counsel.

12     Q.   Okay.  And just so I'm clear, you've

13  been -- so you've at least been represented

14  continuously since April of 2015 vis-a-vis these

15  issues involved in your lawsuit, correct?

16     A.   Yes.

17     Q.   Okay.  And you did not do anything from

18  April '15 to the present to make sure before those

19  text messages disappeared and went away to preserve

20  them, right, to save them, to get them into a file

21  where they could be produced?

22     A.   Like I said, they are there.  It's just

23  I'm not able -- I'm not a computer person, so I

24  can't retrieve them.  The way that iTunes or Apple's

25  iCloud account works is -- from what I've asked it's

Page 239

                              D. Trahanas

1

2    very complicated, and unless you're a computer

3    expert you won't be able to retrieve those text

4    messages.

5         Q.    When did you first notify human resources

6    that you were going to be out on leave?

7         A.    February 15th or 16th of 2015.

8         Q.    And how did you notify human resources?

9         A.    I e-mailed.  I e-mailed them.

10        Q.    Who did you e-mail?

11        A.    I believe Ms. Fernandez.

12        Q.    And what did you say in the e-mail?

13        A.    I don't recall.

14        Q.    Did you provide any medical documentation

15   of the need for leave?

16        A.    In the e-mail, probably.  I would believe

17   that that would be sent through the doctor's office.

18   I don't think I would have access to that.

19        Q.    Okay.  When did you -- and did you e-mail

20   and notify HR first thing in the morning on the day

21   that you didn't report to work, or what time of day?

22        A.    I don't recall.  If you have an e-mail

23   that I could refresh my memory, I'd be more than

24   happy to try and answer, but I can't recall right

25   now.

Page 240

1                          D. Trahanas

2        Q.   When did you notify Dr. Schwulst?

3        A.   I believe February 16th, February 16th or

4    17th, via e-mail.

5        Q.   So was it the second day that you did not

6    report to work that you notified Dr. Schwulst?

7        A.   I would have to take a look and see the

8    dates on -- I'm not sure what's Monday, what's

9    Tuesday.

10       Q.   Was Monday the first day you took off?  So

11   let's set aside whether it was the 15th or 16th.

12            Was Monday the first day you took off?

13       A.   Yes.

14       Q.   Okay.  And you did not notify Dr. Schwulst

15   until the following Tuesday; is that right?

16            MR. DeROSE:  Objection, Counsel.  She just

17   said she doesn't know unless she can see a document.

18   BY MS. WERMUTH:

19       Q.   You can answer the question.

20            MR. DeROSE:  Asked and answered.

21            MS. WERMUTH:  You've stated your

22   objection.

23   BY MS. WERMUTH:

24       Q.   You can go ahead and answer my question.

25       A.   You said the following Tuesday?

```
1                      D. Trahanas
2        Q.   The Tuesday -- okay.  So you've testified
3   that the first day that you didn't report to work in
4   connection with the leave of absence was a Monday,
5   right?
6              So my question is, did you notify
7   Dr. Schwulst on that Monday or the next day,
8   Tuesday?
9        A.   Like I said, I can't remember if it was
10  the 16th or 17th or Monday or Tuesday.  I'd have to
11  refresh my memory with the e-mails.
12       Q.   Can you mark that, please.
13                      (Exhibit 30 was marked for
14                       identification.)
15             MR. DeROSE:  Remember, an hour and a half
16  before we get --
17             MS. WERMUTH:  We may have to just agree to
18  continue the deposition.
19             MR. DeROSE:  Well, no, you get seven
20  hours.
21             MS. WERMUTH:  And it hasn't been close to
22  seven hours yet.
23             MR. DeROSE:  Well, I didn't say you have
24  to leave now.  I'll wait for seven hours.
25
```

Page 242

```
 1                        D. Trahanas
 2    BY MS. WERMUTH:
 3         Q.    Okay.  So, Ms. Trahanas, these are e-mails
 4    in Deposition Exhibit 30 that you produced to us.
 5              Can I ask you to look at the second page,
 6    which is marked Trahanas 193.
 7         A.    Yes.
 8         Q.    Actually no, I'm sorry, don't look at
 9    that.  Look at the first page.
10              So it's Tuesday, February 17th, 2015, at
11    12:00 noon.
12         A.    Yes.
13         Q.    "Hello, Steve.  I am taking a medical
14    leave of absence.  I have contacted HR, and they
15    will be notifying you."
16              Do you see that?
17         A.    Yes.
18         Q.    So was that the first notice that you gave
19    to Dr. Schwulst that you were going to be taking a
20    leave of absence?
21         A.    Yes.
22         Q.    So it was on the second day of your
23    absence at noon, correct?
24         A.    Yes.
25         Q.    And he responds about an hour, over an
```

```
 1                           D. Trahanas
 2     hour later, "Diane, what is going on?  Can you call
 3     me," right?
 4          A.   Yes.
 5          Q.   And you say, "I really appreciate your
 6     concern, but it's a private matter that I am not
 7     comfortable discussing."
 8               Do you see that?
 9          A.   Yes.
10          Q.   Okay.  And then he responds, "When are you
11     coming back?"
12          A.   Yes.
13          Q.   And then three -- I'm sorry, a day later
14     you tell him you are unsure, right?
15          A.   Yes.
16          Q.   And you tell him you will only be
17     communicating with HR?
18          A.   Correct.
19          Q.   Okay.  So you didn't want to talk directly
20     with him?
21          A.   Correct.
22          Q.   And you wanted to limit any e-mails, texts
23     or calls from him, right?
24          A.   Yes.
25          Q.   Okay.  Now, I haven't seen any similar
```

1                         D. Trahanas

2    e-mail that you sent to HR.

3             Are you sure you sent an e-mail to HR?

4         A.   If I e-mailed him that -- well, I said

5    contacted, so it's quite possible that I called them

6    and my doctor was going to send over the paperwork.

7    It may have been an e-mail; it may have been a phone

8    call.  I can't recall.

9         Q.   And if you look at 22, if you look at

10   Exhibit 22, the big stack of text messages.

11            MR. DeROSE:  Let me look at it over your

12   shoulder for a second when she gives you the page.

13   Oh, I have that.

14   BY MS. WERMUTH:

15        Q.   Can you just turn to the last page.

16        A.   Yes.

17        Q.   Wait, I'm sorry, turn to the

18   second-to-last page.  So there's a text from

19   Dr. Schwulst to you, "Are we meeting with Harris

20   today?"

21            Do you see that?

22            MR. DeROSE:  Do you see it?

23            MS. WERMUTH:  2246.

24            THE WITNESS:  Okay.  Oh, here.

25

1                          D. Trahanas

2   BY MS. WERMUTH:

3        Q.   "Are we meeting with Harris today," do you

4   see that?

5        A.   Yes, I see that.

6        Q.   So that's on the 16th, which was that

7   Monday.  And you respond, "He changed the time last

8   week and hasn't confirmed this week.  I will be

9   staying home sick today."

10       A.   Yes.

11       Q.   So you told him that Monday that you were

12  staying home sick, right?

13       A.   Yes.

14       Q.   And then Tuesday at 1:00 o'clock he texts

15  you and says, "Are you okay?  Can you call me?"

16       A.   Yes.

17       Q.   And then you did not respond?

18       A.   Correct.

19            MR. DeROSE:  When you say you did not, you

20  got the 12:00 o'clock response, 12:00 o'clock noon

21  response on the 17th, Tuesday.  Am I wrong in that?

22            MS. WERMUTH:  Yes, you are wrong on that.

23            THE WITNESS:  I did not respond to that

24  text message.

25            MS. WERMUTH:  Thank you.

```
 1                      D. Trahanas
 2   BY MS. WERMUTH:
 3       Q.   Okay.  So going to Exhibit 30, okay, so he
 4   had texted you that day of the 17th, and you had
 5   e-mailed him at noon on the 17th, okay.  Got it.
 6            Now, he also tried to call you on the
 7   17th; is that right?
 8       A.   Yes.
 9       Q.   And you did not return his phone call
10   either, right?
11       A.   Correct.
12       Q.   Okay.  And that is -- let me just get that
13   marked.
14            You took a screen shot of the
15   transcription of the message that he left you,
16   right?
17       A.   Yes.
18       Q.   You also saved that message, right?
19       A.   I have that message, yes.
20       Q.   Can we mark that.  Thank you.
21                      (Exhibit 31 was marked for
22                       identification.)
23   BY MS. WERMUTH:
24       Q.   Okay.  Now, according to Exhibit 31,
25   Dr. Schwulst tells you that he asked his HR people,
```

Page 247

1                          D. Trahanas

2     and then it's blank, blank -- or blank days they

3     blank blank not have heard anything about it, okay.

4            So do you recall that in his voicemail

5     message he told you he contacted HR and they had

6     nothing to share with him?

7          A.   I'm sorry, your question was if I recall

8     the voicemail that he left?

9          Q.   Yes.  Do you recall him telling you in the

10    voicemail that he contacted HR and they did not have

11    any information?

12         A.   I don't recall remembering it at the time.

13    I see it here now, but ...

14         Q.   Okay.  Now, at some point you had to speak

15    with The Hartford; is that right?

16         A.   I believe so.

17         Q.   And The Hartford is the insurance company

18    that administers leaves of absence for Northwestern

19    University.  Is that your understanding?

20         A.   My understanding is they're like

21    mediators.  I'm not sure.  They're the ones that

22    approve leaves.

23         Q.   And you were approved for a leave of

24    absence, right?

25         A.   Correct.

Page 248

1                          D. Trahanas

2        Q.   And you were approved -- and you received

3    pay during the period of time that you were on a

4    leave of absence; is that right?

5        A.   Yes.

6        Q.   Okay.  And you texted Melissa Wallin on

7    that same day; is that right?

8        A.   On the 17th?

9        Q.   Yes.

10       A.   Yes, after I received a voicemail from

11   Salina -- I'm sorry, a text message from Salina.

12       Q.   Can you mark that, please.

13                      (Exhibit 32 was marked for

14                       identification.)

15            MR. DeROSE:  32, Counsel?

16            MS. WERMUTH:  Yes.

17   BY MS. WERMUTH:

18       Q.   Now, this is a text message, portion of a

19   text message I guess that you sent to Melissa Wallin

20   on February 17th, 2015.

21            Is that accurate?

22       A.   Yes.

23       Q.   Okay.  And you say, "My boss may approach

24   you as I have received a text from another co-worker

25   inquiring about my private personal medical leave of

Page 249

1                        D. Trahanas

2   absence because that's exactly what it is."

3            So you tell Melissa that you were on a

4   medical leave of absence, right?

5       A.   Yes.

6       Q.   So you disclosed that information to her?

7       A.   I disclosed that I was taking a leave of

8   absence.

9       Q.   Okay.  A medical leave of absence, right?

10      A.   Yes.

11      Q.   And you say, "Please do not be concerned,

12  and let him know that you are unaware of my private

13  info."

14      A.   Yes.

15      Q.   Okay.  She did not respond to that text,

16  right?

17      A.   She did not, no.

18      Q.   Okay.  And then there's another text at

19  the bottom of the page that's cut off.

20      A.   That's a text message from months later.

21  It has nothing to do with -- I don't even remember

22  what's on it.

23      Q.   Do you still have that text?

24      A.   I -- I could find it.  Yeah, I probably

25  have it.

Page 250

                              D. Trahanas

1

2     Q.    These are terrible copies.

3           I'm sorry, can we go off the record for a

4     second.

5                         (Whereupon, an off-the-record

6                         discussion was held.)

7     BY MS. WERMUTH:

8     Q.    Now, you had to interview with

9     The Hartford on the 17th to tell them about the

10    nature of your request for leave; is that right?

11    You had a phone interview with The Hartford?

12    A.    I can't definitively say yes.  I don't

13    remember.

14    Q.    Okay.  And ultimately Dr. Cano had to

15    submit information to The Hartford to support your

16    request for a leave; is that right?

17    A.    Yes, yes.

18    Q.    And you were on an approved paid leave of

19    absence through May 24th of 2015; is that right?

20    A.    It's possible, but I'm not sure of the

21    exact date to which it was a paid leave or not.

22    Q.    At some point was your pay turned off?

23    A.    I don't know.  I don't remember.

24    Q.    Do you remember if The Hartford asked you

25    whether you were going to be filing for a worker's

```
 1                       D. Trahanas
 2   comp claim?
 3        A.   It's possible, but I don't recall.
 4        Q.   You never did file for a worker's comp
 5   claim --
 6        A.   No.
 7        Q.   -- correct?  Okay.
 8             Now, let me ask you this:  The week before
 9   you went on a leave of absence you worked at the
10   lab, right?
11        A.   To the best of my recollection, yes.
12        Q.   Okay.  And you were in the middle of
13   running experiments at the time before you went on a
14   leave of absence, right?
15        A.   I mean, we were always running
16   experiments.  So I believe at the time we were
17   trying to test -- we were trying something new.  It
18   wasn't just the typical project in terms of like
19   changing the data we were analyzing but keeping
20   procedures the same or the protocol.
21             So I think we were -- I think we were
22   trying to figure out the results after we do what's
23   called a clodronate injection.  I think that was
24   kind of what we were working on at the time.
25        Q.   Okay.  So this injection was an injection
```

Page 252

1                          D. Trahanas

2    into the model, the mice?

3         A.    Correct.

4         Q.    Okay.  So you had done the injection

5    before you went on the leave of absence; is that

6    right?

7         A.    Well, after you do the injection, to what

8    I remember, I believe we would have to collect the

9    samples about a day or 48 hours after.  I don't

10   think it would last days after.

11        Q.    So my question is, you had injected the

12   mice before you went on your leave of absence?

13        A.    So my response would be I didn't inject

14   mice -- let's say Friday was my last day of work --

15   to wait until Monday.  We didn't do a set of

16   injections -- we don't do a set of injections on

17   Friday because it's the last day of the week, and so

18   we wouldn't be able to collect anything come

19   Saturday or Sunday.

20        Q.    Because if that were the case, then you

21   would be off protocol?

22        A.    For that specific hypothesis, yeah, for

23   that specific project at the time, from what I

24   remember, correct.

25        Q.    Okay.  And if you're off protocol -- and

Page 253

1                          D. Trahanas

2    I'm talking now about the animal treatment protocol,

3    right?

4         A.   I'm referring to our protocol for the

5    project that we were working on.

6         Q.   I see, okay.  But there's also the

7    treatment of the mouse protocol, right?

8         A.   Of course.

9         Q.   Of course.  And so if at any point in time

10   you're off protocol with the treatment of the mice,

11   that either has to get reported or the mice have to

12   be euthanized; is that right?

13        A.   If we were approved to do an experiment,

14   let's say, and we hit the mouse, we wouldn't have to

15   report like that day that we did a hit or traumatic

16   brain injury in the mouse.  We would just go on

17   doing our research.

18             If a mouse was ever sick, we never had a

19   sick mouse, then it would -- we would be notified

20   via e-mail with the people who run the subbasement

21   at Northwestern or the animal caretakers that our

22   animal is sick and we need to attend to it, and we

23   could either euthanize it or we could pay to have

24   them do it for us.

25        Q.   Okay.  So here's my question:  If you go

                              D. Trahanas

1    off the mice care protocol, like if somehow you're

2    not compliant with the treatment of the mice, that

3    protocol -- and you told me you were familiar with

4    that protocol, right?

5        A.    Yes.

6        Q.    So if at any point in time you veer from

7    that protocol, the scientist in charge,

8    Dr. Schwulst, would either have to notify IUCAC.  Is

9    that what it was called?

10       A.    IAC -- yes, CUC, IACUC, yes.

11       Q.    I-A-C-U-C?

12       A.    Yes.

13       Q.    And/or you'd have to euthanize the mice,

14   right?

15       A.    I can't say that we would kill the mice

16   if -- we wouldn't have mice ordered prior to them

17   approving us, so I wouldn't -- we wouldn't choose

18   between euthanizing them and the protocol.  It would

19   just be we have mice, we do our experiment, and that

20   would really be it.

21       Q.    Okay.  We're going to take a quick break.

22       A.    Okay.

23                      (Whereupon, a recess was taken

24                      from 4:19 p.m. to 4:22 p.m.)

Page 255

1                    D. Trahanas

2          MS. WERMUTH:  Let's go back on the record.

3  BY MS. WERMUTH:

4     Q.   Let me ask this quick question:  Did --

5  strike that.

6          Can we go off the record.

7                    (Whereupon, a recess was taken

8                    from 4:22 p.m. to 4:24 p.m.)

9          MS. WERMUTH:  Let's go back on the record.

10                   (Exhibit 33 was marked for

11                   identification.)

12 BY MS. WERMUTH:

13    Q.   So very quickly, Ms. Trahanas, let's go

14 through these exhibits that we've marked.

15         So Deposition Exhibit 33 is a letter to

16 you dated February 20th, 2015, from The Hartford.

17         Do you see that?

18    A.   Yes, I do see it.

19    Q.   Okay.  And if you look at the second page,

20 there's a notice of approval of your continuous FML

21 leave and continuous short-term disability leave

22 through March 2nd, 2015, right?

23    A.   Correct.

24    Q.   Okay.  And you were paid through that time

25 period, correct?

Page 256

```
 1                          D. Trahanas
 2        A.    Yeah, yes.
 3                        (Exhibit 34 was marked for
 4                        identification.)
 5   BY MS. WERMUTH:
 6        Q.    Okay.  And then if you look at
 7   Exhibit 34 -- I'm sorry, so Exhibit 34 is just --
 8   I'm sorry.  I'm not even going to ask you about
 9   that.
10             That didn't go to you.  That went to your
11   doctor; is that right?
12        A.    I don't recognize the --
13        Q.    It says "Dear Dr. Cano"?
14        A.    Yeah, that probably went to her.
15                        (Exhibit 35 was marked for
16                        identification.)
17   BY MS. WERMUTH:
18        Q.    Okay.  And then Exhibit 35 -- I'm sorry,
19   yeah, 35, that went to you, and that's dated
20   April 21, 2015.
21             Do you see that?
22        A.    Yes.
23        Q.    Okay.  And according to this letter, you
24   were approved on FML and short-term disability leave
25   through May 3rd, 2015; is that right?
```

Page 257

1                        D. Trahanas

2       A.    Yes.

3       Q.    Okay.  And you were paid during that time

4  period; is that right?

5       A.    It's been a long time since I've seen any

6  of the time-related things from Northwestern, so

7  without doing math, I suppose, yeah, that's what

8  this is reflecting, but so yes.

9                          (Exhibit 36 was marked for

10                          identification.)

11  BY MS. WERMUTH:

12      Q.    Okay.  And then on Exhibit 36 you were

13  notified that as of May 10th your FMLA leave had

14  exhausted, but you were eligible for additional

15  leave, right?

16      A.    Yes, I see that.

17                          (Exhibit 37 was marked for

18                          identification.)

19  BY MS. WERMUTH:

20      Q.    Okay.  And then in Exhibit 37, also dated

21  May 13th, you were notified that your short-term

22  disability was approved through 5/24/2015 but that

23  your FML had been exhausted, right?

24      A.    I see that on this, yes.

25      Q.    Okay.  And were you paid through

Page 258

1                          D. Trahanas

2     May 4th of 2015?

3          A.    I see zero.

4          Q.    I'm sorry, May 24th of 2015.

5          A.    I'm not sure because I see zeros here, so

6     like I said, I don't remember how --

7          Q.    Where do you see zeros?

8          A.    On the second page, 59 -- 5917, remaining

9     remaining zero, zero, zero, zero.  So I'm not sure

10    if that -- like I said in the previous one, I'm not

11    sure how the hours worked.  It says 450, 12 next to

12    that, so --

13         Q.    So those are hours, not pay.  So you can

14    see that you have been -- if you go down to the last

15    row, short-term disability/medical leave approved,

16    right?

17         A.    You're referring to 2/16 to 5/24 --

18         Q.    Yes.

19         A.    -- of that line?

20         Q.    Yes.

21         A.    Yes.

22         Q.    Okay.  You just don't recall if you were

23    paid?

24         A.    Yes.

25         Q.    But you were approved on a leave of

Page 259

```
 1                      D. Trahanas

 2    absence through 5/24/2015?

 3        A.    Correct.

 4                      (Exhibit 38 was marked for

 5                      identification.)

 6    BY MS. WERMUTH:

 7        Q.    Okay.  And then Exhibit 38 is dated

 8    June 9th, and that's a notice that in the third

 9    paragraph says, "On June 8th, 2015, it was brought

10    to our attention that you instructed The Hartford to

11    close your claim.  As of 6/9/2015 you have not

12    returned to work."

13                Those two statements are accurate; is that

14    correct?

15        A.    Yes.

16        Q.    Okay.  And you were further informed that

17    if you intended to resign that you should let

18    Victoria Sherb know immediately.  If you've not been

19    released to return to work, you must submit

20    documentation from your physician so that your

21    leave -- so that the university can determine

22    whether to extend your leave.

23                Do you see that?

24        A.    Yes, I see that.

25        Q.    Okay.  So you had told The Hartford that
```

Page 260

1                         D. Trahanas

2    you -- to close the claim, right, to close your

3    claim, right?

4         A.   Yes.

5                         (Exhibit 39 was marked for

6                         identification.)

7    BY MS. WERMUTH:

8         Q.   Okay.  And then Exhibit 39 is just -- that

9    was the official notice on June 12th that your

10   short-term disability was approved through

11   May 24th of 2015; is that right?

12        A.   That's what it says, yes.

13        Q.   Now, can you go back to Dr. Cano's

14   records, please, which are Exhibit 29, and can you

15   turn to Page 10470.

16        A.   Okay, I'm there.

17        Q.   So these are notes from a visit with

18   Dr. Cano dated 4/28/2015.

19             Do you see that?

20        A.   Yes.

21        Q.   Okay.  And if you look on the next page of

22   this visit at 10471 where it says Past History --

23        A.   Yes.

24        Q.   -- it says, "Says she is trying to study

25   for MCAT."

```
 1                         D. Trahanas

 2              Do you see that?

 3    A.    Yes.

 4    Q.    "Plans to leave current job."

 5              Do you see that?

 6    A.    Yes.

 7    Q.    Okay.  So you told Dr. Cano in April, on

 8    April 28th of 2015 that you did not intend to return

 9    to Northwestern; is that right?

10    A.    I didn't -- I didn't tell her.  That I

11    think is reflecting our conversation of plans that I

12    wouldn't be able to go back to my current job.

13    Q.    Well, it says "plans to leave current

14    job," right?

15    A.    Like, I mean, we had made plans that I

16    would not be able to return being supervised under

17    Dr. Schwulst.

18    Q.    Okay.  Well, then go to Page 10467.

19    Actually go to Page 10466, please.

20              MR. DeROSE:  And, Counsel, so the record

21    is clear, the records speak for themselves, but

22    you're asking her if she agrees with the statements

23    she sees in the records or did she actually say

24    these things to the doctor?

25              MS. WERMUTH:  Well, my questions speak for
```

1                          D. Trahanas

2    themselves, but I've moved on to a different

3    question.

4    BY MS. WERMUTH:

5         Q.    So are you on Page 10466?

6         A.    Yes.

7                MR. DeROSE:  Counsel, can I be clear on

8    the record?  Are you asking her to confirm what's

9    written in the record, or you're asking her is this

10   what she's saying, because you asked her did you say

11   this, and the record says what it says.

12               MS. WERMUTH:  I understand, so I'm

13   asking -- so, look, right now she has answered the

14   question I already asked.  So let me ask this

15   question, and if you find it confusing -- if the

16   witness finds it confusing, she can let me know

17   that.

18   BY MS. WERMUTH:

19        Q.    Okay.  So you met with Dr. Cano on

20   5/26/2015?

21        A.    Yes.

22        Q.    Okay.  And there's a -- if you could turn

23   to Page 10467, in the section that reads Past

24   History there's a note where the doctor writes,

25   "Says she is studying for the MCAT exam."

Page 263

1                          D. Trahanas

2              Do you see that?

3        A.    Yes.

4        Q.    And that's true, you were studying for the

5   MCAT in May of 2015?

6        A.    I was trying to.

7        Q.    And you told her that you were trying to?

8        A.    Yes.

9        Q.    Okay.  And then the next sentence, the

10  doctor writes, "Says she left job."

11             Did you tell Dr. Cano on 5/28/2017 [sic]

12  that you left your job?

13       A.    I don't recall telling her I left my job.

14  I recall us having a conversation about me leaving.

15       Q.    This is written in the past tense.  It

16  says she left job.

17             So your testimony is that you did not tell

18  her on 5/28/2015 that you left your job?

19             MR. DeROSE:  Objection, Counsel.  That's

20  not what she just said.  Do you want it read back?

21             MS. WERMUTH:  I don't.

22             MR. DeROSE:  She said I don't recall,

23  Counsel.

24             MS. WERMUTH:  No, sir.

25             MR. DeROSE:  Wait one second.

Page 264

1                        D. Trahanas

2              MS. WERMUTH:  I asked a new question.

3              MR. DeROSE:  Let me --

4              MS. WERMUTH:  I asked a new question.

5              MR. DeROSE:  I am going to make my record.

6     You cannot take an answer from the client, and I

7     object to it, when she says I don't recall and then

8     you turn it around to a different answer.

9              MS. WERMUTH:  First of all, that's not

10    what she said.  She didn't say she didn't recall.

11             MR. DeROSE:  Would you please, sir, for me

12    read back her last answer to counsel's questions.

13                        (Record read.)

14    BY MS. WERMUTH:

15         Q.   So the next sentence reads, "Plans to file

16    for unemployment benefits today."

17              Do you see that note?

18         A.   Yes, I see the note.

19         Q.   Did you tell Dr. Cano that you planned to

20    file for unemployment benefits on 5/28/2015?

21         A.   I don't recall telling her I would file it

22    that day.

23         Q.   Okay.  And I'm sorry, it's 5/26, not 28,

24    2015.

25              When did you apply for unemployment

Page 265

```
 1                        D. Trahanas
 2    benefits?
 3         A.    June of 2015.
 4         Q.    Is there any reason why you didn't produce
 5    the records relating to your application for
 6    unemployment?
 7         A.    There's no reason.  I just don't have
 8    them.
 9         Q.    Why didn't you retain those records?
10         A.    I don't recall if I even have any paper --
11    I think you have to go to the unemployment office
12    and you file it with an adviser there or
13    representative there.  I can't -- I can't recall
14    taking something home or having any papers.
15         Q.    Okay.  Can you please look at Page 10641
16    in Exhibit 29.
17         A.    29?
18         Q.    Yes, 10461.
19         A.    I'm there.
20         Q.    Okay.  So you saw Dr. Cano on June 16th of
21    2015; is that right?
22         A.    Yes.
23         Q.    Okay.  And if you turn to Page 10462, the
24    second page of the note, under Past History Dr. Cano
25    writes, "Says Northwestern is denying unemployment
```

1                          D. Trahanas

2    benefits."

3              Do you see that, the second sentence under

4    Past History?

5         A.   I do see that.

6         Q.   Okay.  So that means, if her notes are

7    accurate, that you applied for unemployment benefits

8    sometime before June 16th of 2015; is that right?

9         A.   According to this, yes.

10        Q.   Okay.  And you have no reason to dispute

11   the accuracy of Dr. Cano's notes, do you?

12        A.   Generally no, but like I said, I can't

13   recall specific dates as to when the unemployment

14   benefits were submitted.

15        Q.   Okay.  Then if you go to Page 10464, are

16   you with me?

17        A.   Sorry, they're sticking.

18        Q.   Yeah, that's okay.

19        A.   Okay, yes.

20        Q.   So this is still part of the June 16th,

21   2015 note, and just above the chart there's four

22   bullet points, and the third bullet, do you see like

23   a dash --

24        A.   Yes.

25        Q.   -- four dashes?

Page 267

D. Trahanas

1
2       So the third dash says, "Patient requests
3  letter to date to return to work as of last
4  appointment."
5       A.   Yes.
6       Q.   "But with recommendations for appropriate
7  work environment."
8       A.   Yes.
9       Q.   Okay.  So even though you had, according
10 to Dr. Cano's notes, left Northwestern and applied
11 for unemployment, you were asking her on
12 June 16th to give you a note to return to work; is
13 that right?
14      A.   We just -- our conversation was about me
15 being able to work but with her discretion not to
16 work under Dr. Schwulst or in the current
17 environment that I had been working in.
18      Q.   Okay.  But as of the date that you asked
19 for that letter you had already applied for
20 unemployment?
21      A.   It would seem so.
22      Q.   Okay.  And she gave you that note that
23 day, correct?
24      A.   On June 16th?
25      Q.   Yes.  It says given letter today.

Page 268

1                          D. Trahanas

2       A.   Yes.

3       Q.   And the next page is that letter, correct?

4       A.   Yes, that's the letter.

5       Q.   Okay.  So you walked out with that letter?

6       A.   Yes.

7       Q.   And what did you do with it?

8       A.   Are you saying that day, or are you saying

9  like -- because I have the letter.

10       Q.   Once you got that letter, did you ever

11  give it to anybody at Northwestern?

12       A.   It's possible I dropped it off to somebody

13  at HR, maybe like Daina's -- the person at the front

14  desk at HR, but I don't specifically -- I don't

15  recall.

16       Q.   Okay.  Can you mark that, please.

17                      (Exhibit 40 was marked for

18                       identification.)

19            MR. DeROSE:  This is 40, Counsel?

20            MS. WERMUTH:  Yes.

21  BY MS. WERMUTH:

22       Q.   Okay.  Deposition Exhibit 40 is the letter

23  notifying you that your job was being terminated

24  because they had not heard back from you; is that

25  right?

```
 1                         D. Trahanas
 2       A.   Yes, I see -- yes, I see it.
 3       Q.   And that letter then was also sent to you
 4  by e-mail from Victoria Sherb as well.
 5            Do you remember getting that e-mail?
 6       A.   I know I have it.  I can't -- I can't
 7  testify that I saw it that day or when I saw it, but
 8  I do have it.
 9       Q.   I can just mark that.
10                      (Exhibit 41 was marked for
11                       identification.)
12  BY MS. WERMUTH:
13       Q.   And Exhibit 41, that's the e-mail that you
14  got from Victoria Sherb with the letter attached,
15  right?
16       A.   Yes.
17       Q.   And Victoria Sherb also reached out to you
18  in advance of that by e-mail.
19            Do you remember communicating with her by
20  e-mail prior to that notice in Exhibit 41?
21            MR. DeROSE:  It is an e-mail, isn't it?
22            MS. WERMUTH:  I'll withdraw the question.
23            Can we mark this, please, as 42.
24                      (Exhibit 42 was marked for
25                       identification.)
```

```
1                       D. Trahanas
2    BY MS. WERMUTH:
3         Q.   According to -- so you now have Exhibit 42
4    in front of you?
5         A.   Yes.
6         Q.   And you see in the middle of the first
7    page there's an e-mail from Victoria Sherb dated
8    June 9th of 2015?
9         A.   I do see it.
10        Q.   And it says, "Hi Diane, I have tried
11   calling you a few times to inquire about the status
12   of your medical leave."
13             Do you see that?
14        A.   I do see that.
15        Q.   Okay.  And then she says, "Yesterday it
16   was brought to my attention you closed your leave
17   claim with The Hartford."
18             Do you see that?
19        A.   I see that as well.
20        Q.   Okay.  And then you responded to this
21   e-mail on the 15th, so six days later, saying, "My
22   doctor is not allowing me to return to work at
23   Northwestern University."
24        A.   Yes, that's stated in the e-mail.
25        Q.   Okay.  Can you mark that, please.
```

```
1                    D. Trahanas
2                    (Exhibit 43 was marked for
3                    identification.)
4          THE WITNESS:  I believe there is a
5   subsequent e-mail to this chain.  I'd like to state
6   that for the record.
7   BY MS. WERMUTH:
8        Q.   Between you and Victoria?
9        A.   Correct.
10       Q.   And what do you think that chain says?
11       A.   I believe it was an e-mail from me to her,
12  and I received an automatic message.  She was on
13  leave or wasn't available at the time.
14       Q.   And what do you recall doing with that, if
15  anything?
16       A.   Doing with the e-mail or why I e-mailed
17  her?
18       Q.   So I'm confused.
19            What is the subsequent communication you
20  had with Victoria Sherb after you gave her the
21  e-mail in Exhibit 42?
22       A.   So after I gave her the e-mail in
23  Exhibit 42 I tried to follow up and clarify what I
24  had written as just Northwestern University, as I
25  had spoken to my physician; and she had told me I
```

1                          D. Trahanas

2    can go back to work so long as it's not under

3    Dr. Schwulst's supervision.

4               And so I e-mailed Victoria, and I received

5    an automatic vacation response or out of the office

6    response.

7          Q.    Okay.  And did you follow up after that?

8          A.    No.

9          Q.    Okay.  Can we give you Exhibit 43.  These

10   are e-mails between you and -- I'm sorry, text

11   messages between you and Salina Dominguez.

12              Can you tell me the date on these?

13         A.    February 17th.

14         Q.    And where do you see that?

15         A.    I see that on the second page of

16   Exhibit 43 at the top.

17         Q.    So where do these messages start?

18              So --

19         A.    So I know what you're getting at.  You

20   want to know the first.  I'm trying to see -- okay.

21              So the second page actually should be the

22   first.  It should be the top of that text message

23   thread so Trahanas 108 at the bottom.  This should

24   be the first part.  So Salina sent me this text

25   first.

Page 273

```
 1                         D. Trahanas

 2        Q.    Are you sure?

 3        A.    Pretty sure, yes.

 4        Q.    Okay.  So Salina says, "Steve and Rana

 5   came over to me asking about you"?

 6        A.    Yes.

 7        Q.    Okay.  "Steve said you only sent him a

 8   one-line e-mail saying you were taking your med

 9   leave."

10        A.    Yes.

11        Q.    All right.  And then she goes through,

12   "That's TMI to for me and Rana."

13              What does that mean?

14        A.    TMI is short for too much information.

15        Q.    "You need to talk to HR and make sure he's

16   aware your businesses stays private."

17              Did you do that?  Did you follow her

18   advice?

19        A.    Yes, I spoke to HR after.

20        Q.    After this?

21        A.    Not the minute after this, but after this,

22   yes.

23        Q.    Okay.  What does -- the first page, 107,

24   where does that fit in the string?

25        A.    107 would be towards the end, so
```

1                          D. Trahanas

2   somewhere -- does it say a time?  Somewhere towards

3   the end of that conversation.  I mean, if you want

4   to give me a few minutes I can organize them for

5   you.

6        Q.   Can we -- I mean, I don't want to take up

7   my seven-hour time with you doing that, if we can

8   all agree to go off the record and not use record

9   time for that.

10            MR. DeROSE:  This is all news to me.  I'm

11  an old man, these new ways of communicating.

12            Go ahead and put them in order.

13            MS. WERMUTH:  Go ahead and go off the

14  record then.

15                     (Whereupon, a recess was taken

16                     from 4:50 p.m. to 4:56 p.m.)

17  BY MS. WERMUTH:

18       Q.   Okay.  So this is Exhibit 43.

19            So I understand it, the first text message

20  on this date came from Salina to you?

21       A.   Correct.

22       Q.   Okay.  Are there any text messages

23  preceding 1:46 p.m. on that date between you and

24  Salina?

25       A.   We texted often.  I wouldn't be able -- it

1                           D. Trahanas

2    wasn't that day.  I wouldn't know from what day or

3    the contents of those texts, but I'm sure there are.

4    I don't know if I have them still, like if they're

5    on -- they're somewhere on my computer or like Apple

6    has them, but I don't -- not that day.

7          Q.   Okay.  So it sounds to me like Salina may

8    have known that you were on medical leave at the

9    time that she sent this.

10              Did you notify her in advance -- strike

11   that.

12              When did you first tell Salina that you

13   were on medical leave?

14         A.   With this text she told me actually.  She

15   didn't know.

16         Q.   You didn't tell her yourself?

17         A.   No, prior to this, no.

18         Q.   And she said -- and apparently what

19   Dr. Schwulst said was that you sent him a one-line

20   e-mail saying you were taking medical leave, taking

21   your medical leave, right?

22         A.   That's what it says, yes.

23         Q.   Okay.  So that according to her text

24   that's the only thing Dr. Schwulst said, right?

25         A.   As -- as far as the text, yes, but her and

1                          D. Trahanas

2   I spoke subsequently to the text.  I can't recall if

3   it was that day or the day after that.  Him and Rana

4   came over asking her and talking about it.  And then

5   they kind of went around the lab talking about it

6   with everyone and stipulating as to what my medical

7   leave was for.

8        Q.   Stipulating to what your --

9        A.   Like they were taking guesses at why I

10  wasn't there.

11       Q.   And this is information that you know only

12  because Salina told you, correct?

13       A.   Correct.

14       Q.   All right.  So you don't have firsthand?

15  You weren't in the lab, you didn't hear those

16  conversations?

17       A.   I did not.

18       Q.   Okay.  And did Salina take a guess as to

19  why you were out?

20       A.   Take a -- I mean, she asked me, even in

21  this thread I believe somewhere, she asked me kind

22  of what was going on.

23       Q.   Okay.  Because she was concerned?

24       A.   Yeah.  I mean, she knew a little bit of my

25  home background, but also she knew what was going on

1                          D. Trahanas

2    in the lab with Dr. Schwulst and everybody else.

3         Q.   And your home background, you had shared

4    with her your home background, right?

5         A.   Yes.

6         Q.   And your home background involved some

7    domestic violence; is that right?

8         A.   At some point, yes.

9         Q.   Okay.  And is that what you mean by your

10   home background?

11        A.   Just the -- just a lot of stress at home.

12        Q.   Okay.  And your parents are not divorced?

13        A.   They're not.

14        Q.   Did your mother file for divorce at some

15   point in time?

16        A.   She -- she asked for divorce papers.  She

17   has the papers, but she has not filed for divorce.

18        Q.   She never filed for divorce?

19        A.   Correct.

20        Q.   And you never told -- did you ever tell

21   your psychiatrist that she had filed for divorce?

22        A.   No.  I told her that she was speaking to

23   attorneys and looking to file for divorce.

24        Q.   Did you -- so you voluntarily shared this

25   information with Salina, right?

1                          D. Trahanas

2        A.    Correct.

3        Q.    Did you voluntarily share that information

4    that you shared with Salina with other people in the

5    lab as well?

6        A.    Yes.

7        Q.    Who else?

8        A.    Rana.

9        Q.    Okay.  So you voluntarily told Rana about

10   your home life, right?

11       A.    I was speaking -- she was speaking to me

12   about her experience because one time she had gotten

13   in a fight with at the time her husband prior to her

14   divorcing, and I touched on it, but I didn't get

15   into details at that time.

16       Q.    Okay.  Anyone else that you shared

17   information about why you were on medical leave or

18   your home life with in the lab other than Salina and

19   Rana?

20       A.    Other than the text message with Melissa

21   that is -- I'm not sure what exhibit that is, no, I

22   did not.

23       Q.    Okay.  And did you -- so you never told

24   Angelica about your depression or anxiety or your

25   home life?

1                        D. Trahanas

2        A.    Angelica knew a little bit about my home

3    life.

4        Q.    And your depression and anxiety, did you

5    tell her about that?

6        A.    I definitely told her after I left

7    Northwestern.  I can't recall a time where I

8    specifically told her while I was at Northwestern.

9        Q.    What about Carla Cuda, did you have any

10   conversations with Carla?

11       A.    Not as I guess detailed as Salina or

12   Melissa.

13       Q.    Okay.  And then on Trahanas 114, Salina --

14   or no, I guess this is -- I don't know.

15             The dark bubbles is your stuff, your text,

16   right?

17       A.    That would be correct.

18       Q.    Okay.  So you asked should I text Melissa?

19       A.    Yes.

20       Q.    Okay.  And then that's the text that we

21   saw, right?

22       A.    Correct.

23       Q.    Okay.  And then you asked Salina to let

24   Amy know, correct?

25       A.    Correct.

Page 280

1                          D. Trahanas

2         Q.    So there were some people that you did

3    want them to know the information?

4         A.    I wanted her to -- I wanted Amy to know to

5    not be concerned because she had reached out to me,

6    but I didn't want to text everyone back.  I

7    didn't -- the only person I texted back was Salina

8    and Melissa because I knew that they all knew that I

9    was close with Melissa that they would possibly go

10   to her to ask for information.

11        Q.    So some people reached out to you to find

12   out if you were okay?

13        A.    Yes.

14        Q.    And Dr. Schwulst sent you a text message

15   asking you that same question, are you okay?

16        A.    Yes.

17        Q.    So it's possible that conversations in the

18   lab about your absence were out of concern?

19              MR. DeROSE:  Objection to what's possible,

20   but you may answer.

21              THE WITNESS:  It's possible.

22   BY MS. WERMUTH:

23        Q.    Okay.  In your Complaint, in

24   Paragraph 46 --

25        A.    I'm sorry, can you tell me the exhibit

```
 1                      D. Trahanas

 2   number?

 3        Q.   Yes.  I have to look.

 4             MR. DeROSE:  You can get mine here too.

 5             THE WITNESS:  Is that it?

 6             MR. DeROSE:  I think it is.

 7             MS. HARRIS:  25.

 8             MS. WERMUTH:  25, I'm sorry.  Thank you,

 9   Danielle.

10             THE WITNESS:  Okay.  What number?

11   BY MS. WERMUTH:

12        Q.   46.

13        A.   Okay.

14        Q.   Okay.  You say, "On several occasions

15   thereafter," and this is after supposedly

16   Dr. Schwulst shared confidential information -- by

17   the way, when did Dr. Schwulst supposedly share

18   confidential medical information about you?  Is that

19   this set of text messages that you're referring to?

20        A.   Oh, no.  This was early on.  Definitely by

21   the end of 2012, so at least by November-December of

22   2012.

23        Q.   Okay.  And had you already told some of

24   the other people in the lab about your ADHD,

25   depression and anxiety before he did?
```

                              D. Trahanas

1

2      A.    No.  He was the one that told -- he told

3   Rana, and Rana and Sasha were very close, so Rana

4   told Sasha.

5      Q.    Wait.  Were you present when Dr. Schwulst

6   told Rana supposedly?

7      A.    No, but they came to me after.

8      Q.    Who did?

9      A.    Rana.

10     Q.    Okay.  So sometime in 2012 Rana came to

11  you and said what?

12     A.    Something to the effect of, dude, why

13  didn't you tell me you were taking antidepressants,

14  and something to the effect of I guess it makes

15  sense that you work out that much.

16     Q.    And why do you believe that she heard from

17  Dr. Schwulst about you taking antidepressants?

18     A.    There would be nobody else for her to know

19  that from at that time.

20     Q.    He's the only person that supposedly you

21  had told that to before she made that comment to

22  you?

23     A.    Yes.

24     Q.    Did you take your medication at work?

25     A.    Yes.

1                        D. Trahanas

2       Q.   Is it possible she saw you taking the

3   medication at work?

4       A.   Her desk is like two bays over.  No.

5       Q.   Okay.  So you made an assumption that she

6   learned this information from Dr. Schwulst?

7       A.   I can't say that it was an assumption

8   because there were other times where Rana would say,

9   dude, why didn't you take your meds, and she would

10  kind of ask Steve and be like, hey, Steve, did she

11  take her meds yet today?

12           So I don't think that that's assuming.  I

13  think that that would be accurately inferring.

14      Q.   Okay.  So Paragraph 47, the comments that

15  you put in Paragraph 47 of your Complaint refer to

16  comments that Rana made; is that right?  You say on

17  one occasion a certain co-worker told plaintiff --

18      A.   Yes.

19      Q.   So you're talking about the one occasion

20  where Rana said, dude, take your meds?

21      A.   Yes.

22      Q.   Okay.  And that was not Dr. Schwulst who

23  said the things in Paragraph 47, correct?

24      A.   No.

25      Q.   Okay.  And then in Paragraph 49 you say

                           D. Trahanas

1

2    that Dr. Schwulst and a co-worker yelled at you and

3    said Diane always screws something up and claimed

4    that you did not know how to complete experiments

5    and use the equipment.

6           Do you see that?

7    A.   Yes.

8    Q.   Okay.  But that's not in reference -- I

9    mean that doesn't -- nothing about those statements

10   specifically and explicitly refers to any mental

11   health issues that you suffer from, right?

12   A.   47 does.

13   Q.   I'm not asking you about 47.  You already

14   told me 47 was said by Rana, so now I'm asking about

15   Paragraph 49.

16          The statement "Diane always screws

17   something up" doesn't explicitly refer to a

18   disability, correct?

19          MR. DeROSE:  Well, Counsel, objection due

20   to the form of the question.  "Always screws up" may

21   be talking about a mental disability.

22          MS. WERMUTH:  Okay, no, no, no, you can't

23   answer.  You're testifying now.

24          MR. DeROSE:  You do what you want.

25          Go ahead, you may answer.

```
 1                      D. Trahanas
 2           MS. WERMUTH:  You really need to stop
 3   this, John.
 4           MR. DeROSE:  You really need to stop
 5   asking argumentative questions and you won't draw
 6   these kind of objections.  You have one assumption
 7   of what those words mean.  Everybody else in the
 8   room might have another one.
 9           MS. WERMUTH:  I need you to stop, okay,
10   because your objections are speaking at length, and
11   they're giving the witness -- and it's clear by the
12   way that she answers after your long objections that
13   you're coaching her on how to answer.
14           MR. DeROSE:  Counsel, I have sat her quiet
15   for about five hours.  If you think this is
16   coaching, I'm sure you have lawyers that do much
17   more than you see happening today; and you can show
18   this to any federal judge you want and see what he
19   thinks about my behavior or she thinks about my
20   behavior in this room with you today.
21           So, please, I don't like those
22   corrections.
23   BY MS. WERMUTH:
24      Q.   Ms. Trahanas, there's nothing in the
25   statement "Diane always screws something up" that
```

1                           D. Trahanas

2    specifically refers to a disability, correct?

3               MR. DeROSE:  Objection to the form.  It

4    calls for a conclusion on the witness' part.

5               You may answer.

6    BY MS. WERMUTH:

7        Q.   You can answer.

8        A.   Firstly the tone of voice and the facial

9    expressions and body language of when these things

10   were being said, it's definitely possible that they

11   could be interpreted.

12              In terms of disability, are you including

13   any of the three that I'm being treated for or are

14   you including all three, because it's alluding to

15   the fact that I would work quickly, and so because

16   I'm kind of working quickly that I'm messing things

17   up or doing something wrong or not paying attention,

18   and so I would say that that speaks to my ADHD.

19       Q.   So you interpreted "Diane always screws

20   something up" as a reference to your ADHD, just so

21   I'm clear?

22       A.   I don't want to necessarily say interpret.

23   Like I said, it was the manner in which it was being

24   said and what I was doing at the time when these

25   things were being said.

1                          D. Trahanas

2      Q.   Okay.  So -- strike that.

3           And you never complained to anyone in HR

4   that you felt like being yelled at for making

5   mistakes in your work was somehow related to what

6   you claimed to be a disability; is that right?

7      A.   No, I did not.  There's no way for me to

8   do that without getting hurt.

9      Q.   Now, you claim that some of the co-workers

10  in the lab, not Dr. Schwulst but others, gave you

11  inaccurate scientific protocols --

12     A.   Correct.

13     Q.   -- for purposes of messing you up?

14     A.   Yes, I agree with that.

15     Q.   Okay.  And who did that?

16     A.   Rana and Sasha Alexander.

17     Q.   Okay.  And so Dr. Schwulst didn't do that?

18     A.   No.

19     Q.   Okay.  Now, if they gave you inaccurate

20  protocols, that would interfere with your ability to

21  perform your job accurately; is that right?

22     A.   Amongst other things.

23     Q.   Well, it would also interfere with your

24  ability to perform the scientific research well,

25  right?

Page 288

                              D. Trahanas

1

2      A.    That's another thing.  It wasted

3   Dr. Schwulst's money, wasted Dr. Perlman's money, it

4   wasted our time.  It wasted us getting less results

5   that were accurate for us to publish more.  I mean,

6   it really -- there's a lot of effects of that.

7      Q.    Absolutely.  And the effects were, as you

8   point out, not just negative on you in your personal

9   career but on Dr. Schwulst's career, correct?

10     A.    Correct.

11     Q.    Okay.  So he presumably didn't approve of

12  such conduct, right?

13          MR. DeROSE:  Objection to what someone

14  else does, but you may answer.

15  BY MS. WERMUTH:

16     Q.    Let me ask it this way:  You don't have

17  any reason to believe that he was involved in giving

18  you inaccurate protocols?

19     A.    No.

20     Q.    Right.  Because that would be against his

21  own interests, right?

22     A.    Correct.

23     Q.    And you don't believe that Dr. Perlman was

24  involved in giving you incorrect protocols, right?

25     A.    No, I don't believe they would purposely

1                          D. Trahanas

2    do such a thing, Dr. Perlman and Dr. Schwulst that

3    is.

4         Q.    You do think Sasha and Rana did it

5    intentionally though?

6         A.    I don't think.  I know.

7         Q.    And did you report that to Dr. Schwulst?

8         A.    Dr. Perlman knew.

9         Q.    The question is, did you report it to

10   Dr. Schwulst?

11        A.    I mentioned it to him in a very

12   lighthearted way so I wouldn't seem like I'm kind of

13   blaming other people, like basically I didn't want

14   him thinking what we just did for like four or six

15   months just was a big waste and it was my fault.  I

16   was trying to kind of like cover my -- cover me but

17   also kind of let him know like, well, hey, sort of

18   this happened.

19             And I'm sure -- I'm not sure, but I would

20   assume Dr. Perlman did speak to him about it, but I

21   mentioned it in a lighthearted way in the lab one

22   day when he was back from service because at the

23   time that I found out he was on service and we had a

24   meeting with the entire Perlman lab, which I

25   attended regularly, and so that's when we found out

1                         D. Trahanas

2     that I got the wrong cocktails or the wrong

3     protocol.

4          Q.   Okay.  And when was that?

5          A.   The meeting or when I told Dr. Schwulst?

6     The meeting?

7          Q.   Let's start with the meeting, yes.

8          A.   It was in 2013.  I know we sent e-mails

9     with my other lab members providing me with other

10    cocktails, so it was at that time.  I can't recall

11    the exact date, but those e-mails are subsequently

12    after I found out during the lab meeting that they

13    were supplying me with the wrong stuff.

14         Q.   So I'm confused.  So the way that you got

15    the wrong protocol was by e-mail from Sasha or

16    e-mail from Rana?

17         A.   It's possible, or they gave me a sheet

18    with like a cocktail mix.  I mean, it's not a

19    protocol.  It's just a cocktail.

20         Q.   Like a recipe?

21         A.   Yes, exactly.

22         Q.   Okay.  So you got one recipe or one set of

23    protocols from was it Rana or Sasha?

24         A.   Both of them.

25         Q.   Okay.  At the same time?

                            D. Trahanas

1

2      A.   So Sasha basically would review what Rana

3  would give me because he was just a little more --

4  he was kind of like the guru, the flow Joe or the

5  flow cytometry guru of the lab.

6      Q.   And he's a Ph.D. scientist working on the

7  faculty or at least in an assistant or associate

8  professor position, and he gives you -- and he's --

9  is he an M.D. in addition to a Ph.D., do you know?

10     A.   It's possible.  He came here from Russia,

11 so I'm not sure if he was an M.D. there and is here.

12     Q.   Okay.

13     A.   I'm not sure.

14     Q.   So you're telling me this individual

15 intentionally gave you a protocol that would both

16 interfere with Dr. Perlman's science and

17 Dr. Schwulst's science?

18     A.   Yes.

19     Q.   Okay.  And you learned that it was the

20 wrong protocol because you attended a meeting and

21 learned that there was a different protocol that was

22 being used?

23     A.   Correct.

24     Q.   Okay.  So now it wasn't -- it was like an

25 old protocol that he gave you, correct?

Page 292

1                          D. Trahanas

2       A.    Yes.

3       Q.    And he gave it to you by e-mail or

4  personally and handed you something?

5       A.    I can't recall if it was a piece of paper

6  that I put in my lab notebook or if it was e-mailed.

7  It could be both.

8       Q.    Okay.  And you would agree with me as we

9  talked about earlier that protocols, as you refine

10  your science and your techniques, protocols change

11  over time, right?

12      A.    Sure.

13      Q.    Okay.  They're constantly changing?

14      A.    But they had already refined it at that

15  time.

16      Q.    Okay.  Is it possible he grabbed the wrong

17  one?

18            MR. DeROSE:  Objection what's possible,

19  Counsel, calls for conjecture but --

20            MS. WERMUTH:  Well, she said it was

21  intentional, so I'm trying to figure out --

22            MR. DeROSE:  Wait a minute.  I'm trying to

23  finish my record.

24            Objection to possible, calls for

25  conjecture on the witness' part, but you may answer

1                           D. Trahanas

2     the question.

3     BY MS. WERMUTH:

4          Q.   Thank you.

5               It's certainly possible that he

6     unintentionally gave you the old protocol?

7          A.   He's a very meticulous guy, so it is

8     possible but highly unlikely.

9          Q.   Okay.  And this came out in a lab meeting?

10         A.   Correct.

11         Q.   Okay.  And so this was one occasion; is

12    that right?

13         A.   Yes.

14         Q.   And this was in 2013?

15         A.   Yes.

16         Q.   Okay.  And so during the lab meeting you

17    somehow came to learn that you were using an old

18    protocol?

19         A.   Yes.

20         Q.   Okay.  And you mentioned that in the

21    meeting?

22         A.   Yes.

23         Q.   Okay.  So there was discussion among

24    everybody in the meeting about what the right

25    protocol was?

```
 1                      D. Trahanas

 2       A.    Yes.

 3       Q.    Okay.  And Dr. Perlman was there?

 4       A.    Yes.

 5       Q.    Dr. Schwulst was not there?

 6       A.    He was on clinic.

 7       Q.    Okay.  And what did Dr. Perlman say?

 8       A.    He's like give her the new one.  And

 9  actually Dr. Spare, Angelica stuck up for me

10  because, I mean, I was still relatively new.  I'm

11  one person, part of another big lab, Dr. Perlman's

12  lab.  I mean, you can understand trying to be

13  diplomatic but also trying to kind of stick up for

14  yourself.  It was really hard for me at the time.

15  But Dr. Spare, Angelica, stuck up for me.  And right

16  before she basically yelled at Rana and Sasha

17  because they were laughing.  They thought it was

18  kind of comical that I didn't get the right protocol

19  or I wasn't doing the right thing, like for some

20  reason I should have known that it was the old

21  cocktail and it wasn't the new one.

22       Q.    Okay.  So Dr. Spare yelled at them in the

23  meeting?

24       A.    Yes.

25       Q.    Okay.  And Dr. Perlman said make sure
```

1                          D. Trahanas

2    Diane gets the new protocol?

3         A.   Yes.

4         Q.   Okay.  And then that was the last time

5    that that happened, like they didn't as far as you

6    know give you an outdated protocol after that?

7         A.   As far as I know, no.

8         Q.   Okay.  How many times have you taken the

9    MCAT?

10        A.   Five.  Five.

11                      (Exhibit 44 was marked for

12                       identification.)

13   BY MS. WERMUTH:

14        Q.   Okay.  You produced, Ms. Trahanas,

15   Exhibit 44.

16             Can you tell me what this is?

17        A.   This is the AMCAS report for my

18   application to medical school for the 2015 entering

19   class.

20        Q.   Okay.  So I have a few questions to ask

21   about this.

22        A.   Sure.

23        Q.   So it says in the upper left Report Date:

24   10/28/2014.

25             Do you see that?

```
 1                        D. Trahanas
 2        A.    Yes.
 3        Q.    Okay.  And then so what does that mean?
 4   So this is a -- you produced a report as it existed
 5   on October 28th of 2014, right?
 6        A.    Yes.
 7        Q.    And then Submission Date, what does that
 8   mean?
 9        A.    I'm not -- I'm really not sure.
10        Q.    What does Processed Date mean?
11        A.    It probably alludes to when they were done
12   reviewing the transcripts and all the information
13   within my report.  By "they" I mean AMCAS.
14        Q.    Okay.  So can you print out the final
15   processed report?
16        A.    This would be it because in October most
17   of -- most of the schools won't accept an AMCAS
18   report after that.
19        Q.    Okay.  But it doesn't -- so when was your
20   application for medical school for 2015
21   matriculation, when was it fully complete and
22   processed?
23        A.    Before the 2 -- before this, before
24   Dr. Schwulst's letter, initial first letter.
25        Q.    Oh, it was done?
```

Page 297

1                          D. Trahanas

2          A.   Yes.

3          Q.   So Dr. Schwulst's letters were not -- you

4     were not using them in connection with this

5     particular application?

6          A.   Yes, that's separate from what I can do

7     for the application and finish.  When you mean

8     finish, that's a separate -- that's not -- that's

9     part of my file.  That's theoretically not part of

10    the application.  The application would be like my

11    credentials.  Part of my file would be the letters

12    of support.

13         Q.   When does the whole file have to be

14    complete for purposes of being a candidate for

15    matriculation in 2015?

16         A.   Each school varies.

17         Q.   Okay.  All right.  So this is like your --

18    what I see here in Exhibit 44 is basically your

19    application, like the information that you entered?

20         A.   Correct.

21         Q.   Okay.  So can you turn to the second page?

22    I'm sorry, it actually says Page 3.  What's Page 1?

23    There's Page 1 missing.

24         A.   I'm not sure.  It may just be a title page

25    or something.  This is all I have.

1                        D. Trahanas

2       Q.    Okay.  And then Page 3 under Additional

3    Application Information, okay, it says -- I'm sorry.

4             So it says Previous Matriculation: No.

5             Does that mean you haven't gone to medical

6    school before?

7       A.    Correct.

8       Q.    Okay.  So when it says Explanation of

9    Reapplication, that's not referring to reapplying to

10   medical school generally, right?  That refers to --

11      A.    Right.

12      Q.    -- okay, that particular institution, if

13   you had been enrolled before?

14      A.    Correct.

15      Q.    Okay.  Because you had applied to medical

16   school before this 2015 --

17      A.    Cycle.

18      Q.    -- application -- cycle?  Thank you.

19      A.    Yes.

20      Q.    Okay.  Now, you had asked Dr. Schwulst in

21   the summer of 2014 if you could have time off to

22   study to take the MCAT exam in September of 2014; is

23   that right?

24      A.    Correct.

25      Q.    And you took some time off to do that; is

```
 1                      D. Trahanas
 2   that right?
 3        A.   I did.
 4        Q.   How long did you take off?
 5        A.   I can't specifically recall but probably
 6   two weeks.  I was working during that time though
 7   like via e-mail and remote log-in, simple tasks.
 8        Q.   Can you mark that, please.
 9                     (Exhibit 45 was marked for
10                      identification.)
11   BY MS. WERMUTH:
12        Q.   So, Ms. Trahanas, Exhibit 45 is an e-mail
13   from you to Dr. Schwulst dated June 27th of 2014; is
14   that right?
15        A.   Yes.
16        Q.   Okay.  And it's flagged as important.
17             Do you see that?
18        A.   Yes.
19        Q.   Okay.  And in the middle, in the first
20   paragraph you tell him you've been trying to study
21   for the MCAT, but you were anxious and you would
22   like to take vacation time in August to prep for the
23   September testing.
24             Do you see that?
25        A.   I do see that.
```

D. Trahanas

1

2     Q.    Okay.  So you took some time off then in

3     August to do that; is that right?

4     A.    Correct.

5     Q.    And you think it was a couple of weeks?

6     A.    I believe so, yes.

7     Q.    And you were paid for that time?

8     A.    I believe it was part of probably my

9     vacation time pay.

10    Q.    Okay.  And did you leave the state during

11    the period of time that you were out in August of

12    2014?

13    A.    No.

14    Q.    Okay.  Did you take the September MCAT

15    test?

16    A.    I did not take it in 2014.  I took it in

17    2015.

18    Q.    Okay.  So you did not take it in September

19    of 2014?

20    A.    I did not.

21    Q.    Do you remember telling Dr. Schwulst, when

22    he asked you how it went, do you remember telling

23    him it went okay?

24    A.    Yes.

25    Q.    So you lied to him?

Page 301

1                           D. Trahanas

2        A.   I didn't lie to him.  I just didn't want

3    to disappoint him.

4        Q.   Well, you told him it went okay, but you

5    didn't even take it so you don't call that a lie?

6             MR. DeROSE:  Objection, Counsel.  Don't

7    answer that question.

8    BY MS. WERMUTH:

9        Q.   You're not going to answer the question as

10   to whether or not telling somebody a test went well

11   that you didn't take is a lie?

12            MR. DeROSE:  She's being instructed by her

13   lawyer not to answer it.

14            MS. WERMUTH:  On what basis, sir?

15            MR. DeROSE:  On the basis that that's

16   argumentative.

17            MS. WERMUTH:  But that's not a basis to

18   instruct a witness not to answer a question.

19            MR. DeROSE:  Don't answer the question.

20   I'll tell my client when I think a question is out

21   of line.  I won't tell you everything about me

22   either.  There's some things that are none of your

23   business.

24            MS. WERMUTH:  So I can't call the court

25   right now, but I will take this up to the judge.

```
 1                        D. Trahanas

 2            MR. DeROSE:  Why don't you.

 3   BY MS. WERMUTH:

 4       Q.    Okay.  So are you going to follow your

 5   lawyer's instruction?

 6            MR. DeROSE:  If you want to answer it, go

 7   ahead.

 8            See how well that plays in front of a jury

 9   some day, Counsel.

10            Go ahead and answer it.  Did you think you

11   were lying is what she wants to know.

12            THE WITNESS:  I mean, did he specifically

13   say did you take the test, I don't remember.  I

14   mean, do you think you would have done well, do you

15   think you did well, I don't remember specifically

16   what he asked me, but sure.

17   BY MS. WERMUTH:

18       Q.    Ms. Trahanas, you told him it went well,

19   right?  You told him it went well?

20       A.    You said that I said it went okay.

21       Q.    No, I didn't.  But in any event, you told

22   him whether it went well or went okay, you told

23   him -- you led him to believe that you took the

24   test?

25       A.    At that time, yes.
```

                           D. Trahanas

1

2     Q.    Okay.  Thank you.  And so when, in fact,

3  did you take the test for the 2015 cycle?

4     A.    September.

5     Q.    Of what year?

6     A.    Oh, I'm sorry, I took the test September

7  of 2015, so for the test for 2014 I just used one of

8  my older scores.

9     Q.    Okay.  And so you understand that every

10  time you take the MCAT test it gets reported to all

11  of the schools that you want to -- that you end up

12  applying to, right?  Like you don't get to pick

13  which MCAT score gets reported?

14     A.    Correct, but they go by the most recent

15  score.

16     Q.    Who does?

17     A.    The schools.

18     Q.    Okay.  And how do you know that?

19     A.    I believe it states it on the AMCAS

20  website or the application process.

21     Q.    So the school -- I'm sorry.

22           AMCAS reports every single MCAT score

23  you've ever received, right, at the time you apply?

24     A.    Is that the same question you just asked

25  me?

                            D. Trahanas

1

2    Q.   Well, I just want to make sure we're

3    saying the same thing.

4         So let me ask it.  So let's look at

5    Exhibit 44 again.

6    A.   Sure.

7    Q.   Are you with me on Exhibit 44?

8         All right.  And let's go to the -- it says

9    Page 8 or Trahanas 149.

10   A.   Yes.

11   Q.   Okay.  And there are one, two, three, at

12   the bottom under MCAT test scores, there are one,

13   two, three, four, five, six entries, right?

14   A.   Correct.

15   Q.   All six of those entries obviously

16   appeared in your AMCAS report for the 2015 cycle?

17   A.   On my AMCAS report, yes.

18   Q.   Okay.  And so all of those scores get

19   released to the schools that you're applying to?

20   A.   I can't say that definitively.

21   Q.   Okay.  You just don't know?

22   A.   They don't accept scores that are over

23   three years old, so anything post -- or pre 2011 for

24   that 2015 entering class, which the application

25   cycle starts 2014, they wouldn't accept any of those

1                        D. Trahanas

2    test scores.

3         Q.   Okay.  But you did take it six times

4    between 2006 and 2011.

5              Do I understand that --

6         A.   Yes.

7         Q.   -- correctly?

8              And your composite total scores are in the

9    far right?

10        A.   Yes.

11        Q.   And there's a new scoring system now, but

12   at the time the scoring system was based on numbers

13   up to, what, 45, is that right, or higher?  Yes, 45.

14        A.   45.

15        Q.   Okay.  And so a score of 21 puts you in

16   the bottom 30th percentile.

17             Does that sound right?

18        A.   I would have to look at the curve that

19   they make.  I'm not quite sure.

20        Q.   Can you mark that, please.

21                    (Exhibit 46 was marked for

22                    identification.)

23   BY MS. WERMUTH:

24        Q.   Okay.  So this is an MCAT conversion chart

25   that I'll represent I pulled off the AMCAS website,

1                              D. Trahanas

2    okay?

3         A.    Okay.

4         Q.    Okay.  So if you look, there's the old

5    scoring with 44/45 at the top end.  There's the 2015

6    scoring system, which I guess is when the conversion

7    happened.

8              Does that sound familiar to you?

9         A.    I believe so, yes.

10        Q.    Okay.  And then there's a percentile,

11   corresponding percentile in the third column?

12        A.    Yes.

13        Q.    Do you see that?  Okay.

14             So in 2011 your score was 21, right?

15        A.    Yes.

16        Q.    So that puts you down in the 24th to

17   27th percentile?

18        A.    It does if you look at just that score.

19   If a school perhaps would take not the composite

20   score but your highest score from each date,

21   assuming that they would accept a prior date to

22   2011, the score could be different.

23             So I'm just not sure if every school, you

24   know, which schools would do something like that.

25        Q.    Okay.  But just to be clear --

Page 307

1                          D. Trahanas

2        A.    For that score, yes.

3        Q.    -- your composite score puts you in the

4   24th to 27th percentile?

5        A.    Yes.

6        Q.    Okay.  But you don't know if a school

7   looked at a particular subset of the scores, right?

8   Is that your testimony?

9        A.    Yes.

10       Q.    Can you mark that, please.

11                       (Exhibit 47 was marked for

12                       identification.)

13   BY MS. WERMUTH:

14       Q.    Okay.  Ms. Trahanas, you've been given

15   Deposition Exhibit 47.

16       A.    Yes.

17       Q.    Okay.  So these again also come off the

18   AMCAS website or AAMC website, and these relate to

19   the scores in 2011, which is the last time you took

20   the test, right?

21       A.    Yes.

22       Q.    Okay, as of October 2014.

23             And if you look at the second page, it

24   gives you also the percentage where you would fall

25   if you looked at each one of the individual exams,

1                      D. Trahanas

2    okay.

3              So for physical sciences you got an 8,

4    which puts you somewhere in the 38th to

5    54th percentile, right, for that year; is that

6    right?

7         A.   Yes.

8         Q.   And then in verbal reasoning you got a 3,

9    which puts you in the 2 to 5 percentile, right?

10        A.   Correct.

11        Q.   And then in the writing sample you got an

12   M, which puts you in the 10 to 33 percentile, right?

13        A.   I see scaled score on the right that says

14   25th percentile for M.

15        Q.   All right.  But do you see scaled score M

16   in the chart and then you go across for the

17   percentile rank range?

18        A.   Sure.

19        Q.   And you would agree with me there it says

20   10.9 to 32.5?

21        A.   It does, but I'm not sure what the scaled

22   scores on the right are.

23        Q.   Okay.  Well, O is a better grade than M,

24   right?

25        A.   Yeah, if I remember correctly, yes.

1                          D. Trahanas

2        Q.   And Q is a better score than O?

3        A.   Yes.

4        Q.   Okay.  And then in biological sciences you

5    got a 10, right?

6        A.   Yes.

7        Q.   Which puts you in the 55 to 76 percentile,

8    right?

9        A.   Yes.

10       Q.   Okay.  And in addition to -- you would

11   agree with me that your MCAT scores are not very

12   strong?

13       A.   Standing alone, possibly not, but in the

14   entirety of my application I think they're okay.

15       Q.   Do you know what the acceptance rate is

16   for a Caucasian applicant scoring a composite score

17   of 21?  Was that your 2011 score?

18       A.   Offhand I do not know.

19       Q.   Okay.  Can I have that marked, please.

20                      (Exhibit 48 was marked for

21                       identification.)

22   BY MS. WERMUTH:

23       Q.   Okay.  So according to this data that

24   again I pulled off the internet you had a total MCAT

25   score of 21 in the 2015 cycle.

1                         D. Trahanas

2        A.    2014.

3        Q.    Well, so this is two cycles, 2013 through

4    2016.

5              Do you see at the top?

6        A.    Yes.

7        Q.    Okay.  And you look at the 21 to 23 score

8    range, right?  The acceptance rate for someone with

9    a 3.8 to 4 is 11 percent, 3.6 to 8 is a 7 percent,

10   and so on, and then you get down to 3 to 3.19 and

11   that's a 4 percent acceptance rate.

12             Do you see that?

13       A.    I see that on this sheet, yes.

14       Q.    Okay.  Now, you took the test again in

15   September of '15; is that right?

16       A.    Correct.

17       Q.    And did you apply -- you're in the midst

18   of applying for the -- no, I'm sorry.

19             So you took it in '15 for what cycle?

20       A.    This cycle, 2017.

21       Q.    Okay.  So you're in the middle of an

22   application right now?

23       A.    Correct.

24       Q.    Have you also applied to physician

25   assistants' programs?

                          D. Trahanas

1

2      A.   I looked at them, but I started their

3  application but I did not apply.

4      Q.   And what was your score from the

5  September 2015 exam?

6      A.   498.

7      Q.   Which according to Exhibit 46 puts you in

8  a, what, 41st percentile to 43rd percentile?

9      A.   Yes.

10      Q.   Okay.  And it's your understanding that

11  although all of your MCAT scores over time get

12  reported in your AMCAS report each cycle, your

13  letters of reference do not carry over from cycle to

14  cycle.  You understand that, right?

15      A.   They are kept in a file, but they are not

16  in my AMCAS report for the subsequent year.

17      Q.   Right.  And so they don't get released to

18  schools, old reference letters don't get released to

19  schools in subsequent cycles?

20      A.   Not for that cycle, but they do have it on

21  file.  It stays in my file.

22      Q.   AMCAS has it on file?

23      A.   No, each school does.  So once you apply,

24  they'll have to know -- if you're a re-applicant you

25  have to indicate it to them.  So what they'll do is

```
 1                        D. Trahanas
 2   they'll compare your previous year's application to
 3   your new application, what's changed, what's
 4   improved, et cetera.
 5        Q.   Did you apply in this current cycle to all
 6   the same schools that you applied to in the 2015
 7   cycle?
 8        A.   Not all schools.
 9        Q.   Okay.  So -- can we mark this, please.
10                        (Exhibit 49 was marked for
11                         identification.)
12   BY MS. WERMUTH:
13        Q.   So I also printed this off of the AAMC
14   website.
15             Can you look at the second page with me?
16   So this is an FAQ.
17             Do you see that?
18        A.   Yes.
19        Q.   Okay, Exhibit 49.  And look at the FAQ on
20   the second page in the middle, do I need to submit
21   new letters of evaluation if I applied with AMCAS
22   previously.
23             Do you see that?
24        A.   I do see that.
25        Q.   And it says, "AMCAS does not keep letters
```

1                        D. Trahanas

2    on file from applications in previous years.  You

3    must resubmit letters of evaluation to AMCAS for

4    each application cycle you apply."

5               Do you see that?

6        A.   I do.

7        Q.   Okay.  You don't have any reason to

8    believe that's not accurate?

9        A.   I agreed with you before that that's true

10   for AMCAS, but that's not true for each school.

11       Q.   Okay.  But you said on the AMCAS website

12   is where you learned what each school does?

13       A.   They have a -- I forget what the exact tab

14   is that kind of gives you a synopsis of each

15   school's GPA range, MCAT range, and a little tidbit

16   of each of the school's information.

17               So I don't remember what tab, but it is

18   there, yes.

19       Q.   And according to that tab you can find

20   information about whether or not a school has kept

21   your old application and old letters on file?

22       A.   I mean, I can't click on the tab, and the

23   school is not going to give me that information,

24   like it's not -- are you asking if the website gives

25   me that information?

1               D. Trahanas

2       Q.   How do you know?  So you've testified that

3   each school keeps old letters of recommendation if

4   you've reapplied.

5            How do you know that to be the case?

6       A.   After speaking with all the previous

7   schools that I had called in 2015, and also I've

8   spoken to other faculty members at other medical

9   schools.

10      Q.   Okay.  So when did you -- so you called

11  the schools to which you were applying in the

12  current cycle to find out whether or not they would

13  keep old letters of evaluation on file?

14      A.   The current cycle right now?

15      Q.   Yes.

16      A.   No.  I did that in 2015.

17      Q.   Okay.  And you did that with every school

18  that you applied to?

19      A.   Correct.

20      Q.   Did you talk to every single school?

21      A.    I believe it was maybe 12 of the 15

22  schools that I spoke with.

23      Q.   And did every single one of those 12

24  schools tell you that, in fact, they were going to

25  keep those letters if you reapplied?

                          D. Trahanas

1

2      A.   Not every but most.  And they asked me to

3  explain in next year's cycle if I were to reapply to

4  give them an explanation of why that was the

5  previous year.

6      Q.   And did you reapply to all the same

7  schools --

8      A.   I did not.

9      Q.   -- in the cycle?

10     A.   I did not reapply that next cycle.  I

11 didn't have any letters to submit to them.

12     Q.   In the current cycle did you reapply to

13 the schools that you applied to in the 2015 cycle?

14     A.   Some of them but not all of them.

15     Q.   Okay.  How many schools did you apply to

16 in the current cycle?

17     A.   From the previous set or just in general?

18     Q.   Total.

19     A.   15.

20     Q.   Okay.  And that's my next question then.

21 How many of those 15 had you applied to previously

22 in the 2015 cycle?

23     A.   Four possibly.

24     Q.   Okay.  So at least 11 of the schools do

25 not have your old letters of recommendation?

1                          D. Trahanas

2        A.    Correct.

3        Q.    Okay.  And when do you expect to hear

4   from -- when are the decision dates typically?

5        A.    Right now we're in the midst -- this is

6   like interview season, so starting January until

7   like April you'll be notified.

8        Q.    Okay.  All right.  So I'm going to just

9   ask that I make sure that I get the 2017 cycle

10  application and know which schools she has applied

11  to, and then I'll ask to learn if you've been

12  accepted or rejected from any schools.

13            Okay.  So was there -- so I'm assuming all

14  the schools that you applied to in 2015, none of

15  them accepted you, is that right --

16       A.    Correct.

17       Q.    -- in the 2015 cycle?  Okay.

18            And you don't know if that was because of

19  your letters or if it was because of your MCAT

20  scores?  You don't know the reason, you just get a

21  letter?

22       A.    They don't give you a specific explanation

23  from each school with the letter, but it definitely

24  hurts you with a bad letter on there for sure.

25       Q.    Did you save all of your notifications

1                        D. Trahanas

2    from the medical schools in the 2015 cycle?

3         A.   Oh, some e-mail, some just don't get back

4    to you.  I don't remember.  Or they may have mailed

5    the letters, but I can't recall where any of that

6    is.  I mean, I don't --

7         Q.   So you didn't do anything to preserve

8    those letters despite the allegations you have in

9    this particular litigation?

10        A.   I can't recall for sure.  It's possible

11   that I have marked them, but I don't know right now.

12        Q.   Okay.  So sticking with Exhibit 44 for

13   another minute, your application in the 2015

14   cycle -- is it 44?  Yes.

15             Okay.  So on Page 3, 4, 5, 6 and 7 you

16   have to enter all of your grades from your

17   undergraduate and Master's Degree program; is that

18   right?

19        A.   Yes.

20        Q.   Okay.  And so these are grades that you

21   manually enter?

22        A.   Yes.

23        Q.   Okay.  And so I see during your

24   undergraduate experience you had some Cs and even an

25   F in one of your classes; is that right?

                                    D. Trahanas

1

2       A.    That's correct.

3       Q.    Okay.  And the Cs and the one F are all in

4   hard science classes; is that right?

5             So let's just look at Page 3.  You got a C

6   in General Chemistry I, correct?

7       A.    Correct.

8       Q.    You got a C in General Chemistry II,

9   correct?

10      A.    Correct.

11      Q.    You got a C on Page 4 on Intro to Physics?

12      A.    Yes.

13      Q.    You got a C in Organic Chemistry I, right?

14      A.    Yes.

15      Q.    You got an F in Organic Chemistry II?

16      A.    Yes.

17      Q.    Okay.

18      A.    With a subsequent B grade.

19      Q.    All right.  So you retook that class?

20      A.    Correct.

21      Q.    But you still got the F?

22      A.    For the first time.

23      Q.    You had to report it?

24      A.    Yes.

25      Q.    And the next page, you got a C in Intro to

1                           D. Trahanas

2      Physics II?

3           A.    That's just a lecture.  The lab I got a B.

4           Q.    Okay.  And then you got a C in ecology and

5      evolution?

6           A.    Yes.

7           Q.    Page 6, you got a C in vertebrate

8      embryology?

9           A.    Yes.

10          Q.    Okay.  On Page 10 you list your

11     experience.  This is a section where you're listing

12     your experience, correct?

13          A.    Yes.

14          Q.    Okay.  And at the end, the last entry is

15     your job with Dr. Schwulst, right?

16          A.    Correct.

17          Q.    Okay.  And you indicate that the

18     experience name was Northwestern University research

19     scientist and lab manager; is that right?

20          A.    Correct.

21          Q.    But, in fact, your title was Research

22     Technologist 2, correct?

23          A.    My official title as my payment, yes, but

24     like I said earlier, I did -- I was the only person

25     that worked for him was the lab manager.  There was

1                          D. Trahanas

2    nobody else there.

3         Q.    And are research scientist positions, are

4    those faculty positions at Northwestern University?

5         A.    To my knowledge, as long as you're doing

6    research you're a scientist.

7         Q.    So there isn't a separate non-tenure track

8    position for an academic at Northwestern University

9    called research scientist?

10        A.    I'm not sure.

11        Q.    And then on the next Page, 11, your job at

12   University of Chicago?

13        A.    Yes.

14        Q.    You testified earlier today that your job

15   title was Research Technologist 1?

16        A.    Yes.

17        Q.    But you put here that you were a lab

18   manager?

19        A.    I was a lab manager.

20        Q.    I thought you were a Research

21   Technologist 1.

22        A.    Just like I was a research tech for

23   Dr. Schwulst, I was the same for doctor or for

24   Dr. Sokoloff.

25        Q.    And would your employment records at

```
 1                    D. Trahanas
 2   University of Chicago support that?
 3        A.   They would support the pay that I received
 4   for tech.
 5        Q.   Tech 1?
 6        A.   Yes.
 7        Q.   At $15 an hour?
 8        A.   Yes.
 9        Q.   Okay.  Now, on February 19th of 2015 you
10   received a notice from AMCAS; is that right?
11        A.   I'm sorry, am I looking at a specific
12   exhibit?
13        Q.   No, I'm just asking you.  December -- or
14   February 19th of 2015, you received an e-mail
15   notification from AMCAS?
16        A.   Correct.
17        Q.   Okay.  And that notification or that
18   e-mail notified you that a letter of reference, a
19   second letter of evaluation or reference had been
20   submitted by Dr. Schwulst, right?
21        A.   Yes.
22        Q.   Okay.  Now, previously Dr. Schwulst had
23   given you a letter of recommendation, right?
24        A.   A positive letter of recommendation,
25   correct.
```

1                          D. Trahanas

2        Q.    Okay.  And one that he even let you look

3    at and revise, right?

4        A.    Yeah.

5        Q.    Okay.  And it was positive?

6        A.    Yes.

7        Q.    Okay.  And you also got a letter of

8    recommendation from Dr. Perlman, right?

9        A.    Yes.

10       Q.    And that was a positive letter of

11   recommendation as well?

12       A.    Correct.

13       Q.    Okay.  And you quote that letter in full

14   in your Complaint; is that right?

15       A.    I believe so.

16       Q.    Okay.  And I'll just go ahead and have

17   these letters marked.  I'll have this marked,

18   please.

19                          (Exhibit 50 was marked for

20                          identification.)

21   BY MS. WERMUTH:

22       Q.    Okay.  So Exhibit 50 is the first letter

23   of recommendation that Dr. Schwulst submitted to

24   AMCAS on your behalf; is that right?

25       A.    That's correct.

Page 323

                          D. Trahanas

1

2      Q.   Okay.  And then there's some handwriting

3   at the bottom.

4           Do you recognize that?

5      A.   Yes, that's my handwriting.

6      Q.   Okay.  And when did you write that?

7      A.   March of 2015.

8      Q.   And what tells you that?

9      A.   My memory.

10     Q.   Okay.  So there's nothing on the document

11  that tells you that?

12     A.   No.

13     Q.   Okay.  You just recall doing that?

14     A.   Correct.

15     Q.   And were you -- where did you do that?

16     A.   At home.

17     Q.   Okay.  Were you by yourself?

18     A.   In my room, yes.  I'm not sure if anybody

19  else was home.

20     Q.   Okay.  You weren't with your lawyer?

21     A.   At this time, no.

22     Q.   Okay.  Can you just read what you wrote

23  because I want to make sure I understand it.

24     A.   Original letter of recommendation.  Only

25  letter given permission to Dr. Schwulst to upload.

D. Trahanas

1
2    Never spoke about any subsequent letters being
3    uploaded.  Certainly not any letters
4    needing/permitted to be uploaded on February 19th,
5    comma, which defamed/nullified I want to say
6    anything in this letter above as soon as I took
7    medical leave.
8        Q.   Okay.  So now you asked Dr. Schwulst to be
9    an evaluator for you, right, for medical school?
10       A.   Correct.
11       Q.   Okay.  And so as an applicant you don't
12   give permission or not, am I right, to upload
13   letters?  What you do is you identify who your
14   evaluators are once you have asked them to be an
15   evaluator, right?
16       A.   Well, by asking I believe that would be
17   under permission.
18       Q.   Okay.  So you gave Dr. Schwulst permission
19   to serve as your evaluator, right?
20       A.   Right.  My e-mail asked him to be a
21   positive letter of recommendation, which he agreed
22   to, and so did Dr. Perlman.
23       Q.   But you asked him to be an evaluator for
24   you?
25       A.   Correct.

1                        D. Trahanas

2      Q.    And he agreed to do that?

3      A.    Yes.

4      Q.    Okay.  And you would agree with me that

5  applications -- that letters of evaluation for

6  applications to medical school -- well, strike that.

7            So physicians, folks with medical degrees,

8  have to abide by certain ethical codes, right?

9      A.    Absolutely.

10     Q.    Okay.  And physicians and folks with

11  medical degrees have to abide by certain

12  professional standards, right?

13     A.    Sure, first of which is do no harm to

14  somebody else.

15     Q.    And so those standards also though require

16  then someone to be candid when they are performing

17  an evaluation of someone who is interested in

18  joining that select group of professionals, right?

19     A.    Yes.

20     Q.    And that candor that's required in that

21  process provides the best opportunity then for folks

22  who -- strike that.

23            And AMCAS will not -- AMCAS maintains

24  confidentiality over letters of evaluation.

25            You would agree with that?

1                          D. Trahanas

2        A.    To the applicant, yes.  I'm not sure if

3   you waive, if you waive that if you are able to see

4   the letters.  There's a choice to waive your right

5   to see the letters.

6        Q.    Okay.  And did you click the button saying

7   that you were waiving any right to see the letters?

8        A.    More than likely.

9        Q.    Okay.  For all three of your evaluators?

10       A.    Correct.

11       Q.    In the 2015 cycle?

12       A.    Correct.

13       Q.    And, again, the purpose of that

14  confidentiality and waiving the right to review them

15  is to promote candor in the process, right?

16       A.    I'm not --

17       Q.    Is that your understanding?

18       A.    I can't speak to that.  I mean, my

19  experience is everyone knows, everyone sees the

20  letters anyway, and it doesn't really affect whether

21  you waive or you don't waive any school application.

22  It's not going to affect you negatively if you see a

23  letter.

24       Q.    Okay.  But my question is more about the

25  process.  So AMCAS treats the letters as

1                      D. Trahanas

2    confidential?

3         A.   As long as you waive your right.

4         Q.   As long as you waive that right.  And the

5    purpose of that confidentiality is to promote candor

6    in the process?

7              MR. DeROSE:  Objection, objection to

8    someone else's purpose.  I don't see how -- calls

9    for conjecture on the witness' part.

10             But you may answer if you know.

11             THE WITNESS:  I'm not entirely sure.  It's

12   possible.  But either way the person who uploads the

13   letter would not know if I have or have not waived

14   my right unless they exclusively asked me.

15             MS. WERMUTH:  Can we have that marked,

16   please.

17                       (Exhibit 51 was marked for

18                        identification.)

19   BY MS. WERMUTH:

20        Q.   Have you ever seen Deposition Exhibit 51

21   before?

22        A.   If you had sent this to us, I'm sure I had

23   seen it at some point.

24        Q.   Let me ask you this:  You participated in

25   the medical application process that's administered

Page 328

D. Trahanas

1    by AAMC, right?  Or AMCAS, I'm sorry.

2    A.   The application is on AMCAS.  I'm not sure

3    exactly what AAMC is in affiliation with AMCAS.  I

4    don't know if one owns the other or if they're the

5    same entity.

6    Q.   Okay.  But you know they're affiliated in

7    some respect?

8    A.   Capacity, yes.

9    Q.   And so you consented to use their

10   processes when you decided to apply through their

11   system, correct?

12   A.   Sure.  You can't apply if you don't.

13   Q.   Okay.  Did you ever read their bulletin on

14   maintaining the confidentiality of letters of

15   evaluation before today?

16        MR. DeROSE:  She asked you a question.

17   Don't read it.

18        THE WITNESS:  No.

19   BY MS. WERMUTH:

20   Q.   Okay.

21   A.   I can't recall any -- I wouldn't be able

22   to tell you anything that's on this page.

23   Q.   Okay.  You never read it before?

24   A.   No.

Page 329

                          D. Trahanas

1

2        Q.   Okay.   Can we get these two documents

3    marked, please.

4                      (Exhibit 52 and Exhibit 53 were

5                      marked for identification.)

6    BY MS. WERMUTH:

7        Q.   Okay.   So 52 is the letter that

8    Dr. Perlman wrote on your behalf and submitted to

9    AMCAS; is that right?

10       A.   Yes.

11       Q.   Okay.   And then 53 is the letter that

12   Dr. Goldstein wrote on your behalf?

13       A.   Correct.

14       Q.   Okay.   And had you -- had Debra Goldstein

15   shared with you a copy of the letter before she

16   submitted it?

17       A.   Yes.

18       Q.   Oh, she did?

19       A.   Yes.

20       Q.   Okay.   And on the second page, the first

21   paragraph she refers to your composite MCAT score as

22   a negative in your application, right?

23       A.   She says the only negative.

24       Q.   Right, okay.   And you don't find that

25   statement to be defamatory, that she calls your MCAT

1                          D. Trahanas

2    score negative?

3         A.   I wouldn't accuse her of being defamatory

4    with that statement, but she also told me that she

5    showed me the letter prior to her submitting it.

6         Q.   Okay.  So can you mark that, please.

7                         (Exhibit 54 was marked for

8                          identification.)

9    BY MS. WERMUTH:

10        Q.   So Deposition Exhibit 54, on the first

11   page at the top that is a notice to you dated

12   February 19, 2015, that a letter of evaluation had

13   been submitted by Dr. Schwulst?

14        A.   Correct.

15        Q.   Okay.  And after receiving that e-mail did

16   you contact Dr. Schwulst?

17        A.   I did.

18        Q.   Okay.  And by what means did you contact

19   Dr. Schwulst?

20        A.   E-mail.

21        Q.   Okay.  And what did you say to

22   Dr. Schwulst?

23        A.   As it's -- do you want me to read what it

24   states here?

25        Q.   It's on the first page as well, right?

1                          D. Trahanas

2       A.   Correct.

3       Q.   All right.  Now, you had told Dr. Schwulst

4  that you had not wanted to talk to him while you

5  were on leave; is that right?

6       A.   Correct.  Well, I was limiting

7  communications.

8       Q.   Okay.  And that you wanted communications

9  to go through human resources, right?

10      A.   Correct.

11      Q.   Okay.  So you did not hear back personally

12  from Dr. Schwulst in response to this e-mail; is

13  that right?

14      A.   Correct.

15      Q.   Okay.  Now, it looks like you blind carbon

16  copied Daina Fernandez and Heather Burke?

17      A.   Correct.

18      Q.   Okay.  And did you communicate with them

19  after the fact?

20      A.   I communicated with them -- I communicated

21  with Daina before I sent him this e-mail.

22      Q.   Oh, before you sent it?

23      A.   Yes.

24      Q.   Okay.  So when you first got the AMCAS

25  e-mail what was the first thing you did?

Page 332

1                              D. Trahanas

2              MR. DeROSE:  Could I have 54?  Do I have a

3    copy of it?

4              MS. WERMUTH:  I thought I gave one over.

5    I don't have an extra floating around me, but we can

6    give you an extra one if you'd like.

7              MR. DeROSE:  Would you, because I want it.

8    These are all marked.

9              THE WITNESS:  I'm sorry, I had spoken to

10   her before I had written this e-mail and asked her

11   what I should do.

12   BY MS. WERMUTH:

13       Q.   Okay.  And was that a telephone

14   conversation?

15       A.   It was.

16       Q.   So you called her in her office?

17       A.   Correct.

18       Q.   And she answered the phone?

19       A.   Yes.

20       Q.   Okay.  And you told her that you had

21   received this notification?

22       A.   Yes.

23       Q.   And you asked her what you should do?

24       A.   Yes.

25       Q.   Okay.

1                          D. Trahanas

2          A.    Where she instructed me to send him a

3    non-accusatory type of e-mail so I wouldn't, you

4    know, upset someone, and also to bcc her because she

5    didn't want to be seen on the thread because she

6    told me last time I got her involved he kind of

7    yelled at her.  He yelled at her and was unhappy

8    that she was involved with the whole promotion

9    situation.

10         Q.    So --

11         A.    So I bcc'd her and Heather.

12         Q.    I'm sorry, Daina Fernandez told you that

13   Dr. Schwulst had yelled at her about her involvement

14   in the pay and promotion question?

15         A.    Correct.

16         Q.    Okay.  And so she said, you know, do a

17   non-accusatory e-mail to him?

18         A.    Correct.

19         Q.    Okay.  And you followed her advice; is

20   that right?

21         A.    I believe so.

22         Q.    Okay.  And you sent that to him the

23   following day on the 20th I see; is that right?

24         A.    Yes.

25         Q.    Okay.  And then later that afternoon you

1                          D. Trahanas

2    e-mailed Heather?

3         A.    Yes.

4         Q.    And that said that Dr. Schwulst may be

5    limiting communication with you as you had

6    requested, right?

7         A.    Yes, that's what it says.

8         Q.    Okay.  But you wanted a response, so you

9    asked her to see to it that he replies to it?

10        A.    I mean, it was an emergency, yes.

11        Q.    Okay.  And she responded of course I will

12   forward to him and ask that he reply at his earliest

13   convenience, right?

14        A.    Yes, I see that.

15        Q.    And at some point thereafter did you hear

16   back from -- and you thanked her, and then you

17   forwarded that communication to Daina, right --

18        A.    Yes.

19        Q.    -- Fernandez?  Okay.

20              And then on page Trahanas 176 there's

21   another e-mail to you from the same day,

22   February 20th, from Heather saying I just wanted to

23   let you know that we are looking into this and will

24   follow up with you via e-mail sometime next week.

25        A.    That's what it says.

Page 335

1                          D. Trahanas

2        Q.    Okay.  And did you get a subsequent e-mail

3    from Ms. Fernandez?

4        A.    I got no subsequent communication with

5    anyone from Northwestern after that e-mail regarding

6    the letters.

7        Q.    Okay.  But you did get another

8    communication from AMCAS?

9        A.    Correct.

10        Q.    Okay.  Indicating that Dr. Schwulst had

11    submitted a third letter; is that right?

12        A.    Correct.

13        Q.    Okay.  And let me just get that marked.

14                      (Exhibit 55 was marked for

15                      identification.)

16    BY MS. WERMUTH:

17        Q.    Looking at Deposition Exhibit 55, it was

18    Thursday, February 26th that you got notice from

19    AMCAS of a third letter from Dr. Schwulst; is that

20    right?

21        A.    Yes.

22        Q.    Okay.  And by the way, I think, and we can

23    redact this, I'm just realizing now that there's a

24    lawyer, it looks like a lawyer e-mail here that you

25    produced that probably ought to be redacted.

                              D. Trahanas

1

2          MR. DeROSE:  I will be referring to it in

3    the case.

4          MS. WERMUTH:  You will be?

5          MR. DeROSE:  Yes, ma'am.

6          MS. WERMUTH:  So you're not claiming

7    privilege over this communication?

8          MR. DeROSE:  I am not at all.

9    BY MS. WERMUTH:

10        Q.  So you forwarded this to the lawyer who

11   was representing you at the time; is that right?

12        A.  Yes.

13        Q.  And you asked her when you can start

14   talking about lawsuit stuff?

15        A.  Yes.

16        Q.  Okay.  And how did you come to know this

17   lawyer, Pamela Visvardis?

18        A.  She's a family friend.

19        Q.  Okay.  And so at that point in time you

20   were thinking about filing a lawsuit against

21   Dr. Schwulst?

22        A.  She gave -- it was possibly an option that

23   she gave me.  I'm not sure exactly against who or

24   specifically what.

25        Q.  Okay.  And why did you switch counsel?

```
 1                         D. Trahanas
 2   Why did you leave or why is Ms. Visvardis no longer
 3   representing you?
 4        A.   This isn't her area of expertise.
 5        Q.   Okay.  Now, ultimately you got copies of
 6   the letters that Dr. Schwulst submitted, is that
 7   right --
 8        A.   Yes.
 9        Q.   -- the two separate letters?
10             MR. DeROSE:  And, Counsel, just so you
11   know, and if you want to inquire you can, I will be
12   using the letters that her lawyer sent and that
13   Dr. Schwulst's lawyer sent back to her.
14             MS. WERMUTH:  Okay.  So you're waiving any
15   privilege over any communications between
16   Ms. Trahanas and her lawyer, her prior lawyer?
17             MR. DeROSE:  Correct.
18             MS. WERMUTH:  Okay.  Can we mark that,
19   please.  Thank you.
20                     (Exhibit 56 was marked for
21                      identification.)
22   BY MS. WERMUTH:
23        Q.   So you now have Deposition Exhibit 56.
24             Is that the second letter, as you
25   understand it, that Dr. Schwulst submitted?
```

1                          D. Trahanas

2          A.    As I understand it, yes.

3          Q.    Okay.  And as you understand it.

4                And he writes that he is formally

5     withdrawing his prior letter, correct?

6          A.    Correct.

7          Q.    And then he also writes, "I can no longer

8     support her candidacy for admission to medical

9     school," right?

10         A.    Yes, that's stated.

11         Q.    So he's providing his opinion to AMCAS in

12    this letter.  Would you agree with that?

13               MR. DeROSE:  Objection.  There's no

14    indication of an opinion.

15    BY MS. WERMUTH:

16         Q.    You can answer the question.

17               MR. DeROSE:  If you see an answer, go

18    ahead.

19               THE WITNESS:  I'm not sure what his -- I

20    can't speak for him.

21    BY MS. WERMUTH:

22         Q.    That's not my question.

23               So let me ask you this:  What statement in

24    here, if any, is a false statement of fact?

25               MR. DeROSE:  Objection, calls for a

Page 339

1                        D. Trahanas

2    conclusion on the witness' part.

3    BY MS. WERMUTH:

4        Q.   Do you see anything that's a false

5    statement of fact, a lie?

6        A.   The entire thing.

7        Q.   Well, he's saying he's formally

8    withdrawing his prior letter, right?

9        A.   Correct, which would --

10       Q.   That's not a lie.  That's a statement that

11   he's making, I withdraw my reference.

12       A.   He's withdrawing his reference based on

13   what?

14       Q.   Okay.  That's not my -- I'm asking

15   about -- so you've tried to state a claim for

16   defamation, okay?

17       A.   Correct.

18       Q.   So what I need to understand is the

19   admissions committee doesn't know based on what.

20   All they know is what he puts in the letter, right?

21       A.   Right.

22       Q.   Okay.  So what he puts in the letter is

23   I'm writing to formally withdraw my letter of

24   support, right?

25       A.   Meaning he's withdrawing everything that

1                        D. Trahanas

2   he wrote in the previous letter.

3       Q.   Okay.  So that's not a lie.

4            MR. DeROSE:  Well, Counsel, wait a minute.

5   This is not a law school test.  Objection to asking

6   her to draw conclusions on what constitutes

7   defamation.  I suggest to you all of these letters

8   taken together are what we are talking about.

9            MS. WERMUTH:  Okay.  Well, now you're

10  testifying, and that's improper.

11           MR. DeROSE:  And I object, but you started

12  the area.

13           MS. WERMUTH:  That's improper.

14           MR. DeROSE:  So are your questions.

15           MS. WERMUTH:  I'm asking her if she reads

16  this letter and sees a false statement of fact in

17  it.  That's all I'm asking.

18           THE WITNESS:  Yes.

19  BY MS. WERMUTH:

20      Q.   Okay.  And what false statement of fact do

21  you see?  Read me the false statement.

22      A.   "I'm writing to formally withdraw my prior

23  letter of reference for Ms. Diane Trahanas.  I can

24  no longer support her candidacy for admission to

25  medical school."

```
1                         D. Trahanas
2       Q.   So you say the entire letter is a false
3  statement of fact?
4       A.   He's withdrawing his prior letter, so he's
5  basically saying the prior letter was wrong, which
6  it was not.
7       Q.   Do you know when he prepared Exhibit 56?
8       A.   I do not.  It is dated February 9th, which
9  I'm not sure as to the authenticity of that, but
10 it's dated February 9th on this.
11      Q.   Okay.  And you just don't know when he
12 prepared it?
13      A.   Correct.
14      Q.   Can we mark this, please.
15                   (Exhibit 57 was marked for
16                   identification.)
17 BY MS. WERMUTH:
18      Q.   Okay.  And Exhibit 57, that is a copy that
19 you received now of the third letter that
20 Dr. Schwulst submitted to AMCAS; is that right?
21      A.   Correct.
22      Q.   Okay.  All right.  Now, you have
23 complained that your access to information on the
24 computer was improper while you were on medical
25 leave?
```

Page 342

1                          D. Trahanas

2        A.    Correct.

3        Q.    Okay.  And why do you contend that you

4    should have been provided with access to sensitive

5    research information while you were on medical

6    leave?

7        A.    As far as I know in the handbook nothing

8    should have changed when I went to medical school.

9              Secondly, I took leave before and I was

10   allowed access to the same information.  And

11   everything on that computer was in my head anyway,

12   so it's not sensitive in terms of it being

13   classified where I didn't know it.

14       Q.    Okay.  So if it's in your head, you don't

15   need access to the computer then; is that right?

16       A.    Well, I'm just saying at some point I had

17   composed what was in that computer.

18       Q.    And you didn't anticipate working while

19   you were on this medical leave in February 2017,

20   correct?

21       A.    Not necessarily, but I had worked on prior

22   medical leaves or vacation days that I had taken

23   with e-mails or preparing graphs if we needed to

24   make a deadline for, you know, a specific

25   publication.

Page 343

1                    D. Trahanas

2       Q.   Here's my question:  Did you anticipate

3   working during the medical leave that you took in

4   February, starting in February 2017?

5       A.   I was instructed by my physician to just

6   take a break.

7       Q.   Okay.  So you didn't need access to it

8   because you didn't anticipate working, correct?

9       A.   I didn't need access for that reason, but

10  Ms. Burke asked me a few questions, and that's when

11  I needed that information.

12      Q.   Okay.  And those questions were about the

13  location of mice and certain information about where

14  data was being housed, right?

15      A.   Well, the mice, I answered her that that

16  was just known, but yeah, anything data or file-wise

17  on the computer I hadn't memorized, so I would have

18  to take a look.

19      Q.   And you had specific credentials, log-in

20  credentials that were unique to you, right, like

21  your user name and your password?

22      A.   It was to our lab.

23      Q.   So what was the user name?

24      A.   It could have been Schwulst's lab; it

25  could have just been lab.  I don't recall.

```
 1                       D. Trahanas
 2        Q.   Wasn't the user name your name?
 3        A.   It's possible.
 4        Q.   Okay.
 5        A.   I mean, I was the one that used that
 6   computer most of the time, but Dr. Schwulst had the
 7   password, the user name and password.  I mean, it
 8   was his computer.  He purchased it.
 9        Q.   Okay.  And he had it -- but they were your
10   credentials, right, that you had saved information
11   under?  Is it your testimony then that you gave him
12   information about what your credentials were?
13        A.   Yes.  He needed to have it.  I mean, he
14   needed to have that information.  He had that
15   information on a Post-It note since a long time
16   before that February.
17        Q.   Can you look at Exhibit 5, which is the
18   handbook.
19             MR. DeROSE:  The big one.
20             MS. WERMUTH:  One of the big ones but near
21   the bottom.
22   BY MS. WERMUTH:
23        Q.   Now, you testified a minute ago that when
24   you go on a medical leave of absence at the
25   university nothing is supposed to change.  Can you
```

```
1                          D. Trahanas
2    tell me -- and you said that that was in the
3    handbook.
4              Can you tell me where in the handbook I
5    can find reference to that?
6         A.   I would have to read -- do you want me to
7    read through the entire thing to find it?  I can't
8    recall a page number right now.
9         Q.   Well, why don't you go to the leave
10   section and tell me if you can find reference to
11   that.
12        A.   What page?
13        Q.   Let's see.  Probably 31.
14        A.   It could possibly be in the benefits
15   handbook and not in the staff handbook.
16        Q.   There's nothing in the staff handbook that
17   says anything --
18        A.   Not that I can see right now.  I would
19   really have to look through the entirety of it.
20        Q.   Okay.
21                       (Exhibit 58 was marked for
22                        identification.)
23   BY MS. WERMUTH:
24        Q.   Okay.  So this Exhibit 58 is a series of
25   e-mails between you and Heather Burke, right?
```

1                          D. Trahanas

2        A.    Yes.

3        Q.    Okay.  And the e-mail from Heather Burke

4   comes to you on February 19th at 3:45 p.m., right?

5        A.    Yes.

6        Q.    Okay.  And she says that there are certain

7   things, information about the lab that she needs

8   help with and asks for some -- asks for your

9   response, right?

10       A.    Yes.

11       Q.    Okay.  And you don't know if Dr. Schwulst

12  asked her for this information?

13       A.    I don't know for a fact.

14       Q.    Okay.  Or if he did you don't know when he

15  asked her to find out this information?

16       A.    Correct.

17       Q.    All right.  So for all you know it could

18  have been on February 17th that he asked her for

19  that information, but she didn't get around to

20  e-mailing you until the 19th?

21       A.    It's possible.

22       Q.    Okay.  And you respond to each of the

23  questions.

24             So with number one you tell her where the

25  labs are and that they're labeled Steven -- where

Page 347

1                          D. Trahanas

2    the mice are, right?

3         A.   Correct.

4         Q.   And then you tell her what the computer

5    user name and password is?

6         A.   Yes.

7         Q.   Okay.  And it's actually your user name,

8    Diane Trahanas, right?

9         A.   Yes.

10        Q.   Password NIKE, all caps?

11        A.   Yes.

12        Q.   And you said that it has been provided to

13   Dr. Schwulst now on a Post-It we placed on the back

14   of his lab desktop computer.

15             Do you see that?

16        A.   Yes.

17        Q.   So you had put that Post-It note on his

18   computer sometime prior, right?

19        A.   We had put it there, yes.

20        Q.   So you don't know if he remembered it was

21   there or not?  You frankly don't know?

22        A.   I can't speak for him.

23        Q.   Okay.  And then items 3 and 5, you say

24   that you've tried to access the computer but you are

25   now blocked from that access, right?

```
                              D. Trahanas
 1
 2      A.    Correct.
 3      Q.    Okay.  And then you answer question 6 as
 4   well, right?
 5      A.    Yes.
 6      Q.    Okay.  And then did you -- and then you
 7   followed up on the computer issue with Daina
 8   Fernandez as well; is that right?
 9      A.    Yes.
10      Q.    Okay.  And what did you want Daina
11   Fernandez to do, give you access to the computer
12   again?
13      A.    I just wanted a reason as to why I've been
14   locked out of my work computer.
15      Q.    Well, you were on a leave of absence with
16   no end date at that point in time; is that right?
17      A.    I didn't know.  Yeah, I didn't know when
18   I'd be returning exactly.
19      Q.    Did Daina give you an answer on why you
20   were no longer being given access to your computer?
21      A.    No.
22      Q.    Okay.  Did you speak with her by phone?
23      A.    If it was not by phone it was by e-mail.
24      Q.    And she didn't give you an explanation; is
25   that right?
```

```
 1                         D. Trahanas

 2       A.   No.

 3       Q.   And you went to the EEOC on June 28th of

 4  2015 to look into filing a charge of discrimination;

 5  is that right?

 6       A.   Yes.

 7       Q.   And did you go by yourself, or did you go

 8  with somebody?

 9       A.   I went by myself.

10       Q.   Okay.  Were you represented by Mr. DeRose

11  at the time?

12       A.   Yes.

13       Q.   Okay.  Can I mark that, please.

14                  (Exhibit 59 was marked for

15                  identification.)

16  BY MS. WERMUTH:

17       Q.   Do you recognize Deposition Exhibit 59?

18       A.   Yes.

19       Q.   Okay.  And is that your signature on the

20  last page of this exhibit?

21       A.   Yes.

22       Q.   Okay.  And you filled out this form; is

23  that right?

24       A.   Yes.

25       Q.   Okay.  And I notice on Page -- the first
```

D. Trahanas

1

2    page there's a question under your e-mail address,

3    it says, "Do you have a disability?"

4            Do you see that?

5    A.   Yes.

6    Q.   You answered the question "no"; is that

7    right?

8    A.   I suppose.

9    Q.   Well, there's an X in the "no" box, right?

10   A.   There is an X in the "no" box.

11   Q.   And you put the X in the "no" box?

12   A.   I must have.

13   Q.   Okay.  And did you speak with an intake

14   coordinator that day?

15   A.   I spoke to two -- I spoke -- I was there

16   twice.  I can't remember who I spoke to first.  I

17   mean, I can't recall as to each conversation and

18   what they were about.

19           MR. DeROSE:  Counsel, are these from two

20   different cases by some reason?

21           MS. WERMUTH:  I'm sorry?

22           MR. DeROSE:  This is a three- or four-page

23   document.

24           MS. WERMUTH:  Yes, sir.

25           MR. DeROSE:  And they have the Trahanas

1                          D. Trahanas

2    Bates stamp numbers on them, but the second, third

3    and fourth page, do they concern her?  They're

4    blank.

5              MS. WERMUTH:  Well, I'll ask your witness

6    that question.

7    BY MS. WERMUTH:

8         Q.   Did you leave Pages 3 and -- the second,

9    third and fourth page blank except for your

10   signature on the fourth page?

11        A.   That would make no sense.  I mean --

12             MR. DeROSE:  You know what --

13             THE WITNESS:  -- why would I include my

14   demographic information but not include the reason

15   for going?  So I don't know.

16   BY MS. WERMUTH:

17        Q.   Well, you did sign the fourth page, right?

18        A.   That's my signature, but as far as 2 and 3

19   should have been -- should have writing on it.

20        Q.   Do you have a copy with writing?

21        A.   Not that -- not that I know of.

22        Q.   Okay.  So these are records we subpoenaed

23   from the EEOC.

24        A.   Okay.

25        Q.   And when we got them from the EEOC we

1                          D. Trahanas

2    produced them to your counsel, so I'm just producing

3    what the EEOC gave me.

4              MR. DeROSE:  Counsel, I apologize to you.

5    If you look on the second page, it's only an

6    example, but it says discharged by John Soto in the

7    answer number 5, so I thought this was from another

8    case because I don't know a John Soto in our case.

9              I apologize to you.

10   BY MS. WERMUTH:

11        Q.   Okay.  But you're telling me you did

12   complete the second and third pages?

13        A.   Like I said, I would -- I don't remember,

14   but I would think so.  I mean --

15        Q.   Can we get that marked, please.

16                       (Exhibit 60 was marked for

17                        identification.)

18   BY MS. WERMUTH:

19        Q.   Okay.  Ms. Trahanas, I know these are not

20   your notes.  Again, I'll represent that these are

21   notes that we received from the EEOC.  And I

22   shouldn't say we subpoenaed them.  We did a FOIA

23   request for their records, so that's what I meant.

24              MR. DeROSE:  Is this 58?  What is this

25   exhibit?

Page 353

1                          D. Trahanas

2               THE WITNESS:  60.

3               MS. WERMUTH:  This is 60.

4               MR. DeROSE:  Excuse me.

5    BY MS. WERMUTH:

6          Q.   So, you know, I'm not suggesting that

7    these are your notes, but these are notes from one

8    of the investigators related to it looks like a

9    telephone conference with you on July 7th.

10              So I'm going to ask you a couple questions

11   about these notes to see if it jogs your memory

12   about your conversation.

13              But do you remember having a telephone

14   conference with the EEOC July 7th of 2015?

15         A.   It's possible.  I don't fully recall it.

16         Q.   Do you remember having a telephone

17   conversation with someone at the EEOC?

18         A.   I can't say that my memory recalls it, but

19   if it's documented, I suppose that it happened.

20         Q.   Okay.  So if you look next to -- so you go

21   about almost halfway down, there's a big black

22   scratch-out.

23              Do you see that?

24         A.   On the first page?

25         Q.   Yeah.

                            D. Trahanas

1

2       A.    Yes, like midsection?

3       Q.    Yeah.  So two lines above that it looks

4   like it reads "locked out of computer February" and

5   then there's a scribbly date, 2015.

6             Do you see that?

7       A.    Yeah.

8       Q.    Is that something you recall telling the

9   EEOC?

10      A.    Yes.

11      Q.    Okay.  And then it goes on, it says, "PCP

12  released to return to work, comma, chose not to

13  return 5/24/15."

14            Do you remember telling the investigator

15  that?

16      A.    Like I said, I vaguely remember this

17  entire conversation, but I'm not sure I specifically

18  said it like that.

19      Q.    Okay.  Well, go to the third page, if you

20  would, where it says 3 of 4 at the top, which is

21  also Bates labeled Trahanas-NU1635.

22      A.    Okay.

23      Q.    Again, halfway down it says, "PCP given

24  the option of filing a complaint."

25            Do you see that?

Page 355

1                              D. Trahanas

2         A.    Yes.

3         Q.    Okay.  And right above that it says, "FMLA

4    was approved as of May 24th, 2015."

5               You told the investigator that, right?

6         A.    It would seem so.

7         Q.    And that's consistent with the records

8    we've seen already today, that you were approved --

9    FMLA approved through that date, correct?

10        A.    The records from The Hartford, yes.

11        Q.    Okay.  And then it says, "After May 24th,

12   2015, PCP was cleared to return to work, but PCP

13   elected not to return to work."

14              Do you see that note?

15        A.    Yes, I see that.

16        Q.    Okay.  And did you tell the investigator

17   that as well?

18        A.    Not in those words.

19        Q.    Well, what do you recall telling the

20   investigator?

21        A.    I don't know the last time I used the word

22   "elected" or "elect."  I mean, I -- I'm sure I told

23   him I didn't go back to work.  I'm not sure as to

24   the exact phrase or conversation or --

25        Q.    Okay.  Can we get that marked.

Page 356

```
 1                    D. Trahanas
 2                    (Exhibit 61 was marked for
 3                    identification.)
 4    BY MS. WERMUTH:
 5         Q.   You've been handed Deposition Exhibit 61
 6    now.
 7              Do you recognize that letter?
 8         A.   Yes.
 9         Q.   Okay.  And that was a letter approving a
10    family medical leave of absence in May of 2014; is
11    that right?
12         A.   Yes.  I thought you said May 24th, I'm
13    sorry.
14         Q.   May of 2014?
15         A.   Yes.
16         Q.   Okay.  And we talked about that earlier.
17    I just wanted to get the actual dates in the record,
18    okay?
19         A.   Okay.
20         Q.   You don't have any reason to dispute that
21    this was when you were on leave previously?  It's
22    consistent with your memory; is that right?
23         A.   I believe so, and there's e-mails between
24    I and Dr. Schwulst about my leave at the time, so
25    that could, you know, concur with this as well.
```

```
 1                        D. Trahanas
 2        Q.   Okay.  But you did -- you had something
 3   wrong with your ankle or foot; is that right?
 4        A.   Yes.  I had severe ligament sprains.  I
 5   was in a boot, and I had a sprained wrist.
 6        Q.   Okay.
 7        A.   But I was working during that time via
 8   remote log-in.
 9        Q.   Okay.
10                        (Exhibit 62 was marked for
11                         identification.)
12   BY MS. WERMUTH:
13        Q.   Okay.  You've been given Deposition
14   Exhibit 62 now, and again, I'm going to represent to
15   you that these are notes that we received from the
16   EEOC in connection with our FOIA request, but it
17   looks according to these notes that there was either
18   a conversation of some sort between you and the EEOC
19   on September 25th -- 24th, 2015.
20             Does that -- is that consistent with your
21   memory?
22        A.   It's possible.  I don't specifically
23   recall that date or --
24        Q.   Okay.
25        A.   Is this a meeting?
```

Page 358

1                        D. Trahanas

2        Q.   Well, I'm asking you that.  Again, these

3   are not your notes.  I recognize these are documents

4   that we got from the EEOC.  I'm wondering if this

5   helps you remember when you met with the EEOC.

6        A.   It's possible this was my second meeting

7   that I was referring to earlier.

8        Q.   Okay.  All right.  And then you did, in

9   fact, file a charge of discrimination with the EEOC

10  on that same date; is that right?

11       A.   I would think that it was filed

12  June 28th of 2015, as reflected on Exhibit 59.

13       Q.   Okay.  We will mark your charge.

14       A.   Okay.

15                      (Exhibit 63 was marked for

16                       identification.)

17  BY MS. WERMUTH:

18       Q.   All right.  So Deposition Exhibit 63 -- is

19  the charge marked 62?  Which document is marked 63?

20       A.   62 is the charge.

21       Q.   According to this, it looks like you filed

22  on September 24th, 2015; is that right?

23       A.   Yes, received at the bottom I see.

24       Q.   Okay.  And that's your -- well, there's

25  your signature in the lower left --

1                          D. Trahanas

2        A.    Yes.

3        Q.    -- right?

4              That is your signature, correct?

5        A.    Yes.

6        Q.    And September 24th, 2015, is the date next

7    to your signature, right?

8        A.    Yes.

9        Q.    And according to this charge, dates

10   discrimination took place, it's typed in there

11   5/24/2015 as the last date of discrimination; is

12   that right?

13       A.    Yes.

14       Q.    Okay.  And you reviewed this before you

15   signed it; is that right?

16       A.    More than likely I at least glanced at it,

17   yes.

18       Q.    Okay.  Well, you were declaring under

19   penalty of perjury that the above information was

20   true and correct?

21       A.    Right.

22       Q.    So you probably more than glanced at it?

23       A.    Yeah.

24       Q.    Okay.  And there's some initials next

25   to -- there's like a handwritten change with the box

```
1                         D. Trahanas
2    checked "Retaliation," and then there's initials
3    there.
4              Do you see that?
5        A.   KH.
6        Q.   Can you explain to me what that is?
7        A.   I have no idea.
8        Q.   Did you handwrite in the checkmark for
9    "Retaliation"?
10       A.   I don't know what that stands for, and I
11   can't recall writing it.  I would have no guess as
12   to what that is.
13                        (Exhibit 64 was marked for
14                         identification.)
15   BY MS. WERMUTH:
16       Q.   Okay.  And then Deposition Exhibit 64 is
17   your dismissal notice and right to sue letter; is
18   that right?
19       A.   Yes, it is.
20       Q.   And it's dated September 29th of 2015?
21       A.   Correct.
22       Q.   Okay.  And there's a checkmark in the box
23   that says, "The EEOC issues the following
24   determination:  Based upon its investigation, the
25   EEOC is unable to conclude that the information
```

```
 1                        D. Trahanas
 2    obtained establishes violations of the statutes."
 3              Do you see that?
 4         A.   I do see that checkmarked.
 5         Q.   Okay.  And you received this dismissal
 6    notice?
 7         A.   I'm sure I did.
 8         Q.   Okay.
 9         A.   So as I look at it right now, it's
10    probably Katarzyna who initialed the retaliation.
11         Q.   Okay.  And was that on there before --
12    Katarzyna Hammond is the investigator?
13         A.   That would be my guess.  I just saw KH,
14    and that's what I'm assuming.  I don't know if
15    that's true or not.
16         Q.   Okay.  When you signed this, was that box
17    marked and were those initials there?
18         A.   The X is mine.  The KH, like I said, I
19    don't know if she did that with me in the room or
20    she did that after.  I'm not sure.
21         Q.   Wait.  So you put the X in the box?
22         A.    If I signed it I'm assuming that I filled
23    it out or helped fill it out.
24         Q.   As you sit here right now, do you know
25    whether or not you put that X in the "Retaliation"
```

Page 362

1                         D. Trahanas

2    box?

3         A.   No, I can't definitively say at this time

4    whether that's my X or not.

5         Q.   Okay.  And can you say at this moment

6    whether or not that X was there when you signed it

7    on September 24th, 2015?

8         A.   At this moment I can't recall.

9         Q.   I appreciate everybody's patience.  Let's

10   see.  I'm having trouble finding a document.

11              Mark that, please.

12                      (Exhibit 65 was marked for

13                       identification.)

14   BY MS. WERMUTH:

15        Q.   You have now been handed what's been

16   marked Deposition Exhibit 65, which is a document

17   that you've produced to us.

18              There's handwriting on this document.  Is

19   that your handwriting?

20        A.   Yes.

21        Q.   Okay.  And what is this document?

22        A.   This is a list of medical schools to which

23   AMCAS allows you to apply to.

24        Q.   Okay.  Can you tell me which of these

25   schools you applied to in the 2015 cycle?

Page 363

                              D. Trahanas

1

2       A.   They're listed in the interrogatories I'm

3  pretty sure.  Right now I have to go through this

4  entire thing.

5       Q.   Okay.  So your Answers to Interrogatories

6  indicate which schools you applied to?

7       A.   If not in the interrogatories, my

8  Complaint or somewhere else; they've been listed.

9       Q.   Okay.  You're right.  Okay.  So let me

10  just get your interrogatory answers, and we will cut

11  to the chase that way.

12                      (Exhibit 66 was marked for

13                      identification.)

14  BY MS. WERMUTH:

15       Q.   Okay.  So looking at Page 8 of Deposition

16  Exhibit 66 --

17            MR. DeROSE:  Of the Second Amended

18  Complaint you mean?

19            MS. WERMUTH:  Did I give you the Second

20  Amended Complaint?

21            THE WITNESS:  Oh, yeah, this is --

22            MS. WERMUTH:  I intended to mark the

23  Answers to Interrogatories.

24  BY MS. WERMUTH:

25       Q.   Okay.  So Page 8 of the Answers to

1                    D. Trahanas

2    Interrogatories has your signature, right?

3         A.    Yes.

4         Q.    And that signature, you're certifying that

5    you're declaring under penalty of perjury that the

6    information in the Answers to Interrogatories is

7    accurate?

8         A.    Correct.

9         Q.    Okay.  And so Interrogatory Number 16 has

10   you list -- you list all the schools that you

11   applied to in the 2015 cycle?

12        A.    Correct.

13        Q.    Okay.  And which of those schools did you

14   also apply to in the more current, the current

15   cycle?

16        A.    I would have to look.

17        Q.    And you can look and let us know, correct?

18        A.    I can give you one.

19        Q.    Yeah, go ahead and give me which you know

20   for sure.

21        A.    You know what, there's two Florida ones,

22   so I don't want to -- I don't want to misstate which

23   of the two.  So if I could, I would just rather wait

24   to make sure that it's accurate.

25             MS. WERMUTH:  Okay.  And, John, you will

```
 1                        D. Trahanas
 2   agree to produce the information about the current
 3   cycle?
 4            MR. DeROSE:  Right.  Will you tell me what
 5   the exhibit number is that you're looking at?
 6            MS. WERMUTH:  It is 66.
 7            MR. DeROSE:  Thank you.  You've got to
 8   give it to me in a letter.
 9            MS. WERMUTH:  I will do that.  We have a
10   lot of follow-up to do, absolutely.
11            MR. DeROSE:  All right.
12   BY MS. WERMUTH:
13       Q.   Okay.  And then you also in your Complaint
14   indicate which schools you actually talked to about
15   the letters of evaluation submitted by Dr. Schwulst,
16   right?
17       A.   Correct.
18       Q.   And with some of those schools you have
19   information about who you spoke with and other
20   schools you just do not --
21       A.   Correct.
22       Q.   -- right?
23            And all of the people that you spoke with
24   you did by telephone, correct?
25       A.   Yes.
```

```
 1                        D. Trahanas
 2       Q.   Okay.  And all of those people -- do you
 3  have the Complaint?
 4            Okay.  So do you want to get Exhibit 25 in
 5  front of you, which is the Complaint.
 6            MR. DeROSE:  It would be a bigger
 7  document.
 8            THE WITNESS:  Oh, yes.
 9  BY MS. WERMUTH:
10       Q.   Okay.  And if you'd look at Page 23.
11       A.   Yes.
12       Q.   Okay.  So, for example, in subpart A, you
13  spoke to someone named Kelly at Central Michigan
14  University, but you don't know Kelly's last name?
15       A.   No.
16       Q.   And you don't know Kelly's position?
17       A.   Just an administrator I'm sure in the
18  dean's office.
19       Q.   But you don't specifically know --
20       A.   No.
21       Q.   -- Kelly's position, correct?
22       A.   No.
23       Q.   And at FIU you spoke to an unidentified
24  female, correct?
25       A.   Correct.
```

1                        D. Trahanas

2        Q.   And you don't know either the identity of

3   the individual or her position, correct?

4        A.   Oftentimes they don't -- they won't

5   release that information, so correct, I don't

6   remember -- or I did not know or wasn't told.

7        Q.   Okay.  So the specific people that you --

8   so F is where you know somebody in specific,

9   Toni Sorrentino at Quinnipiac?  I don't know how to

10  say that word.

11       A.   Yes.

12       Q.   And do you know what his position or her

13  position was?

14       A.   She was an administrator in the dean's

15  office at that school.

16       Q.   And how do you know that?

17       A.   To my best -- to my knowledge, to my

18  memory.

19       Q.   And the only other person you identified

20  is at Florida Atlantic University, someone who

21  identified himself as Eddie?

22       A.   Yes.

23       Q.   Okay.  And you don't know what Eddie's

24  position was?

25       A.   He answered the phone, so no.  He

1                       D. Trahanas

2    didn't -- he didn't tell me.

3         Q.   After leaving Northwestern University, did

4    you begin looking for work?

5         A.   Yes.

6         Q.   Okay.  You actually began looking for work

7    before you left Northwestern University, right?

8         A.   I began looking for work while I was

9    employed, while I was Dr. Schwulst's research tech

10   because of how stressed I was.

11        Q.   And in 2015 after you actually left the

12   university you did get an interview with another lab

13   at Northwestern University; is that right?

14        A.   Yes.

15        Q.   Okay.  Who did you interview with?

16        A.   I don't remember their name.

17        Q.   Do you remember whose lab you were

18   applying to?

19        A.   I can try and look at the website and see

20   if a name sticks out at Northwestern, but right now

21   I don't recall as I sit here.

22        Q.   And you have no reason to believe that

23   Dr. Schwulst was involved in any way with your

24   application to that particular lab with which you

25   got an interview; is that right?

1                         D. Trahanas

2       A.   I would have no way of knowing that.

3                         (Exhibit 67 was marked for

4                         identification.)

5  BY MS. WERMUTH:

6       Q.   Okay.  Ms. Trahanas, can you tell me what

7  Deposition Exhibit 67 is?

8       A.   It's titled Northwestern Application

9  Summary.

10      Q.   Right.  Well, you produced this to us, so

11  I'd like to know what this is.

12      A.   I believe when -- in your interrogatories

13  you requested for proof of -- proof of searching for

14  work.  I can't remember specifically which

15  interrogatory.  But I remembered applying at

16  Northwestern's jobs, and so I went into my

17  Northwestern account and found this.

18      Q.   Okay.  And so these were -- this shows

19  three jobs that you applied for at Northwestern

20  University?

21      A.   Yes.

22      Q.   Can you tell when you applied for those

23  jobs?

24      A.   I can't -- I can't -- I don't remember.

25      Q.   Was it before you left the university or

Page 370

1                           D. Trahanas

2    after you left the university?

3         A.   Well, if we look at the job ID number with

4    the job ID numbers that you guys gave us -- I'm

5    sorry, not guys but Northwestern provided us with,

6    I'm sure I'd be able to tell you.  It says which

7    date -- which job coincides with which date.

8         Q.   Okay.  Did you apply for more than three

9    jobs?

10        A.   At Northwestern?

11        Q.   Yes.

12        A.   After I was terminate -- or you're saying

13   in 2015 or throughout?

14        Q.   Well, let's start with after you left the

15   university.

16        A.   Yes.

17        Q.   How many did you apply for at

18   Northwestern?

19        A.   I can't give you an exact number.

20        Q.   Okay.

21        A.   More than 20.

22        Q.   More than 20 jobs at Northwestern

23   University?

24        A.   I believe so, yes.

25        Q.   Are you sure about that?

1                          D. Trahanas

2          A.   Like I said, I can't give you a number for

3     certain.

4          Q.   Would the job log that we produced, is

5     that consistent with your memory of how many jobs

6     you applied for?

7          A.   I know that we also gave you a job log

8     from the employment office for which there were lots

9     of applications to Northwestern, so it wasn't just

10    only in Northwestern's job log.  It was also my

11    unemployment log that we supplied.

12                         (Exhibit 68 was marked for

13                         identification.)

14    BY MS. WERMUTH:

15         Q.   Just so I know what that is, can you tell

16    me what this document is, Exhibit 68?

17         A.   These are my notes.

18         Q.   These are the notes of the conversations

19    with the folks at the medical schools to which you

20    applied that are referenced in the Complaint that we

21    just looked at?

22         A.   Correct.

23         Q.   Okay.  And were those notes all taken the

24    same day?

25         A.   Yes.  They were with each phone call.

1                        D. Trahanas

2        Q.    Okay.  But so did you sit down on one day

3    and make all of these phone calls?

4        A.    To the best of my recollection, all of

5    these phone calls were made in one day.

6        Q.    And when did you make these phone calls?

7    There's no date on the document.

8        A.    From what I can remember, it was mid

9    March, maybe end of March.

10        Q.    2015?

11        A.    Correct.

12        Q.    Okay.

13                         (Exhibit 69 was marked for

14                         identification.)

15    BY MS. WERMUTH:

16        Q.    Can you tell me what Deposition Exhibit 69

17    is?

18        A.    It's a copy of my -- a version of my CV.

19        Q.    Okay.  And is this a current version?

20        A.    Well, the margins and stuff have changed,

21    so no.  I'm sure I've fixed that.  And I would --

22    it's -- I can update -- it's been updated.  There's

23    several updates to this.

24        Q.    Did you use this particular resumi¿½ to

25    apply for any jobs after you left Northwestern

1                          D. Trahanas

2    University?

3         A.    To those jobs that I sent you for the

4    interrogatories, yes.

5         Q.    Okay.  So when I look at research

6    experience on the first page, I see that from 2012

7    to 2015 you have yourself listed as a research

8    scientist and a lab manager --

9         A.    Yes.

10        Q.    -- at Northwestern, right?

11        A.    Yes.

12        Q.    Even though your title was Research

13   Technologist 2?

14        A.    My title was.  My job wasn't.

15        Q.    Okay.  And then from 2011 to 2012 you have

16   yourself listed as both a lab manager and a senior

17   research technologist at the University of Chicago.

18             Do you see that?

19        A.    Yes.

20        Q.    But your title at the University of

21   Chicago was Research Technologist 1?

22        A.    Yes, but my duties were everything.

23        Q.    But you did not have the title senior

24   research technologist?

25        A.    I didn't have -- no.

Page 374

                              D. Trahanas

1

2       Q.   Okay.  Can I get that marked.

3                      (Exhibit 70 was marked for

4                      identification.)

5    BY MS. WERMUTH:

6       Q.   Can you tell me what this exhibit is?

7            MR. DeROSE:  This is 70, Counsel?

8            MS. WERMUTH:  Yes.

9            THE WITNESS:  This is a resumï¿½ format of

10   my CV.

11   BY MS. WERMUTH:

12      Q.   Okay.  And is this a resumï¿½ that you're

13   using in your job search or have used in your job

14   search since leaving Northwestern University?

15      A.   Yes.

16      Q.   Okay.  And, again, at Northwestern you

17   describe your position as being research scientist

18   and lab manager; is that right?

19      A.   Yes.

20      Q.   Okay.  At University of Chicago you

21   describe your position as being lab manager and

22   researcher?

23      A.   Yes.

24      Q.   Okay.  And are you currently using

25   Deposition Exhibit 70 in your job search now?

                              D. Trahanas

1

2      A.    It's been updated with my other

3  publications.  I've had subsequent publications, so

4  it's been updated.

5      Q.    When did you update it?

6      A.    2016 possibly, end of 2015.

7      Q.    Is there any reason why you didn't give us

8  your updated version?

9      A.    Not specifically.  I mean, I may have

10 labeled this just resume, and so this is the one

11 copy that I thought was it.  But I can certainly

12 give you the -- if there is an updated one or if I

13 did change anything.

14     Q.    And the subsequent publications that you

15 referred to are the ones, are the publications that

16 came out of the work that you did in Dr. Schwulst's

17 lab?

18     A.    That's one, and another is from my work at

19 Northern Illinois University.

20     Q.    Which that work preceded the period of

21 time that you were in Dr. Schwulst's lab; is that

22 right?

23     A.    Yes.

24     Q.    But the publication came out after?

25     A.    Yes.

```
1                           D. Trahanas

2         Q.   After 2015?

3         A.   I believe it's 2017.

4         Q.   Oh, did you continue to work on the

5    manuscript between 2015 and 2017?

6         A.   Not experiment wise, but in terms of

7    reviewing the article, yes.

8         Q.   Okay.  But you weren't doing the

9    underlying research?

10        A.   No.

11                      (Exhibit 71 was marked for

12                       identification.)

13   BY MS. WERMUTH:

14        Q.   You have been given Deposition Exhibit 71.

15             What do you recognize that document to be?

16        A.   An updated version of my CV.

17        Q.   Okay.  And does it differ in any -- well,

18   we can figure out if it differs.

19             Is this the one that you're currently

20   using in your job search?

21        A.   Yes.

22                      (Group Exhibit 72 was marked for

23                       identification.)

24   BY MS. WERMUTH:

25        Q.   Okay.  Do you recognize Deposition
```

Page 377

```
 1                        D. Trahanas
 2    Exhibit 72?  I can call this a group one.
 3              It's a series of cover letters; is that
 4    right?
 5         A.   Yes.
 6         Q.   Okay.  And what are the dates on these
 7    letters?  I can't tell.  Can you tell?
 8         A.   No.  I mean, they're not written on the
 9    sheet of paper.  I'm trying to see if I can remember
10    what dates they were sent out.
11              No, they're not written.
12         Q.   Did you get any of these jobs or were you
13    offered any of these jobs?
14         A.   No.
15         Q.   Okay.  Have you been offered a job that
16    you've declined since being -- since leaving
17    Northwestern University?
18         A.   Recently, yes.
19         Q.   Okay.  And what was that job?
20         A.   It was a sales position, something to do
21    with solar energy from what I understood it.  It's a
22    newer company.
23         Q.   And you declined the offer?
24         A.   It seemed like a sketchy place, so I
25    didn't trust them, so yeah.  They didn't offer me --
```

Page 378

                              D. Trahanas

1

2    they invited me for a second interview, and I

3    declined the second interview.

4        Q.   And are there documents -- wait.  I

5    thought you said they offered you a job.

6        A.   I meant like an interview.

7        Q.   Okay.  So here's my question.  Let me go

8    back to my question.

9        A.   Okay.

10       Q.   Is there any job or position that you've

11   been offered since leaving Northwestern University

12   that you have declined?

13       A.   No.

14       Q.   Okay.  Can we get this marked, please.

15                    (Exhibit 73 was marked for

16                    identification.)

17   BY MS. WERMUTH:

18       Q.   You've now been handed Deposition

19   Exhibit 73.

20            Is this the job search log that you were

21   referring to previously?

22       A.   Yes, the unemployment search log, I

23   believe so.

24       Q.   Okay.  So you kept records it looks like

25   from July of 2015 to October of 2015.

Page 379

                              D. Trahanas

1

2            Why did you stop keeping records of your

3    job search activities?

4        A.    This was via the unemployment website, so

5    I -- after unemployment ends you're no longer

6    granted access.

7        Q.    Well, how many months of unemployment did

8    you receive?

9        A.    I can't say.  I can't say precisely.  I

10   don't know.

11       Q.    Okay.  And are there any other documents

12   other than this job log that show that you applied

13   for these jobs, cover letters, communications with

14   these employers, any other documents that you have

15   that you haven't produced as it relates to these

16   jobs?

17       A.    I mean, some of the cover letters, I would

18   have to look and see if some of these are this.

19       Q.    So other than the four cover letters that

20   we looked at --

21       A.    Correct.

22       Q.    -- are there any other documents?

23       A.    There might be, or I wrote over these

24   because they're relatively all very similar, so

25   either as I went I would just alter the title and

Page 380

```
1                    D. Trahanas
2   the position and the company.
3            And so I wouldn't have like let's say 150,
4   or I'm not sure how many jobs are in here, I
5   wouldn't have like 160 versions of a cover letter.
6   I would just replace, like I said, the position and
7   the institution that I was applying to more or less.
8       Q.   Did you keep records after October 27th of
9   2015 about any of the jobs that you applied for?
10      A.   I'm sure there are records, but I would
11  have to Google probably any company that's bio
12  related within a 100-mile radius and check with each
13  website to conclude if yes or no.
14      Q.   That's not my question.  So my question
15  is, did you retain any documents related to your job
16  search after the date of this log, October 25th --
17  October 27th, 2015?
18      A.   Unless I -- they sent me an e-mail
19  confirming my job application, I don't have other
20  like -- I never made like an Excel file or list like
21  this.  That would be the only records I would have.
22      Q.   Well, let's say you applied online.  Would
23  you have printed a copy for purposes of this
24  litigation of the online application before
25  submitting it?
```

                          D. Trahanas

1

2        A.    From 2015?

3        Q.    From 2015 to the present.

4        A.    I haven't printed it out, no.

5        Q.    Okay.

6        A.    Like I said, I would have to go back to

7    each place and check and see if I did apply that

8    year or when I did or if I did.  There's like a

9    thousand companies.

10       Q.    You're telling me you applied to a

11   thousand companies?

12       A.    No, I'm just saying there are a thousand.

13   I don't remember right as I sit here which ones I

14   applied to one position or ten positions or none.

15       Q.    Okay.  So you can't tell us how many

16   companies -- after the date of this log, you can't

17   tell us exactly where you applied, how many

18   applications you made, and what the results of those

19   applications were?

20       A.    As I sit here, not accurately.

21       Q.    And you didn't search your e-mails for any

22   confirmation e-mails from prospective employers, you

23   didn't -- in connection with answering the requests

24   for production in this case?

25       A.    I did search, but, I mean, with promotions

1                          D. Trahanas

2    and, I mean, any type of search that you do on

3    Gmail, if you type in "job" in the Gmail account,

4    it's going to have like 14,000 e-mails.  So to the

5    best that I could, yeah, I provided you with

6    everything I could.

7         Q.   So the only e-mails that I -- and I don't

8    even know if these are e-mails -- that I got from

9    you showing job search efforts, I'll present them to

10   you.

11        A.   For the record we also did state it's

12   ongoing.

13        Q.   So you have an obligation ongoing to

14   preserve all the records related to your job search

15   efforts, right?  You understand that, right?

16        A.   From the time that -- the interrogatories,

17   yes.

18        Q.   No, from the time that you go to the EEOC,

19   right?

20             MR. DeROSE:  No, Counsel, I don't know

21   that that's true.  We will give you anything we get

22   from the day we give you our discovery onward.

23   No -- I don't know of the requirement at the EEOC.

24             MS. WERMUTH:  Certainly at the date of the

25   Complaint.

1                          D. Trahanas

2              MR. DeROSE:  The filing of the Complaint

3    we are preserving things.  We're not throwing

4    anything out.  You can rest assured of that.  And

5    you've gotten volumes, as you know.

6              MS. WERMUTH:  But I've not gotten job

7    search records other than this log and the four

8    cover letters and the two e-mails that I'm going

9    to -- I don't know if they're e-mails, but let's

10   mark this, please.  Thank you.

11                        (Exhibit 74 was marked for

12                         identification.)

13   BY MS. WERMUTH:

14       Q.   Okay.  Deposition Exhibit 74, it looks

15   like you had an e-mail communication in July of 2015

16   with Elspeth Morrison Beauchamp, a post-doctoral

17   fellow in somebody's lab.

18       A.   This was a -- sorry.

19       Q.   Go ahead.

20       A.   This was the job I was -- that you had

21   asked me earlier about that I was referring to at

22   Northwestern with the interview.

23       Q.   Okay.  And it looks like you set something

24   up for July 30th at 1:30.

25              Did that interview actually take place?

Page 384

                         D. Trahanas

1

2      A.   Yes, to the best of my knowledge.  I would

3  have no reason to think otherwise.

4      Q.   You don't recall interviewing at

5  Northwestern University a month after leaving, two

6  months after leaving?

7      A.   I mean, there were a million things going

8  on at that time.  I can't say for certain.  I mean,

9  I set it up, so I would have no reason to believe I

10  wouldn't go.

11      Q.   Do you keep an electronic calendar?

12      A.   No.

13      Q.   In 2015 did you keep an electronic

14  calendar?

15      A.   No.

16      Q.   So you don't use the Gmail calendar

17  function?

18      A.   No.  It doesn't -- I don't -- I don't like

19  it, no.

20      Q.   Do you keep a paper calendar?

21      A.   No.

22      Q.   You just remember your appointments in

23  your head?

24      A.   Yes.

25      Q.   Can I get that marked, please.

Page 385

```
 1                    D. Trahanas
 2               (Exhibit 75 was marked for
 3               identification.)
 4          MR. DeROSE:  Wait a minute, I want to go
 5   on the record.  We have taken one break in the
 6   morning session for about five minutes before we
 7   took a half hour lunch; and then the afternoon
 8   session we've probably taken a five-minute break.
 9          So whatever time it is, I'm going to look
10   for a similar courtesy --
11          MS. WERMUTH:  I understand.
12          MR. DeROSE:  -- when I depose your
13   witnesses.
14          MS. WERMUTH:  I understand.  I do
15   appreciate that.
16          MR. DeROSE:  I don't want you to make
17   light of how my -- maybe at the end of the dep I'd
18   like to agree on how much time we spent today in the
19   dep.
20          MS. WERMUTH:  Okay.
21   BY MS. WERMUTH:
22      Q.   Okay.  This is the only other e-mail that
23   I saw related to some sort of job search efforts,
24   although I can't -- I can't tell if you actually
25   sent in a resume or not.
```

1                     D. Trahanas

2           Do you know?

3     A.    Is your copy clearer?  Because I'm not

4  sure if that's --

5     Q.    No.

6     A.    Okay.

7     Q.    I can't read it at all.

8     A.    Okay.

9     Q.    Can you tell me the date on that?

10    A.    In the middle where I respond hello Anne,

11 it looks like it says something 2016.  I don't know

12 what month and day that is.  But that's the most I

13 can make out from this copy.  I can't recall if I

14 sent a CV or resumï¿½ or followed up.

15    Q.    Okay.  Okay.  You're currently working at

16 a dental office?

17    A.    Yes.

18    Q.    How many hours a week?

19    A.    It's intermittent.

20    Q.    What's your rate?

21    A.    15 an hour.

22    Q.    When did you start working there?

23    A.    2016, fall of 2016.

24    Q.    And on average how many hours a week do

25 you work?

1                          D. Trahanas

2         A.    Like I said, it's intermittent; so if

3    there's other people in the dental office that are

4    gone, I fill in for them.

5         Q.    It's literally just a fill-in job?

6         A.    At one point in time it was for six, seven

7    months, and then subsequently it's intermittently.

8         Q.    Okay.  And why did the number of hours --

9    or why did it become an intermittent job?  Was that

10   your choice?

11        A.    Yeah.  I mean, if I can go she would love

12   me to go.  It's just I had -- it was at the time I

13   was taking classes or perhaps I was shadowing

14   another doctor, so I had to make time to ensure that

15   I was fulfilling shadowing hours or observation.

16        Q.    Okay.  And you were doing those shadow

17   hours and observation for purposes of your medical

18   school application?

19        A.    Correct.

20        Q.    Okay.  And when did you start doing

21   shadowing and observations?

22        A.    2016 towards the end, maybe the beginning

23   of -- towards the end of 2016.

24        Q.    Okay.  So by deciding to focus on getting

25   into medical school and doing that shadowing, that

1                               D. Trahanas

2    interfered with your ability to get full-time

3    employment, would you -- or to work full-time?

4         A.   No.   The position, that position didn't

5    have a full-time position.   She has three people

6    that work in the office, who some -- because each

7    specific day that one of us goes someone handles

8    only like errands or ordering.   Sometimes, you know,

9    I'll do finances.

10        Q.   I think you're going a little bit beyond

11   the question, so let me ask you this:   Are you still

12   currently looking for full-time employment?

13        A.   Yes.

14        Q.   In late 2016 were you looking for

15   full-time employment?

16        A.   Yes.

17        Q.   Okay.   But I thought you just testified

18   that you couldn't work more hours at the dental

19   office because you were spending time in class and

20   doing observations?

21        A.   I didn't -- I didn't say more hours.   The

22   days that she's open and the times are very

23   specific.   So those specific hours of operation,

24   like I said, some days she needed me one day and

25   that week I would be in class perhaps.

1                          D. Trahanas

2          Q.    When is the last time you made an

3   application for full-time employment?

4          A.    Oh, three weeks ago, two weeks ago.

5          Q.    And you have those documents to give your

6   lawyer?

7          A.    I can give it to -- I can give it to him,

8   yes.

9          Q.    And who is that employer that you applied

10  with?

11         A.    It's multiple.

12         Q.    Three weeks ago?

13         A.    Yes.

14         Q.    How many?

15         A.    At least ten.

16         Q.    All on the same day?

17         A.    The same week.

18         Q.    Are you driving for Uber?

19         A.    I do.

20         Q.    How frequently?

21         A.    It depends on -- it depends on multiple

22  factors and time of day, you know, demand.  There's

23  certain times that Uber would prefer drivers, and

24  they have certain promotions to have you fulfill.

25         Q.    When did you start driving for Uber?

Page 390

1                          D. Trahanas

2        A.    February of 2017.

3        Q.    And you're also a soccer coach?

4        A.    Yes.

5        Q.    And, I'm sorry, do you get a 1099 from

6   Uber?

7        A.    I'm not sure.  It's my first year, so I'll

8   find out I guess in the next couple weeks.

9        Q.    Okay.  So I'll ask for a couple of the

10  1099 and the W-2s from the dental office.

11              What about the soccer coaching, what's

12  your pay rate for that?

13       A.    There's two different clubs.

14       Q.    Okay.

15       A.    So one is $50 an hour, the other is 60.

16       Q.    And how many hours a week -- $60 an hour?

17       A.    Yes.

18       Q.    How many hours a week do you work at those

19  jobs?

20       A.    It depends on the season, but it could be

21  anywhere from six to ten hours or none depending on

22  the week.  We also have to go to games, but that's

23  not paid time.

24       Q.    You don't get paid to be at a game?

25       A.    No.

Page 391

1                         D. Trahanas

2          Q.   Do you get a W-2 from the soccer club,

3    either soccer club?

4          A.   I know from the Nazarene United one

5    because I've worked with them for a few years, I

6    believe it's a W-2.  And I'm sure the other one is

7    also going to be a W-2.

8          Q.   Okay.  And when did you start working --

9    you said the Nazarene one, you've worked for them

10   for how many years?

11         A.   Probably end of 2015.

12         Q.   Okay.  And the other one you've worked at

13   for how long?

14         A.   I just started last year, so July of 2017.

15         Q.   One last document.

16                         (Exhibit 76 was marked for

17                         identification.)

18   BY MS. WERMUTH:

19         Q.   You've been handed Deposition

20   Exhibit 75 -- 76, which looks like two separate

21   pages.  Can you tell me what these items are?

22         A.   You guys asked for notes, any electronic

23   or otherwise notes, and I happened to come across

24   these on my computer, so I provided them.

25         Q.   Okay.  So they're just like in a Word

1                          D. Trahanas

2    document or what kind of system?

3         A.   It's on a Mac.  It's Notepad.

4         Q.   Got it, okay.  Both of these are on --

5         A.   It's one page.  I just don't know how it

6    can print on one page.

7         Q.   Okay.  Well, except that there's two

8    different dates on these.

9              Do you see that?  So there's a date on the

10   first page of December 16, 2015, and then there's a

11   date on the second page of October 30th, 2017.

12        A.   That's the date that it was printed.  If

13   you look on the left --

14        Q.   Okay, notes on my -- okay.

15        A.   -- it says notes on my computer, and

16   that's the day it was printed.  The big, I guess the

17   big date, the big font is the font of Notepad.

18        Q.   Okay.  Well, on the first page, the lower

19   left says Google -- mail.google.com, right?

20        A.   Yes.

21        Q.   All right.  So is this a Google Mail

22   document?  Is this a Notes document?

23        A.   No, I had to -- in order to print it I had

24   to e-mail it to myself so I could print it.  I don't

25   have a printer at home.

Page 393

1                          D. Trahanas

2          Q.    When did you write these notes for the

3    first time?

4          A.    December 16th of 2015.

5          Q.    Okay.  Now, according to these notes, I

6    have just a couple quick questions, in the middle it

7    says "E-mailed Harris."

8                Do you see that?

9          A.    Yes.

10         Q.    "To seek advice about a few co-workers

11   sabotaging my work and Steve making me uncomfortable

12   with the sexual harassment discrimination comments."

13               So I have not seen an e-mail that

14   explicitly says either one of those things from you

15   to Harris Perlman.

16               Do you know when you supposedly sent this

17   e-mail?

18         A.    There was an e-mail where Harris dodged

19   for like months.

20         Q.    Was it from your Gmail account?

21         A.    I can't definitively say if it was Gmail

22   or my Northwestern account.

23         Q.    And in the e-mail were you specific about

24   what you wanted to talk to him about?

25         A.    To the best of my recollection, honestly,

Page 394

                              D. Trahanas

1

2    to get him to meet with me I probably was very

3    vague.

4         Q.   So you didn't use the words "sexual

5    harassment" in your e-mail to him?

6         A.   Probably not.

7         Q.   Okay.  Or the word "discrimination"?

8         A.   Probably not.

9         Q.   Okay.  And so when you e-mailed, according

10   to this note, Harris Perlman, I know you don't know

11   which e-mail account you e-mailed -- which of your

12   e-mail accounts you used, but did you e-mail him at

13   his Northwestern account or at some other like Gmail

14   type account?

15        A.   I don't know.

16        Q.   Okay.  All right.  Then underneath that

17   paragraph, "Why I don't dress like Rana to work."

18             Do you see that?

19        A.   Yes.

20        Q.   What is that a reference to?

21        A.   Rana would dress rather specifically to

22   work every day.

23        Q.   And how was that?

24        A.   Stiletto heels, short shorts and low tops.

25        Q.   Did you guys wear lab coats in the lab?

Page 395

D. Trahanas

1

2      A.    Unless we knew that we were going to be --
3  unless we knew that the lab was going to be I guess
4  looked at for the day, they were going to come and
5  do I guess an inspection, no, we wouldn't.

6      Q.    Okay.  And this note here isn't because
7  someone supposedly said this to you.  You're
8  explaining why you don't dress like Rana; is that
9  right?

10     A.    Dr. Schwulst said that to me one time.

11     Q.    When?

12     A.    It was in the lab.  He was sitting at his
13  desk, I was sitting at mine, and Rana came over and
14  as she walked away he asked me.

15     Q.    Can you give me a date?

16     A.    Not definitively.

17     Q.    Can you give me a year?

18     A.    I don't recall.

19     Q.    And you never complained to anyone in HR
20  about that comment, correct?

21     A.    Not to HR.

22     Q.    Or anyone in the administration?

23     A.    Not the administration.

24     Q.    Or anyone in management in the lab?

25     A.    Not management.

1                          D. Trahanas

2              MS. WERMUTH:   Okay.   I have no further

3    questions.

4              MR. DeROSE:   I'm going to need about five

5    minutes, but before I do that, Mr. Reporter, can you

6    give us an idea how long you think this dep took

7    today to this point?

8              THE COURT REPORTER:   Can we go off the

9    record?

10             MR. DeROSE:   Surely, of course.

11                         (Whereupon, an off-the-record

12                         discussion was held.)

13                         EXAMINATION

14   BY MR. DeROSE:

15        Q.   Get in front of you 76.

16             Now, these notes, as I understand, what

17   you're telling us, you made these on December 16,

18   2015?

19        A.   Correct.

20        Q.   All right.   And where you got the words

21   counsel just asked you about, "Why I don't dress

22   like Rana to work," did somebody ask you that?

23        A.   Yes, Dr. Schwulst said that to me.

24        Q.   And he asked you that sometime before

25   December 16, 2015?

Page 397

```
 1                      D. Trahanas
 2        A.   Yes.
 3        Q.   And you've already described how Rana
 4   comes to work.
 5             Does she come to work dressed that way on
 6   a regular basis?
 7        A.   Yes.
 8        Q.   And you never wear short shorts when you
 9   go to work?
10        A.   No.
11        Q.   Or low-hanging blouses?
12        A.   No.
13        Q.   Did he say why he was asking you why you
14   don't dress like Rana?
15        A.   He was not explaining why.
16        Q.   All right.  Did you feel offended in some
17   way?
18        A.   Of course.
19        Q.   Why?
20             It's going to take a long time if you just
21   can't answer the question quicker than that.
22        A.   Because he already -- he already had bias
23   towards Rana with other things, and I felt that the
24   only reason why possibly had something to do with
25   the way she dressed.  So I was sad because I felt
```

D. Trahanas

1

2    that I would never be able -- I wouldn't dress like

3    that, so I would be not able to, you know, be like

4    Rana I suppose.

5         Q.    When you say you wouldn't be able to dress

6    like that, did you find something about Rana's dress

7    different than -- how would you describe Rana's

8    dress yourself as a woman?

9         A.    Inappropriate for a laboratory.

10        Q.    What was inappropriate about it?

11        A.    The heels, that's -- I mean, open-toed

12   heels, in case of an emergency she wouldn't be able

13   to run.

14        Q.    What about the shorts?

15        A.    Very revealing.

16        Q.    In what way?

17        A.    They would show -- basically they were all

18   the way up to her thighs where your thigh starts

19   to -- and it revealed some of a back portion of her

20   body.

21        Q.    Were there times when those of you who

22   were in the laboratory used your phones to take

23   photographs of each other, maybe at parties or just

24   greet each other on various days?

25        A.    I mean, we have pictures if we were out

                            D. Trahanas

1

2    perhaps, not that I have any.   I think I have one

3    maybe on Instagram with someone from work, but I

4    don't know.   It wasn't at work.

5         Q.   Do you have any photograph depicting the

6    way Rana would dress when she would come to work?

7         A.   No, but we would often talk about it.

8         Q.   Who is the "we"?

9         A.   People in the lab, so Angelica, Carla,

10   Salina.

11        Q.   What would you say about the way she

12   dressed?

13        A.   We just -- we would reiterate how

14   inappropriate it was and why she would be trying to

15   do that.

16        Q.   Now I want to stay on 76 with you.   Right

17   after those words you have typed on here

18   "Blackmailed me with a letter of recommendation,

19   December."

20             Do you see that?

21        A.   Yes.

22        Q.   And then you've got certain quotes.

23        A.   Yes.

24        Q.   Who are you quoting?

25        A.   Dr. Schwulst.

```
 1                        D. Trahanas

 2       Q.   Are you saying that Dr. Schwulst said to

 3  you, quote, "Diane, if you're going to go nuclear on

 4  us, then you are going to start clocking in and out;

 5  if you put the numbers down you are overpaid,"

 6  closed quotes?

 7       A.   Correct.

 8       Q.   Then you've got a "me."  Now, is that your

 9  answer to him?

10       A.   Yes, in that conversation.

11       Q.   And you said, "I disagree with being

12  overpaid.  Clocking in and out is not a problem, but

13  I will need to be getting paid overtime when I clock

14  over 40 hours a week, and with our type of

15  experiments that happens a lot."

16       A.   Yes.

17       Q.   How long would you work overtime?  How

18  long would these experiments take?

19            MS. WERMUTH:  Objection, relevance.

20  BY MR. DeROSE:

21       Q.   Go ahead.  You may answer.

22       A.   Some took 24 hours, 18 hours.  18 hours

23  was very common; 24 depending on the number of mice

24  we had and what we were specifically looking at, how

25  many tissues I needed to process at that time.
```

Page 401

                          D. Trahanas

1

2          Q.    When you're doing an 18-hour experiment,

3     do you go home for some of that time and come back?

4          A.    No.  You have to be moving constantly.

5          Q.    In the lab?

6          A.    Yes.

7          Q.    So when one experiment takes a 24-hour

8     period, you're in the lab all that time?

9          A.    You start -- I would start in the

10    subbasement where the mice are, retrieve the tissue

11    samples from the mice, and then bring the tissue

12    samples upstairs and start processing the tissue.

13         Q.    So once the experiment starts it is a

14    continuous 24-hour experiment or an 18-hour

15    experiment?

16         A.    Yes, because the tissue will start

17    degrading or won't be viable.  It will -- it would

18    alter the results if we don't do it in the same day.

19         Q.    And while you're there for that 24 hours,

20    who is in the lab during the nighttime with you,

21    like from 9:00 o'clock until 8:00 o'clock in the

22    morning?

23         A.    Dr. Spare was there twice, not -- she

24    slept on the floor one day.  And then the other time

25    I believe she left at like 3:00 or 4:00 in the

Page 402

1                          D. Trahanas

2       morning.

3              And the other days I was -- unless it was

4       somebody from the other lab that left at like

5       midnight, like Rojo or Alex, then it would just be

6       me.

7              Q.   Well, was Dr. Schwulst, was he in the lab

8       for that 24-hour lab test?

9              A.   No.

10             Q.   He never spent the night in the lab?

11             A.   Not in the lab.

12             Q.   And then he writes -- further down I see

13      quotes again.  Is that a quote to him you're giving

14      us?

15             A.   He said that to me.

16             Q.   All right.  So he says, quote, "You should

17      really think long term here, ya know, Harris sent in

18      his letter of rec late, so you probably won't get

19      into school this year, and you'll need my letter of

20      recommendation for next year's application," closed

21      quotes.

22             A.   That's correct.

23             Q.   "I mean, I wrote you a kick ass letter,

24      didn't I?  You've got -- you've also gotten to go on

25      conferences.  I've treated you like a grad student."

Page 403

1                          D. Trahanas

2              Is that all something that he said to you?

3         A.    During that same conversation, yes.

4         Q.    What did you say to him when he said "I

5    wrote you a kick ass letter"?

6         A.    It was a good letter.  I agreed with that.

7         Q.    And he said if you didn't get into medical

8    school that year because Dr. Harris' letter was late

9    you would need a letter from him the following year?

10        A.    Yes.

11        Q.    Did you believe that?

12        A.    Yes.

13        Q.    Because you were relying on his letter of

14   recommendation to get you into medical school?

15        A.    Right.  I mean, I invested two and a half

16   years at that time at work, and there would be

17   nowhere else for me to go the subsequent year.

18        Q.    All right.  And just a couple more because

19   it's very late and I appreciate it.

20              Would you go to Exhibit 60, the

21   handwritten notes that the lady from EEOC apparently

22   wrote, according to counsel.

23              Have you got that?

24        A.    60, yeah, yes.

25        Q.    You don't have 60 or I don't have 60.

1                      D. Trahanas

2    It's a handwritten note.

3              All right.  Right under where counsel

4    directed your attention to with that long cross-out

5    line, it says, "Dr. Schwulst, sex, male."

6              Do you know why the lady wrote that?

7              MS. WERMUTH:  Objection, foundation.

8    BY MR. DeROSE:

9         Q.   Did you tell her that Dr. Schwulst was a

10   male?

11        A.   If she asked, yes.

12        Q.   All right.  And then it says, "Made

13   comments to her first three/four months.  PCP, if I

14   tell you that means the complainant at the EEOC --

15   "PCP was called a softball player because all

16   softball players are lesbians."

17             Do you remember telling her that?

18        A.   Yes.  I remember that was the reason to go

19   to the EEOC, part of the reason.

20        Q.   Then she writes, "PCP said she played

21   basketball, and he said doesn't matter, all

22   basketball players are lesbians also."

23             Did you tell her that?  Ma'am, can you

24   answer the question?

25        A.   Yes.

                              D. Trahanas

1
2        Q.    Don't just nod your head because we can't
3   take that down.  No matter how hard you shake your
4   head we won't get enough sound out of that, okay?
5        A.    Yes, that was part of my complaint.
6        Q.    "PCP states he knew she was a big sports
7   fan."
8              And Carla Cuda was a laboratory worker?
9        A.    Carla was a person in our lab.
10       Q.    And then you gave the lady a list of
11  witnesses including Ms. Dominguez and any names that
12  would help her?
13       A.    Yes.
14       Q.    All right.  One more and I'll be all
15  finished.
16             Wait a minute.  There might be something
17  else on this document.
18             Yes, go to Page 2.  About five lines down
19  she writes, "PCP states Schwulst would refer to her
20  as a softball player, meaning PCP was a lesbian.
21  And PCP states she's never been with a significant
22  other around" something "or others, around him or
23  others."
24             Did you ever bring a boyfriend around to
25  the laboratory?

1                          D. Trahanas

2          A.    Not that I recall.

3          Q.    Did you ever go to any parties where you

4    could bring someone with you to the party?

5          A.    Yes, there were multiple parties during

6    the year.

7          Q.    Did you ever bring anybody to any of the

8    parties?

9          A.    Once.

10         Q.    Who did you bring?

11         A.    My mom.

12         Q.    Was there any talk about the fact that you

13   had to bring your mom to the party instead of a

14   significant other?

15         A.    Not that I recall.

16         Q.    And if you'll look, I'm not going to

17   belabor the record with it, but if you look at the

18   paragraph at about the middle of the page, you're

19   complaining to her about him withdrawing those

20   letters of recommendation, giving you one that

21   wasn't good, and then trying to nullify the second

22   letter with a third?

23         A.    Yes.

24         Q.    And we've already seen the letters here

25   today, have we not?

1                          D. Trahanas

2        A.    We have.

3        Q.    All right.  One more document and I'll be

4    done.  Counsel also showed you Exhibit Number 62.

5              Do you have that in front of you?  It's a

6    typed document.  And that's a document that counsel

7    tells us they had subpoenaed from the EEOC, and I

8    want you to look down about the middle of the page

9    right after the date 5/24.

10             Do you see that sentence?

11       A.    Yes.

12       Q.    All right.  Now, the next sentence, it

13   says, "After a while R sent a notice," that would be

14   respondent, "sent a notice to PCP to go back to

15   work.  PCP was unable to do it due to a hostile

16   environment."

17             Do you remember telling that to anybody at

18   the EEOC?  Just that sentence, ma'am, do you

19   remember saying it?

20       A.    I remember talking about a hostile,

21   stressful work environment.

22       Q.    Now look at the next paragraph that's

23   typed.

24             By the way, you didn't talk to anybody

25   while they were typing at the EEOC, did you?

```
 1                       D. Trahanas
 2        A.   No.
 3        Q.   So if the notes are typed, they're typed
 4   sometime after you finished your conversation with
 5   them, as best you know?
 6             MS. WERMUTH:  Objection to the form of the
 7   question.  Also assumes that this was an in-person
 8   meeting, which she testified she wasn't sure about,
 9   so it assumes facts not of record.
10             MR. DeROSE:  Counsel, you're exactly
11   right.
12   BY MR. DeROSE:
13        Q.   You don't know how these notes got typed
14   and into the EEOC file; is that correct?
15        A.   I can't say with certainty one way or the
16   other.
17        Q.   And you didn't see anybody ever in your
18   memory over at the EEOC typing things down while you
19   were talking to them?
20        A.   I do, but I can't recall which meeting it
21   was.
22        Q.   Look at the next paragraph, "Medical
23   leave, February 17, 2015, due to high anxiety,
24   mental stress and depression.  Diagnosed few years
25   ago prior to going on leave.  It got exacerbated.
```

Page 409

1                           D. Trahanas

2    It was stressful work environment.  Doctor gave PCP

3    a note May 24, 2015, that no release to the same

4    position under the same employer."

5              What employer did the doctor give you a

6    letter to that said you can't go back to work with

7    that person?

8              MS. WERMUTH:  Object to the form of the

9    question.  It misstates what's written here.  It

10   also misstates the record evidence.

11   BY MR. DeROSE:

12        Q.   You may answer.

13        A.   The employer would be Dr. Schwulst, which

14   would be the position of research tech.

15        Q.   Is it fair to say that you don't know how

16   the letter from Dr. Cano got over to Northwestern?

17        A.   Yes, that would be fair.

18        Q.   And you don't know how it ever got into

19   their file?

20        A.   No, I do not.

21             MR. DeROSE:  All right.  I have no further

22   questions, Counsel.  You may inquire.

23             MS. WERMUTH:  I have no further questions.

24             MR. DeROSE:  All right.  Thank you.

25             Signatures are -- can we waive these?

```
 1                    D. Trahanas
 2    That man, he hasn't said boo.  He has only worked
 3    real hard.
 4            You had no trouble taking her down, did
 5    you?
 6            THE COURT REPORTER:  No.
 7            MR. DeROSE:  Diane, do yourself a favor.
 8    Waive the reading of the dep.  Trust that this man
 9    took you down accurately.  He was listening
10    carefully today.
11            THE WITNESS:  I just say it?
12            MR. DeROSE:  Say "I waive."
13            THE WITNESS:  I waive.
14                    (Whereupon, the deposition was
15                    concluded at 8:02 p.m.)
16
17
18
19
20         _____
21              D. Trahanas
22     Subscribed and sworn to before me
23    this _____ day of _____, 20__.
24    _____
25         NOTARY PUBLIC
```

1                     D. Trahanas

2    STATE OF ILLINOIS   )

3                        )  SS:

4    COUNTY OF C O O K   )

5              The within and foregoing deposition of the

6    witness, DIANE M. TRAHANAS, was taken before GREG S.

7    WEILAND, CSR, RMR, CRR, at Suite 400, 123 North

8    Wacker Drive, in the City of Chicago, Cook County,

9    Illinois, commencing at 10:13 o'clock a.m., on the

10   5th day of January,  2018.

11             The said witness was first duly sworn and

12   was then examined upon oral interrogatories; the

13   questions and answers were taken down in shorthand

14   by the undersigned, acting as stenographer and

15   Notary Public; and the within and foregoing is a

16   true, accurate and complete record of all the

17   questions asked of and answers made by the

18   aforementioned witness at the time and place

19   hereinabove referred to.

20             The signature of the witness was waived by

21   agreement of counsel.

22             The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.

25

Page 412

1          Witness my signature on this 18th day of

2   January, 2018.

3

4

    _____
5   GREG S. WEILAND, CSR, RMR, CRR
    License No. 084-003472
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAME OF CASE:

DATE OF DEPOSITION:

NAME OF WITNESS:

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

Page ______ Line ______ Reason ______

From ______________________ to ______________________

_________________________

Page 414

1

2                IN THE UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF ILLINOIS

4                        EASTERN DIVISION

5

6

7   DIANE M. TRAHANAS,            )
                                  )
8       Plaintiff,                )
                                  )
9          vs.                    ) No. 15-cv-11192
                                  )
10  NORTHWESTERN UNIVERSITY       )
    and STEVEN J. SCHWULST,       )
11  M.D.,                         )
                                  )
12      Defendants.               )
    _____)

13

14

15

16

17          DEPOSITION OF DIANE M. TRAHANAS

18                      VOLUME II

19                  Chicago, Illinois

20              Tuesday, January 8, 2019

21

22

23  Reported by:

24  PAULA CAMPBELL, CSR, RDR, CRR, CRC

25  JOB NO. 153261

Page 415

1

2

3

4

5

6

7

8                    January 8, 2019

9                    10:06 A.M.

10

11

12        Volume II of the discovery

13 deposition of DIANE M. TRAHANAS, held at the

14 offices of COZEN O'CONNOR, 123 North Wacker

15 Drive, Chicago, Illinois, pursuant to notice

16 before Paula Campbell, CSR, RDR, CRR, CRC.

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3          JOHN P. DeROSE & ASSOCIATES

4          Attorneys for the Plaintiff

5                15 Spinning Wheel Road

6                Hinsdale, Illinois 60521

7          BY:    JOHN DeROSE, ESQ.

8

9          COZEN O'CONNOR

10         Attorneys for the Defendants

11               123 North Wacker Drive

12               Chicago, Illinois 60606

13         BY:    ANNA WERMUTH, ESQ.

14                DANIELLE HARRIS, ESQ.

15

16

17

18   ALSO PRESENT:

19               Robert Zellner, Videographer

20               Thalia L. Myrianthopoulos, Northwestern

21               Steven J. Schwulst

22

23

24

25

D. TRAHANAS - VOLUME II

1    VIDEOGRAPHER:  And good morning.  This is

3   the start of disc labeled number one of the

4   continuing videotaped deposition of Diane, M.

5   Trahanas in the matter of Diane M. Trahanas

6   versus Northwestern University and Steven J.

7   Schwulst, M.D., in the United States District

8   Court for the Northern District of Illinois,

9   Eastern Division, bearing case number

10  15-cv-11192.

11      This deposition is being held at Cozen

12  O'Connor, at 123 North Wacker Drive,

13  Suite 1800, in Chicago, Illinois, 60606, on

14  Tuesday January 8th, 2019, at approximately

15  10:06 A.M.

16      My name is Robert Zellner from TSG

17  Reporting, Inc., and I am the legal video

18  specialist.  And the court reporter is Paula

19  Campbell, also in association with TSG

20  Reporting.

21      And will counsel please introduce

22  yourselves for the record?

23      MS. WERMUTH:  This is Anna Wermuth.  I'm

24  counsel for Northwestern University and for

25  Dr. Schwulst.

1         D. TRAHANAS - VOLUME II

2    MR. DeROSE:  And I'm John DeRose on behalf

3 of Ms. Trahanas.

4    We have other people here.  Can we have

5 them all identified also?

6    MS. WERMUTH:  Yes.  I was getting to that.

7 To my left.

8    MS. MYRIANTHOPOULOS:  Thalia

9 Myrianthopoulos on behalf of Northwestern

10 University.

11    MR. SCHWULST:  Steven Schwulst.

12    MS. HARRIS:  Danielle Harris on behalf of

13 the defendants.

14    MR. DeROSE:  And, Counsel, before we start,

15 can we indicate, although the videographer

16 thought it was a continuing video deposition,

17 it is not.  This is the first time you have

18 dep- -- videotaped Ms. Trahanas.  I do not

19 believe that there was a prior authorization to

20 do that, but go ahead.

21    MS. WERMUTH:  Okay.  I believe that the

22 deposition notice indicated that it would be

23 taken pursuant to transcription and video.

24    MR. DeROSE:  Do you have a copy of that

25 here now?

1          D. TRAHANAS - VOLUME II

2      MS. WERMUTH:  I don't have it with me, but

3  I can get it.

4      MR. DeROSE:  That's all right.  Go ahead.

5      MS. WERMUTH:  And I'll just -- I'll add

6  that this is a continuing deposition in the

7  case of Diane Trahanas versus Northwestern

8  University and Steven Schwulst, M.D., and that

9  this deposition is being taken pursuant to

10 Judge Mason's order of December 3rd, 2018.

11     MR. DeROSE:  All right.  And, Counsel, can

12 we also mention this deposition is for a very

13 limited purpose.  I allowed you to go beyond

14 the seven hours for the deposition of

15 Ms. Trahanas a couple of years ago, and you

16 took, I believe, as much as nine hours of

17 deposition.

18     Today's deposition is limited for the

19 purpose that His Honor, Judge Mason, set

20 forward concerning your inquiry of the searches

21 that Ms. Trahanas made for any letters of --

22 she received from medical schools, and I would

23 ask that we try to stay as closely as possible

24 into that very limited area.

25     MS. WERMUTH:  I would disagree that the

1                    D. TRAHANAS - VOLUME II
2        only issue for today is her searches within her
3        gmail account, but rather her preservation
4        obligations generally, her -- her efforts to
5        preserve, and then her efforts to collect
6        certain electronically stored information.  So
7        I'll be talking about those topics.
8            MR. DeROSE:  And I believe that that is
9        appropriate.  I think that is what His Honor
10       ordered, and I do ask that you just stay to
11       that and don't go into the other areas where we
12       already had extensive discovery.
13   BY MS. WERMUTH:
14       Q.  Ms. Trahanas, you recall that I took your
15   deposition about a year ago in January of 2018?
16       A.  Yes.
17           MS. WERMUTH:  Oh, I'm sorry.  Can you swear
18       the witness in, please.  Thank you.
19           MR. DeROSE:  Oh boy.
20           REPORTER:  Would you please raise your
21       right hand.
22   D I A N E   T R A H A N A S,
23       called as a witness, having been duly sworn,
24       was examined and testified as follows:
25   ///

1          D. TRAHANAS - VOLUME II

2    EXAMINATION

3    BY MS. WERMUTH:

4         Q.  Okay.  And just to reiterate my --

5              MR. DeROSE:  Excuse me one second.  Will

6         you get a napkin there?  In the wintertime my

7         nose -- oh, I forget that, yeah.  Give me one

8         second, Counsel.

9              Thank you.  I got it.

10             MS. WERMUTH:  Are we ready to proceed?

11             MR. DeROSE:  Yes.

12             MS. WERMUTH:  Yes, okay.

13             VIDEOGRAPHER:  Just a little higher up.

14        Thank you.  Thanks.

15   BY MS. WERMUTH:

16        Q.  Okay.  Ms. Trahanas, I'll ask you the

17   question again.

18             Do you recall that I took your deposition

19   on January 5th of 2018?

20        A.  Yes.

21        Q.  Okay.  You were under oath at that time;

22   correct?

23        A.  Correct.

24        Q.  And you swore to tell the truth; correct?

25        A.  Yes.

Page 422

1        D. TRAHANAS - VOLUME II

2        Q.  And you did tell the truth at that time; is

3  that correct?

4        A.  Yes.

5        Q.  Okay.  If I were --

6        MS. WERMUTH:  What I'm going to do, John,

7        and what I've talked to the court reporter is

8        we are going to -- for ease of administration,

9        we're going to continue with the pagination of

10       this deposition in sequence with her -- the

11       plaintiff's first deposition, and we're also

12       going to then sequentially mark exhibit

13       numbers.  Okay?

14       MR. DeROSE:  That's fine.

15       MS. WERMUTH:  Okay.  Thank you.

16       All right.  I will then have this exhibit,

17       if you would, Madam Court Reporter, marked

18       as -- oh, actually, you know what, I don't need

19       to mark this.  It's marked in the -- in the

20       first deposition.

21  BY MS. WERMUTH:

22       Q.  So let me hand to you, Ms. Trahanas, what

23  was previously marked as your Deposition Exhibit 55.

24  I'm sorry.

25       MR. DeROSE:  This is a problem I have.  Too

1                    D. TRAHANAS - VOLUME II

2          big of tables.

3               MS. WERMUTH:  Yeah, yeah.  I'll make sure I

4          stand up and pass it to you.  Okay?

5               MR. DeROSE:  Thank you.

6    BY MS. WERMUTH:

7          Q.  All right.  So, Ms. Trahanas, I know we

8    talked a little bit about this exhibit in your first

9    deposition, but let me ask you a couple quick

10   questions about it.

11              In the e-mail on the first page dated

12   February 26th, 2015, from you to pam@lattaslaw, do

13   you see that?

14         A.  Yes.

15         Q.  Okay.  And Pam was your -- was representing

16   you at the time of this e-mail; is that right?

17         A.  Could you please define "representing"?

18         Q.  Well, okay.  Let me -- strike that.

19              Pam Visvardis is an attorney; correct?

20         A.  She is.

21         Q.  Okay.  And you were consulting with her

22   about legal action vis-à-vis Dr. Schwulst in

23   February of 2015; correct?

24         A.  I wouldn't describe it as consulting.

25         Q.  What would you describe it as then?

1                    D. TRAHANAS - VOLUME II

2          A.   Asking a friend for a favor.

3          Q.   Okay.  And your friend was a lawyer; right?

4          A.   Correct.

5          Q.   And your friend sent a legal demand letter

6     to Dr. Schwulst on your behalf in February of 2015;

7     correct?

8          A.   Correct.

9          Q.   Okay.  So she was then representing you in

10    February of 2015; correct?

11         A.   Via the demand letter, yes.

12         Q.   Yeah.

13              And, in fact, in this e-mail on Exhibit 55

14    you say to her, "Let me know when you can start

15    talking about lawsuit stuff."

16              Do you see that?

17         A.   I do see that.

18         Q.   Okay.  So, and you were talking about a

19    lawsuit against Dr. Schwulst; is that correct?

20         A.   I don't recall exactly what in context that

21    was reference to.

22         Q.   Was there other litigation that you were

23    contemplating in January -- or, I'm sorry,

24    February 2015?

25              MR. DeROSE:  Well, Counsel, now wait a

1    D. TRAHANAS - VOLUME II

2    minute.  This is -- I allow a certain amount of

3    background, but we're really here to talk about

4    her searches, not about whatever she was

5    contemplating against anybody in a lawsuit.

6        MS. WERMUTH:  Well, I would disagree,

7    because under Rule 37, which was part of what

8    our motion was related to, preservation

9    obligations attach at certain points in time.

10        So I'm trying to discern at what points in

11    time Ms. Trahanas was contemplating seeking

12    legal action.  She's now telling me that she

13    doesn't recall whether or not she was

14    seeking -- wanting to talk to Pam Visvardis

15    about a lawsuit against Dr. Schwulst or some

16    other lawsuit, and I'm trying to get to the

17    bottom of that.

18    A.   That's mischaracterizing, I believe, what I

19  said.

20  BY MS. WERMUTH:

21    Q.   Please tell me what you said.

22    A.   Can you read it back to her, please.

23        (Record was read as requested.)

24        MS. WERMUTH:  There was a question about

25    the phrase in the e-mail, "Let me know when we

1          D. TRAHANAS - VOLUME II

2    [sic] can start talking about lawsuit stuff."

3          (Record was read as requested.)

4  BY MS. WERMUTH:

5    Q.  Okay.  So, Ms. Trahanas, can you please

6  read all of Exhibit 55 and tell me if you understand

7  what you are talking -- or what you are writing

8  about in connection with mentioning "lawsuit stuff"?

9          THE WITNESS:  John, are we still --

10         MR. DeROSE:  Read it out loud or --

11         MS. WERMUTH:  Read it to herself.

12         MR. DeROSE:  Read it to herself.

13    A.  Just the first page?

14  BY MS. WERMUTH:

15    Q.  I'm asking you to read the exhibit so that

16  you can answer the question in the context which you

17  say that you need context for.

18    A.  I believe John just objected, though, to

19  the question.

20         MR. DeROSE:  Just --

21         MS. WERMUTH:  This is being argumentative.

22    A.  I'm just double checking, because --

23         MR. DeROSE:  All right.  Read the document.

24         MS. WERMUTH:  He will state an objection if

25    he has an objection.  It's not your place to

1        D. TRAHANAS - VOLUME II

2      object.

3      A.  I honestly couldn't tell you what in

4   context.

5           MR. DeROSE:  Read the whole document to

6      yourself.

7      A.  Okay.  I believe I've reviewed the entire

8   document.

9   BY MS. WERMUTH:

10     Q.  Okay.  So now that you've reviewed the

11  document, can you tell me what you're referring to

12  when you e-mail Miss Visvardis on February 26, 2015,

13  about "lawsuit stuff"?

14     A.  I'm not sure, because on Wednesday,

15  March 4th, I asked her what her opinion and what to

16  do would be, like how to you pursue further.  So how

17  could I be speaking about a lawsuit when I'm not

18  even sure what I'm doing?

19          MS. WERMUTH:  I'm going to strike that

20     answer as nonresponsive.

21  BY MS. WERMUTH:

22     Q.  You write -- these are your words; correct?

23          MR. DeROSE:  I object to striking it.

24          MS. WERMUTH:  That's fine.

25          MR. DeROSE:  But go ahead, Counsel.

1              D. TRAHANAS - VOLUME II

2         MS. WERMUTH:  That's fine.

3    BY MS. WERMUTH:

4         Q.  You -- these are your words; right?  You

5    wrote the e-mail talking about -- using the phrase

6    "lawsuit stuff," did you not?

7         A.  Sure, it could be -- I could have

8    written --

9         MR. DeROSE:  That's the answer is yes.

10   Okay.

11        A.  Sure.  Yes.  I'm sorry.

12   BY MS. WERMUTH:

13        Q.  And as you sit here today, you don't

14   recall, is that your testimony, what you meant by

15   "lawsuit stuff"?

16        A.  Correct.

17        Q.  So is it your testimony -- well, strike

18   that.

19             In February 2015 were you contemplating

20   taking legal action against Dr. Schwulst?

21        A.  No.

22        Q.  Really?  Okay.

23        MS. WERMUTH:  Can we mark this as 77,

24        please.

25             (Trahanas Exhibit 77 marked for

1                    D. TRAHANAS - VOLUME II

2          identification.)

3    BY MS. WERMUTH:

4          Q.  Do you have now in front of you what's been

5    marked as Deposition Exhibit 77?

6          A.  Yes.

7          Q.  Do you recognize that document?

8          A.  Yes.

9          Q.  And did you see that -- so, strike that.

10         That is a letter from Pam Visvardis to

11   Dr. Schwulst; correct?

12         A.  Yes.

13         Q.  And it's dated February 27th, 2015.

14         Do you see that?

15         A.  Correct.

16         Q.  And you received a copy of this letter at

17   the same time; correct?

18         A.  I'm not sure if it's the exact date, but

19   yes, around that time.

20         Q.  Right.

21         And in this letter on your behalf, where

22   Pam Visvardis writes that her firm represents you,

23   do you see that in the first sentence?

24         A.  Yes.

25         Q.  So does that refresh your recollection as

```
 1              D. TRAHANAS - VOLUME II
 2   to whether or not Miss Visvardis represented you in
 3   February of 2015?
 4        A.  I believe I already answered the question.
 5        Q.  And the answer is?
 6        A.  She was doing me a favor, so she wrote a
 7   letter to Dr. Schwulst for the letters.
 8        Q.  She's an attorney; correct?
 9        A.  Correct.
10        Q.  And she has a legal obligation to abide by
11   her ethical obligations as a lawyer; correct?
12        A.  Yes.
13        Q.  Okay.  And --
14            MR. DeROSE:  Objection.  Calls -- wait,
15        wait.  Let me make my objections.  Objections
16        to what an attorney's obligation is to this lay
17        person.
18            Go ahead.
19   BY MS. WERMUTH:
20        Q.  And, in fact, in this letter Miss Visvardis
21   indicates that she or her firm was representing you
22   at the time; correct?
23        A.  She indicates that, yes.
24        Q.  Right.
25            You don't think she's lying?
```

1          D. TRAHANAS - VOLUME II

2      MR. DeROSE:  Objection to that question.

3  Don't answer that?

4      MS. WERMUTH:  On what basis?

5      MR. DeROSE:  On your asking her to arrive

6  at a conclusion of what someone else is doing.

7  She's not here to be a jury.  So I don't want

8  her to answer that question.

9      MS. WERMUTH:  She can answer it subject to

10  your objection.

11      MR. DeROSE:  Well, I -- I suggest not

12  Kate -- Counsel.  I don't think a judge is

13  going to ask a lay person to say if a lawyer

14  was lying in sending a letter, okay.  So you

15  will have to bring that one in front of Judge

16  Mason.

17      MS. WERMUTH:  You know what, John, I don't

18  understand why your client is -- you have --

19  you have told me that she was represented by

20  Pam Visvardis at this time.  I don't understand

21  why your client is suddenly taking the position

22  that she's not sure whether or not

23  Miss Visvardis or her firm was representing

24  her.  It's clear as day.  She is being

25  unnecessarily argumentative.

1           D. TRAHANAS - VOLUME II

2      MR. DeROSE:  She hasn't argued with you

3  about anything.

4      MS. WERMUTH:  Sure she has.  She is asking

5  the court reporter to read stuff back.  She is

6  asking you if you are making objections.  She

7  is arguing with me about her answers.

8      MR. DeROSE:  Well, she will stop doing

9  that --

10      MS. WERMUTH:  Thank you.

11      MR. DeROSE:  -- because I just told her

12  that.  But she has not raised her voice.  She

13  has not --

14      MS. WERMUTH:  It doesn't matter.  It

15  doesn't -- the voice isn't the -- the issue.

16  She is arguing with me on not answering

17  question.

18      MR. DeROSE:  Counsel, excuse me.  I am the

19  one who objected to you asking her if she

20  thought her friend, a lawyer, was lying.  And I

21  do not want her to answer that question,

22  because her opinion and conclusion about

23  whether another person is lying or not is

24  really not appropriate in this case.

25      MS. WERMUTH:  I'm going to ask this

Page 433

D. TRAHANAS - VOLUME II

1

2   question, and I'm going to ask it, and I'm

3   going to get an answer to it.

4       MR. DeROSE:  No, you're not, and I already

5   told --

6       MS. WERMUTH:  Excuse me.

7       MR. DeROSE:  -- she is not going to answer.

8       MS. WERMUTH:  Hang on.  I'm going do this

9   question, if I may.

10  BY MS. WERMUTH:

11      Q.  Miss Visvardis wrote on February 27th of

12  2015 that her firm represented you; correct?

13      MR. DeROSE:  Asked and answered.

14  BY MS. WERMUTH:

15      Q.  Please answer.

16      A.  Yes.

17      Q.  And in this letter she threatens legal

18  action against Dr. Schwulst; is that correct?

19      MR. DeROSE:  Can you led me to where you're

20  talking about?  What paragraph, Counsel?

21      MS. WERMUTH:  She can read the letter and

22  answer the question.

23      MR. DeROSE:  All right.  Take your time and

24  read the letter.

25      A.  Okay.  I'm finished reading.

1              D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3         Q.  Okay.  And you would agree with me that in

4    this letter legal action is threatened against

5    Dr. Schwulst; correct?

6         A.  I don't know if I would say -- I don't know

7    if it technically counts as threatened, but it's

8    asked to be complied with certain expectations.

9         Q.  Well, so you've read the full letter;

10   correct?

11        A.  Yes.

12        Q.  You will turn to the second page with me,

13   please.

14        A.  Okay.

15        Q.  The final paragraph, it says, "If you fail

16   to comply with these demands, our client" -- that

17   refers to you; correct?

18        A.  Yes.

19        Q.  -- "our client has authorized us to file

20   suit against you in the Circuit Court of Cook

21   County."

22             Do you see that?

23        A.  I see that.

24        Q.  Okay.  So the letter suggests that if

25   certain actions are not taken by Dr. Schwulst, you

```
1                    D. TRAHANAS - VOLUME II
2    have authorized a lawsuit to be filed against him;
3    correct?
4            MR. DeROSE:  The letter says what it says.
5            MS. WERMUTH:  She can answer the question,
6        John.
7            MR. DeROSE:  Would you read the question
8        back so I -- I think it's -- you're asking
9        about what the letter says.
10           MS. WERMUTH:  Which I can do.
11           MR. DeROSE:  Ma'am, would you read that
12       question back, please?
13           (Record was read as requested.)
14           MR. DeROSE:  Objection.  The letter says
15       what it says.
16           MS. WERMUTH:  She can still answer the
17       question over your objections.
18           MR. DeROSE:  All right.  Does the letter
19       say that?
20           MS. WERMUTH:  John, it's my question.
21           MR. DeROSE:  All right.  Go ahead.  Go
22       ahead, Counsel.
23       A.  If I heard correctly, you're asking if the
24   letter states that.  Yes, I do see that on the piece
25   of paper that the letter states that, yes.
```

1          D. TRAHANAS - VOLUME II

2   BY MS. WERMUTH:

3       Q.  Well, the letter wouldn't state that if you

4   didn't authorize such action to be taken; correct?

5           MR. DeROSE:  Objection, Counsel.

6           Objection.

7           MS. WERMUTH:  What is the basis for the

8           objection, John?

9           MR. DeROSE:  Is that the letter says what

10          it says.  The author said that.  You can't ask

11          her the letter wouldn't say something --

12          MS. WERMUTH:  John --

13          MR. DeROSE:  -- if she didn't authorize it.

14          MS. WERMUTH:  John, let me take you back

15          through every deposition you took where you

16          read full pages of documents into the record

17          and asked my clients to confirm that it said

18          what it said.  If you don't like this, I'm

19          going to call Judge Mason, because there hasn't

20          been a question, a noncontroversial question

21          that I've asked today that hasn't elicited

22          either an argument from your client or an

23          argument from you.

24          MR. DeROSE:  Here's your program, Counsel,

25          you had a nine-hour deposition where I never

1      D. TRAHANAS - VOLUME II
2  requested one time that you contact the
3  lawyer -- or the judge.  I've never recommended
4  that to any lawyer, only other lawyers who feel
5  like they can't handle an appropriate question,
6  go and talk to the judge.  I don't really care.
7      If you want to call the judge, the judge
8  has a limited purpose for this deposition.  You
9  had nine hours to ask about all this, and you
10  did already.
11     MS. WERMUTH:  I didn't -- I didn't have
12  nine hours to ask about all this, because I've
13  learned through the course after her deposition
14  that there is certain e-mails that she never
15  produced.  So let me -- the judge has allowed
16  this deposition, regardless of what -- how many
17  hours --
18     MR. DeROSE:  For a limited purpose, not for
19  what -- what she's doing with her -- her
20  friend, who happened to be a lawyer at the
21  time.
22     MS. WERMUTH:  No, no, no, no.  Her friend
23  who is representing her and threatening legal
24  action.  It's important to know when her
25  preservation obligation kicked in.

1              D. TRAHANAS - VOLUME II

2          MR. DeROSE:  And Dr. Schwulst's lawyer

3      responded also threatening legal action against

4      Diane.

5          MS. WERMUTH:  What is -- that's not the

6      question, though.  The question is the judge

7      allowed me to take the deposition of

8      Ms. Trahanas a second time for this purpose.

9      And I'm --

10         MR. DeROSE:  All right.  Go ahead.  Let's

11     see if we can get through this somehow.

12         MS. WERMUTH:  Yeah, let's do that.  Let's

13     do that, John.

14  BY MS. WERMUTH:

15     Q.  According to this letter, you authorized

16  legal action to be taken against Dr. Schwulst if he

17  failed to comply with the demands in this letter;

18  correct?

19     A.  I never signed an authorization form to --

20  to say --

21         MR. DeROSE:  But that's what the letter

22     says.

23     A.  That's what the letter says, yes.

24  BY MS. WERMUTH:

25     Q.  Which means you told Pam that you would

```
                        D. TRAHANAS - VOLUME II
 1
 2    authorize legal action if he didn't comply; correct?
 3         A.  I don't recall what I told Pam.
 4         Q.  All right.  So if I have to take Pam's
 5    deposition, she'll tell me?
 6         A.  Well, I would believe it's privileged,
 7    then, if you're saying that she's a lawyer, but, I
 8    mean, that would be up to John I guess.
 9         Q.  I asked that question early on and your
10    lawyer told me he was waiving privilege over your
11    relationship with Miss Visvardis.
12         A.  For these --
13         Q.  Absolutely.
14         A.  -- for these documents, I believe.
15         Q.  Well, you can't do a limited waiver
16    Ms. Trahanas.
17              MR. DeROSE:  All right.  Counsel, please.
18              MS. WERMUTH:  Well, she's arguing with me.
19         A.  I'm just asking.
20              MR. DeROSE:  Just answer the question.
21    BY MS. WERMUTH:
22         Q.  You can't ask questions in a deposition.
23    You're the witness.  I'm asking the question.
24         A.  I apologize.
25         Q.  You can talk to your lawyer on a break if
```

1          D. TRAHANAS - VOLUME II

2   you'd like to do that.

3          MR. DeROSE:  All right.  Counsel, please.

4          MS. WERMUTH:  No.  You "please," John.

5          MR. DeROSE:  Will you ask you --

6          MS. WERMUTH:  You "please," John.

7          MR. DeROSE:  Just ask your questions.

8          MS. WERMUTH:  I'm trying.  Your client

9       hasn't answered any question yet, literally.

10         MR. DeROSE:  Well, Counsel, I disagree with

11      you, but go ahead.

12  BY MS. WERMUTH:

13      Q.  Did Miss Visvardis ever tell you about

14  Rule 37?

15      A.  No.

16      Q.  Did Miss Visvardis ever tell you about your

17  obligation to preserve relevant information in

18  connection with legal action?

19      A.  No.

20      Q.  Did you ever read Rule 37?

21      A.  Up until maybe if it was mentioned in your

22  letter to the judge, no.

23      Q.  So you have read it since I filed the

24  motion for sanctions?

25      A.  If it was in that letter, perhaps, but I

1          D. TRAHANAS - VOLUME II

2    don't recall what it is.

3          MS. WERMUTH:  Can we mark this as 78,

4       please.

5          (Trahanas Exhibit 78 marked for

6       identification.)

7          MR. DeROSE:  Thank you.  Diane, can you

8       push that over?

9          MS. WERMUTH:  Yeah, sorry.

10          MR. DeROSE:  Never mind.  I got it.

11   BY MS. WERMUTH:

12       Q.  Okay.  Ms. Trahanas, you have now been

13   handed what's been marked as Deposition Exhibit 78.

14          Do you recognize that document?

15       A.  No.

16       Q.  So you've never -- you've never read

17   Rule 37 before?

18       A.  Not in this document form, no.

19       Q.  Have you read it in any form?

20       A.  I don't recall.

21       Q.  At the time -- in February of 2015 -- so

22   let me go back to Exhibit 55, please.

23       A.  Okay.

24          MR. DeROSE:  The last one was 78?

25          MS. WERMUTH:  Correct.

```
 1              D. TRAHANAS - VOLUME II
 2         MR. DeROSE:  Okay.  Thank you.
 3   BY MS. WERMUTH:
 4      Q.  By the way, I'm sorry, let me go back to
 5   Exhibit 55.  The first e-mail on the first page is
 6   from AMCAS to you; right?
 7      A.  Yes.
 8      Q.  Okay.  And one of the things that AMCAS
 9   tells you is that you can check the status of your
10   application throughout the admissions process by
11   logging in; right?
12      A.  Yes, it says that.
13      Q.  Okay.  Okay.  So you had the capability to
14   log in to AMCAS to see what schools were doing with
15   your applications while they were pending; is that
16   correct?
17      A.  I -- that can mean a lot of different
18   things.  I'm not sure exactly what you're asking me,
19   so I would ask you to rephrase it, if you could.
20      Q.  What -- what about my question do you not
21   understand, Ms. Trahanas?
22      A.  Checking on my status, I mean, I'm not sure
23   if you're saying if they received an evaluation
24   letter, if a grade was changed or I needed to update
25   like --
```

                        D. TRAHANAS - VOLUME II

1

2       Q.   Let me ask you this question:  You had an

3   AMCAS account; right?

4       A.   Yes.

5       Q.   Okay.  And you had electronic access to

6   that account; right?

7       A.   Yes.

8       Q.   And you continue to have electronic access

9   to that account; correct?

10      A.   Yes.  At the time, yes.

11      Q.   Well, do you continue to have access to

12  that account?

13      A.   When you have an application, yes.

14      Q.   Okay.  So in February of 2015 you had

15  access to that account?

16      A.   Correct.

17      Q.   Okay.  So you could go in to that account

18  and see whether or not schools had rejected you or

19  accepted you; correct?

20      A.   No.

21      Q.   That was not included among the information

22  that you could check?

23      A.   Not that I recall, no.

24      Q.   Okay.  Now if February of 2015 you had

25  already received a number of e-mails from schools

1           D. TRAHANAS - VOLUME II

2   rejecting your application; correct?

3        A.  No.

4        Q.  Zero?  You -- you hadn't received any?

5        A.  I don't recall what I received.

6        Q.  What was the gmail address account that you

7   used in connection with your AMCAS application?

8        A.  It's the account that's in front of us,

9   diane.trahanas, T-r-a-h-a-n-a-s, at gmail.com.

10       Q.  And that's an e-mail account that you've

11  had how long?

12       A.  Maybe a couple years before 2015.  I

13  couldn't tell you the year.

14       Q.  Okay.  And you continue to have that same

15  e-mail address; correct?

16       A.  Yes.

17       Q.  And so, as you sit here today, it's your

18  testimony that you cannot remember whether or not in

19  February 2015 you had received any rejection e-mails

20  from any of those medical schools you had applied to

21  for that cycle?

22       A.  If -- if I remember -- if I received any or

23  which one -- I'm sorry.  Can -- can you repeat that?

24           (Record was read as requested.)

25       A.  I can't remember what I had received or not

Page 445

D. TRAHANAS - VOLUME II

1

2    received.

3        Q.  Did you tell Pam Visvardis that you had

4    already been rejected from some of these schools in

5    February of 2015?

6        A.  Other than the e-mail chain that you have

7    in front of me, I don't recall any other further

8    correspondence with Miss Visvardis.

9        Q.  Okay.  So I'm not asking you if there is

10   other correspondence.  What I'm asking you is:  Have

11   you -- did you communicate in any form, written or

12   verbal or any chat, any form with Miss Visvardis

13   where you told her you had already been rejected

14   from some of the medical schools to which you had

15   applied?

16       A.  I don't recall.

17       Q.  Did you tell her that you hadn't completed

18   your application to some of the medical schools to

19   which you had applied?

20       A.  I don't recall.

21       Q.  And going back to what's been marked as

22   Deposition Exhibit 77, that letter sent on your

23   behalf was sent to Dr. Steven Schwulst; right?

24       A.  Yes.

25       Q.  It was not sent to the University; correct?

Page 446

D. TRAHANAS - VOLUME II

1
2    A.   Correct.

3    Q.   Okay.  And so, when you had authorized

4 legal action at that point in time, you had

5 authorized it only against Dr. Schwulst; correct?

6    A.   I'm not trying to be argumentative, but,

7 again, I don't know what "authorized" -- the

8 definition of "authorized" in the legal realm is.

9 So it says it in the letter.

10   Q.   Well, there's nothing in the letter that

11 suggests that you're contemplating taking legal

12 action against the University at that point in time;

13 would you agree with me?

14   A.   Yes, I would agree with that.

15   Q.   And -- and is it true that you didn't

16 consider that until you engaged Mr. DeRose?

17   A.   Correct.

18   Q.   Okay.  And when did you engage Mr. DeRose?

19   A.   Sometime later in 2015, maybe the summer,

20 early summer.

21   Q.   June or July of 2015?

22   A.   I believe so, yeah, around that time.

23   Q.   Do you have an engagement letter with

24 Mr. DeRose?

25   A.   If that's a contract, then yes.

D. TRAHANAS - VOLUME II

1

2      Q.   Okay.  All right.  So I'd like to talk to

3  you a little bit about your gmail account.  You gave

4  us the address of your gmail account already.  And

5  just so that I'm clear, that was the address that

6  you used to apply to medical schools in the 2015

7  cycle; correct?

8      A.   That's the address that's in association

9  with my AMCAS application, but you don't use the

10  e-mail address, right, to apply to the schools.

11      Q.   Well, you -- you submitted that e-mail

12  address in your AMCAS application; correct?

13      A.   Correct.

14      Q.   And -- and then in your AMCAS application

15  you identify which schools you are applying to;

16  correct?

17      A.   Yes.

18      Q.   And AMCAS pushes your information to those

19  schools; correct?

20      A.   Yes.

21      Q.   Including your gmail address; right?

22      A.   I don't get a copy of what the schools get

23  into my gmail account.

24      Q.   Okay.

25      A.   We -- we put our information into AMCAS.

1             D. TRAHANAS - VOLUME II

2    We pay them, and they distribute it to the schools.

3         Q.   Okay.  But you do hear back directly from

4    the schools; correct?

5         A.   Sometimes yes, sometimes no.

6         Q.   How many times have you applied to medical

7    school?

8         A.   I believe I already asked and answered

9    this.  2008, 2015, and 2018.

10        Q.   Three times only?

11        A.   That I can recall, yes.

12        Q.   All right.  So when you -- and by the way,

13   you know that I asked you to bring your login

14   credentials to your gmail account; correct?

15             MR. DeROSE:  And I objected to it.

16             MS. WERMUTH:  I understand.

17   BY MS. WERMUTH:

18        Q.   I'm asking --

19             MR. DeROSE:  All right.  Counsel, but I

20        want to make that clear.  Go ahead.

21   BY MS. WERMUTH:

22        Q.   You understand that I asked you to bring

23   those; correct?

24        A.   Yes, I did see that.

25        Q.   Okay.  And you -- is it your position that

1                    D. TRAHANAS - VOLUME II

2    you will not log into your gmail account during this

3    deposition today?

4         A.  It is my position that the judge did not

5    grant you access to review my gmails.

6         Q.  Okay.  So I'm going to -- I disagree with

7    you on the -- what the judge actually ordered,

8    but -- so let me ask you this question.

9         A.  Okay.

10        Q.  As you sit here today, are you going to

11   allow me to ask you to log into your gmail account?

12        A.  That's access by proxy, so no.

13        Q.  You're not going to?

14        A.  Correct.

15        Q.  Okay.  So --

16            MR. DeROSE:  That's also following the

17        advice of her lawyer, but go ahead.

18   BY MS. WERMUTH:

19        Q.  Okay.  So let me ask you this, when you log

20   into your gmail account, do you have folders, e-mail

21   folders?

22        A.  Folders, I'm not sure -- there is -- are

23   folders the same thing as tabs?  Or I guess I can't

24   ask you a question.

25            Can you please be more specific?

1                    D. TRAHANAS - VOLUME II

2        Q.   Do you have an inbox?

3        A.   Yes.

4        Q.   Do you have an outbox?

5        A.   Yes.

6        Q.   Do you have a sent items?

7        A.   Yes.

8        Q.   Do you have a trash folder?

9        A.   Yes.

10       Q.   Do you have an archive folder?

11       A.   I don't use it.  I don't know.

12       Q.   You don't know?

13            Do you have -- do you have an important

14   folder?

15       A.   I don't recall.  It's possible.

16       Q.   What about a starred folder?

17       A.   I believe so.

18       Q.   Do you have an importance folder?

19            MR. DeROSE:   Importance as opposed to

20       important?

21            MS. WERMUTH:   Important.

22       A.   I don't recall.

23   BY MS. WERMUTH:

24       Q.   Now, if you -- if you logged into your

25   e-mail here, you could tell me whether or not you

1               D. TRAHANAS - VOLUME II

2    have those folders, right, because you would be able

3    to see your e-mail?

4        A.  Probably, yeah.

5        Q.  Okay.  Do you have a spam folder?

6        A.  I don't know if that's a folder.

7        Q.  Okay.  Can you identify any other folders

8    or categories of e-mails that you have that I

9    haven't gone through?

10        A.  I think if you mean by categories, there

11    is, like, promotional type stuff.

12        Q.  Okay.  Any others?

13        A.  But I don't know if that's necessarily what

14    you mean by "folder."  That's all I can recall at

15    this time.

16        Q.  In connection with your medical school

17    applications, did you create a medical school

18    folder?

19        A.  I don't recall.

20        Q.  As you sit here today, do you have a folder

21    where you keep your medical school application

22    information in your gmail?

23        A.  I don't recall.

24        Q.  But if you looked at your gmail account,

25    you could answer that question; correct?

Page 452

                    D. TRAHANAS - VOLUME II

1

2       A.  I'm not sure.

3       Q.  Well, if you looked at it, you could see

4   whether or not you had a folder for your medical

5   school applications; correct?

6       A.  Sure, but I wouldn't be able to tell you

7   exactly what's in there by just looking at the

8   folder.  Right?

9       Q.  That's not what I -- okay.

10          But you could tell me whether or not you

11  had a folder that you designated for medical school

12  applications?

13      A.  Yes.

14      Q.  Correct?

15      A.  Yes.

16      Q.  But as you sit here now, you can't answer

17  that question, because you're not going to log in;

18  correct?

19      A.  Correct.

20      Q.  Are you familiar with gmail settings?

21      A.  I'm not sure if we would have the same

22  definition of "familiar," so I'm going to say I'm

23  not sure.

24      Q.  Well, tell me what you define settings to

25  be, then.

D. TRAHANAS - VOLUME II

1

2      A.   You open up the screen, and maybe your

3  background and, like you said, an inbox folder, a

4  sent folder, and there is a settings icon

5  somewhere --

6      Q.   Right.

7      A.   -- on the page.

8      Q.   Right.  And it looks like a little gear.

9           Would you agree with me?

10     A.   Yes.

11     Q.   And if you click on that little gear, you

12  can change the settings in connection with your

13  gmail account; correct?

14     A.   Yes.

15     Q.   Okay.  And do you -- as you sit here today,

16  can you tell me how your gmail account is set up?

17     A.   I have no idea.

18     Q.   No idea.

19          Have you ever gone into that settings tool

20  to change your settings in your gmail account?

21     A.   It's possible to change a password or a

22  privacy.  It's possible.

23     Q.   When's the last time you went into settings

24  and made any changes in your gmail account settings?

25     A.   I don't -- I don't recall.

                    D. TRAHANAS - VOLUME II

1

2      Q.   Did you -- excuse me.

3           When you threatened -- or when you -- your

4      friend/lawyer Pam Visvardis sent a letter to

5      Dr. Schwulst in February of 2015, at that point in

6      time did you change any of your settings in your

7      gmail account?

8      A.   I don't recall.

9      Q.   When you filed your charge of

10     discrimination against the University, did you

11     change any settings your gmail account?

12     A.   I don't recall.

13     Q.   What you filed your lawsuit against

14     Dr. Schwulst and the University, did you change any

15     settings in your gmail account?

16     A.   I don't recall.

17     Q.   And during the pendency of the litigation,

18     since have you changed the settings in your gmail

19     account?

20     A.   I don't recall.

21          MS. WERMUTH:  Mark this as 79, please.

22          (Trahanas Exhibit 79 marked for

23          identification.)

24          MR. DeROSE:  Thank you, Counsel.  Good job.

25     ///

1              D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3         Q.  Okay.  Ms. Trahanas, I'm showing you a

4    screenshot of a gmail account to see if we can --

5    since -- since we can't see yours, to see if we can

6    get some clarity around some of these issues.

7              So in the -- on the right, upper right

8    corner there is a little sort of circular gear icon.

9              Do you see that?

10        A.  The colored one, I'm sorry, or the one with

11   the bell?

12        Q.  So underneath the bell.

13        A.  Oh, yes.

14        Q.  Do you see it looks like a gear?

15        A.  Yes.

16        Q.  You understand that to be the setting icon;

17   correct?

18        A.  Yes, yes.

19        Q.  Okay.  And when you go to the left, you'll

20   see there is an inbox, a starred box, a snoozed box.

21             Do you see me?

22        A.  Yes, I follow.

23        Q.  Okay.  Sent, drafts, and then there is

24   categories.

25             Do you see all of these on the -- on the

1                      D. TRAHANAS - VOLUME II

2    left?

3         A.  Yes.

4         Q.  Okay.  Are there any, as you sit here today

5    looking at these, are there any on the left side

6    here that you don't have in your account?

7         A.  Snoozed.

8         Q.  You don't have snoozed?

9         A.  No.

10        Q.  Okay.  Any -- any else?

11        A.  Categories.

12        Q.  So the promotions issue that you talked

13   about before is not in a categories file on your

14   gmail?

15        A.  The promotions I was referring to is if you

16   look closer to the top of the page, is if it looks

17   like a tab, that's the promotions I was referring

18   to.

19        Q.  Do you see, though, that same word and icon

20   is under categories as well?  So do you see how

21   categories has a little arrow, and then there's four

22   sub --

23        A.  Oh, yes.

24        Q.  -- folders --

25        A.  I see that.

D. TRAHANAS - VOLUME II

1

2      Q.   -- social, updates, forums, and promotions.

3           So you don't have a categories file?  You

4  would just have one that says promotions; is that

5  your testimony?

6      A.   I've never noticed it in this format on the

7  left-hand side.  I've only see it where it's on the

8  top.

9      Q.   Okay.  Any other folders or icons along the

10  left that you don't have?

11      A.   I don't recall most of these, other than

12  sent, drafts, trash.  I've never ever in my life

13  seen "managed labels."  So sent, draft.  Perhaps

14  there's a starred.  I don't know what "less" is.

15  I've never seen that icon.  Did I -- I'm not sure if

16  I already said trash, but I've seen that.

17      Q.   Inbox you have; correct?

18      A.   Yes, inbox.

19      Q.   What about chat, do you have gmail chat?

20      A.   I don't recall it going a folder.

21      Q.   But you do have gmail chat; correct?

22      A.   I don't know.

23      Q.   Okay.  I think your testimony last time

24  indicated that you did.

25           Any other folders that are not listed here

Page 458

1                    D. TRAHANAS - VOLUME II
2   or icons not listed here that you use to organize
3   your e-mails?
4        A.  I'm not sure if spam is, like, an automatic
5   default of gmail, but I don't have a folder that
6   I've created.  But other than that, I don't -- I
7   don't recognize any other folders.
8        Q.  Okay.  And are there any folders that you
9   created that are not default gmail accounts that
10  don't show up on this particular exhibit?
11       A.  Yes.
12       Q.  What are those?
13       A.  Workout routines.
14       Q.  Any others?
15       A.  I don't recall definitively what they are.
16       Q.  Do you have any -- well, do you recall
17  generally what any of them are, or might be, if not
18  definitively?
19       A.  Something with workout routines, or soccer,
20  nutrition, something like that.
21       Q.  No others?
22       A.  Not that I recall.
23       Q.  What about one in connection with your
24  litigation that's pending currently against
25  Dr. Schwulst and the University?

D. TRAHANAS - VOLUME II

1

2      A.  No.

3      Q.  What about one related to your work at

4  Northwestern University?

5      A.  No.

6      Q.  When you were employed at Northwestern

7  University, you had a Northwestern University e-mail

8  account; correct?

9      A.  Yes.

10     Q.  And you also had a gmail account, correct,

11 that you used for work; correct?

12     A.  Yes.

13     Q.  And did you somehow connect those two

14 accounts to one another?

15     A.  At some point, yes.  I don't recall when.

16     Q.  And how -- how is it that you did that?

17     A.  I don't recall.

18     Q.  So as you sit here today, you can't tell me

19 how you connected those two e-mail accounts?

20     A.  I would imagine I asked IT at Northwestern

21 to help me with that.  I don't know how to do that.

22     Q.  And did -- did IT help you connect those

23 e-mail accounts?

24     A.  I would be speculating.  Like I said, I'm

25 not familiar with it, so I'd rather not assume.

1                    D. TRAHANAS - VOLUME II

2          Q.   I don't understand your answer.  I think

3    you testified that you would have worked with IT to

4    connect the two accounts?

5          A.   I don't recall specifically, but if I don't

6    remember how to do any of that, or I don't know,

7    then yes, I probably would have used a resource like

8    that, yes.

9          Q.   Did you disconnect those accounts at some

10   point in time?

11         A.   Not that I recall, no.

12         Q.   And so, is there a way in looking at your

13   gmail to see whether or not there's an import of

14   Northwestern e-mails?

15         A.   Not that I know of.

16         Q.   When e-mails come in -- strike that.

17              In settings -- strike that.

18              Do you have any filters set up on your

19   incoming e-mail?

20         A.   Not that I know of.  I don't -- I don't

21   know.

22         Q.   Okay.  So you don't recall setting up any

23   filters to send particular e-mails to particular

24   places when they come in?

25         A.   Correct.

D. TRAHANAS - VOLUME II

1

2      Q.   Okay.  And do you have any auto delete set

3  up on your e-mail?

4      A.   I don't know.

5      Q.   And why is it that you don't know?

6      MR. DeROSE:  Objection to the form of the

7      question.

8      Counsel, I got to tell you I'm amazed with

9      the familiarity the two of you have with this,

10      but why you don't know something -- go ahead

11      and answer it, if you have any way to answer

12      that.

13      A.   I'm not a computer expert, so I can't know

14  every possible setting or default for everything we

15  use.

16  BY MS. WERMUTH:

17      Q.   Have you ever gone into your settings to

18  determine what the defaults are on your gmail

19  account?

20      A.   I don't recall.

21      Q.   And once you initiated legal action, did

22  you go in to your settings to make sure that if

23  there were any defaults, you turned them off so as

24  to not destroy relevant information?

25      A.   I don't recall.

1              D. TRAHANAS - VOLUME II

2      Q.  And you haven't done that since I took your

3  deposition in January of last year; correct?

4      A.  I'm sorry.  Can you -- can you repeat that?

5      Q.  You haven't -- you said you don't recall,

6  but let me ask you this question:  In the last year

7  since I took your deposition, have you gone into

8  your settings to make sure that any auto deletes

9  have been turned off?

10     A.  I don't recall.

11         MS. WERMUTH:  Can we have this marked,

12     please.

13         (Trahanas Exhibit 80 marked for

14     identification.)

15         MS. WERMUTH:  I'm sorry.  Got it.

16         MR. DeROSE:  Yeah, thank you.  And I'm

17     learning a lot, because I don't know half the

18     things you ladies are talking about, but go

19     ahead.

20         MS. WERMUTH:  Is this Exhibit 80?  Thank

21     you.

22  BY MS. WERMUTH:

23     Q.  Okay.  So you've been handed, Ms. Trahanas,

24  what's been marked as Exhibit 80.  And you see sort

25  of in the -- in the middle of the page near the top

                      D. TRAHANAS - VOLUME II

1    where it says "search e-mail."

2           Do you see that?

3        A.  Yes.

4        Q.  And then just below that it says

5    "settings."

6           Do you see that?

7        A.  Yes.

8        Q.  Okay.  And then under settings there is

9    several hyperlinks, and you can see that one of them

10   is underlined and in the color blue.

11          Do you see that?

12       A.  Yes.

13       Q.  Okay.  So one of the settings is general,

14   one is labels, one is inbox, one is accounts and

15   imports, filters and blocked addresses, forwarding

16   and POP/IMAP, add-ons and chat.

17          Do you see that?

18       A.  Yes, I do.

19       Q.  Okay.  Have you ever gone into this

20   settings tab to see these hyperlinks?

21       A.  It's possible at some point, but I don't

22   recall.

23       Q.  Okay.  Do you know what POP or IMAP stands

24   for?

25

1                    D. TRAHANAS - VOLUME II

2        A.  No.

3        Q.  Do you know whether or not POP and IMAP

4   have anything to do with how e-mails are stored on a

5   server?

6        A.  No.  I have no idea.

7        Q.  Okay.  And you can see from these two pages

8   that I clicked on that particular link, forwarding

9   and POP/IMAP.

10           Do you see that?

11       A.  Yes.

12       Q.  Okay.  And if you look at POP download, do

13  you see that?

14       A.  Yes.

15       Q.  Okay.  And it allows you to enable POP for

16  all e-mail or for types of e-mail, do you see

17  that -- or based on dates.

18           Do you see that?

19       A.  Yes.

20       Q.  And you'll see also that you can indicate

21  where POP e-mails ought to be, if you look at number

22  two, where POP e-mails ought to be moved once they

23  are accessed.

24           Do you see that?  There is a drop down box

25  there.

1                    D. TRAHANAS - VOLUME II

2        A.  So number two?

3        Q.  Correct.

4        A.  When messages are accessed with POP, keep

5    gmail's copy in the inbox.  That's what I'm reading.

6        Q.  Right.

7        A.  Okay.  I follow you.

8        Q.  And you -- have you ever looked at that?

9        A.  Not that I can recall.

10       Q.  Have you ever indicated where those

11   messages accessed with POP should be moved once they

12   are accessed?

13       A.  Can I ask what POP is or can -- I don't --

14   I can't answer the question, because I'm not sure

15   what POP is.

16       Q.  My question is:  Have you ever looked at

17   this and directed where those e-mails ought to be

18   located?

19       A.  Not that I can remember, no.

20       Q.  Okay.  Do you see in the next section where

21   it says IMAP access?

22       A.  Underneath, yes.

23       Q.  Yes.

24            And then, on the next page under IMAP it

25   says, "When I mark a message in IMAP as deleted,"

1                    D. TRAHANAS - VOLUME II

2   and then there are options, auto expunge on, auto

3   expunge off.

4           Do you see that?

5       A.  I do see.

6       Q.  Have you, in connection with this

7   litigation, gone in to see whether or not you have

8   an auto expunge on or off?

9       A.  I have never made any adjustments to my

10  gmail to change anything.

11      Q.  Anything ever?

12      A.  In correlation with this litigation, to

13  change anything in my settings.

14      Q.  So in the -- if the default auto expunge is

15  on, you never went in to turn it off?

16      A.  I don't recall seeing this.  I don't know.

17      Q.  I think you just testified that you've

18  never made any changes to your settings in

19  connection with the litigation --

20      A.  Right.

21      Q.  -- correct?

22      A.  I don't recognize this.

23      Q.  So you have not turned auto expunge off

24  since filing your lawsuit; correct?

25      A.  I -- I can't tell you either way.  I don't

1           D. TRAHANAS - VOLUME II

2    know what the default is.

3         Q.  Well, it says what the default is, right,

4    auto expunge on; right?  It says default at the end

5    of that entry.

6         A.  It says -- it says it for this account.

7    I'm not sure if it's different for different gmail

8    accounts.

9         Q.  And you didn't bother to go in and look

10   whether or not auto expunge was on or off?  Is

11   that -- do I understand your testimony correctly?

12        A.  I -- I don't know.  I don't recall.

13        Q.  Is it I don't know, I don't recall, or I

14   didn't do it, because you've said all three now?

15   Which one is it?

16        A.  I'm not sure what the default is, so I

17   can't speak to one or the other.  I don't -- I don't

18   recognize this page, as I've said.

19        Q.  Okay.  Regardless of what the default may

20   be in your gmail, what you're telling me is you

21   didn't bother to look what the default was in your

22   gmail account; correct?

23        A.  I was never instructed to look.

24        Q.  Okay.

25        A.  So . . .

D. TRAHANAS - VOLUME II

1

2    Q.  And so, you didn't; correct?

3    A.  I don't recall.

4    Q.  And as you sit here today, you cannot tell

5  me that you took any measures to make sure that

6  relevant e-mails in your gmail account were not

7  being auto expunged in connection with your legal

8  claims against Dr. Schwulst or the University?

9    A.  That's not what I said.

10    Q.  That's my question.

11    A.  I don't recall what exactly -- my settings

12  there is.

13    Q.  Okay.  That's not my question.

14    My question is:  You did not take any steps

15  in your gmail account to make sure that e-mails that

16  were relevant to the litigation were not being auto

17  expunged; is that fair?

18    A.  I don't even know what -- I don't think I

19  understand the question.

20    Q.  Setting aside this particular page --

21    A.  Okay.

22    Q.  -- did you -- when you were thinking about

23  filing claims against Dr. Schwulst, did you go into

24  your gmail account to preserve and make sure that

25  e-mails were not being deleted?

1                    D. TRAHANAS - VOLUME II

2        A.  As far as I know, if you don't delete

3    something, it doesn't get deleted.

4        Q.  Okay.  So let me ask you about your

5    deletion practices, then.  When e-mails come into

6    your gmail inbox, what do you do with them?

7        A.  Can you be more specific?

8        Q.  When you get an e-mail to your gmail

9    account, what do you do with it?

10       A.  It depends on the e-mail.  It depends on

11   the time.

12       Q.  Okay.  So what are the variety of options

13   that you would do with an e-mail that comes into

14   your gmail account?

15       A.  If I happen to see it, and it's important,

16   I might open it.  If it's not, I may open it later.

17   I may not ever get to it.  I may forget about it.

18   There is a lot of things that people do with

19   e-mails.

20       Q.  I'm asking what you do.

21       A.  I'm just giving you an example.  I'm one of

22   those people.  I -- it would depend on the time and

23   where I'm at and what I'm doing.

24       Q.  So if it was a work-related e-mail, what

25   would you do with it?

1                     D. TRAHANAS - VOLUME II

2          A.   At the time that I was at Northwestern or

3     now?

4          Q.   When you were at Northwestern and you got a

5     work e-mail, what would you do with it?

6          A.   It depends who it was from.

7          Q.   Okay.

8          A.   So if it was from my superiors, that would

9     take priority.

10         Q.   So you would read it?

11         A.   More than likely, yes.

12         Q.   Yeah.

13              And after you read it, what would you do

14     with it?

15         A.   Address whatever they were asking me to do

16     in the e-mail.

17         Q.   Okay.  What did you do with the e-mail, is

18     my question, not what did you do in response to any

19     instruction?  What did you do with the e-mail after

20     you read it?

21         A.   With any e-mail or the -- like, I'm not

22     sure which "the e-mail" --

23         Q.   We were talking about your work e-mails,

24     weren't we, Ms. Trahanas?

25         A.   Sure.

1          D. TRAHANAS - VOLUME II

2     Q.   Okay.  So you get a work e-mail from one of

3  your superiors, right --

4     A.   Okay.

5     Q.   -- which is what you said.

6     A.   Sure.

7     Q.   You will open it and read it, right,

8  because you said you would give priority to that?

9     A.   Sometimes yes, but it depends if I was busy

10  that day or not, or where I was, what we were doing,

11  what it was in relation with.

12     Q.   Okay.  So there would be some e-mails you

13  wouldn't look at at all, even though they were work

14  related, you would never read them; is that your

15  testimony?

16     A.   It's possible, but not that I recall, no.

17     Q.   Okay.  And so, after you read an e-mail

18  from work, I don't care if you read it immediately

19  or an hour later or two days later, once you read an

20  e-mail from work, what did you do with the e-mail?

21     A.   I don't know.  I mean, I would address

22  what's in the e-mail.  If I needed to forward it to

23  somebody, I would forward it.  If I needed to reply,

24  I would reply.  If I needed to, you know, send it

25  over to Harris, or send it over to Steve, or print

1                    D. TRAHANAS - VOLUME II

2    out a result that's from that e-mail, depending on

3    what experiment we were working on, I would print

4    out, you know, the attachment.  I don't know.

5         Q.  Would you archive it?

6         A.  I don't know how to ar- -- no, I don't.

7         Q.  Would you delete it?

8         A.  If it was -- it's possible I've deleted an

9    e-mail from work while I was at Northwestern.  I

10   don't know.

11        Q.  Do you have any practices with respect to

12   organizing your gmail e-mails?

13        A.  No, I have an inbox.

14        Q.  You have an inbox.

15            And do you clean out that inbox from time

16   to time?

17        A.  If it's spam mail, yeah, I will delete an

18   e-mail.

19        Q.  Okay.  What about if it's work related, do

20   you clean out your inbox?

21        A.  Again, it depends on the relevancy of the

22   e-mail.  If people were e-mailing me nonsense, or

23   Okay, see you in five, or some miniscule thing, then

24   I'd probably end up deleting it.  I'm not sure.

25        Q.  Would you put it into a folder?

1                    D. TRAHANAS - VOLUME II

2          A.   It would be in the deleted folder, the

3     trash.

4          Q.   Okay.  So if you deleted something, it

5     would go into trash?

6          A.   I believe, yeah.

7          Q.   Okay.  Did you organize your e-mails into

8     other types of folders, like these are -- these are

9     experiment-related e-mails?

10         A.   No.

11         Q.   No.  So it would either be in your inbox or

12    in your trash?

13         A.   Correct.

14         Q.   Okay.  And right this minute, can you tell

15    me how far back in time you have e-mails from

16    your -- in your inbox in your gmail account?

17         A.   At least until two thousand maybe -- prior

18    to me starting at Northwestern, at least.  So I

19    started in June of 2012.  I'm not sure if it's that

20    year or the year before.  I couldn't tell you.

21         Q.   So in your e-mail box right now, your

22    inbox -- I'm sorry.  Strike that.

23              In your inbox in your gmail account right

24    this minute you have e-mails dating back, you think,

25    at least until 2012 and maybe earlier?

1                    D. TRAHANAS - VOLUME II

2        A.  I don't know for sure.

3        Q.  Okay.  You do know that you have produced

4   e-mails to us in this litigation dating back to

5   2012?

6        A.  Correct, that's why I say at least until

7   2012.

8        Q.  Okay.  And are you familiar with org- --

9   filtering your e-mails from the sender?  Do you know

10  how to do that?

11       A.  No.

12       Q.  Okay.  So you don't know how to create a

13  rule that allows you to look at all the e-mails from

14  a particular sender?

15       A.  When you say "filter," I would assume that

16  that means block -- like block somehow or redirect

17  it.

18       Q.  No, I'm talking more about a sort.

19            So, like, do you know how in gmail to say,

20  okay, I want to see all my e-mails from

21  Dr. Schwulst?

22       A.  Sure, you search for it.

23       Q.  Beyond searching, do you know that you can

24  apply a rule that allows you to sort by sender?

25       A.  In a possible setting, yes.

1          D. TRAHANAS - VOLUME II

2     Q.  Okay.

3     A.  It's possible.

4     Q.  And did you do that in connection with

5  pulling e-mails that were relevant to the document

6  requests that we made in this case?

7     A.  I don't recall.

8     Q.  How many times have you searched your

9  e-mail in connection with the lawsuit pending in

10 this case?

11    A.  I can't give you a number.

12    Q.  Can you give me an approximate number?

13    A.  I'd be speculating either way, so I'd

14 rather not.

15    Q.  Was it one time?  Did you search one time?

16    A.  I'd be speculating either way, but clearly

17 not one time, no.

18    Q.  Was it ten times?

19    A.  It was much more than ten.

20    Q.  More than ten times?

21    A.  Much more.

22    Q.  Twenty times?

23    A.  Much more.

24    Q.  Fifty times?

25    A.  Are you saying for a specific thing or are

1                 D. TRAHANAS - VOLUME II

2    you saying in general?

3         Q.   In connection with the legal claims that

4    you have pending against Dr. Schwulst and

5    Northwestern University, how many times have you

6    searched your gmail account to find relevant

7    e-mails?

8         A.   I can't give you a specific number.  It's a

9    lot.

10        Q.   Is it 50 times?

11        A.   It's a lot.

12        Q.   So more than 20; yes?

13        A.   More than 50, could be more than 100, could

14   be more than 200.  I honestly couldn't tell you the

15   number.  It's a lot.

16        Q.   More than 200 times that you searched your

17   gmail account for relevant e-mails?

18             MR. DeROSE:  She said she can't tell you.

19        Counsel, that's not fair.  She said she can't

20        tell you.

21             MS. WERMUTH:  She's giving me numbers.  I'm

22        trying to hone in on the number she's giving

23        me.  Please don't instruct her.

24             MR. DeROSE:  Well, but please.  I don't

25        want you to guess.

                    D. TRAHANAS - VOLUME II
1
2          But go ahead, Counsel.  The way that
3       questioning pattern came out, I think you're
4       asking her to guess, but go ahead.  Go ahead,
5       Counsel.
6   BY MS. WERMUTH:
7       Q.  Can you give me an approximation of the
8   number of times you searched your gmail account for
9   relevant e-mails in connection with this litigation?
10      A.  I can't give you a specific number.
11      Q.  Did you document your searches in any way?
12      A.  No.
13      Q.  Did you confer with your counsel on which
14  search terms you should be using?
15      A.  Yes, he --
16      Q.  I don't want to know exactly what he
17  told --
18      A.  Yeah.
19      Q.  -- you, but you did have conversations with
20  your counsel on the topic of search terms?
21      A.  On being thorough with my searches, yes.
22      Q.  I'm --
23          MR. DeROSE:  That's about all I could tell
24      her, by the way.  I don't know how to do all
25      this stuff, but go ahead, Counsel.

1               D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3        Q.   Okay.   I'm not asking about thoroughness.

4    I'm asking about specific search terms.

5             Did you have conversations with your

6    counsel about specific search terms?

7        A.   I'm not sure if that's really privileged.

8             MR. DeROSE:   And, Counsel, I don't know how

9        to give her search terms, so, but go ahead.

10            And don't guess.   If you know an answer,

11       tell her yes or no.

12            MS. WERMUTH:   Please don't instruct the

13       witness during the course of the deposition.

14            MR. DeROSE:   Counsel, please don't give me

15       instructions of how I shall proceed in this

16       deposition.   I've been very patient with you.

17       Go ahead.

18            MS. WERMUTH:   You're instructing the

19       witness during the course of the deposition,

20       which is not proper.   I'm going to say that.

21            MR. DeROSE:   Counsel, please.   I don't need

22       your instruction of what's proper.   I will try

23       to conform myself to the Federal Rules of

24       Evidence, and I'm trying not to interrupt at

25       all, but you're asking her did I give her

Page 479

D. TRAHANAS - VOLUME II

2      search terms.  I can't do it.

3   BY MS. WERMUTH:

4      Q.  So the answer is no, you didn't discuss

5   specific search terms with your counsel?

6      A.  No, he didn't instruct me on what to

7   search.

8      Q.  When did you start using Gchat?

9      A.  I don't know.

10     Q.  Does it go back as far as 2012, Gchat?

11     A.  I don't recall.

12     Q.  Do you use the Google Drive at all?

13     A.  Yes.

14     Q.  And do you back up files on -- on Google

15  Drive?

16     A.  No.

17     Q.  You've never backed up files on Google

18  Drive?

19     A.  I didn't say never, but I -- I don't

20  practice that.

21     Q.  Have you ever done that?

22     A.  Yes.

23     Q.  When was the last time you did that?

24     A.  A couple of days ago.

25     Q.  Why?

Page 480

1          D. TRAHANAS - VOLUME II

2      A.  For a soccer schedule for work.

3      Q.  When was the time before that that you

4  backed up your files on Google Drive?

5      A.  I don't know.

6      Q.  Did you back up your Google Drive files

7  when you filed your lawsuit against Northwestern and

8  Dr. Schwulst?

9      A.  So backed up files and download I think --

10  I'm not sure if -- I want to make sure that we're

11  both on the same page.  So are you assuming

12  downloading and -- can you be more specific on

13  downloading versus backing up?

14      Q.  I didn't say downloading.  I asked you if

15  you backed up files on Google Drive, saved them and

16  backed them up so that they were preserved.  Did you

17  do that?

18      A.  Yes, save files on Google Drive, yes.

19      Q.  And did you back up those files to make

20  sure that they stayed intact?

21      A.  They are in Google Drive.  That's where

22  they are.

23      Q.  And your e-mail is connected to Google

24  Drive; correct?

25      A.  It's connected to Google.  I don't know

1          D. TRAHANAS - VOLUME II

2    necessarily it's connected to the gmail account.

3          Q.  And you didn't bother to check; correct?

4          A.  It's available to me.  I mean, it's there.

5    That's how I checked, I guess.

6          Q.  Have you been backing up your e-mails on

7    Google Drive?

8          A.  No.

9          Q.  You've never done that?

10         A.  No.

11         Q.  When you were applying to medical school,

12   how frequently were you checking your gmail account

13   in 2014 and 2015?

14         A.  It was my primary means of communication

15   for work, so I would assume once a day.

16         Q.  Okay.  And -- and did you have a process

17   for going through your e-mails when you looked at it

18   at least once a day?

19         A.  Like I said, I would try and prioritize it,

20   especially if it was a busy day, like an

21   experimental day.

22         Q.  Okay.  And what if you got e-mails from a

23   medical school in that late 2014/early 2015 time

24   frame, what did you do with those e-mails?  Would

25   you review them?

1          D. TRAHANAS - VOLUME II

2      A.  I'm -- yes, I suppose.

3      Q.  And you did get e-mails from the schools

4  that you were applying to, correct, in 2014 and

5  2015?

6      A.  I don't recall which schools gave me

7  e-mails.

8      Q.  That's not my question.

9          You did get e-mails from some of the

10 schools you applied to in 2014 and 2015; correct?

11     A.  Yes.

12     Q.  Okay.  And you would review those e-mails;

13 right?

14     A.  I would think so, yes.

15     Q.  Yeah, because they are giving you important

16 information about your application typically; right?

17     A.  Sometimes they are sending you

18 advertisements about other programs, but yes.

19     Q.  Okay.  But they might be sending you

20 information about, Hey, we want to invite you to

21 submit a secondary application, and the deadline is

22 X date; right?

23     A.  Yes.

24     Q.  Okay.  So that's an important e-mail from a

25 medical school; right?

Page 483

1            D. TRAHANAS - VOLUME II

2       A.   Yes.

3       Q.   Because if you don't submit your secondary

4  application on time, you are no longer considered a

5  candidate; correct?

6       A.   I don't agree with that statement.

7       Q.   Okay.  So has any school that you applied

8  to told you that you could submit your secondary

9  application after the deadline and still be

10  considered a candidate?

11      A.   I know schools that will reject you, and

12  you can still get an invitation right before the

13  matriculation of that class.

14      Q.   An invitation for what?

15      A.   To matriculate into their program.

16      Q.   So you're telling me that a school will

17  reject a candidate and then later send that

18  candidate a letter or an e-mail accepting them?

19      A.   Yes.

20      Q.   Has that ever happened to you?

21      A.   No.

22      Q.   What school do you know does that?

23      A.   They were both in the south.  I can't

24  exactly tell you which schools they are.

25      Q.   And how do you know that two schools in the

1                    D. TRAHANAS - VOLUME II

2    south do that?

3         A.  Two friends of mine got e-mails.

4         Q.  After they were already rejected?

5         A.  Correct.

6         Q.  Were they two schools that you applied to?

7         A.  No, I don't believe so.  I don't recall.

8         Q.  And -- and just so I'm clear, you typically

9    did one of two things with your e-mails when you get

10   them, you either put them in -- you leave them in

11   your inbox, or you put them in trash; is that right?

12        A.  Yes, to the best of my recollection, yes.

13        Q.  Okay.  Is there anywhere else you would

14   have put them, other than trash or leave them in

15   your inbox?

16        A.  Not that I recall.

17        Q.  And do you have any process for going

18   through your trash items on any periodic basis?

19        A.  No routine process, no.

20        Q.  And since this litigation has started, have

21   you gone in and cleaned out your trash box and

22   permanently deleted any e-mails?

23        A.  Can you be more specific?

24        Q.  Since -- since February of 2016, have you

25   permanently deleted any e-mails from your trash box?

1        D. TRAHANAS - VOLUME II

2        A.  Yes.

3        Q.  When?

4        A.  I'm not sure.  I got a couple viral type

5    of, like, spam messages that I immediately

6    permanently deleted, because it was like a

7    phishing/hacking scam, and I clicked on one, so I

8    didn't want to continue downloading -- I didn't want

9    them to infect the computer, so I deleted that.  I

10   don't recall a time.

11       Q.  Okay.  Have you permanently deleted any

12   e-mails from the medical schools that you applied to

13   in the 2015 cycle?

14       A.  From -- like ever?  Can you please be more

15   specific?  I'm sorry.

16       Q.  How many schools did you apply to in the

17   2015 cycle?

18       A.  Fifteen.

19       Q.  And you got e-mails from some of those

20   schools; correct?

21       A.  Yes, from some of the schools, yes, it's

22   possible.

23       Q.  And when you got those e-mails, what did

24   you do with them?

25       A.  I don't recall.

Page 486

1          D. TRAHANAS - VOLUME II

2      Q.  Did you permanently delete any of those

3  e-mails?

4      A.  Yes.

5      Q.  Why?

6      A.  You don't have access to -- secondary

7  applications are on a time frame, so some schools

8  give you a rejection within your secondary

9  application, so you don't necessarily get a

10 rejection letter.  Some schools won't even send you

11 a letter.  Some schools will call you, and some

12 schools will mail you letters.  So I don't know

13 which schools did what.

14     Q.  Okay.  But here's my question:  Why did you

15 permanently delete e-mails from the schools that

16 sent you e-mails?  You said you permanently deleted

17 some.  Why?

18     A.  I can't tell you why at the time.  I don't

19 know.

20     Q.  When did you permanently delete e-mails

21 from medical schools that sent you e-mails?

22     A.  I don't recall a time.  If you remember

23 correctly, I was seeing a psychiatrist eight times

24 in two months.  It was a very stressful time.  I

25 don't recall.

1          D. TRAHANAS - VOLUME II

2     Q.  I don't know what time period you're

3 talking about.  Can you tell me?

4     A.  December, January.

5     Q.  Okay.  So you're saying you don't recall if

6 you permanently deleted e-mails during that point in

7 time?

8     A.  I don't recall which schools or -- yes.

9     Q.  Okay.  So let's go through the schools

10 then, since you can't recall.

11          MR. DeROSE:  How long have we been going

12     now?

13          MS. WERMUTH:  About an hour fifteen.  Do

14     you want a break?

15          MR. DeROSE:  Yeah, let's take a break.

16          VIDEOGRAPHER:  Ending disc number one of

17     the deposition of Diane Trahanas.  Off the

18     record at 11:21 A.M.

19          (Recess taken from 11:21 A.M. to

20     11:47 A.M.)

21          VIDEOGRAPHER:  And beginning disc number

22     two of the deposition of Diane Trahanas.  We're

23     back on the record at 11:47 A.M.

24          MS. WERMUTH:  Okay.  Before I continue the

25     examination, can I get this marked, please, as

Page 488

1              D. TRAHANAS - VOLUME II

2        Exhibit 81.

3             (Trahanas Exhibit 81 marked for

4        identification.)

5             THE WITNESS:  I got it, John.

6             MR. DeROSE:  That's all right.  I can get

7        it.

8             MS. WERMUTH:  So I just want it clear on

9        the record that this is the dep -- Exhibit 81

10       is the deposition notice that we served in this

11       case which does indicate that it would be

12       recorded before a court reporter and a

13       videographer.

14            MR. DeROSE:  And I do acknowledge that,

15       Counsel.  I got to read more carefully.

16            MS. WERMUTH:  No worries.

17  BY MS. WERMUTH:

18       Q.  All right.  Ms. Trahanas, before we broke

19  you were -- you had told me that two of your friends

20  were admitted to medical school after initially

21  being rejected from medical school.

22            Do you remember that testimony?

23       A.  I did not say they were admitted.

24       Q.  Oh, you didn't say that?

25       A.  No, I said that they were offered.

1                    D. TRAHANAS - VOLUME II

2          Q.  Offered what?

3          A.  An invitation to matriculate.

4          Q.  They were offered admission?

5          A.  Yes, but they did not accept.

6          Q.  Okay.

7          A.  They did not go.

8          Q.  They were offered admission?

9          A.  Right, after their rejection, correct.

10         Q.  After being rejected?

11         A.  Correct.

12         Q.  Not after being wait listed, but after

13    being rejected?

14         A.  Correct.

15         Q.  And those were osteopathic or allopathic

16    school?

17         A.  M.D. schools, so allopathic.

18         Q.  And you can't remember the names of the

19    schools?

20         A.  Not at this time.

21         Q.  Can you tell me your friends' names?

22         A.  Can I talk to my counsel?

23              MR. DeROSE:  Tell them the names.  They are

24         not going to investigate this.  Tell them the

25         names.

D. TRAHANAS - VOLUME II

1

2      THE WITNESS:  I don't want to get them

3   involved.

4      MR. DeROSE:  They are not involved.  Give

5   them the names, please.

6   A.  Peter Gerginis.

7  BY MS. WERMUTH:

8   Q.  How do you spell that last name?

9   A.  G-e-r-g-i-n-i-s.

10   Q.  The other person?

11   A.  It was his friend.  I don't know his first

12  and last name.

13   Q.  It was Peter's friend?

14   A.  Yes.

15   Q.  And it was two different schools, or they

16  were accepted or offered admission to the same

17  school?

18   A.  I don't recall.  I know it was somewhere in

19  the south.

20   Q.  So you don't know if it was one school or

21  two schools?

22   A.  I don't remember.

23   Q.  And is Peter Gerginis in medical school

24  now?

25   A.  He is doing a residency now.

D. TRAHANAS - VOLUME II

1

2    Q.   Okay.  So he did go to medical school?

3    A.   Yes.

4    Q.   Where did he go to medical school?

5    A.   He -- I don't know which medical school

6  exactly he went to, but it was somewhere in the

7  Dominican, but he studied in London, and he is an

8  anesthesiology -- anesthesiology resident --

9    Q.   Where?

10    A.   -- currently.  I don't know where.

11    Q.   Do you stay in touch with him?

12    A.   From time to time.

13    Q.   By what means?

14    A.   Social gatherings.

15    Q.   Do you have his e-mail address?

16    A.   I don't have his e-mail.

17    Q.   Do you have his cell phone number?

18    A.   I don't know it, but I could get it.

19    Q.   You can get it.

20         Do you have his address?

21    A.   No.

22    Q.   And how do you know Peter?

23    A.   A family friend.

24    Q.   And Peter's friend, male or female?

25    A.   Male.

1          D. TRAHANAS - VOLUME II

2     Q.  And have you met this individual?

3     A.  Yes.

4     Q.  Where?

5     A.  It was a social gathering -- a Greek social

6  gathering.

7     Q.  Where?

8     A.  In the city.  I don't remember the venue.

9     Q.  When?

10     A.  A year or two ago.

11     Q.  And did the friend end up going to medical

12  school?

13     A.  I don't know.

14     Q.  And how is it that you learned that Peter

15  and his friend were rejected and subsequently

16  offered admission?

17     A.  We had a conversation about it.

18     Q.  When?

19     A.  At the time of the event.

20     Q.  The social gathering you're talking about?

21     A.  Yes.

22     Q.  And that was in Chicago?

23     A.  Yes.

24     Q.  Where in Chicago?

25     A.  I don't know.  I believe I already answered

1          D. TRAHANAS - VOLUME II

2    that.

3          MR. DeROSE:  And, Counsel, we do agree that

4          this is supposed to be a deposition about my

5          client's searches.  You know, so I do ask that

6          you try to stay in what the court talked about.

7          This is not a discovery deposition.

8          MS. WERMUTH:  I understand, but she also --

9          first of all, it's not just the searches.  We

10         already discussed that this morning.  But she

11         opened the door on this, so I'm just -- I'm

12         just closing out this line of inquiry.

13         I mean, she offered this in connection with

14         a question that I didn't pose.  So because she

15         offered it, I'm just going to ask her some

16         follow-up questions about it.

17   BY MS. WERMUTH:

18         Q.  When -- so just so I'm clear, you remember

19   that the social gathering was one or two years ago

20   in Chicago, you just don't remember the actual venue

21   or location?

22         A.  Correct.

23         Q.  And do you know -- do you recall what the

24   purpose of the gathering was?

25         MR. DeROSE:  Objection.  Don't answer the

```
1                    D. TRAHANAS - VOLUME II
2        question.
3   BY MS. WERMUTH:
4        Q.  Are you going to follow your lawyer's
5   advice?
6        A.  I am going to take my legal counsel's
7   advice.
8        Q.  When you say a school in the south, do you
9   mean the southern United States or do you mean
10  outside of the U.S.?
11           MR. DeROSE:  Don't answer the question.
12  BY MS. WERMUTH:
13       Q.  Are you going to follow that instruction?
14       A.  I'm taking legal counsel's advice, correct.
15       Q.  Was it a school in the Caribbean?
16           MR. DeROSE:  Do not answer the question.
17           MS. WERMUTH:  All right.  Then I will move
18       to strike the testimony about the two
19       individuals getting accepted, because if I
20       can't learn where they got accepted from, she
21       can't use that in her -- in her motion.
22           MR. DeROSE:  Fine, Counsel.  You can make
23       the motion.  Do whatever you want.  Go ahead.
24           MS. WERMUTH:  Yeah, I will.  I have.  I've
25       made the motion to strike.
```

1          D. TRAHANAS - VOLUME II

2          MR. DeROSE:  You have to bring it up to a

3     judge, because none of us are going to strike

4     it for you, but go ahead.

5  BY MS. WERMUTH:

6     Q.  Before we broke, Ms. Trahanas, you

7  testified that it was your practice to, and tell me

8  if I'm wrong, to permanently delete spam that you

9  felt could potentially cause some sort of viral

10  infection in your computer.  Do I understand that

11  correctly?

12     A.  Yes.

13     Q.  Okay.  And did you have any practices with

14  respect to permanent deletions of other types of

15  e-mails?

16     A.  I'm sorry.  Can you read back the first

17  part of that question?

18          (Record was read as requested.)

19     A.  I don't have a set protocol on practices of

20  deletion of e-mails, no.

21     Q.  Okay.  But you didn't suspend any of your

22  deletion practices when you were involved in the

23  litigation; correct?

24     A.  Can you be more specific?

25     Q.  You didn't stop permanently deleting

1          D. TRAHANAS - VOLUME II
2    e-mails after February of 2015; correct?
3        A.  I'd still ask you to be a little more
4    specific.
5        Q.  Have you permanently deleted any e-mails
6    since February of 2015 from your gmail account?
7            MR. DeROSE:  Counsel, could you say -- can
8        you ask it with respect to this case?
9            MS. WERMUTH:  No.
10           MR. DeROSE:  Because that's what we are
11       here about.
12           MS. WERMUTH:  I will get there.  This is my
13       question.  This is my deposition.
14   BY MS. WERMUTH:
15       Q.  Have you permanently deleted any e-mails
16   from your gmail account since February of 2015?
17       A.  Yes.
18       Q.  What e-mails?
19       A.  Like I said earlier, any sort of spam or
20   excessive promotional advertisements, maybe
21   anything -- like an invitation or like a Facebook
22   things that says that it's someone's birthday.
23       Q.  Okay.
24       A.  Trash, basically.
25       Q.  Have you permanently deleted since February

1                    D. TRAHANAS - VOLUME II

2    of 2015 any e-mails to or from AMCAS?

3         A.  I don't recall what -- can you be more

4    specific?

5         Q.  You receive -- in connection with your

6    medical school applications in 20 -- for the 2015

7    cycle and the 2018 cycle, you received e-mails from

8    AMCAS; correct?

9         A.  Yes.

10        Q.  Yes.

11             Have you permanently deleted any of those

12   e-mails?

13        A.  No.

14        Q.  None of them?

15        A.  No.

16        Q.  And so, if you went into your inbox and

17   used a search term AMCAS, you would -- you would

18   discover many e-mails; yes?

19        A.  Any e-mails that I have found, I have

20   produced to you.  I gave to my lawyer, and he gave

21   to you.

22        Q.  That's not my question.

23             If you went into your inbox and used a

24   search term AMCAS, how many e-mails would you find?

25        A.  I don't know.

1               D. TRAHANAS - VOLUME II

2       Q.  And did you ever use the search term AMCAS

3   in your inbox?

4       A.  I'm sure I did.  I don't recall the dates

5   of that search.

6       Q.  Did you search the term AMCAS in your sent

7   items?

8       A.  You search AMCAS, everything comes up.

9       Q.  Did you search -- so the answer is yes, you

10  searched in your sent items; is that right?

11      A.  Yes.

12      Q.  And you searched the term AMCAS in your

13  trash items as well?

14      A.  Yes.

15      Q.  And in connection with your deposition

16  today you were asked certain discovery questions; is

17  that right, Ms. Trahanas?

18      A.  Yes.

19          MS. WERMUTH:  Can we have this marked,

20      please.

21          (Trahanas Exhibit 82 marked for

22      identification.)

23          MS. WERMUTH:  I'm sorry.

24          MR. DeROSE:  That's okay.

25          MS. WERMUTH:  Is that better?

1                    D. TRAHANAS - VOLUME II

2            MR. DeROSE:  Yes.

3    BY MS. WERMUTH:

4        Q.  Okay.  You've been handed what's been

5    marked as Deposition Exhibit 82.

6            Do you recognize this document?

7        A.  It's possible I've seen it.  I . . .

8        Q.  Did you see the questions, at least, if not

9    the responses?

10       A.  Oh, yes.

11       Q.  Right?

12       A.  I'm sorry.  I thought this -- I'm sorry.

13   Yes, yes.  I thought this was something else.

14       Q.  So you have seen this before?

15       A.  Yes, yes.

16       Q.  Okay.  And so, in -- in connection with the

17   third request on the last page, where we asked for

18   the searches that you performed in your gmail

19   account --

20       A.  I see that.

21       Q.  -- specifically for e-mails to and/or from

22   medical schools to which you applied in the 2015 and

23   2018 cycles, you responded that you do not remember

24   the variations on the words you used, but that you

25   believe that you used obvious words like university,

                    D. TRAHANAS - VOLUME II
1   Northwestern, Schwulst, et cetera.

2          What does "et cetera" mean?

3          MR. DeROSE:  What does "et cetera" mean?  I

4      typed it.  You don't know what that word means?

5      Counsel, this is --

6          MS. WERMUTH:  No, no, no.

7   BY MS. WERMUTH:

8      Q.  In this connection what -- she is -- I'm

9   asking for search terms, university, Northwestern,

10  Schwulst, et cetera.

11         So what are the other search terms

12  comprised in the word "et cetera"?

13         MR. DeROSE:  Oh, that's a different

14     question.

15  BY MS. WERMUTH:

16     Q.  What are the search terms?

17     A.  These would be examples.  So I don't want

18  my testimony to be mischaracterized, because I've

19  seen that in letters before.  These are examples.

20  It doesn't just mean only them.

21     Q.  Then why didn't you give us a complete

22  answer?

23     A.  I'm trying to give you as much as I can

24  recall.  An example would be Dr. Steven Schwulst,

```
 1              D. TRAHANAS - VOLUME II
 2   Steve Schwulst, Steve J. Schwulst, Schwulst, M.D.
 3   Dr. Harris Perlman, Perlman, Perlman lab.
 4       Q.  Why didn't you give us all of those
 5   iterations here?
 6            MR. DeROSE:  Counsel, do you see who signed
 7       this?  I'm the one who prepared that.  That's
 8       not a fair question.  I wrote that.
 9            MS. WERMUTH:  Counsel, your witness helped
10       you prepare this answer, because you've said on
11       the record that you don't know what search
12       terms she used.  So I'm asking her to tell me.
13       She clearly gave you the information to prepare
14       this answer.  These are fair questions.  This
15       is about the e-mail searches.  I need to know
16       what --
17            MR. DeROSE:  But your question was why
18       didn't you write it down here.  She didn't
19       write this.  I wrote it, Counsel.  Please, just
20       ask her what other terms.  I don't have any
21       problem with that, but don't ask her why did
22       she not put them in here.  I wrote this.
23            MS. WERMUTH:  I can certainly ask that.
24   BY MS. WERMUTH:
25       Q.  But why don't you tell me every single term
```

1              D. TRAHANAS - VOLUME II

2    that you remember searching in your gmail, and which

3    boxes you search in?

4         A.   Like it says here -- I mean, I can give you

5    all the obvious ones.  Whether there were

6    variations, or derivatives, or even after -- you had

7    requested after my deposition a lot of, you know,

8    follow-up items, I searched for those.  After each

9    deposition, if there was something said by

10   Dr. Perlman, I searched for something that I may

11   have read in his deposition or heard, like -- excuse

12   me, like lab invitation, lab party invitation,

13   Perlman lab, Harris lab, lab personnel, laboratory,

14   Schwulst lab, Schwulst laboratory, every person that

15   I ever met or worked with in both the Perlman or

16   Schwulst laboratory.

17            I would say keywords for the research

18   projects we were doing, like flow cytometry, flow

19   cytometer.  I had gone to San Diego for a lecture

20   and for also a conference, so shock society, shock

21   journal, publications, published, anything that's

22   probably on my CV, Northwestern, that's in here,

23   though, University of, stereotaxic.  We had gone to

24   Michigan for a stereotaxic, I guess, introductory

25   course with a Ph.D. doctor there, so Michigan.

1           D. TRAHANAS - VOLUME II

2           You had asked me for a job search at one

3    point, so things like job, job opportunity,

4    employment, employment opportunity, taxes, because

5    you had asked for my tax records, places that I

6    thought that maybe I had applied to, like the

7    University of Illinois at Chicago, Rush University,

8    Abbvie, Abbott, any local labs, Pfizer,

9    pharmaceutical, pharmaceutical sales, research tech,

10   research technician, research technician probably

11   with every number after that, maybe three or four,

12   lab manager, managerial, lab managerial.

13          These are all examples.  AMCAS, AMCAS

14   applications, all the schools that were on my list

15   of AMCAS that I had applied to, Dr. Debra

16   Goldstein's -- I'm sorry, Goldstein's name, letter

17   of evaluation, Sasha, because -- that's Alexander

18   Misharin, but we also called him Sasha, any probably

19   supplies to do with the lab, lab supply, order,

20   mouse, mouse order, procurement, Holly, because she

21   was the procurement person that I had dealt with,

22   addresses, like 676 was Dr. Schwulst's office,

23   Huron, that was the street that our building was on,

24   Fienberg, Fienberg School of Medicine, Northwestern

25   Memorial, anything to do with the hospital.  These

```
 1                    D. TRAHANAS - VOLUME II
 2      are examples.
 3      BY MS. WERMUTH:
 4           Q.  And you didn't document any of your
 5      searches?
 6           A.  No.
 7           Q.  And for all of the search terms that you
 8      just identified, tell me where in your gmail account
 9      you searched?
10           A.  Everywhere.
11           Q.  Tell me.
12           A.  You type it in the search bar, it will come
13      up.  It will bring up the folder that any one of
14      those terms is in.
15           Q.  So if it -- so you search -- it's your
16      testimony that you used those terms in your
17      search -- I'm sorry, in your trash folder?
18           A.  Yes, everywhere, yes.
19           Q.  In your sent folder?
20           A.  Yes.
21           Q.  In your inbox?
22           A.  Correct.
23           Q.  And you don't know what other folders you
24      had other than those?
25           A.  Well, if you type in the search criteria,
```

D. TRAHANAS - VOLUME II

1  it will open up every folder regardless of what

2  folder it's in.  So if it hits, you know, let's say

3  Dr. Perlman, it's going to bring up the e-mails that

4  are in trash, sent, inbox.

5  Q.  And if your -- if your account was set up

6  for default to archive, would the archive e-mails

7  come up as well?

8  A.  I don't know that I have -- I don't know.

9  Q.  And the only way for us to know what your

10 settings are is for us to actually look at your

11 account; right?

12 A.  I don't -- I don't know if there is a

13 default for that or not.

14 Q.  Right.

15     And the only way you could answer that

16 question is if you looked at your account, right, to

17 see whether or not your settings are set up for

18 default?

19 A.  It's possible, yes.

20 Q.  Well, if you looked at your account, you

21 could see what your settings are; correct?

22 A.  Yes.

23 Q.  Right.

24     And you're not going to do that today;

Page 506

1          D. TRAHANAS - VOLUME II

2   correct?

3          MR. DeROSE:  The judge ordered that we

4       didn't have to do that.

5          MS. WERMUTH:  I disagree with your

6       characterization.  I'm asking her the question.

7          MR. DeROSE:  All right.

8   BY MS. WERMUTH:

9       Q.  You're not going to do that today?

10          MR. DeROSE:  You asked the question.  She's

11       following her lawyer's advice.

12          Do not answer the question.

13          MS. WERMUTH:  She can answer the question

14       that, no, she is going to follow her lawyer's

15       advice and not open up her gmail account.

16       Right?

17          MR. DeROSE:  Go ahead and answer the

18       question.

19       A.  I mean, I already answered it, but no,

20   that's correct.  I will follow my lawyer's advice.

21   BY MS. WERMUTH:

22       Q.  Now, before we went on break, we were going

23   to start looking at e-mails from the medical schools

24   you applied to.  And your testimony was that there

25   was a lot going on in December and January of 2014

```
 1                 D. TRAHANAS - VOLUME II
 2   and 2015 that you don't recall because you were
 3   seeing a psychiatrist.
 4           Do you remember that testimony?
 5      A.   I'm not sure if that's verbatim, but
 6   that's -- might be paraphrasing it, yes.
 7           MS. WERMUTH:  Can we go -- can we go back
 8           and look at what her testimony was about seeing
 9           a psychiatrist.
10           (Record was read as follows:  "Q.  When did
11           you permanently delete e-mails from medical
12           schools that sent you e-mails?  A.  I don't
13           recall a time.  If you remember correctly, I
14           was seeing a psychiatrist eight times in two
15           months.  It was a very stressful time.  I don't
16           recall.")
17   BY MS. WERMUTH:
18      Q.   Is it your testimony that because
19   December 2014 and January 2015 was a stressful time,
20   you have difficulty recalling what happened during
21   those two months?
22      A.   Can you please be more specific?
23      Q.   Do you have difficulty recalling -- strike
24   that.
25           MS. WERMUTH:  Can you just read my question
```

1          D. TRAHANAS - VOLUME II

2     back.  I don't know how to be more specific.

3          (Record was read as requested.)

4     A.  I would have difficulty with recalling

5     specific e-mails or papers or notes in the lab I

6     took, or anything like that, but I can't not recall

7     everything that was going on at that time.

8     Q.  Can you recall getting e-mails from medical

9     schools that you applied to in November and December

10    of 2014?

11    A.  Yes.

12    Q.  Okay.  So you do remember that?

13    A.  I remember getting e-mails.

14         MS. WERMUTH:  Can we mark this, please.

15         (Trahanas Exhibit 83 marked for

16         identification.)

17    BY MS. WERMUTH:

18    Q.  All right.  So, Ms. Trahanas, you know that

19    we, at your counsel's urging, subpoenaed the medical

20    schools that you applied to for the 2015 cycle?

21    A.  Yes.

22    Q.  Okay.  And so, what I -- what's marked now

23    as Exhibit 83 is a set of materials that we received

24    from University of Central Florida in connection

25    with the subpoena we sent to that school.  Okay?

Page 509

1          D. TRAHANAS - VOLUME II

2     A.  Okay.

3     Q.  All right.  And according to the materials,

4  and I'm directing your attention to the page that's

5  Bates labeled Trahanas-NU11725.

6     A.  Okay.  I'm on that page.

7     Q.  Okay.  So according to the materials we

8  received from University of Central Florida, they

9  had your e-mail address as diane.trahanas@gmail.com.

10         Do you see that?

11     A.  Yes, I do.

12     Q.  Okay.  And that is the gmail address that

13  you testified to already today; correct?

14     A.  Correct.

15     Q.  Okay.  And then if you turn to

16  Page 11740 --

17         MR. DeROSE:  Give me a second to get there,

18     Counsel.

19         MS. WERMUTH:  Certainly.  Second-to-last

20     page.

21         MR. DeROSE:  Okay.  That helps.  Go ahead.

22     I'm there.  I'm sorry.

23  BY MS. WERMUTH:

24     Q.  Okay.  You'll see on this page that

25  there's -- in the AMCAS report there is a

1                    D. TRAHANAS - VOLUME II

2     transaction history.

3              Do you see that?

4          A.  Yes.

5          Q.  And is this the sort of thing that if you

6     logged into your AMCAS account, you could see a

7     transaction history from each school?

8          A.  I have never seen this before -- no.  A

9     transaction history?  No.

10         Q.  You can't see that when you log into your

11    AMCAS?

12         A.  I've given you the AMCAS application from

13    that cycle in 2018, and this is not in there.

14         Q.  That's not my question.  Because what you

15    gave me was a snapshot in time, your application at

16    a snapshot in time.

17              I'm asking you if you go in -- if you --

18    for example, if you went into your AMCAS account in

19    March of 2015, could you see a transaction history

20    from each school?

21         A.  I -- I don't know.

22         Q.  And you didn't look for that when we asked

23    you for information about your medical school

24    application materials?

25         A.  I don't know if this is available to us.

D. TRAHANAS - VOLUME II

1

2    Q.  I understand that, but you didn't look is

3  my question.  Right?  You didn't -- so when we gave

4  you a discovery request for information related to

5  your medical school, you didn't log back into your

6  AMCAS account to look at what was in there to see

7  whether or not it was responsive to our request?

8    A.  I did, because I had to print out for you

9  the 2018 application.

10    Q.  Did you do that for 2015, though?

11    A.  I don't recall.

12    Q.  All right.  And if you look at this

13  transaction history with central -- University of

14  Central Florida, you'll see there are a variety of

15  entries dated November 17th and November 18th of

16  2014 with respect to rejecting your application.

17        Do you see that?

18    A.  Yes.

19    Q.  Okay.  And then -- and then there's an

20  entry on December 11th of 2014, which says,

21  "Admission status:  Rejected, not yet entered on

22  spreadsheet."

23        Do you see that?

24    A.  I do see that.

25    Q.  Okay.  So according to these records from

```
 1                  D. TRAHANAS - VOLUME II
 2    University of Central Florida, you were rejected on
 3    or about December 11th of 2015 at the latest;
 4    correct?
 5         A.  Yeah, as it states on this piece, yes.
 6         Q.  Okay.
 7              MR. DeROSE:  Objection, counsel.
 8              MS. WERMUTH:  I said 2014.
 9              MR. DeROSE:  Excuse me, Counsel.  We don't
10         know if not entered -- "not yet entered on
11         spreadsheets" mean they notified her.
12              MS. WERMUTH:  That's not my question.
13              MR. DeROSE:  I know it's not your question,
14         but --
15              MS. WERMUTH:  And now you're giving -- now
16         you are instructing the witness again.
17              MR. DeROSE:  No, I'm not instructing her of
18         anything.  I want to make sure this record is
19         clear.  If they don't even have it on their
20         spreadsheets, it doesn't mean that she was
21         notified she was rejected.
22              MS. WERMUTH:  Can I finish -- that's just
23         pure argument.  You can make that argument in
24         briefing, okay.
25    ///
```

1                  D. TRAHANAS - VOLUME II

2  BY MS. WERMUTH:

3       Q.  I'd like to turn to the next page, please.

4         MR. DeROSE:  And, Counsel, excuse me, but

5      you seem to have a practice of not allowing me

6      to finish making my record.  These are very

7      important dates for all of us.  Okay.

8         MS. WERMUTH:  You can object.  Of course

9      you can object.

10        MR. DeROSE:  All right.  Then let me make

11     my record.

12        MS. WERMUTH:  The problem is when you make

13     an argumentative objection, it instructs the

14     witness, and there is case law on that.  You

15     need to object and state the grounds, but not

16     give argument.

17        MR. DeROSE:  All right.  Counsel, go ahead.

18     I don't mean to be obstrep- -- obstreperous.

19     Go ahead.

20        MS. WERMUTH:  Thank you.

21  BY MS. WERMUTH:

22       Q.  The next page, please, 11741.

23       A.  Okay.  I'm there.

24       Q.  Okay.  You see this document, do you not?

25       A.  Yes, it's in front of me.

D. TRAHANAS - VOLUME II

1

2    Q.  And the first two sentences say, "The

3    following is an e-mail that is housed within the

4    AMCAS system."

5         Do you see that?

6    A.  Yes.

7    Q.  It was sent from the ucf.com e-mail address

8    to the applicant on November 18th, 2014, at

9    8:55 A.M.

10        Do you see that?

11   A.  Yes.

12   Q.  So according to University of Central

13   Florida, they sent you an e-mail on November 18th of

14   2014 at 8:55 in the morning; correct?

15   A.  Yes, that's what it says, yes.

16   Q.  And then the content of the e-mail follows.

17        Do you see that?

18   A.  Yes.

19   Q.  So according to University of Central

20   Michigan -- I'm sorry, Central Florida's records,

21   they e-mailed you on November 18th of 2014 telling

22   you that you were rejected; is that right?

23   A.  I'll agree that it says that here, but

24   based on the page that we just looked at on NU11740,

25   the dates don't coincide.

1                    D. TRAHANAS - VOLUME II

2        Q.   Well, it certainly says that on

3    November 18th there was a preliminary objection;

4    right?

5             MR. DeROSE:   A preliminary objection or

6        rejection?

7             MS. WERMUTH:   Rejection.

8    BY MS. WERMUTH:

9        Q.   Do you see that, the third -- the third

10   entry under "transaction history"?

11       A.   Yes, I see.   There is three on that date,

12   so I'm just looking at all three.

13       Q.   But the third one says, "Admission action:

14   Preliminary rejection"; right?

15       A.   Yes, the --

16       Q.   Is it your testimony that you did not

17   receive the e-mail on Page 11741?

18       A.   I don't recall.

19       Q.   Did you search UCF in your gmail account?

20       A.   I searched UCF.   I searched University of

21   Central Florida.   I searched whatever University of

22   Central Florida's medical school is in association

23   with that on my AMCAS list.

24       Q.   Now, it -- this -- this report on

25   Page 11741 also tells us that this e-mail is housed

1                    D. TRAHANAS - VOLUME II

2    within the AMCAS system.

3            Do you see that?

4        A.  Yes, at the top.

5        Q.  Did you search the -- your AMCAS materials

6    for UCF?

7        A.  The am -- I've never received an e-mail via

8    AMCAS system.

9        Q.  That's not -- yes, you have.  You've

10   produced e-mails from AMCAS; right?

11       A.  Like an am -- so how I'm reading this is as

12   AMCAS is acting like a gmail account, so that am --

13   so this is -- this e-mail is provided on an AMCAS

14   forum, just like an e-mail is provided on a gmail

15   forum.  I've never seen an e-mail from an AMCAS

16   forum.

17       Q.  Okay.  So I don't know if you're

18   interpreting it correctly.  My question is this --

19   let me ask you this:  If you're sitting here right

20   now, can you log into the AMCAS website and see your

21   old application materials?

22       A.  Yes, but I -- yeah.  Yes, it's possible.

23       Q.  Okay.  And did you, in connection with the

24   discovery requests that were served in this

25   litigation, go into your AMCAS account online to

1          D. TRAHANAS - VOLUME II

2    search for any transaction history or any

3    communications from the schools that you applied to

4    in the 2015 cycle?

5          A.  Anything that had to do with the 2015 or

6    2018 cycle I searched on AMCAS.

7          Q.  When?

8          A.  When the requests were submitted, when we

9    were supposed to, after interrogatories at some

10   point.

11         Q.  How many times did you search am -- your

12   AMCAS materials online through -- through AMCAS's

13   website?

14         A.  I don't recall.

15         Q.  Is it your testimony that you did not

16   receive this e-mail from the University of Central

17   Florida in 11741?

18         A.  I don't -- I don't recall.

19         Q.  Do you have any reason to believe that

20   University of Central Florida did not reject your

21   application in 2014?

22         A.  I'm sorry.  Could you read that back?

23            (Record was read as requested.)

24         A.  I don't know.

25         Q.  So in the 2015 cycle you were applying to

D. TRAHANAS - VOLUME II

1

2    law -- medical school for the second time; is that

3    right?

4         A.  Yes.

5         Q.  Okay.  And so, you were interested in

6    knowing whether or not you were admitted to the

7    schools that you were applying to; right?

8         A.  Well, sure, I was applying, yes.

9         Q.  Right.

10             You spent time putting together an

11   application; right?

12        A.  Yes.

13        Q.  And you -- and you paid money to have the

14   application sent to the schools that you applied to;

15   right?

16        A.  Yes.

17        Q.  So you were interested in knowing whether

18   or not you were going to be admitted to those

19   schools; right?

20        A.  Sure.

21        Q.  So if you got a rejection notice, you would

22   know that you were rejected from that school; right?

23        A.  Well, if I had gotten the notice, then I

24   would know at that time, yes.

25        Q.  And you know, as you sit here today, that

D. TRAHANAS - VOLUME II

1    you were not accepted to the University of Central

2    Florida; correct?

3        A.  After seeing this, I would assume that that

4    statement is correct, but I don't know that prior to

5    looking at this.

6        Q.  So you're tell -- really?  So you're

7    telling me that in 2014 you believe that your

8    application to University of Central Florida was

9    still live?  Is that your testimony?

10       A.  No, my testimony is that this gives me

11   evidence -- this is the evidence that shows that I

12   had been preliminary rejected from UCF.

13       Q.  Well, let's look at what the e-mail says.

14   Look at the -- the second paragraph, the last

15   sentence.  "As such, our committee will no longer

16   consider your application for this application

17   cycle."

18           Do you see that?

19       A.  Yes.

20       Q.  So that's not just a preliminary rejection,

21   you're being rejected?

22       A.  Right, I -- I was just trying to be -- I

23   was just trying to quote from 11 -- I didn't want to

24   misrepresent it, because that's what it said here.

D. TRAHANAS - VOLUME II

1

2    Q.   So your testimony is in November of 2018

3  you just cannot remember whether or not in 20 -- in

4  November of 2018 -- I'm sorry.  Strike that whole

5  thing.

6          As you sit here right now, it's your

7  testimony that you cannot remember receiving a

8  rejection notice from UCF in November of 2014?

9    A.   Correct.

10    Q.   Even though you were specifically applying

11  and looking for notices from these schools at the

12  time?

13    A.   I was expecting to hear back from them,

14  but -- I was expecting to hear back from them.

15    Q.   And so, a rejection had no impact or your

16  memory at all?  The fact that you were rejected, it

17  just is not sticking in your memory; is that right?

18    A.   There were 15 schools that I applied to

19  that year.  That's a lot of schools to keep track of

20  when you're working 24-hour shifts and you have

21  multiple projects going on at work.  I wasn't just a

22  full-time person working on applications at home.

23    Q.   Okay.  That's pure argument.

24          My question is this --

25          MR. DeROSE:  Well, excuse me, Counsel.

1          D. TRAHANAS - VOLUME II

2          MS. WERMUTH:  No.

3          MR. DeROSE:  That's not argument.  That's

4     an answer to your question.

5          MS. WERMUTH:  No, my question --

6          MR. DeROSE:  My objection to you --

7          MS. WERMUTH:  No.

8          MR. DeROSE:  Excuse me.  Let me finish

9     my -- Counsel, you continue to do this.

10          Ask her a question and don't -- you don't

11     editorialize on it, and I will try not to also,

12     because that's --

13          MS. WERMUTH:  If it's argument, I'm going

14     to move to strike it.

15          Now I'd like an answer to my question.

16     BY MS. WERMUTH:

17     Q.  You had spent time and money preparing

18     applications to medical school, right, in 20 -- in

19     the 2014-2015 cycle; correct?

20          MR. DeROSE:  Asked and answered.  Answer it

21     again.

22     A.  Yes.

23     BY MS. WERMUTH:

24     Q.  You were invested in the process; right?

25     A.  Yes.

1          D. TRAHANAS - VOLUME II

2     Q.  You wanted to go to medical school?

3     A.  Absolutely.

4     Q.  Yeah.

5          So you were looking for communications from

6 the medical schools in 2014 and 2015; correct?

7     A.  I'm sure I was.  I don't recall when and

8 where I was at the time.

9     Q.  So you -- you have no memory of getting an

10 e-mail from the University of Central Florida

11 telling you that your application was no longer

12 going to be considered for that cycle?

13          MR. DeROSE:  Asked and answered.

14     Objection.

15          Go ahead and answer it again.

16     A.  That's correct.  I don't recollect.

17 BY MS. WERMUTH:

18     Q.  And you have no recollection of what you

19 would have done with this e-mail either; is that

20 your testimony?

21     A.  I can't say for certain.  Maybe I deleted

22 it.  If it's a rejection, there is nothing further

23 for me to have done, so you kind of move on, right.

24     Q.  I don't know.  I'm asking you.

25          Did you delete it?

 1              D. TRAHANAS - VOLUME II
 2      A.  I don't recall if I deleted it on that date
 3   that -- if I had received it in an e-mail or what.
 4      Q.  And if you delete it, it goes into your
 5   trash; right?
 6      A.  Yes.
 7      Q.  Which is still searchable; right?
 8      A.  Yes.
 9      Q.  And you're telling me that you searched the
10   words UCF, University of Central Florida, and other
11   iterations in connection with the discovery requests
12   we made in this litigation?
13      A.  Correct.
14      Q.  And you found zero e-mails to or from the
15   University of Central Florida?
16      A.  Everything I had, I gave you.
17      Q.  My question is this:  You found zero
18   communications to or from the University of Central
19   Florida?
20      A.  For that year, yes.  I don't know if I
21   applied to that in 2018 and gave you any
22   communications from that.  If I had it, I gave it to
23   you.
24           MS. WERMUTH:  Can we mark this, please.
25           (Trahanas Exhibit 84 marked for

1              D. TRAHANAS - VOLUME II

2         identification.)

3              MR. DeROSE:  Am I correct the last one was

4         83?

5              REPORTER:  Yes.

6              MR. DeROSE:  So you are numbering each one

7         of these?  Okay.

8    BY MS. WERMUTH:

9         Q.  Okay.  I'm handing you now -- or you've

10   been handed now what's been marked as Exhibit 83 --

11             MR. DeROSE:  No.  This is --

12   BY MS. WERMUTH:

13        Q.  I'm sorry, 84.  84.

14             And these are the materials that we

15   received in connection with the subpoena that we

16   made to University of Miami.  And I'm turning your

17   attention to Trahanas-NU11777.

18             MR. DeROSE:  Is that in the front area?

19             MS. WERMUTH:  Yeah, it's three or four

20        pages in.  Five pages -- five pages in.

21             MR. DeROSE:  All right.  I'm there.

22   BY MS. WERMUTH:

23        Q.  Okay.  And you see that the University of

24   Miami sent us this letter?  You see that,

25   Ms. Trahanas?

1              D. TRAHANAS - VOLUME II

2        A.  Yes, I do.

3        Q.  Okay.  And according to this letter and the

4   University of Miami's records, they received your

5   AMCAS application on November 5th of 2014.

6              Do you see that?

7        A.  I do.

8        Q.  Do you have any reason to dispute that?

9        A.  Just to be clear, I'm not sure if that

10  means that all letters had been submitted at that

11  point, but my am -- my AMCAS application was

12  submitted, correct.

13       Q.  Okay.  So you are in agreement with the

14  first paragraph?

15       A.  I believe so, yes.

16       Q.  All right.  Then they write that on

17  December 2nd they sent you an acknowledgment e-mail.

18             Do you see that?

19       A.  Yes.

20       Q.  Okay.  Did you receive that e-mail?

21       A.  I don't recall.

22       Q.  And if you look at the following page,

23  11778, there's an e-mail dated December 2nd, 2014 --

24             MR. DeROSE:  Excuse me.  Are you on the

25       last page --

1    D. TRAHANAS - VOLUME II

2        MS. WERMUTH:  Nope, the next page, sir.

3        MR. DeROSE:  Okay.  Go ahead.

4    BY MS. WERMUTH:

5        Q.  -- from med.admissions@miami.edu to

6    diane.trahanas@gmail.com.

7            Do you see that?

8        A.  I see that at the top, yes.

9        Q.  Okay.  And the substance of the e-mail is

10   similar to what is described in the paragraph we

11   just looked at on 11777; correct?

12       A.  I mean, it doesn't specifically state an

13   acknowledgment, but I'll say that it does state

14   there is a correspondence, and it says a decision to

15   send you a secondary application.

16       Q.  Right.

17            So it says, "Your verified AMCAS

18   application for the 2015 entering class has arrived

19   at the University of Miami, Miller School of

20   Medicine"; correct?

21       A.  Yes.

22       Q.  Okay.  And then there is a -- as you point

23   out, there is a sentence inviting you to complete a

24   secondary application; right?

25       A.  Yes.  I'm sorry.  Can I --

D. TRAHANAS - VOLUME II

1                      

2          MR. DeROSE:  Well, it only says -- Counsel,

3     it doesn't say that.  "A decision will be

4     made" --

5          MS. WERMUTH:  Oh, I see.  You're right.

6     I'm sorry.

7  BY MS. WERMUTH:

8     Q.  "A decision to send you a secondary

9  application will be made shortly."

10     Do you see that?

11     A.  Yes.

12     Q.  Okay.  And then, on the next page, where

13  the e-mail follows, 11779, near the end, in the

14  second-to-last paragraph it says, "Most of our

15  communications with you will be done by e-mail, so

16  make certain that your e-mail address is correct on

17  your AMCAS application"; right?

18     A.  Yes, I see that.

19     Q.  Okay.  Going back to 11777, University of

20  Miami, then tells us that on December 4th you

21  received an e-mail invi- -- well, strike that.

22     Do you recall receiving the e-mail on

23  Pages 11778 through 79?

24     A.  I don't recall.

25     Q.  You do see that it was sent to the gmail

1                    D. TRAHANAS - VOLUME II

2     address that you've described for us today,

3     diane.trahanas@gmail.com?

4         A.  Can you point to me where you're looking

5     at?  I'm sorry.

6         Q.  11778.

7         A.  So is 779 a continuation of 778?  I know I

8     can't ask questions, but it says Page 1 of 1 at the

9     top, so I'm not sure if this is a --

10        Q.  Okay.  Let me ask you this.  Look at

11    Page 778.

12        A.  Okay.

13        Q.  That has your gmail address on it; correct?

14        A.  Yes.

15        Q.  And that e-mail tells you that your

16    verified AMCAS application has arrived?

17        A.  Yes.

18        Q.  And that e-mail also says a decision to

19    send you a secondary application will be made

20    shortly; correct?

21        A.  Yes.

22        Q.  Okay.  And that was sent to the gmail

23    address that you've testified was -- is the address

24    that you continue to use this day?

25        A.  Yes.

1                    D. TRAHANAS - VOLUME II

2        Q.  And did you search your gmail address for

3   University of Miami?

4        A.  Yes.

5        Q.  Is there any reason why you didn't produce

6   this particular e-mail dated December 2nd, 2014?

7        A.  I -- I gave you what you have.

8        Q.  All right.  And then, if you look at the

9   last page of this exhibit, 798.

10       A.  Okay.

11       Q.  According to the University of Miami's

12  records, they sent you an e-mail on December 4th of

13  2014, from med.admissions@miami.edu to

14  diane.trahanas@gmail.com.

15           Do you see that?

16       A.  Yes.

17       Q.  Do you recall being invited to complete a

18  secondary application at the University of Miami?

19       A.  I don't recall.

20       Q.  Do you recall getting this e-mail?

21       A.  I don't recall.

22       Q.  Did you search for this e-mail in your

23  gmail account?

24       A.  I searched for anything to do with the

25  University of Miami.

1              D. TRAHANAS - VOLUME II

2     Q.  Any reason why you didn't produce this

3  e-mail?

4     A.  I didn't have it.

5     Q.  This e-mail tells you that the deadline to

6  complete your secondary application was

7  January 15th.

8          Do you see that?

9     A.  I do.

10    Q.  And you did not complete a secondary

11 application for the University of Miami, did you?

12    A.  I don't recall.  Is there a page in here

13 that I can look at?

14    Q.  Did you complete a secondary application to

15 any of the medical schools to which you applied in

16 2015 cycle?

17    A.  I don't recall.

18    Q.  You literally can't tell me as you sit here

19 today that you -- there was a single school that you

20 submitted a secondary application to?

21    A.  I don't remember.

22    Q.  All right.  Well, if you look at

23 Page 11777, Paragraph 4 in that letter tells us that

24 the deadline for submitting a supplemental/secondary

25 application was January 15th of 2015.

1                      D. TRAHANAS - VOLUME II

2             Do you see that?

3        A.  I do, yes.

4        Q.  And Paragraph 5 says a

5   supplemental/secondary application was never

6   received from Diane Trahanas.

7             Do you see that?

8        A.  I see that.

9        Q.  Do you have any reason to dispute that?

10       A.  No, this is what I was trying to ask for

11  earlier, but yes.

12       Q.  Yes what?

13       A.  I see that.

14       Q.  And you don't dispute it?

15       A.  No.

16            MS. WERMUTH:  Can I have this marked,

17       please.

18            (Trahanas Exhibit 85 marked for

19       identification.)

20  BY MS. WERMUTH:

21       Q.  Okay.  Ms. Trahanas, you've been handed

22  what's been marked as Deposition Exhibit 85.  These

23  are the materials that we received in connection

24  with our subpoena to Oakland University.  And I'm

25  going to direct your attention to the page Bates

1                   D. TRAHANAS - VOLUME II

2    labeled Trahanas -- Trahanas-NU11665.

3         A.   Okay.  I'm there.

4         Q.   This appears to be an e-mail to you from

5    Oakland dated January 5th of 2015 from a Christina

6    Grabowski.

7              Do you see that?

8         A.   Yes.

9         Q.   According to this e-mail you were eject --

10   rejected from Oakland on or about January 5th of

11   2015; is that correct?

12        A.   Just to be clear, it doesn't -- it's not

13   necessarily a rejection letter.  It just says, "You

14   do not meet the minimum requirement for receiving

15   our secondary application."  So it's addressing the

16   secondary application more so than saying a

17   rejection letter, or attaching one.

18        Q.   So as you sit here and read this, you think

19   this is a, Hey, maybe we'll accept you, but we're

20   not going to give you the secondary application?  Is

21   that how you read this communication?

22        A.   No, I'm just trying to be clear for the

23   record.  I just -- you asked me to if it's a

24   rejection letter.

25        Q.   Do you believe that you were accepted to

1          D. TRAHANAS - VOLUME II

2    Oakland University School of Medicine?

3          A.  No.

4          Q.  In fact, you know you were rejected from

5    Oakland; correct?

6          A.  After reviewing the subpoenaed documents,

7    yes.

8          Q.  You didn't know you were rejected until

9    after you reviewed the subpoenaed documents?  You

10   were still waiting three years later to -- to see

11   whether or not you were admitted to Oakland; is that

12   your testimony?

13         A.  No, I'm saying that it's confirmed.

14         Q.  So you were rejected from Oakland; correct?

15         A.  To the best of my recollection, yes.

16         Q.  In January of 2015; correct?

17         A.  I don't know what the date was.

18         Q.  Well, according to this, it was January of

19   2015; correct?

20             MR. DeROSE:  She just said what this letter

21         means to her.  Doesn't -- it doesn't say you

22         were rejected.

23   BY MS. WERMUTH:

24         Q.  It does say, "We wish you the best in your

25   pursuit of medical education"; right?

1          D. TRAHANAS - VOLUME II

2      A.  Yes, I do see that.

3      Q.  And it does say that you must have a total

4  MCATs score of 24 or above to receive our secondary

5  application; correct?

6      A.  It says that, yes.

7      Q.  And you did not have an MCATs score of 24

8  or above -- a total MCATs score of 24 or above;

9  correct?

10     A.  Well, it depends how the school is grading

11 your MCATs.  Some schools take your composite score.

12 Other schools gather the highest score in each

13 category.

14     Q.  According to this communication from

15 Oakland, you did not have a total MCATs score of 24;

16 correct?

17     A.  Correct.

18     Q.  So according to their standards, you did

19 not have a total MCATs score of 24; correct?

20     A.  Yes, I would agree to that.

21     Q.  But you didn't -- you didn't understand

22 that to be a rejection notice; is that your

23 testimony?

24     A.  I mean, I already told you what I think

25 it -- it indicated.

                    D. TRAHANAS - VOLUME II

1

2       Q.   And I want to be clear for the record,

3   since you want clarity for the record, you didn't

4   believe it indicated that you were being rejected at

5   that time?

6       A.   I don't know at that time what I thought.

7   I can't -- I can't speak to that.  I don't recall

8   seeing this letter, so I don't know.

9       Q.   Did you search for Oakland in your gmail

10  account?

11      A.   Yes.

12      Q.   Did you search for O -- OUWB?

13      A.   Yes, Oakland University William Beaumont

14  School of Medicine, OUWBSOM, several variations of

15  it.

16      Q.   And nothing came up?

17      A.   I gave you everything I have.  No.

18      Q.   So nothing came up in your inbox, your sent

19  items, or your trash?

20      A.   Correct, that's what I just said.

21          (Trahanas Exhibit 86 marked for

22      identification.)

23          MS. WERMUTH:  Can you reach that, John?

24      I'm sorry.

25          MR. DeROSE:  No, no.  Yes, I have it.

```
 1                    D. TRAHANAS - VOLUME II

 2        Thank you.

 3   BY MS. WERMUTH:

 4        Q.  Okay.  You've been handed what's been

 5   marked as Deposition Exhibit 86 -- are you marking

 6   on the exhibits?

 7        A.  Oh.

 8            MR. DeROSE:  No, you're not to mark.

 9        A.  I'm sorry.  I just circled the bottoms.

10   BY MS. WERMUTH:

11        Q.  Okay.  So --

12        A.  On the last two documents.  The rest are

13   untouched.

14        Q.  When you say "circle the bottoms," what do

15   you mean by that?

16            MR. DeROSE:  Show us the pages.  Can I see

17        it?

18            Counsel, the record shows on the one she

19        just showed me she is circling the Bates stamp

20        number of the pages.  And there is also a star

21        on there.

22            THE WITNESS:  On this one, yeah.

23            MR. DeROSE:  All right.  Give me the number

24        of the one.  She put a star -- do not -- put

25        your pen down, please.
```

1              D. TRAHANAS - VOLUME II

2         THE WITNESS:  Sorry.

3         MR. DeROSE:  Can I see that document?

4         THE WITNESS:  Yes.

5         MR. DeROSE:  The client has put a star on

6    Trahanas-NU11665.  She has also circled NU11665

7    on the document, Counsel.  And I will ask her

8    not to do that again.  I'm sorry.  I didn't

9    know that -- you want examine that, in case you

10   want to say anything more?

11        THE WITNESS:  These are the other two

12   pages.

13        MR. DeROSE:  And the other page, she put a

14   circle on Trahanas-NU11778, where it says

15   NU11778.  There are no other marks on the page.

16        Counsel, you want to examine that?

17        MS. WERMUTH:  That's fine.  Thank you.

18        MR. DeROSE:  Please do not mark any

19   documents.  Those are court records.

20        THE WITNESS:  I'm sorry.  I didn't -- I

21   didn't know.

22   BY MS. WERMUTH:

23        Q.  Okay.  So I believe Deposition Exhibit 86

24   is the materials that we received from Geisinger.

25   Bear with me.

1       D. TRAHANAS - VOLUME II

2           Do you have the documents Bates labeled

3   11709 through 11723 in front of you?

4       A.  Yes, I do.

5       Q.  Okay.  And again, I'll represent to you

6   that these are the documents that we received from

7   Geisinger in connection with our subpoena, which

8   were produced to your Counsel.

9           Can you turn to the second-to-last page,

10  which is Bates labeled 7 -- 11722.  Can you take a

11  moment to read that, please.  Let me know when

12  you're done.

13      A.  Finished.

14      Q.  You're done?  Okay.

15      A.  Yes.

16      Q.  Do you recall receiving a communication

17  from Geisinger inviting you to submit a secondary

18  application?

19      A.  I -- I don't recall this.

20      Q.  Okay.  But you don't dispute Geisinger's

21  records in this regard, do you?

22      A.  I do not dispute it.

23      Q.  Okay.  And if you look on Page 11712,

24  which, John, for your information, is closer to the

25  beginning.

Page 539

1          D. TRAHANAS - VOLUME II

2          MR. DeROSE:  All right.

3    BY MS. WERMUTH:

4      Q.  But maybe a third of the way through.

5          MR. DeROSE:  What's the number, 1 --

6          MS. WERMUTH:  11712.

7          MR. DeROSE:  Okay.  I'm there.  Go ahead.

8    BY MS. WERMUTH:

9      Q.  Okay.  You see the e-mail on file with

10   Geisinger is diane.trahanas@gmail.com; is that

11   right?

12     A.  Yes.

13     Q.  And -- and did you search Geisinger in your

14   e-mail?

15     A.  I did.  I searched, excuse me, Geisinger

16   Commonwealth.  I searched the state that it's in,

17   but I don't recall what that was.

18     Q.  Did you search TCMC?

19         (Pause.)

20     Q.  I'm sorry, did you answer, or are you still

21   thinking?

22     A.  No, I'm thinking.  If that's how it was

23   indicated on the MCATs application, then yes, I

24   would have searched that, but I don't recall

25   specifically.

1        D. TRAHANAS - VOLUME II

2    Q.  Did you search TCMEDC?

3    A.  I don't recall.

4    Q.  And according to this e-mail, in order to

5  submit the secondary or the supplemental application

6  you had to also submit a $100 application fee.

7        Do you see that on page -- I'm sorry,

8  11722?

9    A.  Yes, I see that.

10    Q.  Did you submit the $100 to TCMC or

11  Geisinger?

12    A.  Not that I recall.

13    Q.  Okay.  And then on the next page, 11723,

14  there's a communication to you that begins, "Dear

15  Diane, It is my unfortunate obligation to inform you

16  that the admissions committee has decided not to

17  accept your application, because materials related

18  to the application process were incomplete."

19        Do you see that?

20    A.  I see that.

21    Q.  So -- and the date of that communication,

22  according to Geisinger's records, was

23  January 15th of 2015; correct?

24    A.  Yes.

25    Q.  And you do understand this to be a

1                   D. TRAHANAS - VOLUME II

2    rejection letter, do you not?

3         A.  I mean, again, it doesn't say rejection,

4    but it does say "has decided not to accept your

5    application, because materials related to the

6    application process were incomplete."

7         Q.  So not accepting is the same as rejecting,

8    is it not?

9              MR. DeROSE:  Well, objection.  Counsel,

10        until -- in the next paragraph they invite her

11        to go to their master's of biomedical science

12        program.

13             MS. WERMUTH:  They didn't invite her to go

14        to it.  They invited her to look at it.

15             MR. DeROSE:  Okay.  All right.

16   BY MS. WERMUTH:

17        Q.  So I just want to be clear here.

18   Ms. Trahanas, as you sit here and read this, do you

19   think that you were being told by Geisinger that

20   there was a chance you were going to get accepted to

21   their medical school?

22        A.  There's always a chance you can get into a

23   medical school even the day that the school starts.

24        Q.  This e-mail, when you read this, you're

25   thinking to yourself, Oh, there's still a chance, or

```
1                    D. TRAHANAS - VOLUME II
2     are you thinking, I was just rejected?
3          A.  I don't know what I was thinking when I
4     read this.
5          Q.  That's fine.  That's fine.
6               If you -- if you view this as an acceptance
7     letter, that's fine.  The fact is you never --
8               MR. DeROSE:  Counsel, she did not --
9               MS. WERMUTH:  The fact is --
10              MR. DeROSE:  Wait a minute.  Wait.  Wait.
11          Let me make my record.
12              Counsel, your observation after the answer
13          to that question is inappropriate.  She did not
14          say that she viewed this as an acceptance
15          letter.  Now, I ask you not to be
16          argumentative.  Just ask your questions.
17              MS. WERMUTH:  I'm trying.
18     BY MS. WERMUTH:
19          Q.  Do you view this as an acceptance letter?
20     11723, do you view this as an acceptance letter?
21          A.  I do not view it as an acceptance letter.
22          Q.  And as you sit here today, you know that
23     you did not submit your secondary application to
24     Geisinger; correct?
25          A.  Um, after reading this, yes.
```

1                    D. TRAHANAS - VOLUME II

2        Q.   Yes what?

3        A.   That the secondary application was

4   incomplete.

5        Q.   You didn't complete it; correct?

6        A.   According to this, yes, I would agree.

7        Q.   So you don't have an independent

8   recollection of -- of whether or not you completed

9   the application?

10        A.   No.

11        Q.   Really?

12             MR. DeROSE:   Counsel, please, not "really,"

13        because December and -- January of

14        2015/December of 2014 she was in care with her

15        psychiatrist.   Please.

16   BY MS. WERMUTH:

17        Q.   So is it -- is it your testimony, then,

18   that there's a lot of things that happened in

19   2015 -- December 2014 and January 2015 that you just

20   don't remember?

21        A.   You've already asked me that question, and

22   I told you that with every e-mail that I've received

23   or responded to, with everything going on at work, I

24   couldn't possibly recollect that.   It doesn't mean I

25   don't remember anything that happened at that time.

Page 544

1              D. TRAHANAS - VOLUME II

2      Q.  But your testimony is that you don't

3  remember anything about your communications from the

4  medical schools at that time; that's your testimony?

5      A.  I did not say that.  That's

6  mischaracterizing it.

7      Q.  Well, we've looked at how many schools now,

8  and you've told me for each one of the schools that

9  we've looked at you don't remember anything about

10  the communications you were receiving at the time;

11  is that right?

12      A.  I didn't say don't remember anything.  I

13  can't possibly tell you what I said in the past two

14  hours about each school and every question you

15  asked.

16      Q.  Well, if we have to do this, then we'll do

17  this.

18          MR. DeROSE:  If we have to do what,

19      Counsel?

20          MS. WERMUTH:  Go back through them.

21          MR. DeROSE:  Well, if you're going to do it

22      and ask her the same questions, I'm going to be

23      objecting asked and answered.  This is not

24      going to be a trial by ordeal, Counsel.

25          You can ask her all the questions you want,

                    D. TRAHANAS - VOLUME II

1       but if they've been asked and answered, you

2       will get that objection, and she will be

3       instructed not to answer.

4   BY MS. WERMUTH:

5       Q.  Do you have any recollection of getting any

6   rejection communications from the University of

7   Central Florida?

8       A.  I've already asked and -- you've already

9   asked -- I've already answered.

10          MR. DeROSE:  Answer it again.

11  BY MS. WERMUTH:

12      Q.  What's the answer?

13      A.  Can you please read that back to me?

14          REPORTER:  The question?

15          THE WITNESS:  Yeah, I'm sorry.

16          (Record was read as requested.)

17      A.  No.

18  BY MS. WERMUTH:

19      Q.  Do you have any recollection of getting any

20  rejection communications from University of Miami?

21          MR. DeROSE:  Don't look at them.  Just

22      answer the question.

23      A.  No, I don't recall when I got -- if I got

24  any e-mails, when I got them, what it was about,

1              D. TRAHANAS - VOLUME II

2   when it was a rejection letter, if it was a

3   secondary application, or anything specific.

4   BY MS. WERMUTH:

5      Q.  To any of the 15 schools that you applied

6   to in the 2015 cycle?

7      A.  Based on not looking at anything right now,

8   I can't definitively say yes.

9      Q.  Okay.  Then we are going to go through one

10  by one.

11          With respect to Oakland University, do you

12  recall getting a rejection notice from Oakland

13  University?

14          MR. DeROSE:  Objection.  Asked and

15      answered.  Do not answer the question.

16          Counsel, you got a record there.  Use your

17      record.

18          Do not look, Diane.

19  BY MS. WERMUTH:

20      Q.  Are you following the instruction to not

21  answer the question?

22      A.  I'm, yeah, taking advice from John.

23          MS. WERMUTH:  Can I mark this, please.

24          MR. DeROSE:  Good job.

25          MS. WERMUTH:  I don't mean to throw it.

1          D. TRAHANAS - VOLUME II

2          MR. DeROSE:  No, no, no.  I appreciate it.

3          (Trahanas Exhibit 87 marked for

4     identification.)

5   BY MS. WERMUTH:

6     Q.  Okay.  Ms. Trahanas, you now have what's

7   marked as Deposition Exhibit 87, which are the

8   materials that we received from Central Michigan

9   University in connection with our subpoena to that

10  school.

11         Can you turn to the last page, please?

12    A.  I'm there.

13    Q.  And this is the page Bates labeled

14  Trahanas-NU11800.  And this is a communication from

15  Chris Austin, the director of admissions at CMU

16  College of Medicine, to you.

17         Do you see that?

18    A.  I do.

19    Q.  Have you read it?

20    A.  Right now or in -- I can read it real

21  quick.

22         (Pause.)

23    A.  Okay.

24    Q.  Do you recall receiving this communication

25  from Central Michigan College of Medicine?

1          D. TRAHANAS - VOLUME II

2     A.  I don't recall the specific e-mail.

3     Q.  Do you recall generally receiving a

4 communication in December of 2014 from Central

5 Michigan College of Medicine?

6     A.  I -- I don't remember.

7     Q.  Okay.  So you don't remember being rejected

8 from Central Michigan College of Medicine in

9 December of 2014?

10         MR. DeROSE:  Objection.  This letter does

11     not say rejected in any place, but go ahead.

12     A.  I don't remember receiving it in December.

13 I don't remember if -- I don't recall.

14 BY MS. WERMUTH:

15     Q.  You don't recall what, receiving this, or

16 being rejected, or both?

17         MR. DeROSE:  Counsel, she's not being

18     rejected.  They said we are unable to move your

19     application forward at this time.  It's

20     clearing -- you're right to ask did you receive

21     this, and she said she doesn't remember.  But

22     characterizing any document the way you're

23     doing is not fair.

24         MS. WERMUTH:  I object to your commentary

25     which is instructing the witness improperly.

```
                    D. TRAHANAS - VOLUME II
1
2        I've said it four times now --
3            MR. DeROSE:  Well, you know what --
4            MS. WERMUTH:  -- and I'll say it again
5        every single time you do it.
6            MR. DeROSE:  All right.  Counsel, all I'm
7        going to say, then, you're going to get an
8        objection the document speaks for itself.  The
9        document only says what it says.
10           MS. WERMUTH:  I am permitted to ask
11       questions about the document.
12   BY MS. WERMUTH:
13       Q.  Do you -- when you read this, Ms. Trahanas,
14   do you believe -- do you not read this as a
15   rejection letter?
16       A.  I read it as a delay in the application.
17       Q.  A delay?  You thought this was a delay?
18       A.  I don't remember what I thought at the
19   time.  That was four plus years ago.  I don't
20   remember at the time what I thought about it.  I
21   don't remember reading it.  I don't remember it.
22       Q.  As you sit here today, you think it's a
23   delay in the application?  That's what you're
24   telling me?
25       A.  Well, like I said with the other
```

1                    D. TRAHANAS - VOLUME II

2    applications, it doesn't specifically state that

3    it's a rejection.

4         Q.  It does say this, "We wish you every

5    success in finding a position at another fine

6    institution"; right?  It says that?

7         A.  Yes, I do see that.

8         Q.  But you think this is, nevertheless, a

9    delay in your application?

10        A.  Well, in the second paragraph that's what I

11   would read that as.

12        Q.  A rejection?

13            MR. DeROSE:  Wait.

14        A.  No, a delay.

15   BY MS. WERMUTH:

16        Q.  You still read it as a delay?

17        A.  I'm saying according to the second

18   paragraph.

19        Q.  Read the -- read the letter as a whole.

20   You think that Central Michigan College of Medicine

21   is telling you we're delaying review of your

22   application?  You think that's what this message is

23   in total?

24            MR. DeROSE:  You know what, Counsel, I

25        don't want to argue with you, but, first of

Page 551

1          D. TRAHANAS - VOLUME II

2   all, she told you that applications get

3   considered later when they don't fill their

4   class.  They said we're not considering your

5   application at this time.  That's all they're

6   saying.

7        MS. WERMUTH:  You're arguing.  She --

8        MR. DeROSE:  I'm not arguing.

9        MS. WERMUTH:  Let me finish.  Let me

10   finish.

11        MR. DeROSE:  I am not arguing.  I'm making

12   a statement.  Wait a minute.

13        MS. WERMUTH:  You're arguing.

14        MR. DeROSE:  Let me finish.  I am not

15   arguing.  I'm saying the document says what it

16   says, and no more.  No less, no more.  It says

17   at this time we're not considering your

18   application.

19        MS. WERMUTH:  No, it doesn't say that.  If

20   it says what it says, it certainly doesn't say

21   that.

22        MR. DeROSE:  Well, we are not able to -- I

23   don't have it right in front of me now, but it

24   said we cannot consider the application.  They

25   got probably many more bright students that

Page 552

1           D. TRAHANAS - VOLUME II

2    they are looking at.

3         MS. WERMUTH:  That's not what it says.  It

4    doesn't say that, John.

5         MR. DeROSE:  I agree.

6         MS. WERMUTH:  And you have mischaracterized

7    it now several times.

8         MR. DeROSE:  But you --

9         MS. WERMUTH:  The fact of the matter is

10   this is a rejection letter.  If she wants to

11   characterize it differently, fine.

12        MR. DeROSE:  Well, that can be your

13   argument.

14        MS. WERMUTH:  The other thing is the

15   testimony about schools accepting people

16   after -- after rejecting them is testimony that

17   I've already moved to strike today because

18   there is no foundation for it.  She says that

19   none of the schools that she applied to ever

20   did anything of the sort.

21        MR. DeROSE:  Do you see the word

22   "rejection" in there?

23        MS. WERMUTH:  It certainly says we wish you

24   every success -- we're not -- we're unable to

25   move your application forward, and we wish you

D. TRAHANAS - VOLUME II

1   success in another institution --

2       MR. DeROSE:  We're not able to --

3       MS. WERMUTH:  -- not our institution.

4       MR. DeROSE:  What page are you on again?

5       MS. WERMUTH:  11800.

6       MR. DeROSE:  Give me one moment.  I think

7   it says more than.

8       MS. WERMUTH:  Honestly, I'm moving on.

9       MR. DeROSE:  Well, before you move on, I

10  got to make a record on what it says.

11      MS. WERMUTH:  I thought it -- I thought the

12  record is clear, John.  I thought you said the

13  record is clear.

14      MR. DeROSE:  Yeah, but you just said that

15  it says something different than it says.

16      MS. WERMUTH:  Honestly, it's an absurd

17  argument to -- it is an absurd argument to

18  suggest that this is anything other than a

19  rejection letter.  If that's the position you

20  want to take, that's fine.

21      MR. DeROSE:  Excuse me.

22      MS. WERMUTH:  I don't think any court of

23  law will agree with you.

24      MR. DeROSE:  I want to read the one

1        D. TRAHANAS - VOLUME II

2        sentence into the record again that you just

3        misstated.

4             MS. WERMUTH:  I didn't misstate it.

5             MR. DeROSE:  The sentence -- the sentence

6        says, "We are unable to move your application

7        forward at this time."  Period.

8             MS. WERMUTH:  And then there is another

9        sentence that says, "We wish you every success

10        in finding a position at another fine

11        institution."

12             MR. DeROSE:  And that's fine, Counsel.  But

13        the document says what it says.

14             MS. WERMUTH:  Can you mark this, please.

15             (Trahanas Exhibit 88 marked for

16        identification.)

17             MS. WERMUTH:  Here, I will ask you

18        please -- thank you.  I don't want throw a

19        heavy one.

20   BY MS. WERMUTH:

21        Q.  Okay.  Ms. Trahanas, you've been handed

22   Deposition Exhibit 88.  These are the materials that

23   we received from the University of South Carolina.

24             Were you accepted to medical school at the

25   University of South Carolina?

Page 555

D. TRAHANAS - VOLUME II

1

2      A.  No.

3      Q.  And you received a rejection notice from

4  the University of South Carolina; is that correct?

5      A.  I don't recall receiving a rejection letter

6  from them.

7      Q.  How do you know that you were rejected?

8      A.  The subpoenaed documents you gave me

9  probably.

10     Q.  You didn't know that before the subpoena --

11 you got the subpoenaed documents in 2018; is that

12 your testimony?

13     A.  I don't think that's what I said, but I

14 don't know when I knew.

15     Q.  Can you turn, please, to the page that's

16 Bates labeled Trahanas-NU11819.  Are you with me?

17     A.  Yes.

18     Q.  You'll see that that's an e-mail dated

19 December 1st of 2014.

20         Do you see that?

21     A.  Yes.

22     Q.  From admissions@greenville --

23 greenvillemed.sc.edu to diane.trahanas@gmail.com?

24     A.  I see that at the top, yes.

25     Q.  Okay.

Page 556

1          D. TRAHANAS - VOLUME II

2          MR. DeROSE:  You said 118?

3          MS. WERMUTH:  19.

4          MR. DeROSE:  19.  How close -- is it at the

5     bottom there?  I'm having a little trouble

6     here.

7          I'm sorry.  Go ahead, Counsel.  I'm sorry.

8  BY MS. WERMUTH:

9      Q.  Do you recall receiving that e-mail?

10     A.  I don't recall receiving this e-mail.

11     Q.  Did you search your gmail account for

12  greenvillemed?

13     A.  Yes, University of South Carolina,

14  Carolina, southern, Greenville, Greenville School of

15  Medicine, Greenville Medical School, South

16  Carolina -- or USC, Greenville Medical School,

17  School of Medicine.

18     Q.  And no e-mails came up when you ran all of

19  those searches that you just told me you ran?

20     A.  Correct, unless I reapplied to this in 2018

21  and I have e-mails that I gave you from that.  I

22  don't remember what -- what schools those were.

23     Q.  When did you first -- strike that.

24          Central Michigan University, did you run

25  any of -- did you run that school's name through

                    D. TRAHANAS - VOLUME II

1    your gmail account?

2        A.  Yes.

3        Q.  And that would include your inbox, sent

4    box, and deleted items?

5        A.  Yes.

6        Q.  And you found no e-mails responsive to

7    those search queries?

8        A.  For the 2015 cycle, that's correct.  I

9    don't know if I applied in 2018.  If so, I'm

10   positive I gave you those e-mails or

11   correspondences.

12       Q.  And in looking at Page 11819, this is an

13   invitation to submit a secondary application to the

14   University of Southern -- South Carolina; correct?

15       A.  Yes.

16       Q.  And it tells you in this e-mail that the

17   supplemental application was due January 15th of

18   2015; correct?

19       A.  Yes.

20       Q.  And you did not submit a secondary

21   application by that date; correct?

22       A.  I don't believe so, correct.

23           MS. WERMUTH:  Excuse me, Ms. Trahanas, will

24       you hand that to John?  Thank you.

1          D. TRAHANAS - VOLUME II

2          (Trahanas Exhibit 89 marked for

3      identification.)

4   BY MS. WERMUTH:

5      Q.  You now have Deposition Exhibit 89 in front

6   of you.  These are the materials that we received

7   from Florida International University.  And I'm

8   going to direct your attention to NU -- I'm sorry,

9   Trahanas-NU12041, which is near the end.

10         MR. DeROSE:  Let me get there. All right.

11      I'm there, honey -- Counsel.

12   BY MS. WERMUTH:

13      Q.  According to the records we received from

14   FIU, you were invited to submit a secondary

15   application on December 1st of 2014.

16         Do you see that?  So let me ask this in a

17   better way.  There's -- if you look at the -- the

18   screenshot that FIU sent us on Page 11241, there's

19   an area that looks like it's boxed off, and in the

20   middle of it says, "Acknowledgment e-mail sent."

21         Do you see that under "description"?

22      A.  I do.

23      Q.  And then, next to that, under "Comments,"

24   it says "Selected for secondary application."

25         Do you see that?

1           D. TRAHANAS - VOLUME II

2       A.  I see that.

3       Q.  And the date is 12/1/2014.

4           Do you see that?

5       A.  Yes.

6       Q.  Okay.  And then, according to -- and do you

7   have memory of being selected and receiving an

8   acknowledgment e-mail from FIU to submit a secondary

9   application?

10      A.  I don't recall.

11      Q.  And did you search your e-mail for FIU or

12  Herbert Wertheim for responsive e-mails?

13      A.  Yes, both the long and the -- so both the

14  acronym and Florida International University.

15      Q.  And you did not turn up any e-mails in

16  connection with that search?

17      A.  For the 2015 cycle, no.  Like I said

18  earlier, if I applied to it in 2018, I gave you

19  those e-mails.

20      Q.  And then there's an entry two levels below

21  what we just looked at where it says, "Secondary

22  application started."

23          Do you see that?

24      A.  Yes.

25      Q.  And -- and then under "Date" it says

1          D. TRAHANAS - VOLUME II

2    12/3/2014.

3          Do you see that?

4    A.  Yes.

5    Q.  And then under "Username" it has your gmail

6    account.

7          Do you see that?

8    A.  Yes.

9    Q.  Okay.  So according to their records, FIU's

10   records, you went in and started the secondary

11   application on December 3rd of 2014.

12         Do you see that?

13   A.  Sure, but I'm not sure what "started"

14   means.

15   Q.  Okay.  So let me ask you that question.

16         Did you start a secondary application for

17   FIU in December of 2014?

18   A.  I don't remember.

19   Q.  And then, there is a -- an entry below that

20   where it says "Withdrawn before accepted, applicant

21   withdrew."

22         Do you see that?

23   A.  I do.

24   Q.  And it says under "Comments," "Passive."

25         Do you see that?

1              D. TRAHANAS - VOLUME II

2        A.   I see that.

3        Q.   And then, the date that's being marked as

4   the date of your passive withdrawal is December 16

5   of 2014.

6             Do you see that?

7        A.   Yes.

8        Q.   And do you know, as you sit here now, when

9   the appli- -- secondary application to FIU was due?

10       A.   No.

11       Q.   Do you have reason to believe it was due on

12  December 15th of 2014?

13       A.   I have no idea.

14       Q.   And you did not complete a secondary

15  application for FIU; correct?

16       A.   I don't recall.

17       Q.   Well, according to FIU's records, you did

18  not complete a secondary application; is that right?

19            MR. DeROSE:  If you know what their records

20       show.

21       A.   I'm not sure what "passive" means in that

22  box that you referred to on Bates stamp

23  Trahanas-NU12041 -- I'm sorry, 12041.

24  BY MS. WERMUTH:

25       Q.   But as you sit here today, you can't tell

D. TRAHANAS - VOLUME II

1         D. TRAHANAS - VOLUME II

2 me with certainty that you finished a secondary

3 application for FIU; correct?

4   A. That's correct.

5   Q. You were never invited to interview at FIU;

6 correct?

7   A. Not that I recall.

8   Q. And you were not invited to interview at

9 University of Central Florida; correct?

10   A. Not that I recall.

11   Q. And you were not invited to interview at

12 University of Miami; correct?

13   A. Not that I recall.

14   Q. And you were not invited to interview at

15 Oakland University; correct?

16   A. Not that I recall.

17   Q. And you were not invited to interview at

18 Geisinger Commonwealth; correct?

19   A. Not that I recall, yes.

20   Q. And you were not invited to interview at

21 Central Michigan University; right?

22   A. Not that I recall.

23   Q. And you were not invited to interview at

24 the University of South Carolina; right?

25   A. Not that I recall.

1          D. TRAHANAS - VOLUME II

2     Q.  And you were not invited to interview with

3  FIU?  Did I ask you that one?

4          MR. DeROSE:  Answer it again.

5     A.  I'll answer it.  Not that I recall.

6  BY MS. WERMUTH:

7     Q.  Okay.  In fact, you haven't interviewed

8  with any medical school; correct?

9     A.  Um, yes, that would be correct.

10          MS. WERMUTH:  Can I have this marked,

11      please.

12          Excuse me, Ms. Trahanas, would you mind?

13      Thank you.

14          (Trahanas Exhibit 90 marked for

15      identification.)

16  BY MS. WERMUTH:

17     Q.  Okay.  Ms. Trahanas, do you recall being

18  invited for -- to -- to submit a secondary

19  application for Florida Atlantic University?

20     A.  I -- I don't recall.

21     Q.  Do you recall -- strike that.

22          You did not complete a secondary

23  application for Florida Atlantic University; is that

24  correct?

25          MR. DeROSE:  If you know without looking at

1                    D. TRAHANAS - VOLUME II

2         documents, you can answer.

3         A.  I don't recall.

4  BY MS. WERMUTH:

5         Q.  You think you may have completed a

6  secondary application for Florida Atlantic; is that

7  your testimony?

8         A.  I don't remember.

9         Q.  Has any school ever indicated to you that

10 you could submit a secondary application after

11 January 30th of any given application cycle?

12        A.  I don't know.

13        Q.  You don't know?

14        A.  (Witness nods.)

15        Q.  Have you received any communication from

16 any school that you applied to with a date for a

17 secondary application after January 30th?

18        A.  For any application cycle, I don't know.

19        Q.  What about for the 2015 application cycle?

20        A.  For either.  I don't know.

21             MS. WERMUTH:  Can you mark this, please.

22             (Trahanas Exhibit 91 marked for

23        identification.)

24             MS. WERMUTH:  Thank you.

25  ///

1              D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3         Q.   Okay.  Ms. Trahanas, you've been handed

4    what's been marked as Deposition Exhibit 91.  This

5    was material that was appended to Jorge Girotti's

6    expert report.

7              You attended his deposition; right?

8         A.   Correct.

9         Q.   Okay.  And according to these materials,

10   Florida Atlantic University, if you -- if you look

11   on the first page of this, will not consider

12   secondary applications submitted after

13   December 31st of an application cycle.

14             Do you see that?

15        A.   Yes, I see it at the bottom.

16        Q.   And if you look at Deposition Exhibit 90,

17   which was Florida Atlanta [sic] subpoena materials,

18   are you with me -- Florida Atlantic?  On

19   Page 12060 --

20        A.   I'm on that page.

21             MR. DeROSE:  Give me a couple seconds.

22             MS. WERMUTH:  Certainly.

23             MR. DeROSE:  I'm almost there.  All right.

24        Counsel, go ahead.

25   ///

1          D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3        Q.  You'll see on that page that in the middle

4    of the sort of grid area under application status --

5    I'm sorry, under "Description" it says "Selected

6    secondary application."

7             Do you see that?

8        A.  Yes, I follow you.

9        Q.  And the date indicated there is 12/15/2014.

10            Do you see that?

11       A.  Yes.

12       Q.  And then, right below it, it says an

13   acknowledgment e-mail was sent to you on

14   12/15/2014 regarding your selection for secondary

15   application.

16            Do you see that?

17       A.  I see that.

18       Q.  Okay.  And as you sit here today, you can't

19   tell me with certainty that you submitted the

20   secondary application; correct?

21       A.  That's correct.

22       Q.  And you can't tell me with certainty that

23   you submitted the secondary application before

24   December 31st of 2014; correct?

25       A.  That's correct.

1          D. TRAHANAS - VOLUME II

2      Q.  And you haven't produced any evidence that

3  you have submitted a secondary application to FAU;

4  correct?

5      A.  Not that I recall.

6      Q.  Okay.  And you -- and you did not get an

7  interview with FAU; correct?

8      A.  Correct.

9      Q.  And did you, excuse me, search FAU and its

10 various iterations in your gmail account?

11     A.  Yes.  I remember FAU, Florida Atlantic

12 University with the Charles E. Schmidt portion, also

13 with the College of Medicine portion, also FAU

14 Charles E. Schmidt College of Medicine.

15     Q.  And you didn't -- no e-mails were returned

16 in connection with that search -- those searches?

17     A.  If I applied in 2018, then I gave you

18 those, but I -- I don't know what -- if I had it, I

19 gave it to you.  I'm not sure what year -- which

20 schools I applied to in 2018 that may have

21 overlapped with that year, 2015.

22          MS. WERMUTH:  Can we mark this, please.

23          (Trahanas Exhibit 92 marked for

24      identification.)

25          MS. WERMUTH:  Do you mind passing that?

1            D. TRAHANAS - VOLUME II

2       Thank you.

3   BY MS. WERMUTH:

4       Q.   Okay.   Ms. Trahanas, you have Deposition

5   Exhibit 92 in front of you.   These are the materials

6   that we received from Florida State in connection

7   with our subpoena.

8            MS. WERMUTH:   Oh, did I have this marked?

9            MR. DeROSE:   Yes.   Well, I don't know.

10           I -- 92.

11           MS. WERMUTH:   92, and that is -- I said

12           that was Florida State.   Okay.   I'm sorry.   I

13           got myself confused here for a moment.

14  BY MS. WERMUTH:

15      Q.   Okay.   And if I could direct your

16  attention, please, Ms. Trahanas, to the pages Bates

17  labeled Trahanas-NU11658.

18           MR. DeROSE:   Give me one second.   All

19           right.   Go ahead.

20  BY MS. WERMUTH:

21      Q.   And 659.   Actually, you know what, I'm

22  sorry.   Let's look first at Page 660 to 661.

23  According to FSU's records, you were e-mailed at

24  diane.trahanas@gmail.com from

25  medadmissions@med.fsu.edu on December 1st of 2014.

1          D. TRAHANAS - VOLUME II

2          Do you see that?

3     A.  I see that at the top, yes.

4     Q.  Okay.  And according to this e-mail, FSU

5  was confirming receipt of your AMCAS application; is

6  that right?

7     A.  Yes, I see that.

8     Q.  And they also invited you to complete a

9  secondary application; is that right?

10    A.  Yes.

11    Q.  And if you look at the next page, 661,

12  where the e-mail is continued, there's a sentence

13  that reads, "The deadline to submit the secondary

14  and all supplemental materials is December 31st,

15  2014."

16          Do you see that?

17    A.  Yes.

18    Q.  Okay.  And you did not submit a secondary

19  application to FSU; correct?

20    A.  Not that I recall.  I don't know.

21    Q.  You don't know or you don't -- or did you

22  do it?

23          MR. DeROSE:  She just said she doesn't

24       recall, but go ahead.

25          MS. WERMUTH:  Well, she said I don't

1          D. TRAHANAS - VOLUME II

2     recall, and then she said I don't know, and I'm

3     just trying to understand --

4          MR. DeROSE:  All right.  That's fair

5     enough.

6          Do you not recall or you don't know?

7  BY MS. WERMUTH:

8     Q.  Did you submit a secondary application to

9  FSU?

10    A.  Not that I recall.

11    Q.  Turning to Pages 11658 to 659, this is an

12 e-mail to the diane.trahanas@gmail.com account.

13         Do you see that?  Do you see that your

14 gmail account is listed as the recipient?

15    A.  I'm sorry.  I'm on Page 11658.

16    Q.  Correct.

17    A.  Okay.

18    Q.  Do you see that your gmail account is

19 listed as the recipient?

20    A.  Yes.

21    Q.  And it is from medadmissions@med.fsu.edu.

22         Do you see that?

23    A.  Yes, I do.

24    Q.  And the date of the e-mail is 1/6/2015.

25         Do you see that?

1                    D. TRAHANAS - VOLUME II

2          A.  I do.

3          Q.  And do you see what the subject line says?

4          A.  Yes.

5          Q.  It says that your application was

6     incomplete; correct?

7          A.  Correct.

8          Q.  And in the third paragraph of this e-mail,

9     it reads, "Unfortunately, your application will not

10    be considered this admission cycle, as all required

11    admission criteria were not met."

12             Do you see that?

13         A.  I do.

14         Q.  Does this help refresh your memory as to

15    whether you completed your secondary application to

16    FSU?

17         A.  I would believe what it says.

18         Q.  All right.  You have no reason to dispute

19    what this e-mail says?

20         A.  Correct.

21         Q.  Okay.  And did you search for FSU or

22    Florida State University in your gmail account?

23         A.  I did, along with college of -- FSU College

24    of Medicine and the long form.

25             MS. WERMUTH:  Can I have this marked,

1          D. TRAHANAS - VOLUME II

2      please.

3          (Trahanas Exhibit 93 marked for

4      identification.)

5          MS. WERMUTH:  Thank you.  Would you mind

6      passing that?  Thank you.

7  BY MS. WERMUTH:

8      Q.  Okay.  Ms. Trahanas, you've been handed now

9  what's been marked as Deposition Exhibit 93.

10         Do you recognize this document?  Strike

11 that.  I'm sorry.  Let me tell you what this is.

12         VIDEOGRAPHER:  Microphone, Counsel.

13 BY MS. WERMUTH:

14     Q.  Okay.  I'm sorry.  Deposition Exhibit 93 --

15 let me make sure I get the right one here.

16         Okay.  So these, I'll represent to you, in

17 this exhibit are the records we received from

18 Virginia Tech College of Medicine in connection with

19 our subpoena.

20         You applied to Virginia Tech; correct?

21     A.  I have no reason to dispute otherwise, but

22 yes.

23         MR. DeROSE:  It's Carilion, C-a-r-i -- or,

24     excuse me, C-a-r-l-l-i-o-n [sic] School of

25     Medicine, not College of Medicine.

1              D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3        Q.  Virginia Tech, yeah, Carilion School of

4    Medicine.

5              You applied to that school in the 2015

6    cycle; right?

7        A.  Yes.

8        Q.  Okay.  And if you look at the page that's

9    Bates labeled -- it actually has a labeling that the

10   school itself put on the documents, so it's

11   VTCSOM0002.

12       A.  I'm on that page.

13       Q.  And on this page it appears to be an e-mail

14   with diane.trahanas@gmail.com as the recipient.

15             Do you see that?

16       A.  Yes.

17       Q.  And that's your -- the gmail account that

18   we've been discussing today; correct?

19       A.  Yes.

20       Q.  And the e-mail is from

21   vtcadmissions2015@carilionclinic.org.

22             Do you see that?

23       A.  I do.

24       Q.  And the date of the e-mail is December 4th,

25   2014.

Page 574

1                    D. TRAHANAS - VOLUME II
2              Do you see that?
3         A.   Yes.
4         Q.   And on this date you were notified by
5    Virginia Tech that after review and consideration of
6    your record, the admissions committee had decided
7    not to invite you to submit a secondary application.
8              Do you see that?
9         A.   Yes.
10        Q.   Okay.  And do you recall receiving this
11   e-mail?
12        A.   I don't recall.
13        Q.   And did you search for Virginia Tech in
14   your gmail account?
15        A.   Yes.
16        Q.   Did you --
17        A.   I'm sorry.
18        Q.   Tell me all of the iterations that you
19   searched for.
20        A.   VTC, Virginia Tech, Carilion, Virginia Tech
21   Carilion SOM, Virginia Tech Carilion School of
22   Medicine.  I think that's all of them.
23        Q.   And you did not turn up any e-mails in
24   those searches?
25        A.   I'm not sure if I reapplied to this school

1            D. TRAHANAS - VOLUME II

2  in 2018, but yes, I don't have any correspondence

3  with them.

4       Q.  From the 2015 cycle?

5       A.  Yeah.

6       Q.  Did you ever contact anyone at Google to

7  see whether or not you could retrieve e-mails that

8  you had deleted from these medical schools?

9       A.  No.

10      Q.  And according to this e-mail, the last

11 paragraph says, "On behalf of the admissions

12 committee, I want to thank you for your interest in

13 the Virginia Tech Carilion School of Medicine, and I

14 wish you the best of luck with applications you may

15 have pending at other medical schools."

16           Do you see that?

17      A.  I do.

18      Q.  So did you understand this to be a notice

19 that you were being rejected from Virginia Tech?

20      A.  I don't recall at the time how I

21 interpreted it, but it doesn't invite me to a

22 secondary application.

23      Q.  Right.

24           And it also doesn't invite you to an

25 interview; correct?

```
 1              D. TRAHANAS - VOLUME II
 2       A.  Correct.
 3            MS. WERMUTH:  Can we mark this, please.
 4            (Trahanas Exhibit 94 marked for
 5       identification.)
 6  BY MS. WERMUTH:
 7       Q.  Okay.  You've been handed now what's been
 8  marked as Deposition Exhibit 94.  These are
 9  materials we received in connection with our
10  subpoena to Wayne State University.
11            MS. WERMUTH:  We'll take a break after this
12       one.
13       A.  Okay.  Thanks.
14       Q.  Okay.  So if you could turn to Trahanas-NU
15  at 1111 -- I'm sorry, 11987.
16       A.  I'm on that page now.
17       Q.  Okay.  And according to Wayne State's
18  records, you -- there -- there was an action taken
19  on your application on January 9th of 2015 that is
20  coded as a preliminary rejection.
21            Do you see that?
22       A.  Yes.
23       Q.  Okay.  And do you recall receiving any
24  notification from Wayne State about the preliminary
25  rejection on that date?
```

                    D. TRAHANAS - VOLUME II

1

2       A.  No.

3       Q.  Okay.  And on the next page, 11988, are you

4  with me?

5       A.  I am.

6       Q.  You'll see that Wayne State has coded your

7  application as rejected on February 15th of 2017.

8            Do you see that?

9       A.  I do see that.

10       Q.  And you don't dispute that this one is a

11  rejection; right?

12       A.  No, it says rejection.

13       Q.  And do you recall receiving a communication

14  from Wayne State with a rejection?

15       A.  No.

16       Q.  But you know you were rejected from Wayne

17  State; correct?

18       A.  I -- I don't dispute their record.

19       Q.  And did you search for Wayne State in your

20  gmail account?

21       A.  I did.  Wayne State, Wayne State

22  University, Wayne State University School of

23  Medicine, Michigan -- Wayne State Michigan, I'm

24  sorry.  That's what I recall.

25            MR. DeROSE:  Counsel, could you give me the

1          D. TRAHANAS - VOLUME II

2     number of the page you just talked about?  What

3     was it?  I'm sorry, because I'm on 11998, and

4     it's not a rejection at all.

5          MS. WERMUTH:  11988.

6          MR. DeROSE:  11988.  Okay.  I got it.

7          MS. WERMUTH:  Okay.  We can take a break

8     now.

9          VIDEOGRAPHER:  Ending disc number two of

10    the deposition of Diane Trahanas.  We are off

11    the record at 1:43 P.M.

12         (Lunch recess taken from 1:43 P.M.

13    to 2:23 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1          D. TRAHANAS - VOLUME II

2              AFTERNOON SESSION

3            (Time noted: 2:23 P.M.)

4       VIDEOGRAPHER:  And beginning disc number

5    three of the deposition of Diane Trahanas.  We

6    are back on the record at 2:23 P.M.

7       MS. WERMUTH:  Okay.  I would like to have

8    this marked, please.

9       (Trahanas Exhibit 95 marked for

10   identification.)

11      MS. WERMUTH:  Do you mind passing it?  I

12   appreciate that.

13  D I A N E   T R A H A N A S,

14    resumed and testified as follows:

15  CONTINUED EXAMINATION

16  BY MS. WERMUTH:

17      Q.  All right.  Ms. Trahanas, you've been

18  handed what's been marked as Deposition Exhibit 95.

19  These are the materials that we received from -- by

20  subpoena from Wash U.  You applied to Wash U in the

21  2015 app- -- application cycle; right?

22      A.  Yes.

23      Q.  Okay.  And if you would turn to Page --

24  what's marked WU0005.  According to this document,

25  this is an e-mail sent to the

1                   D. TRAHANAS - VOLUME II

2   diane.trahanas@gmail.com address on December 1st,

3   2014.

4           Do you see that?

5       A.  Yes, at the top.

6       Q.  And -- okay.  And it's from

7   wumscoa@wustl.edu.

8           Do you see that?

9       A.  I do.

10      Q.  Do you recall receiving this e-mail on or

11  about December 1st of 2014?

12      A.  I don't recall.

13      Q.  Okay.  Do you recall being invited to

14  submit supplemental application materials to

15  Washington University School of Medicine?

16      A.  I don't recall.

17      Q.  Okay.  According to this e-mail you were

18  invited to do that; do you agree?

19      A.  I do agree.

20      Q.  Okay.  And then, on the next page, Bates

21  labeled WU0006, on 12/18 of 2014 an e-mail is sent

22  to you at diane.trahanas@gmail.com.

23          Do you see that?

24      A.  Yes.

25      Q.  And it's from wumscoa@wustl.edu.

1           D. TRAHANAS - VOLUME II

2           Do you see that?

3      A.   Yes.

4      Q.   Okay.  And according to this e-mail, your

5  supplemental application was still in draft status.

6           Do you see that?

7      A.   I do.

8      Q.   Do you recall starting to draft a

9  supplemental application for Washington University

10  School of Medicine?

11      A.   I don't recall.

12      Q.   Okay.  Did you ever complete one for

13  Wash U?

14      A.   I don't recall.

15      Q.   Well, on the next page, WU0007, on

16  January 18 of 2015, from the same e-mail address to

17  your gmail address you were notified again that your

18  supplemental application could not be processed

19  without you completing it; right?

20      A.   Yes, it says that in the e-mail.

21      Q.   Okay.  And as you sit here today, you

22  cannot state with any certainty that you, in fact,

23  did complete your supplemental application materials

24  by Wash U's deadline?

25      A.   That's correct.

1          D. TRAHANAS - VOLUME II

2      Q.  Or that you completed them at all, you

3  can't say that with certainty; right?

4      A.  Correct.

5      Q.  And did you search Wash U and any iteration

6  of Wash U College of Medicine in your e-mail

7  searches?

8      A.  Yes.  Washington University, Washington

9  University School of Medicine, Washington University

10  St. Louis.  I believe I only searched St. Louis as

11  well.  Did I say Wash -- and then Wash University.

12      Q.  How is it that you're recalling all of

13  these specific e-mail searches, the actual search

14  terms, as you sit here today?

15      A.  I'm not sure I can explain my, I guess,

16  neurological response to that, but sometimes things

17  are triggered from your memory.  But I remember

18  searching for different iterations.

19          Also, I believe Dr. Schwulst went to this

20  school, so he would refer to it as, like, Wash U, so

21  that would give me, you know, something to -- an

22  iteration to look for.

23      Q.  You'll see from the e-mails we just looked

24  at there's no -- the first one mentions Washington

25  University, but none of the other ones that we

D. TRAHANAS - VOLUME II

1  looked at mentions it.

3        Do you see that?

4        So Page Bates labeled 6 and 7, there is no

5  reference to university or Washington in those

6  e-mails.

7        Do you see that?

8    A.  Yes.  Well, no, it says Washington

9  University School of Medicine in the subject line.

10    Q.  Not on Page 6 or 7; correct?

11    A.  Not that I can see.

12        MR. DeROSE:  On 7 don't you have a wstl.ed?

13        MS. WERMUTH:  My question is whether it has

14    the word "Washington" or the word "University"

15    in these e-mails, which are the --

16  BY MS. WERMUTH:

17    Q.  Did you search by "WUSTL"?  That wasn't one

18  of the terms that you mentioned.

19    A.  I don't -- yeah, I don't recall.

20    Q.  Do you recall when you first -- you've

21  mentioned for each of the 10 or 12 schools that

22  we've talked about already today that you -- you

23  took some iteration of their name and ran searches

24  in your e-mail.  Do you remember the first time you

25  ran searches using the names of the schools?

1          D. TRAHANAS - VOLUME II

2      A.  No.

3      Q.  Did you -- did you search for the word just

4  "medical school" or the words "medical school"?

5      A.  Yes, medical school, medicine, School of

6  Medicine.

7      Q.  Did you search for the word "application"?

8      A.  Sure, medical school application, med

9  school application.

10     Q.  No.  My question is did you search for the

11 word "application," not in connection with other

12 words, but I'm just wondering did you do -- run any

13 searches under -- just using the term "application"

14 or "apply"?

15     A.  I don't recall.

16         MS. WERMUTH:  Can you mark this, please.

17         (Trahanas Exhibit 96 marked for

18     identification.)

19         MS. WERMUTH:  Can I ask you -- thank you.

20 BY MS. WERMUTH:

21     Q.  Okay.  You've been handed now what's been

22 marked as Deposition Exhibit 96.  These are

23 materials we received from the Frank H. Netter

24 School of Medicine at Quinnipiac.

25         Is that how you pronounce it, do you know?

Page 585

D. TRAHANAS - VOLUME II

1

2      A.  I believe so.

3      Q.  Okay.  You applied to Quinnipiac University

4  in the 2015 cycle; correct?

5      A.  Yes.

6      Q.  Okay.  And if you look on Page NU -- I'm

7  sorry.  Trahanas-NU11824, which is the last page?

8      A.  Yes, I'm on that page.

9      Q.  You see an e-mail dated 12 -- is that a 6

10  or 8?  My eyes are bad with this copy -- 12/8/2014.

11          Do you see that?

12      A.  Yes.

13      Q.  And it's an e-mail from Tony Sorrento [sic]

14  to you, and what did you under- -- well, strike

15  that.

16          Do you recall receiving this e-mail on or

17  about December 8th of 2014?

18      A.  I don't recall.

19      Q.  And as read it today, you don't have any

20  reason to believe that this was not sent to you on

21  or about December 8th, 2014?

22      A.  I have no way of confirming if it was sent

23  or not.  There's no -- just like in snail mail, you

24  get like a certification of something being sent.

25  There is nothing signed back.

                    D. TRAHANAS - VOLUME II

1

2    Q.  Do you have reason to dispute Quinnipiac's

3    records?

4    A.  I can't speak to what -- how well their

5    computer system is.  I don't know.

6    Q.  You were never offered admission at

7    Quinnipiac; correct?

8    A.  Correct.

9    Q.  And you were never offered the opportunity

10   to interview at Quinnipiac; correct?

11   A.  Correct.

12   Q.  And you were never offered the opportunity

13   to submit secondary application materials at

14   Quinnipiac; right?

15   A.  I don't -- I don't recall.

16   Q.  Well, according to this e-mail, you were

17   being told in early December of 2014 that a decision

18   had been made not to send you a secondary

19   application in order to complete your application.

20       Do you see that?

21   A.  Yes, I see that.

22   Q.  Okay.  Did you search your gmail account

23   for Quinnipiac, or Netter, or any of the other --

24   A.  I recall Quinnipiac University, Quinnipiac

25   University School of Medicine.  Those are the two I

1           D. TRAHANAS - VOLUME II

2    remember.

3         Q.  You didn't search Netter?

4         A.  I don't recall.

5             MS. WERMUTH:  Can you mark that, please.

6             (Trahanas Exhibit 97 marked for

7         identification.)

8    BY MS. WERMUTH:

9         Q.  Okay.  You've been handed what's been

10   marked as Deposition Exhibit 97.  These are the

11   materials we received from Western Michigan in

12   connection with our subpoena.  I guess it's the

13   Western Michigan University Homer Stryker M.D.

14   School of Medicine.

15            Did you see apply to that school in the

16   2015 cycle?

17        A.  Yes.

18        Q.  Okay.  Let me ask you this:  As you sit

19   here right now, can you tell -- can you name for me

20   the schools that you applied to in 20 -- the 2018

21   cycle?

22        A.  I can recall one.

23        Q.  Only one?

24        A.  Definitively one.

25        Q.  And what school is that?

1          D. TRAHANAS - VOLUME II

2     A.  Loyola University.

3     Q.  And you were rejected from Loyola; right?

4     A.  Correct.

5     Q.  Okay.  So looking at Deposition Exhibit 97,

6  can you turn to Page Trahanas-NU11769, please.

7  According to the records we received from Western

8  Michigan, an e-mail was sent to you on

9  December 9th of 2014 with this content.

10         Do you recall receiving an e-mail with this

11  content?

12     A.  No, I do not.

13     Q.  Okay.  And according to this particular

14  record, you were being notified by Western Michigan

15  that they were not going to extend you an invitation

16  to complete a supplemental application.

17         Do you see that?

18     A.  Yes.

19     Q.  Do you recall a communication from Western

20  Michigan telling you as much?

21     A.  I don't recall that.

22     Q.  Do you recall being rejected from Western

23  Michigan?

24     A.  I don't recall.

25     Q.  All right.  Can you turn to the page marked

D. TRAHANAS - VOLUME II

1

2    11772.  Do you see in the middle of the page there's

3    a box that says --

4              MR. DeROSE:  Excuse me.

5              MS. WERMUTH:  Bless you.

6              MR. DeROSE:  Thank you.

7    BY MS. WERMUTH:

8         Q.  -- "Applicant status activity log."

9             Do you see that?

10        A.  I do.

11        Q.  And do you see that there is an entry with

12   a date of 12/9/2014 at 9:47 A.M.?

13        A.  Yes.

14        Q.  And the action associated with that entry

15   is "Decline after AMCAS"?

16        A.  I see that.

17        Q.  Okay.  And you have no review to dispute

18   the accuracy of Western Michigan's records?

19        A.  Correct.

20        Q.  And did you search Western Michigan

21   University in your gmail account?

22        A.  I remember searching Western Michigan

23   University.  That's the one I can definitively say.

24        Q.  What about Homer?

25        A.  I don't recall.

Page 590

1          D. TRAHANAS - VOLUME II

2     Q.   What about Stryker?

3     A.   It's possible.  I don't recall.

4          MS. WERMUTH:  Mark this, please.

5          (Trahanas Exhibit 98 marked for

6     identification.)

7          MS. WERMUTH:  Would you mind passing that

8     to your Counsel.  Thank you.

9  BY MS. WERMUTH:

10     Q.   Okay.  You've been handed what's been

11 marked as Deposition Exhibit 98, which is the

12 materials we received from Sidney Kimmel Medical

13 College at Thomas Jefferson University.  Turning to

14 Page Trahanas-NU11683, do you see that the preferred

15 contact information provided to this particular

16 school is your e-mail at diane.trahanas@gmail.com?

17     A.   Yes, I do.

18     Q.   Okay.  And that was your preferred contact

19 method; is that right?

20     A.   Yes.

21     Q.   And you'll see in the -- on the same page

22 in the upper right, not the far upper right, but in

23 the light green box where it says "action"?

24     A.   I'm sorry.  There's -- there is no green on

25 my page.

1          D. TRAHANAS - VOLUME II

2      Q.  Oh, I'm so sorry.

3      A.  That's okay.

4      Q.  Yeah, yeah.

5          So there's a box that says "primary

6   applicant information" on the left.

7          Do you see that?

8      A.  I do.

9      Q.  And it has your name, and then it has your

10  AAMC I.D. number.

11         Do you see that?

12     A.  I follow, yes.

13     Q.  Okay.  And there is a box -- there is a

14  field here that says "action," colon.

15         Do you see that?

16     A.  Yes.

17     Q.  And next to that it says "Preliminary

18  rejection 1/20/2015."

19         Do you see that?

20     A.  I do.

21     Q.  Do you recall receiving an e-mail from

22  Sidney Kimmel --

23     A.  I do --

24     Q.  -- with a preliminary rejection on

25  1/20/2015?

1                    D. TRAHANAS - VOLUME II

2        A.  I do not recall that.

3        Q.  And you know that you were not accepted to

4   Sidney Kimmel; correct?

5        A.  Correct.

6        Q.  And you did not receive an invitation

7   for -- to submit secondary materials; correct?

8        A.  I -- I don't recall.

9        Q.  You did not receive an invitation to

10  interview; correct?

11       A.  Correct.

12       Q.  Do you know that most interviews for

13  medical school applicants are done -- are completed

14  typically before the end of January of each

15  application cycle?

16       A.  That's not -- no, I don't know that.

17       Q.  You don't know that.

18            And is the reason that you don't know

19  because you were not invited to interview with any

20  of the medical schools?

21       A.  No.  It's because I've known people to

22  interview as late as June.  And typically, at least

23  until April, I would say that's a normal interview

24  cycle.

25       Q.  What's the basis of that understanding on

D. TRAHANAS - VOLUME II

1  your part?

3      A.  Working in the medical field, having a lot
4  of friends that are students, or were students, or
5  residents, and speaking to various deans or
6  programs, medical school programs.  Also, it depends
7  on the type of medical school that you're referring
8  to.

9      Q.  And the type of medical schools that you
10  applied to in the 2015 cycle all completed their
11  interview cycle some time in, at the very latest, in
12  January or February of 2015?

13      A.  I don't know.

14      Q.  You don't know, okay.

15          Did you search your Gchats for data related
16  to your medical school applications?

17      A.  Um, anything -- any term I searched for
18  would search for anything that's related to my
19  gmail.  So inbox, send, trash, if that's a folder,
20  then it searches it.

21      Q.  So it automatically searches Gchat when
22  you're in gmail?  So if you're running a search in
23  gmail, Gchat gets included in that search?

24      A.  Yes, much like anything sent is -- is
25  found, as much as anything in the inbox, per se.

1          D. TRAHANAS - VOLUME II

2    Q.  Did you search Sidney Kimmel or Thomas

3 Jefferson in your gmail account?

4    A.  Sidney Kimmel College of Medicine I

5 remember.  And again, if it was on the AMCAS

6 application, the way that the name is on the AMCAS

7 application, I would include that or some iteration

8 of that.  So if Thomas Jefferson is in that list,

9 then I would search for that too.

10    Q.  Okay.  Now for the 2018 cycle, by that time

11 you're -- you're well entrenched in the litigation

12 here; right?

13    A.  The 2018, so yes.

14    Q.  Right.

15      So you filed the lawsuit in December of

16 2015; correct?

17    A.  Correct.

18    Q.  Okay.  So by the time you went through the

19 application cycle for 2017, which would

20 have -- strike that.

21      That -- the application cycle for 2018

22 matriculation would have required you to submit

23 application materials in 2017; right?

24    A.  Correct.

25    Q.  And by that time your lawsuit had been

```
1                    D. TRAHANAS - VOLUME II
2    pending a couple of years?
3         A.  Correct.
4         Q.  And so, you knew you had an obligation to
5    preserve the e-mails related to your 2018
6    application cycle; correct?
7         A.  Yes.
8         Q.  Okay.  And you produced some of those
9    communications, but not all of them; correct?
10        A.  Whatever I had, I know I sent you, so
11   I'm . . .
12             MS. WERMUTH:  Give me just a minute,
13        please.
14             (Whereupon a discussion was had off the
15        record.)
16             MS. WERMUTH:  So can I please have this
17        marked.
18             (Trahanas Exhibit 99 marked for
19        identification.)
20        Q.  Okay.  So this is Deposition Exhibit 99,
21   and you see it's Bates labeled TRAHANAS ADD
22   Exhibit 425.
23             Do you know what -- what that means?
24        A.  Um, I remember it as it being requested.  I
25   sent my 2018 AMCAS report, and so this was added to
```

Page 596

D. TRAHANAS - VOLUME II

1
2  the other documents I had sent.

3     Q.  Okay.  So you did not produce this in

4  connection with our first request for documents, it

5  was only after we specifically came back and -- and

6  asked your lawyer to make sure we got this; is that

7  right?

8     A.  It -- I don't recall either way.  He may

9  have had it before, but we didn't add it until later

10 because he needed to Bates stamp it.  I don't know.

11    Q.  But it's -- it's marked "add" because it

12 was not included with the original production;

13 correct?

14    A.  I would assume so, yes.

15    Q.  And it looks like, based on what is listed

16 as a report date, that it wasn't actually run -- or

17 printed until February of 2018.

18        Do you see that?

19    A.  Yes.

20    Q.  Okay.  And if I look at the last page of

21 this exhibit --

22    A.  Uh-hum.

23    Q.  -- there's a list of schools.

24        Do you see that?

25    A.  Yes.

1          D. TRAHANAS - VOLUME II

2     Q.   Do you know what that means, the designated

3  program, do you know what means?

4     A.   Those are the schools I had applied to --

5     Q.   Okay.

6     A.   -- for the 2018 cycle.

7     Q.   Okay.  So in addition to producing your

8  application -- and, by the way, in order to produce

9  this application, you had to go into the AMCAS

10  system and have this printed; right?

11     A.   Correct.

12     Q.   And you were able to access the system in

13  February of 2018?

14     A.   According to this, yes.

15     Q.   Well, do you remember accessing it in

16  February of 2018?

17     A.   I remember accessing it.  I don't remember

18  when.

19     Q.   Okay.  And when you accessed it, were you

20  also able to access a report for the 2018 entering

21  class?  I'm sorry, 2015 entering class, not 2018.

22     A.   I don't recall.

23     Q.   And if you were to log into your AMCAS --

24  the AMCAS system now, would you still be able to see

25  your 2018 materials?

1          D. TRAHANAS - VOLUME II

2      A.  I don't know.

3      Q.  And if you logged in now, would you be able

4  to see your 2015 materials?

5      A.  I don't know.

6      Q.  And you didn't check for that before coming

7  here today?

8      A.  I checked --

9          MR. DeROSE:  You mean ever or just for the

10         dep?  I don't know what you mean by that.

11     A.  Yeah, can you please clarify?

12 BY MS. WERMUTH:

13     Q.  Okay.  So any time between October 2014 and

14 the present have you gone into the AMCAS system to

15 see if you can still access your 2015 application

16 materials?

17     A.  Yes.

18     Q.  When?

19     A.  I don't know.

20     Q.  How many times?

21     A.  I don't recall.

22     Q.  And between the time that you originally

23 applied, which looks like it was for the 2018 class,

24 September 24th, 2017, and the present, have you gone

25 into the AMCAS system to find -- to -- to look at or

1                    D. TRAHANAS - VOLUME II

2    pull information relating to your 2018 application

3    cycle?

4         A.  Since the submission date, yes.

5         Q.  Okay.  How many times?

6         A.  I don't know.

7         Q.  When?

8         A.  I don't recall dates.

9         Q.  And between February 5th, 2018, and today,

10   have you gone into the AMCAS system to pull

11   information in connection with this litigation?

12        A.  I don't -- it says here February 5th of

13   2018, so that's at least once.  I don't know how

14   many other times.

15        Q.  Any times after February 5th, 2018?

16        A.  I -- I don't recall.

17        Q.  Okay.  And so, the schools on the last

18   page, which are Bates labeled 440, those are the

19   schools you applied to in the 2015 cycle -- I'm

20   sorry, 2018 cycle?

21        A.  Yes.

22        Q.  And it looks like three of them overlap

23   with your application in 2015; is that right?  Wayne

24   State, Oakland?

25        A.  I would agree with those two, yes.

1                        D. TRAHANAS - VOLUME II

2          Q.   Florida State?

3          A.   No.

4          Q.   Central Michigan.   Central Michigan you

5    applied to in 2015?

6          A.   I know there was another Michigan school,

7    and I know there was a couple Florida schools.   I

8    would have to look and double check.

9               (Whereupon a discussion was had off the

10          record.)

11   BY MS. WERMUTH:

12         Q.   Okay.   So Exhibit 94.

13         A.   Okay.

14         Q.   You applied to Wayne State in 2015 cycle;

15   right?

16         A.   Yes.

17         Q.   And the 2018 cycle; correct?

18         A.   Correct.

19         Q.   Exhibit 92, you applied to Florida State in

20   the 2015 cycle?

21         A.   Yes.

22         Q.   You applied to Florida State in the 2018

23   cycle; correct?

24         A.   Yes.

25         Q.   Exhibit 87, you applied to Central Michigan

1          D. TRAHANAS - VOLUME II

2    in the 2015 cycle; correct?

3         A.  Correct.

4         Q.  And you also applied in the 2018 cycle?

5         A.  Yes.

6         Q.  Exhibit 85, you applied to Oakland in the

7    2015 cycle?

8         A.  Yes.

9         Q.  And in the 2018 cycle?

10        A.  Correct.

11        Q.  The remaining schools you applied to in

12   2018 you did not apply to in 2015; am I correct?

13        A.  Correct.

14             MS. WERMUTH:  Okay.  Can we mark these,

15        please.

16             (Trahanas Exhibit 100 marked for

17        identification.)

18   BY MS. WERMUTH:

19        Q.  Okay.  So I'm handing you now what's been

20   also marked as -- I'm sorry, what's been marked as

21   Deposition Exhibit 100, which is also an

22   additional -- says "Trahanas Additional Doc 101."

23             Do you see that?

24        A.  Yes.

25        Q.  Do you recognize the materials in

1          D. TRAHANAS - VOLUME II

2   Exhibit 100?

3        A.  Yes.

4        Q.  And what do you recognize these to be?

5        A.  Notifications from the various schools that

6   I had applied to for the 2018 cycle.

7        Q.  And in order to retrieve these informations

8   from your -- I'm sorry.

9            And the reason it's Bates labeled

10  "additional" is because it was not part of your

11  original production to us; is that right?

12       A.  Correct.

13       Q.  Okay.  And the reason it was not part of

14  your original production to us is because you didn't

15  search for these schools in your gmail, is that

16  correct, in connection with the original request?

17       A.  If I remember correctly, the original

18  request was made at my deposition for these

19  documents.

20       Q.  Okay.  And so, you searched for these after

21  your deposition; is that right?

22       A.  I -- I don't recall when I searched for

23  them.

24       Q.  Well, I can -- we can determine when you

25  produced them based on when your lawyer sent them to

1     D. TRAHANAS - VOLUME II

2 us, but you would agree with me they were not

3 submitted with your original request -- I mean your

4 original production; right?

5   A. As I look at the documents right now, these

6 wouldn't have been available to me at that time,

7 because they are in February.

8   Q. Okay. Although some were in December of

9 2017; correct? November 2017 I see.

10   A. I do see one for November, and I do see one

11 for December, yes.

12    MS. WERMUTH: Okay. Could you mark that,

13   please.

14    (Trahanas Exhibit 101 marked for

15   identification.)

16    MS. WERMUTH: Do you mind passing that?

17   Thank you.

18 BY MS. WERMUTH:

19   Q. You've been handed what's been marked as

20 Deposition Exhibit 101.

21   Do you recognize this document?

22   A. It seems familiar.

23   Q. Okay. So this is the document request that

24 the defendants' served on you on September 5th of

25 2017. Okay? You helped your lawyer respond to

Page 604

1              D. TRAHANAS - VOLUME II

2       these document requests; correct?

3           A.  Yes.

4           Q.  Okay.  And you'll see on Page 2 there's a

5       definition of "document."

6               Do you see that?

7           A.  Yes.

8           Q.  And that -- that definition includes

9       e-mails, if you look five lines in?

10          A.  I see that.

11          Q.  Okay.  And it also, if you look two lines

12      up, any -- "all other records kept by written,

13      electronic, photographic, or mechanical means."

14              Do you see that?

15          A.  Yes.

16          Q.  Okay.  So you understood that when you were

17      searching for documents, you needed to look at

18      e-mails and other electronically stored information;

19      is that right?

20          A.  Yes.

21          Q.  Okay.  And you will agree with me that

22      document request No. 5 specifically asks for

23      documents -- electronic documents regarding your

24      applications to medical school.

25              Do you see that?  It's on Page 6, document

1               D.  TRAHANAS - VOLUME II

2    request No. 5.

3         A.  Yes.

4         Q.  Okay.  So there was a specific request for

5    documents related to your applications to medical

6    school; right?

7         A.  Yes.

8         Q.  Right.

9             And it says applications in the plural;

10   correct?

11        A.  Yes.

12        Q.  Okay.  Yeah, and you would agree with me

13   that -- strike that.

14            So there's a document request No. 4 on that

15   same page.  It asks for all communications between

16   you and any other person concerning matters alleged

17   in the second amended complaint.

18            Do you see that?

19        A.  I do.

20        Q.  And that would include e-mail messages;

21   right?

22        A.  Yes.

23        Q.  Okay.  And that would encompass

24   communications with medical schools; correct?

25        A.  Yes.

                      D. TRAHANAS - VOLUME II

1

2    Q.  Do you recall what your testimony was in

3    January of 2018 about your searches for -- in your

4    e-mail?

5    A.  No, I do not recall.

6    Q.  Do you remember that you said you searched

7    for names and events?

8    A.  Yes, I recall that, now that you say it.

9    Q.  Okay.  And did that include names of

10   medical schools?

11   A.  I don't recall.

12   Q.  Do you remember when I asked you if you

13   searched in Gchat?

14   A.  At my earlier deposition --

15   Q.  Correct.

16   A.  -- or earlier today?

17   Q.  No, at your deposition in 2018.

18   A.  I don't remember.

19   Q.  Okay.  So you don't remember telling me

20   that you did not search in Gchat?

21   A.  I don't recall.

22   Q.  And then, do you remember when I asked you

23   what you did to search for medical school

24   applications at that time?

25   A.  I don't recall.

1          D. TRAHANAS - VOLUME II

2      Q.  So you don't know if your testimony today

3  is consistent with what you told me a year ago?

4          MR. DeROSE:  And, Counsel, that's not the

5      appropriate --

6          MS. WERMUTH:  I'll withdraw it.

7          MR. DeROSE:  -- way to impeach.

8          MS. WERMUTH:  I'll withdraw it.

9          MR. DeROSE:  So, all right.  Thank you.

10         MS. WERMUTH:  I'll withdraw it.  The record

11     stands.  She was under oath at the time.

12         MR. DeROSE:  Well, there was no doubt about

13     that.  If you want to show her questions and

14     answers and what did you say, I'd be happy to

15     let you show her her dep.

16  BY MS. WERMUTH:

17     Q.  Okay.  Sticking with Exhibits 100 and

18  101 -- I'm sorry, 99 and 100.

19     A.  Okay.

20     Q.  I don't see any e-mails in -- or any

21  communications in Deposition Exhibit 100 coming from

22  East Tennessee State.  Can you tell me if I'm wrong?

23     A.  You are not wrong.

24     Q.  Okay.  Did you do anything to search for

25  communications from East Tennessee State?

```
 1                    D. TRAHANAS - VOLUME II
 2         A.  Yes.
 3         Q.  And did you not discover any e-mails from
 4    East Tennessee State?
 5         A.  Anything I had, I gave you.
 6         Q.  Did you delete e-mails from East Tennessee
 7    State during the pendency of this litigation?
 8         A.  No.
 9         Q.  So you didn't -- so your testimony is you
10    didn't ever receive an e-mail from East Tennessee
11    State?
12         A.  Correct.
13             MR. DeROSE:  Counsel, what she said was I
14         gave you what I got, and I did not delete
15         anything.  So you know that's not fair.
16             MS. WERMUTH:  It is fair.  It's a
17         legitimate question.
18    BY MS. WERMUTH:
19         Q.  Okay.  Looking at Exhibit 99, it looks like
20    the first e-mail is from SF -- FSU -- I'm sorry,
21    100, from FSU.
22             Do you see that?
23         A.  Yes.
24         Q.  Now, I'm having a little trouble following
25    these particular e-mails.  So I see there's -- it
```

Page 609

D. TRAHANAS - VOLUME II

1

2    says medadmissions@med.fsu.edu to me.

3         Do you see that?

4    A.  Correct.

5    Q.  And then there's, like, a little arrow --

6    A.  Yes.

7    Q.  -- next to that.

8         What -- what does that arrow indicate?

9    A.  My e-mail address.

10   Q.  Okay.  So if I clicked on that, I would see

11   diane.trahanas@gmail.com?

12   A.  Yes.

13   Q.  What is the question mark to the left?

14   A.  We'd have to ask FSU about that.  I don't

15   know.

16   Q.  So that's not something you put on this

17   communication?

18   A.  No.

19   Q.  Is it a gmail indicator?

20   A.  I've never seen that before in -- a gmail

21   indicator.

22   Q.  And I only see the date Feb 21, but I don't

23   see a year.  Can you explain that to me?

24        MR. DeROSE:  Don't guess.  If you know,

25        just tell her.

1          D. TRAHANAS - VOLUME II

2          MS. WERMUTH:  Please don't instruct the

3      witness.  Thank you.

4          MR. DeROSE:  Excuse me, Counsel, I'm not

5      instructing the witness, but I'm telling her if

6      she doesn't know she --

7          MS. WERMUTH:  I'm not instructing, but I'm

8      telling her.

9          MR. DeROSE:  Excuse me.  It's not a hard

10     question.  If you don't know, tell her.

11         MS. WERMUTH:  I object to you instructing

12     the witness.

13         MR. DeROSE:  You can object to everything.

14     I've before very patient with -- this is way

15     beyond what the judge allowed, but you keep

16     going, Counsel.  I'll bring it up with the

17     court if I must.

18     A.  I'm sorry.  Can I have you read the

19 question back?

20         (Record was read as requested.)

21     A.  I cannot explain that to you.

22 BY MS. WERMUTH:

23     Q.  How do you know this is for the 2018 cycle?

24     A.  It's in regards to my application for

25 Florida State University for the 2018 entering

1                      D. TRAHANAS - VOLUME II

2    class.

3         Q.   How do you know that?

4         A.   This is the e-mail that came up when I

5    searched for the 2018 applications.  So

6    February 21st is of 2018.  Why it doesn't say 2018,

7    I can't tell you.

8         Q.   So just so I'm clear, when you searched for

9    medical school applications for the 2018 cycle, you

10   put the school name in and a year in connection with

11   this?

12        A.   No.

13        Q.   Okay.  So you applied to FSU in both 2015

14   and 2018.  How do I know that this is the 2018

15   response?

16        A.   Because this is what came up when I

17   searched for it, so this is the -- this is the

18   e-mail that they gave me in response to that.  I

19   don't know why 2018 is cut off.

20        Q.   But I -- what I'm asking you is why you

21   believe it's 2018.  Like, what did you do when you

22   searched for it to -- to con- -- for you to be

23   convinced today that this relates to the 2018

24   application?

25        A.   Because it would say February 21st, 2018.

1              D. TRAHANAS - VOLUME II

2      Q.  But it doesn't say that.

3      A.  It's not printed here.

4      Q.  So with it -- without it being printed

5  here, how can you be assured today, as you sit here,

6  that it's from 2018 and not from 2015?

7      A.  Because I know I searched for it, and I

8  remember giving this to John.

9      Q.  But you searched for it for 2015 as well.

10 So how do you know that this is the result that came

11 up for 2018?

12     A.  Because it would have the date next to it.

13          MS. WERMUTH:  All right.  Then I'm going to

14     ask for copies with dates on them, then.  Okay?

15          MR. DeROSE:  If you've got them.  I don't

16     know if we can produce it, if this is what --

17          MS. WERMUTH:  Well, it doesn't have the

18     year on it.

19          MR. DeROSE:  If you've got more documents

20     that we haven't produced, please give them to

21     me, and I will get them to counsel right

22     away --

23          MS. WERMUTH:  I'm talking about a

24     document --

25          MR. DeROSE:  -- even though discovery is

1                D. TRAHANAS - VOLUME II

2    closed.

3         MS. WERMUTH:  -- with -- with a date, a

4    full date on it.

5         MR. DeROSE:  I understand what you're

6    asking for.

7         MS. WERMUTH:  It's not an additional

8    document.  It's a full document.

9         MR. DeROSE:  Counsel, can you please tell

10   me how this relates to the discovery deposition

11   that His Honor granted you for a very limited

12   purpose?

13        MS. WERMUTH:  I don't think I have to

14   explain that to you.  What I've told you is

15   that how she searched her e-mails, what she

16   discovered when she searched her e-mails are

17   part of it.  She is telling me she discovered

18   this when she searched her e-mails, but I can't

19   tell what year this is, because there is no

20   year date on there.

21        MR. DeROSE:  I can't either.

22        MS. WERMUTH:  There you go.

23        MR. DeROSE:  And she might not have a date

24   for it, and I can't create what we don't have.

25   That's why I constantly asked you subpoena the

1              D. TRAHANAS - VOLUME II

2       records from the schools.  She doesn't have to

3       produce things she doesn't have.

4            MS. WERMUTH:  But she has a duty to

5       preserve things that she should preserve.  And

6       if she's deleting e-mails or not preserving

7       them with the dates on them, that's an issue

8       that I'm going to continue to raise.

9  BY MS. WERMUTH:

10      Q.  Let's turn to the next page, please.  This

11  is from Nova -- Nova Southeastern University.  You

12  applied to that school only in the 2018 cycle;

13  right?

14      A.  Correct.

15      Q.  Okay.  By the way, let me go back to -- I'm

16  sorry.  Let's go back to FSU, the first page there.

17          It says in this e-mail that all of the

18  required admission criteria were not met.

19          Do you see that in the -- in the sentence

20  that -- the paragraph that begins with

21  "unfortunately"?

22      A.  I do see that.

23      Q.  Were you invited to submit secondary

24  application materials to FSU?

25      A.  I don't know.

1           D. TRAHANAS - VOLUME II

2      Q.  Did you -- did any e-mails other than just

3  this one e-mail come up in your e-mail search?

4      A.  If it came up, it would -- I would have

5  given it to you.

6      Q.  So you may have deleted other e-mails from

7  FSU?

8      A.  That's not what I said.

9      Q.  But that's my question.  Is it possible you

10  deleted other e-mails from FSU?

11          MR. DeROSE:  Objection what's possible.

12          MS. WERMUTH:  Okay.  She can answer.

13      A.  What I searched for, I found, gave to John,

14  and he gave to you.

15  BY MS. WERMUTH:

16      Q.  Okay.  But here's my question:  Did you

17  delete e-mails to or from any of the schools you

18  applied to in 2018?

19      A.  No.

20      Q.  You didn't delete any of them?

21      A.  To the best of my recollection, I would

22  never delete something when I'm supposed to preserve

23  it.

24      Q.  Okay.  The next page, please, which is

25  Bates labeled Trahanas Additional Doc 100, again, I

1              D. TRAHANAS - VOLUME II

2    don't see a date on here, but the only year that you

3    applied to this school was in 2018 cycle; is that

4    right?

5         A.   Correct.

6         Q.   Okay.

7              MR. DeROSE:  We have the question mark and

8         the -- it's just like the last one.

9              MS. WERMUTH:  I get to ask those questions.

10             MR. DeROSE:  I understand that, but,

11        Counsel, these are all the things out of her

12        computer.  So probably her computer is the one

13        that's putting the question mark on it.

14             MS. WERMUTH:  That's what I'm trying to

15        find out from her.

16             MR. DeROSE:  Well, I'm trying to help you.

17             MS. WERMUTH:  I see a question mark on this

18        page, just like I saw on the prior page.

19             MR. DeROSE:  So do I.

20   BY MS. WERMUTH:

21        Q.   And you had previously indicated that you

22   thought the question mark came from FSU.

23             Does this help you understand where the

24   question mark comes from?

25        A.   No.  Again, I don't know if that's their

1                    D. TRAHANAS - VOLUME II

2    icon, just a question mark.  Sometimes people put

3    their picture as an identification on their gmail or

4    another e-mail address.  But if it's a school

5    address, I doubt it.

6              MR. DeROSE:  This is the problem with you

7         guessing, because I have a very different

8         theory about it.

9              Go ahead, Counsel.

10   A.   I don't know.

11             MR. DeROSE:  That's better.

12             MS. WERMUTH:  I continue to object to this

13        coaching.

14             MR. DeROSE:  Counsel --

15             MS. WERMUTH:  I think it's wildly

16        inappropriate.

17             MR. DeROSE:  -- this is not coaching.  You

18        and I know very well when she searches that

19        number -- that her computer is putting the

20        question mark on.

21             MS. WERMUTH:  We -- I don't know that.

22             MR. DeROSE:  Oh, well, I -- I can -- and I

23        don't even know computers as well as either one

24        of you.  You are kind of --

25             MS. WERMUTH:  Well, you're not under oath

1               D. TRAHANAS - VOLUME II

2      here.  Your client is.

3         MR. DeROSE:  You are kind of wasting time.

4      We've been together now for about six hours on

5      a very limited deposition.

6         Go ahead.

7  BY MS. WERMUTH:

8      Q.  Was there any e-mail prior to one on

9  February 26th that you received from Nova

10  Southeastern University that you did not produce?

11     A.  No.  If I had it, I produced it.

12     Q.  So if -- so you -- you did -- so my

13  question then is:  Did you receive an e-mail from

14  Nova Southeastern University acknowledging receipt

15  of your application?

16     A.  If I had received it, I would give it to

17  you.

18     Q.  So is the answer to my question, no, I did

19  not receive an e-mail acknowledging --

20     A.  No, I didn't say no, I didn't receive it.

21  I -- if I had it, and I received it, I would have

22  given it to John to give to you.

23     Q.  Okay.  My question is:  As you sit here

24  today, do you recall receiving from Nova -- Nova

25  Southeastern University an e-mail acknowledging

D. TRAHANAS - VOLUME II

1    receipt of your application?

3    A.  No, I don't recall that.

4    Q.  Do you recall receiving from Nova

5    Southeastern University an e-mail asking you to

6    submit secondary -- or inviting you to submit

7    secondary application materials?

8    A.  No, I don't recall.

9    Q.  And you didn't delete any such e-mails?

10    A.  Correct.

11    Q.  This one's difficult to read.  This is

12    tradition -- or Trahanas Additional Doc 97.  It

13    looks like it's from Central Michigan College of

14    Medicine.

15    Do you see this?

16    A.  Yes.

17    Q.  And it says "admission decision"?

18    A.  Yes.

19    Q.  And it says February 27th, but again I

20    don't have a year.  I do see, though, that there's

21    an indication in the body of the e-mail that this

22    was the 2018 entering class.

23    Do you see that?

24    A.  Yes.

25    Q.  Okay.  Did you receive any e-mails from

1                    D. TRAHANAS - VOLUME II

2    Central Michigan prior to February 27th of 2018

3    acknowledging receipt of your application?

4         A.  I don't recall.

5         Q.  Did you delete an e-mail acknowledging

6    receipt of your application from CMU?

7         A.  No.

8         Q.  Did you receive prior to February 27th,

9    2018, any e-mail from Central Michigan college

10   asking or inviting you to submit secondary

11   materials?

12        A.  I don't recall.

13        Q.  Did you delete any such e-mail?

14        A.  No.

15        Q.  Okay.  Trahanas Additional Doc 94, this is

16   Loyola Stritch.  It looks to be in letter form, but

17   it looks like it was sent to you by e-mail.

18             Did you pull this from your gmail account?

19        A.  Yes.

20        Q.  Okay.  And it says in the body of the

21   e-mail, "We are sorry to inform you that we will not

22   be able to offer you an interview for the class of

23   2022."

24             Do you see that?

25        A.  Yes.

1          D. TRAHANAS - VOLUME II

2      Q.  Did you apply to Loyola Stritch for the

3  entering class of 2022?

4      A.  No.

5      Q.  Did you receive any communications from

6  Loyola Stritch prior to February 27th, 2018,

7  regarding receipt of your application?

8      A.  I don't recall.

9      Q.  Did you delete any such e-mails?

10     A.  No.

11     Q.  Did you receive any e-mails prior to

12 February 27th, 2018, from Loyola Stritch inviting

13 you to submit a secondary application?

14     A.  I don't recall.

15     Q.  Trahanas Additional Doc 95.  Okay.  Is this

16 an e-mail?  This is strange to me.  It says

17 mdadmissions@wayne.edu.

18         Do you see that?

19     A.  I do.

20     Q.  To me.

21         Do you see that?

22     A.  Yes.

23     Q.  And this looks like it was from your inbox;

24 is that right?

25     A.  Yes.

1          D. TRAHANAS - VOLUME II

2      Q.  And this was one of the schools that you

3  applied to in 2015 as well; correct?

4      A.  Correct.

5      Q.  Okay.  But we know this is the e-mail from

6  2018, because it talks about the 2018 entering

7  class.

8          Do you see that?

9      A.  Yes.

10      Q.  And did you receive any e-mails from Wayne

11  State prior to February 28th of 2018 acknowledging

12  receipt of your application?

13      A.  I don't recall.

14      Q.  Did you delete any such e-mail?

15      A.  No.

16      Q.  Did you receive any e-mails from Wayne

17  State University prior to February 28th, 2018,

18  inviting you to submit secondary materials?

19      A.  I don't recall.

20      Q.  But you didn't delete any such e-mails?

21      A.  Correct.

22      Q.  Please look at Trahanas Additional Doc 96.

23  This is from Oakland; is that right?

24      A.  Yes.

25      Q.  To your gmail account dated March 7th,

Page 623

                    D. TRAHANAS - VOLUME II

1   2018.

2        Do you see that?

3   A.  Yes.

4   Q.  Did you receive any e-mails from Oakland

5   prior to March 7th, 2018, acknowledging receipt of

6   your application for the 2018 cycle?

7   A.  I don't recall.

8   Q.  Did you delete any e-mails from Oakland?

9   A.  No.

10  Q.  Did you receive an e-mail from Oakland

11  inviting you to submit secondary application

12  materials for the 2018 cycle?

13  A.  I don't recall.

14  Q.  All right.  This page isn't Bates labeled,

15  I'm not sure why, but it looks to be an e-mail from

16  coopermed.rowan.edu to you.

17       Do you see that?

18  A.  Yes.

19  Q.  And it says -- it's dated March 23rd, but

20  again, I don't see the year.

21       Did you apply to Cooper Medical in any year

22  other than the 2018 cycle?

23  A.  No.

24  Q.  Okay.  And did you receive any e-mail

1                    D. TRAHANAS - VOLUME II

2    communications from Cooper Medical School prior to

3    March 23rd, 2018, in connection with your

4    application for the 2018 cycle?

5         A.  I -- I don't recall.

6         Q.  Did you delete any e-mails from Cooper

7    Medical School?

8         A.  No.

9         Q.  Trahanas Additional Doc 102 is RFU.  What

10   is that school?

11        A.  Oh, Rosalind Franklin University.

12        Q.  Okay.  And this is an e-mail that you

13   retrieved from your inbox?

14        A.  Yes.

15        Q.  And it says April 3rd, two days ago.

16            Do you see that?

17        A.  Yes.

18        Q.  Does that mean you did the search on

19   April 5th of 2018?

20        A.  I -- I don't know what that means.  I don't

21   know.

22        Q.  Is it possible that you searched for this

23   e-mail on or about April 5th of 2018?

24        A.  It's possible.

25        Q.  Now, in this e-mail it says in the -- in

5

                    D. TRAHANAS - VOLUME II

1

2   being invited to submit secondary application

3   materials.

4           Do you see that?

5       A.  Yes.

6       Q.  And you were told that those materials were

7   due on January 15th of 2018?

8       A.  Correct.

9       Q.  Did you submit those materials?

10      A.  I don't recall.

11      Q.  From just a year ago you don't recall if

12  you submitted the final application materials to

13  Tulane -- I'm sorry, to Howard?

14      A.  I don't recall.

15      Q.  Did you get any follow-up e-mail from

16  Howard after they invited you to submit secondary

17  application materials?

18      A.  If I had it, I -- I would give it to you.

19      Q.  Did you delete any e-mails from Howard

20  University?

21      A.  No.

22      Q.  Tulane, the final page, this is an e-mail

23  dated December 20th of 2017.

24          Do you see that?

25      A.  Yes.

                    D. TRAHANAS - VOLUME II

1

2      Q.   And this was still in your e-mail box when

3   you searched for Tulane University; correct?

4      A.   Yes.

5      Q.   And this is a -- an e-mail inviting you to

6   submit secondary application materials to Tulane;

7   correct?

8      A.   Yes.

9      Q.   Did you submit the application fee for the

10  secondary application materials?

11     A.   I don't recall.

12     Q.   Did you submit secondary application

13  materials?

14     A.   I -- I don't recall.

15     Q.   Did you receive any other e-mail

16  communications from Tulane University?

17     A.   If I had it, I would give it to you.

18     Q.   Did you delete e-mails from Tulane

19  University?

20     A.   No.

21     Q.   Okay.  Were you rejected from Howard

22  University?

23     A.   Um, I did not interview there.  I don't

24  remember.  I don't recall.

25     Q.   Were you accepted to any medical school for

1                    D. TRAHANAS - VOLUME II

2     the 2018 cycle?

3          A.  No.

4          Q.  Okay.  So you were ultimately rejected from

5     Howard University?

6          A.  Yes.

7          Q.  Okay.  And also from Tulane University?

8          A.  Yes.

9          Q.  How were you notified of -- of those

10    decisions?

11         A.  I don't know, but you just asked me to --

12    if I was not accepted.

13         Q.  Were you notified of decisions by Tulane or

14    Howard University that you were not accepted for

15    admission?

16         A.  I -- I don't have anything else.  If

17    it's --

18         Q.  My question is were you notified?

19         A.  I don't recall.

20         Q.  Okay.  So you testified previously that

21    sometimes notifications come by hard copy mail;

22    right?

23         A.  Yes.

24         Q.  Okay.  And you've been providing to us

25    anything that's come by hard copy mail from these

1          D. TRAHANAS - VOLUME II

2     universities as well?

3          A.  Correct.

4          MS. WERMUTH:  Can I have this marked,

5     please.

6          (Trahanas Exhibit 102 marked for

7     identification.)

8          MS. WERMUTH:  Would you mind passing that?

9     Thank you.

10    BY MS. WERMUTH:

11         Q.  Okay.  Ms. Trahanas, now, we've looked

12    already at Deposition Exhibit 101, which is our

13    document requests, right, which were served on you

14    on September 5th of 2017; right?

15         A.  Yes.

16         Q.  Okay.  And I sent this letter to your

17    counsel on January 29th of 2018, and you'll see from

18    the second page that in the middle, the fifth

19    bullet -- I'm sorry, of 102, of Exhibit 102, the

20    fifth bullet, we are asking for all of your medical

21    application materials for the 2015 and 2018 cycle.

22         Do you see that?

23         A.  Yes.

24         Q.  Okay.  So before January 29th of 2018 had

25    you searched your e-mail for any of these medical

1                     D. TRAHANAS - VOLUME II

2     school application materials?

3          A.  I don't recall.

4          Q.  After getting this letter, did you search

5     e-mails in your gmail account for medical school

6     application materials?

7          A.  Yes.

8          Q.  Okay.

9              MS. WERMUTH:  Mark this, please.

10             (Trahanas Exhibit 103 marked for

11         identification.)

12    BY MS. WERMUTH:

13         Q.  In a follow-up to my January 9 --

14    29th letter, Exhibit 102, I received an e-mail from

15    your counsel on February 6th, so if you look at the

16    second page of Exhibit 102.

17         A.  Okay.

18         Q.  Do you see that?  Okay.

19             Attaching some additional documents.  Okay.

20    And you'll see I responded to that e-mail on

21    February 21 indicating that we still did not have

22    any rejection letters from the 2015 cycle.

23             Do you see that at the bottom of Page 1?

24         A.  Yes.

25         Q.  Okay.  So between January 29th, when I sent

D. TRAHANAS - VOLUME II

1  the letter and you did searches, and February 21,

2  did you find any documents responsive to our

3  requests regarding medical school applications?

4      A.  The documents that I found, I gave to John,

5  who gave to you.

6      Q.  Yeah, but my question is when.

7          So you said that after getting the

8  January 29th letter you did a search.  And by

9  February 21 I still didn't have any -- any of those

10  records.  So I'm trying to figure out when you did

11  the search.

12          MR. DeROSE:  Well, Counsel, you may have or

13      may not have.  I don't have to -- and she

14      doesn't have to accept your representation.

15      But go ahead.

16      A.  I don't know.

17  BY MS. WERMUTH:

18      Q.  You don't know when you first did the

19  search for the medical school materials?

20      A.  I don't recall.

21      Q.  Okay.  And you haven't seen any

22  correspondence from your lawyer contesting our

23  assertion in Exhibit 103 about the medical school

24  applications; am I correct about that?

Page 632

D. TRAHANAS - VOLUME II

1

2     A.  I haven't seen every correspondence between

3  you and opposing counsel.

4          MS. WERMUTH:  Can you pass this to your

5      lawyer, please.

6          (Trahanas Exhibit 104 marked for

7      identification.)

8          MS. WERMUTH:  Can we mark that?  Thank you.

9  BY MS. WERMUTH:

10     Q.  Okay.  Deposition Exhibit 104,

11  Ms. Trahanas, is an e-mail that I sent to your

12  lawyer on April 4th of 2018.

13     A.  Okay.

14     Q.  And I indicate in this letter that we

15  expect to receive the remaining 2018 medical school

16  acceptance and/or rejection letters.

17          Do you see that?

18     A.  Yes.

19     Q.  And also, that if you look at the last

20  paragraph, we still not -- have not received any of

21  Ms. Trahanas' acceptance and/or rejection letters

22  from the 29 -- 2009 or 2015 application cycles.

23          Do you see that?

24     A.  Yes.

25     Q.  Okay.  By the way, to this day we haven't

D. TRAHANAS - VOLUME II

1    received any letters at all from the 2019 -- or

2    materials at all for the 2019 cycle.

3            Have you --

4            MR. DeROSE:  2019 or 2009?

5            MS. WERMUTH:  I'm sorry, 2009.  2009.

6    BY MS. WERMUTH:

7        Q.  Have you searched for 2009 materials?

8        A.  Yes.

9        Q.  Did you print your 2009 AMCAS application?

10       A.  No.

11       Q.  So this is dated April 4th, and we were

12   looking at Deposition Exhibit 100.  You might

13   remember Deposition Exhibit 100 at Page 102.  It's

14   not in order for some reason, so 102 is near the

15   end.  It's Roseland Franklin.

16       A.  Okay.  I'm there.

17       Q.  Okay.  And I was asking you if you searched

18   on April 5th for e-mails related to your medical

19   school applications.

20           Do you remember that?

21       A.  I do remember you asking, yes.

22       Q.  Okay.  And you can see that my e-mail of

23   April -- that I sent an e-mail to your lawyer on

24   April 4th of 2018.

1              D. TRAHANAS - VOLUME II

2         Do you see that?

3     A.   Yes.

4     Q.   Does this refresh your recollection as to

5  whether or not you did a search on April 5th for

6  certain e-mails then?

7     A.   I don't recall.

8         MS. WERMUTH:   John, I'm probably about 30

9         minutes out, by the way.

10        MR. DeROSE:   All right.   Can we take one

11       minute?

12        MS. WERMUTH:   Sure.

13        MR. DeROSE:   Just tell Donna that we should

14       be done --

15        MS. WERMUTH:   Let's go off the record.

16       Let's go off the record.

17        MR. DeROSE:   Yeah, don't -- yeah, it's off

18       the record.

19        VIDEOGRAPHER:   Going off the record at

20       3:39 P.M.

21        (Trahanas Exhibit 105 marked for

22       identification.)

23        VIDEOGRAPHER:   We are back on the record at

24       3:40 P.M.

25  ///

1                    D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3        Q.  All right.  So, Ms. Trahanas, you'll see in

4    Deposition Exhibit 105 that as a followup to my

5    April 4th e-mail I sent another e-mail to your

6    lawyer on June 5th of 2018.

7            Do you see that?

8        A.  I do.

9        Q.  And in my e-mail I indicate that we had

10   still not received any acceptance or rejection

11   letters from the 2015 application cycle.

12           Do you see that?

13       A.  I --

14           MR. DeROSE:  It's an e-mail from Miss

15       Harris, but go ahead.

16           MS. WERMUTH:  Oh, fair enough.

17   BY MS. WERMUTH:

18       Q.  From Miss Harris, with a copy to me, to

19   your lawyer.

20           Do you see that?

21       A.  I do.

22       Q.  Okay.  And in the body of the e-mail

23   Miss Harris indicates that we had still not received

24   any acceptance or rejection letters from the 2015

25   application cycle.

                    D. TRAHANAS - VOLUME II
2       Do you see that?
3    A.  I see that written here, yes.
4    Q.  Did you do any searches after this e-mail
5  came through?
6    A.  Yes.
7    Q.  Okay.  Do you recall when?
8    A.  No.
9    Q.  What searches did you do?
10   A.  I -- I don't recall what exact searches I
11 did.
12   Q.  Was that the first time you did a search
13 for anything from the 2015 application cycle?
14   A.  No.  I -- no.
15   Q.  Okay.  Now, in -- in connection with --
16 with that request, we got one e-mail back from you
17 from the 2015 cycle.
18       MS. WERMUTH:  Can you mark that, please.
19       (Trahanas Exhibit 106 marked for
20       identification.)
21       MS. WERMUTH:  Do you mind passing that to
22       your counsel?  Thank you.
23 BY MS. WERMUTH:
24   Q.  Okay.  You've been handed what's been
25 marked as Deposition Exhibit 6 -- I'm sorry, 106.

1                    D. TRAHANAS - VOLUME II

2     And this is an e-mail from the University of Miami

3     Miller School of Medicine.

4                Do you see that?

5         A.  Yes.

6         Q.  And it says two messages, but I only see

7     one.  Was there another message that you didn't

8     print and produce?

9         A.  No.  As I look at the document, though, the

10    time and the date are identical, so they may have

11    sent the same e-mail.

12        Q.  Well, so it says two messages, but I only

13    see, like, literally one message.  I see another

14    something, but then it looks like the text was

15    deleted or hidden.

16                Do you see it says "quoted text hidden"?

17        A.  I see that at the bottom left, yes.

18        Q.  And is there a reason why you hid that

19    text?

20        A.  I did not hide that.

21        Q.  Is there a reason why the text is hidden?

22        A.  I have no idea.

23        Q.  And you've retained this -- this actual

24    electronic e-mail since; right?

25        A.  Yes.

D. TRAHANAS - VOLUME II

1  Q.  Okay.  Now, we received this in June of

2  2018?

3       MR. DeROSE:  How do you know that?  It's

4  not on here.

5       MS. WERMUTH:  Well, I'll tell you.  First

6  of all, what I can do is pull the e-mails where

7  you sent it to me, John, if you -- if you want

8  me to do that, but --

9       MR. DeROSE:  No.  Go ahead.  I don't want

10  you to do that.

11       MS. WERMUTH:  But let me do this.

12       (Trahanas Exhibit 107 marked for

13  identification.)

14       MS. WERMUTH:  Ms. Trahanas, if you can give

15  that to counsel, I appreciate it.  Thank you.

16       Actually, here it is.  I'm sorry.  I

17  probably marked the wrong thing.  Let me mark

18  this one.

19       MR. DeROSE:  This should not be 107?

20       MS. WERMUTH:  No, it can -- it can be in

21  there.  That's fine.

22       We'll mark this 108.

23       (Trahanas Exhibit 108 marked for

24  identification.)

1          D. TRAHANAS - VOLUME II

2    BY MS. WERMUTH:

3        Q.  Okay.  So Exhibit 108 is an e-mail on the

4    bottom from your lawyer to me and Danielle, and he

5    says, "Attached please find additional discovery

6    documents being tendered in Trahanas versus

7    Northwestern University and Dr. Schwulst bearing

8    Bates stamp Nos. Trahanas Additional Discovery Doc

9    158 through 213."

10            Do you see that?

11       A.  I do.

12       Q.  Okay.  And actually, then, when you turn to

13   the next page, there's two PDFs attached.  And one

14   is documents 153 through 177, and then 15 -- 178

15   through 213.

16            Do you see that?

17       A.  I do.

18       Q.  Okay.  And you'll agree with me that

19   Exhibit 106 is marked Doc 153.

20            Do you see that?

21       A.  Yes.

22       Q.  Okay.  So -- so just to clarify, this --

23   that e-mail, doc -- I'm sorry.

24            Deposition Exhibit 106 was produced to us

25   on June 29th, 2018.

1               D. TRAHANAS - VOLUME II

2          Do you see that?

3     A.  Yes.

4     Q.  Okay.  Now, can you tell me why it is that

5  you didn't produce Exhibit 106 prior to -- to

6  June 29th of 2018?

7     A.  That's when John sent it.

8     Q.  When did you first collect it?

9     A.  I don't know.

10     Q.  And if you were to access your gmail

11  account, you could determine when you did that

12  search; correct?

13     A.  Not that I know of.

14     Q.  And that e-mail remains in your gmail

15  account to this day, correct, Exhibit 106?

16     A.  Oh, yes.

17     Q.  You have not deleted it; correct?

18     A.  Correct.

19     Q.  But you can't explain why it was not

20  produced until June 29th of 2018?

21     A.  I already answered that question.

22     Q.  You can answer it again.

23     A.  That's when John sent the e-mail.

24     Q.  But you don't know -- you can't tell me

25  when you gave it to him?

1              D. TRAHANAS - VOLUME II

2      A.  Correct.

3      Q.  So it might have been on or around

4  June 29th of 2018?

5          MR. DeROSE:  Objection when it might have

6      been.

7          But go ahead, if you know.

8      A.  I don't know.

9          MS. WERMUTH:  Can we take a quick break?

10          VIDEOGRAPHER:  Going off the record at

11      3:47 P.M.

12          (Recess taken from 3:47 P.M. to

13      3:56 P.M.)

14          VIDEOGRAPHER:  And we are back on the

15      record at 3:56 P.M.

16  BY MS. WERMUTH:

17      Q.  Ms. Trahanas, I just have a couple more

18  questions for you.

19          You have some yellow papers in front of you

20  today?

21      A.  Yes.

22      Q.  You've been taking notes during the

23  deposition today?

24      A.  Yes.

25      Q.  Okay.  I'll ask that I have -- have a copy

D. TRAHANAS - VOLUME II

1   of the notes made before we adjourn today.

2          MS. WERMUTH:  Okay.  And that's all I have.

3          MR. DeROSE:  All right.  I have just a few,

4      and I'll try to keep it as limited as I can.

5   EXAMINATION

6   BY MR. DeROSE:

7      Q.  Could you pull Exhibit 89 there, 89?

8      A.  Yes.

9      Q.  That's a pretty voluminous package, right,

10  you got there?  It's one of the big other ones we've

11  seen today?

12     A.  Yes.

13     Q.  And I just picked that up.

14         I want you to go down about five pages in.

15  It will have Exhibit A to the original --

16     A.  Okay.

17     Q.  Five pages down from the top, or four

18  pages, they have an Exhibit A to the subpoena --

19  ma'am, it looks like this.  All right.  Thank you.

20         And you see at the top the Exhibit A that

21  went to the medical school in this one, it was

22  Florida International University Herbert Wertheim,

23  W-e-r-t-h-e-i-m, College of Medicine, asking for all

24  documents and electronically stored information that

1              D. TRAHANAS - VOLUME II

2    the university medical school had in relation to

3    your application.

4              Do you see that?

5        A.  Yes.

6        Q.  All right.  Now I want you to just piece

7    through this very voluminous document.  Do you see

8    any letters in there from -- go fast, because

9    it's -- I suggest you are not going to find them --

10   any letters in there from Dr. Schwulst?

11       A.  I -- I did not find any.

12       Q.  All right.  And you didn't see any letters

13   of recommendation from Dr. Harris Perlman either?

14       A.  I did not, correct.

15       Q.  And you didn't see any letter of

16   recommendation from other doctor, Dr. Goldstein,

17   that you had with your application?

18       A.  I did not.

19       Q.  As a matter of fact, none of the letters

20   that -- or none of the material that you submitted

21   with the application is there; is that correct?

22            MS. WERMUTH:  Object to the extent you've

23        mischaracterized the evidence.

24   BY MR. DeROSE:

25       Q.  Is that correct?

D. TRAHANAS - VOLUME II

1

2     A.  None of the letters in association with

3  this application are in this packet, correct.

4     Q.  All right.  And now I want you to look at

5  Exhibit 97, and I'm going to direct your attention.

6  And this is a response to a subpoena from -- I

7  forget which university it is.  This is Western

8  Michigan University Homer Stryker, S-t-r-y-k-e-r,

9  School of Medicine.  And in there, if you look at

10  page on the bottom that has Bates stamp

11  Trahanas-NU11765.

12     A.  I'm on that page.

13     Q.  All right.  And that's that letter of

14  February 9th, 2015, from Dr. Schwulst withdrawing

15  his -- formally withdrawing his prior letter of

16  reference for you; correct?

17     A.  Correct.

18     Q.  And this is the letter that you were asking

19  for back in February of 2015 because you knew that

20  Dr. Schwulst had written something to the medical

21  schools?

22     A.  Yes.

23     Q.  So since this is in response to the

24  subpoena that defense counsel has written, there's

25  no question that this letter got to doctor -- excuse

Page 645

D. TRAHANAS - VOLUME II

1   me, got to the medical school in this particular

2   case; correct?

3   

4           MS. WERMUTH:  Object to the form of the

5       question.  I also, in terms of foundation,

6       especially since this witness has already

7       testified that she can't attest to the records

8       produced by this particular -- by the schools,

9       I also object insofar as it's argumentative.

10  BY MR. DeROSE:

11      Q.  As far as you understood it, you did not

12  see the packet of materials that Western Michigan

13  sent in response to this subpoena until you saw what

14  counsel sent back to us; correct?

15      A.  Correct.

16      Q.  All right.  So, and this letter from

17  Dr. Schwulst is in the response to their subpoena;

18  correct?

19      A.  Correct.

20      Q.  And also, his next letter dated -- give me

21  one second, I think it's a prior page -- his letter

22  dated February 24th, 2015, where he says, "Please

23  disregard the letter dated February 9th, 2015, as it

24  was entered in error, and I stand by the evaluation

25  offered in the original letter."

1                D. TRAHANAS - VOLUME II

2        Seeing this letter now, you're satisfied

3 that this letter also got to the medical school that

4 counsel has been able to get in response to the

5 subpoenas?

6     A. Yes.

7        MS. WERMUTH: Same -- hang on. Same

8     objections. It's argumentative. And it lacks

9     foundation.

10 BY MR. DeROSE:

11     Q. All right. Now, I want you to look at

12 Exhibit No. 98. And this is a packet of materials

13 that counsel was able to get from -- let me see what

14 medical school. Well, whatever school it is, I

15 can't find it right now. It's not important.

16        But Exhibit 98 is also a packet of

17 materials that you were provided and I was provided

18 in answer to the subpoenas that counsel served on

19 this medical school; correct?

20     A. Yes.

21     Q. All right. And now I want you to look at

22 the document marked Trahanas-NU11686 in that packet.

23 And again, do you see the letter from Dr. Schwulst

24 on February 9th, 2015, saying "I am writing to

25 formally withdraw my prior letter of reference for

```
1                    D. TRAHANAS - VOLUME II
2    Ms. Diane Trahanas"?
3         A.  I do.
4         Q.  And can you tell us how many days after you
5    went on FMLA this letter would be written, if it was
6    sent on the day it indicates?
7         A.  It was submitted on February 19th of 2015.
8         Q.  All right.  So, yeah, that's right, I think
9    the doctor testified that he dated this letter
10   before you went on FMLA.
11              But what is the date you went --
12              MS. WERMUTH:  Hang --
13   BY MR. DeROSE:
14        Q.  -- on FMLA?
15              MS. WERMUTH:  Wait.  Let me object to the
16        form of the question, insofar as you have
17        mischaracterized Dr. Schwulst's testimony in
18        connection with the narrative portion of your
19        question, which is also objectionable as a
20        narrative.
21              MR. DeROSE:  Excuse me.
22   BY MR. DeROSE:
23        Q.  Were you at Dr. Schwulst's dep?
24        A.  Yes.
25        Q.  And he indicated in his dep that this
```

D. TRAHANAS - VOLUME II

1    February 9th date should have been February 19th,

2    didn't he?

3         A.  Yes.

4         Q.  And what was the day you went on FMLA?

5              MS. WERMUTH:  Objection.  Asked and

6         answered.

7              MR. DeROSE:  I didn't get the answer now,

8         but let -- let me please ask it again.

9              MS. WERMUTH:  Well, it's been answered in a

10        different deposition, but . . .

11             MR. DeROSE:  Oh, I'm talking about today.

12   BY MR. DeROSE:

13        Q.  What was the date you went on FMLA?

14        A.  February 17th --

15        Q.  And --

16        A.  -- 2015.

17        Q.  All right.  And if this should be

18   February 19th, this would be two days after you took

19   your FMLA?

20        A.  That's --

21             MS. WERMUTH:  Objection.  Argumentative.

22        A.  -- correct.

23   BY MR. DeROSE:

24        Q.  And you were asking -- by the way, did you

1          D. TRAHANAS - VOLUME II

2    get notice that Dr. Trahanas [sic] had sent

3    something to the medical schools just on that very

4    date, February 19th?

5          MS. WERMUTH:  Object to the form of the

6          question.  You misstated record evidence.

7          A.  I received an indication that Dr. Schwulst

8    had submitted a letter to AMCAS.

9    BY MR. DeROSE:

10         Q.  All right.  And as far as you knew, AMCAS

11   was just the clearinghouse for sending all the

12   information regarding your applications to all those

13   different medical schools we've talked about today?

14         A.  AMCAS is the distributing company for our

15   medical school applications.

16         Q.  And counsel has asked you several questions

17   today about letters you were receiving from medical

18   schools in December 2014 and January 2015.  Can you

19   tell us what was going on in your life -- and they

20   were inviting you to make further submissions for

21   your application; is that correct?

22         MS. WERMUTH:  Objection.  Vague.

23         A.  At that time, yes.

24   BY MR. DeROSE:

25         Q.  What do they call them, supplemental

1              D. TRAHANAS - VOLUME II

2    submission or --

3         A.  Supplemental applications.

4         Q.  All right.  What was going on in your life

5    in December 2014 and January 2015?

6         A.  I was seeing my psychiatrist, who

7    recommended to me to take time off work because of

8    the excessive hours and hostile work environment.

9    So I was seeing my psychiatrist at least once a week

10   for about eight weeks.

11              I had a car accident, and so did my mom,

12   and I was working a lot of hours trying to finish up

13   our project so that we could submit it in February.

14        Q.  Submit it for publication?

15        A.  For review for publication, correct.

16        Q.  And you know that that particular project

17   ultimately was approved for publication?

18        A.  That particular project I'm unsure of what

19   ended up happening, but we had been published prior

20   to that.

21        Q.  And by "we," you mean you and Dr. Schwulst?

22        A.  Correct, with a couple other people.

23        Q.  What is the longest time you spent working

24   on one of these projects alone in the laboratory?

25              MS. WERMUTH:  You know what, this goes way

1          D. TRAHANAS - VOLUME II

2    beyond the scope of this particular deposition.

3    You asked her those questions in her first

4    deposition.

5         MR. DeROSE:  All right, Counsel.  But the

6    record says what it says.

7         I have no more questions.

8         MS. WERMUTH:  No further questions.

9         VIDEOGRAPHER:  This concludes the

10   deposition of Diane Trahanas.  We are off the

11   record at 4:09 P.M.

12        (Whereupon a discussion was had off the

13   record.)

14        MS. WERMUTH:  Back on the record.

15        Okay.  So we're back on the record just for

16   a moment to indicate that Deposition Exhibit 79

17   has some additional -- is another exhibit that

18   has some handwritten notations that were made

19   by the witness, Diane Trahanas, today.  It

20   includes five asterisks or stars and four

21   circles on the left-hand side of the page.

22        (Trahanas Exhibit 109 marked for

23   identification.)

24        MS. WERMUTH:  And then, we've also marked

25   as Deposition Exhibit 109 Ms. Trahanas'

Page 652

1          D. TRAHANAS - VOLUME II

2    handwritten notes from today's deposition.

3        (Time noted:  4:15 P.M.)

4

5    _____

6          DIANE M. TRAHANAS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3        I, Paula Campbell, CSR, RDR, CRR, CRC, do

4    hereby certify that on Tuesday, January  8, 2019

5    appeared before me, DIANE M. TRAHANAS.

6        I further certify that the said witness was

7    first duly sworn to testify to the truth in the

8    cause aforesaid.

9        I further certify that the signature of the

10   witness to the foregoing deposition was waived by

11   agreement of counsel.

12       I further certify that I am not counsel for

13   nor in any way related to any of the parties to

14   this suit, nor financially interested in the

15   action.

16       IN TESTIMONY WHEREOF, I have hereunto set my

17   hand on this 18th day of January, 2019.

18

19   _____

20                  Paula Campbell, CSR, RDR, CRR, CRC
                     Certified Shorthand Reporter
21                   Registered Diplomate Reporter
                     Certified Realtime Reporter
22                   Certified Realtime Captioner
23                   Illinois C.S.R. No. 084-003481

24

25

1

2   ----------------------- I N D E X ------------------

3

4   WITNESS                         EXAMINATION BY        PAGE

5   DIANE M. TRAHANAS               MS. WERMUTH            421

6                                   MR. DeROSE             642

7

8   ----------------------EXHIBITS----------------------

9   TRAHANAS                                  PAGE   LINE

10  Exhibit 77   Trahanas-NU001588 through    428     25

11               1589

12  Exhibit 78   Rule 37. Failure to make     441      5

13               disclosures or to

14               cooperate in discovery;

15               sanctions

16  Exhibit 79   one-page document showing    454     22

17               a gmail screenshot

18  Exhibit 80   two-page document showing    462     13

19               gmail settings

20  Exhibit 81   Notice of Plaintiff's        488      3

21               Second Deposition

22  Exhibit 82   Plaintiff's Response to      498     21

23               Defendants' Rule 34

24               Request to Plaintiff

25  ///

Page 655

1

2       ----------------------EXHIBITS----------------------

3   TRAHANAS                                    PAGE    LINE

4   Exhibit 83  documents from University    508      15

5               of Central Florida College

6               of Medicine

7   Exhibit 84  documents from University    523      25

8               of Miami School of

9               Medicine

10  Exhibit 85  documents from University    531      18

11              of William Beaumont School

12              of Medicine

13  Exhibit 86  documents from Geisinger     535      21

14              Commonwealth School of

15              Medicine

16  Exhibit 87  documents from Central       547       3

17              Michigan College of

18              Medicine

19  Exhibit 88  documents from University    554      15

20              of South Carolina School

21              of Medicine Greenville

22  Exhibit 89  documents from Florida       558       2

23              International University,

24              Herbert Wertheim College

25              of Medicine

```
 1
 2   ----------------------EXHIBITS----------------------
 3   TRAHANAS                                  PAGE    LINE
 4   Exhibit 90  Charles E. Schmidt College    563     14
 5               of Medicine, Florida
 6               Atlantic University
 7   Exhibit 91  two-page document for         564     22
 8               Florida Atlantic
 9               University
10   Exhibit 92  documents from Florida        567     23
11               State University College
12               of Medicine
13   Exhibit 93  documents from Virginia       572     3
14               Tech Carilion School of
15               Medicine
16   Exhibit 94  documents from Wayne State    576     4
17               University School of
18               Medicine
19   Exhibit 95  documents from Washington     579     9
20               University in St. Louis
21               School of Medicine
22   Exhibit 96  documents from Frank H.       584     17
23               Netter MD School of
24               Medicine
25   ///
```

Page 657

1

2    ----------------------EXHIBITS---------------------

3    TRAHANAS                                    PAGE   LINE

4    Exhibit 97   documents from Western     587      6

5                 Michigan University

6                 Stryker M.D. School of

7                 Medicine

8    Exhibit 98   documents from Sidney      590      5

9                 Kimmel Medical College at

10                Thomas Jefferson

11                University

12   Exhibit 99   TRAHANAS ADD EX 425        595      18

13                through 440

14   Exhibit 100  Trahanas Additional Doc    601      16

15                101 (various numbers)

16   Exhibit 101  Defendants' First Request  603      14

17                for Production of

18                Documents to Plaintiff

19   Exhibit 102  1/29/18 letter from Anna   629      6

20                Wermuth to John P. DeRose

21   Exhibit 103  2/21/18 e-mail from Anna   630      10

22                Wermuth to John P. DeRose

23   Exhibit 104  4/4/18 e-mail from         632      6

24                Danielle Harris to John P.

25                DeRose

Page 658

```
 1

 2    ----------------------EXHIBITS---------------------

 3    TRAHANAS                              PAGE    LINE

 4    Exhibit 105 6/5/18 e-mail from        634      21

 5                Danielle Harris to John P.

 6                DeRose

 7    Exhibit 106 Trahanas Additional       636      19

 8                Discovery Doc 153

 9    Exhibit 107 6/26/18 letter from Anna  638      13

10                Wermuth to John P. DeRose

11    Exhibit 108 7/2/18 e-mail from John P. 638     24

12                DeRose to Anna Wermuth

13    Exhibit 109 three pages of handwritten 651     14

14                notes

15

16    -------------EXHIBITS PREVIOUSLY MARKED--------------

17    TRAHANAS                              PAGE    LINE

18    Exhibit 55  Trahanas 212 through 215  422      22

19

20

21

22

23

24

25
```

Page 659

1                        ERRATA SHEET

2     Case Name:

3     Deposition Date:

4     Deponent:

5     Pg.  No. Now Reads        Should Read   Reason

6     ____  ____ _____   _____   _____

7     ____  ____ _____   _____   _____

8     ____  ____ _____   _____   _____

9     ____  ____ _____   _____   _____

10    ____  ____ _____   _____   _____

11    ____  ____ _____   _____   _____

12    ____  ____ _____   _____   _____

13    ____  ____ _____   _____   _____

14    ____  ____ _____   _____   _____

15    ____  ____ _____   _____   _____

16    ____  ____ _____   _____   _____

17    ____  ____ _____   _____   _____

18    ____  ____ _____   _____   _____

19    ____  ____ _____   _____   _____

20

                                _____

21                              Signature of Deponent

22    SUBSCRIBED AND SWORN BEFORE ME

23    THIS ـ____ DAY OF _____, 2019.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____

# EXHIBIT B

# DEP. EX. 2



NORTHWESTERN
UNIVERSITY

**Personal Data Form**
Please print or type



EXHIBIT
2
Trahanas 1/5/18

| 1) NAME | | | 2) UNIVERSITY ID NO. (Can be found on Wildcard) |
|---|---|---|---|
| Trahanas | Dianne | M | |
| Last | First | Middle | |

3) INDICATE TYPE OF TRANSACTION
☑ New Employee (Complete items 1 through 20 below, skip 4)          ☐ Name Change (Complete items 1, 2, 3, 4,19, and 20 below)
☐ Rehire (Complete items 1,2,3,19,&20 below)          ☐ Address Change (Complete items 1,2,3,12,13,14,15,19&20 below)
          (Address Changes should be made at https://nuhr.northwestern.edu)

4) Name Change To:          (must attach copy of Social Security Card showing name change)

**EMPLOYMENT INFORMATION**

5) What is the date you began working for Northwestern University?    Month  June    Day  11    Year  2012

6) If a temporary employee, where should we send your check/payroll advice (if printed):   ☐ Home Address   ☐ Permanent address   ☐ Department

**PERSONAL INFORMATION**

| 7) Birth Date 7/17/85 | 8) Sex: ☑ Female ☐ Male | 9) Marital Status: ☑ Single ☐ Married |
|---|---|---|
| 10) Country of Citizenship: USA | | Visa: ☐ F1, ☐ J1, ☐ H1, ☐ Other |
| | | or US Permanent Resident (not US citizen) ☐ |
| 11) Social Security Number (only provide if new hire): | | |

All new hires must complete Form I-9 online at northwestern.i9servicecenter.com at least by the end of their first day and provide required documentation to be
employed and paid through the payroll and should not provide services until this is done. Please do not complete multiple I-9s unless you have left and been rehired.
If you are not a U.S. Citizen or permanent resident, please contact the Payroll Division to complete information in Foreign National Information System (FNIS).

**ADDRESS INFORMATION**    (This will update all benefit carriers for faculty and staff)

12) Current Home Address/ Local Residence
    is this Residence part of University Housing? ☐ Yes ☑ No
13) Permanent Mailing Address (if different from current/local address)

| No. & Street 10602 S. Vicky Lane | Apartment | No. & Street | Apartment |
|---|---|---|---|
| City Palos Hills | State IL | City | State |
| Zip Code 60465 | Country USA | Zip Code | Country |

**TELEPHONE NUMBERS**

| 14) Local Home Phone: ( 708) 369 - 5736 | 15) Cellular Phone: ( 708 ) 369 - 5736 |
|---|---|
| 16) University Work Phone: ( ) - | 17) Off Campus Work Phone: ( ) - |

**DEMOGRAPHIC DATA** (Please see reverse for explanation and disability category codes)

| 18) Are you Hispanic or Latino? ☐ Yes ☑ No | What is your race? Select one or more. ☐ American Indian or Alaskan Native   ☐ Asian   ☐ Black or African American   ☐ Pacific Islander   ☑ White |
|---|---|
| Disabled veteran?   ☐ Yes ☑ No | Armed Forces Service Medal Veteran? ☐ Yes ☑ No | Do you have a disability? ☐ Yes ☑ No |
| Other Protected Veteran? ☐ Yes ☑ No | Recently Separated Veteran?   ☐ Yes ☑ No | Identify disability category: _____ |

19) As a condition of employment, I understand that Northwestern University requires employees to sign up for direct
deposit. If I do not sign up for direct deposit before my first pay date after being hired, I understand that Northwestern
University will deposit wage payments to a Paychek Plus card which will be provided to me free of charge.

20) Date: 6/11/12

Employee's Signature: _____

Do you want to contribute to the Northwestern University Voluntary Savings Plan (VSP)?

If yes, please provide your email address: _____
VSP is a 403b retirement pretax savings plan.  Benefit eligible faculty and staff will automatically be contacted regarding retirement savings plan participation.

**To be completed by Department - For Temporary Employees Only**

| Hire/Rehire Date _____ | Job Code _____ | Supervisor's Name _____ | Supervisor's Employee ID# _____ |
|---|---|---|---|
| Hourly Rate _____ | HR Dept# _____ | Supervisor's Signature _____ | Supervisor's Phone _____ |

Fund _____ Fin Dept _____ Project _____ Activity _____ Program _____ Acct _____
(Fund, Financial Department, and Account are required while you may not have a project, activity, or program especially if not on a grant.)

When hiring/rehiring temporary employees, fax the Personal Data form to Payroll at 847-491-3733 (Evanston) or 312-503-9702 (Chicago).    Revised 12/2010
All original forms (Personal Data, W-4, Direct Deposit) should then be mailed to the Payroll Office, 720 University Place, Evanston Campus.

Trahanas-NU000066

# EXHIBIT B
# DEP. EX. 4



## NORTHWESTERN
### UNIVERSITY

Dear Northwestern Staff Member:

The Staff Handbook contains information that all members of the University staff will find useful. It includes descriptions of policies about work, paid time off, and leaves of absences. It also contains policies that every employee must know regarding conflict of interest, drugs and alcohol, and sexual harassment. Please be sure to call anyone in the Department of Human Resources if you have questions about these policies. We are happy to help.

The Standards for Business Conduct booklet contains an overview of the major policies that guide business conduct at Northwestern as well as a reference for additional resources.

I have received the Northwestern University Staff Handbook and the Standards for Business Conduct booklet.

Name    Diane   M Trahanas

(Please Print)

Signature _____

Date    6/11/12

EXHIBIT
4
Trahanas 1/5/18

Trahanas-NU000084

# EXHIBIT B
# DEP. EX. 5



Northwestern University

Staff Handbook

EXHIBIT

5

Trahanas 1/5/18

PENGAD 800-631-6989

Trahanas-NU001324



# NORTHWESTERN
## UNIVERSITY

Staff Handbook

© 2005, Northwestern University

Trahanas-NU001325

Staff Handbook

3

Table of contents

Introduction                                                    5
   About this handbook                          5
   Mission of the University                    6
   History and structure of the University      6
   The staff                                    7
   The Department of Human Resources            7

Employment                                                      8
   Nondiscrimination                            9
   Affirmative action                           9
   Accommodation of disabilities                10
   Evaluative authority over relatives          10
   Transfer and promotion                       11
   Orientation and review period                12
   Employment at will                           12
   Termination of employment                    13
   Reinstatement                                13
   Reemployment                                 13

Training                                                       14
   Opportunities                                14
   Recognition programs                         14

Work and hours                                                 15
   The work day                                 15
   Varying schedules                            15
   Recording hours                              16
   Lunch periods                                16
   Rest periods                                 16
   Salaries                                     17
   Performance review                           17
   Pay periods                                  17
   Overtime                                     17

Absence                                                        18
   Tardiness                                    19
   Vacation                                     20
   University scheduled holidays                23
   Holiday pay                                  23
   Personal floating holidays                   24
   Paid sick time                               25
   Election, Funeral, and Jury Duty Time         28
   Military reserve training                    29
   Military leave for active duty                30
   Leave of absence                             31

Benefit plans                                                  34

Faculty and Staff Assistance Program                           34

Trahanas-NU001326

Payroll                                                                                      35
   Direct deposit                                                            35
   Personnel records                                                         35
   Updating personal information                                             35
   Employee identification                                                   36
   Pretax transit                                                            36
   Completing the biweekly time report                                       37
   Time reporting using the Electronic Time Entry System (ETES)              43
   Transferring from biweekly to monthly                                     45
   Leaving Northwestern employment                                           45
   Codes for reporting hours                                                 46

Job Performance and Conduct                                                                  47
   Civility, Mutual Respect, and Violence on Campus                          47

   Job Performance                                                           48
      Performance review                                       48
      Violations warranting immediate discharge                48
      Violations warranting discipline                         48

   Personal Safeguards                                                       49
      Safety                                                   49
      Injury or illness related to the job                     49
      Indemnification                                          50
      Personal visitors in the workplace                       50
      Sexual harassment                                        51
      Drug free workplace                                      54
      University policy on drugs and alcohol                   54
      Employee complaints                                      57

   University safeguards                                                     60
      Solicitation                                             60
      Personal mail and phone use                              60
      Equipment and facilities                                 60
      Security of confidential information                     60
      Personal appearance and hygiene                          60
      Smoking                                                  60
      Patents and inventions                                   60
      Use of computers and networks                            61
      Conflict of interest                                     62

Services and Facilities                                                                      66
   Credit union                                                              66
   Parking                                                                   66
   Cultural opportunities                                                    66
   Athletic events                                                           66
   Childcare and family resources                                            67

The Staff Advisory Council                                                                   68

Appendices                                                                                   69

Useful phone numbers                                                                         80

Trahanas-NU001327

About this handbook

This handbook provides descriptions of policies relating to work at Northwestern University. It presents material in these general areas:

- Employment
- Training
- Work and hours
- Absence, including both paid time benefits and unpaid absences
- Payroll
- Job performance and conduct
- Services, including the Faculty and Staff Assistance Program

New members of the University staff will find this handbook a useful introduction to the way the University works, and long-standing staff members will find it a handy reference for answering many questions about University employment. The handbook also includes guidelines for job performance and behavior. A companion handbook contains summary plan descriptions of the University's employee benefit plans.

In summarizing the terms and conditions of staff employment at Northwestern, this handbook does not provide a detailed description of all employment policies and practices; each University department adopts policies particular to its functions. From time to time policies and programs of the University may change. To be sure of having current information, each staff member should confer with his or her supervisor, consult with their department head's copy of the manual *Human Resources Policies and Procedures*, or call the Department of Human Resources. Human Resources offices are located on the Evanston campus at 720 University Place and on the Chicago campus at Abbott Hall, room 150, 710 North Lake Shore Drive. The manual *Human Resources Policies and Procedures* can also be accessed through NUNet at *http://www.northwestern.edu/hr/policies/.*

This staff handbook contains the policy information ordinarily needed by staff employees of the University; but more extensive information on some matters may be found in the *Faculty Handbook*, the policy on patents, the policy on research safety, and other publications.

For jobs covered by a labor agreement, some of the policies and programs described in this handbook may be modified by the agreement or may not apply. Employees holding such jobs should obtain a copy of the labor agreement from their union steward to determine those differences.

This handbook is not an employment contract nor an assurance of continued employment. Northwestern University may change without notice any statement in this handbook concerning rules, policies, tuition, fees, curricula, courses, procedures, benefits, or other matters. Accordingly, staff employees should check the most current information if there is any doubt about the application of a policy. The current edition of this handbook is found on line at *http://www.northwestern.edu/hr/handbook.pdf.*

Trahanas-NU001328

**Mission of the University**

Northwestern University is committed to excellent teaching, innovative research, and the personal and intellectual growth of its students in a diverse academic community.

**History and structure of the University**

Northwestern University was established under a charter approved by the Illinois state legislature on January 28, 1851. Northwestern is a private, nonsectarian university with campuses fronting on Lake Michigan in Evanston and in Chicago.

On the 240-acre Evanston campus are:
- the Judd A. and Marjorie Weinberg College of Arts and Sciences
- the Robert R. McCormick School of Engineering and Applied Sciences
- the Medill School of Journalism
- the School of Education and Social Policy
- the School of Music
- the School of Communication
- the Graduate School
- the J. L. Kellogg School of Management

These schools enroll more than 11,700 students during the academic year.

The 20-acre Chicago campus includes
- the School of Law
- the Feinberg School of Medicine
- the Managers' Program, the evening program of the Kellogg School of Management
- the School of Continuing Studies, Northwestern's continuing education division

Approximately 2,000 full-time and 2,000 part-time students are enrolled annually in the schools on the Chicago campus.

Northwestern University operates under the supervision of a Board of Trustees, whose members serve without pay. An organization chart of the University's administration appears in the University phone directory.

The University is privately endowed and self-supporting; its operating revenues for the year 2003 were $1.1 billion. Roughly 25 percent of the University's income comes from endowment and gifts, 40 percent from student tuition and fees, 25 percent from government contracts and grants, and 10 percent from other sources.

The regular faculty of the University numbers about 2,400. The faculty of each college or school consists of the dean of the school and the school's officers of instruction: professor, associate professor, assistant professor, associate in the Medical School), instructor, and lecturer. Deans of schools report to the provost; directors of university-wide centers and various administrative departments report to a vice president.

The staff

The staff supports the faculty, students, and University in their educational and research missions.

The regular staff numbers about 4,500 employees, and over 1,000 temporary staff are added to the University employment during the academic year. Occupational categories include jobs in service, maintenance, clerical, technical, professional, and administrative areas. These job categories are common to both the academic and administrative units of the University. Each category includes numerous job classifications and titles. Staff classifications are divided into two general categories, exempt staff and nonexempt staff.

The exempt staff consists of employees whose responsibilities are primarily executive, managerial, or administrative, or whose positions require an advanced educational degree or knowledge and experience in a field considered professional. These positions are paid monthly and are exempt from the overtime requirements of the Fair Labor Standards Act (FLSA) that mandate overtime pay for time worked in excess of 40 hours per week.

The nonexempt staff consists of employees holding positions in support activities. Employees in these jobs are not exempt from the FLSA overtime provisions and they are paid by the hour and are paid 1½ times their regular pay rate for hours worked in excess of 40 in a week.

The Department of Human Resources

**Role.** The Department of Human Resources provides services to the University in recruiting and training, in the administration of compensation and benefits, and in payroll. The department assists other departments in meeting their staffing goals, managing job performance, and interpreting policy. The department also supports employees and their supervisors in reaching understanding and reconciling differences to promote effective working relationships.

**Questions on policies and procedures**. Employees and supervisors are encouraged to call on a member of the Department of Human Resources staff at any time for help in any area of policy or procedure. Any question can be addressed to any member of the department, who will answer it or direct it to the appropriate authority in the department.

**Working relationships**. Occasionally, a member of the University staff and his or her supervisor may have difficulty working with each other or maintaining an effective working relationship. Support for employee relations is available to assure treatment consistent with the policies in this handbook, and employees should seek help to mediate difficult discussions. Those in supervisory positions also frequently call on the Human Resources department to act as a neutral third party in order to facilitate communication and restore productive working relationships.

Employment procedures

The Department of Human Resources and the supervisor seeking to fill a job vacancy work jointly on recruiting and hiring staff and in using the services of the human resources offices in finding, screening, and selecting candidates.

Northwestern University is committed to

- affirmative action as an integral part of the process of recruitment, selection, placement, transfer, and promotion
- promotion from within whenever possible
- full and timely consideration of all candidates

**Posting.** The Open Positions List announces job openings to the University community and beyond to make openings available as widely as possible and to identify as many suitable candidates as feasible. Candidates may be hired only after the position has been posted on the Open Positions List for at least a week, or at least two weeks for positions above exempt grade 9. Offers of employment may be made only after the required posting period. The List is available at *http://www.northwestern.edu/hr/recruiting/.*

**Transfer or promotion from within.** Northwestern University assists employees in attaining personal career goals by giving qualified, interested employees an opportunity for transfer or promotion. Employees should watch the Open Positions List for job opportunities and apply at the human resources offices in Evanston or Chicago for jobs of interest. Further information follows on page 11.

**Employee referrals.** Employees are encouraged to refer qualified people . Northwestern University for employment.

**Applications and résumés.** An interested applicant applies by sending his or her resume to *resume@northwestern.edu*, indicating the open job for which he or she is applying as listed at the website *http://www.northwestern.edu/hr/jobs.* An applicant may also fax the resume to 847-491-5136 for Evanston campus positions or 312-503-1741 for Chicago campus positions. A staffing specialist or human resources consultant forwards appropriate applications to the hiring manager, who reviews applications and selects applicants to be interviewed. The employment counselor or consultant interviews applicants as arranged with supervisors.

**Good faith search.** An effort is made in good faith to include among the applicants members of groups underrepresented in the University's workforce. Searches are conducted in compliance with the equal employment opportunity laws of the United States and the affirmative action plan of the University.

Employment                                                                                                    9

Nondiscrimination

Northwestern University does not discriminate against any individual or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, sexual orientation, parental status, marital status, age, disability, citizenship, veteran or status in matters of admissions, employment, housing, or services or in the educational programs or activities it operates.

Harassment, whether verbal, physical, or visual, that is based on any of these characteristics is a form of discrimination. This includes harassing conduct that affecting tangible job benefits, interfering unreasonably with an individual's academic or work performance, or creating what a reasonable person would sense is an intimidating, hostile, or offensive environment.

While Northwestern University is committed to the principles of free inquiry and free expression, discrimination and harassment identified in this policy are neither legally protected expression nor the proper exercise of academic freedom.

**Complaint.** A complaint of discrimination on any basis in this policy can be filed with the director of equal opportunity, affirmative action, and labor relations. A complaint about the actions of the director will be investigated by an impartial University official. Academic exempt employees direct complaints to the department chair. Complaints involving deans are investigated by the office of the Provost. Time spent during scheduled working hours in the formal procedure is treated as time worked. Complaints of sexual harassment follow the procedures on page 51.

**Appeal.** An employee not satisfied with the resolution of a complaint may appeal to the associate vice president for human resources and, if still dissatisfied after that review, to the senior vice president for business and finance, whose finding is the final response for the University.

Affirmative action

Northwestern University actively seeks women, minorities, veterans, and disabled persons for employment and promotion to maintain a University community based on equal opportunity.

Trahanas-NU001332

10                                                                                    Employme-

| | |
|---|---|
| Accommodation of disabilities | Northwestern University reasonably accommodates employees with disabilities. To be eligible for an accommodation, employees must declare their disabilities. A "reasonable accommodation" may include the purchase of special equipment, changing the physical layout of the workplace, restructuring job duties, modifying the work schedule, etc. |
| | Once the Department of Human Resources is provided with written documentation by a physician identifying the disability and specifying recommended accommodations based on the job duties, the employee has fulfilled his or her responsibility. |
| | The Office of Equal Employment Opportunity, Affirmative Action and Labor Relations (EEO/AA/LR) is responsible for the management, implementation and coordination of the Employees with Disabilities Accommodation policy. This office must approve all accommodations and employment decisions in which an employee or applicant has declared a disability. |
| | The Employees with Disabilities Accommodation Policy can be accessed on line at *http://www.northwestern.edu/hr/eeo/emplaccopol.html.* |
| Evaluative authority over relatives | No faculty or staff member may have evaluative authority in such matters as employment, compensation, promotion, or termination over another employee who is the faculty or staff member's spouse, domestic partner, relative, or an individual with whom the faculty or staff member is having or has recently had a sexual relationship. |
| | No faculty or staff member may have evaluative or supervisory authority (including the assignment of grades, the supervision of dissertations, or decisions relating to employment or financial support) over a student who is a relative or with whom the faculty or staff member is having or has recently had a romantic or sexual relationship. |
| | For purposes of this policy, a relative is a blood relation, in-law, step or adoptive relative, as close as or closer than nephew or niece. |
| | When a situation occurs that potentially violates this policy, the faculty or staff member with evaluative authority must report the relationship to his or her supervisor or department chair, dean, the Department of Human Resources, or the University Provost. If the person to whom the relationship is reported determines that such action is necessary, it is the responsibility of both the faculty or staff member with the evaluative authority and the individual to whom the relationship is reported to ensure that the evaluative authority is reassigned. If this is not feasible in a particular instance, the faculty or staff member and the individual to whom the relationship is reported must bring the matter to the attention of the Provost or the Associate Vice President of Human Resources. |

Trahanas-NU001333

Employment

| | |
|---|---|
| Transfer and promotion | Northwestern University recognizes the value of its staff as an important asset in the community, and it encourages them to develop and consider other University job opportunities as part of their personal and career advancement. |

**Service requirement.** To be eligible for a transfer or promotion, a staff member must be in his or her current position for at least one year. No specified service period is required for a transfer or promotion within a department, but a department may reasonably limit such transfers or promotions.

**Performance requirement.** A staff member must receive an overall evaluation of satisfactory or effective on the most recent performance review and have no current disciplinary action.

**Qualifications.** To be considered for transfer to another position, a staff member must meet the minimum qualifications of the position.

**Application.** To ensure consideration for a position, the staff member submits an application for transfer or promotion along with a resume to the human resources department. The staff member may work with a human resources consultant, staffing specialist, or other human resources representative on jobs of interest. The application is found on line at *http://www.northwestern.edu/hr/jobs/transfer.html.*

**Hiring manager.** The hiring manager reviews applications and determines whom to interview for the position. The hiring manager may contact the staff member directly to set up an interview.

**References.** The hiring manager, a human resources consultant, or a staffing specialist checks at least two references when the staff member becomes a candidate of choice for the position, normally, including the current supervisor.

**Supervisor notice.** In general, the staff member is notifies his or her supervisor during the transfer process. The human resources consultant or staffing specialist may coordinate this notice.

**Performance evaluations.** Performance evaluations of finalist candidates are confidential but may be made available to the hiring manager.

**Decision.** Offer decisions are made jointly by the hiring manager and the staffing specialist or human resources consultant, who reviews the offer for equity and adherence to compensation guidelines.

**Transfer date.** The human resources consultant or staffing specialist coordinates the transfer date with the hiring manager and the employee's current manager. Generally, exempt staff members provide three weeks of working notice and nonexempt staff provide two weeks of working notice, but the needs of the supervisors may call for other arrangements.

**Vacation and sick time.** When transferring to a new position in the University, the individual retains the vacation and sick time accrued in the former position. For transfers between nonexempt and exempt, see page 25.

| | |
|---|---|
| Pay practice | **Lateral transfer.** A staff member who transfers to a position having the same grade or salary range is not eligible for a salary increase and remains at the same salary in the new position. |
| | **Promotion.** A staff member who transfers to a position having a higher grade or salary range may be eligible for a salary increase. The amount of the increase is based on the compensation guidelines for promotions. |
| | **Orientation and review period.** The staff member is required to complete a six-month orientation and review period in the new position. The staff member retains the accrued University service after the transfer to the new position. |
| Orientation and review period | The orientation and review period gives the supervising staff or faculty member an opportunity to provide orientation and training for a new staff member, to review the performance expectations for the position, and to determine whether expectations are met during the initial period on the job. The goal is success on the job for the new staff member. |
| | **Length.** The orientation and review period is the initial six months of service in the position. Police officers work on a probationary basis for the first 12 months. |
| | **Procedures.** The staff member can expect to complete an orientation checklist, to receive a job description and work schedule and a schedule of training and feedback meetings. Written performance expectations or objectives can b expected, as well as meetings to review progress and performance during th review period. |
| | **Performance evaluation.** Performance is typically evaluated at the end of the review period. |
| | **Unsatisfactory performance in new position.** An employee who is not performing adequately in a position may be recommended by the supervisor for extension of the review period or for dismissal from that position at any time during the review period. |
| Employment at will | Successful completion of the orientation and review period does not guarantee continued or permanent employment. Either the employee or Northwestern University may end the employment relationship at will, with or without cause or advance notice, at any time during or after the orientation and review period. |

**Trahanas-NU001335**

Employment                                                                                    13

| Termination of employment | **Notice.** Employees must provide two weeks of working notice to their supervisors to leave the University in good standing. |
|---|---|

**Exit interview.** Terminating employees should schedule an exit interview with the Department of Human Resources at least a week before their last work day.

**University property.** Before the last day of work, employees must return to their department any University property, materials, and written information issued to them and in their possession. This property may include credit cards, identification badges or cards, keys, manuals, calculators, computers, other office equipment, key cards, and other materials. Northwestern will take all appropriate action to recover its property.

**Benefits.** The employee is notified in writing by the Benefits Division of the Department of Human Resources about benefits that may be continued.

**Vacation.** Unused accruals of vacation and personal floating holidays are paid on the payroll following the individual's last pay period and the employing department's notice to the payroll division that the employment has ended.

**NetID and email.** Email and NetID access are terminated within 21 days of the termination date.

**Future references.** Former employees who want the University to verify employment can use the automated verification service by following the instructions at *http://www.northwestern.edu/hr/hris/personal/payroll/employverify.html*. Northwestern verifies dates of employment, job title, and salary.

Reinstatement

An employee who leaves University employment in good standing may be reinstated within 30 calendar days to an available regular position for which he or she is qualified without the loss of prior service or benefits status. Paid time benefits are not accrued during the absence and the number of days absent is not included in the calculation of University service.

Rehire

Northwestern University considers reemploying people who have separated from the University when the previous work record, the reason for the separation, and the present qualifications warrant consideration.

Individuals may not be reemployed without the approval of the associate vice president or appropriate administrator in the Department of Human Resources. A record of the approval becomes a part of the personnel file. The rehired individual is considered a new employee with no University service for the purposes of accruing paid time benefits, service recognition, and qualifying for tuition, retirement, and insured benefit plans.

14                                                                                              Training

**Training Opportunities**

Northwestern University offers a wide range of professional development opportunities through which employees can enhance their workplace skills and knowledge. Educational development is supported across the University. Participation in work-related courses or educational programs during work hours is at the discretion of the manager or department head.

The Training and Development Division of the Department of Human Resources offers workshops and coaching throughout the calendar year. Employees may register for a variety of offerings, including leadership and management, business processes, workplace skills, computer applications, and organization development. These workshops are held on both the Evanston and Chicago campuses. The Training and Development Division publishes and distributes quarterly schedules of offerings. In addition, all information can be accessed on-line at *http://www.northwestern.edu/hr/training*.

**Recognition programs**

Northwestern offers a variety of employee recognition programs, awards, and activities. These include

- Service Excellence Awards
- annual Staff Service Recognition Luncheon
- Length of Service Recognition.
- Employee of the Year Award

The Service Excellence Award program provides recognition for exceptional service performance. Nominations from anyone in the community, including faculty, staff, students, supervisors, vendors and others, are accepted throughout the year to recognize instances of exceptional service rendered by a staff employee.

Employees are honored with length of service recognition after their 5th, 10th, and 15th anniversaries. Employees who have completed 20, 25, 30, 35, and 45 years of service during the preceding year are honored at the annual Staff Service Recognition Luncheon.

The Employee of the Year award recipients and finalists for each campus are honored at the annual Staff Service Recognition Luncheon. A call for nominations and an explanation of the selection criteria are made in University publications and by email.

For further information concerning these offerings, contact the Training and Development Division, at 847-467-5081.

Trahanas-NU001337

The work day

Scheduled work hours vary among departments, with the most common full-time schedules totaling 35, 37½, or 40 hours per week. A 35-hour work week is the minimum considered full time. Most regular work schedules continue throughout the year, but some are partial year (for example, nine- or ten-month) work schedules. Nine-, ten-, and eleven month employees are considered full time during the months when they work the full work week.

The most common office hours of the University work day are 8:30 a.m. to 5:00 p.m., Monday through Friday. However, each department determines the hours of work for its employees as necessary to staff its operations. Departments and supervisors set and adjust individual employee schedules to meet the department's operational needs. They may adopt work schedules to accommodate individual employee needs to the extent that department operations permit.

Varying schedules

A work schedule can be any combination of days and hours totaling no more than 40 hours in a work week. The hours scheduled for work must total to the standard hours budgeted for the position. No combination of hours and days may exceed 14 days without a full day off.

Working a regular daily schedule is not a University requirement, although working a regular daily schedule may be a departmental requirement. Work schedules can vary among employees within the same office or department throughout the year, or they can be changed on a seasonal or other basis.

Examples of flexible scheduling with this policy include a schedule in which an employee works four days of 10 hours each for a total of 40 in the week, or a work schedule of three days of 9½ hours and one day of 9 hours for 37½ hours in the week. Overtime at 1½ times the nonexempt employee's hourly rate is paid for any hour worked over 40 hours in a work week.

School or administrative department business offices may choose to coordinate schedules in the departments of the unit. For staff using the Electronic Time Entry System (ETES) to record hours, the payroll division must be notified of a schedule change prior to the beginning of the pay period when the change is to occur.

Trahanas-NU001338

16                                                                                  Work and Hot

**Recording hours**

**Nonexempt staff** are required to report accurately all work hours, as well as paid time off, and are required by law to be paid for all time worked. The staff member's accounting of all scheduled hours and worked hours is reported on the Biweekly Employee Time Report or in the Electronic Time Entry System (ETES). Anyone falsifying the reporting of work time or time off is subject to disciplinary action up to and including discharge from University employment.

The individual's NetID and password are used to access ETES. When properly used, the NetID and password are considered authorizing signatures for entries and approvals.

Instructions for reporting time through ETES begin on page 43. Instructions for use of paper time sheets begin on page 37. The department manager or the individual's supervisor can inform the nonexempt staff member about the time reporting method in use in the department.

**Exempt staff** positions may require employees to work beyond the hours of the work week normally scheduled. Exempt employees are not compensated for this time nor provided compensatory paid time off. Exempt employees are not required to record work hours or scheduled hours.

**Lunch periods**

Lunch periods are unpaid and range from a minimum of 30 minutes to a maximum of one hour. However, for certain employees who are required to remain on duty or on call through the lunch period, the lunch period is part of the paid work shift. Employees are not allowed to shorten or eliminate scheduled lunch periods to alter the beginning or ending of a workday. In a work period of 7½ hours or more, a meal period of at least 30 minutes must be provided before the end of 5 hours of work.

**Rest periods**

In work situations where employees are free to move about and visit restrooms from time to time, formal rest periods are unnecessary. Therefore, many departments and offices do not have formal rest breaks. However, full-time employees who are substantially bound to one work site and to continuous tasks without freedom to move should have a specific rest break each half day. Under similar working conditions, part-time employees who work at least four but less than seven hours per day are eligible for one such rest break per day.

Rest periods do not exceed 15 minutes and may not be accumulated or used to shorten the beginning or ending of a workday.

Rest breaks are scheduled at the discretion of the supervisor.

Trahanas-NU001339

Work and Hours                                                                                          17

**Salaries**

It is the University's goal to pay staff salaries that are equitable within the University and related to the salaries paid for similar work in the appropriate labor market. Accordingly, most positions are classified and then assigned salary ranges that define the minimum and maximum pay for the position. An employee's salary may advance within the salary range as the result of periodic performance and salary reviews. Such increases in pay are considered merit increases, which may vary in amount according to supervisory evaluation of the employee's performance. In general, salaries are reviewed annually. Salary increases that are granted ordinarily take effect on or near September 1, the beginning of the University's fiscal year. Bargaining unit employees receive increases according to terms of their labor agreements.

**Performance review**

Employees participate in an annual performance review, in which the employee and supervisor discuss how well work expectations have been met. The supervisor evaluates performance in terms of achievement of standards and objectives related to job responsibilities. The performance rating is considered in determining the amount of the employee's annual salary increase.

**Pay periods**

The work week of the University starts at the beginning of Sunday and ends at the end of the following Saturday. Nonexempt staff are paid every two weeks on the Friday following the end of each two-week pay period.

Exempt employees are paid monthly, and paychecks are issued on the last working day of the month.

**Overtime**

For the hours worked beyond 40 in a work week, paying the premium rate of 1½ times the regular hourly rate is required for nonexempt employees. Time paid for University scheduled holidays is considered time worked when computing premium overtime in a week where a University scheduled holiday falls.

Not paying the rate of 1½ times the regular rate for hours worked beyond 40 in a work week is a violation of federal law.

Trahanas-NU001340

18                                                                                    Absence

**Types of Absence**

**Definition.** A staff employee is considered absent if he or she is not present for work as scheduled, regardless of cause.

Paid absences and unpaid absences. Some absences are paid as benefits. These paid time benefits are described on pages 20 to 29. Some other absences are excused but they are not paid. Unpaid absences are described on pages 30 to 33.

**Scheduled absences.** An employee is to notify his or her supervisor as early as possible about scheduling absences, whether paid or unpaid. Scheduled absences are arranged at the mutual convenience of the department and the employee. An employee's request for absence may be denied, especially if the absence interferes with department operations, as when the request is not sufficiently in advance of the requested date.

**Unscheduled absences.** On each day that a staff member takes an absence not scheduled in advance with the supervisor, the employee is to advise the supervisor and give the expected return date.

Lack of notice to the supervisor for an absence of three consecutive days indicates that the individual has abandoned the job and is grounds for termination of employment. Lack of notice during an absence of less than three days is grounds for corrective action that may include termination of employment.

**Excessive absence.** Unexcused absences are cause for corrective action and may result in termination. Excessive excused absences may also be reason for corrective action. Each department defines excessive absence based on its own operations and informs its employees of its policy.

Documentation of absence. A supervisor may require documentation from an employee for requests for absence prior to the absence or at the time of returning from the absence. Documentation or justification is not required for vacation or personal floating holiday time unless an emergency necessitates short notice.

Trahanas-NU001341

Absence                                                                                                    19

Tardiness

Staff members are expected to be at their place of work, prepared to work, at the times established by supervisors. An employee is tardy if he or she fails to report to the assigned workplace, prepared to work, at the scheduled time. This includes returning from breaks and lunch periods.

Departments define the punctuality standards for their operations and communicate them to employees. Staff members who expect to be late are to notify their supervisors according to the department's procedures.

Excessive tardiness is grounds for corrective action and may lead to termination of employment.

For each full or partial six-minute period that a nonexempt staff member is late, time worked is reduced by one-tenth of an hour and is recorded on the Biweekly Employee Time Report or in the Electronic Time Entry System (ETES) as unexcused absence, with the code UXA.

Supervisors may adjust work schedules to accommodate an individual's scheduling need. However, if a nonexempt staff member is not at work, the individual is not paid for that time, unless he or she has arranged with the supervisor in advance the use of paid benefit time, such as vacation or paid sick time. A nonexempt employee may not be paid for time not at work, as when tardy, and may not work any hours (such as to compensate for tardiness) without being paid for them. The employee is to be paid according to the time actually worked, even if this time does not coincide with the planned work schedule.

Trahanas-NU001342

Vacation accrual for nonexempt staff

Nonexempt staff earn vacation according to the following schedule.

| Service completed | Qualified service period in years | Approximate annual vacation | Vacation factor |
|---|---|---|---|
| Under 6 months | 0.00 - 0.49 | 1 week after 6 months | .0385 per hour |
| 6-12 months | 0.50 - 0.99 | 2 weeks after 12 months | .0770 per hour |
| 1 – 9 years | 1.00 - 9.99 | 3 weeks | .0575 per hour |
| 10 – 19 years | 10.00 - 19.99 | 4 weeks | .0767 per hour |
| 20 years | 20.00 or more | 5 weeks | .0958 per hour |

The **qualified service period** is the amount of employment service used as the basis for benefits accumulations. It consists of the service since the hire date and excludes time off for sickness or leaves of absence, except military leave.

During the qualified period of service indicated in the table, vacation is calculated by multiplying the **vacation factor** by the employee's accrual base hours.

**Accrual base hours** are regular, scheduled work hours. These scheduled work hours may be paid as

- regular hours worked, but not overtime hours worked
- vacation
- holiday time, whether personal floating holiday or scheduled by the University, or
- leave for jury duty or a funeral

For each of these hours, the employee receives as vacation the fraction of an hour indicated by the **vacation factor**.

A full-time work schedule without leaves or sickness absence results in accrual of the approximate annual vacation indicated in the table.

Vacation is *not* accrued on hours reported as absent without pay or during sick time or family leave, whether paid or unpaid. When the vacation accrual maximum has been reached, vacation is not accrued until some vacation has been used, as described below in the section "Maximum accumulation of vacation time."

| Vacation accrual for exempt staff | Vacation balances for exempt staff are maintained by the department, and yearly totals are submitted to the HRIS Division of the Department of Human Resources. Listed below are the amounts of vacation time exempt employees receive. |
|---|---|

| Service completed | Annual allowance | Days earned per month |
|---|---|---|
| Under 6 months | 1 week | 0.83 |
| 7 - 12 months | 2 weeks | 1.67 |
| 1 - 9 years | 3 weeks | 1.25 |
| 10 - 19 years | 4 weeks | 1.67 |
| 20 or more | 5 weeks | 2.08 |

After six months of continuous service, employees may use one week of vacation time. After completing the first year, employees may use the remainder of the first year's vacation. Thereafter, for those paid monthly, one-twelfth of the annual vacation time is accumulated at the end of each completed month of service.

| Accrual calculation | Following the first year of employment, an employee accrues vacation time at the end of each pay period. Accumulated vacation time appears on a nonexempt employee's payroll check stub or direct deposit notice. The employing department maintains records of vacation accruals and usage for exempt employees. |
|---|---|

| Maximum accumulation of vacation time | Staff members, both exempt and nonexempt, do not accumulate more than one and one-half times their annual allowance of vacation time at any time during the year. When this maximum has accumulated, no additional vacation accrues until some of the accumulated time has been used and the accumulation falls below the maximum. For an employee who has reached the maximum accumulation, vacation that might otherwise accrue is lost. The employee and the department must assure that vacation time is scheduled to avoid losing it. Employees who separate from the University are paid their accrued vacation up to the maximum allowed. |
|---|---|

| Accruals for 9- 10- and 11-month work schedules | Employees working 9, 10, or 11 months per year accrue vacation and nonexempt sick time at the rates shown in these tables during the time paid in the 9, 10, and 11 months of the work schedule. Vacation and sick time do not accrue during the months off work, and consequently the annual amount of vacation accrues in proportion to the number of months worked during the year. In addition, the University service indicated by the "Qualified service period" and "Service completed" in the tables above accrues during the time worked in the 9-, 10-, or 11-month schedule but does not accrue in the months not worked. During the months not worked, employees on these schedules are on leave of absence to assure continuity of benefits. |
|---|---|

**Trahanas-NU001344**

22                                                        Paid Time Benefits

Using vacation time

**When available.** Vacation is available for use in the first full pay period following the date when six or twelve months of service is completed. After six months of continuous service, employees accrue and may use up to one week of vacation time. After completing the first year, employees may use the remainder of the first year's vacation.

**Scheduled.** Use of vacation time must be scheduled in advance in accordance with department rules. The department and the employee schedule vacation time when it is mutually convenient. The department may limit the amount of vacation taken at one time in consideration of departmental needs and the vacation entitlement of other employees. Departments may specify periods when no vacation may be taken.

**No advance.** Vacation time is not advanced, that is, vacation cannot be taken before it is accrued.

**Not cashable.** No payment is made to an employee in lieu of vacation time, except at termination of employment.

**Portability.** Employees who transfer from one department to another retain their accumulated vacation time.

**Coinciding holiday.** When a University holiday falls during an employee's vacation, the day is paid as holiday time rather than as vacation.

Trahanas-NU001345

| | |
|---|---|
| University scheduled holidays | Employees are paid their average daily rate for the scheduled holidays observed by the University. |

The University observes these holidays and pays employees for the day:

| New Year's Day | Labor Day | Friday after Thanksgiving |
|---|---|---|
| Memorial Day | Thanksgiving Day | Christmas Day |
| Independence Day | | |

Additional holidays may be scheduled, usually at Christmas and New Year's. The Department of Human Resources publishes a calendar of the dates on which holidays are observed. Normally, holidays whose traditional date falls on a Sunday are observed on the following Monday, and holidays falling on a Saturday are observed on the previous Friday.

| | |
|---|---|
| Holiday pay | **Average rate.** Nonexempt employees are paid one tenth of their position's biweekly standard hours for the holiday, calculated scheduled biweekly hours divided by 10. |

**Holiday work.** Nonexempt employees required to work on a regular holiday receive pay at a rate 1½ times their regular hourly rate for the work on the holiday, plus an alternate day off with pay as a substitute for the holiday. If management determines that it cannot schedule another day off within 30 days before or after the holiday worked, the employee receives the alternate day's straight time pay in lieu of the day off. Hours paid but not worked do not count toward overtime pay in the week paid.

**Alternate holiday.** If a holiday falls on an employee's scheduled day off, the employee receives an alternate workday off, scheduled within 30 days of the holiday.

**Forfeiture for absence.** To be paid for a university scheduled holiday, exempt and nonexempt employees must be in paid status for at least 50 percent of the pay period in which the holiday falls. The holiday itself is included in the pay period hours, whether 70, 75, or 80, but is excluded from the paid status time for determining holiday pay eligibility.

Paid status means being paid for time
- at work,
- on paid vacation,
- on approved, paid sick time,
- for a personal floating holiday,
- on jury duty,
- on funeral leave, or
- on paid military leave.

Scheduling of vacation, personal floating holidays, and alternate holidays is always at the mutual convenience of the employee and the employing department and requires the prior approval of the supervisor.

**Newly hired employee.** A newly hired employee is eligible for holiday pay for a holiday following the first day of work if the employee works 50 percent of the work days between the first day of work and the end of the pay period.

Trahanas-NU001346

**Personal floating holidays**

The University annually provides up to three days of paid time absent from work, to be scheduled at the discretion of the employee and with the approval of the department or supervisor. Floating holidays are made available to employees for personal business, family sickness or bereavement beyond the leave, religious observance, or other occasions of their choosing on University business days. Floating holidays may also be used to extend vacation.

**Eligibility.** An employee with six months of service is entitled to take three personal floating holidays before the end of the year, with a day becoming available on each of January 1, April 1, and July 1 following the completion of six months of service.

**No carryover.** For nonexempt staff, floating holidays earned during the year at the dates specified must be taken by the end of the last full pay period of the year and may not be taken in a final partial pay period of a calendar year or in the following calendar year. Floating holidays not taken in the year earned are converted to sick time days, available as paid sick time in case of illness. For exempt staff, floating holidays unused by year-end are forfeited.

**Scheduling.** Floating holidays must be scheduled with the employee's supervisor. If department work and other vacation and holiday schedules permit, the floating holiday may be scheduled with other holidays or vacation.

Floating holidays are to be scheduled as far in advance as possible to permit coordination of department work loads. Scheduling of holidays on short notice for emergency purposes is at the discretion of the department or supervisor, and the supervisor may request documentation of the reason for emergency use.

Trahanas-NU001347

Paid Time Benefits                                                                                    25

| | |
|---|---|
| Paid sick time | Northwestern University provides paid time as a form of income protection for employees unable to work because of illness. Paid sick time is applicable only to absence required by bona fide disability and related visits to certified caregivers for treatment. |
| Accrual for nonexempt employees | During each year of full-time service, a nonexempt employee may accrue up to 10 days of time that may be taken as paid time absent if a disability or illness renders the employee unable to work. Part time employees accrue the fraction of 10 days of sick time proportionate to the fraction of full time that they work. |
| | Sick time accrues with additional service and continues to accrue from year to year without limit. Longer service employees accordingly have greater income protection in case of serious disability or sickness. |
| | Paid sick time is not accrued on hours that are reported as absent without pay or that are taken as sick time, whether paid or unpaid. |
| Available paid sick time for exempt employees | Paid sick time is available to exempt employees on the following schedule. |

| In this year of continuous service . . . | As indicated by this qualified service period (in years) . . . | The days of paid sick time available are . . . | At this percent of salary . . . |
|---|---|---|---|
| First | 0.00 - 0.99 | 1 per completed month, up to 10 | 100 |
| 2nd and 3rd | 1.00 - 2.99 | 20 | 100 |
| 4th and 5th | 3.00 - 4.99 | 42 | 100 |
| 6th through 10th | 5.00 - 9.99 | 65 | 100 |
| | | 65 | 60 |
| 11th and after | 10.00 or more | 130 | 100 |

| | |
|---|---|
| | For exempt employees, unused sick time days are not accumulated and are not carried forward for use in another year. As indicated by the qualified service period, the amount of sick time changes on the service anniversary. |
| Transferring between nonexempt and exempt status | A staff member transferring from a nonexempt position to an exempt position receives the sick time allocation for exempt staff based on the qualified service period. |
| | An employee transferring from an exempt position to a nonexempt position receives the sick time accrual based on the accrual for the person's qualified years of service less the number of sick days taken in those years. |
| Sick time and Workers' Compensation | Absence due to an injury on the job or occupational disease is not charged to sick time but rather is paid as Workers' Compensation. |

Trahanas-NU001348

26                                                                                   Paid Time Benefi

**Use of paid sick time**

**Evidence.** A supervisor may require satisfactory evidence for any claim for paid sick time. An employee who reports that his or her doctor has advised not working may be required to provide a statement from the caregiver to receive paid sick time. The caregiver's statement must say that the employee is disabled and unable to work without endangering his or her health or the health of others in the workplace. Upon returning to work after an absence of 15 or more working days, the employee is required to submit a physician's statement about ability to return. A department may require such a statement after a shorter period of absence.

**Physician visit.** Visits to certified caregivers for treatment or checkups qualify for use of sick time. This use of paid sick time must be scheduled at a time least disruptive to department operations and requires supervisory approval. Documentation may be required.

**No advance.** Paid sick time is not available in advance of accrual.

**Portability.** Transfer from one position or department to another does not affect an employee's sick time accumulation.

**Available if disabled from work.** An employee who must cease work because of illness or disability qualifies for payment of accrued sick time prior to termination or leave of absence from employment. The scheduling of this benefit may be coordinated with benefits provided by the University's short term and long term disability plans.

**Abuse.** Sick time abuse is a basis not only for disapproval of sick time pay but also for corrective action, up to and including termination of employment.

**Retirement bonus.** A nonexempt employee who retires from the University at age 60 or older is paid a bonus equal to 25 percent of the value of accumulated sick time, to a maximum of $3,000.

**Supplemental disability insurance**

Disability insurance is available in addition to the paid sick time benefit. Staff members with short service with the University may find the Short Term Disability Plan insurance to be valuable protection of income in cases where they have not accrued very much sick time. Details on the Short Term Disability can be accessed at *http://www.northwestern.edu/hr/benefits/*.

Long Term Disability insurance is recommended for all. Costs and benefits for this plan are found at *http://www.northwestern.edu/hr/benefits/*.

Trahanas-NU001349

Paid Time Benefits                                                                                      27

| | |
|---|---|
| Sick time for pregnancy and maternity | **Pregnancy.** Earned sick time is applicable to disabilities due to pregnancy that prevent the employee from working scheduled hours.

When a pregnant employee leaves her job while still able to work, either permanently or on an authorized leave of absence, she does not receive paid sick time, because the absence is not due to disability.

**Maternity.** For time off work during the disability following delivery, up to six weeks of accrued paid sick time may be used. A participant in the Short Term Disability plan may also apply for benefits from that plan.

**Additional time off for maternity.** An employee may seek up to an additional six weeks of leave for child care, whether the additional time is needed for disability or wanted for family care. |

**Additional time off for maternity.** An employee may seek up to an additional six weeks of leave for child care, whether the additional time is needed for disability or wanted for family care.

- Paid sick time. If additional accrued paid sick time is requested for disability beyond the six weeks accrued and made available for maternity, the employee must provide the department with a caregiver's statement to establish that the employee is still unable to work because of the disability.
- Vacation and holiday pay. For the additional six-week period, the employee may be paid by using accrued vacation and personal floating holidays.
- If disability is the reason for extending the maternity leave beyond six weeks and if the employee has participated in the University's Short Term Disability Plan, she may apply for benefits to be paid according to that plan.
- When the paid time is exhausted within 12 weeks of the delivery, including time paid from the accruals of up to six weeks of sick time and accruals of vacation and personal floating holidays, the paid time may be followed by unpaid leave of absence.

**Holding the job.** An employee who has completed 12 continuous months of employment and has worked at least 1250 hours during those 12 months will have the job held during the 12 week period of leave.

| | |
|---|---|
| Sick time for illness in the immediate family | Up to five working days in a calendar year may be used from the paid sick time allowance to care for a close relative who is ill. For the purpose of this policy, "close relative" is limited to |

- a child (natural, adopted, or foster child; or a stepchild or legal ward) under 18 years of age or, if older, unable to care for himself or herself because of a serious illness or disability
- a parent (natural, foster, or adoptive parent; or a stepparent) or legal guardian of the employee or employee's spouse
- a spouse or NU-registered domestic partner.

See also the provisions for leave for family care on page 31.

Trahanas-NU001350

28                                                                                          Paid Time Benefits

| | |
|---|---|
| Election time | Employees who are unable to vote before or after regular working hours on Election Day may take the time needed to vote, not to exceed two hours, during the working day without loss of pay. Prior supervisory approval is required. |
| | An employee must notify the supervisor in writing at least two days before the election of why he or she needs to vote during working hours. |
| Funeral time | Employees may receive paid time off from work to attend a funeral or make funeral arrangements for close relatives. |
| | Up to three days' absence with pay is allowed for death in the immediate family (parent, stepparent, spouse or NU-registered domestic partner, child, stepchild, sibling, or stepsibling). |
| | Up to one day is allowed for a grandparent, grandchild, child-in-law, parent-in-law, brother- or sister-in-law, or stepsibling-in-law. |
| | With prior supervisory approval, additional time for travel or making arrangements, or for the funeral of another relative such as an uncle, aunt, nephew, or niece, may be taken as vacation, personal floating holiday time, or absence without pay. |
| | The employee should provide the supervisor with as much notice as possible. Evidence of the death and relationship may be required. |
| Jury duty | The University encourages participation in jury duty. An employee is allowed to be absent with pay for jury duty but is expected to report for regularly scheduled work on days when not required to perform jury duty. |
| | Pay during jury duty. Pay for petit jury duty, such as for Cook County, may be retained by the employee. When an employee serves on a grand jury, as in federal matters, his or her regular pay is reduced by the amount of grand jury pay received. The employee should call the Payroll Office for instructions for this occasion. |
| | Notice. An employee should provide appropriate documentation with as much notice as possible to the department head, who forwards the notice to the Department of Human Resources. The employee must provide proof of jury duty service upon return to work. |
| | Reporting. Exempt employees are to send proof of jury duty service to the Payroll Division of the Department of Human Resources for the employee file. |

Trahanas-NU001351

Paid Time Benefits                                                                          29

Military reserve          The University grants time off for mandatory periods of training to eligible
training                  employees who are members of a military reserve or National Guard unit. Employees
                          who have completed at least six months of University service receive their regular
                          University wages for this period, less the amount of gross pay from federal or state
                          authorities, for training periods of two work weeks or less.

Trahanas-NU001352

**Military leave for active duty**

Eligible employees who enlist or are inducted into the armed forces of the United States are entitled to military leave of absence by federal law.

Military leaves continue until any of the following:

- 90 days after date of discharge or release from active military service
- 31 days after date of release from six months of active duty training
- 90 days after release from hospitalization, provided this does not extend more than a year beyond the date of discharge

**Paid time accruals.** On starting military leave for active duty, the employee may have vacation and personal floating holiday accruals paid by check. Sick time accruals are not paid, but the balance of the accrual at the time of starting the leave remains available at the time the individual returns to employment with the University.

**Employee requests leave.** The employee's written request for a military leave of absence should be submitted to the employee's department head who forwards it to the appropriate administrator in the Department of Human Resources. Evidence of the induction or enlistment date should be attached.

**Affect on benefit plans.** The various benefit plans for an employee granted a military leave of absence are affected. For more information, contact the Benefits Division of the Department of Human Resources.

**Return from military leave.** An employee returning from military leave . reinstated to his or her former or a comparable position unless such reinstatement is impossible or unreasonable for the University. University service continues to accrue to the credit of the individual during the period of leave for active military duty.

| | |
|---|---|
| Leave of absence | For employees with at least one year of service, the University grants unpaid leaves of absence for family needs such as adoption or foster care of a child, or care of a spouse, child, or parent with a serious health condition, and grants medical leave for a personal serious health condition. The University may also grant leaves for personal development, research, or travel. Leave is provided after layoff following the discontinuation of a job. |
| Kinds of leave | **Paid leave** is available for absence due to sickness or injury and for military duty, as described starting on page 25. |
| | **Unpaid leave of absence** is granted for<br>• **personal medical care**, for an employee's serious health condition;<br>• **maternity**, which is a form of family care leave;<br>• **family care**, for adoption, or to care for a serious health condition of a spouse, parent, or child; and<br>• **personal development**. |
| Provisions for each kind of leave | Leaves of absence of each kind have provisions with respect to each of the following:<br>• availability<br>• duration<br>• holding the position<br>• benefits available during the leave<br>• certification and approvals |
| | General descriptions of the provisions follow. Detailed provisions governing these leaves and an application form are found in the leave of absence booklet, available on line at *http://www.northwestern.edu/hr/forms/LOABook2002.pdf*, and at the Department of Human Resources |
| Availability of leaves of absence | **Personal medical care or family care.** A leave of absence is available to an employee for care of a personal serious health condition or for family care if the employee has completed 12 continuous months of employment and has worked at least 1250 hours during those 12 months. |
| | **Personal leave.** A leave of absence for personal reasons, such as personal development related to Northwestern work or career, for travel, or for research, is available to employees who have completed at least 12 continuous months of University employment. |
| | Unpaid leave of absence may be granted after accrued paid time benefits are exhausted. If departmental operations permit, a personal leave of absence may be granted for sufficient reason to eligible employees who wish to continue University employment but find that they need more time away from work than is available in their accrued vacation and personal floating holidays. |

Trahanas-NU001354

| | |
|---|---|
| Duration of leaves of absence | **Leave for personal health or family care.** An absence of up to 12 weeks is available during which the employee's job or an equivalent job is held for the employee and benefits can be continued. Paid time for personal health for family care is used prior to unpaid time in this order: |

- available paid sick time or paid family sick time,
- accrued vacation and personal floating holiday time, and
- unpaid leave.

An unpaid medical absence extending beyond two weeks requires that a medical leave of absence be approved prior to the absence or as soon as possible during the absence if the employee is to retain employment status with the University.

**End of leave.** A leave of absence ends on return to active employment, whether at Northwestern or any other employer. The staff member who does not report to work at the expiration of a leave or does not request an extension of the leave at least two weeks before the expiration indicates to the University that he or she is abandoning the job.

| | |
|---|---|
| Holding positions during leaves of absence | **Personal medical care and family care.** Leave for personal medical care or for care of a parent, spouse, son, daughter, or NU-registered domestic partner — and including leave for childbirth — provides for holding the employee's position or a similar position for 12 weeks from the start of the serious health condition. This 12-week period includes any paid time taken since the onset of the condition, such as holiday time, vacation, and paid sick time. |

During leaves for the care of family members other than those listed above, the position can be held for the employee if departmental operations permit.

**Similar position.** If departmental operations require, a different position equivalent in pay and benefits and with similar responsibilities may be held by the department for the employee to assume on return from the leave.

**Intermittent and reduced schedule leave.** If an intermittent or reduced schedule leave is granted for family or personal medical care, the employee may be required to transfer to another, perhaps dissimilar, position in the department with equivalent pay and benefits.

**Leave at large.** A leave is considered at large when the position cannot be held for a personal leave or after the 12 weeks of holding the job during a medical leave. (Family care leave is not extended beyond 12 weeks, but medical leave for an employee's own serious health condition is available beyond 12 weeks.) A leave at large provides no guarantee that the employee will obtain other Northwestern University employment.

**Trahanas-NU001355**

Unpaid Leave of Absence                                                                    33

| | |
|---|---|
| Benefits during leave of absence | **Service accrual preserved.** A leave of absence enables an employee to return to active employment at the end of the leave without loss of service credit accrued at the time the leave began. |

**Paid time benefits accruals.** Employees do not accrue vacation, personal floating holidays, paid sick time, or holiday time while on an unpaid leave of absence; nor do they accrue service credit during the leave, unless on active duty military leave.

**Insurance benefits availability.** During leave of any length for personal medical care, the employee pays only the employee share of health plan premiums. Leave for family care permits the employee to continue insured benefits for up to 12 weeks, with the University paying the employer share and the employee paying the employee share. During a leave of absence for other reasons, and for nonmedical leave beyond 12 weeks, the employee may continue insured benefits by paying the entire premium, as usually paid by both the employer and the employee.

**Long term disability.** For participants in the Long Term Disability plan, benefits may be available after six months of medical disability. For eligibility requirements, call the Benefits Division of the Department of Human Resources. The employee may also qualify for Social Security disability benefits.

Certification and approval for leaves of absence.

**Written request.** The employee's written request specifying the reason for the leave and the start and ending dates must be submitted to the department manager at least two weeks before the leave starts, except in emergency.

**Provider certification.** For a medical or family medical care leave, a written statement from the health care provider is required. The certification form is available in the Leave of Absence booklet available from the Department of Human Resources or on-line at the address above.

**Approval of leave.** An absence of more than two weeks for medical for family care, or for other personal reasons, requires a leave of absence approved by the Department of Human Resources if the employee is to retain employment status.

**Return to work.** To be restored to active employment after a medical leave of 15 or more work days, the employee is required to submit a medical certification of ability to return to work.

Trahanas-NU001356

34                                                                 Benefi

**Benefit plans**

Northwestern University provides the following benefits to eligible employees:

- group term life insurance
- optional term life insurance
- health care plans
- dental care plans
- flexible spending account (FSA)
- **short term disability plan**
- long-term disability (LTD) plan
- accidental death and dismemberment (AD&D) plan
- educational assistance plan for employee undergraduate and graduate study at Northwestern University
- portable tuition plan
- retirement plan
- travel accident plan

No individual may be covered more than once simultaneously under any University sponsored employee benefit plans.

**Plan descriptions**

A companion to this handbook contains the summary plan descriptions for each of the University's benefit plans. The plan descriptions are also available on line at *http://www.northwestern.edu/hr/benefits/.*

**Faculty and Staff Assistance Program**

The University offers to its faculty and staff a cost-free, confidential, voluntary counseling service for help in handling issues of personal life such as problems of relationships with others, loss of a loved one, alcohol or drug use, stress from work from emotional pressure, financial or legal issues, or other personal problems. The service is provided for the faculty and staff and for members of their families or households.

Perspectives, Inc., provides the service as a contractor to the University, but Perspectives works separately from the University and shares no files or individual names with the University. The use of their service is a matter between the faculty or staff member and Perspectives, and is not reported to the University except as summarized in statistical reports.

Perspectives, Inc., is staffed by licensed clinical social workers and has affiliated professionals at the doctoral level or equivalent in psychological, legal, financial, and other areas. Perspectives has a number of offices in the Chicago metropolitan area, and appointments can be arranged at the convenience of the faculty or staff member, whether near home or near either campus. To make an inquiry or arrange an appointment, call Perspectives at 800-456-6327. Counselors are available 24 hours a day.

Payroll                                                                                          35

| | |
|---|---|
| Direct deposit | Direct deposit is the usual method of wage payment to employees paid through Northwestern's payroll system. It guarantees that wages will be deposited in the employee's bank account on payday, even if the employee is absent or on vacation. Each payday the employee receives a direct deposit verification, similar to a pay stub, confirming the amount paid, deductions, and the amount deposited. |
| | Some local banks offer free checking accounts to Northwestern employees who have direct deposit. For bank information and direct deposit applications, contact the Payroll Division of the Department of Human Resources. |
| | Employees can sign up for Direct Deposit by using the HRIS Self-Service feature at *http://nuhr.northwestern.edu/*. |
| Personnel records | The Department of Human Resources maintains a personal file for every employee. The file includes the record of transactions relating to employment at the University. The file is confidential, and no information is provided to persons outside the University without the employee's consent or legal authorization. |
| | An employee interested in reviewing his or her personal file may request a review in writing to the Department of Human Resources. |
| | After separation from employment by the University, files are available for an employee's review until one year after the separation. |
| Home address, telephone, and other required information | **Home address and phone.** Employees are required to maintain their home address and telephone number on the University's HRIS on-line self-service web page, available at *https://nuhr.northwestern.edu*. |
| | **Other information.** A change of name or marital status, or information about a birth or death in the staff member's immediate family should be reported to the Payroll Division. This information is submitted on the Personal Data Form, available from the employee's department or from Human Resources and at *http://www.northwestern.edu/hr/hris/*. |
| | Name changes must be accompanied by a copy of the Social Security Card bearing the same name as the name to be used in the payroll system. |
| | Name and address changes are reported to the providers of benefits, such as HMOs. However, it is important to notify the Benefits Division of Human Resources of any change in family circumstances that will affect those who are covered by or or who are beneficiaries of employee insurance plans. |

Trahanas-NU001358

36                                                                                           Payroll

| Employee identification card | An identification card with a photograph is issued by the Department of University Services to new employees when hired. Identification cards provide access to University buildings, library borrowing privileges, personal check cashing privileges at the Bursar's Office, and discounts on tickets to certain University theater and sports events. Spouses, retirees, and registered domestic partners may also receive identification cards from the University Services department. |
|---|---|
| Net ID and Email | Each staff member is provided with a University network ID and password, as well as an email address for the conduct of University business. The individual's Net ID and password are not to be shared with anyone. Sharing of NetID or passwords is a violation of the University network policy. |
| Transit cards and transit checks | CTA transit farecards and RTA transit checks for purchase of Metra tickets are available to be purchased through pre-tax payroll deduction. The pre-tax deduction enables an employee to save the amount of taxes that would ordinarily be assessed on income used to pay for transit. Applications are available from the Payroll Division of the Human Resources department and on line at *http://www.northwestern.edu/hr/hris/*. |

Trahanas-NU001359

| | |
|---|---|
| Completing the biweekly employee time report | Biweekly Employee Time Reports are distributed to the department every other week through campus mail. Each nonexempt employee should keep the Biweekly Employee Time Report form at the workplace and fill it out every day he or she is at work. After an absence, the time report should be filled out on the first day back at work. |
| | Members of departments using the Electronic Time Entry System (ETES) instead of the printed time report will find ETES instructions starting on page 43. |
| Time reporting | The employee must account for all time that is to be paid, whether for work or as paid time benefits, and for all of the position's standard hours during the biweekly pay period. Time is recorded in hours and tenths of hours (6 minutes). Time that cannot be divided evenly by 6 minutes should be rounded to the nearest tenth of an hour. These hours are reported in one of the following classifications. |

- **Regular.** Hours worked under 40 in a week are regular time. The timesheet code is REG.
- **Overtime.** Hours worked beyond 40 in the University's work week are paid at 1½ times the regular hourly rate. The timesheet code is OTP.
- **Paid time off.**
  - Vacation (VAC)
  - Paid sick time (SCK)
  - Personal floating holiday (PFH)
  - Jury duty (JUR)
  - Funeral leave (FNL)
  - Other paid time (OPT)
  - Workers compensation (WCK)
- **Unpaid time off.**
  - Excused absence (EXA)
  - Unexcused absence (UXA)

**Reporting in each pay period.** A time report must be submitted for each pay period in order for an hourly-paid employee to continue on the payroll. If an individual takes a pay period as absent without pay, a report must be made on a timesheet for the time and submitted with the supervisor's signature of approval.

Dropping below 17½ paid hours per week or below 50 percent paid time in a pay period jeopardizes continuation of employee benefits. An employee absent and unpaid for a full biweekly pay period must request and receive approval for a leave of absence to avoid termination of University employment. Ordinarily, 30 days notice is needed for planned leaves of absence. See the policy on Leave of Absence.

Trahanas-NU001360

38                                                                                                    Time Reporti

| Approval required | After completing the Biweekly Employee Time Report, the employee should sign it and give it to the supervisor or supervisor's designee to sign. An employee cannot sign his or her own Biweekly Employee Time Report for the supervisor even if authorized to sign other documents. |

Employees who expect to be absent when the report must be submitted should leave it with the supervisor, who indicates the absence on the employee signature line.

Falsifying a Biweekly Employee Time Report is a serious offense that can lead to disciplinary action up to and including discharge.

| Submitting the report | The Biweekly Employee Time Report must be received in the Payroll Division of the Human Resources department by noon of the Friday before payday. If a holiday occurs during a pay week, the form must be submitted one day earlier for each holiday. A schedule of payroll deadlines is published to all departments. Missing a deadline for submitting the Biweekly Employee Time Report means not being paid the following Friday. Employees whose reports are received after noon on the cutoff day but before 5 p.m. on payday can receive their paychecks on the Wednesday following the regular payday in the employing department without direct deposit. |

Supervisors should note that the signed Biweekly Employee Time Report must be delivered directly to Human Resources; it is not to be returned to the employee.

On the Evanston campus, the Biweekly Employee Time Report should be taken Human Resources, 720 University Place, ground floor, or placed in a drop box at:
» the east entrance to the Human Resources building
» the administration office of the Kellogg Graduate School of Management, Leverone Hall 2-003
» the mail room of the School of Education, Annenberg Hall
» the mail room of the Robert R. McCormick School of Engineering and Applied Science

On the Chicago campus, the forms may be delivered to the Chicago Human Resources office, Abbott Hall, Room 150.

Use of the pink or green transmittal envelopes available at the Human Resources Department offices on both campuses helps give priority to processing this mail.

| Reporting regular time | The Biweekly Employee Time Report must report every hour worked. Employees should fill in daily the number of hours worked for that given day. All hours worked up to 40 hours in the University work week are recorded as regular pay (REG). |

EXAMPLE: An employee is scheduled for 37.5 hours in a work week but works 38.5 Hours should be reported as follows:

| Sun | Mon | Tues | Wed | Thur | Fri | Sat | Type | Total |
|-----|-----|------|-----|------|-----|-----|------|-------|
|     | 7.5 | 7.5  | 8   | 7.5  | 8   |     | REG  | 38.5  |

Trahanas-NU001361

| Reporting overtime | Time worked beyond 40 hours in a work week is overtime. An employee may work extra hours only with the supervisor's approval. The University work week begins at the start of Sunday and ends at the end of the following Saturday. |

Time worked for a University department other than one's own department is included in determining overtime.

For work beyond 40 hours in a work week, the hours beyond 40 should be recorded as overtime, coded OTP.

Only hours worked and University Scheduled Holiday hours are used in computing the hours to start overtime. Sick time, vacation and personal floating holiday time, paid Workers' Compensation (WCK), and other paid time not worked, are not included in the accumulation of hours to qualify for overtime.

EXAMPLE: An employee works 9 hours on each of Monday, Tuesday and Wednesday, and on Thursday takes 8 hours of vacation time. After Thursday, the employee would have to work another 13 hours before receiving premium overtime. The time worked for that week would be recorded as follows:

| Sun | Mon | Tues | Wed | Thur | Fri | Sat | Type | Total |
|-----|-----|------|-----|------|-----|-----|------|-------|
|     | 9   | 9    | 9   |      | 5   | 8   | REG  | 40    |
|     |     |      |     | 8    |     |     | VAC  | 8     |
|     |     |      |     |      |     | 3   | OTP  | 3     |

In this example, Saturday is the employee's scheduled day off, but the first eight hours worked are regular work hours because there were only 32 hours worked before Saturday. Thus the last three hours of the 11 hours worked on Saturday are premium overtime because at the end of eight hours on Saturday, the employee had worked 40 hours for the week.

Because the scheduling policy allows adjusting an employee's weekly schedule, the same employee with the approval of the supervisor might elect to change the schedule for that work week, working Monday, Tuesday, Wednesday, Friday and Saturday, and not using a vacation day on Thursday. The employee would report the hours for that week as follows:

| Sun | Mon | Tues | Wed | Thur | Fri | Sat | Type | Total |
|-----|-----|------|-----|------|-----|-----|------|-------|
|     | 9   | 9    | 9   |      | 5   | 8   | REG  | 40    |
|     |     |      |     |      |     |     | VAC  |       |
|     |     |      |     |      |     | 3   | OTP  | 3     |

In this schedule, the work days are changed without the use of the vacation day on Thursday.

Trahanas-NU001362

40                                                                                              Time Report:

**Reporting holidays**

Hourly-paid employees are paid one tenth of their biweekly standard hours for each University scheduled holiday. Even if an employee's normal work schedule for the day observed as a scheduled holiday is more or less than one tenth of the biweekly standard hours, the employee is paid for one tenth of the biweekly scheduled hours for the holiday.

EXAMPLE:  An employee's biweekly schedule is 80 hours. The employee works 8 hours on each of Tuesday, Wednesday, and Thursday in the first week, for a total of 24 regular hours. Monday of the following week is the holiday and the employee earns 8 hours of holiday pay. The employee is required to be in paid status for 16 more hours in the pay period to earn the 8 hours of holiday time.

| Su | Mo | Tu | We | Th | Fri | Sa | Su | Mo | Tu | We | Th | Fr | S | | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 8 | 8 | 8 | | | | | | 8 | 8 | | | REG | 40 |
| | | | | | | | | 8 | | | | | | HOL | 8 |
| | | | | | 8 | 8 | | | 8 | | | 8 | | EXA | 32 |

In the case above, the employee has paid time for at least 50% of the pay period, which allows payment of the scheduled holiday pay, even though the individual had excused absence (EXA) for 32 hours during the period.

**Reporting sick time**

Sick time is reported for all of the work hours missed due to sickness. For example, if a day missed due to sickness is scheduled for five hours of work, five hours of sick time are reported. If the day is scheduled for 10 hours, then 10 hours of sick time are reported.

Trahanas-NU001363

| Reporting holiday work | When working on a University scheduled holiday, the employee should report the number of hours worked for the holiday as regular hours worked (REG) and half of the hours worked as straight overtime (OTS). If the holiday time is to be rescheduled to a later time, note in the comment section, "Holiday to be scheduled at a later date." |

| Su | Mo | Tu | We | Th | Fri | Sa | Su | Mo | Tu | We | Th | Fr | S | | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 8 | 8 | 8 | 8 | | | 8 | 8 | 8 | 8 | 8 | | REG | 80 |
| | | | | | | | | 4 | | | | | | OTS | 4 |

If the supervisor and the employee are not able to schedule the hours off and payment is to be made for the holiday, then one-tenth of the employee's biweekly scheduled hours are entered as holiday time, HOL. The employee will be paid the premium rate at 1½ times the regular hourly rate for the hours worked on the holiday and will be paid the regular rate for the holiday. Record on the time report the premium time as OTP and the holiday time as HOL.

| Su | Mo | Tu | We | Th | Fri | Sa | Su | Mo | Tu | We | Th | Fr | S | | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 8 | 8 | 8 | 8 | | | | 8 | 8 | 8 | 8 | | REG | 72 |
| | | | | | | | | 8 | | | | | | HOL | 8 |
| | | | | | | | | 8 | | | | | | OTP | 8 |

**Reporting unpaid absence**

All of the biweekly position's standard hours must be accounted for on the Biweekly Employee Time Report. If the regular hours and other paid hours do not total to biweekly standard hours, the Payroll Division will assume that the unreported hours are unexcused absences and record them as UXA.

| Su | Mo | Tu | We | Th | Fri | Sa | Su | Mo | Tu | We | Th | Fr | S | | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 8 | 8 | 8 | | | | | 8 | 8 | | | | REG | 40 |
| | | | | | | | | 8 | | | | | | HOL | 8 |
| | | | | | | | | | | | | | | UXA | 32 |

Employees cannot be unpaid for a full pay period without being on an approved leave of absence.

**Reporting tardiness**

An employee late in arriving for work or in returning from lunch must report the tardiness as unexcused absence (UXA). The time is rounded to the nearest tenth of an hour. A shorter lunch period or extending the end of the work day does not make up for tardiness.

Trahanas-NU001364

42                                                                Time Reportin

**Correcting errors on the report**

To correct an error on the Biweekly Employee Time Report, an employee must complete a Biweekly Employee Time Report marking it as "correction" and accurately account for all scheduled and extra hours worked during that pay period. The entire form should be completed, including
- the total column for each line on which a number has been entered
- the reason for the correction under "explanation"

The same supervisor who signed the original form should sign the corrected form.

When time reported on the Biweekly Employee Time Report does not conform to University policy, or the paid time off entered is more than that earned, the time will be treated as absent without pay, coded as UXA. A corrected report must be submitted to change the unpaid time to an appropriate paid time category.

If a corrected report is received by 5:00 PM of the payday, a payment correction can be paid the following Wednesday. If a corrected report is not in by 5:00 PM of the payday, the adjustment will be made in the next regular paycheck. Corrected reports must be delivered to the Payroll Division of Human Resources, 720 University Place, Evanston.

**Verifying hours reported**

When the paycheck or notice of deposit is delivered, the employee should compare the hours shown with those reported on the Biweekly Employee Time Report. If they are not the same, the employee should notify the Payroll Division of Human Resources at 847 467-7606.

Vacation, paid sick time, and personal floating holiday balances are shown on each nonexempt employee's check stub. Before time off is taken, time must be available in these balances if the time off is to be considered paid time off. Any errors should be checked by calling the Payroll Division.

**Trahanas-NU001365**

Time Reporting                                                                                                    43

| | |
|---|---|
| Using the Electronic Time Entry System (ETES) | ETES is an on-line computer system that allows biweekly regular, temporary, and work study employees to enter hours worked using a personal computer at the work station. It replaces paper timesheets. Employees complete their electronic time reports and have them approved by 5:00 p.m. on the second Friday of the pay period. An employee who works during the weekend may enter those hours worked on Friday or on the following Monday morning on return to work. |
| ETES instructions | Detailed instructions for using ETES are found in the on-line training at *http://www.northwestern.edu/hr/hris/hris/development/etes/cbt/index.htm.* <br><br> Training manuals may be downloaded from: *http://www.northwestern.edu/hjr/hjrs/hjris/development/etes/etesmanuals.html.* |
| ETES automatic calculations | ETES will calculate overtime, holiday earnings, tardiness, and grace periods using rules built into the system for each employee. After each biweekly payroll, leave accruals are updated for sick time, vacation, and personal floating holidays and are available to each biweekly staff member in ETES. |
| Supervisor's authorization | Supervisors of biweekly employees complete an *ETES Authorization for Supervisors* and attend an ETES training session in order to access ETES. The *Authorization* can be found at *http://northwestern.edu/hr/hris/hris/development/etes/etesecauth/.pdf.* |
| Approving time in ETES | Supervisors approve time reported in ETES by Monday at 10:00 a.m. following the close of the biweekly pay period. Email notices are sent two days prior to the approval deadline, reminding supervisors to approve time in ETES. <br><br> A second reminder is sent to supervisors whose approvals are missing by 8:00 a.m. Monday. <br><br> If the supervisor does not approve the time in ETES by 10:00 a.m., the staff member is paid for the time reported, but a paper timesheet signed by the supervisor is required. |
| Access to ETES | ETES is accessed with web browsers, Microsoft Internet Explorer or Netscape, by entering the address *https://www-etes.itcs.northwestern.edu/etes_prod/.* <br><br> Both the staff member entering time and the supervisor approving it should use their own University NetIDs and passwords to log in. Questions about a NetID should be directed to the Help Desk at 847-491-4357. |
| Elapsed and positive time entry | The school or department determines whether to use elapsed time entry or positive pay for the members of the department. With elapsed time entry, the system fills in the scheduled hours as hours worked. The individual is required to adjust the hours as worked or code them as taken for sick pay, vacation, personal floating holidays, or as other absence. Positive pay entry presents an empty time report and the individual enters the time worked or paid for other reasons for each day. |

Trahanas-NU001366

| Quick steps for entering time into ETES | 1. Open Microsoft Internet Explorer or Netscape. <br> 2. Enter address *https://www-etes.ites.northwestern.edu/etes_prod/* (This is easier if the address is kept as a bookmark.) <br> 3. Log in using NetID and password. <br> 4. Click "My Time Sheet". <br> 5. Enter hours worked for the current pay period. <br> 6. For hours not worked but to be paid, select an appropriate earning code from the drop down menu and enter the hours in the "Hours/Amt" box. <br> 7. Click "Save". <br> 8. View Summary. <br> 9. Approve time sheet by clicking on the "Approve" box. <br> 10. Click on "Save". <br> 11. Close the window. |
|---|---|
| Overtime calculations | ETES calculates and pays overtime at 1½ times the regular hourly rate for hours reported beyond 40 in a work week. Time paid for a scheduled University holiday is considered as time worked in the week when the holiday falls for the purpose of calculating overtime for that week. |
| Charging overtime to a special account | Nonexempt staff instructed to charge overtime to a special account are to report time in ETES as follows. <br> • In the "Work Hrs" box, enter the number of scheduled regular hours worked. <br> • In the "Earn Code" box, select the OTP code from the drop down list. <br> • In the "Hrs/Amt" box, enter the hours of overtime worked on that day. <br> • In the "Special Account" box at the far right, enter the special account to which the overtime hours are to be charged. |
| Holidays in ETES | The Electronic Time Entry System automatically enters holiday hours into the time entry system for the days on which the University observes scheduled holidays, and it includes the earnings code HOL to identify the hours. The number of holiday hours is calculated as one tenth of the biweekly scheduled work hours. The calendar of holidays is published at the Department of Human Resources web site. |
| Work on a holiday | Instructions for entering time into ETES for work on a holiday are found in the Users Guide for ETES, pages 39-46. |
| Unexcused absence | If an employee is late or misses a scheduled work day entirely without prior approval of the supervisor, the scheduled time to work that was not excused prior to the absence is entered as Unexcused Absence, with the earnings code UXA. These hours are included in the summary of hours reported but they are not paid. |
| Jury duty | Time served on jury duty is reported as follows. <br> • In the "Earn Code" box, select the code JUR from the drop down menu. <br> • In the "Hrs/Amt" box, record the number of regularly scheduled work hours. <br> • In the "Notes" field, include the comment that documentation will follow. |

| | |
|---|---|
| Funeral time | Time taken to attend a funeral of a family member is indicated as follows.<br>• In the "Earn Code" box, select the earnings code FUL.<br>• In the "Hrs/Amt" box, enter the number of hours taken for the funeral.<br>• In the "Notes" for that day, indicate the relationship of the deceased to the employee. Available time for funerals is described on page 28. |
| Viewing leave accruals | The current balances of leave accruals can be viewed by clicking on the words "Accrual Balance" at the bottom of the ETES time entry screen. |
| Time summary in ETES | The summary of hours recorded for the current pay period is viewable by clicking on the "Summary" icon at the bottom left of the ETES time entry screen. The summary shows the hours of each type, whether regular, sick, vacation, or holiday; and it shows overtime hours that will be paid for the period. |
| Employee approval of time | Each nonexempt staff member is notified by email two days prior to the end of the pay period to complete and approve time entry in ETES. If the staff member does not approve the time, the supervisor can do so without the employee's approval. |
| Supervisor approval | Two days prior to the end of the pay period, the supervisor is notified by email to approve the time entered. The employee will be paid without the approval, but a paper timesheet will be sent to the supervisor to confirm the approval. |
| Updating addresses | The home address and phone number of biweekly and temporary employees may be updated in ETES on the "My Profile" page. Temporary employees may also update their check addresses in the "My Profile" section. |
| Errors and warnings | Yellow and red warning messages indicate entries outside of the timekeeping rules of the system. Red warnings require a correction to complete the entry. Yellow warnings indicate a possible error, but may be ignored if there is no error known in the entry. The Users Guide for ETES describes warning and error messages. |
| Questions regarding ETES | Further documentation on using ETES is available on line at *http://www.northwestern.edu/hr/hris/hris/development/etes/index.html.*<br>Assistance from the ETES help desk is available at 847-467-7606 or by email from *eteshelp@northwestern.edu* |
| Transferring from biweekly position to monthly position | Employees who transfer from the biweekly to the monthly payroll retain their vacation and personal floating holiday balances, but not their sick leave balance. Sick leave for monthly employees is not accumulated but is allocated annually. |
| Leaving Northwestern employment | To indicate departure from the Northwestern payroll, the departing employee should circle the last day worked on the Biweekly Employee Time Report and record the final date on line marked "Explanation or comment".<br><br>After the employing department has notified the Payroll Division that an employee is leaving the University, a paycheck is issued after the pay period of the last work day and will include pay for any unused vacation time and personal floating holidays. |

Trahanas-NU001368

Recording paid time off

This table shows the codes to use for indicating the hours of a paid absence and the reason for the absence in order to receive pay for these benefits provided by the University.

| To be paid the hours for this benefit . . . | See this page ... | And for each day on the report, record the hours to be paid as . . . |
|---|---|---|
| Vacation | 22 | VAC, vacation. |
| Paid sick time | 26 | SCK, sick leave taken |
| Sick leave for family illness | 27 | SKF, sick family leave taken |
| University scheduled holidays | 23 | HOL, holiday time taken. |
| Work on holidays when a substitute day off is scheduled within 30 calendar days | 23 | REG, and half the hours worked as OTS. When the holiday is taken, record the hours as HOL. |
| Work on holidays when a substitute day off cannot be scheduled within 30 calendar days. | 23 | HOL, holiday time taken, and record the same hours as OTP, premium overtime. |
| Personal floating holidays | 24 | PFH, personal floating holiday. |
| Funeral leave | 28 | FUL, funeral leave, and record the name and relationship of deceased in the Comment line. |
| Election time | 28 | ELE, election time. |
| Jury duty | 28 | JUR, jury duty, and attach a copy of the court summons or the pay stub from jury duty. |
| Military leave, when vacation is not used for military duty | 29 | MIL, military leave, and write "military leave" in the comment line. Present your military pay voucher to the Payroll Office when you return. |
| Occupational disability leave | 25 | WRK for the first three days of absence due to a work related illness or injury, with an explanation. Any more lost time is paid by the insurance carrier. DIS should be reported for time after the first three days of absence, while Workers' Compensation benefits are paid. |

Questions

Employees with questions about recording paid time off should call the Payroll Division at 847 467-7606.

| | |
|---|---|
| Civility, mutual respect, and violence on campus | As members of the Northwestern community, its faculty, staff, and students are expected to deal with each other with respect and consideration. |
| Expected behavior | Each community member is expected to treat other community members with civility and respect, recognizing that disagreement and informed debate are valued in an academic community. |
| Unacceptable behavior | Demeaning, intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in the University environment depart from the standard for civility and respect. These behaviors have no place in the academic community. |
| Violence | Violence is behavior that causes harm to a person or damage to property or causes fear for one's safety or the safety of others. Examples of violent behavior include physical contact that is harmful and expression of intent to cause physical harm. Such behavior is unacceptable in the Northwestern community. |
| Weapons | Weapons of any kind are prohibited on campus except for those carried by sworn police officers or other authorized security officers. |
| Responsibility to act | A member of the community who is involved in or witnesses behavior on campus that poses imminent danger should immediately contact the University Police.<br><br>In situations that do not involve imminent danger or for advice on the appropriate course of action, a member of the community is to notify a supervisor, department head, or student affairs staff member. Alternatively, the observer may report the incident to the Office of the Provost, the Department of Human Resources, or the Office of the Vice President for Student Affairs. |
| Orders of Protection | Community members who have obtained restraining or personal protection orders are encouraged to provide a copy of the order to University Police for enforcement on campus. |
| Visitors | Visitors, vendors, and the families of members of the community are expected to comply with the provisions of this policy. Noncompliant behavior leads to removal from the campus. |
| Resources | Guidance for identifying potential threatening or violent behavior and for the best ways to deal with incidents is found at *http://www.northwestern.edu/hr/policies.* |
| Violation | A community member who has violated this policy is subject to disciplinary action which may include separation of the offending party from the University, consistent with established disciplinary procedures. |

Trahanas-NU001370

48                                                            Performance and Conduct

**Performance review**

Performance evaluations for regular staff employees are conducted annually, but they may be conducted at any time.

Supervising staff or faculty members are expected to provide position descriptions, facilitate the creation of performance objectives, and monitor performance and behaviors of each staff member.

Staff members are expected to understand the position description, assist in the creation of performance objectives, monitor progress throughout the year, and meet with the supervising staff or faculty member periodically through the year.

A year-end evaluation should be completed based on a review of the periodic summary information. The results of the year-end evaluation are used to determine the merit increase and facilitate the creation of the following year's performance and development objectives. *Performance Excellence* is the standard program to conduct the performance process, although a supervisor may use an alternative process that fulfills these needs.

**Violations warranting immediate discharge**

Some violations of policy and rules are serious enough to result in immediate discharge. These include but are not limited to
- falsification of employee records, time reports, reasons for absence, or other University records
- improper disclosure or use of private or confidential information
- unauthorized use of information systems or data
- physical violence or the threat of it
- flagrant insubordination
- gross dereliction of duty
- job abandonment
- theft
- intentional destruction of University property
- conviction of a felony related to the job
- professional misconduct
- scientific misconduct

**Violations requiring correction**

Less serious violations should be addressed through steps of correcting performance and generally do not call for immediate dismissal. These include but are not limited to
- tardiness
- absenteeism
- neglect of duty
- disruptive behavior
- resistance to supervision

An employee who is not performing the assigned job as expected is advised of the inadequate performance and counseled on needed improvement. Additional training may be appropriate.

**Trahanas-NU001371**

Personal Safeguards                                                                                    49

Safety                          **Job safety.**  In the interest of their own safety and that of others, employees must
                                read and understand the *Employee Safety Handbook*, available on line at
                                *http://www.northwestern.edu/risk/handbook.htm* or from the Office of Risk
                                Management (847) 491-5610.

                                **Security of property.**  To avoid theft, employees should be careful not to leave
                                personal or University property unattended during absence from their work place, no
                                matter how short the absence.  The University is not responsible for loss of or
                                damage to an employee's personal property.

                                **Emergency telephones.**  Public emergency telephones are available in several
                                locations on both the Evanston and Chicago campuses.  Maps showing their
                                locations are available from the University Police offices on both campuses and on
                                line at *http://www.northwestern.edu/up/prevention/sad.html*. These telephones are
                                identifiable by their yellow color and, at night, they are identified by blue lights.
                                Lifting the receiver on one of these telephones immediately connects the caller with
                                University Police.

Injury or illness related to the   In accordance with Illinois statute, the University provides workers' compensation
job                             benefits to employees who sustain job-related injuries or diseases.  The Office of
                                Risk Management administers the workers' compensation program and publishes
                                brochures that describe in detail the University's policies and procedures.  These
                                brochures (one for the Evanston Campus, one for the Chicago campus) are available
                                on line at *http://www.northwestern.edu/risk/claims.htm*.

                                Employees must promptly report such injuries or diseases to the claims manager and
                                their supervisor.

                                - **For life threatening emergencies, call 911.**
                                - **For the Evanston Campus during business hours**, the primary care facility is
                                  Occupational Medicine Evanston/Glenbrook Associates (OMEGA), 1000 Central
                                  Street, Suite 840, Evanston, Illinois, (847) 570-2620, or 2050 Pfingston Road,
                                  Suite 280, Glenview, Illinois, (847) 657-1700.
                                - **For the Chicago Campus during business hours**, the primary care facility is the
                                  Northwestern Memorial Corporate Health, Galter Pavilion, 201 East Huron
                                  Street, 9th floor - Suite #240, Chicago, IL, (312) 926-8282.
                                - **During non-business hours**, the hospital emergency rooms are used at Evanston
                                  and Northwestern Memorial Hospitals.

Trahanas-NU001372

50                                                                              Personal Safegu...

| | |
|---|---|
| Indemnification | The University protects each employee against legal liability or legal expenses incurred in connection with the performance of his or her job as long as the employee has performed the job in line with assigned duties, has acted in good faith in the performance of the job, and has not violated any law or University policy. |
| Personal visitors in the workplace | Individuals who make extended visits to the workplace but who do not have official business with the University distract employees and fellow workers from their responsibilities and may put visiting children at risk. Accordingly, visits by friends, children, or other relatives at the employee's work site are to be limited to casual visits of short duration. |
| | The responsibility for the safety of children and other personal visitors to the University lies with the University employee they are visiting. |
| | Buildings should be considered potentially hazardous, particularly for children, and as such are not appropriate as child care sites. The University has no liability for children's or other visitors' safety and does not provide resources in office or laboratory areas for their care or hospitality. |

Trahanas-NU001373

Personal Safeguards                                                                               51

| | |
|---|---|
| University policy on sexual harassment | It is the policy of Northwestern University that no male or female member of the Northwestern community – students, faculty, administrators, or staff – may sexually harass any other member of the community. Sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute harassment when: |

- submission to such conduct is made or threatened to be made, either explicitly or implicitly, a term or condition of an individual's employment or education; or
- submission to or rejection of such conduct is used or threatened to be used as the basis for academic or employment decisions affecting that individual; or
- such conduct has the purpose or effect of substantially interfering with an individual's academic or professional performance or creating what a reasonable person would sense as an intimidating, hostile, or offensive employment, educational, or living environment.

| | |
|---|---|
| Examples | Examples of sexual harassment include: |

- Pressure for a dating, romantic, or intimate relationship
- Unwelcome touching, patting, or hugging
- Pressure for or forced sexual activity
- Unnecessary and unwelcome references to various parts of the body
- Belittling remarks about a person's gender or sexual orientation
- Inappropriate sexual innuendoes or humor
- Obscene gestures
- Offensive sexual graffiti, pictures, or posters
- E-mail and Internet use that violates this policy

| | |
|---|---|
| Investigation and confidentiality | All reports describing conduct that is inconsistent with these policies will be promptly and thoroughly investigated. Complaints about violations of these policies will be handled confidentially, with facts made available only to those who need to know in order to investigate and resolve the matter. |
| Retaliation | The University prohibits retaliation against anyone for registering a complaint pursuant to these policies, assisting another in making a complaint, or participating in an investigation under the policies. Anyone experiencing any conduct that he or she believes to be retaliatory should immediately report it to one of the individuals listed under "Where to go for help," below. |
| Resolution | If a complaint of discrimination, harassment, or sexual harassment is found to be substantiated, appropriate corrective action will follow, up to and including separation of the offending party from the University, consistent with University procedure. |
| Academic freedom | Northwestern University is committed to the principles of free inquiry and free expression – to providing an environment that encourages the exploration and exchange of ideas. The University's discrimination and harassment policies are not intended to stifle this freedom, nor will they be permitted to do so. Prohibited discrimination and harassment, however, are neither legally protected expression nor the proper exercise of academic freedom; and such conduct is incompatible with the values of University. |

Trahanas-NU001374

| Responsibilities under this policy | All members of the University community are responsible for creating a working, learning, and living environment that is free of discrimination and harassment, including sexual harassment. It is important to contact one of the individuals listed under "Where to go for help." if any of the following occurs: <br>• You believe you have been subjected to conduct or comments that may violate this policy <br>• You believe you have been retaliated against in violation of this policy <br>• You hold a supervisory, management or teaching position, and have been told about or witnessed conduct that you think may violate this policy. |
|---|---|
| Vendors, contractors and third parties | The University's policies on discrimination and harassment, including sexual harassment, apply to the conduct of vendors, contractors and third parties. If a member of the University community believes that he or she has been subjected to conduct that violates this policy by a vendor, contractor or third party, he or she should contact one of the individuals listed under "Where to Get Advice and Help." The University will respond as appropriate, given the nature of its relationship to the vendor, contractor or third party. |
| If you are discriminated against or harassed . . . | • Don't blame yourself. <br>• Say no. <br>• Remember that harassment and discrimination, including sexual harassment, are against University policy and may be against the law. <br>• Know your rights under University policy. <br>• Keep a written, dated record of events. <br>• Tell someone. <br>• Get help. <br>• Don't delay. |
| Are you the harasser? | Accused harassers are often surprised to learn how others view their behavior. <br>• Review your attitudes and actions toward others. Do you base your behavior on stereotypes? Is your behavior bias free? <br>• Consider the impact you have on others' attitudes toward their work, education, and self-esteem. <br>• Examine how others respond to what you say and do. <br>• Do not assume that colleagues, peers, employees or students enjoy racial or ethic jokes, sexually oriented comments, remarks about their appearance or religion, or being touched or stared at. <br>• Do not assume that others will tell you they are offended – or harassed – by what you say and do. |
| If you think you may have offended or harassed someone . . . | • Apologize as soon as possible. <br>• Change your behavior. <br>• Read the policies on discrimination, harassment and sexual harassment <br>• Get advice from one of the resource people listed in "Where to Go for Help." |

Trahanas-NU001375

Personal Safeguards                                                                                         53

| | |
|---|---|
| Where to go for help | People are available to help you. The following individuals will take complaints of sexual harassment, explain complaint procedures, answer questions, and ensure that appropriate action is taken. |

Director of the University Sexual Harassment Prevention Office
405 Church Street, Suite 201
Evanston Campus
(847) 491-3745

Associate Vice President for Student Affairs (student-to-student complaints)
Scott Hall, Room 36
601 University Place
Evanston Campus
(847) 491-8430

Associate Vice President for Human Resources
720 University Place
Evanston Campus
(847) 491-7505

Director of Equal Employment Opportunity, Affirmative Action, and Labor Relations
720 University Place
Evanston Campus
(847) 491-7458

Office of the Provost Rebecca Crown Center
633 Clark Street
Evanston Campus
(847) 491-7040
nu-provost@northwestern.edu

| | |
|---|---|
| Discrimination and harassment prevention advisers | In addition to these resources, each school or unit of the University has advisers on the faculty and staff who have been trained to receive a complaint and to answer questions about these policies. |
| Confidential counselors | If you wish to speak with someone who is legally privileged to keep communications confidential, you may contact a confidential counselor. In order for the "confidential counselor" privilege to apply to a particular discussion, the discussion must be conducted confidentially and the complainant must have initiated the discussion for the purpose of seeking confidential counseling. After consulting with a confidential counselor, a complainant may decide to take no further action; such a decision is completely with the complainant's discretion. Because of the confidential nature of the counselor-complainant relationship, seeking advice from a confidential counselor does not constitute reporting an incident. |

Trahanas-NU001376

54                                                                                          Personal Safeguard

| | |
|---|---|
| Drug free workplace | Northwestern University is committed to maintaining a drug free workplace in compliance with applicable laws. The unlawful possession, use, distribution, dispensation, sale, or manufacture of controlled substances is prohibited on University premises. |
| | Violation of this policy may result in the imposition of employment disciplines defined for specific employee categories by existing University policies, statutes, rules, regulations, employment contracts, and labor agreements. At the discretion of the University, any employee convicted of a drug offense involving the workplace shall be subject to employee discipline or required to satisfactorily complete a drug rehabilitation program as a condition of continued employment. |
| University policy on drugs and alcohol | Northwestern University prohibits the unlawful possession, use, or distribution of illicit drugs and alcohol by its students and employees on University property, as part of any University activities, in vehicles owned or operated by the University, or at any work site or other location at which University duties are being performed by Northwestern employees. |
| Health risks and assistance | The use of illicit drugs and the abuse of alcohol may pose serious health risks to the user. Appendix A is a U.S. Department of Education summary of health risks associated with alcohol. Members of the Northwestern faculty and staff are encouraged to call the Faculty and Staff Assistance Program provided by Perspectives, Ltd., at 800-456-6327 for specific information about available counseling, treatment, rehabilitation, or re-entry programs. Summary descriptions of the programs are included in Appendix B. A summary of health risks associated with controlled substances, prepared by the U.S. Department of Justice, is attached as Appendix C. |
| Sanctions | Various local, state, and federal laws govern the possession and distribution (trafficking) of drugs and alcohol. Appendix D shows the penalties under federal law for trafficking in controlled substances and in marijuana. Appendix E provides the federal penalties for illegal possession of a controlled substance. Appendix F describes the sanctions for trafficking in controlled substances under Illinois law. The Illinois sanctions for possession of a controlled substance are in Appendix G. The Illinois penalties for trafficking in or possession of marijuana are found in Appendix H. |

Sanctions continue

Trahanas-NU001377

Sanctions, continued

In addition to the sanctions listed in the appendices, the following additional penalties are prescribed by Illinois law:

- Conviction of a second or subsequent offense under the Controlled Substances Act may result in imprisonment, a fine, or both up to double the maximum otherwise authorized. A prior conviction under federal law or the law of any other state makes a conviction under Illinois law a second offense.
- Conviction for "cannabis trafficking" of 2500 grams or more or for "controlled substance trafficking" (i.e., bringing these items into Illinois for purposes of manufacture or delivery) may result in a prison term of at least twice the minimum term otherwise authorized and a fine of up to twice the authorized amount.
- Delivery of a controlled substance by a person over 18 to a person under 18 may result in imprisonment for up to twice the maximum term and a fine up to twice the specified amount.
- Delivery of cannabis (marijuana or hashish) by a person over 18 to a person under 18 who is at least 3 years younger may result in imprisonment for up to twice the maximum term.
- A person over 18 who uses another person under 18 to deliver controlled substances may be imprisoned for twice the maximum term.
- Violation of provisions of the Controlled Substances Act in or on the grounds of any school or public housing complex or within 1,000 feet of the same will increase the felony status (and prison term) and the applicable fine.
- Participation in any conspiracy with respect to cannabis may result in imprisonment for two to five years and a fine up to $200,000 plus certain forfeitures.
- Possession of cannabis plants may result, depending on the number of plants, in prison terms of up to seven years and fines of up to $100,000 plus costs.
- Conviction under the Controlled Substances Act or the Cannabis Control Act, in addition to all other penalties, will result in a fine of not less than the full street value of the items seized.

Possession of 10 grams or less of cannabis by a person under age 17 may result in a fine of up to $500 under Evanston ordinance.

Illinois law provides for a prison term of anything less than one year and for a fine of up to $1000 for knowingly providing alcohol to persons under 21 or for providing false evidence of age or identity. Persons under 21 who present or offer false evidence for purposes of obtaining or purchasing alcohol may be jailed for up to six months and fined up to $500. The same penalties apply to possession of alcohol by a person under 21 on or in any street or public place. Minors who consume alcohol are subject to prison terms of up to 30 days and fines of up to $500.

Sanctions continue

56                                                                 Personal Safeguard

**Sanctions, continued**    In addition to possible prosecution under these laws, students or employees who violate the prohibitions of this policy are subject to University-imposed disciplinary sanctions consistent with applicable procedures and regulations. Sanctions may include, but need not be limited to, suspension, expulsion, termination of employment, or referral to appropriate authorities for prosecution. Any disciplinary sanction imposed may also include the completion of an appropriate rehabilitation program as a condition of reinstatement or continued employment.

**Monitoring**             Northwestern University will regularly monitor its drug and alcohol abuse prevention program to determine its effectiveness, to implement any necessary changes, and to insure that its disciplinary sanctions are consistently enforced.

**Notice of conviction**   As a condition of employment, an employee of Northwestern will notify his or her supervisor if he or she is convicted of a criminal drug offense involving the workplace within five days of the conviction. In the event any such conviction involves an employee working on a federal contract or grant, the University will notify the granting or contracting federal agency within ten days of receiving notice of a conviction.

Trahanas-NU001379

Personal Safeguards                                                                    57

**Employee complaints**

Employees who believe that they have been treated unfairly on the job should voice their complaints and have them reviewed. An employee who believes that he or she has not been treated fairly in accordance with University policies and who has been unsuccessful in satisfying the complaint through discussion with the supervisor or within the department may use the complaint procedure to obtain an administrative review of the conditions or actions causing the complaint. Complaints are to receive review and response without retaliation against the employee voicing the complaint.

Employees who wish to express a complaint on the Chicago campus should contact their human resources consultant, in Chicago, at the Human Resources office in Abbott Hall, phone (312) 503-8481. In Evanston, contact their department's human resources consultant at 720 University Place, Evanston, (847) 491-7507.

**Matters for complaint.** Complaint matters calling for this procedure include the improper or incorrect application of policy, suspension, and employment termination.

Complaints regarding discrimination, disability, or sexual harassment may be advanced through the means described in the sections on discrimination and sexual harassment in this handbook.

Some matters are resolved by means other than a complaint procedure. For performance evaluation, the judgment of the supervisor is normally determining. An employee may include a rebuttal letter in the record if there is disagreement with the supervisor's evaluation of performance. With respect to University policy and department rules, the employee is obligated to observe these. Recommendations for change in University policy may be made to the Department of Human Resources or through NUSAC, and departmental rules recommendations should be made to the head of the department. For personnel actions such as an unsuccessful application for promotion, the employee may seek an explanation from an staffing specialist or Human Resources Consultant, but the suitability of candidates for a job is determined at the discretion of the job's supervisor.

**Accompanying employee.** Except in a peer review described below, an employee may choose to be accompanied by another employee who may observe and provide support through the steps of the procedure but not express advocacy.

**Pay during formal process.** Time spent during scheduled working hours in meetings with Human Resources or in the formal steps of the procedure is treated as time worked for pay purposes. The employee must obtain prior supervisory approval for absence from duty and must cooperate in scheduling such an absence to lessen inconvenience to the department.

Trahanas-NU001380

58                                                                        Personal Safeguan

**Complaint Procedure**

**Procedural options.** An employee may start with informal discussion or any of these steps.

- Informal discussion only. The employee may choose to have a confidential informal conversation with a human resources consultant. No further action need be taken.
- Personal action. The employee may decide to act on his or her own, perhaps discussing the matter with the person complained against.
- Human Resources facilitation. The employee may ask a human resources consultant to assist in a meeting with the person complained against. If this meeting concludes with a satisfactory solution, the employee may choose to take no further action.
- Formal investigation. The employee may write to the appropriate human resources consultant stating the complaint and asking for investigation and resolution of the complaint, which may include questioning the person complained against and other relevant parties. On the basis of the information, the consultant a resolution of the complaint and notifies the parties to the complaint, in writing when appropriate.

**Appeal**

A party dissatisfied with the result of the investigation may appeal by writing to the associate vice president for human resources within 5 days of receiving the decision. Within 30 days, the associate vice president reviews the matter and notifies both parties in writing.

A party dissatisfied with the decision of the associate vice president for human resources may appeal by writing to the senior vice president for business and finance within five business days of receiving the decision of the associate vice president.

If the appeal concerns a termination for one of the causes for immediate discharge such as those enumerated in the policy on performance management, the senior vice president reviews the matter and writes to both parties within five days of receiving the appeal, notifying them of the decision. For appeals of other matters, the employee may request a review by the senior vice president and, if the employee chooses, also request an advisory review by a peer review panel. For all appeals, the decision of the senior vice president is the final decision for the University.

Trahanas-NU001381

Personal Safeguards                                                                                     59

Peer review

Except for matters of discrimination, sexual harassment, or conduct leading to immediate discharge, either party to a complaint may request a peer review when making the final appeal to the senior vice president. The peer review assesses whether the complaint procedure and the appeals were conducted fairly and whether the complaint process was followed according to policy; but the peer review does not take action or recommend a specific action nor does it review the substance of the complaint or any corrective action. On receiving the findings of the peer review, the senior vice president takes appropriate action.

If a peer review is requested, the senior vice president selects three members of the peer review panel from NUSAC, the faculty, or other members of the community as appropriate. The panel meets with each party to the complaint who chooses to meet with the panel and with the Human Resources representatives who have been involved in the matter. The panel reviews any documentation presented by any of those parties. There are no accompanying employees or witnesses, and the panel does not conduct further investigation beyond what is presented.

Within 30 days of receiving the appeal notice the panel writes to the senior vice president regarding the fairness and policy compliance of the complaint and of any corrective action. The memorandum is the only record of the panel's review. The documents presented by the parties are returned to them.

Within five business days of receiving the panel's memorandum, the senior vice president writes to both parties giving the final decision for the University.

Trahanas-NU001382

60                                                                      University Safegu

| | |
|---|---|
| Solicitation | University premises or resources are not to be used for the solicitation of business other than official University business. Employees may not use paid work time for solicitation for charitable causes not sanctioned by the University. |
| Personal mail and phone use | Employees may not use the campus mail system for receiving or sending personal mail. Personal phone use during working hours is to be limited to emergency calls. University stationery is for University business only, not for personal correspondence. It should not be used for business or political correspondence by employees not representing the University in an official capacity. |
| Equipment and facilities of the University | University equipment and facilities provided for use by employees – such as lockers, offices, desks, and personal and network computers, their files, disks, and peripherals – are University property and are fully accessible to the University at all times. |
| | Employees may not use University facilities, supplies, vehicles, or equipment for personal reasons unless authorized to do so by their supervisor. |
| Security of confidential information | Information contained in University files and records, whether paper or computer records, is to be used for its intended purposes only. Inappropriate employee access to, use of, or disclosure of such information will subject an employee to corrective action up to and including discharge. |
| Personal appearance and hygiene | Departments or their supervisors may set standards of personal appearance and hygiene as reasonable and appropriate for the operation of the department. |
| Smoking | Smoking is prohibited in University buildings and within 25 feet of building entrances, as well as in designated outdoor facilities. |
| Patents and inventions | Patentable discoveries or inventions occasionally result from the research and educational activities at the University. Northwestern University desires to assure that all ideas and discoveries are properly disclosed and used for the greatest possible public benefit. The University also desires to protect the patent rights of faculty, staff, and students and to abide by federal law, University policy, and patent regulations of agencies and other sponsors providing funds for programs. |
| | Certain staff members may be required to sign a patent understanding that assigns rights in such inventions to the University and to submit disclosures of all inventions made using University resources. If funds are received from the licensing of such inventions, they will be distributed according to the University patent policy. The Technology Transfer Program administers this policy; further information is available from that office. |

Trahanas-NU001383

University Safeguards                                                                61

| | |
|---|---|
| Use of computers and networks | It is the policy of Northwestern University to maintain access to local, national, and international networks for the purpose of supporting its fundamental activities of instruction, research, and administration.<br><br>Users of the networks are to take the necessary measures to safeguard the operating integrity of the systems and the accessibility of other users. |
| System use | Network users are responsible for:<br>• using the network in ways that do not interfere with or disrupt the normal operation of the system,<br>• respecting the rights of other users, including their rights as set forth in other University policies for students, faculty, and staff – rights that include but are not limited to privacy, freedom from harassment, and freedom of expression,<br>• knowing and obeying the specific policies established for the systems and networks they access.<br><br>Under no circumstances may users give others access to any system that they do not administer. |
| Network administration | Administrators of systems and networks have the responsibility to protect the rights of users, to set policies consistent with those rights, and to publicize those policies to their users. They have authority to control or refuse access to anyone who violates these policies or threatens the rights of other users, and they will make reasonable efforts to notify users affected by decisions they have made. |
| Appeal of an administrative action | Individuals who disagree with an administrative decision may submit an appeal of the decision to the appropriate office. Students may submit appeals to the vice president for student affairs, faculty members may appeal to the provost, and staff members may appeal to the associate vice president for human resources. |

Trahanas-NU001384

| | |
|---|---|
| Conflict of interest | It is the policy of Northwestern University that its employees conduct the affairs of the University in accordance with the highest legal, ethical, and moral standards. |
| | Northwestern University resources are to be used only in the interest of the University. An employee may not commit University resources to activities not in the interest of the University, including personal outside activities. |
| | To avoid conflict of personal interests with University interests, an employee must not be in a position of making a decision for the University if his or her personal economic interest may be directly affected by the outcome. |
| Definitions | A **conflict of interest** exists where the occurrence of an outside activity competes with or diminishes the interest of the University or interferes with the employee's performance of duties on behalf of the University. A conflict of interest also exists where the outcome of a decision that should be made in the best interest of the University is in conflict with the personal or economic interest of the employee. Examples of decisions that commonly present conflicts of interest are those that require determining the use of suppliers, University resources, or one's own work time. |
| | An **outside activity** is any paid or volunteer activity undertaken by an employee of Northwestern University outside the scope of his or her regular University duties. Outside activities include participation in professional, civic, or charitable organizations. |
| | **Paid activity** includes paid services such as consulting, working as a technical or professional advisor or practitioner, or holding a part time job with another employer, whether working in one's University occupation or another. |
| Expectations for conduct | Northwestern University expects its employees to advance the University's mission of education, research, and service, as part of the responsibility with which they are entrusted. This includes applying the time and effort for which they are compensated, and the University resources at their disposal, toward University ends. When the application or use of these resources can result in personal advantage other than the agreed compensation or to the detriment of the University's mission, that use of resources represents a conflict of personal interest with University interest and is to be avoided. |
| | This policy establishes a standard of conduct to enhance the reputation of the University and its employees and to protect the financial well-being and legal obligations of the University. |
| | Since University staff are known to conduct University business with high standards, this policy also establishes a method to protect staff members from any questionable circumstances that might arise and to provide a method to resolve any apparent or real conflict of interest. |

Trahanas-NU001385

| Apparent and real conflicts | **Apparent conflicts of interest.** On occasion, a staff member may be presented with circumstances in which personal and University interests may be unclear or where there may be an appearance of conflict of interest. For example, a staff member may have an outside business interest or time commitment that distracts attention from University work, invites use of University resources for that interest, or appears to influence judgment in University decisions. Often these conflicts are more apparent than real, but the appearance may raise a question of conflict. For example, a job outside of University business hours is not inherently a conflict of interest. Questionable situations are easily resolved by sharing them with the supervisor. |

**Real conflicts of interest.** On other occasions, an individual may have an interest outside University work which could present a conflict in making a decision or in committing time or University resources, such as one's paid time. In these cases, informing the supervisor of the potential conflict often serves to remove the conflict because the supervisor can then become involved in the decision, removing the burden of the conflict from the staff member.

Good judgment of the staff is essential, and no list of rules can provide direction for all the varied circumstances that may arise. In case of doubt or a questionable situation, it is desirable to resolve the issue with one's supervisor.

| Examples of conflict of interest | The following activities are examples of situations that may raise conflict questions. |

**Professional, charitable, or civic organizations.** If University time or resources are used for professional, charitable, or community activities, the use of this time for those activities can be a conflict of interest. Incidental calls or interruptions by such activities are not likely in conflict with job duties. Participation in activities of a professional association representing one's assigned University work may align with rather than conflict with University interest. Conferences, workshops, and symposia as a presenter, attendee, or program organizer, or professional association business activities in the individual's professional area may advance both the individual's and the University's interests. A conflict of interest exists if the supervisor judges that the time on these matters subtracts inordinately from getting the assigned job done or judges that the activity is in conflict with department objectives or job goals. A discussion with the supervisor is needed to resolve any concern and is needed if these activities consume substantial work time or attention. A memorandum of the discussion and approval of the activity should be written to assure understanding and to document approval.

**Consulting.** Consulting activity that uses University resources or an individual's time on the job, because it competes with the University or conflicts with the performance of the job, presents a conflict of interest. Consulting that does not use the University's resources and does not occur during University work does not present a conflict of interest. Activities that present a potential conflict of interest require the written permission of the supervisor or department head. Permission is given if the activity does not compete with University activities or interfere with the performance of the staff member's University duties.

Trahanas-NU001386

64                                                          University Safeguard

Examples, continued      **Non-university activities during scheduled work** use University resources, whether in consulting or other personal activity, and must be approved in advance by the individual's supervisor or department head. A conflict exists when University paid work time is used for activity unrelated to the University's business.

A **gift or gratuity** other than occasional meals. Favors of any value should be recognized for their influence on the objectivity of judgment with respect to the provider of the favor. Social invitations that do not place or appear to place the recipient under any obligation are acceptable, but their effect should be understood.

**Use of University goods or services.** A conflict of interest exists if University resources are used for the personal benefit of an employee or an employee's immediate family (spouse or children). Exceptions are goods or services generally available for sale to all employees, such as those advertised for disposal.

**Economic interests.** A business entity in which an employee has an economic interest represents a potential conflict of interest if the employee has any involvement in the selection of that entity as a University vendor. An economic interest includes the employee's or a relative's ownership or partnership in the business, including serving as stockholder, director or officer in a non-publicly held company. Engaging a relative as an independent contractor is also a conflict of interest for an employee. Conflict of interest can be avoided if the employee brings a supervisor into the decision to engage the vendor.

Trahanas-NU001387

University Safeguards                                                                                      65

| | |
|---|---|
| Approval process | Primary responsibility for conduct within this policy rests with each individual. An employee who may be involved in a conflict of interest or has any question about the application of this policy statement to his or her activities has the responsibility of advance notice and following the disclosure process outlined below. |

**Advance notice.** An employee about to engage in an activity that may present a conflict of interest must provide written notification to the immediate supervisor or department head. The supervisor or department head considers all factors relevant to the situation and within five business days, if possible, advises the employee in writing whether the activity may be undertaken.

**Disclosure.** In addition to the advance notice for an individual about to undertake an activity with a possible conflict of interest, each University staff member is to affirm a lack of conflict or disclose any conflict of interest or potential conflict on a periodic basis in response to a questionnaire distributed for that purpose. The immediate supervisor or the head of the unit reviews responses to the disclosure questionnaire and approves or disapproves relationships or situations where conflict exists.

**Appeal.** A supervisor's disapproval may be appealed to the department head, if this is not the immediate supervisor, or to the dean of the school or to the vice president of an administrative area. The appeal should be in writing, and the individual receiving the appeal should respond within five business days.

It is expected that conflicts of interest are best resolved in the unit where the job is located, but staff members not satisfied with the appeal outcome may seek the help of the associate vice president for human resources in mediating the differences, or in further appealing the judgment if desired.

**Assistance.** A staff member may also wish to discuss his or her concerns regarding a conflict of interest decision with a human resources consultant in the Department of Human Resources. A member of the Northwestern University Staff Advisory Council (NUSAC), while not an advocate in an appeal, may provide support in working through an appeal.

| | |
|---|---|
| Compliance | A member of the staff who does not comply with this policy is subject to discipline up to and including termination of employment. |

Coercion or pressure imposed by supervisors on their subordinates to perform tasks unrelated to University business on University time or to behave in other ways defined in this policy statement as a conflict of interest are not tolerated and are to be reported by the employee to the dean of the school or the vice president of the administrative area. The individual may seek advice or report such incidents to the associate vice president for human resources if personal identification is a concern.

Trahanas-NU001388

66                                                        Services and Facilities

**Credit union**

University faculty and staff are eligible for membership in First Northern Credit Union, a not-for-profit financial cooperative. First Northern is owned and operated by its members – the people who save with and borrow from the credit union. It has no outside stockholders, so it returns profit to members in the form of higher dividends on deposit accounts, lower rates on loans, reduced or eliminated fees, and better service.

**Products.** The credit union offers a wide range of financial products and services, including savings accounts, checking accounts, money market accounts, IRAs, share certificates (CDs), and children's club accounts. First Northern also provides its members with a host of loan products, including home equity loans and lines of credit, first mortgage loans, new and used vehicle loans, VISA Platinum credit cards, and more. Convenient services include free online banking, automated telephone banking program, direct deposit and payroll deduction.

**Financial stability.** Members enjoy the stability of a financial institution that has been growing steadily for more than half a century. All savings are insured both federally and privately for up to $350,000 per account. Membership is free and lasts a lifetime.

**To join:** To join, members must deposit $5.00 into a share savings account. Membership applications are available from the credit union, which is located in the basement of Rebecca Crown Center. First Northern Credit Union's contact information is: 633 Clark Street, Room G-594, Evanston, IL 60208-1124. Phone: (847) 491-3062; Fax: (847) 467-2499. Their web site is *www.fncu.org*.

**Parking**

Parking permits for University parking lots in Evanston are issued for a fee by the University Police Department at 1819 Hinman Street.

University parking on the Chicago campus is limited. Permits are issued by the University Services department to each school and to certain departments and they determine who qualifies for a permit. A fee is charged. The parking office on the Chicago campus is located in room 100, Abbott Hall, 710 North Lake Shore Drive.

Parking fees are paid by monthly payroll deduction on a pretax basis.

**Cultural opportunities**

The University offers many cultural and recreational benefits to employees. Northwestern University is famous for the quality of its theater and music programs, and employees may attend performances at modest cost. The *Observer's* calendar of events and *Plan-it Purple*, the University's on-line calendar found at *http://aquavite.northwestern.edu/cal/pp/* list scheduled dramatic, musical, and film presentations; lectures; colloquia; and exhibits on both campuses.

**Athletic events**

Season tickets to intercollegiate athletic events are available to staff members at reduced rates. In the spring, each staff member receives an application form for football and basketball tickets for the following season. Other tickets may be obtained at the Ryan Field ticket office at 1501 Central Street in Evanston. Tickets can also be ordered by phone by calling (847) 491-CATS.

Trahanas-NU001389

| | |
|---|---|
| Physical education and recreation facilities | The University offers a variety of physical education and recreational facilities to its employees. |

**Evanston campus.** The Henry Crown Sports Pavilion and Dellora A. and Lester J. Norris Aquatics Center on the Evanston campus includes an Olympic-sized pool; tennis, handball, racquetball, basketball, and squash courts; an indoor running track; and fitness equipment. Employees may use this facility on payment of either a daily fee or an annual membership fee.

The 15 outdoor tennis courts at Sheridan Road and Colfax Street and the 3 courts at the Coon Student Sports Center near Ryan Field are available to faculty, staff, and students during daylight hours. Employees need an identification card to use the courts, and in the summer a tennis pass must be purchased at the Tennis Center, 2310 Sheridan Road, from 8:30 a.m. to 7:00 p.m. Guests of employees must pay a $5 fee. Reservations must be made a day in advance by calling (847) 491-3310 after 8:30 a.m.

The Blomquist Recreation Building, 617 Foster Street, is used for aerobics classes, volleyball, and basketball.

Tokens providing access to the Evanston campus University beach are available for a modest fee for employees and their immediate families from the Henry Crown Sports Pavilion or at the beach entrance. The beach is open from mid-June through Labor Day.

| | |
|---|---|
| Childcare resource and referral | Northwestern staff and faculty have access to a resource and referral service through Action for Children. Call 773-564-8890 to speak with an account representative, who can help in identifying centers with spaces that meet your needs. |

For additional childcare programs, visit the website for family and childcare resources at *http://www.northwestern.edu/hr/benefits/childcare.*

Trahanas-NU001390

68                                                                          NUSA

**The Staff Advisory Council (NUSAC)**

Chartered by Northwestern University's president in 1973, NUSAC, the Northwestern University Staff Advisory Council, provides service to the University community through representation of the opinions, concerns, and experiences of its nonexempt and exempt staff. That representation takes place in meetings with the Department of Human Resources and other University administrators as well as through opportunities to nominate staff members for service on University committees and task forces.

NUSAC also provides service to University staff through networking and educational outreach by way of its newsletter, "brown bag lunch" seminars and by sponsorship of the president's annual State of the University address.

**Membership.** Members are regular full time or part time staff with two or more years of continuous service, and they serve no more than two consecutive three-year terms. Eighteen non-faculty employees from both Northwestern's Chicago and Evanston campuses serve on NUSAC, and each member serves on one of three standing committees.

**Committees.** The Human Resources Committee works with the associate vice president for human resources to provide staff input and to discuss proposed policy changes and procedures. The associate vice president reports pending matters of staff interest and asks for NUSAC's input. This committee also appoints a safety officer to serve as liaison to the University Campus Safety and Security Committee, maintains a complaint liaison for each campus, and coordinates NUSAC activities to promote policies beneficial to Northwestern's staff.

The Communications Committee coordinates the publicity and public relations activities of NUSAC to make staff, faculty, and the central administration aware of the Council's goals and activities. This committee publishes a periodic newsletter mailed to all staff and organizes "brown bag lunches" for staff to discuss issues with University representatives.

The Benefits Committee works with the director of benefits and provides a liaison with the General Faculty Committee's Benefits Committee. This committee reports staff suggestions concerning benefits policies and procedures and responds back to the staff.

**Contacting NUSAC.** The ideas, suggestions, and job-related questions of staff employees are important to NUSAC because it strives to address the points of view of all of Northwestern's staff members and works to represent them to the University's administration. NUSAC is listed in the University telephone directory, with the names and telephone numbers of the current chair and vice chair. NUSAC board members are also found on NUInfo.

**NUSAC Meetings.** NUSAC meetings are scheduled for the first Wednesday of the month, during normal working hours, on alternate campuses. The meetings are open to any member of the staff. To be included on the agenda, one should contact the chair in advance of the meeting.

Trahanas-NU001391

Appendices                                                                                                    69

Appendix A.
Health risks associated
with alcohol

Alcohol consumption causes a number of marked changes in behavior. Even low doses significantly impair the judgment and coordination required to drive a car safely, increasing the likelihood that the driver will be involved in an accident. Low to moderate doses of alcohol also increase the incidence of a variety of aggressive acts, including spouse and child abuse. Moderate to high doses of alcohol cause marked impairments in higher mental functions, severely altering a person's ability to learn and remember information. Very high doses cause respiratory depression and death. If combined with other depressants of the central nervous system, much lower doses of alcohol will produce the effects just described.

Repeated use of alcohol can lead to dependence. Sudden cessation of alcohol intake is likely to produce withdrawal symptoms, including severe anxiety, tremors, hallucinations, and convulsion. Alcohol withdrawal can be life-threatening. Long-term consumption of large quantities of alcohol, particularly when combined with poor nutrition, can also lead to permanent damage to vital organs such as the brain and the liver.

Mothers who drink alcohol during pregnancy may give birth to infants with fetal alcohol syndrome. These infants have irreversible abnormalities and mental retardation. In addition, research indicates that children of alcoholic parents are at greater risk than other youngsters of becoming alcoholics.

Trahanas-NU001392

**Appendix B.**
Programs available to
students and employees

**Counseling and Psychological Services (CAPS).** Northwestern's Counseling and Psychological Service is a university counseling center that provides counseling, crisis intervention, consultation, and outreach services for the university community. Students may seek assistance through CAPS for alcohol or substance abuse in a variety of ways. All students who seek counseling service from CAPS are screened during the assessment interview for their level of alcohol and substance use. CAPS professionals are also available for consultation with others in the University community who are concerned about a student's alcohol and substance abuse, and will assist others in planning how to refer a student for assessment and treatment. CAPS also consults regularly with the NU Health Services Alcohol and Substance Abuse Education program.

CAPS offers a variety of treatment alternatives depending upon the level of intervention needed by the student. Frequently CAPS will refer to community resources specializing in alcohol-substance abuse treatment after an initial consultation and assessment. If a student has NU student insurance, CAPS professional staff may authorize utilization of the policy for inpatient, day hospital, or outpatient services. In cases where students are referred to outside resources and CAPS has a written release of information, CAPS professionals may consult with the student's treatment providers and serve as a professional resource for the student and the treatment provider, helping to arrange medical withdrawals, medical clearance for re-entry, and follow-up services at CAPS or in the community.

**PHE.** Peer Health Educators (PHE) is a student group created for the University community. It is affiliated with BACCHUS, a national and community action program for alcohol abuse prevention. In addition, Peer Health Educators address alcohol abuse within the context of other health issues, including stress management, sexual health, violence, prevention, decision-making, and self-esteem.

The Peer Health Educators present firesides and conduct other educational programs on a variety of health-related topics. They receive extensive training on such issues as alcohol, tobacco, and other drug abuse; sexual health promotion; exercise and fitness; stress management; healthy eating and eating disorders. Furthermore, they receive skill-based training on such areas as communication, conflict resolution, cultural competence, and intervention. Among other areas of expertise, they are able to assist in identifying a peer who is affected by alcohol or drug abuse, as well as to provide initial support and additional resources to the affected individuals.

For more information about PHEs, contact the Health Education Department at 847 491-2146.

Trahanas-NU001393

Appendix B.
Programs available to
students and employees,
continued

**ASAEP.** The Alcohol Substance Abuse Education Program (ASAEP) was developed as a means of assisting students who need more alcohol and drug information. ASAEP provides a structured educational environment designed to help students explore attitudes and actions relating to alcohol and drug abuse.

The program is designed to provide accurate information about the psychological and physiological effects of alcohol and substance abuse. It gives students the opportunity to explore their personal reasons for using or abusing alcohol or other substances; examine values and influences associated with such use; explore and discuss responsible drinking behaviors and attitudes; discuss and identify problem drinking, chemical dependency, and appropriate treatment; and identify available campus and community resources.

Students may be referred to ASAEP by members of the University staff, or they may refer themselves to the program. Students involved in ASAEP are expected to abstain from the use of all mood-altering chemicals during the period of their attendance, attend the total program (three sessions of three hours each), participate in the program and complete written assignments, and meet with ASAEP staff at the closing session.

**Faculty and Staff Assistance Program.** Any employee of Northwestern who has a drug or alcohol problem is invited to contact the Faculty and Staff Assistance Program provided to the University by Perspectives, Ltd. to obtain confidential information and assistance. Perspectives, Ltd., can provide counseling and referrals for diagnosis or treatment programs, including Alcoholics Anonymous. Perspectives, Ltd., has a number of offices in the Chicago metropolitan area, including offices near both campuses. Call Perspectives, Ltd., at 800-456-6327. Counselors are available 24 hours a day.

Trahanas-NU001394

72           Appendi

## Appendix C. Controlled Substances -- Uses and Effects

| Drugs CSA Schedules | | Trade or Other Names | Medical Uses | Dependence Physical | Dependence Psycho logical | Tole rance | Duration (Hours) | Usual Methods of Admini stration | Possible Effects | Effects of Overdose | Withdrawal Syndrome |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NARCOTICS** | | | | | | | | | | | |
| Opium | II III V | Dover's Powder, Paregoric, Parepectolin | Analgesic, antidiarrheal | High | High | Yes | 3-6 | Oral, smoked | Euphoria, drowsiness, respiratory depression, constricted pupils, nausea | Slow and shallow breathing, convulsions coma possible death | Watery eyes, runny nose, yawning, loss of appetite, irritability, tremors, panic, cramps, nausea, chills, and sweating |
| Morphine | II III | Morphine, MS Contin, Roxanol, Roxanol SR | Analgesic, antitussive | High | High | Yes | 3-6 | Oral, smoked, injected | | | |
| Codeine | II III V | Tylenol w Codeine, Robitussan AC, Formula w Codeine | Analgesic, antitussive | Moderate | Moderate | Yes | 3-6 | Oral, injected | | | |
| Heroin | II III V | Diacetylmorphine, Horse Smack | None | High | High | Yes | 3-6 | Injected, sniffed, smoked | | | |
| Hydromorphone | II | Dilaudid | Analgesic | High | High | Yes | 3-6 | Oral, injected | | | |
| Meperdine | II | Demerol, Mepergan | Analgesic | High | High | Yes | 3-6 | Oral, injected | | | |
| Methadone | I | Dolophine, Methadone, Methadose | Analgesic | High | High-Low | Yes | 12-24 | Oral injected | | | |
| Other Narcotics | I II III IV V | Numorphan, Percodan, Percocet, Tussionex, Fentnyl, Darvon, Talwin, Lomotil | Analgesic, antidiarrheal, antitussive | High-Low | High-Low | Yes | Variable | Oral, injected | | | |
| **DEPRESSANTS** | IV | | | | | | | | | | |
| Chloral Hydrate | | Noriac | Hypnotic | Moderate | Moderate | Yes | 5-8 | Oral | Slurred speech, disorientation, drunken behavior without odor of alcohol | Shallow respiration, clammy skin, weak and rapid pulse, coma, possible death | Anxiety, insomnia, trem- dele conv. possible death |
| Barbiturates | II III IV | Amytal, Lusate, Nembutal, Phenobarbital | Anasthetic, anticonvulsant, Veterinary euthanasia agent | High-Mod. | High-Mod. | Yes | 1-16 | Oral | | | |
| Benzodiazepines | IV | Xanax, Serax, Valium, Diazepam | Antianxiety, anticonvulsant, sedative, hypnotic | Low | Low | Yes | 4-8 | Oral | | | |
| Methaqualone | I | Quaalude | Sedative, hypnotic | High | High | Yes | 4-8 | Oral | | | |
| Glutethimide | III | Doriden | Sedative, hypnotic | High | Moderate | Yes | 4-8 | Oral | | | |
| Other Depressants | III IV | Equanil, Miltown, Placidyl, Valmid | Antianxiety, sedative, hypnotic | Moderate | Moderate | Yes | 4-8 | Oral | | | |

Trahanas-NU001395

Appendix C. Controlled Substances -- Uses and Effects, continued

| Drugs CSA Schedules | | Trade or Other Names | Medical Uses | Dependence Physical | Psycho-logical | Tole-rance | Duration | Usual Methods of Admini-stration | Possible Effects | Effects of Overdose | Withdrawal Syndrome |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STIMULANTS** | | | | | | | | | | | |
| Cocaine | II | Coke, Flake Snow, Crack | Local anesthetic | Possible | High | Yes | 1-2 | Sniffed, smoked injected | Increased alertness, excitation, pulse rate and blood pressure, insomnia, loss of appetite | Agitation, increase in body hallucinations, convulsions, possible death. | Apathy, long periods of sleep, irritability, depression, disorientation. |
| Amphetamines | II | Biphetamine, Delcobase Desoxyn Dexedrine Obetrol | Attention deficit disorders, narcolepsy, weight control | Possible | High | Yes | 2-4 | Oral, injected | | | |
| Phenmetrazine | II | Preludin | Weight control | Possible | High | Yes | 2-4 | Oral, injected | | | |
| Methylphenidate | II | Ritalin | Attention deficit disorders, narcolepsy | Possible | Moderate | Yes | 2-4 | Oral, injected | | | |
| Other Stimulants | III IV | Adipex, Cylert, Didrex, Sanorex, Tenuate, Tepanil | Weight control | Possible | High | Yes | 2-4 | Oral, injected | | | |
| **HALLUCINOGENS** | | | | | | | | | | | |
| LSD | I | Acid, Microdot | None | None | Unknown | Yes | 8-12 | Oral | Illusions and hallucinations, poor perception of time and distance. | Longer, more intense "trip" episodes, psychosis, death. | Withdrawal syndrome not reported. |
| Mescaline and Peyote | I | Mexc, Buttons, Cactus | None | None | Unknown | Yes | 8-12 | Oral | | | |
| Amphetamine | I | 2,5-DMA, PMA, MDA, MDMA, TPA DOM, DOB | None | Unknown | Unknown | Yes | Variable | Oral, | | | |
| Phencyclidine | II | PCP, Angel Dust, Hog | None | Unknown | High | Yes | Days | Smoked, oral, injected | | | |
| Phencyclidine Analogues | I | PCE PCPy, TCP | None | Unknown | High | Yes | Days | Smoked, oral injected | | | |
| Other Hallucinogens | I | Bufotenine, Icogaine, DMT, DET, Psilocybin, Psilocyn | None | None | Possible Unknown | Yes | Variable | Smoked, oral, injected, sniffed | | | |
| **CANNABIS** | | | | | | | | | | | |
| Marijuana | I | Pot, Acapulco Gold, Grass, Reefer | None | Unknown | Moderate | Yes | 2-4 | Smoked, oral | Euphoria, relaxed appetite, disoriented behavior | Fatigue, paranoia, possible psychosis | Insomnia, hyperactivity, appetite occasionally reported. |
| Tetrahydro-cannabinol | II | THC, Marinol | Cancer chemotherapy | Unknown | Moderate | Yes | 2-4 | Smoked, oral | | | |
| Hashish | I | Hash | None | Unknown | Moderate | Yes | 2-4 | Smoked, oral | | | |
| Hashish Oil | I | Hash Oil | None | Unknown | Moderate | Yes | 2-4 | Smoked, oral | | | |

Trahanas-NU001396

## Appendix D. Federal Trafficking Penalties

| CSA | Penalty 2nd Offense | Penalty 1st Offense | Quantity | Drug | Quantity | Penalty 1st Offense | Penalty 2nd Offense |
|---|---|---|---|---|---|---|---|
| | | | 5-49 gm or 50-499 gm mixture | METHAMPHETAMINE | 50 gm or more or 500 gm or more mixture | | |
| | Not less than 10 years. Not more than 40 years. | Not less than 5 years. Not more than 40 years. | 100-999 gm mixture | HEROIN | 1 kg or more mixture | Not less than 10 years. Not more than life. | Not less than 20 years. Not more than life. |
| I | | | 500-4999 gm mixture | COCAINE | 5 kg or more mixture | | |
| | If death or serious injury, not less than life. | If death or serious injury, not less than 20 years. Not more than life. | 5-49 gm mixture | COCAINE BASE | 50 gm or more mixture | If death or serious injury, not less than 20 years, nor more than life. | If death or serious injury, not less than life. |
| | | | 10-99 gm or 100-99 gm mixture | PCP | 100 gm or more or 1 kg or more mixture | | |
| | Fine of not more than $4 million individual, $10 million other than individual. | Fine of not more than $2 million individual, $5 million other than individual. | 1-10 gm mixture | LSD | 10 gm or more mixture | Fine of not more than $4 million individual, $10 million other than individual. | Fine of not more than $8 million individual, $20 million other than individual. |
| II | | | 40-399 gm mixture | FENTANYL | 400 gm or more mixture | | |
| | | | 10-99 gm mixture | FENTANYL ANALOGUE | 100 gm or more mixture | | |

| CSA | Drug | Quantity | First Offense | Second Offense |
|---|---|---|---|---|
| III | Others | Any | Not more than 20 years. If death or serious injury, not less than 20 years, not more than life. Fine $1 million individual, $5 million not individual. | Not more than 30 years. If death or serious injury, life. Fine $2 million individual, $10 million not individual. |
| III | All | Any | Not more than 5 years. Fine not more than $250.00 individual, $1 million not individual. | Not more than 10 years. Fine not more than $500.00 individual, $2 million not individual. |
| IV | All | Any | Not more than 3 years. Fine not more than $250.00 individual, $1 million not individual. | Not more than 6 years. Fine not more than $500.00 individual, $2 million not individual. |
| V | All | Any | Not more than 1 year. Fine not more than $100.00 individual, $250.00 not individual. | Not more than 2 years. Fine not more than $200.00 individual, $500.00 not ind. |

*Law as originally enacted states 100 gm. Congress requested to make technical correction to 1 kg.      Does not include marijuana, hashish, or hashish oil.

### Federal Trafficking Penalties - Marijuana

| Quantity | Description | First Offense | Second Offense |
|---|---|---|---|
| 1,000 kg or more; or 1,000 or more plants | Marijuana Mixture containing detectable quantity* | Not less than 10 years, not more than life. If death or serious injury, not less than 20 years, not more than life. Fine not more than $4 million individual, $10 million other than individual. | Not less than 20 years, not more than life. If death or serious injury, not less than life. Fine not more than $8 million other than individual. $20 million other than individual. |
| 100 kg to 1,000 kg; or 100-999 plants | Marijuana Mixture containing detectable quantity* | Not less than 5 years, not more than 40 years. If death or serious injury, not less than 20 years, not more than life. Fine not more than $2 million individual, $5 million other than individual. | Not less than 10 years, not more than life. If death or serious injury, not less than life. Fine not more than $4 million individual, $10 million other than individual. |
| 50 to 100 kg | Marijuana | Not more than 20 years. If death or serious injury, not less than 20 years, life. Fine $1 million individual. | Not more than 30 years. If death or serious injury, life. Fine $2 million other than individual. $10 million other than individual. |
| 10 to 100 kg | Hashish | | |
| 1 to 100 kg | Hashish Oil | | |
| 50-99 plants | Marijuana | | |
| Less than 50 kg | Marijuana | Not more than 5 years. Fine not more than $250,000. $1 million other than individual. | Not more than 10 years. Fine $500,000 individual. $2 million other than individual. |
| Less than 10 kg | Hashish | | |
| Less than 1 kg | Hashish Oil | | |

* Includes Hashish and Hashish Oil

Trahanas-NU001397

Appendices                                                                                   75

Appendix E.
Federal penalties and
sanctions for illegal
possession of a
controlled substance

**21 U.S.C. 844(a)**  First conviction: up to one year imprisonment and fined at least $1,000 but not more than $100,000, or both.

After one prior drug conviction: at least fifteen days in prison, not to exceed two years, and fined at least $2,500 but not more than $250,000, or both.

After two or more prior drug convictions: at least ninety days in prison, not to exceed three years, and fined at least $5,000 but not more than $250,000, or both.

Special sentencing provisions for possession of crack cocaine.  Mandatory imprisonment of at least five years, not to exceed twenty years, and fined up to $250,000 or both, if:

a)  First conviction and the amount of crack possessed exceed five grams;
b)  Second crack conviction and the amount of crack possessed exceeds three grams;
c)  Third or subsequent crack conviction and the amount of crack possessed exceeds one gram.

**21 U.S.C. 853(a)(2) and 831(a)(7)**  Forfeiture of personal and real property used to possess or to facilitate possession of a controlled substance if that offense is punishable by more than one year imprisonment.  (see the special sentencing provisions immediately above with respect to crack.)

**21 U.S.C. 881(a)(4)**  Forfeiture of vehicles, boats, aircraft, or any other conveyance used to transport or conceal a controlled substance.

**21 U.S.C. 844(a)**  Civil fine of up to $10,000 (pending adoption of final regulations).

**1 U.S.C. 853a**  Denial of federal benefits, such as student loans, grants, contracts, and professional and commercial licenses, up to one year for the first offense, up to five years for the second and subsequent offenses.

**18 U.S.C. 922(g)**  Ineligible to receive or purchase a firearm.

76                                                                                                Appendix

Appendix F. Illinois trafficking penalties - controlled substances

| Drug | Amount | Felony Status | Prison Term | Fine |
|---|---|---|---|---|
| Any substance containing HEROIN or analog thereof | >10 - 15 grams | Class 1 | 3-15 years | Up to $250,000 |
| | 15 - 99 grams | Class X | 6-30 years | Up to $500,000 |
| | 100 - 399 grams | Class X | 9-40 years | Up to greater of $500,000 or full street value |
| | 400 - 899 grams | Class X | 12-50 years | Up to greater of $500,000 or full street value |
| | 900+ grams | Class X | 15-60 years | Up to greater of $500,000 or full street value |
| Any substance containing COCAINE or analog thereof | >1 - 15 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 15- 99 grams | Class X | 6-30 years | Up to $500,000 |
| | 100 - 399 grams | Class X | 9-40 years | Up to greater of $500,000 or full street value |
| | 400 - 899 grams | Class X | 12-20 years | Up to greater of $500,000 or full street value |
| | 900+ grams | Class X | 15-60 years | Up to greater of $500,000 or full street value |
| Any substance containing MORPHINE or analog thereof | >1-15 grams | Class X | 4-15 years | Up to $250,000 |
| | 15-99 grams | Class X | 6-30 years | Up to $500,000 |
| | 100-399 grams | Class X | 9-40 years | Up to greater of $500,000 or full str. value |
| | 400-899 grams | Class X | 12-50 years | Up to greater of $500,000 or full street value |
| | 900+ grams | Class X | 15-60 years | Up to greater of $500,000 or full street value |
| Any substance containing PEYOTE or analog thereof | >50-200 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 200+ grams | Class X | 6-30 years | Up to $500,000 |
| Any substance containing BARBITURIC or analog thereof | >50-200 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 200+ grams | Class X | 6-30 years | Up to $500,000 |
| Any substance containing AMPHETAMINE or METHAMPHETAMINE or analog thereof | 5-200 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 200+ grams | Class X | 6-30 years | Up to $500,000 |

Trahanas-NU001399



Appendices                                                                                                      77

| Drug | Amount | Felony Status | Prison Term | Fine |
|------|--------|---------------|-------------|------|
| Any substance containing LSD or analog thereof | 3-9 grams or >3-9 objects/parts | Class 1 | 4-15 years | Up to $250,000 |
| | 10-99 grams or >10 objects/parts | Class X | 6-30 years | Up to $500,000 |
| | 100-399 grams | Class X | 9-40 years | Up to greater of $500,000 or full street value |
| | 400-899 grams | Class X | 12-50 years | Up to greater of $500,000 or full street value |
| | 900 + grams | Class X | 15-60 years | Up to greater of $500,000 or full street value |
| Any Substance containing PENTAZOCINE, METHAQUALONE or PCP or analog thereof | >10-30 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 30 + grams | Class X | 6-30 years | Up to $500,000 |
| Any substance containing a substance or analog of substance classified in Schedules I or II, but not listed here | 50-200 grams | Class 1 | 4-15 years | Up to $250,000 |
| | 200 + grams | Class X | 6-30 years | Up to $500,000 |
| Any substance or analog classified in Schedules I or II which is a narcotic drug | Any amount not listed above | Class 2 | 3-7 years | Up to $200,000 |
| Any substance or analog classified in Schedules I or II which is not a narcotic drug | | Class 3 | 2-5 years | Up to $150,000 |
| Any substance classified in Schedule III | | Class 3 | 2-5 years | Up to $125,000 |
| Any substance classified in Schedule IV | | Class 3 | 2-5 years | Up to $100,000 |
| Any substance classified in Schedules V | | Class 3 | 2-5 years | Up to $75,000 |

Trahanas-NU001400

78                                                                                                    Appendices

Appendix G. Illinois trafficking penalties for possession of a controlled substance

| Drug | Amount | Felony | Prison Term | Fine |
|---|---|---|---|---|
| Any substance containing HEROIN | 15-99 grams | Class 1 | 4-15 years | Up to $200,000 |
| | 100-399 grams | Class 1 | 6-30 years | Up to greater of $200,000 or full street value |
| | 400-899 grams | Class 1 | 8-40 years | Up to greater of $200,000 or full street value |
| | 900+ grams | Class 1 | 10-50 years | Up to greater of $200,000 or full street value |
| Any substance containing COCAINE | 15-99 grams | Class 1 | 4-15 years | Up to $200,000 |
| | 100-399 grams | Class 1 | 6-30 years | Up to greater of $200,000 or full street value |
| | 400-899 grams | Class 1 | 8-40 years | Up to greater of $200,000 or full street value |
| | 900+ grams | Class 1 | 10-50 years | Up to greater of $200,000 or full street value |
| Any substance containing MORPHINE | 15-99 grams | Class 1 | 4-15 years | Up to $200,000 |
| | 100-399 grams | Class 1 | 6-30 years | Up to greater of $200,000 or full street value |
| | 400-899 grams | Class 1 | 8-40 years | Up to greater of $200,000 or full street value |
| | 900+ grams | Class 1 | 10-50 years | Up to greater of $200,000 or full street value |
| Any substance containing PEYOTE | 200+ grams | Class 1 | 4-15 years | Up to $200,000 |
| Any substance containing a derivative of BARBITURIC ACID | 200+ grams | Class 1 | 4-15 years | Up to $200,000 |
| Any substance containing AMPHETAMINE or METHAMPHETAMINE | 200+ grams | Class 1 | 4-15 years | Up to $200,000 |
| Any substance containing LSD | 10-99 grams 10+ objects/parts | Class 1 | 4-15 years | Up to $200,000 |
| | 100-399 grams | Class 1 | 6-30 years | Up to greater of $200,000 or full street value |
| | 400-899 grams | Class 1 | 8-40 years | Up to greater of $200,000 or full street value |
| | 900+ grams | Class 1 | 10-50 years | Up to greater of $200,000 or full street value |
| Any substance containing PENTAZOCINE, METHAQUALONE, or PCP | 30+ grams | Class 1 | 4-15 years | Up to $200,000 |
| Any substance in Schedules I or II as a narcotic | 200+ grams | Class 1 | 4-15 years | Up to $200,000 |
| Any controlled substance | Any other amount | Class 4 | 1-3 years | Up to $15,000 |

Trahanas-NU001401



Appendices                                                                                  79

Appendix H. Illinois penalties for marijuana (includes hashish) trafficking

| Amount | Classification | Prison Term | Fine |
|---|---|---|---|
| Up to 2.5 grams | Class B Misdemeanor | Up to 6 months | Up to $500 |
| 2.6 - 10.0 grams | Class A Misdemeanor | Less than 1 year | Up to $1,000 |
| 10.1 - 30.0 grams | Class 4 Felony | 1 - 3 years | Up to $10,000 |
| 30.1 - 500.00 grams | Class 3 Felony | 2 - 5 years | Up to $50,000 |
| More than 500 grams | Class 2 Felony | 3 - 7 years | Up to $100,000 |

## ILLINOIS PENALTIES FOR POSSESSION OF MARIJUANA (INCLUDES HASHISH)

| Amount | Classification | Prison Term | Fine |
|---|---|---|---|
| Up to 2.5 grams | Class C Misdemeanor | Up to 30 days | Up to $500 |
| 2.6 - 10.0 grams | Class B Misdemeanor | Up to 6 months | Up to $500 |
| 10.1 - 30.0 grams | Class A Misdemeanor | Less than 1 year | Up to $1,000 |
|  | Class 4 Felony for 2d and subsequent offenses | 1 - 3 years | Up to $10,000 |
| 30.1 - 500.0 grams | Class 4 Felony | 1 - 3 years | Up to $10,000 |
|  | Class 3 Felony for 2nd and subsequent offenses | 2 - 5 years | Up to $10,000 |
| More than 500 grams | Class 3 Felony | 2 - 5 years | Up to $10,000 |

Trahanas-NU001402

80

| Useful phone numbers | University Police Emergency Phone | 911 |
|---|---|---|
| | Non-emergency, Evanston | 1-3456 |
| | Non-emergency, Chicago | 3-3456 |
| | Benefits | 1-7513 |
| | Cashiers, Bursar Office, Evanston | 1-5343 |
| | Chicago | 3-8525 |
| | Chicago Campus Human Resources Office, Abbott Hall | 3-8481 |
| | Child Care and Family Resources | 3-6631 |
| | Compensation | 1-7506 |
| | Credit Union | 1-3062 |
| | Disability Services | 1-7458 |
| | Equal Employment Opportunity and Affirmative Action | 1-7461 |
| | Employment, Evanston | 1-7507 |
| | Chicago | 3-8481 |
| | Employee Relations, Evanston | 1-7507 |
| | Chicago | 3-8481 |
| | Faculty and Staff Assistance Program | |
| | Perspectives, Ltd., 24 hours | 800-456-6327 |
| | Payroll | 1-7362 |
| | Parking, Chicago | 3-8129 |
| | Evanston | 1-3319 |
| | Records | 1-7362 |
| | Training and Development | 7-5081 |
| | School of Continuing Studies, Evanston | 1-4114 |
| | Chicago | 3-6950 |
| | University Library | 1-7658 |

Trahanas-NU001403



Trahanas-NU001404

# EXHIBIT B
# DEP. EX. 8

05/28/2013 TUE 15:08 FAX Pulmonary Northwestern ☑002/005

# Performance Excellence Annual Plan

*With this document managers and employees together set performance objectives, review quarterly progress, assess Northwestern behaviors, track development objectives, and rate performance for the entire year.*

**Note:** *To navigate through this document, use your tab key or mouse. Type in the grey text fields. Use your cursor to click on the appropriate box for the year-end ratings.*



NORTHWESTERN
UNIVERSITY

Employee: Diane Trahanas
Manager: Steven Schwulst
Start – End: 6/12

Employee ID number: 1079557
Updated: 5/13

---

## PERFORMANCE OBJECTIVES

| | |
|---|---|
| **Objective 1:** | **Quarterly Progress:** |
| Mouse Handling | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☐5 ☒6 ☐7

| | |
|---|---|
| **Objective 2:** | **Quarterly Progress:** |
| Cell Isoation/Processing | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☒5 ☐6 ☐7

| | |
|---|---|
| **Objective 3:** | **Quarterly Progress:** |
| Flow Cytometry | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☒5 ☐6 ☐7

| | |
|---|---|
| **Objective 4:** | **Quarterly Progress:** |
| Data Analysis | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☒5 ☐6 ☐7

| | |
|---|---|
| **Objective 5:** | **Quarterly Progress:** |
| Data/Record Management | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☐5 ☒6 ☐7

| | |
|---|---|
| **Objective 6:** | **Quarterly Progress:** |
| Grant Accounting | |

Year-End Rating: ☐1 ☐2 ☐3 ☐4 ☒5 ☐6 ☐7

---

*If you need to add more objectives: Please do not try to add rows or columns to this form. Instead, type additional objectives, quarterly progress, and year-end ratings in the grey text box below. You will end up with running text to be spaced as you wish. Remember to focus on your highest priorities and add objectives only if necessary.*



EXHIBIT

8

Trahanas 1/5/18

1

Trahanas-NU000040

05/28/2013 TUE 15:08 FAX Pulmonary Northwestern ☑003/005

# Performance Excellence Annual Plan

**NORTHWESTERN BEHAVIORS**

## Coachability

*Being receptive to feedback; willing to learn; embracing continuous improvement.*

**Quarterly Progress:**

Year-End Rating: ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5  ☒ 6  ☐ 7

## Collegiality

*Being helpful, respectful, approachable, and team oriented; building strong working relationships and a positive work environment.*

**Quarterly Progress:**

Year-End Rating: ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5  ☒ 6  ☐ 7

## Communication

*Balancing listening and talking; speaking and writing clearly and accurately; influencing others; keeping others informed.*

**Quarterly Progress:**

Year-End Rating: ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5  ☒ 6  ☐ 7

## Compliance

*Honoring University policies and regulatory requirements.*

**Quarterly Progress:**

Year-End Rating: ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5  ☒ 6  ☐ 7

## Customer Focus

*Striving for high customer satisfaction; going out of the way to be helpful and pleasant; making it as easy as possible for the customer (rather than the department or the University).*

**Quarterly Progress:**

Year-End Rating: ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☒ 5  ☐ 6  ☐ 7

2

Trahanas-NU000041

05/28/2013 TUE 15:09 FAX Pulmonary Northwestern ☒004/005

# Performance Excellence Annual Plan

## NORTHWESTERN BEHAVIORS, *continued*

| **Efficiency** | **Quarterly Progress:** |
|---|---|
| *Planning ahead; managing time well; being on time; being cost conscious; thinking of better ways to do things.* | Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☒ 6 ☐ 7 |

| **Initiative** | **Quarterly Progress:** |
|---|---|
| *Taking ownership of work; doing what is needed without being asked; following through.* | Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7 |

| **Leadership** *(as applicable)* | **Quarterly Progress:** |
|---|---|
| *Setting clear expectations; reviewing progress; providing feedback and guidance; holding people accountable.* | Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7 |

## DEVELOPMENT OBJECTIVES

| **Objective 1:** | **Quarterly Progress:** |
|---|---|
| Advanced Flow Cytometry | Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7 |

| **Objective 2:** | **Quarterly Progress:** |
|---|---|
| Manuscript Preparation | Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☒ 6 ☐ 7 |

*If you need to add more objectives: Please do not try to add rows or columns to this form. Instead, type additional objectives, quarterly progress, and year-end ratings in the grey text box below. You will end up with running text to be spaced as you wish. Remember to focus on your highest priorities and add objectives only if necessary.*

3

Trahanas-NU000042

05/28/2013 TUE 15:09 FAX Pulmonary Northwestern ☑005/005

## Performance Excellence Annual Plan

**OVERALL YEAR-END RATING**

☐ 1 = Unsatisfactory      **Comments:**

☐ 2 = Needs Improvement

☐ 3 = Moderately Effective

☐ 4 = Effective

☒ 5 = Highly Effective

☐ 6 = Outstanding

☐ 7 = Role Model

*See definitions and guidelines
on next page.*

Employee's signature: _____     Date: 5/28/2013

*This signature indicates that the employee has read, but does not necessarily agree with, the year-end rating.
The employee may attach a response page, if he or she wishes.*

Manager's signature: _____     Date:

Manager's supervisor signature (optional): _____     Date:

4

Trahanas-NU000043

# EXHIBIT B
# DEP. EX. 9

## Performance Excellence Annual Plan

*With this document managers and employees together set performance objectives, review quarterly progress, assess Northwestern behaviors, track development objectives, and rate performance for the entire year.*

*Note: To navigate through this document, use your tab key or mouse. Type in the grey text fields. Use your cursor to click on the appropriate box for the year-end ratings.*



NORTHWESTERN
UNIVERSITY

Employee: Diane Trahanas

Manager: Steven Schwulst

Start – End: 4/13 - 4/14

Employee ID number: 1079557

Updated: 4/17/14

---

### PERFORMANCE OBJECTIVES

| **Objective 1:** | **Quarterly Progress:** |
|---|---|
| Enhance flow cytometry skills | Exceeds Expectations |

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

---

| **Objective 2:** | **Quarterly Progress:** |
|---|---|
| Improve quality of benchwork | Meets Expectations |

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

| **Objective 3:** | **Quarterly Progress:** |
|---|---|
| Better account management | Moderately effective |

Year-End Rating: ☐ 1 ☐ 2 ☒ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7

---

| **Objective 4:** | **Quarterly Progress:** |
|---|---|
| | |

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7

---

| **Objective 5:** | **Quarterly Progress:** |
|---|---|
| | |

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7

---

| **Objective 6:** | **Quarterly Progress:** |
|---|---|
| | |

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7

---

*If you need to add more objectives: Please do not try to add rows or columns to this form. Instead, type additional objectives, quarterly progress, and year-end ratings in the grey text box below. You will end up with running text to be spaced as you wish. Remember to focus on your highest priorities and add objectives only if necessary.*



EXHIBIT
9
Trahanas 1/5/18

1

Trahanas-NU000046

## Performance Excellence Annual Plan

### NORTHWESTERN BEHAVIORS

**Coachability**

*Being receptive to feedback;
willing to learn; embracing
continuous improvement.*

**Quarterly Progress:**

Exceeds expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

---

**Collegiality**

*Being helpful, respectful, approachable,
and team oriented; building strong
working relationships and a positive work
environment.*

**Quarterly Progress:**

Meets expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

**Communication**

*Balancing listening and talking;
speaking and writing clearly and
accurately; influencing others;
keeping others informed.*

**Quarterly Progress:**

Exceeds expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

---

**Compliance**

*Honoring University policies and
regulatory requirements.*

**Quarterly Progress:**

Exceeds expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

---

**Customer Focus**

*Striving for high customer satisfaction;
going out of the way to be helpful and
pleasant; making it as easy as possible
for the customer (rather than the
department or the University).*

**Quarterly Progress:**

Exceeds expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

2

Trahanas-NU000047

## Performance Excellence Annual Plan

**NORTHWESTERN BEHAVIORS**, *continued*

---

**Efficiency**

*Planning ahead; managing time well;*
*being on time; being cost conscious;*
*thinking of better ways to do things.*

**Quarterly Progress:**

Meets expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

**Initiative**

*Taking ownership of work;*
*doing what is needed without*
*being asked; following through.*

**Quarterly Progress:**

Meets expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

**Leadership** *(as applicable)*

*Setting clear expectations; reviewing*
*progress; providing feedback and*
*guidance; holding people accountable.*

**Quarterly Progress:**

Meets expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

**DEVELOPMENT OBJECTIVES**

---

**Objective 1:**

Devise an independent side project

**Quarterly Progress:**

Meets expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☒ 4 ☐ 5 ☐ 6 ☐ 7

---

**Objective 2:**

Write an original manuscript and present

at a national meeting

**Quarterly Progress:**

Exceeds expectations

Year-End Rating: ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☒ 5 ☐ 6 ☐ 7

---

*If you need to add more objectives: Please do not try to add rows or columns to this form. Instead, type additional objectives,*
*quarterly progress, and year-end ratings in the grey text box below. You will end up with running text to be spaced as you wish.*
*Remember to focus on your highest priorities and add objectives only if necessary.*

3

## Performance Excellence Annual Plan

OVERALL YEAR-END RATING

☐ 1 = Unsatisfactory

☐ 2 = Needs Improvement

☐ 3 = Moderately Effective

☐ 4 = Effective

☒ 5 = Highly Effective

☐ 6 = Outstanding

☐ 7 = Role Model

*See definitions and guidelines*
*on next page.*

**Comments:**

Ms. Trahanas has improved her performance in most areas with a particular emphasis on advanced flow cytometry skills. She should be considered for a performance based raise. Areas for improvement include a more detailed management of accounts and better interpersonal communication with members of the laboratory.

Employee's signature: _____     Date: 4/17/14

*This signature indicates that the employee has read, but does not necessarily agree with, the year-end rating.*
*The employee may attach a response page, if he or she wishes.*

Manager's signature: _____     Date: 4/17/14

Manager's supervisor signature (optional): _____     Date:

4

Trahanas-NU000049

# EXHIBIT B
# DEP. EX. 10

| | |
|---|---|
| **From:** | Diane Trahanas |
| **To:** | Steven Schwulst |
| **Subject:** | Morning Meeting |
| **Date:** | Monday, March 17, 2014 11:39:14 PM |

Hello Steve,

Just wanted to say Thank you again for meeting with me earlier today and being receptive. I'm excited with where things are going. Can't wait until SHOCK and this paper and the new stuff gets fine tuned.

See you in the morning.

Sincerely,
Diane

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260



EXHIBIT

1C

Trahanas 1/5/18

CONFIDENTIAL

Trahanas-NU009952

# EXHIBIT B
# DEP. EX. 11



Diane Trahanas <diane.trahanas@gmail.com>

## Fwd: Positions Update
2 messages

**Schwulst, Steven** <SSCHWULS@nmh.org>                    Mon, Mar 17, 2014 at 2:15 PM
To: Diane Trahanas <Diane.Trahanas@gmail.com>

FYI--

Begin forwarded message:

From: "Buikema, Nicole" <nashmus1@nmh.org<mailto:nashmus1@nmh.org>>
Subject: RE: Positions Update
Date: March 17, 2014 2:07:23 PM CDT
To: "Schwulst, Steven" <SSCHWULS@nmh.org<mailto:SSCHWULS@nmh.org>>
Cc: "Rufer, Rachel" <rrufer@nmh.org<mailto:rrufer@nmh.org>>, "Dulek, Krissy" <kdulek@nmh.org<mailto:kdulek@nmh.org>>

Steve,

I actually transitioned out of the Department of Surgery and into the BCVI several months ago so I am no longer in the Professional Affairs role.  However, I can tell you that we will be entering our reappointment/merit increase cycle for all NU employees within the next 4-8 weeks.  When you complete her annual review, you will also have the opportunity to propose a merit increase for her which would be effective on 9/1.  Rachel Rufer or Krissy Dulek will be in touch with specific information about this process in the coming weeks.

you are looking to promote her, that will require a slightly different process but we should certainly begin those conversations sooner than later to ensure that a new position is entered into the budget and would then go into effect on 9/1, provided it is approved by the HR Compensation team.

I've copied both Rachel and Krissy on my response so they can be in touch with next steps.

Best,
Nicole

Nicole Buikema
Bluhm Cardiovascular Institute
312.926.8686

From: Schwulst, Steven
Sent: Monday, March 17, 2014 10:23 AM
To: Buikema, Nicole
Subject: Re: Positions Update

Nicole,

My lab tech is approaching her 2 year anniversary in the lab and we have started talking about raises and possibly retitling her position to a higher level.  What would that involve and what would be the process to do this?

Thanks,

Steve

Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery



EXHIBIT
11
Trahanas 1/5/18

Northwestern University
Department of Surgery
Trauma and Critical Care
376 N. St. Clair St., Suite 650
Chicago, IL 60611
Office Phone (312) 695-3903
Lab Phone (312) 503-6260
Fax (312) 695-3644

This message and any included attachments are intended only for the addressee. The information contained in this message is confidential and may constitute proprietary or non-public information under international, federal, or state laws. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and notify the sender of the delivery error by e-mail.

**Diane Trahanas** <diane.trahanas@gmail.com>                    Tue, Dec 16, 2014 at 12:05 PM
To: d-fernandez@northwestern.edu

This is the original email with mention of the promotion back in March.

[Quoted text hidden]

Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

Trahanas 22

# EXHIBIT B
# DEP. EX. 13

## Daina L Fernandez

**From:** Daina L Fernandez
**Sent:** Wednesday, January 14, 2015 3:43 PM
**To:** Heather Allwyn Burke
**Subject:** FW: Promotion

Heather,

Please follow up with Diana Trahanas. She has reached out to me before. We do not process these unless there is approval via Department and Central FSM. Annette Czech in Compensation would and will process IF approved. Please sit down with Dr. Schwulst to discuss whether he has the funding and approval or not. We should not be making these types of promises to employees if we don't have the funding or approval. Please follow up as appropriate. I'm concerned that this employee might escalate, so please see what you can do by working internally and perhaps with Kathleen Dunne.

Thanks, Daina

Daina Fernandez, M.A., PHR
HR Consultant
Northwestern University
720 University Place
Evanston, IL 60208

'hone: (847) 491-8575 Evanston Tu/Th
Phone: (312) 503-1762 Chicago Mon/Wed/Fri
Fax: (847) 467-2688 Evanston
Fax: (312) 503-1741 Chicago

**From:** Daina L Fernandez
**Sent:** Wednesday, January 14, 2015 9:45 AM
**To:** 'Diane Trahanas'
**Cc:** Steven Schwulst
**Subject:** RE: Promotion

Diane,

I have emailed our Compensation Analyst, and will follow up today to see what conversations she has had about this. I see from the long email trail that there were concerns about the budget timing, funding and Dean's approval. I'll have to touch bases with Annette to see what agreements, if any have been made and whether this is something that has been addressed and approved through central FSM. I have a call with her later today on another matter, so I'll be sure to discuss with her

Thanks for your patience,
Daina

Daina Fernandez, M.A., PHR
HR Consultant
Northwestern University
720 University Place



EXHIBIT
13
Trahanas 1/5/18

1

Trahanas-NU001886

**CONFIDENTIAL**

vanston, IL 60208

Phone: (847) 491-8575 Evanston Tu/Th
Phone: (312) 503-1762 Chicago Mon/Wed/Fri
Fax: (847) 467-2688 Evanston
Fax: (312) 503-1741 Chicago

**From:** Diane Trahanas [mailto:diane.trahanas@gmail.com]
**Sent:** Tuesday, January 13, 2015 2:49 PM
**To:** Daina L Fernandez
**Cc:** Steven Schwulst
**Subject:** Re: Promotion

Hello Daina.

I hope this email finds you well. It has been well over a month and I am still waiting on an answer and my promotion to be backdated and taken into effect. My accountant will be doing my taxes and needs to have all the correct information as soon as possible.

Please let me know when I should expect the changes to be implemented and deposited. As I said before, there should be no reason as to why this is taking so long- other promotions and pay raises took into effect immediately for other employees. We are talking about almost a year here- since last March. I feel like I am being misinformed purposely by the department and my time for my level of work and credentials is not properly being compensated. I have been patient and humbly await for your information and response.


Thank You,
Diane


On Wed, Jan 7, 2015 at 12:57 PM, Diane Trahanas <diane.trahanas@gmail.com> wrote:

Hello Daina.

Happy New Year!

Please let me know if you have any more information regarding the promotion. There are changes that need to be made in association with this decision. (I have spoken to a few others and they have informed me that once a promotion or title change was given to them, their next pay check or the next month's paycheck reflected their promotion and pay increase. It will be almost one year that I have been fulfilling these promotional duties and have not been paid. In addition, my taxes will need to be completed accordingly.

Sincerely,




On Tue, Dec 16, 2014 at 3:01 PM, Daina L Fernandez <d-fernandez@northwestern.edu> wrote:

2

**Trahanas-NU001887**

CONFIDENTIAL

Diane,

It has to do with the review dates/processes for these types of requests throughout the year. Instead of taking in the requests one at a time; Compensation has requested that they come in during the off cycle. I have an email in to our Comp Analyst so that we can discuss anything she might be aware of. Heather Burke, as Administrator seems to be in the loop which is good.

Best,

Daina

Daina Fernandez, M.A., PHR

HR Consultant

Northwestern University

720 University Place

Evanston, IL 60208

Phone: (847) 491-8575 Evanston Tu/Th

Phone: (312) 503-1762 Chicago Mon/Wed/Fri

Fax: (847) 467-2688 Evanston

Fax: (312) 503-1741 Chicago

**From:** Diane Trahanas [mailto:diane.trahanas@gmail.com]
**Sent:** Tuesday, December 16, 2014 2:01 PM
**To:** Daina L Fernandez
**Subject:** Fwd: Promotion

Hello Diane.

3

Trahanas-NU001888

**CONFIDENTIAL**

I am a bit confused again. I am not understanding why Dr. Schwulst needs to submit all this unnecessary paperwork, for something that was submitted and agreed upon back in March.

In addition, the raise was supposed to be agreed upon back In September (Start of the Fiscal year) and as seen in our emails, we were waiting until Dr. Schwulst got back from clinical service so him and I could talk about the promotion/raise.

The emails between Dept. of Surgery HR and I show that when Dr. Schwulst and I come to an agreement, the promotion/raise would be sent to the Dean for his signature/approval.

Why is there even mention of an off cycle budget? This is something that was during the fiscal year cycle.

Please let me know how to proceed.

Thank you for your time and efforts.


Sincerely,

Diane


---------- Forwarded message ----------
From: **Steven J Schwulst** <s-schwulst@northwestern.edu>
Date: Tue, Dec 16, 2014 at 1:15 PM
Subject: Fwd: Promotion
To: Diane Trahanas <Diane.Trahanas@gmail.com>

See below. Can you start this while I am on service?

Steven J. Schwulst, MD, FACS

Assistant Professor of Surgery

Northwestern University

Department of Surgery

676 N. St. Clair St., Suite 650

Chicago, IL 60611

(312) 695-3903


Begin forwarded message:

4

CONFIDENTIAL

**From:** "Burke, Heather" <hburke@nm.org>
**To:** "Steven J Schwulst" <s-schwulst@northwestern.edu>
**Cc:** "Rufer, Rachel" <rrufer@nm.org>, "Scarpelli, Chris" <Cscarpel@nm.org>, "Dulek, Krissy" <kdulek@nm.org>
**Subject: RE: Promotion**

Hi Dr. Schwulst,

The process for requesting an off-cycle increase is attached. This document details the steps in the process, as well as supplementary information that you'll need to provide in order to move forward in the process.

Please let me know if you have any questions.

Thanks,
Heather

Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512 office
hburke@nm.org<mailto:nashmus1@nmh.org>

From: Steven J Schwulst [mailto:s-schwulst@northwestern.edu]
Sent: Friday, December 12, 2014 2:00 PM
To: Burke, Heather
Cc: Diane Trahanas
Subject: Re: Promotion

Thanks Heather,

After further discussion, there is not a written offer that can be shared. Nonetheless, I would really like to push for diane getting higher compensation off-cycle. Please advise on how to proceed.


Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery
Northwestern University
Department of Surgery
Trauma and Critical Care
676 N. St. Clair St., Suite 650
Chicago, IL 60611
Office Phone (312) 695-3903
Lab Phone (312) 503-6260
Fax (312) 695-3644

5

CONFIDENTIAL

Trahanas-NU001890

On Dec 11, 2014, at 2:29 PM, Burke, Heather wrote:

Hi Dr. Schwulst,

The mechanism for securing a higher compensation for Diane would be an off-cycle budget request. Attached is an outline of the off-cycle budget request process and all of the information we would need to proceed. Off-cycle budget requests are usually discouraged, however the fact that Diane does indeed have an offer somewhere else may help the case.

We'll need to learn a bit more about the other offer – can you please send us a copy of her competing offer?

Thanks so much,
Heather


Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512 office
hburke@nm.org<mailto:nashmus1@nmh.org>

From: Steven J Schwulst [mailto:s-schwulst@northwestern.edu]
Sent: Thursday, December 11, 2014 9:22 AM
To: Burke, Heather
Cc: Christopher J Scarpelli; Shapiro, Michael
Subject: Re: Promotion

Heather,

I have a problem. Diane, my research technician, is really unhappy with her compensation and is actively looking for and has received an offer for alternate employment. Other than her compensation, she is happy with the work and the work environment. I cannot afford to have Diane leave right now for a higher paying job, it will bring my research effort to a screeching halt. I need to get her a higher hourly wage. We need to find a way around this. Please advise.


Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery
Northwestern University
Department of Surgery
Trauma and Critical Care
676 N. St. Clair St., Suite 650
Chicago, IL 60611
Office Phone (312) 695-3903
Lab Phone (312) 503-6260
Fax (312) 695-3644

6

**Trahanas-NU001891**

**CONFIDENTIAL**

On Sep 29, 2014, at 12:34 PM, Burke, Heather wrote:


Unfortunately, the Dean's Office won't approve an off-cycle request of this nature due to the timing and source of Diane's salary since it is not funded.

Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512 office
hburke@nmh.org<mailto:nashmus1@nmh.org>

From: Schwulst, Steven
Sent: Monday, September 29, 2014 11:43 AM
To: Burke, Heather
Subject: RE: Promotion

There is now mechanism to increase her salary to a higher percentage until next year?

From: Burke, Heather
Sent: Monday, September 29, 2014 11:42 AM
To: Schwulst, Steven
Cc: Scarpelli, Chris
Subject: RE: Promotion

Dr. Schwulst,

I apologize for my delay, I was out at the end of the last week.

Unfortunately, since this request is now considered an "off-cycle" budget request and Diane's salary isn't funded, it won't be approved by the Dean's office. We will need to make sure we include this promotion and associated salary increase in the budget/salary planning cycle next year.

Also, I see Diane had emailed us late last week, can you please communicate this update to her?

If have any additional questions, please feel free to reach out to Chris Scarpelli directly.

Thanks,
Heather

7

CONFIDENTIAL

Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512 office
hburke@nmh.org<mailto:nashmus1@nmh.org>

From: Schwulst, Steven
Sent: Wednesday, September 24, 2014 4:29 PM
To: Burke, Heather
Subject: RE: Promotion

Heather,

I hate to do this, but I can't afford to lose Diane right now. Can we make her an RT3 at $21/hr. This should placate things for the time being.

Steve

From: Burke, Heather
Sent: Wednesday, September 24, 2014 4:22 PM
To: Schwulst, Steven
Subject: FW: Promotion

Hi Dr. Schwulst,

Please see email below from Diane Trahanas. She reached out to Krissy with questions about her salary letter, which per our conversations, reflects the 3% merit increase that was originally submitted and keeps her at Research Tech. 2. We agreed that promotion would be pursued next year.

Krissy advised that Diane reach out to you directly about this.

Thanks,
Heather


Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512 office
hburke@nmh.org<mailto:nashmus1@nmh.org>

8

CONFIDENTIAL

Trahanas-NU001893

From: Dulek, Krissy
Sent: Wednesday, September 24, 2014 4:18 PM
To: Diane M Trahanas
Cc: Burke, Heather
Subject: RE: Promotion

Hi Diane,

Thanks so much for reaching out to me regarding you concerns. I certainly appreciate the
questions that you have, but unfortunately am not the appropriate person to answer these
questions. I urge you to please reach out to Dr. Schwulst with your concerns. As your
supervisor, he would be your point of contact.

All my best,
Krissy

Krissy Dulek
Manager, Research Administration
Department of Surgery
Feinberg School of Medicine
Northwestern University
Chicago, IL 60611
Ph: 312-926-7287
Fax: 312-926-7404

From: Diane M Trahanas [mailto:diane.trahanas@northwestern.edu]
Sent: Wednesday, September 24, 2014 2:34 PM
To: Dulek, Krissy
Cc: Rufer, Rachel
Subject: Promotion

Hello Krissy.

I have received a letter from Chris Scarpelli about my Annual Merit Increase. I wanted to
inform you that this is not reflective of the promotion Dr. Schwulst issued me back in March.
The title change should be from Research Tech 2 to Research Tech 3. The baseline pay for this
is $20.55-$25.70 with the mid range being $23.13. With 2 Bachelors Degrees and a Masters
Degree the increase is supposed to be at the very minimum mirroring my Research Tech 2
midline pay ($23.13). I have been fulfilling my Research Tech 3 responsibilities since March
and have yet to see the reflected title and pay change. Please let me know what other
information you may need from me. I hope to hear from you soon.

Thank You for your time and efforts.

Sincerely,
Diane

From: Rufer, Rachel [rrufer@nmh.org<mailto:rrufer@nmh.org>]


Sent: Friday, June 27, 2014 2:50 PM

9

Trahanas-NU001894

To: Diane M Trahanas
Cc: Dulek, Krissy
Subject: promotion RE: Chart Strings and Finances for Dr. Schwulst Lab
Hi Diane,

I understand your concern about receiving your promotion. This is something that is in the
works for the new fiscal year which starts September 1.

Please let Krissy or I know if you have any questions.

Thanks,
Rachel


From: Diane M Trahanas [mailto:diane.trahanas@northwestern.edu]
Sent: Friday, June 27, 2014 12:27 PM
To: Rachel C. Rufer
Subject: Chart Strings and Finances for Dr. Schwulst Lab

Hello Rachel.

I have been informed again that the chart string I am using on our animal ordering is incorrect/
or insufficient.
Which Chart string has funds left for me to purchase mice/ lab supplies on?

The new Chart string will not be in effect until July 1st, so I believe I need to use up that older
one first.

In addition, I know Dr. Schwulst submitted the paperwork for my promotion, but I have not
seen the change since the submission. Is there someone I or Dr. Schwulst need to contact? Its
been months that my pay increase has not been in effect- do we need to backdate this?

Thank You for your time and efforts.

Sincerely,
Diane


Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery
Northwestern University
Department of Surgery
Trauma and Critical Care
676 N. St. Clair St., Suite 650
Chicago, IL 60611
Office Phone (312) 695-3903
Lab Phone (312) 503-6260
Fax (312) 695-3644

10

CONFIDENTIAL

Trahanas-NU001895

<Off-Cycle_Increase_Process.pdf>

--

Diane M. Trahanas
Northwestern University

Feinberg School of Medicine

Division of Trauma and Critical Care

Department of Surgery

240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611

Lab: 312.503.6260

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care

11

CONFIDENTIAL

Trahanas-NU001896

Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

12

CONFIDENTIAL

Trahanas-NU001897

# EXHIBIT B
# DEP. EX. 16



**Northwestern Medicine®**
Northwestern University
Feinberg School of Medicine

September 2014

Diane Trahanas
Research Technologist 2
MED-Trauma & Critical

Re: Annual Merit Increase

Dear Diane,

I am pleased to inform you that you are being awarded a merit increased based on your performance over the last review period, as evaluated by your supervisor, as well as the position of your pay rate within the pay range and available funds.

Effective September 1, 2014, your new hourly rate is $20.06 for an annual salary of $39,267.45, which will appear in the paycheck you receive on September 19, 2014.

Your work in the Department of Surgery is greatly appreciated!

Sincerely,

Chris Scarpelli
Department Administrator, Surgery
Northwestern University, Feinberg School of Medicine

EXHIBIT
16
Trahanas 1/5/18

Trahanas 1

# EXHIBIT B
# DEP. EX. 17



## FW: Promotion

**Schwulst, Steven** <SSCHWULS@nmh.org>                     Wed, Sep 24, 2014 at 4:27 PM
To: "Diane.Trahanas@gmail.com" <Diane.Trahanas@gmail.com>

Diane,

Can we talk about this when I am off service?  My impression was that this was a substantial percentage raise (4.5% I think?) and in line with what we discussed at your review.  Please refresh my memory if this is incorrect

Steve

**From:** Burke, Heather
**Sent:** Wednesday, September 24, 2014 4:22 PM
**To:** Schwulst, Steven
**Subject:** FW: Promotion

Hi Dr. Schwulst,

Please see email below from Diane Trahanas. She reached out to Krissy with questions about her salary letter, which per our conversations, reflects the 3% merit increase that was originally submitted and keeps her at Research Tech. 2. We agreed that promotion would be pursued next year.

Krissy advised that Diane reach out to you directly about this.

Thanks,

Heather



EXHIBIT
17
Trahanas 1/5/18
PENGAD 800-631-6989

Heather Burke
Manager of Professional Affairs
Department of Surgery

Northwestern Medical Group

312.926.6512 office
hburke@nmh.org

**From:** Dulek, Krissy
**Sent:** Wednesday, September 24, 2014 4:18 PM
**To:** Diane M Trahanas
**Cc:** Burke, Heather
**Subject:** RE: Promotion

Hi Diane,

Thanks so much for reaching out to me regarding you concerns. I certainly appreciate the questions that you have, but unfortunately am not the appropriate person to answer these questions. I urge you to please reach out to Dr. Schwulst with your concerns. As your supervisor, he would be your point of contact.

All my best,

Krissy

Krissy Dulek

Manager, Research Administration

Department of Surgery

Feinberg School of Medicine

Northwestern University

Chicago, IL 60611

Ph: 312-926-7287

Fax: 312-926-7404

From: Diane M Trahanas [mailto:diane.trahanas@northwestern.edu]

Trahanas 262

**Sent:** Wednesday, September 24, 2014 2:34 PM
**To:** Dulek, Krissy
**Cc:** Rufer, Rachel
**Subject:** Promotion

Hello Krissy.

I have received a letter from Chris Scarpelli about my Annual Merit Increase. I wanted to inform you that this is not reflective of the promotion Dr. Schwulst issued me back in March. The title change should be from Research Tech 2 to Research Tech 3. The baseline pay for this is $20.55-$25.70 with the mid range being $23.13. With 2 Bachelors Degrees and a Masters Degree the increase is supposed to be at the very minimum mirroring my Research Tech 2 midline pay ($23.13). I have been fulfilling my Research Tech 3 responsibilities since March and have yet to see the reflected title and pay change. Please let me know what other information you may need from me. I hope to hear from you soon.

Thank You for your time and efforts.

Sincerely,

Diane

**From:** Rufer, Rachel [rrufer@nuon.org]
**Sent:** Friday, June 27, 2014 2:50 PM
**To:** Diane M Trahanas
**Cc:** Dulek, Krissy
**Subject:** promotion RE: Chart Strings and Finances for Dr. Schwulst Lab

Hi Diane.

I understand your concern about receiving your promotion. This is something that is in the works for the new fiscal year which starts September 1.

Please let Krissy or I know if you have any questions.

Thanks,

Rachel

Trahanas 263

**From:** Diane M Trahanas [mailto:diane.trahanas@northwestern.edu]
**Sent:** Friday, June 27, 2014 12:27 PM
**To:** Rachel C. Rufer
**Subject:** Chart Strings and Finances for Dr. Schwulst Lab

Hello Rachel,

I have been informed again that the chart string I am using on our animal ordering is incorrect/ or insufficient.

Which Chart string has funds left for me to purchase mice/ lab supplies on?

The new Chart string will not be in effect until July 1st, so I believe I need to use up that older one first.

In addition, I know Dr. Schwulst submitted the paperwork for my promotion, but I have not seen the change since the submission. Is there someone I or Dr. Schwulst need to contact? Its been months that my pay increase has not been in effect- do we need to backdate this?

Thank You for your time and efforts.

Sincerely,

Diane

This message and any included attachments are intended only for the addressee. The information contained in this message is confidential and may constitute proprietary or non-public information under international, federal, or state laws. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and notify the sender of the delivery error by e-mail.

**Diane Trahanas** <diane.trahanas@gmail.com>                                    Wed, Sep 24, 2014 at 5:58 PM
To: "Schwulst, Steven" <SSCHWULS@nmh.org>, "Dulek, Krissy" <kdulek@nmh.org>, hburke@nmh.org

Hello Everyone,

I just wanted to keep us all on the same page, so emailing all those concerned with the promotion. Dr. Schwulst is on Clinical Service and I would like to wait to talk with him when he returns to get everything straightened out. His clinical service won't be completed until the end of next week- falling into the month of October. He is very busy during his clinical time and don't think spamming everyone with emails will make any progress.

My concern: Will the clarification/agreement we make when he returns in Oct. take effect for THIS September 2014? If so, I would prefer to wait until Dr. Schwulst returns. However, I am uncertain of how the "fiscal year" rules apply.

Please let us know.

Thank You.

Sincerely,
Diane

[Quoted text hidden]
--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

Schwulst, Steven <SSCHWULS@nmh.org>                      Wed, Sep 24, 2014 at 6:01 PM
To: Diane Trahanas <diane.trahanas@gmail.com>

FYI—

The K resubmission got an absolutely horrible score... over 2.5 x lower than the original submission.

**From:** Diane Trahanas [mailto:diane.trahanas@gmail.com]
**Sent:** Wednesday, September 24, 2014 5:58 PM
**To:** Schwulst, Steven; Julek, Krissy; Burke, Heather
**Subject:** Re: FW: Promotion

[Quoted text hidden]
[Quoted text hidden]

Diane Trahanas <diane.trahanas@gmail.com>                 Wed, Sep 24, 2014 at 6:06 PM
To: "Schwulst, Steven" <SSCHWULS@nmh.org>

did u tell Harris yet?

[Quoted text hidden]

Schwulst, Steven <SSCHWULS@nmh.org>                       Wed, Sep 24, 2014 at 6:08 PM
To: Diane Trahanas <diane.trahanas@gmail.com>

th... we'll have to wait 2 weeks to get the summary statement to see why they thought it was so bad. I'm

frustrated b/c the original submission got a good score with very positive reviews. This is the same grant just with revisions based on the previous reviewer's comments.

**From:** Diane Trahanas [mailto:diane.trahanas@gmail.com]
**Sent:** Wednesday, September 24, 2014 6:06 PM
**To:** Schwulst, Steven
**Subject:** Re: FW: Promotion

[Quoted text hidden]
[Quoted text hidden]

---

**Diane Trahanas** <diane.trahanas@gmail.com>                          Wed, Sep 24, 2014 at 6:16 PM
To: "Schwulst, Steven" <SSCHWULS@nmh.org>

I know its a different institute, however maybe b/c of all this funding being cut- they are shutting more people down and HARD.
I believe this was the grant that Harris made you re write.

1.) Can we submit your original good score submission ?
2.) Can we submit your original good score submission? alongside this "newly scored" submissions edited version?
3.) ?????

#whyaretheysomean

[Quoted text hidden]

---

**ne Trahanas** <diane.trahanas@gmail.com>                          Fri, Sep 26, 2014 at 10:36 AM
'Dulek, Krissy" <kdulek@nmh.org>, hburke@nmh.org

Hello Krissy and Heather.

I am just following up on my email regarding waiting to speak with Dr. Schwulst, when he returns from clinical service about my promotion.

My concern: Will the clarification/agreement we make when he returns in Oct. take effect for THIS September 2014? If so, I would prefer to wait until Dr. Schwulst returns. However, I am uncertain of how the "fiscal year" rules apply.

Please let me know as soon as possible.
Thank You,
Diane
[Quoted text hidden]

---

**Dulek, Krissy** <kdulek@nmh.org>                          Fri, Sep 26, 2014 at 12:18 PM
To: Diane Trahanas <diane.trahanas@gmail.com>, "Burke, Heather" <hburke@nmh.org>

Diane,

Any changes would need to be approved by the FSM Dean's Office. If some change is approved, they can retroact.

Thanks,
Krissy

Trahanas 266

From: Diane Trahanas [diane.trahanas@gmail.com]
Sent: Friday, September 26, 2014 10:36 AM
To: Dulek, Krissy; Burke, Heather
Subject: Re: FW: Promotion

Hello Krissy and Heather.

I am just following up on my email regarding waiting to speak with Dr. Schwulst, when he returns from clinical service about my promotion.

My concern: Will the clarification/agreement we make when he returns in Oct. take effect for THIS September 2014? If so, I would prefer to wait until Dr. Schwulst returns. However, I am uncertain of how the "fiscal year" rules apply.

Please let me know as soon as possible.
Thank You,
Diane

On Wed, Sep 24, 2014 at 5:58 PM. Diane Trahanas <diane.trahanas@gmail.com<mailto:diane.trahanas@gmail.com>> wrote:
Hello Everyone.

I just wanted to keep us all on the same page, so emailing all those concerned with the promotion. Dr. Schwulst is on Clinical Service and I would like to wait to talk with him when he returns to get everything straightened out. His clinical service won't be completed until the end of next week- falling into the month of October. He is very busy during his clinical time and don't think spamming everyone with emails will make any progress.

My concern: Will the clarification/agreement we make when he returns in Oct. take effect for THIS September 2014? If so, I would prefer to wait until Dr. Schwulst returns. However, I am uncertain of how the "fiscal year" rules apply.

Please let us know.

Thank You.

Sincerely,
Diane

On Wed, Sep 24, 2014 at 4:27 PM, Schwulst, Steven <SSCHWULS@nmh.org<mailto:SSCHWULS@nmh.org>> wrote:
Diane.

Can we talk about this when I am off service? My impression was that this was a substantial percentage raise (4.5% I think?) and in line with what we discussed at your review  Please refresh my memory if this is incorrect

Steve
From: Burke, Heather
Sent: Wednesday, September 24, 2014 4:22 PM
To: Schwulst, Steven
Subject: FW: Promotion

Hi Dr. Schwulst.

Please see email below from Diane Trahanas. She reached out to Krissy with questions about her salary letter, which per our conversations, reflects the 3% merit increase that was originally submitted and keeps her at Research Tech. 2. We agreed that promotion would be pursued next year.

issy advised that Diane reach out to you directly about this

Thanks,
Heather


Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

312.926.6512<tel:312.926.6512> office
hburke@nmh.org<mailto:nasnmus1@nmh.org>

From: Dulek, Krissy
Sent: Wednesday, September 24, 2014 4:18 PM
To: Diane M Trahanas
Cc: Burke, Heather
Subject: RE: Promotion

Hi Diane,

Thanks so much for reaching out to me regarding you concerns. I certainly appreciate the questions that you have, but unfortunately am not the appropriate person to answer these questions. I urge you to please reach out to Dr. Schwulst with your concerns. As your supervisor, he would be your point of contact.

All my best,
Krissy

Krissy Dulek
  anager, Research Administration
Department of Surgery
Feinberg School of Medicine
Northwestern University
Chicago, IL 60611
Ph: 312-926-7287<tel:312-926-7287>
Fax: 312-926-7404<tel:312-926-7404>

From: Diane M Trahanas [mailto:diane.trahanas@northwestern.edu]
Sent: Wednesday, September 24, 2014 2:34 PM
To: Dulek, Krissy
Cc: Rufer, Rachel
Subject: Promotion

Hello Krissy,

I have received a letter from Chris Scarpelli about my Annual Merit Increase. I wanted to inform you that this is not reflective of the promotion Dr. Schwulst issued me back in March. The title change should be from Research Tech 2 to Research Tech 3. The baseline pay for this is $20.55-$25.70 with the mid range being $23.13. With 2 Bachelors Degrees and a Masters Degree the increase is supposed to be at the very minimum mirroring my Research Tech 2 midline pay ($23.13). I have been fulfilling my Research Tech 3 responsibilities since March and have yet to see the reflected title and pay change. Please let me know what other information you may need from me. I hope to hear from you soon.

Thank You for your time and efforts.

  cerely,

Diane

From: Rufer, Rachel [rrufer@nmh.org<mailto:rrufer@nmh.org>]
[Quoted text hidden]
Lab: 312.503.6260<tel:312.503.6260>

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago. IL 60611
Lab: 312.503.6260

[Quoted text hidden]

**Diane Trahanas** <diane.trahanas@gmail.com>                        Tue, Dec 16, 2014 at 12:01 PM
To: d-fernandez@northwestern.edu

Hello Diane.

These are some of the emails exchanged. I am not sure what the status is of the promotion, but I wanted to send you the emails requested.

I have spoken to Dr. Schwulst and he is aware that I have spoken with you and that I will not be giving a competing agreement to him/department.

Please let me know if you have any other questions.

Much appreciation,
Diane Trahanas

[Quoted text hidden]
--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago. IL 60611
Lab: 312.503.6260

**Diane Trahanas** <diane.trahanas@gmail.com>                        Tue, Dec 16, 2014 at 2:06 PM
To: d-fernandez@northwestern.edu

Additional information that may help piece the story together and allow you to help me understand what is going on.

Thank You,

Diane

---------- Forwarded message ----------
From: **Schwulst, Steven** <SSCHWULS@nmh.org>
Date: Wed, Sep 24, 2014 at 4:27 PM
Subject: FW: Promotion
To: "Diane Trahanas@gmail.com" <Diane.Trahanas@gmail.com>

[Quoted text hidden]

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

Trahanas 270

# EXHIBIT B
# DEP. EX. 18



## Fwd: D. Trahanas Promotion

SSCHWULS@nm.org <SSCHWULS@nm.org>                    Tue, Jan 13, 2015 at 3:40 PM
To: Diane.Trahanas@gmail.com

See below. I don't know what you've been doing but you need to stop. There is a specific protocol to get this done.
We will talk on Friday when I am back from paternity leave.

Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery
Northwestern University
Department of Surgery
676 N. St. Clair St., Suite 650
Chicago, IL 60611
(312) 695-3903



Begin forwarded message:

From: "Burke, Heather" <hburke@nm.org>
Date: January 13, 2015 at 3:34:59 PM CST
To: "Schwulst, Steven" <SSCHWULS@nm.org>
Cc: "Dulek, Krissy" <kdulek@nm.org>, "Rufer, Rachel" <rrufer@nm.org>, "Scarpelli, Chris"
<Cscarpel@nm.org>
Subject: D. Trahanas Promotion

Dr. Schwulst,

HR-Compensation contacted me on Friday regarding Diane Trahanas' promotion. Diane has been
contacting them directly, rather than working with you and the department. It isn't appropriate for the
employee to be making this request directly, rather the employee's supervisor/manager should be
submitting the request. Additionally, per the departmental policy, this request must first come to the
department, along with a number of additional items, for review and approval before HR and HR-
Compensation can get involved.

In order to move forward, we ask that you follow the process (attached again for your reference). Please
submit the following items to me via email:

-    Request approval for an off-cycle promotion with an amount or percentage that you would like the
salary to be increased by as a guideline

    -    Detail why an off-cycle increase is being requested:

        o  Review prior year's performance evaluation. If the performance
           evaluation warranted a request for a higher increase, why was the request

not made at that time?

    o If a higher increase was requested at the time of budget and was rejected, why?

    ○ Were funds budgeted for an increase in salary?

- What is the justification for the off-cycle increase?

    o What additional duties is the employee performing?

    o If applicable, consult the job description and Job Families matrix found on the HR website, to determine if current duties being performed are in line with job being performed. The Job Family matrixes can be found at the link below. The department or HR may be able to provide the job description.

    o http://www.northwestern.edu/hr/compensation/job-families-descriptions/job-families/index.html

    o If possible include a mid-year performance evaluation.

    o Retention off-cycle increases will only be considered if an offer has been made by another department or company. Proof of the offer must be provided.

Please note, in addition to department review and approval, the FSM Dean's office must also approve this request.

Please let me know if you have any additional questions and I look forward to receiving the above information.

Thanks,

Heather

Heather Burke
Manager of Professional Affairs
Department of Surgery

Northwestern Medical Group

251 E. Huron Street, Galter 3-150
Chicago, Illinois 60611
312 926 8512 office

Trahanas 46

# EXHIBIT B

# DEP. EX. 22

Jan 10, 2012, 8:54 PM to Diane Trahanas



Oct 9, 2012, 3:13 PM to Diane Trahanas

Don't forget, we need to do CBC's

Oct 11, 2012, 6:31 AM from Diane Trahanas

Good Morning, I'm on the 6:37 train and should be at the lab by 740. , I don't want to forget to do the NSS, let's meet around 8:10-15. I'll set up in th

Oct 11, 2012, 6:31 AM from Diane Trahanas

e procedure room, and run the NSS before u come down.?.

Oct 11, 2012, 6:32 AM to Diane Trahanas

Sounds good.  I have grand rounds till 8AM then need to change my clothes.  I'll  be down after that

Oct 11, 2012, 7:58 AM to Diane Trahanas

How's lb's morning?

Oct 12, 2012, 8:10 AM to Diane Trahanas

Call me when you're ready to head to the mouse house.

Nov 6, 2012, 7:51 AM to Diane Trahanas

I'll meet you in mouse house around 8:35-8:40

Nov 6, 2012, 7:51 AM from Diane Trahanas

Sounds good



**EXHIBIT**

**22**

Trahanas  1/5/18

**Trahanas-NU002177**

Nov 8, 2012, 8:00 AM to Diane Trahanas

Did my Insanity fit test yesterday... A) I'm not fit B) I almost died C) I'm sore as hell today.

Nov 8, 2012, 1:49 PM from Diane Trahanas

Def just saw this, sorry :(

Nov 9, 2012, 9:15 AM to Diane Trahanas

M&M ran late... Going to change my clothes then come to the lab

Nov 12, 2012, 7:48 AM from Diane Trahanas

Sorry !! I missed The earlier train. I'll be there by 9. Let's meet at 9:30 in the procedure room.

Nov 16, 2012, 2:02 PM from Diane Trahanas

Hey, so I have to re-download the files from the LSR computer. I have to wait for Sasha to finish bc he is running some hour long plate. As soon as he's

Nov 16, 2012, 2:02 PM from Diane Trahanas

done I can hop on, download and then flowjo the data from yesterday.

Nov 16, 2012, 2:02 PM from Diane Trahanas

Hey, so I have to re-download the files from the LSR computer. I have to wait for Sasha to finish bc he is running some hour long plate. As soon as he's

Nov 16, 2012, 2:02 PM from Diane Trahanas

done I can hop on, download and then flowjo the data from yesterday.

Nov 19, 2012, 1:54 PM from Diane Trahanas

Hey Harris should be ready in fifteen to twenty minutes to meet in the lab.

Train is running ten min behind.  I should be there by 8:10

Ok

Let me know when you have everything together so I can come get the data

Lab meeting a go

Hey Steve. Are u going to Harris' lecture? I'll be there in a few min. Rans is going to show me where its at.

Rana**

Already here... where are you losers?

Hahaha... I'll be there in 5. On the bus still:(

One hour in this class and I've learned a bunch.

You learning anything?  It a friggin blizzard here..,

Trahanas-NU002179

Yea... A lot of info yesterday. Some things I knew, but have a better understanding of how and y we do things the way we do for flow. It's been raining/

cloudy here.

Haha...

Lol , its karma for sending Rana my 75 deg forecast.

Hey- I had to go to church, on my way now.

Did you do something bad?

Hahaha, if I were Rana I would say yes. Lol. Its for my grandmas memorial.

Rana definately needs to go to church...

Church and confession.

;)

Trahanas-NU002180

Case complicated, I'll be back around 12:45

Kk

They let us go for lunch then we gotta go back to be selected from a big group of jurors. That's when ill tell them my impartiality.

;) have fun

This is brutal... They are interviewing us still.. I'm probably going to come by after and make our cocktails for tom.

I'm getting Starbucks... You want anything?

Harris is actually early...

Thanks again for Lunch. Congrats to us :)

I'm on my way,  ill show u the data on prism and then we can see if you want to hit some heads today to prep tissue Monday.?.

What time?

Trahanas-NU002181

What time are you doing the BM harvest/flow

I should be back by 1130. I'll start as soon as I get there.

Sorry Big funeral so taking longer than usual.

So long as the work gets done, I don't care what time you get in ;)

Kk, sounds good. I'm waiting on Salina to give me a mouse.

Are we a go for 8:30 or do you need a little more time?

Let's do 9:30. Trains behind schedule

K

Another freight train delay so now I gotta take the cta. I'll call u when I'm all set up

I'm Sorry.

Trahanas-NU002182

We're in lab meeting room

How is my sweet LB?

Sorry meant for my wife...

Your presentation is going to blow these guys outta the water. Besides a couple from earlier they have no personality.

Yeah... I basically rock...

Finally... Let's get some booze

She's the brunette on his website

Where are you?

Dr. Brownstein and his group are going to The Mid. I like that idea better than any other. Any word from Werschenmeyer lab on activities?

Trahanas-NU002183

Jun 3, 2013, 12:11 PM to Diane Trahanas

Unfortunately this is the first time I don't have good plans in place... sorry... This meeting is kind of the lamest shock I've been to... I'm game for anything... If touring the mid, I think you can also do a tour of the navy/marine base... Will have to ask the google.

Jun 3, 2013, 12:13 PM to Diane Trahanas

Don't call him Dr. Brownstrein his name is Buddy...

Jun 4, 2013, 12:12 PM from Diane Trahanas

It's ok, the Mid /Navy base is cool with me.

Jun 3, 2013, 12:12 PM from Diane Trahanas

Lol ok

Jun 3, 2013, 2:06 PM to Diane Trahanas

I'm friggin freezing mr bigglesworth...

Jun 3, 2013, 2:14 PM from Diane Trahanas

It's ridiculously cold- they should have turned the heat on not just the air off.

Jun 3, 2013, 2:16 PM from Diane Trahanas

Is there lunch before kayaking?

Jun 3, 2013, 2:19 PM to Diane Trahanas

Not sure, I bet we're on our own. I'm starving.

Jun 3, 2013, 2:18 PM from Diane Trahanas

U know I am.

Jun 3, 2013, 8:33 PM to Diane Trahanas

Meeting in lobby at 7:30 to go to gas lamp

Trahanas-NU002184

Kk cool

What time are we hitting mice?

I'm thinking around 11?

K

Ill be there by 815. We can look over flow and then ill set up and etc

Sasha is going to help me at 9- he's going to check my lung hating on those 4 non traditional markers.

Gating*

Your timer went off a few minutes ago..,

BM looked good on flow Jo.

Hey Steve. I felt a lil better yesterday but then i was up all night with severe abdominal pain and I was throwing up again. I'm going to my docs at 3 .

Trahanas-NU002185

Aug 7, 2013, 12:15 PM to Diane Trahanas

Wow... What the hell did you eat?

Aug 7, 2013, 12:20 PM from Diane Trahanas

Maybe it's a flu bug

Aug 7, 2013, 12:20 PM from Diane Trahanas

I've never had food poisoning for this long

Aug 7, 2013, 12:20 PM to Diane Trahanas

Stay away...

Aug 7, 2013, 12:21 PM from Diane Trahanas

Ok I'll keep u posted after the docs

Aug 7, 2013, 8:44 PM from Diane Trahanas

My doc isn't sure what I have yet. Running blood tests and cat scan.



Dude... Take whatever time you need, just don't get me sick...

I don't wish this on my worst enemy. Thank you

How are you doing?

I was so dehydrated they didn't get enough blood and I passed out, so they gotta redraw.

But I stopped puking, thankfully.

Dude, do you need to be admitted for IV fluids?

My doc thinks I may need my gallbladder taken out, but she'll know after cat scan, and if I'm not recovered by Monday.

I can stand today, I drank four big gatorades

Yesterday and ate some crackers.

Thank you for asking

Trahanas-NU002187

Are you better?

Yea, slept a looot

Good. See you tomorrow ;)

I still have to go back to my doc. This week I needed off to take care of personal matters

Oh yeah

( it was the one I emailed u about)

Come to Harris's office when you get in

Princess Diana... You rock. Have a great weekend. I'll see you Monday.

How did the brains look?

I sent that before you text me ... But it never went through.

4&5 were the really good hits. 4 was the NSS 8 score.

Trahanas-NU002188



Sep 19, 2013, 12:27 PM from Diane Trahanas

I had no reception so they never got sent...

Sep 19, 2013, 12:27 PM from Diane Trahanas

You were right about the hemorrhaging ... Brains 4 and 5 with the really good hits had blood in their brains even after perfusion.

Sep 21, 2013, 2:46 PM to Diane Trahanas

2,3,6,7, &9 also look like subarachnoid hemorrhage... No?

Sep 21, 2013, 2:46 PM from Diane Trahanas

I think a couple of those were just not great perfusions.

Sep 21, 2013, 2:46 PM from Diane Trahanas

As I test them ill take pics after perfusions.

Sep 21, 2013, 2:46 PM to Diane Trahanas

Which were sham?

Trahanas-NU002189

Sep 21, 2013, 2:48 PM from Diane Trahanas

8-11

Sep 21, 2013, 2:52 PM to Diane Trahanas

I think we need to keep hitting them until they show near-death curling up and hypoventilation.

Sep 21, 2013, 2:50 PM from Diane Trahanas

I agree

Sep 21, 2013, 2:52 PM to Diane Trahanas

Did 4&5 still have bad deficits at sacrifice?

Sep 21, 2013, 2:53 PM from Diane Trahanas

4 was still NSS of 7 if not 8.

Sep 21, 2013, 2:54 PM from Diane Trahanas

And 5 had an NSS of 6

Sep 21, 2013, 2:54 PM to Diane Trahanas

We should also keep them in groups: no gross contusion or hemorrhage is mild TBI

Sep 21, 2013, 2:54 PM from Diane Trahanas

Solid 6 2 hrs post Tbi, 4 hrs and 24 he's

Sep 21, 2013, 2:54 PM from Diane Trahanas

Hrs**

Sep 21, 2013, 2:55 PM to Diane Trahanas

Hmmm... We really need to make sure our injuries are better across the board.

Trahanas-NU002190

I think the death curl idea is a good start

It's a rough tipping point.... A lot of them die if they do the curl

Very true, well see what the hitting tests yield this week.

All right... Good work.  Go do your P90X

Lol kk thanks.

Are you coming in today?

Yea on my way.

I got some good and bad news with the TBIs

I think our model is good.

Ok... We'll go through it in detail after lunch

Then maybe we should go out for beers... Rough week.

Trahanas-NU002191

Sep 30, 2013, 11:15 AM to Diane Trahanas

Are you bringing any Greek pastries?  I could really down some baklava right now...

Sep 30, 2013, 11:16 AM from Diane Trahanas

Bad news is it probably can't get better; ill elaborate when I get there

Sep 30, 2013, 11:16 AM from Diane Trahanas

Ok sounds good

Sep 30, 2013, 11:16 AM from Diane Trahanas

Bad news is it probably can't get better; ill elaborate when I get there

Oct 2, 2013, 8:39 AM from Diane Trahanas

I'm taking out brains today right?

Oct 2, 2013, 8:40 AM to Diane Trahanas

Yup

Oct 2, 2013, 8:40 AM from Diane Trahanas

K

Oct 2, 2013, 9:41 AM from Diane Trahanas

I'm on The train - Ill be there by 10:15

Oct 2, 2013, 6:13 PM from Diane Trahanas

No. 4 had hem

Trahanas-NU002192



Oct 9, 2013, 11:30 AM from Diane Trahanas

Yesterday was a double day, so I am staying home today. I ran the flow – I think It looks better than before.

Oct 9, 2013, 11:29 AM from Diane Trahanas

This is what the whole brains looked like after my injuries. They only got 2cm hits, bc they were still part of the weak bunch Jackson Labs sent us.

Trahanas-NU002193



Oct 9, 2013, 11:23 AM from Diane Trahanas

This is what the whole brains looked like after my injuries. They only got 2cm hits, bc they were still part of the weak bunch Jackson Labs sent us.



Nov 12, 2013, 9:30 AM to Diane Trahanas

Are you going to be in the lab today?

I'm going to be in around noon.

My mom broke her toe/ foot and Im taking her to the doc.

Going to a conference... Out by 9 and will head over to lab

Ok.. I'm walking into lab now. See u when u get here

Why don't you have all the mice drugs and equipment ready to go and we can hit first the practice perfusion on Saluna's mice

Should we just practice perfuse- not on hit mice? Everything is pretty much set to go

I thought we wanted hit mice for the brain vs periph blood exp?

Well hit those Tom and collect Monday?

Ok

Kk

Trahanas-NU002195

Did u want to come down for brain removal or should I start on my own?

Get your day started.  What time do you want to injure?

When I'm letting the auto macs run the Cd45 selection .. Around 10-10:30

Parking

Make sure it's not a tow zone ;)

Lol. Not til 4

I need 20 minutes to down some coffee

Yea np

Ill set things up and meet u in the mouse room in 30

K

K

Hey... When can we go over the flow with Harris

Hey Steve. My aunt passed away yesterday. I won't be able to make it in today of tomorrow.

So sorry... My condolences  We'll talk Monday about what to do while I'm on service.

Thank you. I'll meet with Harris on Monday to go over flow. I do neuronal antibody stain next week too.

Case cancelled... I'm here all day so we can go over flow and make plans for upcoming weeks

Did she pass away?

I'm on my way now

I talked to Carla  and I think I have a good busy plan for next week

I didn't get to meet with Harris

Trahanas-NU002197

Dec 5, 2013, 7:45 PM from Diane Trahanas

I'm taking Tom off since Tuesday was a double day and next week is going to be tiring. If u need anything email text or call me.

Dec 5, 2013, 7:46 PM to Diane Trahanas

K... I'm still waiting to do a case

Dec 5, 2013, 8:18 PM from Diane Trahanas

Bluhhh

Dec 14, 2013, 4:24 PM from Diane Trahanas



Trahanas-NU002198



Dec 14, 2013, 4:26 PM from Diane Trahanas

Not to make your week more stressful, but I got a hemorrhaged brain and I think bc it took the auto macs so long for 20 samples my cell counts and viability were crap. I'm redoing this week. I was so excited bc we got the hem and then... Disappointed.

Dec 21, 2013, 3:15 PM from Diane Trahanas

Happy Holidays to you and your family!! Enjoy your mini vacation!

Dec 21, 2013, 3:15 PM from Diane Trahanas

Thank you very much for the gift cards!! I'll put them to great use:)

Dec 26, 2013, 3:37 PM from Diane Trahanas

You coming to lab Tom? I'm coming in super early.

Dec 26, 2013, 3:38 PM to Diane Trahanas

No... Not getting back in town till late afternoon

Trahanas-NU002199

Ok I'll shoot u an email with results

Happy New Year Steve. I'm feeling like crap and just been getting worse since Monday. Staying home and getting rest. Maybe doc appnt Tom if these meds don't work.

Are you still alive?

Kinda, I'm sleeping and sweating this thing off.

Way to start my new year.

Only me.

Get better... I think we're on the cusp of a breakout year... Making plans for us to go to Detroit on Feb

That would help us out a lot and diminish my disappointment with this cd45 dysfunction

Rana will help us out with that when you get back, don't sweat it... Minor road bump

Trahanas-NU002200

Jan 4, 2014, 11:34 AM from Diane Trahanas

Ok thanks

Jan 12, 2014, 7:37 PM from Diane Trahanas

HinSteve. Hope SF went well. Think I got things back on track. Hitting Monday or Tuesday. Hope it's our last data set. Keep you posted.

Jan 23, 2014, 11:13 PM from Diane Trahanas

I think I got the experiment to work. Had two great injuries with hemorrhaging. Took 24 hrs, but we can look at flow on Monday. I'm presenting next lab meeting.

Jan 23, 2014, 11:14 PM from Diane Trahanas



Jan 23, 2014, 11:17 PM from Diane Trahanas

(I did the peripheral blood and the neuronal experiment at the same time. )

Trahanas-NU002201

Jan 28, 2014, 10:18 AM from Diane Trahanas

Cars not starting.. If my dad can get it to start by noon I'll come in- if he can't ill work from home

Jan 28, 2014, 10:10 AM to Diane Trahanas

We are confirmed to visit the Conti lab on 2/13. I'm thinking drive up on the afternoon of 2/12 and back the evening of 2/13.

Jan 28, 2014, 10:27 AM from Diane Trahanas

Yea that's cool with me.

Jan 28, 2014, 10:35 AM to Diane Trahanas

Can you do lab meeting at 2pm Thursday?

Jan 28, 2014, 10:55 AM to Diane Trahanas

Harris is a flake

Jan 28, 2014, 10:36 AM from Diane Trahanas

Yea I'm going to work on PowerPoint today and Tom, That should be fine

Jan 30, 2014, 6:32 AM to Diane Trahanas

I have misplaced my wildcard... Will need you up lete in lab.  What time are you getting in?

Jan 30, 2014, 6:32 AM from Diane Trahanas

About to get on the train

Jan 30, 2014, 6:33 AM from Diane Trahanas

Let's say 8:30 ish to be safe .

Jan 30, 2014, 6:33 AM to Diane Trahanas

Ok

Trahanas-NU002202

I'll text u when I get to union

Just in case there are switch delays again

Waiting on this never ending freight train.



Just getting to union... Text u when I'm ten min away

I'll Be there in ten

On my way over...

Trahanas-NU002203

Jan 31, 2014, 8:08 AM to Diane Trahanas

Couldn't find my badge... Can you let me know when you get in... I need someone to let me in.

Jan 31, 2014, 8:13 AM from Diane Trahanas

Lol yea np. I'll be there in 15

Jan 31, 2014, 1:00 PM to Diane Trahanas

Harris sucks :(

Jan 31, 2014, 2:43 PM from Diane Trahanas

I'm not going to say what tho

Jan 31, 2014, 2:44 PM from Diane Trahanas

Lol. Well crank everything out. I want this paper as much as you

Feb 3, 2015, 7:08 AM to Diane Trahanas

Will need you to let me in again :(

Feb 3, 2014, 8:07 AM from Diane Trahanas

On the train still

Feb 6, 2014, 7:58 AM from Diane Trahanas

Going to look at flow with Sasha

Feb 6, 2014, 7:58 AM from Diane Trahanas

In ten minutes

Feb 10, 2014, 5:25 PM from Diane Trahanas

What time will we be back Thursday?

**Trahanas-NU002204**

Feb 10, 2014, 5:27 PM to Diane Trahanas

8ish or 9isj

Feb 10, 2014, 5:25 PM from Diane Trahanas

Ok thanks.

Feb 11, 2014, 8:06 AM to Diane Trahanas

Forgot wildcard... Will need you to let me in the lab later this AM.

Feb 11, 2014, 8:36 AM from Diane Trahanas

Be there by 10:30 again.

Feb 12, 2014, 11:40 AM to Diane Trahanas

Princess D... Just got out of clinic... I'm going to change clothes and grab a bite to eat... Let's meet at the Starbucks at noon.

Feb 12, 2014, 11:59 AM from Diane Trahanas

Just turned on my phone. Coming to bux

Feb 12, 2014, 12:04 PM to Diane Trahanas

I'm heading to bux now

Feb 12, 2014, 12:07 PM from Diane Trahanas

Kk

Feb 12, 2014, 12:08 PM to Diane Trahanas

Did you get chocolate?

Feb 12, 2014, 12:09 PM from Diane Trahanas

No I thought were going to do swing by

Trahanas-NU002205

Hey Steve. Cars gotta go to the mechanic. Dropping it off and I'll let u know if I make it to the city. Happy Monday :/

FYI- our equipment finally came in. I have arrangements to get a private cabinet for it in the

Can you email me updates... Where are we at?  What is left to do? When are we meeting with Harris etc etc

Procedure room- that way we don't have to deal with curious George's downstairs and any satellite business.

Harris hasn't set a time with me- or emailed me back.

Make sure you put in your hours for approval

I'll annoy him. I'll email u a list of updates.

I need to stay home today. I have a slight fever, sore throat and a migraine.

Are you coming to work today?

Trahanas-NU002206

Mar 10, 2014, 11:03 AM from Diane Trahanas

I'm going to work from home for a little bc my ankle/foot is killing me. I can't run experiment until myelin beads come in- hopefully they'll be delivered Tom.

Mar 18, 2014, 8:43 AM from Diane Trahanas

My friends giving me a ride to the city, see u around 10:30.

Mar 26, 2014, 7:43 AM from Diane Trahanas

Top row are injuries. 3 hemorrhaged :). Running flow today



Mar 27, 2014, 11:26 AM from Diane Trahanas

Everything is all good with IACUC visit. :)

Trahanas-NU002207



Apr 9, 2014, 12:53 PM from Diane Trahanas

Hi Steve- I'm still at the funeral. We just got fond at the cemetery and going to luncheon. If I get done before 2:30 I'll head in- if not I'll work a little from home and stay late Tom/ Friday.

Apr 9, 2014, 12:53 PM from Diane Trahanas

Done* not fond

Apr 9, 2014, 12:54 PM to Diane Trahanas

Don't worry about it... Just keep working on your paper.

Apr 9, 2014, 12:54 PM from Diane Trahanas

Thank you Boss!

Apr 11, 2014, 2:46 PM to Diane Trahanas

Millenials...

Trahanas-NU002208

Softball

I'm coming in, driving - on my way

> I have a deposition this AM. Will be in after lunch. There is an annual review on your desk, please complete and I will do the same. We'll discuss our two reviews on Friday and submit your actual review Friday afternoon.

Ok. Sounds good.

> Are you coming in today? We need to do your performance evaluation and submit it.

Hi Steve. I need time to let my right side heal and prevent any re injury. My Dr. Is going to fax you the note. Email text me if we hear back from Harris about our paper and I can fix things remotely from home.

> How long are you planning to be out?

Until I see him again next friday to see if I can take the splint and boot off.

> So 2 more weeks?

Trahanas-NU002209

May 5, 2014, 10:21 AM from Diane Trahanas

Yea this week until next Friday

May 5, 2014, 11:02 AM to Diane Trahanas

OK. Just checked with HR... I will need your doctor to fax my office your letter of disability detailing what your activity restrictions are and what the duration of those restrictions will be. Thanks.

May 5, 2014, 11:17 AM from Diane Trahanas

Ok. Called the office, it will be sent today with all the info.

May 5, 2014, 11:21 AM from Diane Trahanas

I gave them 312 695 3644 fax number and titled with attn: Dr. Steve Schwulst.

May 5, 2014, 11:49 AM from Diane Trahanas



May 12, 2014, 1:03 PM from Diane Trahanas

Yes following Drs orders:) peas and ice bags and elevating as much as possible.

**Trahanas-NU002210**



May 12, 2014, 1:03 PM from Diane Trahanas

Hope you and Emily enjoyed the weekend, keep me posted after Harris reads the draft (16th)

May 12, 2014, 1:04 PM to Diane Trahanas

I'm lonely without you.  I have nobody to make fun of Rana with :(

May 12, 2014, 1:03 PM from Diane Trahanas

Hahahahahaha

May 12, 2014, 1:05 PM to Diane Trahanas

Check you email... I do need another figure made.  Can you do it remotely?

May 12, 2014, 1:03 PM from Diane Trahanas

Too bad Salina is in the mouse fm most of the time so I would offer her up otherwise

Trahanas-NU002211

May 12, 2014, 1:05 PM from Diane Trahanas

Yea I think so

May 12, 2014, 1:05 PM to Diane Trahanas

Do you have a draft of yor poster done yet?

May 14, 2014, 1:29 PM to Diane Trahanas

Can you check gmail? I need you to fix some things with the figure.

May 14, 2014, 1:31 PM from Diane Trahanas

Kk

May 15, 2014, 3:21 PM to Diane Trahanas

We are getting an undergraduate for the summer.

May 15, 2014, 3:21 PM to Diane Trahanas

You can make her your biotch

May 15, 2014, 3:21 PM from Diane Trahanas

Just ours or Perlmans?

May 15, 2014, 3:22 PM to Diane Trahanas

Technically Harris' but he is assigning her to our projects

May 15, 2014, 3:22 PM from Diane Trahanas

That's good- it's officially for is then.

May 15, 2014, 3:22 PM from Diane Trahanas

Us

May 15, 2014, 3:22 PM to Diane Trahanas

Appearantly she 'a some sort of prodigy

Trahanas-NU002212

May 15, 2014, 3:22 PM to Diane Trahanas

Probably smarter than both of us

May 15, 2014, 3:23 PM from Diane Trahanas

Thank fully cuz I won't trust some rich lazy kid

May 15, 2014, 3:24 PM from Diane Trahanas

Hahahaha highly doubt it

May 15, 2014, 3:24 PM from Diane Trahanas

Softball players can be smart

May 15, 2014, 3:24 PM to Diane Trahanas

I think she plays violin, not softball

May 15, 2014, 3:24 PM from Diane Trahanas

I was referring to myself lol

May 15, 2014, 3:24 PM from Diane Trahanas

Violin is even smarter

May 15, 2014, 3:27 PM to Diane Trahanas

I'm on service for 1 week next week and anticipate being very busy. I want you to perfect our new equipment and be the Midwest regional expert when I get back ;)

May 15, 2014, 3:27 PM to Diane Trahanas

Huh

May 15, 2014, 3:28 PM from Diane Trahanas

Nevermind bout the violin. I will be the Midwest expert when u get back. 🎻 📷 ✏️

Trahanas-NU002213

May 20, 2014, 3:32 PM from Diane Trahanas

So far it's a bloody mess doing the whole drilling.



May 20, 2014, 3:32 PM from Diane Trahanas

I'm making progress though.

May 20, 2014, 3:33 PM to Diane Trahanas

Ema the Brody lab at wash u and see how they do it... Get in touch with their tech and have phone call

**Trahanas-NU002214**

May 20, 2014, 3:34 PM from Diane Trahanas



May 20, 2014, 3:35 PM from Diane Trahanas

I got it down better, but we might have to slightly up the ket xyl dosage- they don't like the drilling

May 20, 2014, 3:36 PM from Diane Trahanas

I'll still touch base with wash u lab.

May 28, 2014, 12:55 PM from Diane Trahanas

Hi Steve, I'm still coughing annoyingly and not feeling good. Staying at home to rest.

Jun 2, 2014, 10:49 AM from Diane Trahanas

Your presentation done? I'll be there by noon. Ready to hear it after lunch if ur ready?

Jun 2, 2014, 10:50 AM to Diane Trahanas

K

Trahanas-NU002215

Poster ready?

Yea, One final review I'll email u and Carla all the edits then print it.

I'm still coughing (not as much) so keep the masks.

Make sure all figures are the highest resolution possible

Definitely

Totally forgot... I am covering the ICU tomorrow for my boss... So I may not see you until Charlotte...

Did you get in OK?  How's the weather?

Weather was gorgeous today! There's a taste if Charlotte going on . Hope it stays this way for the weekend

Hotel is pretty nice. Flight was 1 hr 35 min

Anyone there yet?

Trahanas-NU002216

Haven't seen any other dorks like me carrying posters or anything.

I've done some hwk a
D asking/surveying- if it's nice Monday we could do the white water rafting and outdoor day pass - zip lining, biking, obstacles, kayaking wall climbing for 56$. If it rains- go karting type place.

Btw no bus for the hotel u gotta can it - 25~ bucks

> Holy crap... Is this English?

> You can get your race number at the registration desk.

Winning gimp number right there.

Trahanas-NU002217



Jun 8, 2014, 11:12 AM to Diane Trahanas

Ran through my talk in my room earlier... I made it my bitch :)

Jun 8, 2014, 11:12 AM from Diane Trahanas

Hahahaha , I expected u would. This guy right now is snoozing everyone.

Jun 8, 2014, 11:13 AM to Diane Trahanas

He can invent all this stuff... But he can't fit his slides on PowerPoint

Jun 8, 2014, 11:14 AM from Diane Trahanas

U read my mind, I'm hoping it's a conversion thing, but I doubt it

Jun 8, 2014, 7:32 PM from Diane Trahanas

Hurry they just called up new investigators!!!

Jun 8, 2014, 7:39 PM from Diane Trahanas

These for now, but I'll fix them on my laptop and send those too. Congrats!

Trahanas-NU002218



Trahanas-NU002219



Jun 8, 2014, 7:57 PM from Diane Trahanas

The entire Schwulst lab in one photo.



Jun 8, 2014, 9:10 PM to Diane Trahanas

What channel is the game on?

Jun 8, 2014, 9:10 PM from Diane Trahanas

33

4th quarter

Lebron is such a bitch...

Wow... These guys are so good.

I can't believe spurs lost

You weenie...

Where u at?

I'm walking to get my shirt

Did you run?

Yea

I changed outta my boot

That thing blew

Trahanas-NU002221

I didn't see you or at the picture

I went back to take it off

I finished ages ago and just got out of the shower

I just finished with all the other weenies

Nice weather and nice course

I'm dying of heat exhaustion but wasn't horrific

I thought it was nice

I wore two long sleeve Dri fits

Why

I'm sprinting to get ready..

I thought it would be cold

Trahanas-NU002222

Jun 9, 2014, 5:51 AM to Diane Trahanas

It's N.C. in June...

Jun 9, 2014, 5:51 AM to Diane Trahanas

You'd better clean up good so you don't look like a scrub...

Jun 9, 2014, 6:09 AM from Diane Trahanas

It's cloudy aaaand I'm always cold. Those are my excuses

Jun 9, 2014, 6:09 AM from Diane Trahanas

I won't embarrass our lab

Jun 9, 2014, 8:20 AM to Diane Trahanas

Make sure you check when the poster needs to come by... or else they will through it away.

Jun 9, 2014, 8:46 AM to Diane Trahanas

They just announced... Posters have to be taken down by 1PM or they get trashed.

Jun 9, 2014, 8:47 AM from Diane Trahanas

I just tk it down now

Jun 9, 2014, 10:35 AM to Diane Trahanas

We are meeting in lobby at 12:45 to go rafting

Jun 9, 2014, 11:25 AM from Diane Trahanas

Awesome!

Jun 10, 2014, 9:57 AM from Diane Trahanas

U walked a tight rope death trap yesterday– so don't be nervous ull be fine!

Jun 10, 2014, ... PM to Diane Trahanas

> Wow... You are really hamming it up...

Jun 10, 2014, ... PM to Diane Trahanas

> You know, karma is a bitch....

Jun 10, 2014, ... PM from Diane Trahanas

Hahahaha technically I should've been in the boot all weekend. So karma will get me

Jun 10, 2014, ... PM from Diane Trahanas

This lady was insistent on getting me to board early- southern kindness I suppose.

Jun 10, 2014, ... PM from Diane Trahanas

The other videos are too long I'll dropbox or google drive them to u.

Jun 10, 2014, ... PM to Diane Trahanas

> A

Jun 10, 2014, ... PM from Diane Trahanas



Jun 17, 2014, 2:37 PM to Diane Trahanas

> I need you to send me all the Courses our new student completed so I can add her to our protocol

Jun 17, 2014, 2:37 PM to Diane Trahanas

> Animal courses that is

Harris said she would come in yesterday/ but he wasn't sure. I'll send u her info ASAP





After a few hours they woke up and were semi mobile. NSS tom. I'll keep u posted. 2mm tip is piercing the brains- literally making brain goop upon impact so 5mm tip seems to be the MVP. May try 2mm tip with yellow rubber pieces from old weight drop.

Kathryn (our assistant) is definitely helping us out. May order mice on Thursday to have for experiment next week. I will shoot u an email with better details. (We have another inspection so that's been keeping Harris and us preoccupied this week.

All brains wlhave hem. I will discuss details with u on their impact vel and tip diameters when u return Monday. NSS 6 is highest so far. Without splatting the brains.

You're the best!!

We'll talk MCAT strategy too

Trahanas-NU002225

Sounds good.

Are you Emily and Sydney going to Harris party Sunday July 13 ?

Yes

Ok, Rana sent out another reminder for the rsvps

Yeah I told her

Ok cool. See u mañana.

Sidney*** sorry

I hope the foam roll helped- since I won't see u for two weeks on clinic can u bring it to Harris'?

Sure

thank you

Trahanas-NU002226

What is his address

9050 Tamaroa Terrace Skokie, IL.

ill be there after 5, world cup in overtime.

a lot of head injuries today

Hope service isn't killing you. I don't have the latest copy of the manuscript and I guess Harris can't find it- can u rend it to us both? That way I have a copy if he has any more issues finding it?

24processing Tom and 72 hrs on Thursday. I'll send u picks.

Are you coming in today?

I'll be there Tomorrow.

Sent you some emails... Need figure revision so we can submit paper by end of week?

Revisions

Aug 11, 2014, [illegible] AM from Diane Trahanas

Yup, looking at the emails now

Aug 11, 2014, 1:18 PM to Diane Trahanas

Can you make the circles of the brain figure tighter? Some need to be bigger, some need to be smaller, some need to be moved over.

Aug 11, 2014, 1:18 PM to Diane Trahanas

They don't all have I be the same size

Aug 11, 2014, [illegible] from Diane Trahanas

Ok. Gotcha

Aug 13, 2014, 11:51 AM from Diane Trahanas

We stayed and ran flow last night, so I'll analyze flow from home.
Brains looked like before- good.

Aug 13, 2014, 11:51 AM to Diane Trahanas

K... I'm stuck in clinic :(

Aug 13, 2014, 11:53 AM from Diane Trahanas

Bluh, I'm studying so Idk how much better I have it.

Aug 20, 2014, 1:05 PM from Diane Trahanas

Hey, finishing submission in the lab to ensure everything gets done perfectly. Is the author order correct? You have yourself as first author instead of Senior author?

Aug 20, 2014, 1:07 PM to Diane Trahanas

No, you are first and I am last (senior)

Aug 20, 2014, [illegible] PM from Diane Trahanas

Ok thanks.

Brains look "gorgeous" on the LSR. Let's hope we can continue using the auto macs. See u in 12 hrs.

Feel like death- coming in to square away our paper and wrap stuff up from yesterday then heading out. U won't want be by u for long anyhow

Paper resubmitted.  Did we do that effing Isis shit?  Harris forwarded me a nastygram about it today...

Yea, Kathryn and I did it Wednesday !

I emailed you a screenshot of your test completion.

Sparta!!  How was it?  Did you make that MCAT your bitch?!

Hey... How you doing?  Coming in today?

Is he feeling better?

Who is he?

Sorry, wrong person

Trahanas-NU002229

Figured

Should I still finish that schematic or are we changing the specific aims?

Yes

Ok, cool.

Harris wants a schematic that incorporates all the aims of the proposal, not one for each aim

Can you go over ideas with Harris and complete by Wenesday?

I have experiment tom and Wednesday but I'll figure it out, yes.

Harris is looking for u– had a question I couldn't answer. Told him id be here around 1.

Ud*

On my way over now... Had clinic

Trahanas-NU002230



No worries

•••○○ Verizon LTE    6:18 PM    73% ▇▇▇

< Back    Arman Fathi    📞  ⓘ

Hey sup saw your post. I have
season tix to the bulls, section
206 row 1 with a parking pass
for each game. i can do this
Sunday at $120 for the pair
and Dec 27 at $240 for the
pair. Keep in touch if you're
interested:)

Whatcha think Boss?

Let me look at the seat pictures online and will get back... Definitely
interested

U got it. Keep me posted.

Is that a friend of yours?

Trahanas-NU002231

It's a friend of a friend. But She's a lawyer and if she's referring me- I trust him.

I'll put you two in touch once you approve of the seats.

Go ahead and put us in touch

Kk. Are u on FB?

Yup

Ok I'll have him message you directly.

Cool

Trahanas-NU002232



●●○○○ Verizon LTE  6:35 PM  67% ■▪
‹ Back    **Arman Fathi**    📞  ⓘ

200 row 1 with a parking pass for each game. I can do this Sunday at $120 for the pair and Dec 27 at $240 for the pair. Keep in touch if you're interested:)

Hello Arman. My boss is definitely interested in purchasing your Dec27 tix- meaning he's buying. 😊 His name is Steve Schwulst. I forwarded him your info/ message. I'm not sure how u sell normally/ get paid so please message him so you two can get everything settled.

Aa  ●📷  📷  😊  🎤  👍

●●○○○ Verizon 📶  12:10 AM  94% ■▪▪
‹ Back    **Arman Fathi**    📞  ⓘ

Sounds good! This Sunday is well below face value and the December game is about where face value is if you purchased it at a single game price. It's easiest to meet somewhere and do cash. The bulls stopped sending us the booklet so everything is digital now....therefore all hard tickets are paper tickets instead of the souvenir tickets. The parking passes are still the same though.

Keep in touch! My number is 3128885400. Feel free to text at you're convenience

Aa  ●📷  📷  😊  🎤  👍

Oct 15, 2014, 11:19 AM to Diane Trahanas

Dude... Did you get me email about the paper?

Trahanas-NU002233

Oct 15, 2014, 11:21 AM from Diane Trahanas

Yea, I'll get that in today after mouse house stuff

Oct 15, 2014, 11:22 AM from Diane Trahanas

I got it when I came up for lunch yesterday – figured we'd get that done today

Oct 15, 2014, 11:28 AM from Diane Trahanas

I'm obviously excited :)

Oct 15, 2014, 4:52 PM from Diane Trahanas



Oct 15, 2014, 4:53 PM to Diane Trahanas

Sweet :)

Oct 17, 2014, 7:53 AM to Diane Trahanas

What time will you be in today

Trahanas-NU002234

11.

I will be out by then for my boy's parent teacher conference

Do you have the tickets on you or are they in the lab?

Oh yea... Ok

I'll bring em by before j go to the airport.

I knew we'd forget.

Getting ready now. Should be there by 9 . Lab or your office?

Ok, Rosemary sent me the form. If I sign it as me- will our grant from shock still cover it? They won't charge us until later.

Forge my signature

Ok.

It's been a month and a week since I asked Harris to upload my LOR. He's leaving wed for a conference. Suggestions on how to push him without being too pushy?

Call him and tell him it needs to be done today.

Ok thanks Steve.

R u coming to lab meeting?

Starts at 4

He'll no

Hell

Hey, are you working this week?

It's snow drizzling

What was that other shooting u were telling me about today? Not the Nordstrom one...

Trahanas-NU002236

My mom just got into a car accident- I need to go back home.

Is she OK?

Idk

OK... Take care of stuff

How is your mom?

Getting a CT- whip lash and a concussion.

Has nausea and vomiting

Sorry, are you at Christ?

Yes.

She should be ok

Good

Trahanas-NU002237

Dec 9, 2014, 1:09 AM from Diane Trahanas

Thank u. I'll be at work tomorrow.

Dec 9, 2014, 1:28 PM from Diane Trahanas

Doesn't look like a neck fracture

Dec 9, 2014, 1:31 PM from Diane Trahanas



Dec 9, 2014, 1:32 PM to Diane Trahanas

:(

Dec 9, 2014, 1:33 PM from Diane Trahanas

She's talking she'll be ok

Dec 11, 2014, 11:40 AM from Diane Trahanas

Sasha might not come in -although I already rented the machine- I'm going to try to do the injections w/ Carla and Salina if they have time today.

Trahanas-NU002238

Get things moving and keep us on schedule.

Are you coming in today?

Yes. Car issues delayed me.

Did you get my email?  I've talked with HR about salary increase and need to discuss with you.

Yes, I was going to talk to you.

Are you taking vacation this week?

No. I'm at the doctors. I'm coming in after I'm done here.

I'm assuming one of the cards on my desk is from u. Not sure if said you will be in lab tom or not. I won't open it until Xmas, but Thank You!

Game Time!!



Dec 27, 2014, 6:49 PM from Diane Trahanas

They've been doing well! Hope it's a good game

Dec 27, 2014, 8:15 PM to Diane Trahanas

Shooting 38% at half time :(

Dec 27, 2014, 9:20 PM from Diane Trahanas

If only they got paid based on performance

Jan 14, 2015, 1:06 PM to Diane Trahanas

Please confirm meeting in my office at 8:15 tomorrow

Jan 15, 2015, 5:16 AM to Diane Trahanas

Please read your email.  Your absence at your performance review is unacceptable.  I expect you in my office as discussed.

Jan 15, 2015, 8:15 AM to Diane Trahanas

Please dial in to my office number now.  312-695-3903

Trahanas-NU002240

I've printed out the performance plan twice but there is no numbering on it. Do u just want me to sign it and scan u that page?

Yes please

Ok.

I Sent it to both your gmail and northwestern.

Got it

Ok.

Great. I have M&M, a meeting with Harris, and another meeting with HR, so I will check in with you later this AM to map out our plans for the next few weeks. I submitted your salary increase request this AM. Please put a reminder on your calendar for a quarterly review April 1st

I will be going down with Funien for Clodronate injections between 12-3- whenever she picks up the macjine.

Machine

Jan 17, 2015, 9:59 AM to Diane Trahanas

Trying to get fingerprinted... Taking forever..,

Jan 22, 2015, 10:17 AM from Diane Trahanas

It shouldn't. How many people are there?

Jan 23, 2015, 12:48 PM to Diane Trahanas

Cover of Shock!!!   That's pretty badass...

Jan 23, 2015, 12:52 PM from Diane Trahanas

That's great for all of us!!

Jan 23, 2015, 12:54 PM to Diane Trahanas

Issue will come out 2/15

Jan 23, 2015, 12:57 PM from Diane Trahanas

I will fix the color letter figure thing when I get home on my computer. I'll login to the work Mac and fix it.

Jan 23, 2015, 12:57 PM from Diane Trahanas

That seemed so far away, and it's just around the corner now. Pretty cool

Jan 26, 2015, 9:22 AM to Diane Trahanas

Are you going to be able to show Harris and me the data at our 10:30 meeting?

Jan 26, 2015, 9:22 AM from Diane Trahanas

I think so.

Jan 26, 2015, 10:41 AM to Diane Trahanas

Come now

Trahanas-NU002242

Come now, Harris' office

Clodronate worked for 24 he experiment we just did. Facial bleeds show no monocytes 24 hrs after injection and right before injury. The monocytes develop into similar pattern as the 48 hr thing we saw.

Huh... Hopefully Sasha can help us figure this out tomorrow

Yea.

Harris is forcing us to go to this lecture in Lurie. I'll be back at 1.

Haha

:(

Sasha thinks we should hold off on the 24 hr experiment this week. Run the naive mice blood first -25,48,72 hrs.

I'm about to give injections, but I don't want to wait but more so not waste mice. so u tell me what you want.

Do we have enough for this weeks abstract?

Trahanas-NU002243

Let's do it all

Ok cool. On it.

Were u going to stop by and look through the data from data?

Just email the prism and I'll call your cell tomorrow to talk

Ok cool

I'm just going to come in after my dentist appointment. I have stuff set up- but it's going to be a hurdle without us collaborating next to each other.

K... Let's knock it out and get you out for a long weekend

Yea that's cool. Np

Big D... What time do you think you will get in?

I should be done by 11:30- are u taking lunch at noon?

Trahanas-NU002244

Jan 30, 2015, 10:20 AM to Diane Trahanas

Whenever... We can do a work lunch at our desks if it speeds up the process and us getting out of here

Jan 30, 2015, 10:20 AM from Diane Trahanas

Are we focusing on blood and brain data for this abstract?

Jan 30, 2015, 10:20 AM to Diane Trahanas

Yup

Jan 30, 2015, 10:21 AM to Diane Trahanas

Only a few hundred words so probably just one set of data. Whatever is most interesting

Jan 30, 2015, 10:22 AM from Diane Trahanas

Yea, ok that sounds good

Jan 30, 2015, 10:23 AM from Diane Trahanas

Ok. Looking like the 48 hr stuff.

Jan 30, 2015, 10:29 AM from Diane Trahanas

I do like how cool their tools look.

Trahanas-NU002245

Jan 30, 2015, 10:28 AM from Diane Trahanas



Feb 12, 2015, 11:27 AM to Diane Trahanas

Are you doing irradiator training today ?

Feb 12, 2015, 11:50 AM from Diane Trahanas

Today is the day off from working overtime last week. So next one.

Feb 12, 2015, 11:57 AM to Diane Trahanas

Please make sure you are at next session so that we can start building the BM chimeras--- I'm doing the training today

Feb 12, 2015, 11:58 AM from Diane Trahanas

Ok I'll confirm the reservation with Joe today.

Feb 16, 2015, 2:43 AM to Diane Trahanas

Are we meeting with Harris today?

He changed the time last week and hasnt confirmed this week. I will be staying home sick today. The presentation is on the big Mac's desktop, if u wanted to look at it.

Are you OK?  Can you call me?

# EXHIBIT B
# DEP. EX. 24



## Fwd: D. Trahanas Update

Steven J Schwulst <s-schwulst@northwestern.edu>                                Wed, Feb 4, 2015 at 10:02 AM
To: Diane Trahanas <Diane.Trahanas@gmail.com>

Diane,

See below, your raise was approved retroactive to 1/19/15. About a 6 grand raise. Congratulations!

Steve

Steven J. Schwulst, MD, FACS
Assistant Professor of Surgery
Northwestern University
Department of Surgery
Trauma and Critical Care
676 N. St. Clair St., Suite 650
Chicago, IL 60611
Office Phone (312) 695-3903
Lab Phone (312) 503-6260
Fax (312) 695-3644


Begin forwarded message:

> **From:** "Burke, Heather" <hburke@nm.org>
> **Subject: D. Trahanas Update**
> **Date:** February 4, 2015 9:48:11 AM CST
> **To:** "Schwulst, Steven" <SSCHWULS@nm.org>
> **Cc:** "Rufer, Rachel" <rrufer@nm.org>, "Scarpelli, Chris" <Cscarpel@nm.org>,
> "Rufer, Rachel" <rrufer@nm.org>
>
> Hi Dr. Schwulst,
>
> I'm writing to update you on the salary increase request for Diane Trahanas. NU approved
> the increase and this change has been entered into the payroll system with an effective
> date of 01/19/2015.
>
> Please let me know if you have any questions.
>
> Thanks,
> Heather



EXHIBIT

24

Trahanas 1/5/18

PENGAD 800-631-6989

Heather Burke
Manager of Professional Affairs
Department of Surgery
Northwestern Medical Group

251 E. Huron Street, Galter 3-150
Chicago, Illinois 60611
312.926.6512 office
hburke@nm.org
nm.org

 Northwestern
Medicine

This message and any included attachments are intended only for the addressee.
The information contained in this message is confidential and may constitute
proprietary or non-public information under international, federal, or state laws.
Unauthorized forwarding, printing, copying, distribution, or use of such information is
strictly prohibited and may be unlawful. If you are not the addressee, please
promptly delete this message and notify the sender of the delivery error by e-mail.

**Diane Trahanas** <diane.trahanas@gmail.com>                    Wed, Feb 4, 2015 at 7:41 PM
Steven J Schwulst <s-schwulst@northwestern.edu>

Thank You Steve. I very much appreciate it.

Sincerely,

Diane
[Quoted text hidden]
--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

# EXHIBIT B
# DEP. EX. 26

| | |
|---|---|
| **From:** | Diane Trahanas |
| **To:** | Rana Saber |
| **Cc:** | Steven Schwulst |
| **Subject:** | Re: this seems right up your alley |
| **Date:** | Friday, March 1, 2013 1:34:51 PM |

im offended b/c in no way do i want to be associated with Lebron.
but i could see the basketball connection. lol

On Fri, Mar 1, 2013 at 1:20 PM, Rana Saber <ranasaber@gmail.com> wrote:
  http://www.youtube.com/watch?v=Ir2TdfSwH8g


--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

EXHIBIT
26
Trahanas 1/8/18
PENGAD 800-631-6989

Trahanas-NU010187

# EXHIBIT B
# DEP. EX. 27

| | |
|---|---|
| **From:** | Diane Trahanas |
| **To:** | Steven Schwulst |
| **Subject:** | football in basketball |
| **Date:** | Monday, March 25, 2013 10:17:37 AM |

http://www.youtube.com/watch?v=sSX-AWViw60

--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260



**CONFIDENTIAL**

Trahanas-NU010259

# EXHIBIT B

# DEP. EX. 28

| | |
|---|---|
| **From:** | Diane Trahanas |
| **To:** | Steven Schwulst |
| **Subject:** | millenial selfie |
| **Date:** | Wednesday, April 16, 2014 2:37:45 PM |

https://www.youtube.com/watch?v=SuyG-llkNow


millennial written all over this
--
Diane M. Trahanas
Northwestern University
Feinberg School of Medicine
Division of Trauma and Critical Care
Department of Surgery
240 E. Huron St
McGaw Pavillion M360f
Chicago, IL 60611
Lab: 312.503.6260

EXHIBIT
28
Trahanas 1/5/18
PENGAD 800-631-6989

**CONFIDENTIAL**

Trahanas-NU010267