**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DIANE M. TRAHANAS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 11192 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| NORTHWESTERN UNIVERSITY and | ) | |
| STEVEN J. SCHWULST, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In her second amended complaint, plaintiff Diane Trahanas brings claims for a Title VII hostile work environment; retaliation under the Family and Medical Leave Act and the Americans with Disabilities Act; defamation; and intentional infliction of emotional distress against defendants Northwestern University and Steven J. Schwulst, M.D. Before the Court is the defendants' motions for summary judgment and to exclude Professor Benjamin Clarke as a rebuttal expert witness. For the reasons set forth below, the defendants' motion to exclude is granted, and defendants' motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

**A.  Trahanas Is Hired into the Schwulst Laboratory**

On June 11, 2012, Diane Trahanas started as a Research Technologist II in the laboratory of Dr. Steven Schwulst, an Assistant Professor of Surgery in the Department of Surgery, Trauma and Critical Care at Northwestern University's Feinberg School of Medicine. Defs.' Statement of Undisputed Material Facts ("SOMF") ¶¶ 10, 3-4, ECF No. 104. Dr. Schwulst's scientific research focused on traumatic brain injuries. SOMF ¶ 12. As Dr. Schwulst's only research tech, Trahanas

had responsibilities ranging from more ministerial tasks like purchasing mice for experiments to technical, research-oriented tasks such as inflicting mice with brain injuries, euthanizing them, and collecting and analyzing the mice's blood and tissue, and assisting with the preparation of research papers for publication. SOMF ¶¶ 17, 15. Trahanas was good at her job and the Schwulst lab was productive while she worked there, though Dr. Schwulst was away from the lab for two weeks per month due to his clinic responsibilities at Northwestern University Hospital. *See* SOMF ¶¶ 20, 37; Pl.'s Statement Add'l Undisputed Material Facts ("PSAF") ¶ 1, ECF No. 108-2. While Trahanas worked at Northwestern she co-authored four research papers with Dr. Schwulst and she twice traveled out of state to attend national scientific conferences with him. SOMF ¶ 20. At one of those conferences, she presented a poster describing the Schwulst lab's research. *Id.*

### B. An Uncomfortable Laboratory Environment

Trahanas and Dr. Schwulst worked closely together throughout her employment at Northwestern. Trahanas admits that, at times, she and Dr. Schwulst got along "very nicely" and joked together. SOMF ¶ 26. However, Trahanas alleges that beginning in the fall of 2012, just a few months after her employment began, Dr. Schwulst started making different "verbally abusive" and "demeaning" comments that negatively impacted her work environment. Pl.'s Resp. SOMF ¶ 27, ECF No. 108-1. Trahanas alleges that Dr. Schwulst would refer to her as a "typical millennial" and "Princess Diana" in situations where he wanted to illustrate a mistake she made or to dismiss requests for guidance in her work. SOMF ¶ 27, Pl.'s Resp. SOMF ¶ 27. Other comments were gender-based. On one occasion, Dr. Schwulst allegedly asked Trahanas why she did not dress like Rana Saber, Dr. Perlman's lab manager, at work; Trahanas contends that Saber wore "stilettos, short shorts and low tops" in the lab. SOMF ¶ 32. Trahanas also claims that Dr. Schwulst often made comments like "after 28, women lose their sparkle," and that he "chided" her on several

occasions leading up to her twenty-eighth birthday that "[her] sparkle is beginning to fade." Pl.'s Resp. SOMF ¶¶ 27, 33.

But the most egregious, and most frequent, topic of Dr. Schwulst's comments was Trahanas's perceived sexual orientation. Trahanas is a straight woman and Dr. Schwulst was aware that Trahanas dated men while she worked for him. SOMF ¶ 5, 25. However, Trahanas alleges that in October 2012, in the course of a conversation about Trahanas's workout routine, Dr. Schwulst commented that women who exercise too much look "manly" and "butch" and that they are lesbians. SOMF ¶ 28. He also asked, "You're a lesbian, Diane, aren't you, right? You're a lesbian." *Id.* After that initial conversation, Trahanas claims that Dr. Schwulst referred to her either as a lesbian or as a "softball player"—a euphemism for lesbian—"regular[ly] and frequently" during the weeks that Dr. Schwulst was actually present in the lab. SOMF ¶ 29, Pl.'s Resp. SOMF ¶ 29. Trahanas identifies two conversations that also involved similar comments: one conversation in May or June of 2014 where Dr. Schwulst remarked that it would "make his life easier if his daughter grew up to be a lesbian like [Trahanas]," and a second conversation in December 2014, where Dr. Schwulst told Trahanas that he was considering buying his wife a charm bracelet, and that if Trahanas were to wear one, it would "have a mitt, a ball and a bat on it because that's what softball players would do." SOMF ¶ 30.

Trahanas also contends that co-worker harassment contributed to the disrespectful work environment. Dr. Schwulst's bench space was located in a laboratory shared with two other research scientists at the University, Dr. Perlman and Dr. Stehlik. SOMF ¶ 13. As a result, Trahanas often interacted with members of the Perlman and Stehlik labs. One employee in particular, Rana Saber, is the chief source of her complaints; Trahanas claims that Saber would blame her "if something went wrong in the lab"; remarked that it was the "blind . . . leading the

blind" when Trahanas showed other lab colleagues how to do something; asked Trahanas if she was "going to play softball" ten to fifteen times; and called Trahanas a lesbian "a few" times in front of their lab coworkers. SOMF ¶ 35. Trahanas also cites one email where Saber blames Trahanas for lab equipment being left on overnight. Pl.'s Resp. SOMF ¶ 35. Finally, Trahanas believes that Saber and Alexander Misharin, another member of the Perlman lab, intentionally sabotaged Trahanas's research for over six months by providing her with an outdated protocol for cell analysis. SOMF ¶ 21. Trahanas realized she had received an outdated protocol during a Perlman lab meeting; after the discovery, Dr. Perlman instructed lab members to ensure Trahanas had the more up-to-date version. SOMF ¶ 23

The extent to which relevant individuals in the University or in the Department administration at Feinberg were aware of this conduct is contested. None of their lab colleagues were present at the initial conversation about Trahanas's sexual orientation in October 2012, SOMF ¶ 28, but Trahanas claims that Dr. Schwulst would use the word "lesbian" or "softball player" to refer to Trahanas in front of her co-workers on a regular basis. SOMF ¶ 29. In response to Dr. Schwulst's remarks, Trahanas would "turn away from Dr. Schwulst, try to deflect the comment, act as if she did not hear it, or make an uncomfortable face." Pl.'s Resp. SOMF ¶ 27. But Trahanas did not report Dr. Schwulst's comments about her sexual orientation to anyone in the University's Human Resources department; she claims she chose not to because she feared he would retaliate. SOMF ¶ 28; Pl.'s Resp. SOMF ¶ 34. Nor did Trahanas make a complaint about Saber's harassing conduct to any of her supervisors, SOMF ¶ 35, or escalate her concerns about the alleged sabotage of her lab work beyond Dr. Perlman or Dr. Schwulst. SOMF ¶ 24.

### C. Conflict Over Trahanas's Pay Raise and Promotion

Despite her allegations about the lab environment, by the spring of 2014, Trahanas had a strong work record at Northwestern: in both 2013 and 2014, Dr. Schwulst rated her performance as "Highly Effective," and in 2014, he complimented her progress in learning the different laboratory equipment and indicated that she "should be considered for a performance based raise." SOMF ¶ 41. In March 2014, Trahanas met with Dr. Schwulst to discuss her pay and performance, and expressed her desire to be retitled and for a pay increase. *Id.* Later that day, Dr. Schwulst emailed former Department Manager of Professional Affairs, Nicole Buikema, stating that he and Trahanas had discussed a pay increase and potential retitling of her position and asking how to begin that process. SOMF ¶ 39. Buikema told him that he could propose that Trahanas receive a pay increase in her 2013 performance review; that any pay increase would be effective at the beginning of the next fiscal year, September 1, 2014; and that retitling was done through a different process and required approval through the HR compensation team. *Id.* Trahanas was included on these emails. *Id.* In June 2014, Trahanas inquired directly with the Department of Surgery Financial Manager, Rachel Rufer, for an update on the potential retitling of her position. SOMF ¶ 42. Rufer responded that it was "something that is in the works for the new fiscal year which starts September 1," *id.*, which, according to Trahanas, led her to believe that her promotion was a sure thing. Pl.'s Resp. SOMF ¶ 42.

In August 2014, Dr. Schwulst and Heather Burke, an HR employee, exchanged emails about Trahanas's merit pay increase and potential promotion. On August 13, Burke sent Dr. Schwulst the Research Technologist II and III job descriptions for his review, and asked him to ensure Trahanas was doing an appropriate level of work at the Research Technologist III level. Burke cautioned that "[i]f she is not doing this level of work, than [sic] a promotion to the higher

title may not be appropriate at this time." *Id.* Burke followed up with Dr. Schwulst on August 20 and September 2. On September 2, Dr. Schwulst responded that he had reviewed the job descriptions and concluded that "Diane is really inbetween [sic] tech 2 and 3," but that "[i]f possible I would like to make her a tech 3 at the minimum salary of 20.5." SOMF Ex. C, Dep. Ex. 247. Based on his response, Burke recommended leaving Trahanas as a Research Tech II and "work[ing] to promotion next year." *Id.*

At some point in September, Trahanas received her annual salary letter, notifying her that she remained in the Research Technologist II position and that she had received a 3% merit pay increase. SOMF ¶ 43. Shortly after receiving the letter, Trahanas emailed Krissy Dulek, the Research Administration Manager in the Department of Surgery, because she believed the letter was incorrect, as it did not reflect a retitling. *Id.* Trahanas wrote that the letter "is not reflective of the promotion Dr. Schwulst issued me back in March"; that "[w]ith 2 Bachelors Degrees and a Masters Degree the increase is supposed to be at the very minimum mirroring my Research Tech 2 midline pay" and that she had been "fulfilling [her] Research Tech 3 responsibilities since March" but "[had] yet to see the reflected title and pay change." PSAF Tab E, Ex. 48B.

Dulek notified Heather Burke of the issue, and on September 24, Burke informed Dr. Schwulst that Trahanas had been advised to contact him directly with her concerns, but that the letter "reflects the 3% merit increase that was originally submitted" and kept Trahanas at the Research Tech II level, as agreed. PSAF Tab E, Ex. 49. Dr. Schwulst responded almost immediately, writing, "I hate to do this, but I can't afford to lose Diane right now. Can we make her an RT3 at $21/hr. This should placate things for the time being." *Id.* Burke told Dr. Schwulst that the Dean's Office would not approve an off-cycle retitling or pay increase because Trahanas's

position was unfunded, and asked him to communicate that update to Trahanas, as she had reached

out to HR personnel again about the issue sometime in late September. PSAF Tab E, Ex. 50.

On December 11, 2014, Dr. Schwulst again reached out to Heather Burke and other

Department administrators, writing:

> I have a problem. Diane, my research technician, is really unhappy with her
> compensation and is actively looking for and has received an offer for alternate
> employment. Other than her compensation, she is happy with the work and the work
> environment. I cannot afford to have Diane leave right now for a higher paying job,
> it will bring my research effort to a screeching halt. I need to get her a higher hourly
> wage. We need to find a way around this. Please advise.

PSAF Tab E, Ex. 54. Burke reiterated that this would be considered an off-cycle budget request,

but indicated a competing job offer might help Trahanas's case. *Id.* On December 16, Dr. Schwulst

emailed Trahanas and asked her to start compiling the required information for an off-cycle request

while he was on service at the hospital. PSAF Tab E, Ex. 58. Trahanas expressed confusion that

her promotion would be considered "off-cycle," writing to Daina Fernandez that "[t]his is

something that was during the fiscal year cycle" and that she was "not understanding why Dr.

Schwulst needs to submit all this unnecessary paperwork, for something that was submitted and

agreed upon back in March." *Id.*

After the new year, Trahanas reached out repeatedly to HR Compensation personnel for

further updates about the promotion. She emailed Fernandez again on January 7 and January 13,

writing on January 13, 2015, that she felt like she was "being misinformed purposely by the

department," and that she was not being properly compensated for her level of work and

credentials. PSAF Tab E, Ex. 60. Her messages were relayed to Burke, who notified Dr. Schwulst

that Trahanas had been contacting HR Compensation directly, and advised him that it "isn't

appropriate for the employee to be making this request directly, rather the employee's

supervisor/manager should be submitting the request." PSAF Tab E, Ex. 62. Dr. Schwulst

forwarded Burke's email to Trahanas on January 13 and wrote: "I don't know what you've been doing but you need to stop. There is a specific protocol to get this done. We will talk on Friday when I am back from paternity leave." *Id.*

On January 14, 2015, Dr. Schwulst emailed Trahanas informing her that they would "be conducting a mid-year performance review" in his office the next morning, January 15. She emailed back to let him know that she was having car issues and, as a result, was "unsure" if she would be able to make the meeting. PSAF Tab E, Ex. 274. He responded that he needed to go over the review with her the next day before he met with his department HR business managers, that he wanted to speak in person, and asked her to "make every effort" to be in his office the next morning. PSAF Tab E, Ex. 276. After she confirmed that night that she would not be able to meet in person, he reminded her that the performance review "was set up by the events [she] set in motion," and that he was "extremely disappointed" in her lack of professionalism. PSAF Tab E, Ex. 278. He also told Trahanas that her "unapproved time away from the lab" had damaged his research mission, that she had exhausted her paid time off for the year, and that he felt that "the leeway" he had given her to set up her work schedule had been abused. *Id.* Dr. Schwulst and Trahanas did later meet to review the performance evaluation; the meeting was contentious, and Trahanas became upset and cried in Dr. Schwulst's office. Pl.'s Resp. SOMF ¶ 46. The raise was approved, however, and on February 4, 2015, Trahanas was notified that her pay would increase by 15% retroactive to January 2015. SOMF ¶ 47.

### D. Trahanas's Medical School Applications

Trahanas wanted to attend medical school, and Dr. Schwulst knew that Trahanas was applying to medical school while she worked in his lab. In June 2014, for example, Trahanas requested to use vacation time to study for the September 2014 MCAT administration. SOMF ¶ 68.

And in the fall of 2014, Trahanas asked Dr. Schwulst to write a letter of recommendation in support of her application. SOMF ¶ 69. In October 2014, he submitted a highly positive letter on her behalf. *Id.* Trahanas also received positive letters of recommendation from Dr. Perlman and from Dr. Debra Goldstein, M.D., another Northwestern professor. SOMF ¶ 70.

Medical school applications have various components, including the application itself, an MCAT score, grades, a personal statement, and letters of recommendation. SOMF ¶ 87. Application materials are submitted through the American Medical College Application Service ("AMCAS"), a third-party service that collects and distributes applicants' materials to the medical schools. SOMF ¶ 65. The application cycle generally has two stages: an initial screening and a secondary stage. SOMF ¶ 87. If an applicant does not meet preliminary admission criteria (such as a minimum GPA or MCAT score), the school may issue a "preliminary rejection" without requesting additional materials. *Id.* If an applicant meets those preliminary criteria, however, a school may invite the applicant to submit a secondary application; after those materials are submitted, an applicant may be selected to interview. *Id.* Secondary materials are generally due in December or January of the application cycle. SOMF ¶ 90.

On paper, Trahanas was not a particularly strong candidate for medical school. She has taken the MCAT seven times, SOMF ¶ 67, and, in the 2014 cycle, applied with a composite MCAT score of 21, which put her in the 24th to 27th percentile of applicants. SOMF ¶ 71. She also struggled in several of her science courses in her undergraduate degree, and her GPA fell in the 3.0-3.19 band. *Id.* Only 4% of applicants from Trahanas's demographic with comparable MCAT scores and undergraduate GPAs were accepted to medical school for matriculation in 2015. SOMF ¶ 71.

Trahanas applied to fifteen medical schools for 2015 matriculation; she was accepted to none. SOMF ¶ 88. Of those fifteen, nine rejected her application or declined to invite her to continue in the application cycle prior to February 19, 2015. SOMF ¶ 89. The six remaining schools invited Trahanas to submit secondary application materials, but she failed to do so by the schools' respective deadlines. The subpoenaed records from five of those schools clearly indicate they considered Trahanas to have withdrawn her application prior to February 19, 2015. SOMF ¶ 90 (Florida International University, Geisinger Commonwealth School of Medicine, University of Miami, Washington University, and University of South Carolina). The remaining school, Florida Atlantic University, invited Trahanas to submit her secondary materials on December 15, 2014; there are no entries in the school's internal application log between December 18, 2014, when the school received a letter of recommendation, and April 1, 2015, the entry for which reads "Withdrew Before Accepted." SOMF ¶ 90.

Trahanas applied to eleven schools for matriculation in 2018. SOMF ¶ 91. She only reapplied to four of the schools from the 2014 application cycle, and she was not accepted to any of those schools. *Id.* According to the defendants' expert, Jorge Girotti, AMCAS does not retain letters of recommendation from previous application cycles, and medical schools only consider letters from the application cycle in which they were written. SOMF ¶ 91. Trahanas disputes this, and contends that each medical school can retain and consider letters from previous cycles. Pl.'s Resp. SOMF ¶ 91.

### E.  Trahanas's FMLA Leave

Trahanas was diagnosed with depression, anxiety, and ADHD in 2007. SOMF ¶ 48. She took medication for these conditions prior to, and throughout, her employment at Northwestern, and she was treated by a psychiatrist, Dr. Deborah Cano, on a monthly basis from March 2013

until December 2016. SOMF ¶¶ 48-50; SOMF Ex. B.2. Trahanas shared her diagnoses with Dr. Schwulst in October 2012. SOMF ¶ 49.

Trahanas's depressive and anxiety-related symptoms worsened in the months leading up to February 2015. On January 16, 2015, Dr. Cano noted that Trahanas reported that her depressive symptoms had all increased since previous visits and were "severe." SOMF Ex. B.2. Trahanas reported daily panic attacks, symptoms including decreased frustration tolerance and irritability, and cited "multiple stressors," mentioning that she was dealing with "[i]ncreased job stress," and that her "boss [was] not being supportive." In her January 27, 2015, visit with Dr. Cano, Trahanas reported that though her symptoms had minimally improved, she was still having weekly panic attacks and experiencing other symptoms including lack of motivation, avoidant tendencies, and feelings of being overwhelmed, hopelessness, and worthlessness. She again noted "persistent job stress." *Id.*

By February 11, 2015, Trahanas's symptoms had somewhat eased. She reported that both her depression- and anxiety-related symptoms had "mildly improved." Her mood was good, and she planned to try out for the Chicago Red Stars, a professional women's soccer team, on February 12. She again reported "[p]ersistent job stress," but told Dr. Cano that she was "taking time off from [her] job starting next Mon, Feb 16." *Id.*

Despite her worsening symptoms, Trahanas regularly reported to work throughout January and the beginning of February. And though by February 12 she had decided she would take time off, Trahanas did not inform Dr. Schwulst or the University of her intentions, and her lab research proceeded as usual. SOMF ¶ [54]. On February 6, 2015, for example, Trahanas sent Dr. Schwulst an email that she had to wait to start the next "clod experiment"—a process in which Trahanas injected the mice with clodronate to deplete their white blood cells before applying an injury to

11

the mice, in order to study how a compromised immune system would react to a traumatic brain injury—because the lab's clodronate supply was insufficient for what she needed. SOMF ¶¶ 73, 75. And on February 9, 2015, Trahanas told Dr. Schwulst that she planned to "do another 48 hour clod experiment next week," SOMF ¶ 76—the week of February 16.

On February 16, Trahanas did not report to work. SOMF ¶ 55. She did not alert Dr. Schwulst that she was beginning a period of FMLA leave; instead, she texted him to let him know that she was staying home sick for the day. *Id.* Trahanas stayed home again on February 17 and, later in the day, told Dr. Schwulst through email that she was on medical leave and would only communicate with Human Resources while she was out of the lab. SOMF ¶ 56. That day, Dr. Cano faxed an "attending physician's statement of disability" for mental health claims to the University's third-party leave administrator. SOMF Ex. E.2. She cited Trahanas's recurrent major depressive and anxiety disorders, writing that Trahanas's persistent symptoms were "affecting her ability to function at work, at home, [and] socially" and impacting her "ability to deal with any level of stress," and that the expected duration of Trahanas's limitations was one to three months. *Id.* She also noted that Trahanas's condition was not related to her work environment. *Id.* The University approved Trahanas to take a full twelve weeks of FMLA leave, through May 10, 2015. SOMF ¶¶ 54, 57.

### F. Dr. Schwulst's Rescission, and Reinstatement, of his Recommendation Letter

After Dr. Schwulst learned that Trahanas was taking medical leave, he contacted Heather Burke and asked her to get certain information from Trahanas that he needed to keep the lab running smoothly while she was out, such as the lab computer password, the location of certain controlled substances, and the location of the mice cages in the "mouse house." SOMF ¶ 77; Pl.'s Resp. SOMF ¶ 77. Burke contacted Trahanas's work email requesting that information on

February 18, and, after receiving no response, sent the same request to her personal email on February 19. SOMF ¶ 77. Trahanas responded on February 20 and informed Burke she had lost computer access. PSAF Tab E, Ex. 299.

On February 19, however, while Dr. Schwulst was waiting for Trahanas's response, he located the mice cages on his own. SOMF ¶ 79. He claims that he saw notations on the cage cards that led him to believe Trahanas had injected the mice with clodronate before her FMLA leave began. *Id.* However, there were no notations on the cage cards or in Trahanas's laboratory notebook with the date and time that the clodronate injections had been administered, *id.*, and he claims he was otherwise unable to discern where in the protocol the mice stood, especially as Trahanas had requested that he limit communications with her. SOMF ¶ 80. Dr. Schwulst alleges that he consulted with Dr. Perlman about the issue, and that Dr. Perlman recommended that he euthanize the mice. SOMF ¶ 81. He did so and, per protocol, removed the cage cards and placed them in locked drop boxes for processing and destruction by the University's Center for Comparative Medicine. *Id.*

That same day, Dr. Schwulst uploaded a second letter to Trahanas's AMCAS account. SOMF ¶ 83. Misdated February 9, 2015, the letter stated that Dr. Schwulst was "formally withdraw[ing] [his] prior letter of reference for [Trahanas]" and that he could "no longer support her candidacy for admission to medical school." *Id.* He alleges that he had a "huge ethical problem" with the fact that the lab mice "were not going to be used for their intended purpose" and were "unnecessarily euthanized" because of Trahanas's failure to document the clodronate injections. SOMF ¶ 82. Trahanas received an AMCAS notification that Dr. Schwulst had uploaded a new letter to her applications, and on February 20, 2015, she emailed Daina Fernandez to inquire about the letter's contents. SOMF ¶ 83.

At some point, Chris Scarpelli, the Administrator for the Department of Surgery, contacted Dr. Schwulst about the February 19, 2015, letter. SOMF ¶ 84. Scarpelli told Dr. Schwulst that he thought Dr. Schwulst's decision to withdraw the original letter could be misconstrued, and instructed him to "cease and desist" from taking further action relating to Trahanas's medical school applications. *Id.* Scarpelli and Dr. Schwulst also agreed that Dr. Schwulst would retract the February 19, 2015 letter. *Id.* On February 26, Dr. Schwulst uploaded a new AMCAS letter that said his earlier letter had been "entered in error," and that he "[stood] by the evaluation offered in the original letter of reference" he submitted in October 2014. SOMF ¶ 85.

On February 27, 2015, attorney Pamela Visvardis sent a letter to Dr. Schwulst on Trahanas's behalf, demanding that he revoke and produce copies of the letters he uploaded to AMCAS on February 19 and February 26, 2015. SOMF ¶ 86. The letter also stated that Trahanas had authorized Visvardis to bring a suit for defamation, slander, and tortious interference with contract if he did not revoke and produce the letters. *Id.*

### G. Trahanas Does Not Return from Leave and Files EEOC Charge

Trahanas's FMLA leave elapsed on May 10, 2015. SOMF ¶ 57. The University granted her an additional paid short-term disability leave through May 24, 2015. *Id.* On June 8, 2015, after her leave had expired, Trahanas instructed the University's third-party leave administrator to close her short-term disability claim. SOMF ¶ 60. On June 9, 2015, Trahanas received a letter from HR employee Victoria Sherb, which stated that Trahanas was required to either inform Sherb that she intended to resign or submit documentation from her physician, so that the University could determine if her leave could be extended. *Id.* On June 15, 2015, Trahanas responded and stated her doctor was "not allowing [her] to return to work at Northwestern University." *Id.*; Pl.'s Resp. SOMF ¶ 60. On June 18, 2015, Trahanas received a letter from Human Resources that stated her

employment was terminated retroactive to May 15, 2015, as she had not returned to work or reopened her leave claim with the third-party administrator. SOMF ¶ 63.

Trahanas filed for unemployment benefits, but her application was denied. SOMF ¶ 62. She secured a return to work letter from Dr. Cano; it read "[Trahanas] was able to return to work on May 25, 2015. I do not recommend she return to her previous job, as the high stress from the work environment there would cause exacerbation of symptoms and likely lead to psychiatric decompensation." *Id.* Trahanas used the letter to contest the denial of unemployment benefits, but does not recall giving the letter to anybody in Human Resources. *Id.* She applied for other jobs within the University and received one interview in another lab, but was ultimately unsuccessful. SOMF ¶ 64.

Trahanas filed her charge of discrimination with the Equal Employment Opportunity Commission on September 24, 2015, alleging sex and disability discrimination and retaliation. SOMF ¶ 92. This lawsuit followed on December 11, 2015.

## DISCUSSION

Two motions are before the Court: the defendants' motion to exclude the expert report and testimony of Professor Benjamin Clarke, offered by Trahanas as a rebuttal expert, and the defendants' motion for summary judgment. The motion to exclude is addressed first to determine the extent of the record under review for the defendants' motion for summary judgment.

**I.  Motion to Exclude Professor Benjamin Clarke's Expert Report and Testimony**

In November 2018, Trahanas disclosed Professor Benjamin Clarke, an associate professor at the Duluth campus of the University of Minnesota Medical School, as a rebuttal witness to provide an opinion on "the fitness of Plaintiff for enrollment in medical school and the impact of the actions and letter sent by Dr. Schwulst on Plaintiff's professional reputation and ability to enroll in medical school." Defs.' Mot. Exclude 1, ECF No. 113 (quoting Trahanas's Rule

26(a)(2)(D)(ii) expert disclosure). Professor Clarke was deposed and submitted an expert report, and Trahanas relies on two of his opinion in her response in opposition to summary judgment: first, that "[g]iven a chance, Ms. Trahanas would succeed in medical school if she found the appropriate medical school"; and second, that Dr. Schwulst's explanation for withdrawing his letter of recommendation is dubious, because a single incident "does not provide reason to revoke a letter of reference." *See* PSAF Tab O, Clarke Dep., ECF No. 108-18; Tab P, Clarke CV and Report, ECF No. 108-19. His report also included the opinions that there were "extreme displays of non-professional behavior that produced a hostile work environment for Ms Trahanas"; that, if Dr. Schwulst believed there was an ethical breach, "[a]n appropriate response by a supervisor would have been to have a conversation with the employee" to counsel her on the issue; that Dr. Schwulst's motivation in withdrawing the letter was "questionable"; and that the "impact of this action was direct and caused considerable damage to Ms Trahanas's professional standing and presumably her wellbeing." Defs.' Mot. Exclude Ex. C. The defendants move to exclude Professor Clarke's report and testimony as untimely and unreliable, pursuant to Federal Rules of Civil Procedure 26 and 37(c) and Federal Rule of Evidence 702. Defs.' Mot. Exclude 1.

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702 and by *Daubert* and its progeny. *Callpod, Inc. v. GN Netcome, Inc.*, 703 F. Supp. 2d 815, 819-20 (N.D. Ill. 2010). Under Rule 702, "scientific, technical, or other specialized knowledge" is admissible through expert opinion testimony if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. *Daubert*'s three-step admissibility analysis that guides the application of Rule 702 first asks whether an expert is qualified by "knowledge, skill, experience, training, or education"; second, if the expert is qualified, whether the "reasoning or methodology underlying the testimony [is] scientifically reliable"; and finally, if

the expert is qualified and their methodology is reliable, whether their testimony is relevant to understanding the evidence or a fact in issue. *Callpod, Inc.*, 703 F. Supp. 2d at 820.

Professor Clarke's proffered opinion testimony fails on each of the three prongs of *Daubert*'s reliability analysis. First, Professor Clarke's education and experience do not qualify him as an expert in the area of medical school admissions. Clarke is neither a physician nor a medical school graduate; he completed the academic requirements to earn a Ph.D. in biochemistry in 1986 at the University of Texas Medical Branch in Galveston. PSAF Tab O, Clarke Dep. Tr. 13:20-15:13. Though his Ph.D. was awarded by a medical school, he did not undergo a full medical school curriculum, nor did he take the MCAT for admission to the program. *Id.* at 16:10-23. He has been a member of the faculty of the University of Minnesota Medical School in Duluth since 1994, and has been in a tenured position since 2000. PSAF Tab P at 2. From 2012 through 2014, Clarke served as a member of the medical school's admissions committee. *Id.* at 14. His service encompassed three admissions cycles. Clarke Dep. Tr. 46:16-47:2. At the University of Minnesota, there are "two levels of review": "an initial prescreener," which involves two faculty members going through the "15 or 1600-some-odd applications that may come in per year" to triage applications and determine which are worthy of further consideration, and the interview stage. Tr. 47:7-17. Clarke did not participate in the initial prescreening. *Id.* After students were selected for an interview, Clarke and other faculty committee members would "interview a portion of the students, review their admissions packets, see if they conformed to what [their] mission for [their] medical school is," and meet and vote on admissions decisions as a committee. Tr. 47:16-48:3. Clarke personally reviewed about forty-five candidates each cycle. Tr. 48:22-49:3.

None of this is enough to qualify him as an expert on the topic of the medical school admissions process generally, much less the specific prospects for admission of a particular

individual or her likelihood of success as a medical school student. While his educational background and experience at the University of Minnesota may have familiarized him with certain aspects of the medical school admissions process, Professor Clarke himself admits that he "would not portray [him]self as an authority" on the theory of medical school admissions and that his familiarity with the process is limited to his three-year stint on the commission in Duluth. Tr. 42:10-17; 52:25-53:6. He has not published any peer-reviewed papers on the topic, *id.*, and he did not participate in Minnesota's prescreening process that narrows the field of applicants by about one-half or two-thirds based on different criteria, including MCAT scores and GPA. Tr. 53:16-54:15. Though he testified that he has had "well over a couple hundred students" pass through his training programs and that he has written letters of recommendation for about half of them, Tr. 53:6-11, his insight into the admissions process itself is limited.

Second, Clarke's opinions as Trahanas's chance of success if she were admitted to medical school, the propriety or credibility of Dr. Schwulst's explanation for the withdrawal of his letter, and the impact that the withdrawal had on Trahanas's professional reputation are "little more than h[is] personal opinion"; they are "not based on a methodology that can be tested." *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 884 (D. Md. 2001) (excluding proffered medical school admissions expert testimony from a former member of Yale University School of Medicine's admissions committee because expert "lack[ed] an extensive background in medical school admissions," "reviewed a total of only five applications" in preparation for her testimony, her work "ha[d] not been subjected to any peer review," and her opinions were "not based on a methodology that can be tested"). In his testimony, Professor Clarke indicated that he had developed his opinions through reading Dr. Schwulst's and Jorge Girotti's depositions and essentially making credibility determinations. For example, he disputed Dr. Schwulst's justification for withdrawing his letter

because, in Professor Clarke's opinion, to do so would be to "plac[e] a lot of emphasis on that particular incident at that particular point in her life and transition" and "just because someone makes a mistake doesn't make it unethical." Tr. 90:19-91:23; *see also* Tr. 128:4-20 ("I'm not certain exactly why he wanted to retract the letter. I understand there was an animal issue involved on the table. I do not understand how that rises to the level of wanting to retract the letter . . . To me, that doesn't rise to the significance. So that implies that something else was driving it."). He concluded that particular behavior was "nonprofessional" based on his experience "as a professional who works in that environment, knowing how I would want to be treated and how I would like to have people around me treated" and as a supervisor and teacher for a graduate course. Tr. 81:18-82:14. There is, moreover, no apparent basis in either his deposition testimony or his written report for the opinion that Trahanas's professional reputation was irreparably damaged by Dr. Schwulst's withdrawal and reinstatement of his initial, positive letter. Because there are no indicia of reliability in the methodology underpinning Professor Clarke's opinions, they cannot be admitted under Rule 702.

Finally, even if Professor Clarke was qualified and had used reliable methods to form his opinions in this case, they are not helpful to a jury in determining an issue of fact or interpreting evidence in the record. A juror does not need to be an expert in animal research protocols, ethics, or in the medical school admission process to make credibility determinations and draw inferences from those determinations. *See, e.g.*, *Bogathy v. Union Pac. R.R.*, No. 17 C 4290, 2020 WL 419406, at *5-6 (N.D. Ill. Jan. 24, 2010) (noting that expert witnesses are "not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies"; a "critical function of the jury" is assessing witness credibility, and "assisting the jury" cannot veer into "doing the jury's job for it").

Because Professor Clarke's opinion does not meet the criteria for admissibility under *Daubert* and Federal Rule of Evidence 702, the Court need not, and does not, reach the issue of whether he was timely disclosed or properly considered a "rebuttal" expert under Federal Rules of Civil Procedure 26 and 37(c). The defendants' motion to exclude him as an expert is granted; and Professor Clarke's testimony and expert report are not considered in resolving the defendants' motion for summary judgment.

## II.     Defendants' Motion for Summary Judgment

The defendants have moved for summary judgment on each of Trahanas's claims. Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the record and the inferences drawn from it in the light most favorable to the non-moving party. *Courtney v. Biosound, Inc.*, 42 F.3d 414 (7th Cir. 1994). However, if the nonmovant bears the burden of proof as to a particular element of her claim, "she may not simply rest on the pleadings; rather, the nonmovant must affirmatively set forth specific facts that show that there is a genuine issue of material fact." *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 567 (7th Cir. 1989). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"—"complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

### A.     Title VII Hostile Work Environment

Trahanas's first claim against Northwestern University is a Title VII hostile work environment claim. To prevail on a Title VII claim, Trahanas must show that 1) her work environment was both subjectively and objectively offensive; 2) that the harassment was based on

her membership in a protected class; 3) that the harassing conduct was severe or pervasive; and 4) that there is a basis for employer liability. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Whether a work environment is "hostile" depends on the totality of the plaintiff's circumstances, taking into account factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* An employer's liability for harassment "may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is the victim's co-worker, there is a basis for employer liability only if the employer was "negligent in controlling working conditions." *Id.* If the harasser is a supervisor, however, "different rules apply." *Id.* If the supervisor's harassment culminates in a tangible employment action, the employer is strictly vicariously liable because "there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 429. If there is no tangible employment action, the employer will still be held vicariously liable if it is unable to establish an affirmative defense. *Id.*

To the extent that Trahanas's complaint and response in opposition to summary judgment may be read as advancing a Title VII claim predicated on co-worker harassment,[1] that claim does

---

[1] The defendants argue that Trahanas's "comprehensive 27-page, 146-paragraph Second Amended Complaint is wholly devoid of any reference to co-worker harassment based on sexual orientation" and that she "cannot now claim that she was subject to a Title VII hostile work environment based not only on Dr. Schwulst's comments but also Saber's comments." Defs.' Memo. Supp. Summ. J. 10 n.13. Trahanas's failure to mention co-worker harassment as a theory of Title VII liability in her second amended complaint does not preclude her from arguing on that basis at summary judgment, as "plaintiffs are not required to plead legal theories." *Whitaker v. Milwaukee Cty.*, 772 F.3d 804, 808 (7th Cir. 2014). But it is also true "[a] plaintiff cannot add additional claims through arguments made in opposing summary judgment," *Messner v. Caledrone*, 407 F. App'x 972, 974 (7th Cir. 2011), and Trahanas's allegations about Saber's comments arguably create a "new factual theory of liability," as those allegations do not appear in the complaint. *Compare* SAC ¶¶ 29-39 (outlining Dr. Schwulst's comments referring to Trahanas as a lesbian, with no mention of Saber doing the same), *with, e.g., id.* ¶¶ 45, 55 (describing "certain

not survive summary judgment. An employer is negligent in controlling working conditions—and therefore liable for coworker harassment—if the employer had actual or constructive knowledge of the harassment but failed to address the problem adequately. *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). And, when a plaintiff claims she is suffering a hostile work environment due to the conduct of both coworkers and her supervisor, "all instances of harassment by all parties are relevant to proving that [her] environment is sufficiently severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000). Trahanas at least gestures at this theory in her pleadings. For example, she alleges that, with Dr. Schwulst's knowledge and encouragement, coworkers would criticize her work and made comments like, "[s]top messing things up," "[y]ou're doing everything wrong and you have no idea what you're doing," and "[d]ude, take your meds." SAC ¶¶ 44-59, *see also* Pl.'s Resp. Opp'n 2-3 (noting comments like "Diane is off her meds!" and "Diane needs psychiatric help!"). Trahanas also claims that Rana Saber called her a lesbian "a few times" and asked if Trahanas if she was "going to play softball" "ten, maybe fifteen" times in front of coworkers from the lab. SOMF ¶ 35. Finally, Trahanas alleges the single incident where she discovered that Rana Saber and Dr. Sasha Misharin had given her an incorrect and outdated protocol for flow cytometry; she claims that Saber and Dr. Misharin were not disciplined for the incident, though both Dr. Perlman and Dr. Schwulst were made aware of it. SAC ¶¶ 60-64; Pl.'s Resp. Opp'n 3.

Most of the coworker harassment that Trahanas describes cannot support a Title VII hostile work environment claim against the University because her coworkers' comments, though perhaps

---

coworkers" harassing and mocking Trahanas because of her alleged disabilities). However, because there is "no material dispute" about the relevant facts, and because the alternative theory of liability did not result in "unfair surprise" to the defendants, *Whitaker*, 772 F.3d at 808, the Court addresses the coworker harassment theory on the merits.

rude and demeaning, were not predicated on Trahanas's "race, color, religion, sex [or] national origin." *See* 42 U.S.C. § 2000e-2(a)(1); *cf. Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 851-52 (a hostile work environment on the basis of disability may be brought under the ADA).[2] Trahanas admits as much in her complaint, characterizing coworkers' comments as harassment based on her depression, anxiety, and ADHD—not, as required for Title VII, on her sex. *See* SAC ¶¶ 45, 53 (claiming she was subjected to a hostile work environment "because of her disability," and describing "demeaning and harassing statements made to Plaintiff about her physical and mental condition and impairment"). Saber's comments calling Trahanas a lesbian or asking if she was going to play softball, by contrast, are gender-based. But Trahanas testified in her deposition that Saber made these comments in front of coworkers, not in front of Dr. Schwulst or Dr. Perlman, SOMF ¶ 35, and that she did not report the comments to either supervisor or to Human Resources. *Id.* Because an employer's "notice or knowledge of the harassment is a prerequisite for liability," and Trahanas failed to present evidence showing that she gave "[Northwestern] enough information to make a reasonable employer think there was some probability that [s]he was being . . . harassed," summary judgment is appropriate. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373-74 (7th Cir. 2007).

Trahanas's main theory of Title VII liability, however, is predicated on Dr. Schwulst's conduct, and there is substantial disagreement between the parties about the nature and extent of his harassing behavior. Trahanas alleges that Dr. Schwulst called her a lesbian (or made references to her being a "softball player," as a euphemism for lesbian), on a daily or near-daily basis during

---

[2] Trahanas's initial complaint made an ADA hostile work environment claim, but that claim was dismissed by the Court, *see* Order Mot. Dismiss 7-8, ECF No. 38, and was not realleged in the plaintiff's second amended complaint, which is the operative complaint for evaluating the defendants' motion for summary judgment. *See* SAC ¶¶ 106-11 (Count I, claiming only a Title VII hostile work environment).

the weeks he was in the laboratory.[3] Trahanas also alleges that Dr. Schwulst told her it would "make his life easier if his daughter grew up to be a lesbian like [her]" and, in a discussion about a gift for his wife in December 2014, said that if Trahanas wore a charm bracelet it would "have a mitt, a ball and a bat on it because that's what softball players would do." SOMF ¶ 30. She claims that this started after a conversation about the "manliness" of her workout routines in October 2012 and continued for the rest of the time that she worked in Dr. Schwulst's lab. Trahanas alleges that Dr. Schwulst made these comments, at times, in front of her coworkers from the Perlman and Stehlik labs, and testified at her deposition that she indicated her discomfort with those comments by falling silent when the topic came up, making uncomfortable faces, and eventually by addressing it with Dr. Schwulst, stating "I'm not a softball player, I'm not a lesbian; I don't know why we keep going back to this." SOMF ¶ 31.

The defendants contest Trahanas's account, both as to the frequency of the alleged comments and as to the impact that Dr. Schwulst's conduct had on Trahanas and the work environment more generally. They note that, at times, Trahanas and Dr. Schwulst had a friendly, even joking working relationship, and that Trahanas made significant contributions to the lab's

---

[3] Trahanas is a heterosexual woman. SOMF ¶ 5. The defendants characterize Trahanas's Title VII claim as one predicated on her "perceived sexual orientation." *See, e.g.*, Defs.' Memo. Supp. Summ. J. 9-11 & nn.11, 15. Trahanas does not contest this characterization, but the complained-of conduct has more to do with Trahanas' perceived failure to conform to sex stereotypes than with her sexual orientation, which was known to everyone in the lab. *See* SOMF ¶¶ 28, 32 (noting that the first time Dr. Schwulst allegedly referred to Trahanas as a "lesbian" was after a discussion of workout routines, where Dr. Schwulst commented that women who exercise too much will start to look "manly" and "butch," and highlighting an instance where Dr. Schwulst asked Trahanas why she did not dress more like Rana Saber at work, i.e. in "stilettos, short shorts and low tops"); *id.* ¶ 25 (Trahanas "dated men when she worked for Dr. Schwulst and she shared with him in 2014 that she had a boyfriend"). *Compare Weller v. Paramedic Servs. of Ill., Inc.*, 297 F. Supp. 3d 836, 839 (N.D. Ill. 2018) ("[Plaintiff] unequivocally pleads that his declination to conform to [his employer's] gender norms ultimately resulted in his employment being terminated. Per the Seventh Circuit's inclusion of sex stereotyping under the Title VII umbrella of gender discrimination, this is enough for [the plaintiff] to state an actionable claim.").

success during her time working there. They highlight that, during her deposition testimony, Trahanas did not quantify the number of times that Dr. Schwulst made inappropriate comments to her (though she described it as "frequent"), and that she first alleged the comments were made on a daily basis in an affidavit that she signed months after her deposition testimony. Defendants also argue that Trahanas herself made joking references to softball, citing one email that Trahanas sent to her lab colleagues that RSVP'd for herself and "+1. . . . And no it's not my softball teammate – so u instigators don't bother with that guess. :)" and citing text messages where Trahanas used softball or baseball emojis in conversation with Dr. Schwulst. SOMF Ex. D at Ex. C, ECF No. 104-5.

But these factual disputes are immaterial, because even if Dr. Schwulst's conduct was sufficiently frequent and severe to constitute a "hostile work environment" under Title VII, Northwestern is entitled to summary judgment on this claim. In situations where supervisor harassment "culminates in a tangible employment action," the employer is strictly liable. *Vance*, 570 U.S. at 424. But where no tangible employment action is taken against the plaintiff, an employer may invoke the *Faragher-Ellerth* affirmative defense,[4] if the employer can demonstrate by a preponderance of the evidence that 1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627-28 (7th Cir. 2019).

The *Faragher-Ellerth* affirmative defense is available here because no tangible employment action was taken against Trahanas. A tangible employment action is a "significant

---

[4] *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998).

change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 431, *citing Ellerth*, 574 U.S. at 761. Trahanas was not hired, fired, or reassigned, nor did she experience a significant change in benefits. *See, e.g.*, SOMF ¶¶ 60-61, 63 (Trahanas's employment was terminated in June 2015, retroactive to May 2015, only after Trahanas informed University HR employee Victoria Sherb that she would not be returning to work at the University at the end of her leave). And while Trahanas's requested promotion and pay increase caused a not-insignificant level of strife in her and Dr. Schwulst's relationship, *see* SOMF ¶ 46; Pl.'s Resp. SOMF ¶ 46 (Dr. Schwulst was angry that Trahanas did not show for the mid-year performance review required for an off-cycle pay increase, and raised his voice at Trahanas, causing her to cry), there is also significant evidence in the record that Dr. Schwulst both inquired through the proper channels about retitling Trahanas's position and, when unsuccessful, secured a substantial merit raise in the hopes of keeping her as his research technician. *Id.* at ¶¶ 39, 47 (noting that Dr. Schwulst emailed Nicole Buikema about the possibility of retitling Trahanas to a higher level on March 17, 2014, the day that Trahanas first raised the topic; that Heather Burke concluded that the bulk of Trahanas's work was still consistent with the Research Tech II position; and that Dr. Schwulst was nonetheless able to secure an off-cycle pay increase of 15% on Trahanas's behalf). Because Trahanas has not alleged an action that caused "substantial detriment to the plaintiff's employment relationship," the University may invoke the affirmative defense. *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).

"While not required as a matter of law, . . . the existence of an appropriate anti-harassment policy will often satisfy" the first prong of the *Faragher-Ellerth* defense, given that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance

26

mechanisms." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999). Here, the parties agree that the University "maintains a policy prohibiting discrimination or harassment" against any individual on any lawfully protected basis, including gender and sexual orientation. SOMF ¶ 7. And the parties agree that Trahanas received the University handbook outlining that policy—and including information about how to file discrimination complaints with a variety of individuals within the university, such as the Director of the University Sexual Harassment Prevention Office or the Associate Vice President for Human Resources—on her first day of employment, and that she signed an acknowledgement form confirming that she could "call anyone in the Department of Human Resources" if she had a question about the policies in the handbook. SOMF ¶ 8.[5] Whether Trahanas actually read the University handbook after receiving it is "irrelevant because it is undisputed that she received a copy of the policy and that she was required as a condition of her employment to read and comply with both the policy and the other terms contained in the Employee Handbook." *Shaw*, 180 F.3d at 811. And, as in *Shaw*, Northwestern's anti-harassment policy made it clear that "sexual harassment will not be tolerated, and provided for multiple mechanisms for the prompt resolution of complaints"—including some avenues that allowed a complaining employee to circumvent her supervisory chain of command. *Id.* at 811-12. Because the University has presented "undisputed evidence establishing that it acted reasonably to prevent" and respond to allegations of sexual harassment, when such allegations are actually made, "it has satisfied the first prong of *Ellerth*'s affirmative defense." *Id.* at 813.

---

[5] Trahanas's objections to this paragraph in the defendants' statement of material facts do not contest that Trahanas received the University handbook or that the relevant anti-discrimination policies were contained within it. *See* Pl. Resp. SOMF ¶ 8 ("objecting" by stating that Trahanas eventually met with Daina Fernandez, a Department of Human Resources employee, later in her employment and other non-responsive bases).

To succeed on the second prong, the University must establish that Trahanas "unreasonably failed to take advantage" of preventive or corrective opportunities to mitigate the harm of the harassing work environment. *Shaw*, 180 F.3d at 813. In their statement of material facts, the defendants cite Trahanas's own deposition testimony "that [she] never reported Dr. Schwulst's comments to Human Resources or anyone else in the Department administration at the medical school." SOMF ¶ 31. In response, Trahanas argues that she feared Dr. Schwulst "would retaliate against her if she inconvenienced or spoke out against him," citing, in most relevant part, to her affidavit, though her affidavit does not say as much. Pl.'s Resp. SOMF ¶ 31; PSAF Tab A, Trahanas Aff. ¶¶ 32-41 (describing Dr. Schwulst's comments calling her "[a] [t]ypical [m]illenial," "Princess Diana," "a lesbian" and a "softball player," and reiterating that his behavior made her feel "embarrassed, demeaned and disrespected"). This argument is unpersuasive. First, the parties agree that the University has both 1) appropriate complaint mechanisms that allow an employee to report harassment outside of her chain of command and 2) a policy prohibiting retaliation against any individual for making a complaint pursuant to the University's anti-discrimination policies. SOMF ¶ 9. And second, even if Trahanas's concerns about potential repercussions were sincere and otherwise supported by evidence in the record, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Shaw*, 180 F.3d at 813.

Trahanas also argues in her response in opposition to summary judgment that she in fact did take advantage of corrective measures available to her through the University's human resources department. She claims that "[she] sought the assistance of the Northwestern HR Compensation Team and the Human Resources Department" and that HR personnel exchanged emails "acknowledging that Dr. Schwulst had been wrong" and expressing concern she might

28

escalate the issue. Pl.'s Resp. Opp'n 10-11. Trahanas also insinuates that it was her decision to seek assistance that prompted Dr. Schwulst to "caution[] her, 'I don't know what you have been doing but you need to stop.'" *Id.* at 11; PSAF ¶ 23.

But Trahanas's argument that she reported the alleged harassment to the University's HR personnel is based on a gross mischaracterization of the evidence that Trahanas, herself, submitted. Dr. Schwulst's email to Trahanas reads, for example, "I do not know what you have been doing but you need to stop. There is a specific protocol to get this done. We will talk on Friday when I am back from paternity leave." PSAF ¶ 23. The "this" Dr. Schwulst refers to is plainly Trahanas's desired off-cycle promotion or raise, and his comment was prompted by Trahanas's own email to Daina Fernandez "complaining that she has not heard anything [about the promotion] for almost a year." PSAF ¶ 20, *see* PSAF Tab E., Ex. 62 (with subject line reading "D. Trahanas promotion"). Another selectively quoted email between Heather Burke and Daina Fernandez reads, in part: "We do not process these unless there is approval via Department and Central FSM. Annette Czech in Compensation would and will process IF approved. . . We should not be making these types of promises to employees if we do not have the funding or approval. Please follow up as appropriate. I am concerned that the employee might escalate . . . ." PSAF ¶ 25. Read in context, it is obvious that the HR employees are discussing the same promotion issue. *See* PSAF Tab E, Ex. 65 (subject line reading "FW: Promotion"). Finally, the email referring to HR personnel "looking into this" was sent in response to Trahanas's email alerting HR that Dr. Schwulst had submitted a new letter to the AMCAS system, and seeking their assistance in determining the contents of the letter. PSAF ¶ 39. Trahanas does not point the Court to any other evidence in the record, nor could she—her contention that she reported workplace harassment is wholly unsupported. So, though the material facts regarding the frequency, severity, and impact of Dr. Schwulst's conduct are disputed, the

University is shielded from liability by the *Faragher-Ellerth* defense, warranting summary judgment on Trahanas's Title VII claim.

### B. ADA and FMLA Retaliation

Second, Trahanas alleges ADA retaliation against Northwestern University and FMLA retaliation against both the University and Dr. Schwulst. "Retaliation claims under the FMLA and ADA require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). The parties do not dispute that Trahanas engaged in statutorily protected activity when she took a leave of absence from February 17, 2015, onward. SOMF ¶ 56; *see also* Defs.' Mot. Summ. J. at 18 & n.22 ("[I]t is undisputed that Plaintiff took a protected FMLA leave of absence," and though the defendants maintain that Trahanas is not "disabled" within the meaning of the ADA, "the University does not dispute that taking time off as a result of a disability may be protected activity"). Trahanas's claims of ADA and FMLA retaliation against Northwestern fail on the causation element, however, because she presents no evidence that the University took adverse action against her because of that protected activity. Trahanas's FMLA retaliation claim against Dr. Schwulst, on the other hand, survives summary judgment—a reasonable jury could find that Dr. Schwulst's withdrawal of his positive recommendation letter for Trahanas's medical school applications was an adverse action, and there is a factual question as to whether his proffered explanation is pretextual.

### 1. ADA and FMLA Retaliation against Northwestern University

Trahanas' argument that the University retaliated against her for taking a leave of absence from the Schwulst laboratory is primarily based on the fact that she was not hired for other jobs that she applied to within the University during and after her FMLA leave. *See* Defs.' Mem. Supp.

Summ. J. 18 (identifying three claimed adverse actions from Trahanas's pleadings, including failure to hire in other positions); Pl.'s Resp. Opp'n Summ. J. 16, ECF No. 108. She also alleges she was "locked out of her work computer," SAC ¶¶ 77, 79, and cites email exchanges between different Northwestern personnel that discussed releasing Trahanas's position if she did not return from her FMLA and short-term disability leave. Pl.'s Resp. Opp'n 16; Defs.' Resp. to PSAF 29, ECF No. 116.

The discussions among University employees about potentially releasing Trahanas's position if she did not return to leave, and Trahanas's inability to access her University-affiliated account while she was on FMLA leave, are not material adverse actions. The decision to take FMLA leave does not immunize an employee "from those petty slights or minor annoyances that often take place at work"—"not everything that makes an employee unhappy is an actionable adverse action." *Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) (internal quotations omitted). Trahanas alleges that she was not locked out of her computer when she took FMLA leave in 2014; even if true, this does not elevate what is ultimately a "minor annoyance" into a significant harm. And while internal discussions about releasing Trahanas's position may be evidence of retaliatory intent, *see id.* at 817-18, they did not actually culminate in adverse action: the parties agree that Trahanas chose not to return to work in Dr. Schwulst's laboratory.[6]

---

[6] The defendants cite evidence that Trahanas informed HR employee Victoria Sherb that she would not be returning to the Schwulst lab after Sherb informed Trahanas she was required to let the University know whether she intended to resign or seek an extension of her leave. SOMF ¶¶ 60-61 (noting, additionally, that Trahanas's employment would be terminated if she failed to respond to Sherb's inquiries). The plaintiff does not dispute that she informed Sherb she would not be returning, but she maintains that her decision not to return to work at the Schwulst lab was made at the direction of Dr. Cano, her psychiatrist. Pl.'s Resp. SOMF ¶ 61. In either case, the University was not the cause of Trahanas's decision not to return to her job.

Failure to hire, on the other, may constitute adverse action in employment discrimination cases. *See, e.g.*, *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). And evidence in the record indicates that Trahanas applied to over twenty jobs at Northwestern from February 2015 onward without success. PSAF Tab V 15-18, ECF No. 108-25. The University is nonetheless entitled to summary judgment on Trahanas's retaliation claim because she offers no evidence whatsoever regarding causation. Nothing in the record supports her contention that the reason she was not hired for these positions is because she took FMLA leave or short-term disability leave; in fact, she does not even argue that the individuals responsible for hiring for those positions knew that she took leave from the Schwulst lab. Her FMLA and ADA[7] retaliation claims against the University therefore fail for lack of evidence on causation. *See Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) (concluding that an unsupported inference that interviewers knew of an employee's protected activity was not enough for a retaliation claim to survive summary judgment,

---

[7] The defendants also argue that the University could not have engaged in ADA retaliation against Trahanas for taking leave because she is not "disabled" within the meaning of the ADA. *See* Defs.' Memo. Supp. Summ. J. 17. The viability of an ADA retaliation claim generally does not turn on whether an individual is disabled, *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010), because Section 12203 of the ADA protects "any individual" who has opposed an unlawful practice under the ADA or who has made a charge, testified, assisted, or otherwise participated in an investigation under the act, 42 U.S.C. § 12203(a). Because Trahanas is not disabled under the ADA, however, her leave of absence from the Schwulst lab may not constitute an ADA "protected activity"; in fact, the documents in the record relating to her leave refer only to the FMLA. *See* SOMF Ex. B.3, Dep. Ex. 38 (June 9, 2015 letter from Northwestern HR that states Trahanas "w[as] initially approved for an FMLA Leave of Absence . . . from 2/16/2015 – 5/24/2015"). At least some courts have concluded that FMLA leave is not a "protected activity" for ADA purposes. *See Acker v. General Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017) (holding that "a request for FMLA leave is not a request for a reasonable accommodation under the ADA," because "an employee seeking FMLA leave is by nature arguing that she *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that she *can* perform the essential functions of the job"); *accord Arms v. Milwaukee Cty.*, No. 18-cv-1835, 2019 WL 1981036, at *5 (E.D. Wis. May 1, 2019) (but noting the Seventh Circuit has not decided the issue). The reasoning seems persuasive, but the Court need not decide the issue here—any ADA retaliation claim Trahanas might have fails on causation.

because "a superior cannot retaliate against an employee for a protected activity about which he has no knowledge"); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006).

## 2. FMLA Retaliation against Dr. Schwulst

Trahanas's FMLA retaliation claim against Dr. Schwulst fares better. To make out a prima facie case of FMLA retaliation, Trahanas must establish that she engaged in a protected activity, that Dr. Schwulst was an employer within the meaning of the FMLA and took a material adverse action against her, and that there is a causal link between the protected activity—here, Trahanas's FMLA leave—and Dr. Schwulst's adverse action.[8] Under the FMLA, but-for causation is not required;[9] it is enough for a plaintiff to demonstrate that "the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 995 (7th Cir. 2010). Causation may be established through both direct and circumstantial evidence, such as suspicious timing; the inquiry is whether, after all of the evidence is put "in a single pile

---

[8] The defendants, relying on cases that distinguish between direct and indirect methods of proof in employment discrimination cases, argue that this standard is appropriate because Trahanas is not attempting to establish retaliation through the indirect method of proof. Defs.' Memo. Supp. Summ. J. 18 n.21; *see, e.g.*, *Bowden v. Kirkland & Ellis*, No. 07 C 975, 2010 WL 3526483, at *14 (N.D. Ill. Sept. 3, 2010). But the Seventh Circuit has instructed that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards"—to succeed on her retaliation claim, Trahanas may introduce whatever evidence there is that "would permit a reasonable factfinder to conclude that the plaintiff's [protected activity]" caused the challenged adverse action. *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

[9] In *University of Texas Southwest Medical Center v. Nassar*, the Supreme Court held that Title VII retaliation claims require a showing of but-for causation. 570 U.S. 338, 360 (2013). The Seventh Circuit "has declined to decide whether *Nassar* raises the causation standard for FMLA retaliation claims," so this district "continues to apply the motivating factor test" to such claims. *Xula v. Chase Bank, JPMorgan Chase*, No. 15 C 4752, 2019 WL 5788074, at *10 (N.D. Ill. Nov. 6, 2019); *see also Haworth v. Round Lake Area Sch.*, No. 17 C 7038, 2019 WL 3080928, at *5 n.2 (N.D. Ill. July 15, 2019) (noting "the motivating factor test still represents 'the controlling law of the Seventh Circuit'" and, additionally, seeing "little textual reason to apply *Nassar* to a § 2615(a)(1) retaliation claim"). Defendants do not argue the issue here, and acknowledge that the "substantial factor" causation standard should apply. Defs.' Memo. Supp. Summ. J. 19-20 n.23.

and . . . evaluated as a whole," *Ortiz*, 834 F.3d at 766, Trahanas has adduced evidence that can support a reasonable jury in finding her FMLA leave was a substantial factor in Dr. Schwulst's decision to withdraw his recommendation letter. One way for her to establish causation is "by showing that the stated reasons for the firing were pretextual." *Penny v. Lincoln's Challenge Acad.*, 822 F. App'x 497, 500 (7th Cir. 2020).

There is sufficient, conflicting evidence in the record for Trahanas's claim to survive summary judgment. First, the defendants do not dispute that Dr. Schwulst, as an individual, may be liable for retaliation. Under the FMLA, an "employer" is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). This definition is "broader than that of Title VII and encompasses some individual liability." *Eppinger v. Caterpillar Inc.*, 682 F. App'x 479, 481 (7th Cir. 2017). Just how much individual liability is not yet clear; the Seventh Circuit has not adopted a test for identifying individual "employers." *See Gibson v. Ind. State Pers. Dep't*, No. 1:17-cv-01212-JPH-TAB, 2019 WL 1099702, at *5 (S.D. Ind. Mar. 8, 2019) ("The Seventh Circuit recently recognized that the FMLA allows claims against individuals . . . but has not clarified what level of responsibility is required for a claim to proceed against an individual."). Several circuits have adopted an "economic reality test," which asks whether an individual possesses "the power to control" a worker. *Eppinger*, 682 F. App'x at 481. Under this test, a court weighs several non-dispositive factors, including an individual's power to hire and fire the complaining employee, supervise and control the employee's work schedule or conditions of employment, determine the rate and method of payment, maintain employment records, and whether the employer controlled the employee's rights under the FMLA. *Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, 18 C 4515, 2020 WL 1986965, at *9-10 (N.D. Ill. Apr. 27, 2020). In this district, courts have also used the

*Riordan* test for evaluating individual liability—asking whether the allegedly liable individual had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation. *Id.* at *9.

Under either test, there is a clear basis for Dr. Schwulst to be held individually liable under the FMLA. The parties agree that Trahanas reported directly to, and worked closely with, Dr. Schwulst, SOMF ¶ 17, and that Dr. Schwulst played a major role in determining whether Trahanas received pay increases or promotions, SOMF ¶¶ 37, 39, 41, 44-47. As the allegations in this case make clear, Dr. Schwulst had at least some control over Trahanas's work schedule, and his conduct and their working relationship was a major determinant in her work environment. And the parties agree that Dr. Schwulst was responsible, in whole, for uploading a second letter to AMCAS withdrawing his initial, positive recommendation letter shortly after Trahanas's FMLA leave began. SOMF ¶¶ 81-83. Whether the relationship between Dr. Schwulst and Trahanas is framed as one in which Dr. Schwulst had "the power to control" Trahanas or simply as one of supervisory authority, Dr. Schwulst is properly considered an "employer" under Section 2611(4)(A)(ii)(I).

Second, contrary to the defendants' arguments, withdrawing a positive medical school recommendation letter may qualify as an adverse action for purposes of the FMLA's retaliation provisions. That Dr. Schwulst's withdrawal did not "materially affect the terms, conditions or privileges of [Trahanas's] employment at the University," Defs.' Memo. Supp. Summ. J. 19, is not dispositive, because "[t]he category of actions prohibited by the [FMLA and ADA's] anti-retaliation provisions is broader than the category of adverse employment actions prohibited by the statutes' anti-discrimination provisions." *Freelain*, 888 F.3d at 901. In the retaliation context, an act is "materially adverse" if it would "dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008); *see also*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (in Title VII context, antiretaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee . . . that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker" from engaging in protected activity).

A reasonable jury could conclude that Dr. Schwulst's withdrawal of his positive medical school recommendation letter is the type of action that would reasonably deter Trahanas from exercising her FMLA rights. The defendants do not dispute that Trahanas wanted to attend medical school. In fact, the parties agree that Trahanas expended a great deal of time and effort applying to medical school by the time she asked Dr. Schwulst to serve as a recommender: as of fall 2014, she had taken the MCAT six times, and she used her vacation time in August 2014 to concentrate on studying before the September 2014 test administration, SOMF ¶¶ 67-68, SOMF Ex. B. Dep. Ex. 44. She was also on her second round of medical school applications, SOMF ¶ 65; and she applied to fifteen medical schools for 2015 matriculation, SOMF ¶¶ 88, 69. So, even if Dr. Schwulst's decision to withdraw his positive letter was not the determinative factor in Trahanas's applications that cycle, the evidence in the record suggests that the rescission of a strong, positive reference could have reasonably dissuaded Trahanas from taking protected FMLA leave.

Finally, there remains an issue of material fact as to causation. To survive summary judgment on her FMLA retaliation claim, Trahanas must "point to evidence supporting a reasonable inference" that Dr. Schwulst withdrew his medical school recommendation letter, in substantial part, "because she took protected leave." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 505 (7th Cir. 2017). As in *Tibbs*, Trahanas's principal evidence that Dr. Schwulst's true intent was retaliatory is the timing of the events at issue. *Id.* Though "suspicious timing alone is

rarely enough by itself" to prove that a particular action is retaliatory," *id.* at 505-06, "[o]ccasionally . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see also Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) ("[E]ven if suspicious timing *alone* is not enough to create a triable issue in a particular case, suspicious timing remains an important evidentiary ally of the plaintiff.") (internal quotations omitted). The Seventh Circuit has cautioned that there is no bright-line legal rule about when such an inference is reasonable, but noted that "[t]he closer two events are, the more likely that the first caused the second." *Loudermilk*, 636 F.3d at 315. Here, Dr. Schwulst's initial, highly positive letter of recommendation was submitted in October 2014. SOMF ¶ 69. His second letter, withdrawing the first and stating that he could no longer support Trahanas's candidacy, was submitted on February 19, 2015, just three days after Trahanas's FMLA leave began on February 16, 2015. SOMF ¶¶ 77, 83.

Other evidence bolsters the inference of retaliatory intent. First, the University itself, through Chris Scarpelli, acknowledged the appearance of a retaliatory motive when Scarpelli told Dr. Schwulst to cease and desist from taking further action involving Trahanas. Schwulst Dep. Tr. 232:8-233:12, ECF No. 80 (Dr. Schwulst testified that Scarpelli told him to cease and desist because "regardless of why [Dr. Schwulst] uploaded that letter . . . it had the potential to be misconstrued"). Second, in light of his clinical obligations, Dr. Schwulst needed Trahanas in the lab for his research to progress. In an email from December 2014 about the off-cycle pay increase, for example, Dr. Schwulst wrote that he "[could] not afford to have Diane leave right now" because it would "bring [his] research effort to a screeching halt." PSAF ¶ 22, Tab E. Ex. 54. And in January 2015, after Trahanas had been out of the lab for just a few days, Dr. Schwulst told Trahanas that her "unapproved time away from the lab ha[d] damaged [his] research mission and [would]

likely preclude submission for [that] year's annual congress on shock . . . ." PSAF ¶ 31. This evidence could support an inference that Dr. Schwulst was angered by Trahanas taking unannounced leave for an undetermined amount of time, especially after a prolonged period of conflict over her promotion and pay raise. Trahanas also presents evidence that she was blocked from accessing her University account during her 2015 FMLA leave, though she had not been denied access during previous leave periods, PSAF Tab F, Trahanas Dep. Tr. 341:22-342:25, and that University HR employees knew that Dr. Schwulst was "anxious to do something" if Trahanas did not return when her "FMLA protected leave" expired, and that "[i]n his ideal world, [the University] would release the position after she's extended past her 12 weeks of FMLA." PSAF Tab E Ex. 128A, 128C.

To rebut the inference of retaliatory motive, Dr. Schwulst introduced evidence that he withdrew the first letter due to the "huge ethical problem" created by Trahanas's alleged failure to note when she had administered clodronate injections, leading the lab's mice to be "unnecessarily euthanized because [Dr. Schwulst] couldn't figure out where they were on experimental protocol." SOMF ¶ 82. Defendants believe summary judgment is appropriate because Trahanas "presents no evidence that Dr. Schwulst's belief" that Trahanas failed to appropriately record the clodronate injections "was not honestly held." Defs.' Memo. Supp. Summ. J. 21. Moreover, Trahanas had taken FMLA leave on at least one other occasion "without any negative impact on her job"; if Dr. Schwulst "harbored animus based on [Trahanas's] use of medical leave," the defendants argue, "presumably he would have taken action against her on that previous occasion." *Id.* The first argument is factually inaccurate, however, and the second creates, at most, a weak inference in Dr. Schwulst's favor, which is not nearly enough to warrant summary judgment.

Trahanas asserts that Dr. Schwulst's justification is pretextual. And to rebut the notion that Dr. Schwulst's belief that Trahanas had administered clodronate injections was "honestly held," Trahanas points to two emails she sent to Dr. Schwulst in the week-and-a-half before her leave began and to her own laboratory notebook. In the first email, sent February 6, 2015, Trahanas told Dr. Schwulst that she had to wait to begin the next clodronate experiment because there was not enough clodronate in the lab. SOMF ¶ 75. In the second, sent February 9, 2015, Trahanas told Dr. Schwulst that she planned to "do another 48 hour clod experiment next week"—the week that Trahanas, instead, began her FMLA leave. SOMF ¶ 76. Finally, Trahanas notes, and the defendants agree, that Trahanas's lab notebook did not contain information about dates and times of clodronate injections in the week before her FMLA leave. SOMF ¶ 79; Pl.'s Resp. SOMF ¶ 79.

Dr. Schwulst contends that the emails and empty notebook are evidence of Trahanas's ethical failure, or, at the very least, are enough for him to form an honest belief that an ethical failure had occurred. Taken at face value, however, the February 6 email and empty notebook support Trahanas's contention that, instead of starting another experiment, she took FMLA leave, and that Dr. Schwulst had no genuine reason to think she had administered clodronate injections. At summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, and Trahanas is entitled to have all reasonable inferences drawn in her favor; evaluated through this lens, the evidence casts sufficient doubt on Dr. Schwulst's explanation as to "make summary judgment an impermissible vehicle for the resolution of this case." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 744 (7th Cir. 2008). Ultimately, whether Dr. Schwulst's explanation is "fishy enough to support an inference that the real reason must be discriminatory" *Loudermilk*, 636 F.3d at 315, is a triable issue of fact for a jury to decide.

### C.     Defamation

Next, Trahanas raises an Illinois state law-based defamation claim against both Northwestern and Dr. Schwulst, primarily based on Dr. Schwulst's February 19, 2015, two-sentence letter that reads, in its totality: "I am writing to formally withdraw my prior letter of reference for Ms. Diane Trahanas. I can no longer support her candidacy for admission to medical school." SOMF Ex. B.3 at 56, ECF No. 104-4. To prevail on a defamation claim, the plaintiff must present evidence showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages." *Benton v. Little League Baseball, Inc.*, 2020 Ill. App. (1st) 190549, at *P43. Illinois recognizes both *per se* and *per quod* defamation: a statement is defamatory *per se* if the statement is so obviously injurious to the plaintiff's reputation that damages are presumed, and defamatory *per quod* if extrinsic evidence is required to demonstrate harm. *Id.* at *P42. Statements that impute a person lacks ability or otherwise prejudices a person in her profession are considered defamatory *per se*. *Dobias v. Oak Park & River Forest High Sch. Dist. 200*, 57 N.E.3d 551, 563 (Ill. App. Ct. 2016).

The most fundamental element of a defamation claim is that "the defendant made a false statement about the plaintiff." *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-06500, 2014 WL 4269126, at *12 (N.D. Ill. Aug. 28, 2014), *citing Solaia Tech. LLC, v. Specialty Publ. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). And under Illinois law, "[w]hether a statement is a factual assertion that could give rise to a defamation claim is a question of law for the court." *Benton*, 2020 Ill. App. (1st) 190549 at *P46. To defend her defamation claim on summary judgment, Trahanas argues that Dr. Schwulst's second letter was written "without any proof of of [sic] breach of scientific ethics by Diane" and "out of anger, spite, and actual malice"; she concludes that, taking all three of his letters together, "Dr. Schwulst sent so many mixed messages" that his involvement "in effect

destroyed the goal for which she was seeking his recommendation." Pl.'s Resp. Opp'n 17. All that may be true, but it does not change the fact that Dr. Schwulst's letter withdrawing his recommendation did not contain any false statements about Trahanas.

The February 19, 2015, letter is a statement of Dr. Schwulst's opinion about Trahanas's candidacy for medical school. Statements of opinions are not per se shielded from defamation claims. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). Opinions are extended First Amendment protection, however, so long as they "cannot be reasonably interpreted as stating actual facts about the plaintiff"; to determine whether a statement is protected as an opinion, Illinois courts consider, in part, "whether the statement contains an objectively verifiable assertion." *Hopewell v. Vitullo*, 701 N.E.2d 99, 103 (Ill. App. Ct. 1998). Here, Dr. Schwulst's statement that he can no longer support Trahanas's candidacy may well suggest "undisclosed . . . facts that support [his] opinion." *Id.* at 104; *see id.* at 105 ("[I]n one sense all opinions imply facts, however . . . '[t]he vaguer and more generalized the opinion the more likely the opinion is non-actionable as a matter of law.'"). But a curious medical school admissions committee member could not, from Dr. Schwulst's letter alone, discern "which implied fact or set of facts was necessary to support [his] opinion"; his two-sentence letter is too "ambiguous and indefinite" to present an objectively verifiable statement of fact about Trahanas. *Id.* at 104-05.

Because Dr. Schwulst did not make a false statement of fact about Trahanas to the medical schools she applied to, summary judgment is appropriate. And, because there is no defamatory statement for Northwestern University to be vicariously liable for, the University's alleged "fail[ure] to take any corrective action," SAC ¶ 135, against Dr. Schwulst once the University

learned he had withdrawn his positive letter of recommendation is immaterial.[10] The University is similarly entitled to summary judgment on Trahanas's defamation claim.

### D. Intentional Infliction of Emotional Distress

Finally, Trahanas alleges Illinois state-law claims for intentional infliction of emotional distress (IIED) against both the University and Dr. Schwulst. To establish IIED, a plaintiff must prove that 1) the defendant's conduct was extreme and outrageous, 2) that the defendant intended to inflict severe emotional distress, or knew that there was at least a high probability that his conduct would cause severe emotional distress, and 3) the conduct actually did cause severe emotional distress. Everyday insults and indignities are not enough—the conduct at issue "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Dunn v. City of Elgin*, 347 F.3d 641, 651 (7th Cir. 2003). And even if a defendant's conduct is sufficiently outrageous, an IIED plaintiff will not prevail unless she can

---

[10] Even if there were a defamatory statement, Trahanas's claim against Northwestern would fail. Under Illinois law, a "principal may be held vicariously liable for his agent's defamatory statements." *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1062 (N.D. Ill. 2019). However, to hold an employer liable for its employee's defamatory statement, a plaintiff "must show that [the employee]'s statements were made 'within the scope of [his] employment.'" *Id.* Conduct is "within the scope of employment" if it is of the kind the employee is employed to perform; occurred substantially within authorized time and space limits; and is performed, at least in part, with a purpose to serve the employer. *Weller v. Paramedic Servs. of Ill.*, 297 F. Supp. 3d 836, 848 (N.D. Ill. 2018). Trahanas's claim against Northwestern is premised on the University's alleged failure to take corrective action once it learned that Dr. Schwulst had withdrawn his initial, positive recommendation letter. But not only is it factually incorrect that the University did nothing in response to Dr. Schwulst's withdrawal of the recommendation letter, *see* SOMF ¶ 84 (noting that Chris Scarpelli instructed Dr. Schwulst to "cease and desist" on the basis that his withdrawal may be misconstrued, and encouraged Dr. Schwulst to reinstate his original letter), such a failure would also be legally insufficient to make Northwestern vicariously liable for a defamatory statement. Trahanas presents no evidence that writing letters of recommendation was the type of work that Dr. Schwulst was employed by Northwestern to perform, or that writing these types of letters served Northwestern's interests, at least in part. With no evidence on these points, there is no basis for holding the University vicariously liable for Dr. Schwulst's individual, intentional conduct.

demonstrate "distress so severe that no reasonable person could be expected to endure it." *Lifton v. Bd. of Educ. of Chi.*, 416 F.3d 571, 579-80 (7th Cir. 2005).

The defendants noted that it was "not entirely clear" which specific conduct Trahanas claims was "extreme and outrageous," especially as to her claim against the University. Defs.' Memo. Supp. Summ. J. 15. In response, Trahanas devotes just two paragraphs to defending her IIED claims against summary judgment, and her argument largely reiterates—without record cites or additional case law—the Court's own language from the order on the defendant's motion to dismiss the first amended complaint.[11] Based on her response, the Court will consider only Trahanas's claims that she was subjected to frequent harassment, that she was forced to work twenty-four-hour shifts, that her experiment was sabotaged for six months, that she was yelled at by Dr. Schwulst, and that she was not able to defend herself against criticism.

---

[11] *Compare* Order Mot. Dismiss 17 ("Here, Trahanas has alleged that she was subjected to frequent harassment, was forced to work 24 hour shifts where coworkers only worked 8 hour shifts, had an experiment sabotaged for over 6 months, was yelled at by her supervisor, and was unable to defend herself when her work was criticized."), *with* Pl.'s Resp. Opp'n 18 ("Trahanas was subjected to frequent harassment, was forced to work 24 hour shifts where coworkers only worked 8 hour shifts, had an experiment sabotaged for over 6 months, was yelled at by her supervisor, and was unable to defend herself when her work was criticized." And *compare* Order Mot. Dismiss 17 ("At the motion to dismiss stage, drawing all inferences in favor of the plaintiff, the Court finds this could state 'extreme and outrageous' conduct that was 'intended to inflict severe emotional distress,' especially after Trahanas told Schwulst that she was experiencing severe anxiety."), *with* Pl.'s Resp. Opp'n 19 ("Drawing all inferences in favor of Diane Trahanas, defendant's conduct was 'extreme and outrageous' and 'intended to inflict severe emotional distress,' especially after her coworkers admitted the sabotage of her work and she told Schwulst that she was experiencing severe anxiety."). Not only is this unhelpful, but an admission by one of Trahanas's coworkers to sabotaging her work appears nowhere in the record that the Court has reviewed. *Contra* Saber Dep. Tr. 61:20-62:9 (Q: Do you remember being in attendance at a staff meeting where you and Alexander [Misharin] were laughing because Diane was working with an outdated cocktail? **A: No, I don't remember that.** Q: Do you remember Dr. Perlman telling you that you should have advised Diane Trahanas that the cocktail that she was working on for the last six months on her experiments with Dr. Schwulst's project was an outdated cocktail? **A: No, I don't remember that.**"). Unsurprisingly, Trahanas does not cite to any evidence that supports her statement.

With this conduct serving as the predicate, the defendants are correct that Trahanas's IIED claim against the University is preempted by the Illinois Human Rights Act. "The Illinois Human Rights Act preempts tort claims that are 'inextricably linked' to allegations of sexual harassment and requires that such claims be brought only before the Illinois Human Rights Commission." *Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 905 (7th Cir. 2002). Preemption extends to IIED claims that are predicated on sexual harassment allegations, *id.*; however, if an IIED claim is predicated on both sexual harassment and "conduct [that] would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish the legal duty that the defendant was alleged to have breached," then the IHRA will not preempt it. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). Because Trahanas did not develop a theory by which the University could be liable for the alleged sabotage of her research, her unusually long hours worked, or her interpersonal conflict with Dr. Schwulst, her IIED claim against the University is "inextricably linked" with her sexual harassment allegations and, as a result, preempted. *See, e.g.*, *Richards v. United States Steel*, 869 F.3d 557, 565 (7th Cir. 2017) (holding that an employee's sexual harassment allegations did not state an emotional-distress claim against her employer independent of the Illinois Human Rights Act); *Brownlee v. Catholic Charities of the Archdiocese of Chi.*, No. 16 C 00665, 2018 WL 1519155, at *6 (N.D. Ill. Mar. 28, 2018) (noting that an employer is only liable for the tortious conduct of an employee "acting in the course and scope of his employment" or an employee's intentional torts that were "ratified" by the employer); *Geise v. Phoenix Co. of Chicago*, 159 Ill. 2d 507, 516-18 (1994).

Summary judgment is also appropriate as to Trahanas's IIED claim against Dr. Schwulst because the conduct she alleges is not "extreme or outrageous," even when viewed in the light most favorable to her. The threshold for outrageous conduct is high, and "[l]iability for emotional

distress, as a common-law tort, is even more constrained in the employment context." *Richards*, 869 F.3d at 567. "[I]f everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 605. As a result, Illinois courts have been reluctant to find workplace behavior outrageous unless an employer or supervisor abuses the power imbalance over an employee "in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Id.* Most of the conduct that Trahanas points to as support for her IIED claim—that she worked longer hours than her peers in other labs,[12] that Dr. Schwulst raised his voice at her in a performance review, and that she felt unable to defend herself against criticism about her work— falls into this category of potentially distressing, but ultimately commonplace, workplace interactions. *See Richards*, 869 F.3d at 567 ("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment and . . . frequently, they produce concern and distress.") (internal quotations and citation omitted). And because Dr. Schwulst was not even

---

[12] The notion that Trahanas was "forced" to work twenty-four-hour shifts is also unsupported by the evidence in the record. In his deposition, Dr. Schwulst clarified that when Trahanas referred to 24-hour and 72-hour experiments, she was referring to "the length of time between when the mice were injured and the time when they were sacrificed and their tissue harvested." Schwulst Dep. Tr. 105:9-20, ECF No. 80. Dr. Schwulst testified that, during a 24-hour experiment, his expectation would be for Diane to "strike the mouse, go home, and come back 24 hours later to harvest the results on the mouse's brain," not for her to remain in the lab for twenty-four consecutive hours. *Id.* 106:14-18. He estimated that Trahanas stayed at the lab late (past midnight) to process tissue "in the neighbor of five of six experiments. So five or six times during the course of her employment." *Id.* 107:4-12. Dr. Schwulst also testified, repeatedly, that he gave Trahanas "great latitude in planning her days" and that it was their typical practice for Trahanas to take time off "on days preceding and after long experiments" to ensure that she was working an appropriate number of hours per week. *See, e.g.*, *id.* 194:11-195:3; 272:3-5; 273:11-274:7. This testimony was uncontradicted; in fact, it was corroborated by Trahanas's emails to Dr. Schwulst. *See, e.g.*, *id.* 271:13-16 (introducing email from Trahanas that reads "I will take the necessary time off next week to even out the time I spent extra this week").

45

aware of, let alone involved in, Saber and Misharin's alleged sabotage of Trahanas's research, there is no basis for including that incident in an evaluation of his conduct.

That leaves Dr. Schwulst's harassing behavior, which Trahanas alleges took place on a daily or near-daily basis while he was in the lab. "A claim for intentional infliction of emotional distress . . . requires more than what is required for sexual harassment." *Lara v. Diamond Detective Agency*, 412 F. Supp. 2d 894, 902 (N.D. Ill. 2006); *cf. id.* at 903 (describing an Illinois case upholding an IIED claim against a defendant who not only repeatedly propositioned the plaintiff and offered her money for sex, but also "fired her when she refused her advances, threatened to kill and rape her, harassed her family and psychotherapist, threatened to challenge custody of her child, and harassed her new employer with letters, phone calls and spurious complaints to government officials"); *Freeman v. Holy Cross Hosp.*, No. 10 C 4157, 2011 WL 1559208, at *2 (N.D. Ill. Apr. 25, 2011) (no extreme or outrageous conduct where the defendant "made comments of a sexual nature, asked [the plaintiff] out on dates, sent sexually suggestive and explicit links to her personal email account, treated her differently than other employees, failed to investigate her harassment claims, attempted to grab her buttocks, and rubbed his hands on her thighs"). In fact, Illinois courts "have limited recovery . . . to victims of only the most intolerable conduct." *Lara*, 412 F. Supp. 2d at 903. Dr. Schwulst's comments calling Trahanas a lesbian or a "softball player" may have been ignorant, unfunny, and unbecoming of a successful physician at a highly-regarded university, but his conduct did not rise to the level of "outrageous" or intolerable, as evidenced by the fact that Trahanas continued to work for him for more than two years after the comments began in October 2012. SOMF ¶ 28. No reasonable jury could conclude, based on the evidence in the record, that Dr. Schwulst's conduct was beyond endurance, so summary judgment is appropriate as to Trahanas's IIED claim against him.

\*     \*     \*

For the foregoing reasons, the defendants' motion to exclude is granted, and the defendants' motion for summary judgment is granted as to Trahanas's Title VII hostile work environment and ADA and FMLA retaliation claims against the University, and as to Trahanas's defamation and intentional infliction of emotional distress claims against both the University and Dr. Schwulst. Trahanas's FMLA retaliation claim against Dr. Schwulst may proceed to trial.

Dated: December 23, 2020

John J. Tharp, Jr.
United States District Judge

47